ORIGINAL

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ AUG 05 2008

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MASSACHUSETTS BRICKLAYERS AND
MASONS TRUST FUNDS, Individually and On
Behalf of All Others Similarly Situated,

        Plaintiff,

    v.

DEUTSCHE ALT-A SECURITIES, INC.,
DEUTSCHE BANK SECURITIES, DEUTSCHE
ALT-A SECURITIES MORTGAGE LOAN
TRUST, SERIES 2006-AR2, DEUTSCHE ALT-
A SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-AR3, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-AR4, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-AR5, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-AR6, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-OA1, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2007-AR2, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2007-AR3, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2007-OA2, DEUTSCHE ALT-A
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2007-RAMP1, DEUTSCHE ALT-B
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-AB2, DEUTSCHE ALT-B
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-AB3, DEUTSCHE ALT-B
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2006-AB4, DEUTSCHE ALT-B
SECURITIES MORTGAGE LOAN TRUST,
SERIES 2007-AB1, ANILESH AHUJA,
JEFFREY LEHOCKY, RICHARD W.
FERGUSON, JOSEPH J. RICE, RICHARD
d'ALBERT, KEVIN P. BURNS AND DOES 1-
20, inclusive,

        Defendants.

08 Civ. **08** **3178**

**NOTICE OF REMOVAL**

**WEXLER, J**

**ORENSTEIN, M.J.**

PLEASE TAKE NOTICE that Defendant Deutsche Bank Securities, Inc. ("DBSI")[1] by and through its undersigned counsel, hereby removes Index No. 08-011904, filed in the Supreme Court of the State of New York, County of Nassau, to the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. §§ 1332(d) and 1453, based upon the following:

1.     On or about June 27, 2008, Plaintiff filed a Summons and Complaint captioned Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities, Inc., et al., Index No. 08-011904 in the Supreme Court of the State of New York, County of Nassau (the "State Court Action"). Pursuant to 28 U.S.C. § 1446(a) and Rule 81.1(b) of the Local Civil Rules of the United States District Court for the Eastern District of New York, copies of the Summons and Complaint filed in the State Court Action are attached hereto as Exhibit A.

2.     On or about July 15, 2008, Plaintiff served a copy of the Summons and Complaint on DBSI. A copy of the service of process is attached hereto as Exhibit B.

3.     Upon information and belief, no defendant has pled, answered, or otherwise appeared in the State Court Action.

4.     This action is within the original jurisdiction of this Court under 28 U.S.C. § 1331 and 15 U.S.C. § 77v(a) because it purports to assert federal claims arising under the Securities Act of 1933 (the "Securities Act"). In particular, Plaintiff purports to assert claims against all defendants except for Deutsche Alt-A Securities, Inc. under Section 11 of the

---

[1]     The Complaint in this action names as a defendant "Deutsche Bank Securities," which is not the proper name for any legal entity. Plaintiff presumably intended to name DBSI.

Securities Act. Plaintiff also purports to assert claims against the Individual Defendants[2] as well as Deutsche Alt-A Securities, Inc. under Section 15 of the Securities Act.

     5.     This action is removable under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2 (2005), codified at 28 U.S.C. §§ 1332(d) and 1453. Pursuant to 28 U.S.C. § 1332(d), as amended by CAFA, a putative class action commenced after February 18, 2005 may be removed to the appropriate federal district court if: (i) any member of the putative class is a citizen of a state different from any defendant; (ii) the putative class action consists of at least 100 putative class members; and (iii) the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d), 1453.

     6.     This action was commenced on June 27, 2008, after the effective date of CAFA. 28 U.S.C. § 1332(d)(2)(A). It is a class action in which at least one member of the putative class of plaintiffs is a citizen of a state different from a defendant. *Id.* Defendant DBSI is a securities firm incorporated under Delaware law, with its principal place of business in New York. *See* Compl. ¶ 14. Upon information and belief, Plaintiff is a resident of Boston, Massachusetts. *See* Compl. Accordingly, because there is diversity between Plaintiff and Defendants insofar as at least one member of the proposed class is a citizen of a state different from at least one defendant, the minimum diversity requirements of CAFA are satisfied. *See* 28 U.S.C. § 1332(d)(2)(C).

     7.     This action is removable under CAFA notwithstanding the fact that certain defendants are citizens of New York, the state in which the action was brought. *See* 28 U.S.C. § 1453(b) ("[A] class action may be removed . . . without regard to whether any defendant is a citizen of the State in which the action is brought . . .").

---

[2]     "Individual Defendants" is defined in the Complaint to include Anilesh Ahuja, Jeffrey Lehocky, Richard W. Ferguson, Joseph J. Rice, Richard d'Albert and Kevin P. Burns. *See* Compl. ¶ 21.

8.     The allegations relating to the number of potential members in Plaintiff's putative class also satisfy CAFA's requirement.  CAFA requires that "the number of members of all proposed plaintiff classes in the aggregate" be at least 100.  28 U.S.C. § 1332(d)(5)(B).  Plaintiff alleges that it believes that "there are thousands of members in the proposed class."  Compl. ¶ 24.

9.     Upon information and belief, the amount in controversy in this action also exceeds $5,000,000.00, exclusive of interest and costs.  Under 28 U.S.C. § 1332(d), as amended by CAFA, the amount in controversy in a putative class action is determined by aggregating the claims of all members.  28 U.S.C. § 1332(d)(6).  Here, the Complaint alleges that DB made misstatements and omissions in registration statements in connection with "hundreds of millions of dollars of Certificates."  Compl. ¶ 3.  The Complaint also alleges that "Deutsche Alt-A caused the Registration Statement/Prospectus Supplements to be issued between May 2006 and May 2007, which Registration Statement/Prospectus Supplements were used to issue billions of dollars in Certificates."  Compl. ¶ 31.  While Plaintiffs do not provide specific allegations of the damages suffered by the putative class as a result of the alleged false registration statements, the number of transactions and the value of the securities indicate that the Complaint's allegations suffice to meet CAFA's amount in controversy requirement.

10.     Because this Notice of Removal is being filed within 30 days of the earliest date that any of the Defendants were served with the Complaint, it is timely filed under 28 U.S.C. § 1446(b).

11.     CAFA does not require that all Defendants consent to this Notice of Removal.  28 U.S.C. § 1453(b) provides that "such action may be removed by any defendant without the consent of all defendants."

4

12. DBSI will promptly serve a copy of this Notice on counsel for Plaintiff and will file a copy of this Notice with the Clerk of the Supreme Court of the State of New York, County of Nassau, pursuant to 28 U.S.C. § 1446(d).

13. No other process, pleading, or order has been served on Defendants in this action.

WHEREFORE, Defendant DBSI prays that the above-captioned matter be removed from the Supreme Court of the State of New York, County of Nassau, to the United States District Court for the Eastern District of New York.

Dated: New York, New York
August 5, 2008

LATHAM & WATKINS LLP

By: _____
Richard D. Owens
Jamie L. Wine
Joseph Salama
885 Third Avenue
Suite 1000
New York, NY 10022
(212) 906-1200

*Attorneys for Defendant Deutsche Bank Securities, Inc.*

5

Exhibit A



# BY HAND

*3:32pm*

RECEIVED BY LEGAL DEPARTMENT

JUL 2 2008

DEUTSCHE BANK AG NY BRANCH

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

————————————————— x

MASSACHUSETTS BRICKLAYERS AND
MASONS TRUST FUNDS, Individually and
On Behalf of All Others Similarly Situated,

                      Plaintiff,

    vs.

DEUTSCHE ALT-A SECURITIES, INC.,
DEUTSCHE BANK SECURITIES,
DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-
AR2, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-
AR3, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-
AR4, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-
AR5, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-
AR6, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-
OA1, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-
AR2, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-
AR3, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-
OA2, DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-
RAMP1,

————————————————— x

Index No. 08 - 011904

Date Purchased:

Plaintiff designates Nassau County

as the place of trial.

The basis of the venue is

Defendant Place of Business

SUMMONS

Plaintiff(s) resides at

645 Morrissey Blvd.
Boston, Mass. 02122-3569

RECEIVED

JUN 27 2008

NASSAU COUNTY
COUNTY CLERK'S OFFICE

[Caption continued on following page.]

———————————————————————— x
:
DEUTSCHE ALT-B SECURITIES :
MORTGAGE LOAN TRUST, SERIES 2006- :
AB2, DEUTSCHE ALT-B SECURITIES :
MORTGAGE LOAN TRUST, SERIES 2006- :
AB3, DEUTSCHE ALT-B SECURITIES :
MORTGAGE LOAN TRUST, SERIES 2006- :
AB4, DEUTSCHE ALT-B SECURITIES :
MORTGAGE LOAN TRUST, SERIES 2007- :
AB1, ANILESH AHUJA, JEFFREY :
LEHOCKY, RICHARD W. FERGUSON, :
JOSEPH J. RICE, RICHARD d'ALBERT, :
KEVIN P. BURNS and DOES 1-20, inclusive, :
:
                    Defendants. :
———————————————————————— x

To the above named Defendant:

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED: Melville, NY
      June 27, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
ANDREI V. RADO
ALAN I. ELLMAN
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Attorneys for Plaintiff

- 2 -

Defendant's address:

Deutsche Bank Securities
c/o CT Corp System
111 Eighth Ave
NY NY 10011

Jeffrey Lehocky
380 Auburn St
Wyckoff NJ 07481

Richard W. Ferguson
968 Weed St
New Canaan CT 06840

Joseph J. Rice
2411 Gladmore St.
East Meadow, NY 11554

Anilesh Ahuja
120 East End Ave. # 8A
New York, NY 10018

Kevin Burns
1641 3rd Ave # 2C
New York, NY 10128

Richard D'Albert aka Dalbert
45 Addison Ave
London U.K. W11 4QR

EUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AR2,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AR3,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AR4,
60 Wall St
NY NY 10005

- 3 -

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AR5,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AR6,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-OA1,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-AR2,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-AR3,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-OA2,
60 Wall St
NY NY 10005

DEUTSCHE ALT-A SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-RAMP1,
60 Wall St
NY NY 10005

DEUTSCHE ALT-B SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AB2,
60 Wall St
NY NY 10005

DEUTSCHE ALT-B SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AB3,
60 Wall St
NY NY 10005

DEUTSCHE ALT-B SECURITIES
MORTGAGE LOAN TRUST, SERIES 2006-AB4,
60 Wall St
NY NY 10005

DEUTSCHE ALT-B SECURITIES
MORTGAGE LOAN TRUST, SERIES 2007-AB1
60 Wall St
NY NY 10005

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

———————————————————— x
                        :

MASSACHUSETTS BRICKLAYERS AND     :   Index No.
MASONS TRUST FUNDS, Individually and    :
On Behalf of All Others Similarly Situated,    :   CLASS ACTION
                        :
                Plaintiff,   :   COMPLAINT FOR VIOLATION OF §§11
                        :   AND 15 OF THE SECURITIES ACT OF
    vs.                           :   1933

DEUTSCHE ALT-A SECURITIES, INC.,     :
DEUTSCHE BANK SECURITIES,         :
DEUTSCHE ALT-A SECURITIES         :
MORTGAGE LOAN TRUST, SERIES 2006-  :
AR2, DEUTSCHE ALT-A SECURITIES     :
MORTGAGE LOAN TRUST, SERIES 2006-  :
AR3, DEUTSCHE ALT-A SECURITIES     :
MORTGAGE LOAN TRUST, SERIES 2006-  :
AR4, DEUTSCHE ALT-A SECURITIES     :
MORTGAGE LOAN TRUST, SERIES 2006-  :
AR5, DEUTSCHE ALT-A SECURITIES     :                 
MORTGAGE LOAN TRUST, SERIES 2006-  :
AR6, DEUTSCHE ALT-A SECURITIES     :         JUN 27 2008
MORTGAGE LOAN TRUST, SERIES 2006-  :         NASSAU COUNTY
OA1, DEUTSCHE ALT-A SECURITIES     :       COUNTY CLERK'S OFFICE
MORTGAGE LOAN TRUST, SERIES 2007-  :
AR2, DEUTSCHE ALT-A SECURITIES     :
MORTGAGE LOAN TRUST, SERIES 2007-  :
AR3, DEUTSCHE ALT-A SECURITIES     :
MORTGAGE LOAN TRUST, SERIES 2007-  :
OA2, DEUTSCHE ALT-A SECURITIES     :
MORTGAGE LOAN TRUST, SERIES 2007-  :
RAMP1,                            :
                            :   DEMAND FOR JURY TRIAL
———————————————————— x

[Caption continued on following page.]

```
─────────────────────────────────── x
                                     :
DEUTSCHE ALT-B SECURITIES            :
MORTGAGE LOAN TRUST, SERIES 2006-    :
AB2, DEUTSCHE ALT-B SECURITIES       :
MORTGAGE LOAN TRUST, SERIES 2006-    :
AB3, DEUTSCHE ALT-B SECURITIES       :
MORTGAGE LOAN TRUST, SERIES 2006-    :
AB4, DEUTSCHE ALT-B SECURITIES       :
MORTGAGE LOAN TRUST, SERIES 2007-    :
AB1, ANILESH AHUJA, JEFFREY          :
LEHOCKY, RICHARD W. FERGUSON,        :
JOSEPH J. RICE, RICHARD d'ALBERT,    :
KEVIN P. BURNS and DOES 1-20, inclusive, :
                                     :
                    Defendants.      :
─────────────────────────────────── x
```

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who acquired the Mortgage Pass-Through Certificates (the "Certificates") of Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A" or the "Depositor") pursuant and/or traceable to the false and misleading registration statement and prospectus supplements issued in connection therewith by Deutsche Alt-A between May 2006 and May 2007 (collectively, the "Registration Statement"). This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.     Deutsche Alt-A is a Delaware corporation formed in 2002 for the purpose of acquiring and owning mortgage loan assets and selling interests in them.  Deutsche Alt-A is a subsidiary of DB Structural Products, Inc. and is a special purpose corporation.  The issuers of the various offerings (the "Defendant Issuers") are the Trusts identified in ¶13, established by Deutsche Alt-A to issue billions of dollars worth of Certificates in 2006-2007.

3.     On May 1, 2006, Deutsche Alt-A and the Defendant Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing hundreds of millions of dollars of Certificates.  The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement.  The Certificates were supported by pools of mortgage loans generally secured by liens on residential properties, including conventional and adjustable rate mortgage loans.

4.     The Registration Statement was false and misleading because it included false statements and/or omissions about (i) the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios for applicants associated with the underlying mortgage loans.

5.     In fact, the originators of the underlying mortgage loans held by the Defendant Issuers were issued to borrowers who: (i) did not meet the prudent or maximum debt-to-income ratio purportedly required by the lender; (ii) did not provide adequate documentation to support the income and assets required to issue the loans pursuant to the lenders' own guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income or assets *required by the lenders' own guidelines* necessary to afford the required mortgage loan payments, which resulted in loans that borrowers could not afford to pay.  Moreover, the lenders and/or their agents knew that the borrowers either could not provide the required documentation or the borrowers refused to provide it and that the appraised values of many properties were regularly inflated, as appraisers were induced by lenders, lenders' correspondents and/or their mortgage brokers/agents to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved.  In this way many appraisers were rewarded for their willingness to support predetermined property values in direct violation of USPAP appraisal regulations.[1]

6.     In fact, the underwriting, quality control, and due diligence practices and policies utilized in connection with the approval and funding of the mortgage loans were so weak that borrowers were being extended loans based on stated income in the mortgage loan applications with

---

[1]     The Uniform Standards of Professional Appraisal Practice ("USPAP") are the generally accepted standards for professional appraisal practice in North America. USPAP contains standards for all types of appraisal services.  Standards are included for real estate, personal property, business and mass appraisal.

- 3 -

purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application or through a check of free "online" salary databases such as salary.com.

7.      As a result of the false and misleading statements in the Registration Statement, the Certificates were sold to plaintiff and the Class, which Certificates plaintiff and the Class would not have purchased had the true facts been disclosed. In fact, the Certificates were secured by assets with a dramatically greater risk profile than represented in the Registration Statement. By failing to disclose the truth about the underlying assets, defendants were able to obtain superior ratings on the Certificates, which ratings would not have been obtained for these tranches or classes without the misrepresentations/omissions in the Registration Statement about the underlying mortgage loans as detailed herein.

8.      By the fall of 2007, the truth about the mortgage loans that secured the Certificates began to be revealed to the public. As a result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiff and the Class and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement/Prospectus Supplements represented.

## JURISDICTION AND VENUE

9.      The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o. Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act. Section 22 of the 1933 Act explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States." Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law. This is an action asserting federal law claims. Thus, it does not fall

- 4 -

within the definition of a "covered class action" under §16(b)-(c) and therefore is not removable to federal court under the Securities Litigation Uniform Standards Act of 1998.

10.     The violations of law complained of herein occurred in this County, including the dissemination of materially false and misleading statements complained of herein into this County. Deutsche Alt-A and Deutsche Bank Securities conduct business in this County.

## PARTIES

11.     Massachusetts Bricklayers and Masons Trust Funds acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements for the Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4, and has been damaged thereby.

12.     Defendant Deutsche Alt-A is a Delaware corporation headquartered in New York, New York. It is a special purpose corporation formed in 2002. Defendant Deutsche Alt-A was the Depositor and controlled the Trusts.

13.     The Defendant Issuers of the various Certificates are each New York common law trusts. Each of these Trusts issued hundreds of million of dollars worth of Certificates pursuant to a Registration Statement. The Defendant Issuers are:

| | |
|---|---|
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-AR3 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-OA2 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR4 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-RAMP1 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 | Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB2 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6 | Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB3. |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-OA1 | Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 |

Deutsche Alt-A Securities Mortgage Loan      Deutsche Alt-B Securities Mortgage Loan
Trust, Series 2007-AR2                        Trust, Series 2007-AB1

14.     Defendant Deutsche Bank Securities ("Deutsche Securities") is a securities firm which provides a range of financial services, including engaging in the mortgage banking business. Deutsche Securities is a corporation based in New York, New York. Deutsche Securities acted as the underwriter in the sale of Deutsche Alt-A offerings, helping to draft and disseminate the offering documents. Deutsche Securities was the underwriter for all of the Trusts. Deutsche Securities failed to perform adequate due diligence with respect to the statements in the Registration Statement about the underwriting of the mortgage loans.

15.     Defendant Anilesh Ahuja ("Ahuja") was Principal Executive Officer and President of Deutsche Alt-A during the relevant time period. Defendant Ahuja signed the May 1, 2006 Registration Statement.

16.     Defendant Jeffrey Lehocky ("Lehocky") was Director, Principal Financial Officer and Principal Accounting Officer of Deutsche Alt-A during the relevant time period. Defendant Lehocky signed the May 1, 2006 Registration Statement.

17.     Defendant Richard W. Ferguson ("Ferguson") was a director of Deutsche Alt-A during the relevant time period. Defendant Ferguson signed the May 1, 2006 Registration Statement.

18.     Defendant Joseph J. Rice ("Rice") was a director of Deutsche Alt-A during the relevant time period. Defendant Rice signed the May 1, 2006 Registration Statement.

19.     Defendant Richard d'Albert ("d'Albert") was a director of Deutsche Alt-A during the relevant time period. Defendant d'Albert signed the May 1, 2006 Registration Statement.

20.     Defendant Kevin P. Burns ("Burns") was a director of Deutsche Alt-A during the relevant time period. Defendant Burns signed the May 1, 2006 Registration Statement.

- 6 -

21.     The defendants identified in ¶¶15-20 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors or trustees to the Trusts as they were directors of Deutsche Alt-A and signed the Registration Statement for the registration of the securities issued by Deutsche Alt-A and the Trusts.

22.     The true names and capacities (whether individual, corporate, associate, or otherwise) of defendants Does 1 through 20, inclusive, and each of them, are unknown to plaintiff, who sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants fictitiously named herein is legally responsible in some manner for the events described herein, and thereby proximately caused the damage to the plaintiff and the members of the Class. Plaintiff will seek to amend this complaint to state the true names and capacities of said defendants when they have been ascertained.

### CLASS ACTION ALLEGATIONS

23.     Plaintiff bring this action as a class action pursuant to CPLR 901, *et seq.*, on behalf of a class consisting of all persons who acquired the Certificates between May 2006 and May 2007 pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-131600) and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Deutsche Alt-A and Deutsche Securities or their transfer agents and may

- 7 -

be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Registration Statement issued hundreds of millions of dollars worth of Certificates.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

29.     Deutsche Alt-A is a Delaware corporation engaged in mortgage lending and other real estate finance-related businesses, including mortgage loan banking, mortgage loan warehouse lending, and insurance underwriting. Deutsche Alt-A was set up to acquire mortgage loan pools that

were transferred to the Trusts, and Certificates of various classes were sold to investors pursuant to the Registration Statement and Prospectus Supplements. While these offering documents contained data about the mortgage loans, some of the most important information for plaintiff and the other members of the Class, which was omitted from the Registration Statement and Prospectus Supplements, actually involved the underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans and the likelihood borrowers would repay the mortgage loans according to the terms of the mortgage note and the mortgage or the deed of trust. This depended on several factors, including creditworthiness of borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrowers, occupancy of the properties securing the mortgage loans, and the accuracy of other data collected during the origination of the mortgage loans.

30.     These omissions caused the Registration Statement/Prospectus Supplements to be false and misleading. The Registration Statement/Prospectus Supplements also included other misleading statements, as detailed below.

### THE REGISTRATION STATEMENT/PROSPECTUS SUPPLEMENTS

31.     Deutsche Alt-A caused the Registration Statement/Prospectus Supplements to be issued between May 2006 and May 2007, which Registration Statement/Prospectus Supplements were used to issue billions of dollars in Certificates. The Registration Statement incorporated by reference the subsequently filed Prospectus Supplements (collectively, the "Registration Statement").

32.     The Deutsche Alt-A and Deutsche Securities were the "Issuers" which caused the May 1, 2006 Registration Statement to be filed with the SEC. The Registration Statement discussed the mortgage loans contained in the mortgage pools held by the Defendant Issuers, representing that the loans underlying the Certificates were loans made to creditworthy borrowers with documentation subject to not quite as rigorous a set of standards as for borrowers with lower credit profiles.

- 9 -

**Omitted Verification Data**

33. The Registration Statement emphasized the underwriting standards utilized to generate the underlying mortgage loans held by the Defendant Issuers, stating "every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation" and that "[u]nder the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income." However, the Registration Statement omitted material facts necessary to make the statements made therein not misleading. The Registration Statement stated that underwriting standards articulated therein were applied by or on behalf of lenders to evaluate borrowers' credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. The Registration Statement further stated that in most cases an employment verification was obtained from an independent source, typically the borrower's employer. The verification process purportedly ensured that the lender confirmed, among other things, the length of employment with an organization, the borrower's actual salary and whether it was expected that the borrower would continue employment in the future. Where a prospective borrower was self-employed, the Registration Statement stated that the borrower was required to submit copies of signed tax returns.

34. These representations were materially false and misleading as they omitted the fact that the lenders and the lenders' agents, such as mortgage brokers, that generated the loans that were transferred to Deutsche Alt-A and were then placed into the Defendant Issuers, had become so aggressive in approving and funding mortgage loans that many of the mortgage loans were actually made to borrowers who had either falsified the required documentation or had not submitted it at all. Similarly, those self-employed borrowers who were actually required to submit stated income

- 10 -

applications would include income levels which were routinely inflated to extreme levels, relative to the stated job titles, in order to get the mortgage loans approved and funded. These procedures had the effect of dramatically increasing the risk profile of the Certificates.

**Defective Appraisals**

35.    The Registration Statement also represented that in determining the adequacy of the property to be used as collateral, an appraisal was to be made of each property considered for financing. In instances where appraisals were conducted, the appraisers were purportedly required to inspect the property to verify that it was in good repair and that construction, if new, had been completed. The appraisals were purportedly based on the market value of comparable homes, the estimated rental income (if applicable) and the cost of replacing the home. The Registration Statement represented that the appraisals generated adhered to USPAP regulations and requirements.

36.    These representations were materially false and misleading in that they omitted facts necessary to make these statements not false or misleading, including the fact that the appraisals were inaccurate due to: (i) a lack of controls at the originators and the Depositor; and (ii) the lenders and/or their agents, such as mortgage brokers, exerted pressure on appraisers to come back with pre-determined, preconceived – and false – appraisal values. Appraisers were secretly pressured to appraise properties at artificial levels or they would not be hired again, resulting in appraisals being done on a "drive-by" basis where appraisers issued their appraisal without reasonable bases for doing so.

**The Prospectus Supplements Contained False Statements**
**About the Originators' Underwriting Practices**

37.    The Prospectus Supplements made false statements about the underwriting practices of American Home Mortgage Corp. ("AHM"), which was a key originator in the following Trusts:

| | |
|---|---|
| 2006-AR2 | 2007-AR2 |
| 2006-AB2 | 2007-AR3 |
| 2006-AB4 | |

- 11 -

2006-AB3
2006-AB5

38.    For example, the May 19, 2006 Prospectus Supplement for Series 2006-AB4, stated:

(a)    American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgage property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

*Omitted Information*: In order to post desired loan production, AHM was as a matter of course granting exceptions even where "compensating factors" did not exist. AHM's business was dependent on continually increasing volume. Thus, it became even more aggressive in early 2007, when AHM made $16.7 billion in mortgage loans. A third of its mortgages were pay-option adjustable rate mortgages ("ARMs"), which allowed borrowers to make payments which were *less than the interest amount accruing on the loan*, resulting in the difference being added to the principal balance each month. AHM granted exceptions as a matter of course because its business relied on volume as it was paid a fee for each loan and it was transferring securitization of these mortgages and not retaining the mortgage loans as assets on its own balance sheet. In fact, AHM went bankrupt in August 2007, after loan volumes dropped.

(b)    American Home underwrites "a borrower's creditworthiness" based solely on information that American Home believes is "indicative of the applicant's willingness and ability to pay the debt they would be incurring."

*Omitted Information*: AHM's loans were particularly popular with speculators who would not occupy the homes, which would decrease the borrowers' "willingness" to pay the debt if home prices stagnated or dropped. This ultimately came to bear on many of AHM's loans and AHM

- 12 -

subsequently suffered losses itself when "borrowers whose incomes [AHM] hadn't verified began to

default on little-money-down loans at an accelerated pace." *Smartmoney.com*, July 31, 2007.

> (c)     Non-conforming loans are generally documented to the requirements
> of Fannie Mae and Freddie Mac, in that the borrower provides the same information
> on the loan application along with documentation to verify the accuracy of the
> information on the application such as income, assets, other liabilities, etc. Certain
> non-conforming stated income or stated asset products allow for less verification
> documentation than Fannie Mae or Freddie Mac require. Certain non-conforming
> Alt-A products also allow for less verification documentation than Fannie Mae or
> Freddie Mac require. For these Alt-A products, the borrower may not be required to
> verify employment income, assets required to close or both.  For some other Alt-A
> products, the borrower is not required to provide any information regarding
> employment income, assets required to close or both.  Alt-A products with less
> verification documentation generally have other compensating factors such as higher
> credit score or lower loan-to-value requirements.

*Omitted Information*:    AHM claimed stated income applications were made where "other

compensating factors," such as higher credit scores or lower loan-to-value requests, existed, but in

fact (i) AHM allowed credit scores to be manipulated by the borrower, who would become an

approved user on another person's credit card or other account who had better credit ratings; and (ii)

AHM had no reasonable basis to believe that lower loan-to-value ratios were being required because

AHM was already aware that the appraisals being used by the Company, particularly in Texas and

Illinois in 2005 and 2006, were faulty and that the same defective methodologies were being used in

states such as California and Florida.

> (d)     In order to determine if a borrower qualifies for a non-conforming
> loan, the loans have been either approved by Fannie Mae's Desktop Underwriter,
> Freddie Mac's Loan Prospector automated underwriting systems, a customized form
> of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they
> have been manually underwritten by American Home's underwriters. American
> Home's Alt-A loan products generally have been approved manually by contract
> underwriters provided by certain mortgage insurance companies or by American
> Home's senior underwriters. American Home Solutions products must receive an
> approval from the Assetwise automated underwriting system. For manually
> underwritten loans, the underwriter must ensure that the borrower's income will
> support the total housing expense on an ongoing basis.  Underwriters may give
> consideration to borrowers who have demonstrated an ability to carry a similar or
> greater housing expense for an extended period. In addition to the monthly housing
> expense, the underwriter must evaluate the borrower's ability to manage all recurring

- 13 -

payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

***Omitted Information***: This statement was misleading because AHM was not nearly as meticulous with evaluating borrowers as indicated by this statement. In an effort to keep loan volume up despite a slowdown in activity, AHM's brokers became so aggressive that borrowers were given loans with different terms than they were originally promised. Borrowers have in fact complained that loans were switched on them by AHM, leaving them with mortgages they could not pay.

(e)    Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%,

- 14 -

25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

*Omitted Information*: AHM's loan-to-value ratios assumed valid appraisals were performed. This was not the case as appraisers were pressured to appraise to certain predetermined values. Inflated appraisals were common.

(f)     American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

*Omitted Information*: AHM was using anything but "common sense" in granting mortgages to customers with little money down where a third of the mortgages were pay-option ARMs and many of the loans were to speculators.

39.     Similar representations about AHM's underwriting practices were made in the Prospectus Supplements of other Trusts in which AHM was a key originator.

40.     The Prospectus Supplements made false statements about the underwriting practices of Mortgage IT, Inc. ("MortgageIT") which was a key originator in the following Trusts:

2006-AR3
2006-AR4
2006-AR6
2007-AR2
2007-AR3

41.     For example, the Prospectus Supplement to the Prospectus dated May 19, 2006, for Series 2006-AR3, stated:

(a)     MortgageIT's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. Because each loan is different, MortgageIT expects and encourages underwriters to use professional judgment based on their experience in making a lending decision. MortgageIT underwrites a borrower's creditworthiness based solely

- 15 -

on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

*Omitted Information*: MortgageIT, a subsidiary of Deutsche Bank (since late 2006), was extremely aggressive in granting loans with little controls over underwriting practices.

(b)     Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Loans in excess of one million dollars require (i) two full appraisals or (ii) one full appraisal and a field review, ordered by a MortgageIT-approved national appraiser, including photographs of the interior and the exterior of the subject property. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, a MortgageIT underwriter or a mortgage insurance company contract underwriter reviews each appraisal for accuracy and consistency.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property this ratio is based on the lower of the sales price of the property and the appraised value. MortgageIT sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, MortgageIT requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all conventional loans in which the loan-to-value ratio exceeds 80%, MortgageIT requires that a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac insure the loan. Higher loan-to-value ratios require higher coverage levels.

*Omitted Information*: MortgageIT did not exercise sufficient controls over brokers to prevent them from pressuring appraisers to appraise to certain values, causing larger numbers of inflated (and hence worthless) appraisals.

(c)     MortgageIT obtains a credit report that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report. A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors

and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores. The minimum credit score allowed by MortgageIT loan guidelines for non-conforming loans is 620 and the average is typically over 700. For certain types of ARM loans with conforming loan amounts, borrowers with full documentation who do not have a credit score may provide an alternative credit history showing at least three tradeline accounts with no payments over 30 days past due in the last 24 months. If these mortgage loans are manually underwritten, they require at least 4 tradeline accounts with a 24-month history reported with the most recent 24-months.

***Omitted Information***: Until fairly recently, MortgageIT had been a larger lender to subprime borrowers. The Company exercised little controls over brokers to confirm that these policies were followed, making it possible for subprime borrowers to get mortgage loans.

       (d)    MortgageIT realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, exceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis.

***Omitted Information***: Due to MortgageIT's lack of controls over its branch officers, there was no common sense underwriting. It was, in fact, the opposite, since brokers were compensated for getting loans approved – not disapproved – and there were little or no consequences to the broker if the loan subsequently went bad.

42. The Prospectus Supplements made false statements about the underwriting practices of Countrywide Home Loans, Inc. ("Countrywide"), which was the key originator in the following Trusts:

          2006-OA1
          2006-AR3
          2006-AR4
          2006-AR6
          2007-AR3

43.    For example, the Prospectus Supplement for Series 2006-AR4, dated September 28, 2006, stated:

(a)    For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

*Omitted Information*: The documents failed to describe the wide latitude lending officers gave to borrowers to "explain" adverse information. Lending officers and originators also knew that borrowers frequently complained to credit rating agencies about adverse information that was in fact true, knowing that the rating agencies, if they could not confirm the adverse information within a specified time period, would remove the adverse information from the report.

(b)    Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

*Omitted Information*:  Countrywide had weak or no controls to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Prospectus Supplements/Registration Statement.  This was particularly true in 2006-2007, when real estate values in many of the locations where the mortgage pools were located had stopped increasing at the rapid pace of 2004-2005.  Thus, the aggressive lending practices

- 18 -

introduced during those years (where borrowers were granted large mortgages in excess of their

ability to pay with the assurance that refinancing would be possible in a short time) were extremely

risky and likely to lead to significant defaults in years when real estate prices did not increase or

even decreased.

> (c)     Under its Standard Underwriting Guidelines, Countrywide Home
> Loans generally permits a debt-to-income ratio based on the borrower's monthly
> housing expenses of up to 33% and a debt-to-income ratio based on the borrower's
> total monthly debt of up to 38%.

*Omitted Information*:  Debt-to-income ratios were misstated (understated) by the manipulation of

reported income levels on Countrywide loan applications, many times with the knowledge of the

mortgage broker.   The broker would get paid if the loan went through – even with false

information – but would not get paid if they raised questions.   Countrywide did not adequately

prevent these practices as its motivation was also to get the loans closed – even if there were

problems.  In fact, during 2007, when there was increasing publicity about suspect lending practices,

Countrywide did an audit of lending practices by mortgage brokers and found many inconsistencies

in loan applications, but did *nothing* about it.

> (d)     Under the Stated Income/Stated Asset Documentation Program, the
> mortgage loan application is reviewed to determine that the stated income is
> reasonable for the borrower's employment and that the stated assets are consistent
> with the borrower's income. The Stated Income/Stated Asset Documentation
> Program permits maximum Loan-to-Value Ratios up to 90%.  Mortgage loans
> originated under the Stated Income/Stated Asset Documentation Program are
> generally eligible for sale to Fannie Mae or Freddie Mac.

*Omitted Information*: Countrywide was offering stated income loans up to 100% loan-to-value until

March 2007.

44.     In fact, in March 2007, Countrywide assured borrowers that 100% financing was still

available:

> "We want to assure homeowners that there is still an extensive selection of
> mortgage loans to suit a multitude of personal and financial circumstances," said
> Tom Hunt, managing director of Countrywide Home Loans. "We recognize it's been

widely reported that some major lenders, like Countrywide, no longer offer 100% financing. In fact, we have made changes to certain subprime and other special mortgage programs, but we have not eliminated 100% financing. We still offer one of the widest selections of low- and no-downpayment options to qualified customers, including those with less-than-perfect credit."

45.     The Prospectus Supplements included false statements about the underwriting

practices of IndyMac Bank, F.S.B. ("IndyMac"), a key originator for the following Trusts:

> 2007-AR3
> 2007-OA2
> 2006-AR5

46.     For example, the Prospectus Supplement for Trust Series 2007-OA2, dated April 3,

2007, stated:

> IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

*Omitted Information*: IndyMac, prior to August 2007, had been granting stated income loans at

relatively high loan-to-value ratios. As *blownmortgage.com* noted on August 16, 2007:

> Stated income loans at high loan-to-value ratios have been a major source of abuse over the last few years by lenders and brokers. It is a loan that has put a large portion of the home buying public in jeopardy of losing their homes – wittingly or unwittingly. It needs to go; or it needs to be heavily curtailed – and we're definitely seeing that.

\*          \*          \*

> IndyMac released another round of massive product changes that specifically focus on making the "liar loans" stated income and no income loan products completely irrelevant to the majority of lending situations; and especially for anyone firmly planted in the Alt-A camp.

> They also eliminate some of the more "affordability" type products including the 40 year amortized loans.

47.     The 2007-OA2 Prospectus Supplement further stated:

- 20 -

In determining a borrower's FICO credit score, IndyMac Bank generally selects the middle credit score of the scores provided by each of the three major U.S. credit repositories (Equifax, TransUnion and Experian) for each borrower, and then selects the lowest of these scores. In some instances, IndyMac Bank selects the middle score of the borrower with the largest amount of qualifying income among all of the borrowers on the mortgage loan. A FICO credit score might not be available for a borrower due to insufficient credit information on file with the credit repositories. In these situations, IndyMac Bank will establish a borrower's credit history through documentation of alternative sources of credit such as utility payments, auto insurance payments and rent payments. In addition to the FICO credit score, other information regarding a borrower's credit quality is considered in the loan approval process, such as the number and degree of any late mortgage or rent payments within the preceding 12-month period, the age of any foreclosure action against any property owned by the borrower, the age of any bankruptcy action, the number of seasoned tradelines reflected on the credit report and any outstanding judgments, liens, charge-offs or collections.

***Omitted Information***: IndyMac was extremely liberal on granting mortgages if the borrower could provide an adequate FICO score. This went to extreme levels, as the following article by *Seeking Alpha*, dated August 15, 2007, shows:

No. If you're 70 years old, and you have $110,000 of negative equity, then you have real problems in this market. (Actually, we're told that the appraisals on the house came in below $900,000, which means that she has even more negative equity than that.) The self-employed bit is the least of Van Cleave's worries: no lender is going to assume that a 70-year-old is going to stay on the payroll at any company for very long.

The fact that Frankie Van Cleave can't get a mortgage is not news. It's the fact that "several mortgage brokers" were still courting her not so long ago which is the more worrying part.

Indeed, I wonder whether underwriting standards have in reality tightened up nearly as much as we're constantly being told they have. Look at the most recent tranche of ABX.HE subprime indices, the 07-02 vintage, containing mortgages written in the first half of this year, long after systemic problems in subprime underwriting had been splashed all over the headlines. It turns out that those subprime loans are trading just as badly as – if not worse than – the subprime loans of the 2006 vintage. And does this sound like underwriting standards are tight, or just that they've been insanely loose right up until now?

IndyMac Bancorp is the latest lender to shun 100% financing for borrowers who want merely to state their income. For Alt-A loans that don't have third-party mortgage insurance, IndyMac is insisting on at least a 5% down payment for "all loan sizes and property types," according to guidelines sent to mortgage brokers.

- 21 -

IndyMac has been providing, all year, 100% financing for people who won't even show them how much money they were making? And it's still providing 95% financing? Yikes. This article isn't showing me how tight underwriting standards are: it's showing me how loose they are.

48. The Prospectus Supplements included false statements about the loan underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint") which was a key originator for the following Trusts:

> 2006-AR2
> 2006-AB2
> 2006-AR5
> 2006-AR4

49. For example, the Prospectus Supplement for Trust Series 2006-AB2, dated May 26, 2006, stated:

(a) Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present.

*Omitted Information*: Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. Exceptions were granted when the borrower could not qualify. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

(b) GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the mortgagor, than on verified income of the mortgagor. Mortgage loans underwritten under this type of program are generally limited to mortgagors with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived. Mortgage loans originated and acquired with limited documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties. Permitted

- 22 -

maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements. Under no documentation programs, income ratios for the prospective mortgagor are not calculated. Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective mortgagor, rather than on verified income and assets of the mortgagor. Documentation concerning income, employment verification and asset verification is not required and income ratios are not calculated. Mortgage loans underwritten under no documentation programs are generally limited to mortgagors with favorable credit histories and who satisfy other standards for limited documentation programs.

*Omitted Information*: These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, appraisers were in fact pressured to appraise to certain levels. Appraisers knew if they appraised under certain levels they would not be hired again.

50.    The Prospectus Supplements made false statements about the loans originated by Impac Funding Corporation ("Impac") which was a key originator for the following Trusts:

2007-OA2          2006-AB3

51.    For example, the Prospectus Supplement dated June 29, 2006 for Series 2006-AB3 stated in part:

(a)    The following provisions apply to all of the Impac Mortgage Loans originated under Impac's Progressive Series Program and Progressive Express Program.

Eligibility.  Impac generally performs a pre-funding audit on each mortgage loan.  This audit includes a review for compliance with the related program parameters and accuracy of the legal documents.

Variations. Impac uses the following parameters as guidelines only.  On a case-by-case basis, Impac may determine that the prospective mortgagor warrants an exception outside the standard program guidelines.  An exception may be allowed if the loan application reflects certain compensating factors, including instances where the prospective mortgagor:

- has demonstrated an ability to save and devote a greater portion of income to basic housing needs;

- 23 -

- may have a potential for increased earnings and advancement because of education or special job training, even if the prospective mortgagor has just entered the job market;

- has demonstrated an ability to maintain a debt free position;

- may have short term income that is verifiable but could not be counted as stable income because it does not meet the remaining term requirements; and

- has net worth substantial enough to suggest that repayment of the loan is within the prospective mortgagor's ability.

*Omitted Information*: Impac lenders did not in fact limit exceptions from its guidelines to a "case-by-case basis" where "compensating factors" existed but granted exceptions on a widespread basis so that borrowers could get into loans. The mortgage lenders working with borrowers were compensated when loans were granted but not when loans were not funded, creating an incentive to find "compensating factors" where they did not exist.

> (b) The philosophy of the Progressive Series Program is that no single borrower characteristic should automatically determine whether an application for a mortgage loan should be approved or disapproved. Lending decisions are based on a risk analysis assessment after the review of the entire mortgage loan file. Each mortgage loan is individually underwritten with emphasis placed on the overall quality of the mortgage loan. The Progressive Series I, II, III, III+, IV, V and VI Program borrowers are required to have debt service-to-income ratios within the range of 45% to 60% calculated on the basis of monthly income and depending on the loan-to-value ratio of the mortgage loan.

*Omitted Information*: In fact, the true philosophy of the Progressive Series Program was not to make a more reasonable and common sense evaluation of the entire loan file but to make it easier to approve loans to borrowers who could not justify the size of the mortgages granted. The Prospectus Supplement misleadingly stated that the program avoided having a loan *approved or disapproved* by a single factor, implying that some loans would qualify by a single factor but would not under their Progressive philosophy. The intent was not to do more careful analysis – but to allow loans to be funded where the borrower could not qualify under traditional standards.

- 24 -

52.     The Prospectus Supplements made false statements about the loans originated by Ohio Savings Bank ("OSB"), a key originator for the 2006-AR2 Trust. The Prospectus Supplement for the 2006-AR2 Trust, dated June 29, 2006, stated:

> (a)     Loan requests are underwritten for compliance with the Gemstone AU recommendation and OSB's standards and guidelines prior to a loan being originated or purchased.  With respect to the loans sold to DB Structured Products, Inc., OSB primarily employs the use of contract underwriting services offered by some of the private mortgage insurance companies to perform the underwrite and validation of the individual loan.  Loans with balances of $650,000 or less are eligible to be underwritten via a contract underwriting relationship and account for the vast majority of all underwriting decisions.  Loans exceeding $650,000 are underwritten by an OSB staff underwriter.  A select segment of correspondents and brokers have been granted varying degrees of delegated underwriting authority.

*Omitted Information*:  OSB's underwriting standards and guidelines were not followed.

> (b)     The underwriter will evaluate the intent and willingness of a borrower to repay the mortgage loan in a timely manner.  In general, intent is evaluated based on past credit performance and the prospective borrower's equity.  The prospective borrower's past regard for such obligations, and the source and amount of the down payment are also evaluated.  OSB utilizes credit scores provided by credit reporting agencies to assist in the analysis of an applicant's credit history.  Under appropriate circumstances, OSB may also consider a private mortgage or rent payment history, in addition to the applicant's credit history and credit scoring as maintained at credit reporting agencies.

*Omitted Information*:  Evaluation of "the intent and willingness of a borrower to repay the mortgage loan in a timely manner" was dramatically skewed by the belief that an application listing that the property was to be owner occupied was correct.  There was no verification either before or after the loan was funded that the borrower took occupancy unless a review of a defaulted loan was being completed.  Therefore, underwriters and others assigned a much higher probability of repayment based upon the baseless belief that the property would be owner occupied.

> (c)     With respect to loans sold to DB Structured Products, Inc., in order to determine the marketability of a property, an independent property valuation must be obtained from a licensed appraiser.  OSB's underwriting guidelines require that the value of the mortgaged property being financed, as indicated by the independent valuation, currently supports and is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values, although there can be no assurance that such

- 25 -

value will support the outstanding loan balance in the future. The loan-to-value (LTV) is based upon the lesser of the sales price, if applicable, or the appraisal. Eligible properties include 1-4 family, attached and detached condominiums, planned unit developments, and manufactured homes for use as the prospective borrower's primary residence, second home, or investment property. Generally, for loans of $1,000,000 or more, two appraisals may be required from two different appraisers.

*Omitted Information*: It is contrary to U.S. Appraisal Standards to say, "[the appraisal] is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values." The mortgage broker or correspondent will order the appraisals and control the appraiser. Control over the appraiser by the broker or correspondent and the attendant pressure on the appraiser to appraise to a certain level is a key risk factor that was not adequately disclosed.

53.     The key originator for the Trust Series 2007-RAMP1 was Residential Funding Company, LLC ("RFC"). The Prospectus Supplement for Series 2007-RAMP1, dated March 1, 2007, stated:

>     (a)     Most negotiated conduit asset program loans are evaluated by RFC to determine whether the characteristics of the loan, the borrower and the collateral, taken as a whole, represent a prudent lending risk. The factors considered include:

> - the mortgage loan's payment terms and characteristics;

> - the borrower's credit score; the value of the mortgaged property, which may be estimated using a broker's price opinion or a statistical valuation;

> - the credit and legal documentation associated with the loan; the seasoning of the loan;

> - an evaluation of the financial capacity, eligibility and experience of the seller and/or servicer of the loan; and

> - the representations and warranties made by the seller.

*Omitted Information*: RFC (a wholly owned subsidiary of Residential Capital, LLC, which is a wholly owned subsidiary of GMAC, LLC) did little to verify the documentation associated with these conduit loans. RFC is now attempting to recover for what it claims are fraudulent loans. Some

- 26 -

of the conduit brokers have been accused of doing loans where the loan amount was $300,000 above the price of other loans in the area.

      (b)    RFC expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.

***Omitted Information***: RFC did little to ensure that originators complied with applicable laws. For this reason, RFC is now facing lawsuits for the extreme number of foreclosures in certain parts of the country, including Ohio. Its conduit originators have been accused of predatory lending, including in Michigan.

      54.    One of the originators, Home 123 Corporation ("Home 123") was an affiliate of New Century, which is no longer in business. On April 2, 2007, New Century filed bankruptcy and Home 123 ceased operations. Home 123 was a key originator for Trust Series 2007-AR3. The Prospectus Supplement for Series 2007-AR3, dated April 30, 2007, concealed the following information about Home 123:

- Home 123 was aggressively granting mortgages to borrowers at or near 100% loan-to-value, even to those with poor credit.

- Home 123 had issued a larger amount of loans with initial "teaser" rates that would eventually lead to major problems for borrowers and investors in the mortgage-back certificates.

      55.    Each of the Trusts included mortgage loans from "various" other lenders. Trust Series 2007-AB1 was made up entirely of these loans. The 2007-AB1 Prospectus Supplement, dated April 13, 2007, represented that:

      (a)    These alternative sets of underwriting criteria are designed to facilitate the loan approval process. Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the Mortgage Loans in a timely fashion. Permitted maximum loan to value ratios under these programs are generally more restrictive than those under the lender's standard "full" documentation programs.

*Omitted Information*:   Alternative loan programs were not limited to borrowers who had demonstrated an ability and willingness to pay, but were widely granted by mortgage brokers who had used and abused the programs to place borrowers in loans where the mortgage loans exceeded the borrower's ability to pay over a long period of time.

> (b)      The adequacy of the mortgaged property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.   Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

*Omitted Information*: Appraisals were of little reliability due to the pressures placed on appraisers to appraise to a certain value so that loans would close.  Appraisers knew if they did not appraise to certain levels they would not be hired by the broker or lender again.

> (c)      From time to time, exceptions to a lender's underwriting policies may be made.  Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter.  Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

*Omitted Information*: Exceptions were much more widely granted and frequently there was no "careful consideration" in granting exceptions.  Applications with reported income levels which could not be reconciled with the borrower's job title were routinely accepted with no questions by many lenders or brokers, including those originating loans for Trusts.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH
## LOANS UNDERLYING THE CERTIFICATES

56.     On November 15, 2007, Moody's Investors Service ("Moody's") announced it had taken negative action on several Deutsche Alt-A Mortgage Loan Trusts, including Series 2006-AR4, 2006-AR5, 2006-AR2, 2006-AR3, 2006-AB4, 2006-AB2 and 2006-AB3.

57.     On January 8, 2008, Moody's again downgraded numerous classes of Certificates of Mortgage Loan Trusts, including Series 2007-AR2, 2007-AR3 and 2007-AB1.

58.     On March 19, 2008, Moody's made additional downgrades of the Trusts, including Series 2006-AR2, 2006-AR3, 2006-AR4, 2006-AR5, 2006-AR6, 2006-AB2, 2006-AB3, 2006-AB4, 2007-AR2, 2007-AR3 and 2007-AB1.

59.     The delinquency rates on the underlying mortgage loans have skyrocketed.  For example:

(a)     The 2007-AR3 mortgage loan pool reported that 7.34% of the pool was in foreclosure as of May 2008, with 3.40% in REO (real estate owned, where a lender takes a property back as a result of foreclosures).

(b)     The 2007-AB1 mortgage pool had a foreclosure rate of 9.82% as of May 2008.

(c)     The 2007-RAMP1 mortgage pool's foreclosure rate increased to 6.94% as of May 2008.

(d)     The 2007-AR2 pool 60+ day delinquencies rate (including 60+ delinquent, REO and foreclosures) totaled 19.55% of the pool as of May 2008.

(e)     The 2006-OA1 pool 60+ day delinquencies rate (including 60+ delinquent, REO and foreclosures) totaled 13.66% of the pool as of May 2008.

(f)     The 2006-AR3 60+ day delinquencies rate (including 60+ delinquent, REO and foreclosures) totaled 18.26% of the pool as of May 2008.

- 29 -

(g)    The 2006-AB3 pool has 13.12% of the pool in foreclosure as of May 2008.

(h)    The 2006-AR2 pool has 10.8% of the pool in foreclosure in May 2008, with 8.32% in REO.

(i)    The 2006-AB2 pool has 8.88% of the pool in foreclosure as of May 2008.

(j)    The 2006-AR6 pool has 8% of the pool in foreclosure as of May 2008.

(k)    The 2006-AR4 pool has 7.65% of the pool in foreclosure as of May 2008.

(l)    The 2006-AB4 pool 60+ day delinquencies rate (including 60+ delinquent, REO and foreclosures) was 19.23% of the pool as of May 2008.

## FIRST CAUSE OF ACTION

### Violations of §11 of the 1933 Act Against
### All Defendants Except Deutsche Alt-A

60.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Cause of Action, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act. This Cause of Action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Deutsche Alt-A.

61.    The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

62.    Each of the Defendant Issuers listed in ¶13 is strictly liable to plaintiff and the Class for the misstatements and omissions complained of herein.

63.    The Individual Defendants signed the Registration Statement which was false due to the misstatements described above.

- 30 -

64.     Defendant Deutsche Securities was an underwriter of the Certificates and sold and marketed these investments to members of the Class.

65.     None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

66.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

67.     Deutsche Securities was the underwriter for the following issuances:

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR4

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-OA1

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-AR2

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-AR3

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-OA2

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-RAMP1

Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB2

Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB3

Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4

Deutsche Alt-B Securities Mortgage Loan Trust, Series 2007-AB1

68.     Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement and Prospectus Supplements.

69.     Plaintiff and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' misconduct.

70.     At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to late fall of 2007. Less than one year has

- 31 -

elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## SECOND CAUSE OF ACTION

### Violations of §15 of the 1933 Act
### Against the Individual Defendants and Deutsche Alt-A

71.     Plaintiff repeats and realleges each and every allegation contained above.

72.     This Cause of Action is brought pursuant to §15 of the 1933 Act against the Individual Defendants and Deutsche Alt-A.

73.     Each of the Individual Defendants was a control person of Deutsche Alt-A and of the Trusts by virtue of his/her position as a director and/or senior officer of Deutsche Alt-A. The Individual Defendants were responsible for the preparation of the contents of the Registration Statement which incorporated by reference the statements in the Prospectus Supplements.

74.     Each of the Individual Defendants was a culpable participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

75.     Deutsche Alt-A was the Depositor for the offerings. The defendants named herein were responsible for overseeing the formation of the Defendant Issuers as well as the operations of the Defendant Issuers, including routing payments from the borrowers to investors.

76.     Deutsche Alt-A and the Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

- 32 -

A. Determining that this action is a proper class action and certifying plaintiff as a Class representative;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: June 27, 2008

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

- 33 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
ANDREI V. RADO
ALAN I. ELLMAN
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Deutsche Mortgage_NY State.doc

Exhibit B

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
07/15/2008
CT Log Number 513637003

||| || ||||| ||||| |||| ||||| |||| ||||| |||| ||||| ||||| ||| |||

**TO:**   Yvonne Falconer
Deutsche Bank AG
60 Wall Street
New York, NY 10005

RECEIVED BY LEGAL DEPARTMENT

JUL 1 6 2008

DEUTSCHE BANK AG NY BRANCH

**RE:**   **Process Served in New York**

**FOR:**   Deutsche Bank Securities Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Massachusetts Bricklayers and Masons Trust Funds, Individually and On Behalf of All Others Similarly Situated, Pltf. vs. Deutsche Alt-A-Securities, Inc., et al. including Deutsche Bank Securities, Inc., Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Letter, Summons, Complaint, Dfts. Addresses |
| **COURT/AGENCY:** | Nassau County: Supreme Court, NY Case # 08-011904 |
| **NATURE OF ACTION:** | Code Violation / Code Enforcement - Securities Act of 1933 - Class members seek judgment for damages due to Dft.'s signature to Registration Statement which was false |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, New York, NY |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/15/2008 at 14:15 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after the service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Samuel H. Rudman Coughlin Stoia Geller Rudman & Robbins LLP 58 South Service Road, Suite 200 Melville, NY 11747 631-367-1173 |
| **REMARKS:** | Documents were altered by the process server at time of service. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 790544721030 Image SOP - Page(s): 43 Email Notification, Yvonne Falconer Yvonne.Falconer@db.com Email Notification, Group Email service.process@db.com |
| **SIGNED:** **PER:** **ADDRESS:** **TELEPHONE:** | C T Corporation System Christopher Tilton 111 Eighth Avenue New York, NY 10011 212-894-8940 |

Page 1 of  1 / RJ

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.