UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— x

MASSACHUSETTS BRICKLAYERS AND
MASONS TRUST FUNDS and THE
PIPEFITTERS' RETIREMENT FUND
LOCAL 597, Individually and On Behalf of
All Others Similarly Situated,

Plaintiffs,

vs.

DEUTSCHE ALT-A SECURITIES, INC., et
al.,

Defendants.

———————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 2:08-cv-03178-LDW-ARL

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATION OF §§11, 12(a)(2) AND 15 OF
THE SECURITIES ACT OF 1933

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates (the "Certificates") of Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A" or the "Depositor") pursuant and/or traceable to the false and misleading Registration Statement and Prospectus Supplements issued in connection therewith by Deutsche Alt-A between May 2006 and May 2007.  This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      Deutsche Alt-A is a Delaware corporation formed in 2002 for the purpose of acquiring and owning mortgage loan assets and selling interests in them.  Deutsche Alt-A is a subsidiary of DB Structural Products, Inc. and is a special purpose corporation.  The issuers of the various offerings are Deutsche Alt-A ("Defendant Issuer") and the Trusts identified in ¶12, established by Deutsche Alt-A to issue hundreds of millions of dollars worth of Certificates in 2006 and 2007.

3.      On May 1, 2006, the Defendant Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing hundreds of millions of dollars of Certificates.  Defendant Issuers issued the Certificates pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement.  The Registration Statement and Prospectus Supplements are referred to collectively herein as the "Registration Statement."  The Certificates were supported by pools of mortgage loans generally secured by liens on residential properties, including conventional, adjustable-rate, and hybrid adjustable-rate mortgage loans.

4.      Investors purchased the Certificates based upon three primary factors: return (in the form of interest payments), timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets).  The Registration Statement included false statements and/or

omissions about: (i) the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans; (ii) the maximum loan-to-value ("LTV") ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; (iv) the debt-to-income ratios permitted on the loans; and (v) the ratings of the certificates.

     5.     The true facts which were omitted from the Registration Statement were:

- The underlying mortgage loans were made to borrowers who: (i) were not in compliance with the prudent or maximum debt-to-income ratio purportedly required by the lenders; (ii) did not provide adequate documentation to support the income and assets required to issue the loans pursuant to the lenders' stated guidelines; (iii) were steered to stated income/asset and low documentation ("low-doc") mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income or assets required by the lenders' own guidelines to afford the required mortgage loan payments, which resulted in a mismatch between the needs and capacity of the borrowers.

- The originators or their agents knew that the borrowers either could not provide the required documentation or the borrowers refused to provide it.

- The underwriting, quality control, and due diligence practices and policies utilized in connection with the approval and funding of the mortgage loans were so weak that borrowers were being extended loans based on stated income in the mortgage loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application or through a check of free "online" salary databases such as www.salary.com.

- The appraisals of many properties were inflated, as appraisers were pressured by lenders, lenders' correspondents and/or their mortgage brokers/agents to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved and funded.  In this way many appraisers were rewarded for their willingness to support preconceived or predetermined property values violating USPAP regulations.[1]

---

[1]     The Uniform Standards of Professional Appraisal Practice ("USPAP") are the generally accepted standards for professional appraisal practice in North America.  USPAP contains standards for all types of appraisal services.  Standards are included for real estate, personal property, business and mass appraisal.

6.     As a result, the Certificates sold to Plaintiffs and the Class were secured by assets that had a much greater risk profile than represented in the Registration Statement.  In this way, defendants were able to obtain superior ratings on the tranches or classes[2] of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings.

7.     By mid 2007, the truth about the mortgage loans that secured the Certificates began to be revealed to the public, disclosing the risks that the Certificates would likely receive less absolute cash flow in the future and that investors would not receive it on a timely basis.  The credit rating agencies also began putting negative watch labels on the Certificate tranches or classes and to downgrade previously assigned ratings.  At present, each Trust contains Certificate tranches that have been downgraded.  As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by Plaintiffs and the Class, and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement/Prospectus Supplements represented.

## JURISDICTION AND VENUE

8.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

9.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Defendants conduct business in this District.

_____

2      The Certificates were divided into tranches or classes depending on among other things, credit risk and priority of payment.

## PARTIES

10.     Lead Plaintiffs Massachusetts Bricklayers and Masons Trust Funds and The Pipefitters' Retirement Fund Local 597 ("Lead Plaintiffs" or "Plaintiffs") acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and have been damaged thereby.  Specifically, on September 14, 2006, Massachusetts Bricklayers and Masons Trust Funds purchased Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 Mortgage Pass-Through Certificates with a face value of $140,000.  On October 25, 2006, The Pipefitters' Retirement Fund Local 597 purchased Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 Mortgage Pass-Through Certificates with a face value of $800,000.

11.     Defendant Deutsche Alt-A is a Delaware corporation headquartered in New York, New York.  It is a special purpose corporation formed in 2002.  Defendant Deutsche Alt-A was an Issuer of the certificates, the Depositor and controlled the Trusts.

12.     The Issuers of the various Certificates are Defendant Deutsche Alt-A and the below listed New York common law trusts, which are not parties to this action.  Deutsche Alt-A and each of these Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Registration Statement.  The non-party Trusts are:

| | |
|---|---|
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-AR3 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-OA2 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR4 | Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-RAMP1 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 | Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB2 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6 | Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB3 |

| | |
|---|---|
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-OA1 | Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 |
| Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-AR2 | Deutsche Alt-B Securities Mortgage Loan Trust, Series 2007-AB1 |

13.     Defendant Deutsche Bank Securities ("Deutsche Securities") is a securities firm which provides a range of financial services, including engaging in the mortgage banking business. Deutsche Securities is a corporation based in New York, New York.  Deutsche Securities acted as the underwriter in the sale of Deutsche Alt-A offerings, helping to draft and disseminate the offering documents.  Deutsche Securities was the underwriter for all of the Trusts.  Deutsche Securities failed to perform adequate due diligence with respect to the statements in the Registration Statement about the underwriting of the mortgage loans.

14.     Defendant DB Structured Products, Inc. is a Delaware corporation based in New York.  DB Structured Products, Inc. acted as the sponsor and was responsible for pooling the mortgage loans to be securitized by the depositor – Deutsche Alt-A.  DB Structured Products, Inc. was also responsible for negotiating the principal securitization transaction documents and participating with the underwriter – Deutsche Securities – in the structuring of such transactions.

15.     Defendant Anilesh Ahuja ("Ahuja") was Principal Executive Officer and President of Deutsche Alt-A during the relevant time period.  Defendant Ahuja signed the May 1, 2006 Registration Statement.

16.     Defendant Jeffrey Lehocky ("Lehocky") was a director, Principal Financial Officer and Principal Accounting Officer of Deutsche Alt-A during the relevant time period.  Defendant Lehocky signed the May 1, 2006 Registration Statement.

17.     Defendant Richard W. Ferguson ("Ferguson") was a director of Deutsche Alt-A during the relevant time period.  Defendant Ferguson signed the May 1, 2006 Registration Statement.

18.    Defendant Joseph J. Rice ("Rice") was a director of Deutsche Alt-A during the relevant time period.  Defendant Rice signed the May 1, 2006 Registration Statement.

19.    Defendant Richard d'Albert ("d'Albert") was a director of Deutsche Alt-A during the relevant time period.  Defendant d'Albert signed the May 1, 2006 Registration Statement.

20.    Defendant Kevin P. Burns ("Burns") was a director of Deutsche Alt-A during the relevant time period.  Defendant Burns signed the May 1, 2006 Registration Statement.

21.    The defendants identified in ¶¶15-20 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors or trustees to the Trusts as they were directors of Deutsche Alt-A and signed the Registration Statement for the registration of the securities issued by Deutsche Alt-A and the Trusts.

22.    These defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

23.    Plaintiffs bring this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons or entities who, between May 2006 and May 2007, acquired Mortgage Pass-Through Certificates from the Trusts listed in paragraph 12, pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-131600), and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Deutsche Alt-A and Deutsche Securities or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Hundreds of millions of dollars worth of Certificates were issued pursuant to the Registration Statement

25.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

29.     Deutsche Alt-A engaged in mortgage lending and other real estate finance-related businesses, including mortgage loan banking, mortgage loan warehouse lending, and insurance underwriting.  Deutsche Alt-A was set up to acquire mortgage loan pools that were transferred to the Trusts, and Certificates of various classes were sold to investors pursuant to the Registration Statement.  While these offering documents contained data about the mortgage loans, some of the most important information for Plaintiffs and the other members of the Class, which was omitted from the Registration Statement relating to the most important aspect of the Certificates; the collateral that secured them and supported their payment stream.  Specifically, the omitted information involved the underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans and the likelihood that borrowers would repay the mortgage loans according to the terms of the mortgage note and the mortgage or the deed of trust.  This depended on several factors, including creditworthiness of borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrowers, occupancy of the properties securing the mortgage loans, and the accuracy of other data collected during the origination of the mortgage loans.

30.     These omissions caused the Registration Statement/Prospectus Supplements to be false and misleading.  The Registration Statement/Prospectus Supplements also included other misleading statements, as detailed below.

**Residential Mortgage Loan Categories**

31.     Typically, borrowers who require funds to finance the purchase of a house, or to refinance an existing mortgage, apply for residential mortgage loans with a loan originator.  Loan originators assess a borrower's ability to make payments on the mortgage loan based on, among

other things, the borrower's Fair Isaac & Company ("FICO") credit score.  Borrowers with higher FICO scores are able to receive loans with less documentation during the approval process, as well as higher loan-to-value ("LTV") ratios.  Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the rate of the loan to issue, the amount of the loan, LTV, and the general structure of the loan.

32.     A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health.  Borrowers who are issued "prime" mortgage loans are deemed to be the most credit-worthy and receive the best rates and structure on mortgage loans.

33.     If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his financial health, then a loan originator will issue the borrower a loan referred to as a "low doc" or Alt-A loan, and the interest rate on that loan will be higher than that of a prime mortgage loan and the general structure of the loan will not be as favorable as it would be for a prime borrower.  While borrowers of low doc or Alt-A loans typically have clean credit histories, the risk profile of the low doc or Alt-A loan increases because of, among other things, higher LTV, higher debt-to-income ratios or inadequate documentation of the borrower's income and assets/reserves.

34.     A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt ratios.  Borrowers who have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger-than-average risk of defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate themselves for assuming more risk.

**The Secondary Market**

35.     Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan.  The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation.  Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan.  As such, under the traditional model, the loan originator had a financial incentive to ensure that: (1) the borrower had the financial wherewithal and ability to repay the promissory note; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

36.     Beginning in the 1990s, persistent low interest rates and low inflation led to a demand for mortgages.  As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market.  As discussed below, these innovations altered: (1) the foregoing traditional lending model, severing the traditional direct link between borrower and lender; and (2) the risks normally associated with mortgage loans.

37.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages.  Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution.  By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages.  The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as mortgage-

backed securities or MBS.  In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

38.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools:



(Source: *The Wall Street Journal*)

39.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  Of course, since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

40.     In this MBS structure, the senior tranches received the highest investment rating by the Rating Agencies, usually AAA.  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.  In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the Rating Agencies.

- 11 -

41.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage-borrowers are current on their mortgages.  The following diagram illustrates the concept of tranches within a MBS comprised of residential mortgages (often referred to as a "residential mortgage backed securities" or "RMBS"):



(Source: *The Wall Street Journal*)

42.     As illustrated below, in the typical securitization transaction, participants in the transaction are: (1) the servicer of the loans to be securitized, often called the "sponsor"; (2) the depositor of the loans in a trust or entity for securitization; (3) the underwriter of the MBS; (4) the entity or trust responsible for issuing the MBS, often called the "trust"; and (5) the investors in the MBS.

43.     The securitization process begins with the sale of mortgage loans by the sponsor – the original owner of the mortgages – to the depositor in return for cash.  The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor.  The depositor then works with the underwriter of the trust to price and sell the certificates to investors:



44.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e.,* principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors.  After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

**Sub-Prime and Low Documentation Alt-A Loans and the Secondary Market**

45.     Over the past 30 years, the sub-prime mortgage market has evolved from being just a small percentage of the overall U.S. home mortgage market to one that has originated hundreds of billions of dollars of sub-prime loans annually.  While several important legislative and regulatory changes have induced such growth, the sub-prime mortgage market would not have experienced such enormous growth without the development of a strong secondary market for home mortgage loans.

46.     During the 1980s, credit rating agencies began rating privately-issued MBS, which made them more suitable to a wider range of investors and expanded the market for MBS.  By 1988, 52% of outstanding residential mortgage loans had been securitized, up from 23% four years earlier.

47.     This rapid expansion of the secondary mortgage market significantly increased mortgage lenders' access to capital and dramatically reduced the need for loan originators to possess

a large deposit base in order to maintain their liquidity.  As a result, non-depository mortgage lenders proliferated, comprising approximately 32% of lenders of home mortgage loans by 1989.

48.     During the early to mid-1990s, rising interest rates decreased the demand for prime mortgage loans.  To spur continued sales of mortgages, lenders became amenable to originating sub-prime mortgages.  This willingness, coupled with technological advances that helped credit rating companies accumulate credit information on a greater number of debtors, increased the market for sub-prime mortgage loans.  By 1998, approximately $150 billion in sub-prime mortgage loans were originated, up from approximately $35 billion in 1994.

49.     The growth in the sub-prime mortgage loan market during the 1990s was also aided by mechanisms that allocated and/or moderated risk in sub-prime MBS.  These mechanisms, called "credit enhancements," allowed issuers to obtain investment-grade ratings on all, or part of, their MBS, despite the higher risk on the sub-prime mortgages upon which the MBS were based.

50.     As a result of these credit enhancement mechanisms, MBS were deemed to be suitable to a wider market of investors, and the value of sub-prime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997.  These sales of MBS provided lenders, including non-depository and mortgage-only companies who were responsible for much of the sub-prime mortgage lending, with ample liquidity to originate new sub-prime loans.  By 2005, the amount of new sub-prime mortgage loans that were originated grew to over $620 billion.

51.     During the 1990s, a new category of mortgage loans emerged.  These loans, which became very popular between 2004 through 2006, offered more lenient lending standards than "prime" loans, but were considered less risky than "sub-prime" loans.  This loan category, which consisted primarily of Alt-A loans, was originally designed for self-employed borrowers who had

high FICO scores and were able to document assets, but could not easily document their income. The Alt-A loans enabled these borrowers to be approved for a mortgage without extensive supporting documentation of their financial history or income.

52.     While Alt-A loans generally have hard to define characteristics, their most distinctive attribute is that borrowers are not required to provide supporting documentation with their applications.  For example, a borrower typically does not provide complete documentation of his assets or the amount or source of his income.  Other characteristics of Alt-A loans include: (i) loan to value ratio in excess of 80%, but that lacks primary mortgage insurance; (ii) a borrower who is a temporary resident alien; (iii) the loan is secured by non-owner occupied property; or (iv) a debt-to-income ratio above normal limits.  MBS that are backed by Alt-A loans are appealing because Alt-A loans are perceived to offer temporary protection from prepayment risk, which is the risk that borrowers will pay off their loans immediately.  Mortgage loan securitizations were traditionally valued using prepayment speeds as an important component.  Alt-A loan borrowers show greater resistance to prepayments during the first nine to twelve months following their origination.  Prime borrowers, by contrast, tend to be very sensitive to changing interest rates and they refinance or prepay their mortgage loans on a continual basis as interest rates decline.

53.     The market for Alt-A loans had increased faster than that of sub-prime.  A record $400 billion of Alt-A loans were originated in 2006 and accounted for 13.4% of all mortgages offered last year, up from 2.1% in 2003.  However, the delinquency rate for Alt-A loans also increased.  After 18 months, Alt-A loans that were originated in 2006 had a delinquency rate of 4.71%, versus 1.97% for such loans from 2005 and 1.07% for 2004.  The trend for 2007 loans was even worse than 2006.

54.      Additionally, over the past several years, the quality of the borrowers of Alt-A-type mortgage loans weakened.  During this time, Alt-A-type loans were extended to borrowers who should otherwise have qualified for: (i) sub-prime loans; (ii) much smaller dollar value loans at lower LTVs; or (iii) no mortgage loans at all.  These lower quality Alt-A-type loans were either Alt-B loans, sub-prime loans, or loans for completely unqualified borrowers and included increased risk such as a high LTV ratio and the lack of supporting financial documentation.  Essentially, these Alt-B loans are sub-prime loans in disguise and should not have been securitized without sufficient disclosures as to the true quality of the loans.  However, certain of these Alt-B mortgage loans were securitized and improperly presented as being the higher-quality Alt-A loans.

55.      Deutsche Bank Alt-A is engaged in mortgage lending and other real estate finance-related businesses, including mortgage loan banking, mortgage loan warehouse lending, and insurance underwriting.  Deutsche Bank Alt-A was set up to acquire mortgage loan pools that were transferred to the Trusts, from which the Certificates of various classes were sold to investors pursuant to the Registration Statement.  While these offering documents contained data about the mortgage loans, some of the most important information for Plaintiffs and the other members of the Class, which was omitted from the Registration Statement, involved the underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans and the likelihood and ability of borrowers to repay the mortgage loans according to the terms of the mortgage note and the mortgage or the deed of trust.  This depended on several factors, including creditworthiness of borrowers, debt-to-income levels, LTV ratios, assets of the borrower, occupancy of the property securing the mortgage loan, and the accuracy of other data collected during the origination of the mortgage loans.

## THE FALSE AND MISLEADING REGISTRATION
## STATEMENT/PROSPECTUS SUPPLEMENTS

56.     Deutsche Alt-A caused the Registration Statement/Prospectus Supplements to be filed with the SEC during 2006 and 2007 in connection with the issuance of hundreds of millions of dollars in Certificates.   The Registration Statement/Prospectus Supplements were false and misleading.  The Registration Statement incorporated by reference the subsequently filed Prospectus Supplements.

57.     Defendant Issuer and Deutsche Securities caused the May 1, 2006 Registration Statement to be filed with the SEC.  The Registration Statement discussed the mortgage loans contained in the mortgage pools held by the Defendant Issuer, representing that some of the loans underlying the Certificates were loans made to borrowers whose documentation was not subject to quite as rigorous a set of standards as other borrowers, but that the loans were made based on the value of the underlying properties, as confirmed by the appraisals of the properties.

**The Registration Statement/Prospectus Supplements Misrepresented and Omitted Material Facts Regarding the Underwriting Standards Applied by the Loan Originators**

58.     The Registration Statement/Prospectus Supplements emphasized the underwriting standards utilized to generate the underlying mortgage loans purchased by Deutsche Bank Alt-A and eventually transferred to the Trusts, but omitted material facts related thereto.  The Registration Statement stated that each originator of mortgage loans would be "experienced in originating . . . mortgage loans in accordance with accepted practices and prudent guidelines."  The Registration Statement also represented that with respect to each mortgage loan, underwriting standards were applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  The Registration Statement further stated that in many cases an employment verification was obtained from an independent source.  The verification purportedly confirmed, among other things, the length of employment with

an organization, the borrower's actual salary and whether it is expected that the borrower would continue employment in the future. Where a prospective borrower was self-employed, the Registration Statement/Prospectus Supplements stated that the borrower was required to submit other verification materials.

59. Contrary to these representations, the originators of the mortgages transferred to the Trusts were not originating loans in accordance with prudent guidelines and were not reviewing loan applications in order to determine whether borrowers had sufficient income to meet their monthly mortgage obligations. Rather, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the underwriters' underwriting standards, including directing applicants to no-doc loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting No Income No Assets ("NINA") and Stated Income Stated Assets ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable loan rate adjusted; and

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

60. Further, the originators of loans transferred to the Trusts and the originators' agents, such as mortgage brokers, had become so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had altered the required documentation. Moreover, in many instances the income/employment verifications that were purportedly completed by the originators were insufficient because the lenders' clerical staff

typically did not have proper verification skills, the mortgage brokers or their agents often completed verifications that were suspect, and oftentimes verifications were provided by inappropriate contacts at the borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of human resources). Unbeknownst to investors, these factors had the effect of dramatically increasing the risk profile of the Certificates.

61.     Similarly, those borrowers who were actually required to submit stated income applications would include income levels which were routinely inflated to extreme levels, relative to the stated job titles, in order to get the mortgage loans approved and funded. Inflation of stated income was so rampant that a study cited by Mortgage Asset Research Institute found that almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, ***and more than half increased the amount by more than 50 percent***.

62.     The originators' lack of underwriting controls essentially encouraged this type of income inflation. For instance, many stated income borrowers were actually wage earners who could have supplied W-2s or other income-verifying documentation, but did not. Numerous mortgages transferred to the Trusts were issued without requiring the borrowers to execute a Form 4506, which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service ("IRS"), out of fear that the lender would be put on notice that the borrower's true income level was less than the income level the borrower reported on his or her loan application.

63.     Further, the originators were not limiting their grant of reduced documentation loans to instances where borrowers could demonstrate "acceptable compensating factors." Instead, the originators were granting 'reduced documentation' and 'no documentation' loans to borrowers with high loan to value ratios, low credit scores, and stated income that was not reasonable given the borrower's stated job title.

64.     The Registration Statement emphasized the underwriting standards utilized to generate the underlying mortgage loans held by the Defendant Issuers, stating "every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation" and that "[u]nder the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income."  However, the Registration Statement omitted material facts necessary to make the statements made therein not misleading.  The Registration Statement stated that underwriting standards articulated therein were applied by or on behalf of lenders to evaluate borrowers' credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  The Registration Statement further stated that in most cases an employment verification was obtained from an independent source, typically the borrower's employer.  The verification process purportedly ensured that the lender confirmed, among other things, the length of employment with an organization, the borrower's actual salary and whether it was expected that the borrower would continue employment in the future.  Where a prospective borrower was self-employed, the Registration Statement stated that the borrower was required to submit copies of signed tax returns.

65.     These representations were materially false and misleading as they omitted the fact that the lenders and the lenders' agents, such as mortgage brokers, that generated the loans that were transferred to Deutsche Alt-A and were then placed into the Trusts, had become so aggressive in approving and funding mortgage loans that many of the mortgage loans were actually made to borrowers who had either falsified the required documentation or had not submitted it at all.  Similarly, those self-employed borrowers who were actually required to submit stated income

applications would include income levels which were routinely inflated to extreme levels, relative to the stated job titles, in order to get the mortgage loans approved and funded. These procedures had the effect of dramatically increasing the risk profile of the Certificates.

**The Registration Statement/Prospectus Supplements Misrepresented and Omitted Material Facts Regarding the Appraisals Conducted by or for the Loan Originators**

66.     The Registration Statement and Prospectus Supplements also represented that, in determining the adequacy of the property to be used as collateral, the originators would obtain an appraisal for each property considered for financing. In instances where appraisals were conducted, the appraisers were purportedly required to inspect the property to verify that it was in good repair and that construction, if new, had been completed. The Registration Statement and Prospectus Supplements asserted that appraisals were based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home, and conformed to USPAP requirements.

67.     Independent and accurate real-estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in MBS with supposedly independent and accurate assessments of the value of the mortgaged properties. Accurate appraisals ensure that a mortgage or home equity loan is not under-collateralized, thereby protecting borrowers from financially over-extending themselves and protecting lenders and investors in MBS in the event a borrower defaults on a loan. Accurate appraisals also provide investors with a basis for assessing the price and risk of MBS.

68.     An accurate appraisal is also critical in determining the LTV ratio, which is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of MBS. The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property. For example, if a borrower seeks to

borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

69.     A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he/she defaults on the loan.  What is worse, particularly in an era of falling housing prices, is that a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

70.     To ensure the accuracy of appraisals, the USPAP imposes certain requirements on appraisers.  With respect to real estate appraisals, the USPAP provides:

(a)     An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)     In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)     An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions; and

(d)     It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i)     The reporting of a predetermined result (*e.g.*, opinion of value);

(ii)     A direction in assignment results that favors the cause of the client;

(iii)     The amount of a value opinion;

(iv)     The attainment of a stipulated result; or

(v)     The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

71.     The representations in the Registration Statement regarding appraisals were materially false and misleading in that they omitted to state that the appraisals were inaccurate: (i) due to a complete lack of controls at the originators; and (ii) because, contrary to USPAP, the appraisers were not independent from the brokers such that the lenders and/or their agents, such as mortgage brokers, exerted pressure on appraisers to come back with pre-determined, preconceived, inflated and false appraisal values.

72.     For instance, in retail or in-house mortgage loan originations, many lenders allowed the sales personnel or account executives to order and control the appraisals.  These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible.  These sales personnel and account executives would secretly pressure appraisers to appraise properties at artificially high levels under threat of not being hired again.

73.     This lack of independence was noted by Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking.  Hummel noted this dynamic created a "terrible conflict of interest" by which appraisers "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or else they would never "see work from these parties again" and were "placed on exclusionary or 'do-not-use' lists."  Too often, the pressure succeeded in generating artificially high appraisals and appraisals being done on a "drive-by" basis where appraisers issued their appraisal without reasonable bases for doing so.

74.     A 2007 survey of 1,200 appraisers conducted by October Research Corp., – a firm in Richfield, Ohio, who publishes *Valuation Review* – found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  This figure was nearly double the findings of a similar study conducted just three years earlier.  The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they

did not cooperate, alter their appraisal, and provide a higher valuation."  Adding to these problems was the fact that, lenders, for originations completed by mortgage brokers, generally lacked *knowledge of the accuracy of the* appraisals since they were typically located far from the actual property and knew very little about the general area where the property was located.

75.     As a result of this conduct, loans were frequently based on inflated appraisals stating that the home securing the loan was worth more than it in fact was.

76.     Numerous appraisers have confirmed that the inflation of appraisals was common place.  For example, the owner of a small Midwest residential real estate appraisal firm in Illinois, who was approved and/or utilized by Countrywide and American Home Mortgage in over 100 transactions stated that mortgage brokers would call him and say "I need this number."  This appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."

77.     An independent appraiser from Florida who was approved by Countrywide, American Home Mortgage, and other originators, stated that she was told by brokers and/or lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN."  In order to stay in business, she gave the valuations the broker or lender demanded, even if it required driving 20 miles away for a comparable sale.  During the relevant period, this appraiser completed over one hundred appraisals for Countrywide, American Home Mortgage, and other originators that were over inflated.

78.     A real estate appraiser in Las Vegas, Nevada, stated that when "the Vegas market had peaked, Countrywide and Wells Fargo were requiring appraisers to come up with real estate appraisals reflecting escalating values or they would black ball them."  This appraiser conducted over 300 appraisals for Countrywide and other originators that, in his opinion, were inflated.

According to this appraiser, typically the appraisals demanded by these lenders were 15% to 25% over the actual market value.

79.     Another independent appraiser stated that, Countrywide in-house and outside loan officers demanded inflated numbers from him in Compton and Watts, California.  He also indicated that he had similar experiences with American Home Mortgage.  The lenders told him either give him the numbers they want, or he would be "done" and would be blackballed by every lender doing business in California.   According to this appraiser, "I did approximately 100 over-inflated appraisals just for Wells Fargo and Countrywide."  In some cases he was appraising houses – that he described as "crack houses" that should have been bulldozed – for $100,000 more than they were worth.  The appraiser stated that the neighborhoods were so bad, that he would sometimes never get out of his car, and would merely drive by and take pictures of the house and give the broker or the lender the number they demanded.

**The Prospectus Supplements Contain False Statements**
**About the Originators' Underwriting Practices**

### American Home Mortgage Corp.'s Underwriting Standards

80.     The Prospectus Supplements made untrue statements about the underwriting practices of American Home Mortgage Corp. ("AHM"), which was a key originator in the following Trusts:

| | |
|---|---|
| Alt-A 2006-AR2 | Alt-B 2006-AB2 |
| Alt-A 2006-AR5 | Alt-B 2006-AB3 |
| Alt-A 2007-AR2 | Alt-B 2006-AB4 |
| Alt-A 2007-AR3 | |

81.     For example, the May 19, 2006 Prospectus Supplement for Series 2006-AB4, stated:

(a)     AHM's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgage property may have been

- 25 -

considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes.  Because each loan is different, AHM expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

***Omitted Information***: Contary to AHM's stated underwriting policy, AHM was not weighing all risk factors inherent in a loan file, nor did it encourage underwriters to use professional judgment based on their experience.  Instead, as discussed by a former Level 5 Underwriter who worked at AHM from 2004 until December 2006, the professional judgment of AHMs underwriters was often overridden by automated underwriting software.  This person pointed to a number of instances where the automated program approved loans that made no sense and were not likely to be paid back.  Despite these misgivings, AHM management overruled the Underwriter's human judgment and approved the risky loans.  This situation caused the Underwriter to "lose respect" for AHM, who believed the underwriter's role was to look at the totality of the information in the loan application and ask "Does it fit?" and "Is it logical?"  The Underwriter said that many of the loans approved by the underwriting software were ones that the Underwriter "would not have lent a dime."

82.    This practice was confirmed by a former Level 3 Underwriter who worked at AHM from June 2004 to August 2007.  According to this Underwriter, the automated underwriting software approved "awful loans" that would not have been approved under AHM's manual underwriting guidelines.

83.    Further, in order to post desired loan production, AHM was as a matter of course granting exceptions even where "compensating factors" did not exist.  AHM's business was dependent on continually increasing volume.  Thus, it became even more aggressive in early 2007, when AHM made $16.7 billion in mortgage loans.  A third of its mortgages were pay-option adjustable rate mortgages ("ARMs"), which allowed borrowers to make payments which were ***less than the interest amount accruing on the loan***, resulting in the difference being added to the

principal balance each month.  AHM granted exceptions as a matter of course because its business relied on volume as it was paid a fee for each loan and it was transferring securitization of these mortgages and not retaining the mortgage loans as assets on its own balance sheet.  In fact, AHM went bankrupt in August 2007, after loan volumes dropped.

84.    It has subsequently come to light that AHM's loan programs were very questionable and risky, and the underwriting standards were commensurately lax.  According to one AHM district manager, the loan pools sold to Deutsche Bank and other Wall Street banks were made up of "nothing but junk."  Managers were "told to ignore the issues which should not be ignored, such as the borrower's ability to repay, and just sell these programs."

85.    Because AHM was a mortgage banker that used its line of credit to fund residential mortgage loans, create a loan pool, and then, to replenish its funds, it would sell the loans in bulk, as soon as possible, to "investors."  The investors were Wall Street firms such as Deutsche Bank that sought the loan pools as collateral for their MBS.  These Wall Street firms initiated the lending process by designing and delivering the loan programs to AHM.  The volume of business was very large and in the 2006 timeframe, AHM was funding mortgages amounting to about $5 billion per month.

86.    AHM sales representatives would contact loan brokers (and others who facilitated loans for borrowers) and would arrange with the loan brokers to offer whatever loan programs the AHM representatives were pushing at the time.  One AHM district manager referred to this effort as "selling the loan programs," but in fact it was more of an effort in persuasion than a sale.  The AHM sales reps pushed the loan products sponsored by investors (the Wall Street firms that eventually would buy AHM's loan pools).  AHM loan programs were so questionable and risky that crossing the line was hardly an issue "unless you were talking about something truly criminal."  The

underwriting standards were commensurately lax, in that they required very little in the way of documentation to qualify borrowers for the loan programs.

87.     In addition to using the services of outside brokers who sold AHM's loan products, AHM had a Retail Lending group that sold loans directly to consumers.  Those in the Retail Lending group were compensated, in part, based upon the type and number of loans they closed.  However, in order to close a loan, the loan had to be approved by AHM's underwriters.  Thus the Retail Lending group's compensation was determined, in part, by whether the underwriter approved the loans the Retail Lending group was attempting to sell to a potential customer.  Similarly, pay raises for the underwriters were determined by the Retail Lending group.  Accordingly, the underwriters' compensation was directly affected by decisions made by the Retail Lending group, and the Retail Lending group's compensation was directly affected by decisions made by the underwriters.  This symbiotic relationship provided powerful incentives for the underwriters to approve as many loans as possible, thereby financially rewarding the Retail Lending group, who in turn would approve pay raises for the underwriters.

88.     As noted by a former AHM employee, even loan pools that were ultimately rated AAA were made up of "nothing but junk."  AHM underwriting guidelines were designed to comply with the needs of the Wall Street firms that sought the loan pools to use as collateral for their securitizations.  When one AHM district manager learned that the rating agencies rated AHM's loan pools as AAA, it left him "wondering."  But AHM, continued to sell these pools to Deutsche Bank and other Wall Street banks, who sold the certificates at issue in this litigation which were backed by the questionable loan pools.

89.     Representatives of the Wall Street firms that purchased AHM's loans essentially told AHM, "Take our product and sell it."  Wall Street firms did not want to "miss out on the housing

boom" and needed investment opportunities to soak up the funds coming in particularly from foreign investors.  AHM ignored issues such as the borrower's ability to repay, and just sold the loans which could than be resold to Deutsche Bank and the other Wall Street banks.  Wall Street firms "fed off each other, and could not get enough of these loan pools, and these Wall Street firms were packaging these pools and securitizing them as fast as they could, and they sold these securities all over the world."  "They distributed this toxic waste throughout the worldwide system."

90.     Deutsche Bank pushed a loan program with the seemingly "vanilla" title of Alt-A, but with especially lax underwriting guidelines.  Deutsche Bank set the guidelines based on what they believed the market for the MBS would swallow.  AHM loan brokers readily received the loan programs and considered them to be attractive products because the credit and documentation requirements were so lax that virtually any prospective borrower could qualify.

91.     The May 19, 2006 Prospectus Supplement for Series 2006-AB4 also stated the following:

> (b)     American Home underwrites "a borrower's creditworthiness" based solely on information that American Home believes is "indicative of the applicant's willingness and ability to pay the debt they would be incurring."

***Omitted Information***: AHM was not underwriting loans based upon a borrower's creditworthiness and repayment ability.  According to a former AHM Executive Vice President who worked at the company from 1999 through April of 2007, AHM's underwriting practices became increasingly lax during the 2005 through 2007 time frame.  This resulted in AHM granting a larger and larger number of loans to people unlikely to repay them.  According to this Vice President, AHM "followed Countrywide" in offering "fast and sleazy products" that had very questionable underwriting requirements and were of low quality.  A former Wholesale Account Executive, who worked at AHM from January 2005 through July 2007, stated that at AHM "anybody could buy a

house with zero percent down and **no proof of ability to pay it [the loan] back**.”  According to this person, AHM regularly extended loans that are now classified as predatory.

92.    AHM’s loans were particularly popular with speculators who would not occupy the homes, which would decrease the borrowers’ “willingness” to pay the debt if home prices stagnated or dropped.  This ultimately came to bear on many of AHM’s loans and AHM subsequently suffered losses itself when “borrowers whose incomes [AHM] hadn’t verified began to default on little-money-down loans at an accelerated pace.”  *Smartmoney.com*, July 31, 2007.

> (c)    Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require.  For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both.  For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both.  Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

*Omitted Information*: AHM claimed stated income applications were made where “other compensating factors,” such as higher credit scores or lower loan-to-value requests, existed, but in fact: (i) AHM allowed credit scores to be manipulated by the borrower, who would become an approved user on another person’s credit card or other account who had better credit ratings; and (ii) AHM had no reasonable basis to believe that lower loan-to-value ratios were being required because AHM was already aware that the appraisals being used by the Company, particularly in Texas and Illinois in 2005 and 2006, were faulty and that the same defective methodologies were being used in states such as California and Florida.

> (d)    In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae’s Desktop Underwriter, Freddie Mac’s Loan Prospector automated underwriting systems, a customized form

of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters.  American Home Solutions products must receive an approval from the Assetwise automated underwriting system.  For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

***Omitted Information***: This statement was misleading because AHM was not nearly as meticulous with evaluating borrowers as indicated by this statement.  In an effort to keep loan volume up despite a slowdown in activity, AHM's brokers became so aggressive that borrowers were given loans with different terms than they were originally promised.  Borrowers have in fact complained that loans were switched on them by AHM, leaving them with mortgages they could not pay.  Further evidence of AHM's poor underwriting practices appeared when IndyMac Bank hired over 1,400 of AHM's former employees.  According to an IndyMac former employee, some of the AHM employees that IndyMac took in operated a "fraud shop" within IndyMac.

(e)     Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

- 31 -

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

**Omitted Information**: Appraisals conducted for AHM were not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment. Instead, contrary to USPAP, many of AHM's appraisals were based upon predetermined values insisted upon by brokers. As described above, AHM appraisers frequently succumbed to brokers' demands to appraise at predetermined inflated values. Indeed, as described by a former AHM Vice President from March 2003 through May 2007, appraisal fraud was a common problem at AHM. This former Vice President recounted how loan officers pressured appraisers to come up with the "right number." Due to inflated appraisals, the loan-to-value ratios represented above were inaccurate because these ratios assumed accurate appraisals were performed.

(f)     American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

*Omitted Information*: AHM was using anything but "common sense" in granting mortgages to customers with little money down where a third of the mortgages were pay-option ARMs and many of the loans were to speculators.

### MortgageIT's Underwriting Standards

93.     The Prospectus Supplements made false statements about the underwriting practices of Mortgage IT, Inc. ("MortgageIT") which was a key originator in the following Trusts:

> Alt-A 2006-AR3
> Alt-A 2006-AR4
> Alt-A 2006-AR6
> Alt-A 2007-AR2
> Alt-A 2007-AR3

94.     For example, the Prospectus Supplement to the Prospectus dated May 19, 2006, for Series 2006-AR3, stated:

> (a)     MortgageIT's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.   Because each loan is different, MortgageIT expects and encourages underwriters to use professional judgment based on their experience in making a lending decision. MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

*Omitted Information*: MortgageIT, a subsidiary of Deutsche Bank (since late 2006), was extremely aggressive in granting loans with few controls over underwriting practices.  A former MortgageIT Senior Vice President of Corporate Compliance and Quality Control Officer from January 2005 to May 2006 admitted that MortgageIT's quality control practices were 'not perfect.'  This person characterized MortgageIT's and its competitors' practices as "extremely aggressive" where the mentality was to "get the loans made and sold as quickly as possible."  Thus, "there was no time to scrutinize loans and furthermore, there was less control over them than would be desirable."

95.     Another former Senior Loan Officer for MortgageIT described how MortgageIT's underwriting standards became progressively looser from 2004 into 2006.  This Senior Loan Officer characterized MortgageIT's loans as "bad loans" that were extended to people whose credit scores 'were not great.'  A former Branch Manager, who worked at MortgageIT from 2004 to March of 2007, characterized MortgageIT's Alt-A loans as "garbage."  In addition, even loans that failed to meet these already lax lending standards were still approved.  This is because branch managers would pressure underwriters to approve previously rejected loans, asking them to "have a second look" at the loan file.  A Senior Underwriter who worked at MortgageIT from September 2005 through February 2006 confirmed these practices, noting that management would frequently override an underwriter's rejection of a loan.

(b)     Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  The appraisers perform on site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Loans in excess of one million dollars require (i) two full appraisals or (ii) one full appraisal and a field review, ordered by a MortgageIT-approved national appraiser, including photographs of the interior and the exterior of the subject property.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.  In addition, a MortgageIT underwriter or a mortgage insurance company contract underwriter reviews each appraisal for accuracy and consistency.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property.  For loans made to purchase a property this ratio is based on the lower of the sales price of the property and the appraised value. MortgageIT sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan.  In general, MortgageIT requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes.  A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan.  In addition, for all conventional loans in which the loan-to-value ratio exceeds 80%, MortgageIT requires that a private mortgage insurance company

that is approved by Fannie Mae and Freddie Mac insure the loan. Higher loan-to-value ratios require higher coverage levels.

**Omitted Information**: MortgageIT did not exercise sufficient controls over brokers to prevent them from pressuring appraisers to appraise to certain values, causing larger numbers of inflated (and hence worthless) appraisals.

(c)     MortgageIT obtains a credit report that summarizes each borrower's credit history.  The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion.  These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report.  A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan.  Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit.  Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores.  The minimum credit score allowed by MortgageIT loan guidelines for non-conforming loans is 620 and the average is typically over 700.  For certain types of ARM loans with conforming loan amounts, borrowers with full documentation who do not have a credit score may provide an alternative credit history showing at least three tradeline accounts with no payments over 30 days past due in the last 24 months.  If these mortgage loans are manually underwritten, they require at least 4 tradeline accounts with a 24-month history reported with the most recent 24-months.

**Omitted Information**: Until fairly recently, MortgageIT had been a larger lender to subprime borrowers.  The Company exercised few controls over brokers to confirm that these policies were followed, making it possible for subprime borrowers to get mortgage loans.  Indeed, in 2006, MortgageIT was extending full doc and no-doc loans to borrowers with credit scores as low as 600.

(d)     MortgageIT realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting.  Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.   Therefore, exceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis.

**Omitted Information**: Due to MortgageIT's lack of controls over its branch officers, there was no common sense underwriting.  It was, in fact, the opposite, since brokers were compensated for

- 35 -

getting loans approved – not disapproved – and there were little or no consequences to the broker if the loan subsequently went bad.

## Countrywide's Underwriting Practices

96.     The Prospectus Supplements omitted material facts about the underwriting practices of Countrywide Home Loans, Inc. ("Countrywide"), which was the key originator in the following Trusts:

> Alt-A 2006-OA1
> Alt-A 2006-AR3
> Alt-A 2006-AR4
> Alt-A 2006-AR6
> Alt-A 2007-AR3

97.     For example, the Prospectus Supplement for Deutsche Alt-A Series Mortgage Loan Trust, Series 2006-OA1, 2006-AR3, and 2006-AR4, each stated:

(a)     Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

*Omitted Information*: While the Prospectus Supplements represented that Countrywide's underwriting of mortgages was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality, Countrywide's underwriting standards were designed to originate as many mortgage loans as possible without regard to the ability of its borrowers to afford such mortgages. Indeed, contrary to the representations in the Prospectus Supplements, it has now been revealed that Countrywide's loan originators systematically disregarded and/or manipulated the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and sold ultimately to Plaintiffs and the Class.  In many instances, this was done by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to

- 36 -

resort to "no documentation loans" and "stated income loans."  In other cases, Countrywide customers were steered to more expensive, higher interest loans that they would be unable to repay, such as sub-prime and "alternative" mortgages, in order to increase Countrywide's supply of mortgages sold to the secondary mortgage markets.

98.    Attorney Generals from various states have launched investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed using for originating residential loans.

99.    For example, the Illinois Attorney General (the "Illinois AG") launched an investigation into Countrywide's loan practices that has culminated in the action styled *The People of the State of Illinois v. Countrywide Financial Corporation, et al.*, No. 08CH22994, originally filed on June 25, 2008 in the Chancery Division of the Circuit Court of Cook County, Illinois (the "Illinois AG Complaint").  In 2004, 2005 and 2006, Countrywide was Illinois' largest mortgage originator, originating and selling approximately 94,000 mortgage loans to Illinois consumers.

100.    According to Countrywide employees who the Illinois AG interviewed, Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan.

101.    With respect to stated income loans, Countrywide employees explained to the Illinois AG that while the company had a "reasonableness standard" in order to check fraudulent stated income, employees were only required to use their judgment in deciding whether or not a stated income loan seemed reasonable.  Beginning in 2005, Countrywide required its employees to utilize a website, www.salary.com. to supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable."  The website only provides a range of salaries based on the zip

code and stated job title of the potential borrower. Even though Countrywide required the use of www.salary.com, if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan. The Illinois AG contends that the foregoing "reasonableness" test contravened proper underwriting practices.

102. The Illinois AG Complaint also alleges that Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income. For example: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

103. Likewise, the *Chicago Tribune* reported that a review of 100 stated income loans by the Mortgage Asset Research Institute revealed that 60% of the income amounts were inflated by more than 50% and that 90% of the loans had inflated income of at least 5%.

104. Countrywide also originated and sold adjustable rate mortgages ("ARMs") to borrowers who could not afford the ARMs once the initial or "teaser" interest rate expired. Indeed, the company admitted in a May 7, 2007 letter to the Office of Thrift Supervision that, in the fourth quarter of 2006 alone, "almost 60% of the borrowers who obtained sub-prime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate" and that "25% of the borrowers would not have qualified for any other [Countrywide] product."

105. The fully indexed rate ("FIR") is the amount of interest that is payable on an ARM once the teaser rate is removed. The "teaser rate," typically 1% to 1.25%, is only applied to the loan

for the first month.  Once the teaser rate is removed, the interest on the mortgage begins accruing according to the FIR.

106.     The FIR can change over time and is dependent on fluctuations in the current value of the chosen rate index, such as the 11th District Cost of Funds Index ("COFI"), the 12 Month Treasury Average Index or the London Interbank Offer Rate.  The FIR is calculated by taking the current value of the rate index (which fluctuates monthly) and adding the margin agreed to by the borrower.  The margin remains static for the life of the loan.  The margin on Countrywide loans could be as high as 4%.  Thus, if the Countrywide ARM identifies the rate index as COFI (which was at 2.8% in July 2008) and the margin as 4%, then once the cap or "teaser rate" has expired, the borrower will be subject to an interest rate equal to the FIR, or 6.8% for that month.

107.     Because the borrower has the option of making monthly payments as though the interest rate has not changed, most of those who had Countrywide ARMs paid only the "minimum" payment – a payment that is based on the teaser rate of 1% to 1.25% as opposed to the FIR of 6.8%; This means that borrowers were making payments that were less than the amount of interest accruing on the loan after the teaser rate expired.  The unpaid interest that accrued while the borrower was making payments based on the teaser rate was tacked on to the principal.  Once the principal was 115% of the original loan, the borrower's monthly payment immediately was raised to a level that would pay off the new balance (original principal plus the unpaid interest) of the loan.  This was called "payment shock."

108.     Countrywide thus admitted to the Office of Thrift Supervision that even though 60% of its potential borrowers would not have qualified for a Countrywide loan with an interest rate of 6.8%, these same borrowers were qualified for a loan whose interest rate reached 6.8% once the teaser rate expired.

109.     Even when Countrywide employees received proper income documentation (*i.e.*, a W-2 form) demonstrating that the borrower did not qualify for a loan, the documentation was ignored and the loan was submitted as a stated income loan so as to obtain approval of the loan.

110.     The California Attorney General ("California AG") also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, styled *The People of the State of California v. Countrywide Financial Corporation, et al*, No. LC081846 (the "California AG Complaint").  The California AG Complaint also alleged that Countrywide departed from its stated underwriting standards.  For example, the California AG Complaint alleged that employees were pressured to issue loans to unqualified borrowers by permitting exceptions to underwriting standards, incentivizing employees to extend more loans without regard to the underwriting standards for such loans, and failing to verify documentation and information provided by borrowers that allowed them to qualify for loans.

111.     According to the California AG Complaint, Countrywide used a system called CLUES, or Countrywide Loan Underwriting Expert System.  A Countrywide underwriter would enter the borrower's financial and credit information and the terms of the loan into CLUES, which would then provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines.  CLUES reports stating that a borrower was not within Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

112.     Moreover, like the employees interviewed by the Illinois AG, California Countrywide employees cited in the California AG Complaint claimed to have purportedly utilized the website www.salary.com to confirm a borrower's stated income.  According to the California AG Complaint, California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, know by how much they could overstate a borrower's

income.  A former California loan officer for Countrywide further explained that its loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make," after which the borrower would state that he or she made X amount of income.

113.    The California AG Complaint alleged that Countrywide's practice of approving loans based on the borrower's ability to pay the teaser rate (as opposed to the FIR), as admitted to by the company in the May 7, 2007 letter to the Office of Thrift Supervision, commenced in 2005.

114.    The Connecticut Attorney General (the "Connecticut AG") filed a complaint in Superior Court, Judicial District of Hartford styled *State of Connecticut v. Countrywide Financial Corporation, et al.*, alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.  The Connecticut AG's complaint further bolsters the allegations that Countrywide employees circumvented the company's underwriting procedures and guidelines to grow the number of Countrywide loan originations.

115.    Many of the allegations in the Illinois, California and Connecticut complaints were confirmed by investigations in other states such as Washington, West Virginia, Indiana and Florida, which revealed the nationwide scope of Countrywide's departures from the underwriting standards set forth in the Prospectus Supplements.  Significantly, on October 6, 2008, Countrywide announced that it had settled the fraud claims brought by 11 states, including California and Illinois, for an estimated $8.4 billion, which, according to the California AG, is likely the largest settlement of allegations of predatory lending.

116.    The SEC has also commenced an investigation into Countrywide and filed a complaint in the United States District Court for the Central District of California, styled *SEC v. Aneglo Mozilo, David Sambol, and Eric Sieracki*, No. 09 Civ. 03994 (the "SEC Complaint").  The

SEC Complaint – brought against the three most senior executives at Countrywide, including Countrywide's founder and former chairman and CEO, Angelo Mozilo – alleges that Countrywide engaged in fraud by failing to disclose Countrywide's risky lending practices to investors.

117.    The SEC Complaint details Countrywide's extremely lax underwriting standards – standards that were acknowledge by Countrywide executives as "likely among the most aggressive in the industry."   As alleged in the SEC Complaint, due to these lax underwriting standards Countrywide did not adequately consider a borrower's repayment ability.  Rather, as Mozilo wrote in a September 2006 email, Countrywide was "**flying blind on how these loans will perform** in the stressed environment of higher unemployment, reduced values and slowing home sales." (emphasis added).  In fact, some of the loan products that Countrywide originated were so risky that Mozilo referred to them as "**poison**" and "**the most dangerous product in existence and there can be nothing more toxic**." (emphasis added).

118.    The SEC Complaint also discusses how Countrywide deviated from its already incredibly lax and risky underwriting standards.  The SEC Complaint quotes from an April 2006 email written by Mozilo stating that Mozilo had "personally observed **a serious lack of compliance within our origination system as it relates to documentation** and generally a deterioration in the quality of loans originated . . . ."  The SEC Complaint also discusses a June 2006 email written by Mozilo expressing concern over evidence of borrowers misrepresenting their income on stated income loans.   The SEC Complaint additionally discusses a December 2007 Countrywide memorandum summarizing the results of an internal review of loans that Countrywide originated during the fourth quarter of 2006 and the first quarter of 2007.  The review, which was undertaken "in order to get a sense of the quality of file documentation and underwriting practices, and to assess

compliance with internal policies and procedures" found "that **borrower repayment capacity was not adequately assessed** by the bank during the underwriting process." (emphasis added).

119.    Press reports and articles further highlight the excess lending and lax underwriting that existed throughout Countrywide during the relevant time period, when the mortgages supporting the Issuing Trusts were originated.  For example, on August 26, 2007, in an article by Gretchen Morgenson entitled "Inside the Countrywide Lending Spree," *The New York Times* described how Countrywide's focus on underwriting was not on the ability of a borrower to repay a loan, but on the amount of fees that Countrywide could generate from the loan.  As such, Countrywide steered borrowers to loans with the highest interest rates and the most fees, while concealing less expensive loan products that those customers could afford.  The result: greater delinquencies.

120.    Similarly, on February 23, 2008, *The Wall Street Journal* reported in an article entitled "Mortgage Chief Picked by BofA Sparks Worries – Countrywide Executive Spearheaded Pursuit of Subprime Business" that Countrywide's stated underwriting standards were not followed and warnings from risk-control managers at Countrywide were not heeded during the time the Registration Statements and Prospectus Supplements were issued.

121.    *The Wall Street Journal* further reported that Countrywide strove to close more loans in 2006, while third party risk analysts concluded that the computer risk models used by Countrywide to project defaults on its sub-prime loans materially underestimated the number of at risk loans.

122.    Countrywide's underwriting standards are also the subject of an investigation by the Federal Bureau of Investigation ("FBI"), which was first reported on March 8, 2008, by *The Wall Street Journal* in an article entitled "FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud."  The FBI investigation is focused on "whether company

officials made misrepresentations about the company's financial position and the quality of its mortgage loans in securities filings."

123.    On March 11, 2008, *The Wall Street Journal* published another article further detailing the FBI's investigation of Countrywide's lending practices.  According to the sources interviewed by *The Wall Street Journal*, federal investigators were finding that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. ***The company . . . packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried***."  (Emphasis added).

124.    On September 30, 2008, MBIA Insurance Corp. ("MBIA") filed a complaint against Countrywide in New York state court alleging that Countrywide had fraudulently induced it to provide insurance for certain investment certificates.  The case is styled *MBIA Insurance Corp. v. Countrywide, et al.*, No. 08/602825, and is currently pending in the Supreme Court of the State of New York, County of New York.  MBIA was able to obtain some 19,000 loan files for the Certificates it insured as a result of its contractual agreements with Countrywide.  After reviewing the portfolios and basically re-underwriting each loan provided by Countrywide, MBIA discovered that there was an "extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow."  MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any borrower income, FICO score, or debt, or [debt-to-income ("DTI")] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible

- 44 -

exception).”  Significantly, “MBIA’s re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies.”

125.    A complaint filed in an action styled *In re Countrywide Financial Corporation Securities Litigation*, No. 07-CV-05295 (MRP) (MANx), currently pending in the Central District of California (“*In re Countrywide Securities Litigation* Complaint”), also details Countrywide’s underwriting practices.  The complaint cites information obtained from several former Countrywide employees.  One of these former employees described Countrywide as a “sweatshop” where underwriters were under constant pressure to approve increasing quantities of loans without regard to quality.  This employee stated that the general rule at Countrywide was that loan applications were not to be scrutinized and underwriters were not to exercise professional judgment.  Rather, loans were to be approved automatically unless there was a “blatant” problem on the face of the loan application.  The culture at Countrywide – as described by senior management to those below them – was that you could make any loan work, and “if you don’t make loans, you don’t have a job.”

126.    This employee described how underwriters and underwriting managers were required to create a “paper trail” in loan files to support their loan approvals.  These underwriters and managers were fully aware that in many cases borrowers were making false statements about their income and assets.  Nevertheless, underwriters had to “paper the file” and “build a case” that a loan was purportedly appropriate. The employee was told that underwriters had to create this paper trail because Countrywide needed to be able to sell its loans on the secondary market.  To do so, the loan files had to include sufficient documentation regarding borrower creditworthiness and loan quality.

127.    To create the necessary paper trail, this employee and his or her colleagues would look for documentation, such as printouts from the website www.salary.com, to support the borrower’s claims about his or her stated income so that the loan could later be sold on the secondary

market.  Because www.salary.com merely contained a range of salaries for a stated job title, the employee could use a www.salary.com printout to establish that it was possible that the borrower's stated income was reasonable given the borrower's stated job title.  However, this method was abused by loan officers who would point to the www.salary.com salary ranges in support of a borrower's income even in instances where the loan officer knew that the borrower's actual income was lower than what the borrower stated on his or her application and below the range of salaries given on www.salary.com.

128.    Also according to this employee, if a borrower applying for a SISA loan provided a bank name, address and account number, it was the practice that bank balances would not be verified.  Rather, underwriters would simply accept whatever bank balance the borrower put on the application.  According to the employee, the underwriters knew that many of these bank balances were inflated and therefore called SISA loans "***liar loans***."  The absence of readily obtainable asset verifications was also reported in an April 6, 2008 article in *The New York Times*.  The article noted that even though Countrywide had the right to verify stated income on an application through the IRS (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.

129.    The poor to non-existent underwriting practices were due, in part, to the fact that underwriters had powerful incentives to approve loans regardless of their quality.  Underwriters were paid a monthly bonus, and, because they received relatively low salaries, depended on these bonuses to make ends meet.  Bonuses were based on the volume of the underwriter's loan production, and calculated using a point system.  Points were assigned to each loan depending on a variety of factors, including the type of loan that was underwritten.  The more points the underwriter accumulated, the

larger the bonus. If an underwriter denied a loan, he or she received a lower number of points toward his or her monthly bonus than if the underwriter approved the loan.

130. Indeed, according to a February 2008 article in *The Wall Street Journal*, Countrywide was so focused on growing loan originations that in at least one building, oversized replicas of monthly bonus checks were hung above employees' cubicles so everyone could see which employees were most successful in originating new mortgages.

131. Another former Countrywide employee, who was involved in overseeing loan originations and became familiar with Countrywide corporate policies and procedures, described Countrywide's underwriting as exceptionally weak. According to this employee, borrowers in Countrywide's prime "no-doc" and "low-doc" loan programs did not provide any meaningful documentation to support their loan applications. Thus, meaningful underwriting was virtually impossible to perform.

132. This employee stated that Countrywide's loan origination standards and procedures were not designed to produce high quality loans. Rather, the rule at Countrywide, as stated in its Sales Training Facilitator Guide, was that "***we always look for ways to make the loan rather than turn it down***." (Emphasis added). Countrywide's loan origination standards and procedures were focused on enabling the company to generate revenue growth and capture an increased share of the mortgage loan market.

133. According to another former Countrywide employee – Brian Koss, who spent four years as a regional Senior Vice President at Countrywide where he ran 54 branches in New England and upstate New York – Countrywide became a victim of "public company panic." According to Mr. Koss, management was "reacting to each quarter's earnings and making short term decisions. They approached making loans like making widgets, focusing on cost to produce and not risk or

compliance." According to Mr. Koss, Countrywide's loan programs where income and assets were stated, but not verified, "were open to abuse and misuse. ***The fiduciary responsibility of making sure whether the loan should truly be done was not as important as getting the deal done***. As long as people had jobs and values were on the rise, life was good." (Emphasis added).

134.    In an action commenced against Countrywide for wrongful termination, styled *Zachary v. Countrywide Financial Corporation*, No. 4:08-cv-00214, currently pending in the United States District Court for the Southern District of Texas, the plaintiff, Mark Zachary ("Zachary"), a Regional Vice President of Countrywide KB Homes Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint venture between Countrywide and KB Home Loans ("KB Home"), engaged in a host of mortgage origination and underwriting activities that did not comport with stated and standard practices. Zachary described how loan officers would go so far as to help the loan applicant submit a loan application with ***false income amounts***, so that the applicant would get the loan under false pretenses.

135.    According to Mr. Zachary, one of these practices involved CWKB's practice of "flipping" a loan application from a "full documentation" loan program to a "stated income" or NINA loan program. He learned that loans were being canceled at the prime regional operations center as full documentation loans and transferred to the sub-prime operations center in Plano, Texas as SISA loans, "low-doc" loans, or NINA loans, a "no-doc" loan. Like the SISA loans, NINA loans were also known as "liar loans" and allowed a borrower to simply state their income without providing any documentation or proof of this income. Thus, rather than denying an applicant based on the information revealed in the original mortgage application, Countrywide pretended that it did not see the disqualifying information, such as insufficient income or assets, and instead allowed

applicants to apply for a low or no documentation loan, implicitly encouraging them to lie on these renewed applications.

136.    Furthermore, Mr. Zachary explained that while a material number of Countrywide's loan applicants were *not* eligible for *any* loan program requiring documentation based on the applicant's verified income level and/or job status, CWKB loan officers would: (1) cancel the application for the loan program that required documentation; (2) re-do the application as a SISA or NINA loan through the company's sub-prime originators in Plano, Texas; and (3) coach the loan applicant as to what income level he or she would need to state in order to qualify for the "low-doc" or "no-doc" loan.

137.    Investigations into Countrywide's business practices document testimony by other former Countrywide employees, who corroborate Zachary's allegations and portray a systemic departure from Countrywide's underwriting standards.

138.    On February 15, 2008, Countrywide shareholders filed a consolidated complaint alleging derivative claims against the officers and directors of Countrywide in an action styled *In re Countrywide Financial Corp. Derivative Litigation*, No. 07-CV-06923-MRP-(MANx), currently pending in the United States District Court for the Central District of California.  This complaint also cited information obtained from several former Countrywide employees, who stated that the vast majority of Countrywide's loans were underwritten in contravention of the company's stated underwriting standards.  For example, a former "Underwriter II" – a Countrywide employment classification – based in a Jacksonville, Florida processing center between June 2006 and April 2007 stated that in Countrywide's campaign to increase the volume of loan originations, as much as 80% of the loans originated by Countrywide in that office involved significant variations from the underwriting standards.

139.    This former underwriter further stated that since late 2004, Countrywide's Structured Loan Desks employed software called the Exception Processing System ("EPS") in order to obtain approval for loans that were exceptions to and should have been rejected by Countrywide's underwriting standards. As many as 15% to 20% of the loans generated each day at the company's Structured Loan Desks were run through EPS and very few were ever rejected. This practice was confirmed by documents publicly filed in an Alaskan criminal case against a former Countrywide manager charged with extending improper loans, which reveal that the objectives of EPS were to "[a]pprove virtually every borrower and loan profile." In fact, the creator of EPS stated that EPS was used by company management in order to approve loans that "violated the rules" or to overrule parameters set by Countrywide's loan origination guidelines. EPS gave management the opportunity to approve loans that, on their surface, should have been rejected. In particular, EPS permitted management to override underwriters and actually allow the origination of loans with unacceptably low credit scores. According to this former underwriter, these facially defective loans were approved and funded as a matter of routine.

140.    Underwriters who raised concerns about loans were silenced by their superiors. One underwriter described how senior management expected underwriters to "keep quiet" regarding risky loans. For example, this underwriter detected a borrower who applied for a jumbo loan that was purportedly for his primary residence. However, the underwriter noted that this "primary" residence was really the borrower's fourth residence, and Countrywide had previously funded the loans on the borrower's other three homes. When the underwriter pointed this out to a supervisor, the supervisor responded: "We only consider the information presented on this particular loan. We don't try to investigate." The underwriter was reprimanded later that day.

141.    Another former employee described the lengths some underwriters went to have loans approved.  In early 2004, the former employee discovered that a fellow employee – a very productive loan officer in Massachusetts – was engaging in cutting and pasting documents from the internet to create a fraudulent verification of employment in support of a loan application.  The employee referred the conduct to Countrywide's Human Resources Department, but no investigation was started.  The loan officer's then left the company on his own accord, but was rehired by Countrywide about a year later as a branch manager.  The employee then contacted the supervising Regional Vice President and objected to the loan officer's rehiring, citing prior participation in fraud.  The Regional Vice President overruled the employee's objection, noting the loan officer's high level of productivity.

142.    Countrywide's risky underwriting practices were also noted by people outside of Countrywide.  A former independent mortgage broker and Senior Loan Officer with Family First Mortgage Corporation in Florida compared Countrywide's lending practices to those of Countrywide's competitors, characterizing Countrywide's as the loosest in the entire industry.  This broker became familiar with Countrywide's lending practices (and those of Countrywide's competitors) because the broker regularly directed loans through the Tampa, Florida office of Countrywide's Wholesale Lending Division.  The broker recalled that although many mortgage lenders began to tighten credit and appraisal standards in or about 2005, Countrywide's standards remained lax and the company "let things slide."

143.    Given these practices, it is unsurprising that New York Senator Charles Schumer publicly stated, "Countrywide did more to contribute to the sub-prime mortgage crisis than anyone else."

144.    The Prospectus Supplement for Deutsche Alt A Series Mortgage Loan Trust, Series 2006-OA1, 2006-AR3, and 2006-AR4 each also stated:

(b)     The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

*Omitted Information*: Contrary to these representations, lending officers were regularly ignoring such adverse information in borrower's credit reports. Lending officers and originators also knew that borrowers frequently disputed adverse information in the reports, even though the adverse information was in fact true, knowing that the credit agencies, if they could not confirm the adverse information within a specified time period, would remove the adverse information from the report.

(c)     Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

*Omitted Information*: Contrary to the above representations, the appraisals obtained by Countrywide underwriters were not independent, but rather were obtained from appraisers who understood that unless appraisals were generated at inflated predetermined amounts that would enable a loan to be approved, they would no longer continue to get business from Countrywide or brokers working with Countrywide. The effect was that purportedly independent appraisals generated in connection with Countrywide home loans were artificially inflated and not prepared in conformance with Fannie Mae or Freddie Mac appraisal standards. Countrywide failed to confirm that appraisers were following

- 52 -

the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting LTV ratios and making the mortgage loans in the pool much riskier than suggested by the Prospectus Supplements/Registration Statement.  This was particularly true after 2005, when real estate values in many of the locations where the mortgage pools were located had stopped increasing at the rapid pace of 2004-2005.  Thus, the aggressive lending practices introduced during those years (where borrowers were granted large mortgages in excess of their ability to pay with the assurance that refinancing would be possible in a short time) were extremely risky and likely to lead to significant defaults in years when real estate prices did not increase.

145.    For example, since at least 2005, loan officers from Countrywide's origination divisions were permitted to: (i) hire appraisers of their own choosing; (ii) discard appraisals that did not support loan transactions; and (iii) substitute more favorable appraisals by replacement appraisers when necessary to obtain a more favorable LTV ratio so as to qualify the loan for approval.  Countrywide loan officers demanded that appraisers assign particular values to a property in order to support the closing of a loan.

146.    Countrywide's pressuring of appraisers was described in the *In re Countrywide Securities Litigation* Complaint, which recounts the experiences Capitol West Appraisals, LLC ("Capitol West") had with Countrywide.  Capitol West – a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, and is a "review appraiser" for Wells Fargo, Washington Mutual ("WaMu") and other lenders – claimed that Countrywide engaged in a pattern and practice of pressuring real estate appraisers to artificially increase appraisal values for properties underlying mortgages Countrywide originated and/or underwrote.  Capitol West stated that Countrywide loan officers sought to pressure Capitol West to increase appraisal values for three

separate loan transactions.  When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide retaliated in a manner that, according to Capitol West, was consistent with Countrywide's course of conduct with respect to all independent appraisers – one designed to undermine that independence and cause appraisers to act in conformity with Countrywide's improper scheme to inflate real estate values.

147.    In particular, according to Capitol West, Countrywide maintained a database titled the "Field Review List," which contained the names of appraisers whose reports Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser.  Capitol West was placed on the Field Review List after refusing to buckle under pressure to inflate real estate values.  The practical effect of being placed on the Field Review List was to be blacklisted, as no mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which Countrywide would be the lender because neither the broker nor the borrower would pay to have two appraisals done.  Instead, the broker would simply retain another appraiser who was not on the Field Review List.

148.    According to Capitol West, Countrywide created certain procedures to further enforce its blacklisting of uncooperative appraisers.  Specifically, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide's computer systems automatically flagged the underlying property for a "field review" of the appraisal by LandSafe Appraisals, Inc. ("LandSafe"), a wholly owned subsidiary of Countrywide.  LandSafe would then issue another appraisal for the subject property that, without exception, would be designed to "shoot holes" in the appraisal performed by the blacklisted appraiser such that the mortgage transaction could not close based on that appraisal.  Indeed, in every instance, LandSafe would find defects in the appraisal from the blacklisted appraiser, even if another, non-blacklisted appraiser arrived at the

same value for the underlying property.  According to Capitol West, this exact set of facts happened with respect to an appraisal it submitted after it was placed on the Field Review List.

149.    Because Countrywide was one of the nation's largest mortgage lenders, a substantial portion of any mortgage broker's loans may have been submitted to Countrywide. Because a broker could not rule out that Countrywide would be the ultimate lender, and because mortgage brokers knew from the blacklist that a field review would be required if a blacklisted appraiser were chosen, with the likely result that a mortgage would not be issued with that appraisal, and, in any event, its mortgage applicant would have to incur the cost of retaining another appraiser, such a broker had a strong incentive to refrain from using a blacklisted appraiser.  By these means, Countrywide systematically enlisted appraisers in its scheme to inflate appraisals.

150.    Additionally, several complaints have been filed against Countrywide and LandSafe, as well as several of the appraisal companies that Countrywide utilized (including eAppraiseIT.com, Lender Services Inc. and LandAmerica Lender Services), alleging that the appraisals obtained were inflated.

151.    Three lawsuits have been filed against Countrywide and LandSafe regarding the use of inflated LandSafe appraisals to obtain loans for individuals.  In addition to the *Zachary* Complaint, two class actions have been brought by KB Home purchasers: (1) *Zaldana, et al. v. KB Home, et al.*, No. CV 08-3399 (EDL), filed in the United States District Court for the Northern District of California (the "*Zaldana* Complaint"); and (2) *Bolden, et al v. KB Home, et al.*, No. BC385040, filed in Los Angeles County Superior Court (the "*Bolden* Complaint").

152.    Mark Zachary stated that while he was employed at CWKB, LandSafe – the only appraiser employed by CWKB to appraise the homes on behalf of the joint venture – was encouraged to inflate the value of appraised homes by as much as 6% in order to allow the borrower

to "roll up" the closing costs into the mortgage.  This practice resulted in the actual home value being less than the mortgaged amount, putting the home buyer "upside down" on the home immediately after purchasing it.  It also put the lender and secondary market end investor at risk because they were unaware of the true value of their asset.

153.    Deborah and Lonnie Bolden describe in the *Bolden* Complaint how CWKB inflated appraisals in a KB development in Live Oak, California.  According to the *Bolden* Complaint, CWKB required the use of LandSafe.  When one of the Bolden's neighbors refused to use CWKB as the lender, they sought an independent appraisal of their property.  The independent appraiser concluded that the neighbor's property was worth $408,000, or approximately 13% less than the $469,000 value appraised by CWKB.  Upon further investigation, the Boldens discovered that the appraisal performed by CWKB provided inflated values of purportedly "comparable" properties to justify an inflated value for the Bolden's home.  Specifically, the Boldens' appraisal report listed two properties as having sold for $461,000 and $480,500, while the public records from the county recorder's office indicated that the homes were actually sold for $408,500 and $410,000, respectively.

154.    Countrywide, LandSafe and eAppraiseIT.com have been sued by investors of Fannie Mae and Freddie Mac on behalf of the companies for damages as a result of generating artificially high and unjustified appraisals for property underlying mortgage packages sold to both Fannie Mae and Freddie Mac.

155.    Additionally, former appraisers for Countrywide have stated that the company applied pressure on them to inflate appraisals.  For example, Jennifer Wertz, a licensed Real Estate Appraiser in California, sued eAppraiseIT.com and Lender Services Inc., among others, after she refused to replace a reference to "declining market conditions" in an appraisal with "stable market

conditions" in two appraisals for WaMu. Thereafter, eAppraiseIT.com and Lender Services Inc. failed to give Wertz any work (even non-WaMu work) because she refused to alter her appraisals.

156. Moreover, individuals who received Countrywide loans and are now seeking to refinance are discovering that the appraised value of their homes has plummeted because the prior appraised "value" of the homes were inflated. For example, an individual living in Portland, Maine discovered that his 1820's Cape Code style home was falsely described in an earlier appraisal done by Countrywide's LandSafe unit in December 2005 as having four bedrooms and two full bathrooms in order to inflate its value. This same house was appraised by the same LandSafe appraiser in November 2007 for $100,000 less, in part because the house actually only had three bedrooms, 1.75 bathrooms and was 200 square feet smaller. When asked for an explanation, the LandSafe-approved appraiser stated that Countrywide had changed its rules after previously allowing their appraisers to overvalue properties to substantiate large loans.

157. Additionally, the Prospectus Supplements for Deutsche Alt-A Series Mortgage Loan Trust, Series 2006-OA1, 2006-AR3, and 2006-AR4 each stated:

> (d)    Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

***Omitted Information***: Countrywide's debt-to-income ratios were misstated (understated) by the previously alleged falsely reported income levels on loan applications, many times with the knowledge of the mortgage broker. Countrywide took no meaningful steps to prevent these practices as Countrywide was highly motivated to close and securitize loans – regardless of the underlying risk profile. In fact, during the summer of 2007, when there was increasing publicity about suspect lending practices, Countrywide did an audit of lending practices by certain mortgage brokers and found many inconsistencies in loan applications, but did nothing about it.

(e)     Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.   The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

***Omitted Information***: False stated income amounts far in excess of those reasonable for the borrowers' employment were regularly ignored in order to approve loans under the SISA asset documentation programs.  In addition, Countrywide was offering SISA loans up to 100% of LTV until March 2007.  In fact, in March 2007, Countrywide assured borrowers that 100% financing was still available:

> "We want to assure homeowners that there is still an extensive selection of mortgage loans to suit a multitude of personal and financial circumstances," said Tom Hunt, managing director of Countrywide Home Loans.  "We recognize it's been widely reported that some major lenders, like Countrywide, no longer offer 100% financing.  In fact, we have made changes to certain subprime and other special mortgage programs, but we have not eliminated 100% financing.  We still offer one of the widest selections of low- and no-downpayment options to qualified customers, including those with less-than-perfect credit."

### IndyMac's Underwriting Practices

158.    The Prospectus Supplements included false statements about the underwriting practices of IndyMac Bank, F.S.B. ("IndyMac"), a key originator for the following Trusts:

> Alt-A 2006-AR5
> Alt-A 2007-OA2
> Alt-A 2007-AR3

159.    For example, the Prospectus Supplement for Trust Series 2007-OA2, dated April 3, 2007, stated:

> IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral.  Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

- 58 -

***Omitted Information***:  IndyMac's company culture focused on originating as many loans as possible without regard to prudent underwriting practices.  IndyMac's philosophy, in the words of its former Chairmen and CEO Michael Perry ("Perry"), was: "business guys rule . . . f'** you to compliance guys."

160.    IndyMac's institutional disregard for basic principles of underwriting and risk management have been documented in numerous articles, lawsuits, and investigative reports, and has been corroborated by both confidential and non-confidential witnesses.

161.    Michelle Leigh ("Leigh") was IndyMac's First Vice President and Division Head of Post Production Quality Control until September 2006. Leigh found that while she was working at IndyMac, 11% to 15% of all current loans had been issued in violation of the Bank's internal policies, ten times the industry norm.  She drafted a report of her findings, intended for the Company's Board of Directors.  However, after Perry reviewed the report, Leigh was instructed to delete the negative information from her report before it was provided to IndyMac's Board of Directors.

162.    An example of one non-conforming loan in her report was a "stated income" loan to an employee of Disneyland, who claimed annual income of $90,000.  In fact, her loan file disclosed that she earned $11.00 per hour.  According to Leigh, Michelle Minier, Executive Vice President of Mortgage Operations, refused to permit this loan to be included in a report to IndyMac's Board of Directors.

163.    Leigh was ultimately fired by IndyMac at approximately the same time as two other top internal control supervisors: Charles Williams ("Williams"), the head of internal audits, and Christopher Newkirk, Executive Vice President of IndyMac's Enterprise Risk Management Department.  According to Leigh, all three were terminated (directly or constructively)

because they called attention to structural deficiencies in the Bank's internal controls, and noted specific deficiencies in internal controls over loan underwriters. The Bank's Post Production Quality Control Department had been put under the supervision of the Mortgage Operation Department, eliminating any checks on the Mortgage Operation Department. This organizational structure and lack of oversight violated FDIC, Fannie Mae and Freddie Mac regulations. According to Leigh, Perry asked Williams to ignore a major problem that Williams had discovered, but Williams refused to do so.

164. Unchecked, shoddy internal controls remained the rule into and throughout the Class Period. Wesley E. Miller ("Miller"), who worked as an underwriter for IndyMac in California from 2005 to 2007, stated that when he rejected a loan as questionable, he was berated by sales managers who then went over his head and obtained approval of the loan from senior vice presidents. According to Miller, the underwriters' decisions might simply be overruled or the underwriter might be pressured or ordered to change his decision, because the managers' instructions were to "find a way to make this [loan application] work," since IndyMac wanted to make as many loans as possible, regardless of the underlying criteria.

165. Scott Montilla ("Montilla"), a former IndyMac loan underwriter in Arizona during the same time period, stated that about one-half of his decisions to reject loans were overridden by the Bank's executives. Moreover, according to Montilla, some borrowers told him that they had no idea their stated incomes were being inflated as part of the application process.

166. According to a Manager in IndyMac's fraud audit and investigation unit from December 2004 until October 2007, everyone at IndyMac knew that the underwriters were "pushing" bad loans and that the idea that IndyMac's Alt-A loans were any different from subprime loans was nonsense. Often, internal investigations would reveal that the IndyMac

underwriter or sales person had pushed through a loan with inadequate or fanciful documentation. The front office often overrode any findings and delinquencies or improper conduct by underwriters, with no or weak explanations.  IndyMac routinely originated loans based upon rampant loan fraud but did not care so long as home prices continued to rise.  CEO Perry had "vitriol" for quality control/audits and Perry took actions to "neuter" the quality control/audits department by moving the quality control department from the secondary mortgage division to the central mortgage operations division.  As a result, the quality control department was now controlled by the very division it was supposed to monitor.

167.    A Senior Underwriter who joined IndyMac in 1997, and worked in IndyMac's Wholesale Mortgage Division until July 2008, confirmed that underwriters were incentivized by IndyMac's bonus system to approve loans without adequate review, and some took advantage of the opportunity. For example, one underwriter in Wisconsin was approving 20 loan applications per day.  This Senior Underwriter was also assigned to process loan applications acquired in connection with IndyMac's hiring of over 1,400 professionals from AHM. For loans that had previously reached the first stage of approvals at AHM, employees were instructed to approve loans whether or not they met IndyMac's standards.  Many loans did not meet IndyMac's standards, but were approved anyway.  As previously stated, AHM employees were operating a "fraud shop" within IndyMac.  Eventually IndyMac hired ten former AHM underwriters to approve additional loans generated by that company because IndyMac appraisers were unwilling to approve many of these loans.

168.    Cody Holland ("Holland") joined IndyMac as a loan officer in September 2007. According to Holland, IndyMac regularly violated its own internal guidelines for loan approvals. Although the guidelines at that time required borrowers to have minimum FICO scores of 620,

loans were approved for borrowers with scores as low as 580.  IndyMac also regularly approved loans with loan-to-value ratios as high as 100%, notwithstanding Perry's public statements that IndyMac had discontinued such loans.

169.    According to a Mortgage Underwriter in a regional office of IndyMac, beginning in August 2007, loan underwriters were told to approve loans that did not satisfy the current guidelines. Loan officers regularly bypassed regional underwriters to gain approval of loans outside the guidelines by contacting senior operations management at the Bank's Pasadena headquarters, who would order approval of loans in markets with which they were not familiar.  FICO score requirements were regularly waived in order to increase loan volume.  IndyMac went so far as to instruct employees during loan underwriting training sessions as to how to obtain exceptions to the lending guidelines, and underwriters began to view the mortgage guidelines as a joke. In addition, appraisals were frequently provided by a small number of brokers who were chosen because of their willingness to inflate appraisals.

170.    According to an IndyMac Underwriting Team Leader from 2005 to July 2007 who supervised eight underwriters, Frank Sillman, head of the IndyMac Mortgage Bank Division, regularly overrode underwriters' decisions to deny loans.  Underwriters were pressured to approve loans and told to "do anything to keep the loan from going to Countrywide." Underwriting team leaders would receive an e-mail towards the end of the month from their Regional Manager, imploring them to "approve as many loans as you can because we need a certain amount of mortgage volume this month."

171.    On June 30, 2008, the Center for Responsible Lending (the "CRL") issued a report titled "IndyMac: What Went Wrong? How an `Alt-A' Lender Fueled its Growth with Unsound and Abusive Mortgage Lending" the CRL corroborates and/or reports the witness

statements recounted above. Based on interviews with 19 former employees, mostly underwriters, and a review of numerous pending actions against Indy Mac, the CRL uncovered evidence of: (i) pressure from managers on underwriters to approve unsound loans in contravention of IndyMac's internal underwriting guidelines; and (ii) managers overruling underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals.

172.    IndyMac's improper and fraudulent lending practices were also documented in the complaint filed in the action styled *Financial Guaranty Insurance Co. v. IndyMac Bank, F.S.B.,* No. 08-CV-06010-LAP, currently pending in the United States District Court for the Southern District of New York.  The complaint in that case quotes former employees stating:

- According to a former IndyMac central banking group vice-president, that IndyMac institutionalized exceptions to its own underwriting guidelines that allowed IndyMac to make and approve mortgage loans that should have been denied under the actual guidelines and that direct fraud by IndyMac loan sales representatives was rampant in the mortgage loan origination process at IndyMac;

- According to a former IndyMac loan underwriter, that IndyMac's loan origination process had evolved into organized chaos where, at management's direction, any concessions or adjustments were made in order to close loans that would not normally be made, including adjusting appraisals to make the loan work;

- According to a former IndyMac vice president in IndyMac's mortgage banking segment, that in order to keep pace with its competition, IndyMac greatly loosened its underwriting guidelines in order to bring in more loans;

- According to a former IndyMac senior auditor in IndyMac's central mortgage operations, that an increasing number of loans were made through apparently fraudulent or misrepresented documentation and there was an increase in defaults because of these misrepresentations in the underwriting process, the relaxation of the underwriting guidelines and approval of borderline loans;

- According to a former IndyMac investigator in IndyMac's central mortgage operations, that the quality of IndyMac's loan origination process had become a running joke within IndyMac, and that a whole class of IndyMac originated mortgages were referred to internally as 'Disneyland Loans', because of insufficient documentation or the borrower's inability to repay the mortgage; and

- According to a former IndyMac senior loan processor, that the increase in the number of IndyMac-originated delinquent loans was due to misrepresentations and fraud occurring in the mortgage loan origination process.

173. On July 20, 2008, *The New York Post* published an article by investigative reporter Teri Buhl titled "[OTS] Officials Missed IndyMac Red Flags." That article listed three "red flags" that regulators should have noticed, and defendants must have been aware of long before the Indy Mac's collapse:

> IndyMac was late in adhering to a federal rule banning lenders from lending to people who did not provide ample documentation verifying their income.
>
> The rule, which was mandated by a group of regulators that included the Federal Reserve, FDIC and OTS, took effect in September 2006. But according to internal IndyMac compliance documents reviewed by *The Post,* IndyMac didn't comply until November 2007 - something OTS compliance officials should have spotted.
>
> Another missed opportunity, CRL said, came when the lender would pull employees in on the weekends in 2006 to tweak loan documents by inflating home appraisals on mortgages that had been rejected by Wall Street. Had OTS safety and soundness officers reviewed IndyMac's appraisal valuation processes, CRL said, they would have noticed the practice.
>
> The third strike for the regulators came in August 2007, when IndyMac bought branches of the defunct American Home Mortgage, even though data show the bank had a growing problem with nonperforming assets.
>
> "The bottom line is that the IndyMac failure could have been prevented if common sense lending standards had been required in 2006," said Martin Eakes, CRL's CEO.

174. Further evidencing the fraudulent quality of the loans underwritten and originated by IndyMac, and its deviation from safe and sound banking practices, on December 31, 2008, Bloomberg.com reported that Fannie Mae and Freddie Mac had found IndyMac to be liable to repurchase between $1 billion and $10 billion in loans that violated representation and warranty agreements between IndyMac and those agencies. When a mortgage originator sells the loan, it makes representations and warranties to the buyer with respect to the borrower, the property securing

the loan, the mortgage instruments, and the underwriting. If those representations and warranties are broken – which most commonly occurs when there is fraud or misrepresentation in the underlying mortgage – the originator/underwriter is obligated to repurchase the mortgage. James Lockhart, director of the Federal Housing Finance Agency, the regulator of Fannie Mae and Freddie Mac explained the reason for such incredibly large repurchase demands: "In 2006 and 2007, the underwriting was so poor, there was a lot of fraud that happened or a total misrepresentation."

175.    IndyMac's fraudulent underwriting practices also encompassed its solicitation and use of artificially inflated property appraisals. IndyMac's solicitation and use of inflated appraisals from non-independent appraisers is currently the subject of investigations by the FBI and FDIC. As *The New York Post* reported on August 3, 2008:

> The federal investigation into mortgage fraud at IndyMac Federal Bank has expanded into the company's Homebuilder Division, according to a bank executive interviewed by the FBI and FDIC. Investigators have seized 2005-06 construction loan audit reports from the files of the Homebuilder Division, the executive told *The Post,* and later questioned him and other workers about the reports, he said.

> The recently renamed Homebuilder Division, which lent money on commercial and residential construction projects until [it] stopped lending at the end of 2007, had a staggering 52 percent of its $1.3 billion in loans classified as non-performing as of March 31, [2008], according to a government filing.

> Even in a down market, a non-performing rate closer to 20 percent to 30 percent is more usual, according to a person familiar with the local real estate market.

> Based on the question asked by investigators, one focus of the probe appears to center on whether or not the appraisal inspectors inflated real-estate development project values and whether IndyMac loan officers gave independent appraisers false information.

> "They asked about how we verify appraisal values," said the executive, who spoke on the condition of anonymity.

> "I explained the lack of risk controls in place for that group, such as loan officers who were allowed to pick their own appraisers instead of using a third

party to assign an independent appraiser - which is a typical industry practice," he said.

176.    Independent witnesses have corroborated the existence of such fraudulent appraisal practices.  According to Andrew Eliopolus, a real estate developer and President of Eliopolus Development, IndyMac approved a $36.5 million loan to Eliopulos Development in order to develop a project near Lancaster, California that contained 539 home plots on about 900 acres.  In April 2007, in connection with a renewal on the loan, IndyMac commissioned an appraisal and determined that the property was worth $82 million.  On the basis of this appraisal the loan was extended through December 31, 2007.  This appraisal permitted IndyMac to claim that the loan-to-value ratio was 33%, and that the loan was over secured.  In order to extend the loan beyond January 1, 2008, IndyMac required a new appraisal, which was completed in December 2007, and determined that the property was worth only $17 million, even though there had not been a significant shift in real estate values in the area where the project was located in the six months between the two appraisals. The loan had been reviewed by the "IndyMac Bank Senior Loan Committee," which Mr. Eliopolus was told consisted solely of Perry.

177.    According to Vernon Martin, Indy Mac's Chief Commercial Appraiser in 2001 and 2002, IndyMac hired CEO Perry's father and father-in-law as the sole construction inspectors in the Sacramento, California region. Perry's father remained associated with IndyMac as a purportedly independent inspector through 2008.  IndyMac also relied heavily on a small number of appraisers who were known to be more "flexible" than others, that is, more willing to grant higher appraisals to parcels of land.  In one instance, prior to the Class Period, a commercial property that had been purchased for $2 million was appraised at $17 million a few months later, even though the property had no tenants. In another instance, an undeveloped parcel of land was purchased for $18 million, and appraised

at $30 million on the claimed basis that the developer added value to the property simply by buying it.

178.    According to former IndyMac loan officer Holland, IndyMac continued to manipulate appraisals into the Class Period, and said manipulation affected both residential and commercial mortgages.  According to Holland, IndyMac selected particular appraisers who were known to inflate their appraisals for properties where the loan appeared questionable.  Holland's statements are corroborated by the confidential witnesses cited in the complaint filed in the action styled *Cedeno v. IndyMac Bancorp, Inc., et al.,* No. 06-CV-6438-JGK, filed in the United States District Court for the Southern District of New York.  According to those witnesses, IndyMac told its outside appraisers the "target value" that was needed to secure approval of a residential loan.  Appraisers who accommodated the Bank's requested appraisal values were rewarded with additional work, while those who did not were cut off.  The witnesses also said that IndyMac's Chief Appraiser and other executives were aware of and acquiesced in this practice, and IndyMac's management intimidated and threatened to fire employees who rejected fraudulent appraisals.

### GreenPoint's Underwriting Practices

179.    The Prospectus Supplements included false statements about the loan underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint") which was a key originator for the following Trusts:

> Alt-A 2006-AR2
> Alt-A 2006-AR4
> Alt-A 2006-AR5
> Alt-B 2006-AB2

180.    For example, the Prospectus Supplements for Trust Series 2006-AR2, 2006-AR5, and 2006-AB2, each stated:

- 67 -

    (a)     Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the guidelines are permitted where compensating factors are present.

***Omitted Information***: GreenPoint's underwriting guidelines were not applied to evaluate the prospective borrower's credit standing, repayment ability or the value and adequacy of the mortgaged property as collateral.  Rather, GreenPoint used guidelines supplied by Wall Street investors, such as Deutsche Alt-A, that were not based upon sound underwriting standards but were merely the minimum standards that investors were willing to accept for loans they would purchase and securitize.  As a former GreenPoint VP/Wholesale Branch Operations Manager – who worked for GreenPoint from July 2003 to January 2008 – explained, the fact that a borrower was unlikely to re-pay his or her loan was irrelevant so long as the loans were within the underwriting guidelines set forth by the investor.

    181.    GreenPoint's investor-driven underwriting guidelines were woefully inadequate.  As described by a former GreenPoint Account Executive – who worked in the Queens, New York branch from July 2003 through September 2007 – beginning in 2005, GreenPoint's underwriting standards became increasingly lenient, especially towards higher risk borrowers.  This Executive characterized GreenPoint's underwriting guidelines as "loose" and becoming progressively "looser" during the 2005 through 2006 timeframe.  This Account Executive attributed GreenPoint's loosening of its underwriting standards to its desire to remain competitive in the lending market explaining that as other lenders relaxed their underwriting standards and began extending loans to "people who probably couldn't repay their loans,"  GreenPoint had to do the same in order to remain competitive.  These statements were confirmed by a former GreenPoint Senior Vice President of Branch Operations for the Western Wholesale Division who worked for GreenPoint and GreenPoint's predecessor, Headlands Mortgage, from 1992 to August 2007.  This Senior Vice President stated that

beginning in 2005 and continuing through 2006, GreenPoint's underwriting guidelines became increasingly lenient and the loans it extended became increasingly risky. GreenPoint began to significantly relax the requirements that borrowers would have to satisfy to qualify for a given loan program, including relaxing requirements involving documentation of repayment ability, minimum LTV ratios and minimum credit scores. GreenPoint's modification, in early 2007, of some of its underwriting standards, on some of its riskiest loan products, was not enough to stem the massive number of failed loans that led to GreenPoint's demise in August 2007.

182. Additionally, GreenPoint did not limit its granting of exceptions to circumstances where compensating factors existed. Rather, it was granting exceptions even in the absence of compensating factors. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. This lack of monitoring was particularly problematic because, as noted by many regulators, brokers were interested mainly in generating upfront fees and did not pay enough attention to whether borrowers were qualified for the loans.

183. The Prospectus Supplements for Trust Series 2006-AR2, 2006-AR5, and 2006-AB2 each also stated:

> (b) GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs. Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower. Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion, and certain credit underwriting documentation concerning income or income verification and/or employment verification is waived. Mortgage loans originated and acquired with limited

documentation programs include cash-out refinance loans, super-jumbo mortgage loans and mortgage loans secured by investor-owned properties. Permitted maximum loan-to-value ratios (including secondary financing) under limited documentation programs are generally more restrictive than mortgage loans originated with full documentation requirements.  Under no documentation programs, income ratios for the prospective borrower are not calculated.  Emphasis is placed on the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and assets of the borrower.  Documentation concerning income, employment verification and asset verification is not required and income ratios are not calculated.  Mortgage loans underwritten under no documentation programs are generally limited to borrowers with favorable credit histories and who satisfy other standards for limited documentation programs.

*Omitted Information*: These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, appraisers were in fact pressured to appraise to certain levels.  Appraisers knew if they appraised under certain levels they would not be hired again.  Thus, the appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

(c)     In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform [to] the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines.  In certain cases, an analysis based on income generated by the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used. GreenPoint's Underwriting Guidelines require that the underwriters be satisfied that the value of the property being financed supports, and will continue to support, the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

- 70 -

***Omitted Information***: The documents failed to describe GreenPoint's practice of allowing its staff or outside brokers to push appraisal values, which distorted the loan-to-value ratios referred to in the Prospectus Supplement.

>(d)   As part of its evaluation of potential borrowers, GreenPoint generally requires a description of the borrower's income. If required by its underwriting guidelines, GreenPoint obtains employment verification providing current and historical income information and/or a telephonic employment confirmation.  Employment verification may be obtained through analysis of the prospective borrower's recent pay stubs and/or W-2 forms for the most recent two years or relevant portions of the borrower's most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the borrower's length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.[3]

***Omitted Information***: GreenPoint did not verify the income of borrowers as represented but had a reputation in the industry for cutting corners on underwriting.  GreenPoint was one of the first innovators of Alt-A mortgages.  However, many of GreenPoint's Alt-A loans were actually subprime loans in disguise, a practice later copied by others.  GreenPoint's practice of disguising subprime loans as Alt-A loans was confirmed by the former GreenPoint Account Executive identified in ¶181.  This former Account Executive stated that GreenPoint offered loans it represented to be Alt-A even though their qualifying requirements were those of "junk" loans. GreenPoint's "innovation" came back to haunt it, as in June 2007 GreenPoint began closing numerous operational centers and branch offices.  A spokesperson for GreenPoint attributed these closures to fallout from the subprime market and the resulting tightened lending standards.  Because GreenPoint was unable to maintain its poor mortgage lending practices, GreenPoint's parent

---

[3]   The text quoted in this paragraph appears in the Prospectus Supplement for 2006-AR2 and 2006-AR5.  The same paragraph also appears in the Prospectus Supplement for 2006-AB2, except that in that paragraph, the word "mortgagor" is substituted for the word "borrower."

company – Capital One – shut down GreenPoint on August 20, 2007, less than a year after Capital One's December 2006 acquisition of GreenPoint.

## Impac's Underwriting Standards

184.   The Prospectus Supplements made false statements about the loans originated by Impac Funding Corporation ("Impac") which was a key originator for the following Trusts:

Alt-A 2007-OA2
Alt-B 2006-AB3

185.   For example, the Prospectus Supplement dated June 29, 2006 for Series 2006-AB3 stated in part:

(a)   The following provisions apply to all of the Impac Mortgage Loans originated under Impac's Progressive Series Program and Progressive Express Program.

Eligibility.  Impac generally performs a pre-funding audit on each mortgage loan.  This audit includes a review for compliance with the related program parameters and accuracy of the legal documents.

Variations. Impac uses the following parameters as guidelines only.  On a case-by-case basis, Impac may determine that the prospective mortgagor warrants an exception outside the standard program guidelines.  An exception may be allowed if the loan application reflects certain compensating factors, including instances where the prospective mortgagor:

- has demonstrated an ability to save and devote a greater portion of income to basic housing needs;

- may have a potential for increased earnings and advancement because of education or special job training, even if the prospective mortgagor has just entered the job market;

- has demonstrated an ability to maintain a debt free position;

- may have short term income that is verifiable but could not be counted as stable income because it does not meet the remaining term requirements; and

- has net worth substantial enough to suggest that repayment of the loan is within the prospective mortgagor's ability.

- 72 -

*Omitted Information*:  Impac lenders did not, in fact, limit exceptions from its guidelines to a "case-by-case basis" where "compensating factors" existed, but granted exceptions on a widespread basis so that borrowers could get into loans.  The mortgage lenders working with borrowers were compensated when loans were granted but not when loans were not funded, creating an incentive to find "compensating factors" where they did not exist.

> (b)     The philosophy of the Progressive Series Program is that no single borrower characteristic should automatically determine whether an application for a mortgage loan should be approved or disapproved. Lending decisions are based on a risk analysis assessment after the review of the entire mortgage loan file. Each mortgage loan is individually underwritten with emphasis placed on the overall quality of the mortgage loan. The Progressive Series I, II, III, III+, IV, V and VI Program borrowers are required to have debt service-to-income ratios within the range of 45% to 60% calculated on the basis of monthly income and depending on the loan-to-value ratio of the mortgage loan.

*Omitted Information*: In fact, the true philosophy of the Progressive Series Program was not to make a more reasonable and common sense evaluation of the entire loan file but to make it easier to approve loans to borrowers whose income and assets could not justify the size of the mortgages granted.  The Prospectus Supplement misleadingly stated that the program avoided having a loan ***approved or disapproved*** by a single factor, implying that some loans would qualify by a single factor but would not under their Progressive philosophy.  The intent was not to do more careful analysis – but to allow loans to be funded where the borrower could not qualify under traditional standards.

### Ohio Savings Bank's Underwriting Standards

186.    The Prospectus Supplements made false statements about the loans originated by Ohio Savings Bank ("OSB"), a key originator for Alt-A 2006-AR2 Trust.  The Prospectus Supplement for the Alt-A 2006-AR2 Trust, dated June 29, 2006, stated:

> (a)     Loan requests are underwritten for compliance with the Gemstone AU [automated underwriting engine] recommendation and OSB's standards and guidelines prior to a loan being originated or purchased.  With respect to the loans

sold to  DB Structured Products, Inc., OSB primarily employs the use of contract underwriting services offered by some of the private mortgage insurance companies to perform the underwrite and validation of the individual loan.  Loans with balances of $650,000 or less are eligible to be underwritten via a contract underwriting relationship and account for the vast majority of all underwriting decisions.  Loans exceeding $650,000 are underwritten by an OSB staff underwriter.  A select segment of correspondents and brokers have been granted varying degrees of delegated underwriting authority.

**Omitted Information**: OSB's underwriting standards and guidelines were not followed.

(b)     The underwriter will evaluate the intent and willingness of a borrower to repay the mortgage loan in a timely manner.  In general, intent is evaluated based on past credit performance and the prospective borrower's equity.  The prospective borrower's past regard for such obligations, and the source and amount of the down payment are also evaluated.  OSB utilizes credit scores provided by credit reporting agencies to assist in the analysis of an applicant's credit history. Under appropriate circumstances, OSB may also consider a private mortgage or rent payment history, in addition to the applicant's credit history and credit scoring as maintained at credit reporting agencies.

**Omitted Information**: Evaluation of "the intent and willingness of a borrower to repay the mortgage loan in a timely manner" was premised on the mistaken belief that an application listing that the property was to be owner occupied would in fact be owner occupied.  There was no verification either before or after the loan was funded that the borrower took occupancy unless a review of a defaulted loan was being completed.  Therefore, underwriters and others assigned a much higher probability of repayment based upon the baseless belief that the property would be owner occupied.

(c)     With respect to loans sold to DB Structured Products, Inc., in order to determine the marketability of a property, an independent property valuation must be obtained from a licensed appraiser. OSB's underwriting guidelines require that the value of the mortgaged property being financed, as indicated by the independent valuation, currently supports and is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values, although there can be no assurance that such value will support the outstanding loan balance in the future.  The loan-to-value (LTV) is based upon the lesser of the sales price, if applicable, or the appraisal. Eligible properties include 1-4 family, attached and detached condominiums, planned unit developments, and manufactured homes for use as the prospective borrower's primary residence, second home, or investment property.  Generally, for loans of $1,000,000 or more, two appraisals may be required from two different appraisers.

*Omitted Information*: It is contrary to U.S. Appraisal Standards to say, "[the appraisal] is anticipated to support in the future the outstanding loan balance and provides sufficient value to mitigate the effects of adverse shifts in real estate values." The mortgage broker or correspondent will order the appraisals and control the appraiser. Control over the appraiser by the broker or correspondent and the attendant pressure on the appraiser to appraise to a certain level is a key risk factor that was not adequately disclosed.

### RFC's Underwriting Standards

187.    The key originator for the Alt-A 2007-RAMP1 Trust was Residential Funding Company, LLC ("RFC"). The Prospectus Supplement for Alt-A 2007-RAMP1 Trust, dated March 1, 2007, stated:

> (a)    Most negotiated conduit asset program loans are evaluated by RFC to determine whether the characteristics of the loan, the borrower and the collateral, taken as a whole, represent a prudent lending risk. The factors considered include:
>
> - the mortgage loan's payment terms and characteristics;
>
> - the borrower's credit score; the value of the mortgaged property, which may be estimated using a broker's price opinion or a statistical valuation;
>
> - the credit and legal documentation associated with the loan; the seasoning of the loan;
>
> - an evaluation of the financial capacity, eligibility and experience of the seller and/or servicer of the loan; and
>
> - the representations and warranties made by the seller.

*Omitted Information*: RFC (a wholly owned subsidiary of Residential Capital, LLC, which is a wholly owned subsidiary of GMAC, LLC) did little to verify the documentation associated with these conduit loans. RFC is now attempting to recover for what it claims are fraudulent loans. Some of the conduit brokers have been accused of granting loans where the loan amount was $300,000 above the price of other loans in the area.

- 75 -

(b)     RFC expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.

***Omitted Information***: RFC failed to ensure that originators complied with applicable laws.  For this reason, RFC is now facing lawsuits for the extreme number of foreclosures in certain parts of the country, including Ohio.  Its conduit originators have been accused of predatory lending, including in Michigan.

### Home 123's Underwriting Standards

188.    One of the Trust's originators, Home 123 Corporation ("Home 123"), was an affiliate of New Century, which is no longer in business.  On April 2, 2007, New Century filed bankruptcy and Home 123 ceased operations.  Home 123 was a key originator for Trust Series 2007-AR3.  The Prospectus Supplement for the Alt-A 2007-AR3 Trust, dated April 30, 2007, concealed the following information about Home 123:

- Home 123 was aggressively granting mortgages to borrowers at or near 100% loan-to-value, even to those with poor credit.

- Home 123 had issued a larger amount of loans with initial "teaser" rates that would eventually lead to major problems for borrowers and investors in the mortgage-back certificates.

### Other Originators

189.    Each of the Trusts included mortgage loans from "various" other lenders.  The Alt-B 2007-AB1 Trust was made up entirely of these loans.  The Prospectus Supplement for the Alt-B 2007-AB1 Trust, dated April 13, 2007, represented that:

(a)     These alternative sets of underwriting criteria are designed to facilitate the loan approval process.  Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the Mortgage Loans in a timely fashion.  Permitted maximum loan to value ratios under these programs are generally more restrictive than those under the lender's standard "full" documentation programs.

*Omitted Information*: Alternative loan programs were not limited to borrowers who had demonstrated an ability and willingness to pay, but were widely granted by mortgage brokers who had used and abused the programs to place borrowers in loans where the mortgage loans exceeded the borrower's ability to pay over a long period of time.

> (b)     The adequacy of the mortgaged property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator.   The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.   Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

*Omitted Information*: Appraisals were of little reliability due to the pressures placed on appraisers to appraise to a certain value so that loans would close.  Appraisers knew if they did not appraise to certain levels they would not be hired by the broker or lender again.

> (c)     From time to time, exceptions to a lender's underwriting policies may be made.  Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter.  Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

*Omitted Information*: Exceptions were much more widely granted and frequently there was no "careful consideration" in granting exceptions.  Applications with reported income levels which could not be reconciled with the borrower's job title were routinely accepted with no questions by many lenders or brokers, including those originating loans for the Trusts.

**The Prospectus Supplements Misstated the True LTV
Ratios Associated with the Underlying Mortgages**

190.   The Prospectus Supplements contained detailed information about the LTV ratios of

the loans underlying the trusts.  In a series of charts, investors were provided with LTV ratio data,

including information about the number of loans containing LTV ratios within a given range.  The

following chart, taken from the Prospectus Supplement for the Alt-A 2006-AR-4 Trust is

representative of the type of LTV ratio information provided in the other Prospectus Supplements:

Original Loan-to-Value Ratios of the Initial Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding as of the Initial Cut-Off Date | % of Aggregate Principal Balance Outstanding as of the Initial Cut-Off Date |
|---|---|---|---|
| Less than or equal to 50.00 | 90 | $   23,314,925 | 2.26% |
| 50.01 - 55.00 | 25 | 7,175,351 | 0.70 |
| 55.01 - 60.00 | 59 | 23,203,856 | 2.25 |
| 60.01 - 65.00 | 103 | 46,611,370 | 4.53 |
| 65.01 - 70.00 | 425 | 125,054,412 | 12.14 |
| 70.01 - 75.00 | 218 | 106,896,758 | 10.38 |
| 75.01 - 80.00 | 1,957 | 662,979,111 | 64.38 |
| 80.01 - 85.00 | 16 | 3,760,289 | 0.37 |
| 85.01 - 90.00 | 74 | 19,641,352 | 1.91 |
| 90.01 - 95.00 | 49 | 11,207,955 | 1.09 |
| Total: | 3,016 | $1,029,845,378 | 100.00% |

***Omitted Information:*** As alleged above, the appraisals of the properties underlying the mortgage

loans were inaccurate and inflated.  These inflated appraisals and misleading sales price figures were

used to form the LTV ratios listed in the Prospectus Supplements.  Incorporating an inflated

appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For instance, as

described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the

LTV ratio is $90,000/$100,000 or 90 percent.  If, however, the appraised value of the house is

artificially increased to $120,000, the LTV ratio drops to just 75 percent ($90,000/$120,000).  Due to

- 78 -

the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts were safer and less risky than they really were.

**The Prospectus Supplements Misstated the Certificates' True Investment Rating**

191.    Each of the Prospectus Supplements provided a rating for the Certificates and/or stated that the Certificates would not be offered unless they receive a rating from a rating agency – such as Standard & Poor's Rating Services ("S&P"), Moody's Investors Services, Inc. ("Moody's"), or Fitch Rating – that was at least as high as those set forth in the Prospectus Supplements.  Moody's and S&P rated Certificates in each of the 14 Trusts.  In addition to the ratings provided by S&P and Moody's, Fitch Ratings provided ratings for two of the Trusts.  The overwhelming majority of the ratings set forth in the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB).

192.    ***Omitted Information***: The ratings stated in the Prospectus Supplements were based, as alleged below, on outdated assumptions, relaxed ratings criteria, and inaccurate loan information. These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they really were.

**The Models that Produced the Certificates' Ratings Were Based upon Outdated Assumptions Regarding Loan Performance**

193.    Moody's and S&P used models to produce the ratings for the Certificates.  These models were based upon loan performance ***prior*** to the year 2000.  However, an unprecedented decline and deterioration in mortgage lending standards occurred ***after*** 2000.  For instance, from 2001 through 2005: (i) the percentage of "sub-prime" mortgage loans tripled; (ii) the combined LTV ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" ARMs quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled;

(vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of loans including "silent seconds" – a nearly non-existent phenomenon a few years prior to the issuance of the Certificates – experienced over a 16,000% increase; and (ix) the volume of nontraditional mortgages more than quintupled.

194.     This decline in lending standards and an increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered Moody's and S&P's pre-2000 loan performance data obsolete.  However, these agencies did not update their models to reflect these changes.  Thus, by the time the agencies provided "investment grade" certifications to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

195.     Moody's and S&P continued to use these models even though more current and accurate models were available.  According to Frank Raiter ("Raiter") – the Managing Director and Head of RMBS Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000 (particularly Alt-A type loans).  These models better captured the changes in the post-2000 mortgage landscape and were, therefore, better at determining default risks posed by these new mortgages.  However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest ratings market share amongst the three major rating agencies).  As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  The current President of S&P, Deven Sharma, agreed, noting "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . .  [E]vents

- 80 -

have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

196.    Executives at Moody's also acknowledged a lack of investment in Moody's rating models and the failure of Moody's rating models to capture the deterioration in lending standards.  In an internal e-mail, Raymond McDaniel ("McDaniel"), the current Chairman and Chief Executive Officer of Moody's, noted that a lack of investment in updating the rating models can put ratings' accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment." McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.  Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decline in underwriting standards]."

197.    Not only were Moody's and S&P's models based on outmoded data, but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And in some instances real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor rating agency.

**The Rating Agencies' Relaxing of Ratings Criteria Led to Artificially High Ratings for the Certificates**

198.    In addition to using flawed models to generate ratings, Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  This easing of ratings standards was due in large part to the fact that rating agencies like Moody's and S&P were compensated by the very entities that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings.  As former S&P Managing Director, Richard Gugliada ("Gugliada"), explained, the easing

of standards as a "*market-share war where criteria were relaxed*" and admitted "*I knew it was wrong at the time . . . [i]t was either that or skip the business*. That wasn't my mandate. My mandate was to find a way. Find the way." According to Gugliada, when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher ("Tesher"), said "Don't kill the golden goose." This comment reflected Tesher's belief that if S&P implemented more stringent rating criteria than its competitors (and thereby began assigning lower ratings to investments that it rated), then entities that needed their investments rated – such as the defendants herein – would avoid S&P. Instead, these entities would seek ratings from S&P's competitors who, because they had weaker rating criteria, would assign a higher rating to the investment.

199.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to the Trusts:

Shah: btw – that deal is ridiculous

Mooney: i know right . . . **[model def does not capture half of the rish [sic]]**

Mooney: *risk*

Shah: *we should not be rating it*

Mooney: *we rate every deal*

Mooney: *it could be structured by cows and we would rate it*

Shah: but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

200.    In another e-mail, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager and stated that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters*."

201.    The loosening of ratings criteria due to market share considerations was evident at Moody's also.  Jerome Fons ("Fons"), a former Managing Director for Credit Quality at Moody's, indicated that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

202.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "***typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality***."  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "***prevented analysts from putting investor interests first***."

203.    McDaniel of Moody's also acknowledged the degradation of ratings standards.  In a presentation to Moody's Board of Directors in October 2007, McDaniel told his Board "The real problem is not that the market . . . underweight[s] ratings quality but rather that in some sectors, it actually penalizes quality. . . .  It turns out that ***ratings quality has surprisingly few friends***."  He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the amount of a mortgage deal that was rated triple-A after its client complained and said it might go with a different rating firm.

- 83 -

204.    As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, *Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter*."

**Due to Defects in the Underwriting Process, Inaccurate Data**
**was Entered into the Ratings Models Thereby Yielding Inaccurate Ratings**

205.    In addition to the eroding rating standards and the flawed rating models alleged above, Moody's and S&P's ratings were also based on inaccurate information.  The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that the defendants provided to them – including appraisal values, LTV ratios, and borrower credit-worthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As alleged above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective underwriting alleged herein.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence was performed.  During a "Town Hall Meeting" hosted by Moody's McDaniel, executives at Moody's acknowledged that the Rating Agencies used inaccurate data to form their ratings:

> "We're on notice that a lot of things that we relied on before just weren't true . . . [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law.  We know that's a lie."

*        *        *

> "There's a lot of fraud that's involved there, things that we didn't see . . . We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis."

*        *        *

"[W]e're being asked to figure out how much everyone lied. . . . [If] all of the information was truthful and comprehensive and complete, we wouldn't have an issue here.

        \*      \*      \*

What we're really being asked to do is figure out how much lying is going on and bake that into a credit [rating] . . . which is a pretty challenging thing to do.  I'm not sure how you tackle that from a modeling standpoint.

206.    In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's subprime ratings leading to massive downgrades and potential more downgrades to come?  We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that ***we had blinders on and never questioned the information we were given***.  Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan?  As for #2, ***it is our job to think of the worst case scenarios and model for them***. . . . ***Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both***.

207.    Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk.  Certificates were given investment grade ratings when in reality they were not of investment grade quality.  As such, the statements regarding the ratings of the Certificates were false and misleading.

208.    The problems identified above were not disclosed to the public and resulted in artificially high ratings for the Certificates.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES

209.    Since the Certificates were issued, the ratings on Certificates within each of the Trusts have been downgraded.  In some instances, Certificates that received a rating of "AA" (the second

highest available) have fallen many notches and are now rated "C" (one of the lowest ratings and far below the threshold of "junk" status).

210.     These downgrades have occurred because the original ratings did not accurately reflect the risk associated with the assets underlying the Certificates.  Further, the delinquency rates on the underlying mortgage loans have skyrocketed.  **In each of the Trusts, the 60+ day delinquency rate is in excess of 25 percent** (the "60+ day delinquency rate" includes loans that are foreclosures, loans that are 60 days or more delinquent, and loans in which the real estate collateral was retaken by the lender).  The majority of the Trusts have 60+ day delinquency rates in excess of 33 percent.  In many of the Trusts, at least **one of every five loans has experienced foreclosure**. The massive foreclosure rates and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above.

211.     Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which Plaintiffs and members of the Class could dispose of them.  These diminutions in value and price have caused damages to the Plaintiffs and the Class.

**COUNT I**

**Violations of §11 of the 1933 Act**
**Against All Defendants**

212.     Plaintiffs repeat and re-allege the allegations set forth above as if set forth fully herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.  This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

213.    The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

214.    The Defendant Issuer is strictly liable to Plaintiffs and the Class for the misstatements and omissions complained of herein.

215.    The Individual Defendants signed the Registration Statement which was false due to the misstatements described above.

216.    Defendant Deutsche Securities was an underwriter of the Certificates and sold and marketed these investments to members of the Class.

217.    None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

218.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

219.    Deutsche Securities was the underwriter for the following issuances:

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR2

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-AR3

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR3

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-OA2

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR4

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-RAMP1

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5

Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB2

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR6

Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB3

Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-OA1

Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4

Deutsche Alt-A Securities Mortgage Loan          Deutsche Alt-B Securities Mortgage Loan
Trust, Series 2007-AR2                           Trust, Series 2007-AB1

220.     Plaintiffs acquired the Certificates pursuant and/or traceable to the Registration

Statement and Prospectus Supplements.

221.     Plaintiffs and the Class have sustained damages as the value of the Certificates has

declined substantially subsequent to the disclosures of defendants' misconduct.

222.     At the time of their purchases of the Certificates, Plaintiffs and other members of the

Class were without knowledge of the facts concerning the wrongful conduct alleged herein and

could not have reasonably discovered those facts prior to late fall of 2007.  Less than one year has

elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon

which this complaint is based to the time that Plaintiffs filed this complaint.  Less than three years

has elapsed between the time that the securities upon which this claim is brought were offered to the

public and the time Plaintiffs filed this complaint.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendant Deutsche Securities

223.     Plaintiffs repeat and re-allege the allegations above as if set forth fully herein.  For

purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be

construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based

solely on claims of strict liability and/or negligence under the 1933 Act.

224.     By means of the defective Prospectus Supplements, Defendant Deutsche Securities

promoted and sold the Certificates to Plaintiffs and other members of the Class.

225.     The Prospectus Supplements contained untrue statements of material fact, and

concealed and failed to disclose material facts, as detailed above.  Defendant Deutsche Securities

owed Plaintiffs and the other members of the Class who purchased the Certificates pursuant to the

Prospectus Supplements the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendant Deutsche Securities, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Supplements as set forth above.

226.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Prospectus Supplements at the time they acquired the Certificates.

227.    By reason of the conduct alleged herein, Defendant Deutsche Securities violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements sustained substantial damages in connection with their purchases of the Certificates.  Accordingly, Plaintiffs and the other members of the Class who hold the Certificates issued pursuant to the Prospectus Supplements have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to the defendant sued herein.  Class members who have sold their Certificates seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants, Deutsche Alt-A, and DB Structured Products, Inc.

228.    Plaintiffs repeat and re-allege the allegations above as if set forth fully herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

- 89 -

229.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants and Deutsche Alt-A.

230.    Each of the Individual Defendants was a control person of Deutsche Alt-A and of the Trusts by virtue of his/her position as a director and/or senior officer of Deutsche Alt-A.  The Individual Defendants were responsible for the preparation of the contents of the Registration Statement which incorporated by reference the statements in the Prospectus Supplements.

231.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

232.    Deutsche Alt-A was the Depositor and an Issuer for the offerings.  DB Structured Products, Inc. was the Sponsor for the offerings.  The defendants named herein were responsible for overseeing the formation of the Trusts as well as the operations of the Trusts, including routing payments from the borrowers to investors.

233.    Deutsche Alt-A and the Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such additional equitable/injunctive or other relief as deemed appropriate
by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  June 18, 2009                          COUGHLIN STOIA GELLER
                                                    RUDMAN & ROBBINS LLP
                                                 SAMUEL H. RUDMAN
                                                 DAVID A. ROSENFELD


                                                        */s/ David A. Rosenfeld*
                                          _____
                                                 DAVID A. ROSENFELD

                                                 58 South Service Road, Suite 200
                                                 Melville, NY  11747
                                                 Telephone:  631/367-7100
                                                 631/367-1173 (fax)

                                                 COUGHLIN STOIA GELLER
                                                    RUDMAN & ROBBINS LLP
                                                 THOMAS E. EGLER
                                                 SUSAN G. TAYLOR
                                                 JARRETT S. CHARO
                                                 655 West Broadway, Suite 1900
                                                 San Diego, CA  92101
                                                 Telephone:  619/231-1058
                                                 619/231-7423 (fax)

                                                 LABATON SUCHAROW LLP
                                                 CHRISTOPHER J. KELLER
                                                 PAUL J. SCARLATO
                                                 JONATHAN GARDNER
                                                 140 Broadway, 34th Floor
                                                 New York, NY  10005
                                                 Telephone:  212/907-0700
                                                 212/818-0477 (fax)

                                                 *Co-Lead Counsel for Plaintiffs*

- 91 -

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on June 18, 2009, I electronically filed the

following documents with the Clerk of the Court using the CM/ECF system, which will send

notification of such public filing to all counsel registered to receive such notice:

AMENDED COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE
SECURITIES ACT OF 1933

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD