UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MASSACHUSETTS BRICKLAYERS AND MASONS
TRUST FUNDS and THE PIPEFITTERS' RETIREMENT
FUND LOCAL 597, Individually and On Behalf of All
Others Similarly Situated,

                                    Plaintiffs,

                    v.

DEUTSCHE ALT-A SECURITIES, INC., et al.

                                    Defendants.

08 Civ. 3178 (LDW)

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   STATEMENT OF FACTS ..................................................................................... 3

    A.    The Certificates ................................................................................ 3

    B.    The Mortgage Pools ......................................................................... 6

    C.    The Plaintiffs.................................................................................... 6

    D.    The Allegations................................................................................ 7

III.  ARGUMENT ........................................................................................................ 8

    A.    Standard Of Review ......................................................................... 8

    B.    Plaintiffs Lack Standing................................................................... 8

        1.    Plaintiffs Lack Standing To Assert Any Claims With Respect To Twelve Of The Fourteen Offerings In Which They Did Not Purchase Certificates ...................................................................... 9

        2.    Plaintiffs Lack Standing To Assert Section 12(a)(2) Claims Because They Fail To Allege That They Purchased Their Certificates Directly In A Public Offering Or That Defendants Solicited Their Purchases .................... 11

    C.    Plaintiffs' Claims Under Sections 11 And 12 Are Time-Barred .............................. 12

        1.    Plaintiffs Had Inquiry Notice Of Their Allegations Relating To Borrowers' Income And Debt-to-Income Ratios .......................................... 14

        2.    Plaintiffs Had Inquiry Notice Of Their Allegations Relating To Appraisals ................................................................................... 15

        3.    Plaintiffs Had Inquiry Notice Of Their Allegations Relating To Other Lending Practices By The "Key Originators" ..................................... 16

        4.    Plaintiffs Had Inquiry Notice Of The Allegations Relating To Credit Ratings ................................................................................. 17

    D.    Plaintiffs Fail To Allege Material Misrepresentations.................................................. 18

        1.    The Complaint Fails To Allege That The Securitized Loans Were Affected By The Alleged Improper Loan Origination Practices .................... 18

i

2.   The Complaint Fails To Allege Any Material Misrepresentation Regarding The Characteristics Of The Securitized Loans ............................ 19

a.   Borrowers' Incomes And Debt-to-Income Ratios ............................ 19

b.   Appraisals And LTVs .................................................... 22

c.   Other Lending Practices By "Key Originators" ................................ 25

3.   The Offering Documents Accurately Disclose The Risk – And Sole Remedy For – Improperly Originated Loans ................................... 29

4.   The Complaint Fails To Allege Any Material Misstatement Concerning The Ratings Of The Certificates .................................. 31

E.   Plaintiffs Fail To State A Claim Under Section 15 ..................................... 33

IV.   CONCLUSION ............................................................................ 34

## TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ................................................................ *passim*

*Barnes v. Osofsky,*
    373 F.2d 269 (2d Cir. 1967).......................................................10

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................. *passim*

*Cross v. 21st Century Holding Co.,*
    No. 00 Civ. 4333, 2001 U.S. Dist. LEXIS 11189 (S.D.N.Y. Aug. 6, 2001) ..............13

*Dodds v. Cigna Sec. Inc.,*
    12 F.3d 346 (2d Cir. 1993).........................................................12

*ECA, Local 134 IEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009).......................................................32

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994).........................................................18

*GVA Mt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,*
    580 F. Supp. 2d 321 (S.D.N.Y. 2008)..........................................14

*Garber v. Legg Mason, Inc.,*
    537 F. Supp. 2d 597 (S.D.N.Y. 2008).........................................21

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................10, 11

*In re AOL Time Warner, Inc. Securities and "ERISA" Litigation,*
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)...........................................9

*In re Chaus Securities Litigation,*
    801 F. Supp. 1257 (S.D.N.Y. 1992).............................................12

*In re Cosi, Inc. Securities Litigation,*
    379 F. Supp. 2d 580 (S.D.N.Y. 2005)..........................................12

*In re Donald J. Trump Casino Securities Litigation,*
    7 F.3d 357, 377 (3d Cir. 1993) ....................................................21

*In re Flag Telecom Holdings, Ltd. Securities Litigation,*
   308 F. Supp. 2d 249 (S.D.N.Y. 2004)....................................................................32

*In re Global Crossing, Ltd. Securities Litigation,*
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)...............................................................10, 11

*In re Global Crossing Ltd., Securities Litigation,*
   No. 02 Civ. 910 (GEL), 2005 U.S. Dist. LEXIS 16228 (S.D.N.Y. Aug. 8,
   2005) ...............................................................................................................32, 33

*In re Merrill Lynch & Co. Research Reports Securities Litigation,*
   272 F. Supp. 2d 243 (S.D.N.Y. 2003).....................................................................7

*In re Morgan Stanley Tech. Fund Securities Litigation,*
   No. 02 Civ. 6153, 2009 WL 256005 (S.D.N.Y. Feb. 2, 2009) ..................................28

*In re N2K Inc. Securities Litigation,*
   82 F. Supp. 2d 204 (S.D.N.Y. 1999), *aff'd* 202 F.3d 81 (2d Cir. 2000) .....................26

*In re New York Community Bancorp, Inc., Securities Litigation,*
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) .......................................................................7

*In re NovaGold Resources Inc. Securities Litigation,*
   No. 08 Civ. 7041, 2009 U.S. Dist. LEXIS 47561 (S.D.N.Y. June 5, 2009)...............13

*In re Openwave System Securities Litigation,*
   528 F. Supp. 2d 236 (S.D.N.Y. 2007)...............................................................12, 13

*In re Progress Energy, Inc. Securities Litigation,*
   371 F. Supp. 2d 548 (S.D.N.Y. 2005).....................................................................24

*In re SCOR Holding (Switzerland) AG Litigation,*
   537 F. Supp. 2d 556 (S.D.N.Y. 2008).....................................................................13

*In re Sterling Foster & Co. Securities Litigation,*
   222 F. Supp. 2d 216 (E.D.N.Y. 2002) .....................................................................11

*In re U.S. West, Inc. Securities Litigation,*
   No. 02-2479, 2003 WL 21246539 (3d Cir. May 30, 2003) .......................................30

*In re Ultrafem Inc. Securities Litigation,*
   91 F. Supp. 2d 678 (S.D.N.Y. 2000)...................................................................11, 12

*J&R Marketing SEP v. General Motors Corp.,*
   549 F.3d 384 (6th Cir. 2008) ...................................................................................31

*Jackson National Life Insurance Co. v. Merrill Lynch & Co.*,
    32 F.3d 697 (2d Cir. 1994)..............................................................13

*Kane v. Wichita Oil Income Fund*,
    No. 90 Civ. 5714, 1991 WL 233266 (S.D.N.Y. Oct. 29, 2001) ..................................33

*Korwek v. Hunt*,
    646 F. Supp. 953 (S.D.N.Y. 1986), *aff'd*, 827 F.2d 874 (2d Cir. 1987) ....................15

*LC Capital Partners, LP v. Frontier Insurance Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003)..............................................................15

*Lavaggi v. The Republic of Argentina*,
    No. 04 Civ. 5068, 2005 WL 2072294 (S.D.N.Y. Aug. 25, 2005) ..............................11

*Lone Star Fund V, L.P. v. Barclays Bank PLC*,
    No. 08-cv-0261, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008) ..............................30

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)..................................................22

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)..............................................................22

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)..................................................26

*Pany v. Empire Blue Cross Blue Shield*,
    152 F.2d 67 (2d Cir. 1998)..............................................................31

*Pfeiffer v. Goldman, Sachs & Co.*,
    No. 02 Civ. 6912, 2003 WL 21505876 (S.D.N.Y. July 1, 2003) ..............................17

*Phillips v. Kidder, Peabody & Co.*,
    933 F. Supp. 303 (S.D.N.Y. 1996) ....................................................16

*Pinter v. Dahl*,
    486 U.S. 622 (1988)..................................................................11

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................32

*U.S. Secs. & Exch. Comm'n v. Universal Express, Inc.*,
    546 F. Supp. 2d 132 (S.D.N.Y. 2008)..................................................19

*Staehr v. Hartford Finance Services Group*,
    547 F.3d 406 (2d Cir. 2008)..................................................................7, 13, 16

*Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*,
    412 F.3d 103 (2d Cir. 2005)..........................................................................24

*Tabor v. Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008)..........................................................27

*W. R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)............................................................................9

*Warth v. Seldin*,
    422 U.S. 490 (1975).........................................................................................9

*White v. H&R Block, Inc.*,
    No. 02 Civ. 8965, 2004 WL 1698628 (S.D.N.Y. July 28, 2004) ................17

## STATUTES AND REGULATIONS

15 U.S.C. § 77(b)(3)(C) ..........................................................................................31

15 U.S.C. § 77k(a) ....................................................................................................8

15 U.S.C. § 77k(f)(1) ................................................................................................9

15 U.S.C. § 77m .....................................................................................................12

15 U.S.C. § 77l(a)(2) .................................................................................................8

17 C.F.R. § 229.512(a)(2) .......................................................................................10

17 C.F.R. § 229.1110 ................................................................................................5

17 C.F.R. § 229.1110(b) ..........................................................................................21

17 C.F.R. § 229.1111(a)(3) ......................................................................................26

17 C.F.R. § 229.1120 ..............................................................................................31

17 C.F.R. § 230.405 ................................................................................................32

17 C.F.R. § 230.436(g) ...........................................................................................31

**MISCELLANEOUS**

5 James Wm. Moore, et al., Moore Federal Practice § 26.63[1][b] (3d ed. 2008) ...........10

Defendants respectfully submit this memorandum of law in support their motion to dismiss the Amended Complaint with prejudice, pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(1) and 12(b)(6).

## I.    PRELIMINARY STATEMENT

Plaintiffs, purchasers of securities in just two pass-through residential mortgage-backed securities ("RMBS") offerings, have brought this putative class action under Sections 11, 12(a) and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of purchasers of certificates (the "Certificates") in those two offerings as well as twelve different RMBS offerings in which plaintiffs did not participate (collectively, the "Offerings"). Amended Complaint (the "Complaint" or "AC") ¶ 12. After the RMBS market declined in the wake of the 2007 real estate and credit crisis, plaintiffs initiated this action not against the lenders, mortgage brokers and appraisers about whose conduct they complain, but instead against various Deutsche Bank-related entities, each of which served a particular role in the Offerings. *See infra* II.A.[1] In fact, this action is one in a series of "cookie-cutter" actions filed by plaintiffs' counsel against a number of investment banks and their affiliates.[2] Those actions contain nearly identical allegations relating to improper lending practices allegedly employed by non-parties in originating loans that were securitized in the public offerings. In this action, plaintiffs claim that those alleged practices should have been disclosed, but were not, in the publicly-filed documents

---

[1]    Those entities are Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A"), Deutsche Bank Structured Products, Inc. ("DBSP") and Deutsche Bank Securities Inc. Plaintiffs also named as defendants former officers and directors of Deutsche Alt-A. *Id.* ¶¶ 15-20. Defendant Kevin P. Burns is not represented by the undersigned counsel.

[2]    *See City of Ann Arbor Employees Retirement Sys. v. Citigroup Mortgage Loan Trust Inc.*, No. 08-cv-01418 (E.D.N.Y.) (Wexler, J.); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 08-cv-10783 (S.D.N.Y.); *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, No. 09-cv-02137 (S.D.N.Y.); and *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance*, No. 08-cv-10446 (D. Mass.).

for the Offerings (the "Offering Documents").  Plaintiffs do not allege, however, that any particular loans securitized in the Offerings were affected by these lending practices.

Plaintiffs' attempt to plead violations of the Securities Act for all fourteen Offerings against the defendants here fails on the face of the Complaint for at least *four* independent reasons:

1. *Plaintiffs Lack Standing*:  Plaintiffs do not have standing to assert Section 11 claims with respect to the twelve Offerings in which they did not purchase securities.  Moreover, plaintiffs do not have *any* standing to assert claims under Section 12(a)(2) because they have not alleged that they purchased the securities in public offerings (rather than in the secondary markets) or directly from defendants. *See infra* III.B.

2. *Plaintiffs' Claims Are Barred By The Statute Of Limitations*:  The alleged lending practices that plaintiffs speculate affected the loans securitized in the Offerings were well-publicized, and thus put plaintiffs on inquiry notice of their allegations, more than one year prior to the filing of the original complaint in this matter on June 27, 2008.  Accordingly, their claims are time-barred pursuant to Section 13 of the Securities Act. *See infra* III.C.

3. *Plaintiffs Have Not Pled A False Statement*:  First, as a matter of law, plaintiffs are not entitled to speculate, as they have, that alleged general practices in the industry affected the loans securitized in the Offerings.  Second, plaintiffs have not provided sufficient factual support to suggest that any of the disclosures in the Offering Documents were false or misleading.  Indeed, the very risks plaintiffs claim should have been disclosed in fact were disclosed.  Third, the Offering Documents accurately disclosed that the contractual remedy for the inclusion of loans affected by the alleged practices in an Offering is for Deutsche Alt-A to repurchase or substitute

those loans.  Because plaintiffs have not alleged that Deutsche Alt-A has failed to honor its

contractual obligations, they have not pled any actionable misrepresentations.  *See infra* III.D.

      4.  *Plaintiffs Have Not Pled Control Person Liability*:  Plaintiffs' Section 15 claim for

"control person" liability fails both because plaintiffs have not alleged a primary violation under

Sections 11 and 12(a)(2) and because plaintiffs fail to allege sufficiently any conduct evidencing

"control."  *See infra* III.E.

      For all of these reasons, each as set forth more fully below, the Complaint should be

dismissed with prejudice.

## II.  STATEMENT OF FACTS

### A.  The Certificates

      This action concerns fourteen trusts (AC ¶ 12), which issued over $13 billion worth of

Certificates.  *See* Ex. 1.[3]  The Certificates are asset-backed securities that entitle an investor to

receive periodic payments from a defined pool of assets – here, residential mortgage loans.  AC

¶¶ 4, 44.  The following table contains basic information about the Certificates issued in the

fourteen Offerings taken from the Prospectus Supplements and the Complaint:

---

[3]    References to "Ex. __" are to the Exhibits to the accompanying Declaration of Joseph M. Salama, dated
August 14, 2009 ("Salama Decl.").

| Offering | Closing Date (On or About) | Initial Certificate Balance (Face Value of Certificates Offered) | # of Mortgage Loans in Collateral Pool | Unpaid Principal Balance of Loans in Collateral Pool | Face Value Purchased by Plaintiffs |
|---|---|---|---|---|---|
| 2006-AB2 | 05/30/06 | $567,509,000 | 2,707 | $572,663,509 | $0 |
| 2006-AB3 | 06/30/06 | $431,983,000 | 2,063 | $435,688,043 | $0 |
| 2006-AB4 | 09/29/06 | $1,108,720,000 | 5,428 | $1,118,789,111 | $140,000 |
| 2006-AR2 | 06/30/06 | $443,392,000 | 1,908 | $449,003,247 | $0 |
| 2006-AR3 | 07/31/06 | $1,198,285,000 | 3,886 | $1,202,494,506 | $0 |
| 2006-AR4 | 09/29/06 | $1,112,812,000 | 3,016 | $1,029,845,378 | $0 |
| 2006-AR5 | 10/31/06 | $1,429,880,808 | 5,488 | $1,313,342,326 | $800,000 |
| 2006-AR6 | 12/15/06 | $1,757,928,000 | 5,565 | $1,764,105,675 | $0 |
| 2006-OA1 | 12/29/06 | $637,716,000 | 1,597 | $640,920,701 | $0 |
| 2007-AB1 | 04/13/07 | $516,039,670 | 2,048 | $524,430,265 | $0 |
| 2007-AR2 | 02/28/07 | $897,805,000 | 2,894 | $900,958,406 | $0 |
| 2007-AR3 | 04/30/07 | $2,358,038,000 | 6,536 | $823,716,468 | $0 |
| 2007-OA2 | 03/30/07 | $442,811,000 | 1,239 | $447,736,948 | $0 |
| 2007-RAMP1 | 02/27/07 | $259,804,000 | 1,303 | $262,959,537 | $0 |
|  |  |  |  |  |  |
| TOTALS |  | $13,162,723,478 |  | $11,486,654,120 | $940,000 |

The Certificates for each Offering are divided into "tranches" or classes. *Id.* ¶¶ 6, 39. Senior tranches receive mortgage proceeds first, while the junior or "subordinated" tranches are the first to absorb losses due to foreclosures or delinquencies of the underlying loans. *Id.* ¶ 39. Returns on the Certificates result from the mortgage loan payments and the "credit enhancements" that are written into the terms of the security. *Id.* ¶¶ 49-50. In addition to the "subordination" discussed above, other forms of credit enhancement include "overcollateralization" and "excess interest."[4]

---

[4]    "Overcollateralization" means that the underlying pool of loans is sufficiently large so that the expected

4

On May 1, 2006, Deutsche Alt-A registered the Certificates pursuant to a Shelf Registration Statement with a Base Prospectus filed with the Securities and Exchange Commission ("SEC") pursuant to Rule 415 of the Securities Act (the "Registration Statement" or "RS") *Id.* ¶¶ 2-3; Ex. 4, RS. For each individual Offering, Deutsche Alt-A also filed a unique prospectus supplement ("Prospectus Supplement" or "Pro. Supp.") that amended the Registration Statement. The Prospectus Supplements provided information about, among other things, the particular mortgage pools that were securitized and the underwriting practices of lenders that originated more than 20% of the loans in the pool (by volume) as required by Item 1110 of Regulation AB, 17 C.F.R. § 229.1110 (2008).[5] *See, e.g.,* Ex. 17, Pro. Supp., 2006-AB4 at LW031, 033.[6] The Registration Statement, Base Prospectus and the Prospectus Supplements comprise what has been defined herein as the "Offering Documents."

None of the defendants originated any of the loans that were securitized in the Offerings. Instead, various non-party lenders originated the loans pursuant to their own underwriting guidelines, which were described in the Prospectus Supplements. DBSP in turn, as the "sponsor" for the Offerings, purchased the mortgage loans from the various originators and pooled them to be securitized by the "depositor," Deutsche Alt-A. AC ¶¶ 14, 29, 42-43.

---

principal payments from the loans exceed the monthly principal distributions to Certificate holders. *See, e.g.,* Ex. 17, Pro. Supp., 2006-AB4 at LW010-11. "Excess interest" refers to the difference between the interest paid on the underlying loans and the interest on the Certificates. *See. e.g.,* Ex. 8, Pro. Supp., 2006-AR5 at 2. The excess principal and interest amounts are available to offset losses that otherwise would be absorbed by the Certificates. *See, e.g.,* Ex. 17, Pro. Supp., 2006-AB4 at LW010-11.

[5]    The Complaint identifies nine so-called "key originators" that it alleges originated loans securitized in the Offerings: American Home Mortgage Corporation ("AHM"), MortgageIT, Inc. ("MortgageIT"), Countrywide (Home Loans, Inc. (Countrywide), IndyMac Bank, F.S.B. ("IndyMac"), GreenPoint Mortgage Funding, Inc ("GreenPoint"), Impac Funding Corporation ("Impac"), Ohio Savings Bank ("OSB"), Residential Funding Company, LLC ("RFC"), and Home 123 Corporation ("Home 123"). *See* AC ¶¶ 37, 43, 80, 93, 96, 158, 179, 184, 186-188. All of these entities, except for Home 123, originated 20% or more of the loans in at least one of the offerings at issue.

[6]    Prospectus Supplements are issued by the various Deutsche Alt-A or Deutsche Alt-B Securities Mortgage Loan Trusts identified in Paragraph 12 of the Amended Complaint. For ease of reference, any citation to a

Deutsche Alt-A then, in turn, deposited the loans into a special purpose vehicle, an issuing trust, in exchange for the Certificates. *Id.* ¶¶ 11, 29, 42-43.  Plaintiffs allege that DBSP also was responsible for negotiating the principal securitization transaction documents and participating with DBSI, the underwriter, to structure the transactions and to sell the certificates to investors. *Id.* ¶¶ 14, 43.

Standard & Poor's, Moody's Investors Services, Inc., and Fitch Ratings rated the Certificates. *Id.* ¶¶ 191, 193.

### B.   The Mortgage Pools

Each offering of certificates is backed by a separate pool of loans. *Id.* ¶¶ 3, 38.  The relevant pools predominantly were comprised of "Alt-A" or "Alt-B" loans rather than subprime mortgage loans.  These loans have a higher risk profile than "prime" loans because of "higher LTV, higher debt-to-income ratios or inadequate documentation of the borrower's income and assets/reserves." [7] *Id.* ¶¶ 32-33.  Each Prospectus Supplement includes extensive disclosures about the risks of the investments and pages of statistical data regarding the loans underlying that particular Offering. *See infra* III.D.3.

### C.   The Plaintiffs

Plaintiffs are "senior" Certificate holders.  Massachusetts Bricklayers and Masons Trust Funds ("Mass Bricklayers") asserts that it owns bonds in the A-1A tranche of the 2006-AB4 securitization, while The Pipefitters' Retirement Fund Local 597 ("Pipefitters") asserts that it owns bonds in the II-A tranche of the 2006-AR5 securitization.  (*See* Rosenfeld Decl. in Support of Motion for Appointment as Lead Plaintiff (Dkt. No. 18) ("Rosenfeld Decl."), Ex. A.)

---

particular Prospectus Supplement will use the convention, "Pro. Supp., [Series Number] at LW___."

[7]   Higher LTVs, or "loan-to-value" ratios, means less equity relative to the loan amount.  Higher debt-to-income ratios mean less borrower income to support the loan payments.

In mid-2007, real estate prices declined precipitously, causing both prices and transaction volumes in real estate-related securities to fall off markedly. *See, e.g.,* Ex. 90,  Edmund L. Andrews & Jeremy W. Peters, *Persistent Fear Drives Stocks Down Sharply*, N.Y. Times, Aug. 29, 2007, at A1.[8]  Subsequently, the Certificates were downgraded by the credit rating agencies. AC ¶ 209.  According to plaintiffs, the delinquency and foreclosures rates of the underlying mortgage loans have increased. *Id.* ¶ 210.  Nonetheless, plaintiffs do not allege that they failed to receive their periodic payments under the terms of the Offering Documents.[9]

**D.     The Allegations**

The Complaint alleges that the Offering Documents materially misrepresented the lending practices that were used to originate the loans underlying the Offerings in three principal ways:

1. *Borrowers' Incomes and Debt-to-Income Ratios.*  Lenders allegedly qualified borrowers for loans without obtaining documentation and/or verification of their incomes. *Id.* ¶¶ 4-5.  This, according to plaintiffs, allowed borrowers to inflate their stated incomes, which in turn resulted in the understatement of the "debt-to-income" ratios used to qualify borrowers. *Id.* ¶¶ 61, 65, 102-03, 114, 128, 157.

---

[8]     In considering  a motion to dismiss, the Court properly may consider not only the allegations of the Complaint, but also materials relied upon in the Complaint, as well as facts of which judicial notice may be taken, such as regulatory filings, press coverage, prior lawsuits and other information in the public domain. *See Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 425, 432 (2d Cir. 2008) (court may take judicial notice that "press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters"); *In re New York Community Bancorp, Inc., Secs. Litig.*, 448 F. Supp. 2d 466, 476 (E.D.N.Y. 2006); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250-52, 265 (S.D.N.Y. 2003).

[9]     The publicly available monthly reports distributed to Certificate holders (upon which the Complaint apparently relies (AC ¶¶ 53, 210)), show that plaintiffs continue to receive monthly distributions of principal and interest due to them and that approximately 26.2% of the tranche held by Mass. Bricklayers and approximately 72.8% of the tranche held by Pipefitters has been paid down through monthly distributions. *See* Exs. 19 and 20, July 27, 2009 Master Servicer Wells Fargo Bank N.A. remittance reports.  In addition, Mass. Bricklayers has admitted that it sold the majority of its bonds for a profit in July

2. *Appraisals.* Appraisals performed when some loans were originated allegedly were inflated. *Id.* ¶¶ 4-5, 66-79, 92, 95, 144-156, 169, 171-73, 175-178, 183, 189, 205. As a consequence, plaintiffs claim that the LTVs for such loans were inflated. *Id.* ¶¶ 4, 66-79, 144-45, 183, 190, 205.

3. *Other Lending Practices.* Lenders generally engaged in other practices that resulted in allegedly imprudent loans, such as qualifying borrowers for adjustable rate mortgages ("ARMs") based on the initial interest rate, rather than a higher rate that might apply in the future, or originating loans outside the guidelines of their loan programs. *Id.* ¶¶ 4-5, 59-60, 83, 86, 91, 97, 104-08, 113, 159.

In addition, the Complaint alleges that the Offering Documents materially misrepresented the ratings of the Certificates by failing to disclose that the rating agencies used outdated assumptions in their rating models, relaxed their rating criteria over time and used inaccurate data regarding the underlying loans. *See id.* ¶¶ 193-207.

## III.   ARGUMENT

### A.      Standard Of Review

Plaintiffs allege claims under Sections 11, 12(a)(2) and 15 of the Securities Act. Section 11 imposes liability for a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability for "a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). Section 15

---

2007 and retains bonds with an alleged face value of only $47,030.94. *See* Rosenfeld Decl., Ex. A, at 3.

imposes joint and several liability on persons who control persons who violate Sections 11 and 12. 15 U.S.C. § 77k(f)(1). Plaintiffs must satisfy the pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure with respect to all of their claims.

The Supreme Court recently clarified that, in applying Rule 8(a), a court must disregard legal conclusions, including "legal conclusion[s] couched as . . . factual allegation[s]." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Once the true factual allegations are distilled, a court should consider whether those allegations are sufficient to state a "plausible" claim for relief. *Iqbal*, 129 S. Ct. at 1949-50. "Plausibility" requires more than just "a sheer possibility that a defendant has acted unlawfully." *Id.* at 1951 (quoting *Twombly*, 550 U.S. at 570). Rather, the plaintiff must "plead[] *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Id.* (emphasis added). A complaint that pleads facts that are "'merely consistent' with a defendant's liability . . . 'stops short of the line between possibility and plausibility.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

**B.      Plaintiffs Lack Standing**

      **1.      Plaintiffs Lack Standing To Assert Any Claims With Respect To Twelve Of The Fourteen Offerings In Which They Did Not Purchase Certificates**

Standing is a constitutional requirement and a "threshold question in every federal case[.]" *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). "At the pleading stage, the plaintiff bears the burden of clearly . . . alleg[ing] facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute." *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 245 (S.D.N.Y. 2004) (citation and internal quotation marks omitted).

To establish standing in a putative class action brought under the Securities Act, "*a named plaintiff must have purchased shares traceable to the challenged offering.*"  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (emphasis added) ("*Global Crossing I*"); *see also Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967); *see also Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) ("The standing question is antecedent to the class certification issue to the extent that a court can only certify a class for claims over which it has power"); 5 James Wm. Moore et al., Moore's Federal Practice § 26.63[1][b] (3d ed. 2008) ("When no named representative has standing at the time the suit is brought, the court should dismiss the suit for lack of jurisdiction notwithstanding the class allegations").

Here, plaintiffs admit that they purchased Certificates with respect to only two of the fourteen Offerings listed in the Complaint.  *See* AC ¶¶ 10, 12.  Thus, they cannot assert any claims, irrespective of whether they are styled as putative class claims, concerning the twelve Offerings in which they did not participate.

Plaintiffs cannot generate standing by pointing to the fact that the Prospectus Supplements for each Offering incorporated the same Registration Statement (*see id.* ¶ 3).  Each Prospectus Supplement constitutes a post-effective amendment to the original Registration Statement and is "deemed to be a new registration statement relating to the securities offered therein."  17 C.F.R. § 229.512(a)(2).  Each of the fourteen Offerings, therefore, is subject to a separate "registration statement" consisting of the Registration Statement, Base Prospectus and the applicable Prospectus Supplement.

In addition, plaintiffs base their claims on the disclosures made in the Prospectus Supplements, not the Registration Statement.  *See, e.g.,* AC ¶¶ 80-192.  It is the Prospectus Supplements that describe the loans in each Offering and the underwriting standards of the

10

lenders that originated the loans. *Compare* Ex. 17, Pro. Supp., 2006-AB4 *with* Ex. 8, Pro. Supp.,

2006-AR5. Plaintiffs do not claim any injury traceable to the disclosures in the Prospectus

Supplements for the twelve Offerings for which they did not purchase Certificates. *See Hoffman*,

591 F. Supp. 2d at 530-31 (finding that plaintiffs did not meet the injury requirement for funds in

which they had not purchased shares because they could not claim to be personally injured by the

violations relating to those funds); *see also Lavaggi v. The Republic of Argentina*, No. 04 Civ.

5068, 2005 WL 2072294, at *2 (S.D.N.Y. Aug. 25, 2005) (finding that plaintiff lacked standing

to assert claims on behalf of a class regarding bonds that he did not own); *Global Crossing I*, 313

F. Supp. 2d 189 at 207 (finding that plaintiffs lacked standing when they failed to purchase

shares traceable to the challenged offering).[10]

Because plaintiffs have failed to allege that they purchased Certificates for twelve of the

fourteen Offerings at issue, the Securities Act claims with respect to those twelve Offerings

should be dismissed.

### 2.     Plaintiffs Lack Standing To Assert Section 12(a)(2) Claims Because They Fail To Allege That They Purchased Their Certificates Directly In A Public Offering Or That Defendants Solicited Their Purchases

To have standing to assert a claim under Section 12(a)(2), plaintiffs must plead that

(1) they purchased their securities directly from the defendant they seek to sue; or (2) the

defendant successfully solicited the plaintiffs to purchase the securities for financial gain. *Pinter*

*v. Dahl*, 486 U.S. 622, 642, 647 (1988); *see also In re Sterling Foster & Co. Secs. Litig.*, 222 F.

Supp. 2d 216, 244-45 (E.D.N.Y. 2002) ("purchasers in private or secondary market offerings are

precluded from bringing actions under Section 12(a)(2)").

---

[10]    Here the standing issue is underscored by the fact that the named plaintiffs allege various misrepresentations about the underwriting practices of the "key originators." Yet, neither of the named plaintiffs purchased securities in Offerings in which Countrywide, MortgageIT, Impac, OSB, RFC and Home 123 were "key originators." *See* AC ¶¶ 95-157 (Countrywide), *id.* ¶¶ 93-95 (MortgageIT), *id.*

Here, plaintiffs have not alleged either of the *Pinter* requirements.  Instead, they allege only that they purchased the Certificates "pursuant and/or traceable to the Registration Statement and Prospectus Supplements."  AC ¶ 220; *see also id.* ¶ 1.  Such an allegation is insufficient to establish standing under Section 12(a)(2).  *See In re Cosi, Inc. Sec. Litig.,* 379 F. Supp. 2d 580, 588-90 (S.D.N.Y. 2005); *In re Ultrafem Inc. Sec. Litig.,* 91 F. Supp. 2d 678, 693-94 (S.D.N.Y. 2000).  Accordingly, plaintiffs' Section 12(a)(2) claim must be dismissed.

## C.    Plaintiffs' Claims Under Sections 11 And 12 Are Time-Barred

Pursuant to Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m, actions brought under Sections 11 or 12(a)(2) must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  "[I]n order to satisfy Section 13, the complaint must set forth: (1) the time and circumstances of the discovery of the [alleged false] statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery."  *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).  Although plaintiffs conclusorily assert that they "could not have reasonably discovered . . . facts prior to late fall of 2007," (AC ¶ 222), they plead no *facts* to support that conclusory allegation.  For this reason alone, the Complaint should be dismissed.  *See Iqbal*, 129 S. Ct. at 1950-52; *Twombly*, 550 U.S. at 570.

Moreover, plaintiffs cannot satisfy the requirements of Section 13 because publicly available information placed plaintiffs on inquiry notice of their purported claims more than one year before they filed suit.  "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge

_____

¶¶ 184-85 (Impac), *id.* ¶ 186 (OSB), *id.* ¶ 187 (RFC), and *id.* ¶ 188 (Home 123).

will be imputed to the investor who does not make such an inquiry." *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 350 (2d Cir. 1993); *see also In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007) (inquiry notice is triggered when a plaintiff has "notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge") (citations omitted). Plaintiffs "need not have notice of the full extent of the fraud or misstatements . . . . Knowledge of facts giving rise to a duty of inquiry into a portion of the fraud or misstatements is sufficient." *Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333, 2001 U.S. Dist. LEXIS 11189, at *17-18 (S.D.N.Y. Aug. 6, 2001) (citations omitted).[11]

In a Securities Act case, the circumstances and information needed to place plaintiffs on inquiry notice relate only to the potential existence of the alleged misrepresentations or omissions. *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 580 (S.D.N.Y. 2008) (statute of limitations for Securities Act claims "begins to run when 'an investor was on notice that the registration statement or prospectus for the offering probably contained [actionable] misrepresentations'") (citations omitted); *see also In re NovaGold Resources Inc. Sec. Litig.*, No. 08 Civ. 7041, 2009 U.S. Dist. LEXIS 47561, at *36-37 (S.D.N.Y. June 5, 2009).

The original complaint in this case was filed on June 27, 2008, making June 27, 2007 the relevant date for determining whether plaintiffs had notice of their claims. Notably, the Complaint alleges only vaguely that "*[b]y mid 2007*, the truth about the mortgage loans that secured the Certificates began to be revealed to the public . . . ." (AC ¶ 7 (emphasis added)), and then cites to numerous sources that pre-date June 27, 2007. *See, e.g., id.* ¶ 74 (citing January

---

[11]   It is appropriate at the motion to dismiss stage to determine whether plaintiffs had inquiry notice. *See Staehr,* 547 F.3d at 412 (courts can "readily resolve the issue of inquiry notice as a matter of law on a motion to dismiss – as has been done in a vast number of cases in this circuit . . .") (citations omitted); *In re Ultrafem,* 91 F. Supp. 2d at 692 ("Dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves").

2007 report that appraisers were coerced by lenders). Indeed, a wealth of information underpinning plaintiffs' allegations was publicly available well before June 27, 2007. Accordingly, plaintiffs' claims are time-barred.[12]

### 1. Plaintiffs Had Inquiry Notice Of Their Allegations Relating To Borrowers' Income And Debt-to-Income Ratios

Plaintiffs allege that the Offering Documents failed to disclose that as a result of increasingly lax underwriting guidelines, loans were made with low or no documentation, also known as "liar loans." *See, e.g.*, AC ¶¶ 4-5, 58-65. This, according to the Complaint, allowed borrowers to inflate their income and resulted in an understatement of the debt-to-income ratio. *See id.* ¶¶ 4-5, 124, 157.

Beginning in 2005 and through June 27, 2007, however, the public record was saturated with reports and news articles that specifically mentioned "liar loans" or otherwise discussed lending to borrowers with low documentation, low creditworthiness or no ability to repay. *See* Salama Decl. ¶¶ 24-51 (citing Exs. 22-49); *see also In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, 272 F. Supp. 2d 243, 250-51, 265 (S.D.N.Y. 2003) (dismissing securities claim against Merrill Lynch based on alleged failure to disclose conflicts of interest in publication of analyst research reports because news articles generally discussing the existence of such conflicts put plaintiffs on inquiry notice). This issue also was the subject of government and regulatory investigations – as alleged in the Complaint – and was discussed at length in public Congressional hearings during the first five months of 2007. *See* AC ¶¶ 98-102, 110-18; *see also* Salama Decl. ¶¶ 35, 41, 43, 44, 47-49, 51 (citing Exs. 33, 39, 41, 42, 45-47, 49); *see*

---

[12]   The disclosures in the Prospectus Supplements also put plaintiffs on inquiry notice at the time of their investments. *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 702 (2d Cir. 1994) (holding that contents of the prospectus and offering memorandum gave plaintiffs notice of facts that "would . . . raise major questions in the mind of a reasonable investor, and therefore . . . trigger the duty of inquiry"). Those disclosures are discussed at length below. *See* Section III.D. *infra.*

*also GVA Mt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 328-29 (S.D.N.Y. 2008) (dismissing securities claim against hedge fund and related entities because SEC and New York Attorney General investigations of funds and individuals involved, as well as other funds, represented "storm warnings" sufficient to put plaintiff on inquiry notice); *Korwek v. Hunt*, 646 F. Supp. 953, 958-59 (S.D.N.Y. 1986), *aff'd*, 827 F.2d 874 (2d Cir. 1987) (dismissing plaintiffs' antitrust and RICO claims when congressional hearings and filing of lawsuits covering some of the same defendants' activities put plaintiffs on inquiry notice).

> **2.**   <u>Plaintiffs Had Inquiry Notice Of Their Allegations Relating To Appraisals</u>

Plaintiffs also assert that the Prospectus Supplements failed to disclose that the underlying mortgage loans were based on allegedly inflated appraisals, which in turn led to alleged misstated LTV ratios. *See AC* ¶¶ 66-79. In support, plaintiffs themselves cite a *January 2007* report finding that appraisers were being coerced by lenders. *See AC* ¶ 74. This report also was widely covered in the press beginning in early 2007. *See* Salama Decl. ¶¶ 55, 58 (citing Exs. 53, 56). In addition, there were repeated and widespread pre-June 27, 2007 reports and media coverage, as well as statements and testimony by industry and government officials detailing the alleged pervasive use of inflated appraisals, appraiser conflicts of interest and misstated LTV ratios. *See* Salama Decl. ¶¶ 52-61 (citing Exs. 50-58). Accordingly, plaintiffs were on inquiry notice prior to June 27, 2007. *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (affirming district court's dismissal of plaintiffs' claim as time-barred because facts pled by plaintiffs represented "storm warnings" that gave rise to a "duty of inquiry" which plaintiffs did not make).

---

15

**3.**     Plaintiffs Had Inquiry Notice Of Their Allegations Relating To Other
Lending Practices By The "Key Originators"

In addition to the widespread coverage concerning the two most prominent allegations in

the Complaint – inflation of borrower income and appraisals – there also was more than ample

discussion in publicly-available materials concerning plaintiffs' less-featured allegations. *See*

Salama Decl. ¶¶ 63-98 (citing Exs. 23-25, 33, 40, 59-84).  For example, it was public knowledge

prior to June 27, 2007 that lenders did not evaluate the borrowers' ability to repay ARMs using

the "fully indexed" interest rate, but instead often used the lower initial rate. *See* AC ¶¶ 59, 104-

05; *see also* Salama Decl. ¶¶ 65, 67, 69, 70 (citing Ex. 59-62); AC ¶ 104 (citing a May 7, 2007

letter from Countrywide to the Office of Thrift Supervision disclosing that "borrowers who

obtained sub-prime hybrid ARMs [from Countrywide] would not have qualified at the fully

indexed rate" and that "25% of the borrowers would not have qualified for any other

[Countrywide] product").

Plaintiffs also allege that the Offering Documents contain false statements about the

underwriting practices of "key originators." *See id.* ¶¶ 80-189.  Preliminarily, there need not

have been public information about each "key originator" in order to place plaintiffs on inquiry

notice. *See Staehr*, 547 F.3d at 425, 432 ("[T]he more widespread and prominent the public

information" accessible to the plaintiffs, the "less company-specific the information must be" to

put plaintiffs on inquiry notice).   Nonetheless, there was such originator-specific public

information before June 27, 2007. *See* Salama Decl. ¶¶ 63, 66, 68, 69, 71, 72, 74-93, 95 (citing

Exs. 21, 23, 25, 33, 40, 61, 63, 64, 66-80, 82).  For example, it was publicly revealed that one of

the "key originators," Home 123 (a subsidiary of New Century), closed its lending businesses in

early 2007.[13]  *See Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 312 (S.D.N.Y. 1996)

(finding that plaintiffs were on inquiry notice based on bankruptcy of issuer and that if plaintiffs

had exercised reasonable diligence, they would have discovered the facts that supported their

claims); *see also* Salama Decl. ¶¶ 80, 87 (citing Exs. 69, 75).  Moreover, numerous lawsuits

relating to the plaintiffs' allegations were filed against "key originators" prior to June 27, 2007.

*See* Salama Decl. ¶¶ 68, 76, 79; *Pfeiffer v. Goldman, Sachs & Co.*, No. 02 Civ. 6912, 2003 WL

21505876, at *3-4 (S.D.N.Y. July 1, 2003) (dismissing securities claims as time-barred where

prior lawsuit with similar allegations triggered inquiry notice).  Plaintiffs even cite to one of

them in the Complaint.  *See* AC ¶ 178 (citing *Cedeno v. IndyMac Bancorp, Inc.*, No. 06 Civ.

6438 (S.D.N.Y. filed Aug. 25, 2006)).

> **4.**     Plaintiffs Had Inquiry Notice Of The Allegations Relating To Credit
> Ratings

Plaintiffs also allege that the Prospectus Supplements misstated the Certificates' true

investment rating because the credit rating agencies' models were based on outdated assumptions

and data, and the credit rating agencies were conflicted in order to capture more market share.

*See* AC ¶¶ 193-208.  These very same allegations were the subject of public announcements,

government inquiries and widespread media articles as early as January 2003.[14]  *See* Salama

Decl. ¶¶ 99-103 (citing Exs. 85-89); *see also White v. H&R Block, Inc.*, No. 02 Civ. 8965, 2004

---

[13]     The Offering Documents at issue also contained cautionary language regarding the financial difficulty of originators that put plaintiffs on inquiry notice: "In addition, numerous residential mortgage loan originators that originate subprime mortgage loans have recently experienced serious financial difficulties and, in some cases, bankruptcy . . . . The inability to repurchase the[] loans in the event of early payment defaults or breaches of representations and warranties may also affect the performance and market value of your securities."  Ex. 14, Pro. Supp., 2007-RAMP1 at LW023; *see also* Ex. 11, Pro. Supp., 2007-AR2 at LW022.

[14]     Plaintiffs' allegations that inaccurate data was fed into credit rating agencies' models are entirely derivative of their claims regarding the loans securitized in the Offerings.  Because plaintiffs were on inquiry notice of their allegations concerning the securitized loans, they also were on inquiry notice of their allegations concerning the impact of these loans on the credit ratings.

WL 1698628, at *6 (S.D.N.Y. July 28, 2004) (granting motion to dismiss plaintiffs' securities claim as time-barred because public information, including press reports, were clearly sufficient warnings to put "a reasonable investor or market professional" on inquiry notice).

Because plaintiffs had inquiry notice of their allegations one year before they brought this action, their claims are time-barred and must be dismissed.

### D.    Plaintiffs Fail To Allege Material Misrepresentations

Plaintiffs allege misrepresentations in fourteen different Offerings in which the total principal amount of securities issued exceeded $13 billion. *See* Ex. 1. Yet plaintiffs seek a pass into the discovery phase with nothing more than general allegations of industry-wide practices that, if sufficient here, would be sufficient without more to assert a claim with respect to *all* of the hundreds of billions of dollars of RMBS underwritten by any firm between 2006 and 2007.[15] As the Supreme Court explained in *Iqbal*, the stakes in cases like this simply are too high to allow a complaint built on speculation to "unlock the doors of discovery." *Iqbal*, 129 S.Ct. at 1950; *see also Twombly*, 550 U.S. at 558.

### 1.    The Complaint Fails To Allege That The Securitized Loans Were Affected By The Alleged Improper Loan Origination Practices

*Not one* allegation in the 233-paragraph Complaint relating to improper lending practices is tied to *any* of the loans securitized in the Offerings. Accordingly, each and every allegation in the Complaint requires the following four leaps of speculation:

a.    The specific originators identified in the Complaint used allegedly improper practices when issuing loans;

b.    Some of the allegedly affected loans were sold to DBSP;

---

[15]    As noted in Section III.C, *supra*, if plaintiffs' generalized, industry-wide allegations are sufficient to state a claim, then certainly they cannot dispute that the myriad public statements about these very practices were sufficient to put them on inquiry notice more than a year prior to bringing this action.

18

c.      Some of the allegedly affected loans sold to DBSP were securitized in each of the Offerings; and

d.      The allegedly affected loans were material to each of the Offerings.

A complaint which required the Court to make just one of these speculative leaps to reach a "plausible claim" would be deficient under *Twombly* and *Iqbal*. *See, e.g., Twombly*, 550 U.S. at 555; *Iqbal*, 129 S. Ct. at 1950. The combination of all four is fatal. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (rejecting "unsupported claims regarding the 'actual' value of the collateral properties when the loans were made" because "[u]nder Rule 12(b)(6) . . . unwarranted deductions of fact are not admitted") (citations omitted).[16] For this reason alone, the Complaint should be dismissed.

2.      The Complaint Fails To Allege Any Material Misrepresentation Regarding The Characteristics Of The Securitized Loans

a.      Borrowers' Incomes And Debt-to-Income Ratios

The Complaint alleges that the Offering Documents falsely represent that the loan originators required borrowers to supply documentation evidencing their claimed level of income and that the originators independently verified those claims. *See, e.g.,* AC ¶¶ 5, 58-65, 92, 97, 157, 183, 185, 187. Plaintiffs allege that the originators failed to do these things and, as a result, borrowers were able to overstate their incomes and that the borrowers' "debt-to-income" ratios were understated. *Id.* ¶¶ 4, 61-62.

---

[16] To the extent plaintiffs seek to imply from the diminution in the trading value of the Certificates that a material amount of loans affected by the alleged underwriting practices were included in the Offerings, their claim is no less speculative. The Court may take judicial notice of the fact that the housing, credit and job markets all have experienced grave disruption over the last two years. *See U.S. Secs. & Exch. Comm'n. v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 137 n.7 (S.D.N.Y. 2008) (finding that court can take judicial notice of industry or economic downturns, including "widespread decline in property values over the past year"). Against this backdrop, the decline in the trading value of the Certificates does not make plaintiffs' allegations any more plausible.

The bulk of the securitized loans were the types described in the Complaint as "Alt-A" loans. The Complaint itself explains that the "most distinctive attribute [of 'Alt-A' loans] is that borrowers *are not required to provide supporting documentation with their applications*." *Id.* ¶ 52 (emphasis added). Indeed, plaintiffs admit that the Offering Documents "represent[ed] that some of the loans underlying the Certificates were loans made to borrowers whose documentation was not subject to quite as rigorous a set of standards as other borrowers." *Id.* ¶ 57; *see also id.* ¶ 31 ("Borrowers with higher FICO scores are able to receive loans with less documentation during the approval process, as well as higher loan-to-value ("LTV") ratios"); *id.* ¶ 33 ("'low doc' or Alt-A loan[s]" are issued to borrowers that are "unable to supply supporting documentation of [their] financial health" and have an increased risk profile because of "higher LTV, higher debt-to-income ratios or inadequate documentation").[17]

In fact, each individual Prospectus Supplement disclosed the quantity of loans originated under programs such as "Stated Documentation," "No Documentation," "No Ratio,"[18] and "Full Documentation." *See, e.g.*, Ex. 17, Pro. Supp., 2006-AB4 at LW027. In the fourteen Offerings, the value of the loans originated with "full documentation" ranged from 4.8% to 19.7% (as a percentage of the total unpaid principal balance of the Offering). *See* Ex. 2. The value of all

---

[17]    The description of Alt-A loans in Paragraph 33 of the Complaint directly undermines the conclusory allegation in Paragraph 63 that the Offering Documents failed to disclose that lenders placed borrowers "with high loan to value ratios, low credit scores, and stated income that was not reasonable" in reduced documentation programs. The allegation is further undermined by the fact that each Prospectus Supplement disclosed the number and dollar volume of securitized loans originated under each type of program, as well as detailed data relating to the loan-to-value ratios and borrower credit scores for the same loans. *See, e.g.*, Ex. 5, Pro. Supp., 2006-AR2 at LW005 (disclosing range and average for LTVs and FICO scores), LW016 (disclosing other statistics for LTVs and FICO scores), LW021-23 (disclosing detailed statistics for loan type, LTVs and FICO scores).

[18]    As explained in the Offering Documents, a "no ratio" loan program is one that "does not require prospective borrowers to provide information regarding their income." *See* Ex. 8, Pro. Supp., 2006-AR5 at LW064.

20

other loans (*i.e.*, those loans originated with less than "full documentation") ranged from 80.3%

to 95.2%.  *See id.*

Finally, each Prospectus Supplement includes a description of the underwriting practices

of any originator of more than 20% of the loans (by dollar volume) in the Offering.  Those

disclosures invariably describe loan programs in which income is not verified and documentary

support is not required.  For example, the Offering Documents disclosed the following about

AHM's Alt-A loan programs:

> For [some] Alt-A products the borrower may not be required to
> verify employment income, assets required to close or both.  For
> some other Alt-A products the borrower is not required to provide
> any information regarding employment income, assets required to
> close or both.

Ex. 4, RS at S-53; *see also* Ex. 8, Pro. Supp., 2006-AR5 at LW062.  Against the backdrop of

these disclosures, the originators' practice of making loans with little or no documentation or

verification of borrowers' incomes was a known risk that plaintiffs accepted.[19]

Moreover, the Offering Documents were not required to spell out the natural potential

consequences of lending to borrowers without documentation or verification of income.  The

federal securities laws do not require defendants to "alert investors to the obvious implications"

of facts already available.  *In re Donald J. Trump Casino Secs. Litig.*, 7 F.3d 357, 377 (3d Cir.

1993); *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612-13 (S.D.N.Y. 2008)

("Any reasonable investor would know" that employees might change jobs following a

reorganization).   Thus, plaintiffs' conclusory allegations that borrowers lied on applications and

that lenders steered borrowers with insufficient income to the programs that did not require a

---

[19]     A table setting forth the analogous disclosures for Countrywide, Mortgage-It, Indymac, Greenpoint, Impac,
OSB and RFC is contained in Ex. 3.  That table also quotes the relevant excerpts from the Prospectus
Supplement for Deutsche Alt-A 2007-AB1, which are not specific to any particular lender because no
lender originated more than 20% of the loans underlying that Offering.  *See* Item 1110(b) of Regulation

statement or verification of income are insufficient to state a claim.  *See, e.g.*, AC ¶¶ 5, 59, 60, 65.[20]

Finally, the Complaint attempts to create the appearance of a misrepresentation by quoting and paraphrasing portions of the Offering Documents that discuss some originators' "full documentation" or similar programs.  *Compare id.* ¶¶ 58-59, 64 *with* Ex. 8, Pro. Supp., 2006-AR5 at LW061-67 ("generally describ[ing]" the underwriting procedures cited by plaintiffs before explaining requirements that were waived under programs not requiring full documentation).  "[T]he central issue," however, is "whether defendants' representations, *taken together and in context*, would have misled a reasonable investor about the nature of the [securities]."  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F. 3d 2, 5 (2d Cir. 1996) (emphasis added) (citation omitted); *see also Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007) ("[T]he prospectus must be read as a whole, not selectively or in a piecemeal fashion.").  Read as a whole, it is clear that the disclosures here were neither false nor misleading.

    b.  <u>Appraisals And LTVs</u>

The Complaint alleges that the appraisals of mortgaged properties were inflated and therefore, the calculations of the amount of the loans relative to the appraised values of the properties – the LTVs – were understated.  *See* AC ¶¶ 68, 75, 190.

In support of the claim that appraisals were inflated, plaintiffs offer three principal allegations:

---

AB, 17 C.F.R. § 229.1110(b); Ex. 18, Pro. Supp., 2007-AB1 at LW035.

[20] Plaintiffs' citation to the Mortgage Asset Research Institute's study concerning purported income inflation (AC ¶ 61), which was completed and published *two months before the May 1, 2006 Registration Statement*, demonstrates only that the disclosed risk about which plaintiffs complain was publicized *prior* to any of the Offerings.  *See* Ex. 91, Merle Sharick et al., Mortgage Asset Research Institute, Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers Assoc. (2006).

- Congressional testimony by Alan Hummel, Chair of the Appraisal Institute, that the dynamic between appraisers and originators "created a 'terrible conflict of interest' by which appraisers 'experience[d] systemic problems of coercion' and were 'ordered to doctor their reports' or else they would never 'see work from these parties again' and were 'placed on exclusionary or 'do-not-use' lists.'" AC ¶ 73.

- A 2007 survey by October Research Corp. of 1,200 appraisers that found that 90% of them were pressured by mortgage brokers and others and that 75% of them reported "'negative ramifications'" if they did not cooperate. *Id.* ¶ 74.

- Statements by three anonymous appraisers who claimed that they were pressured to inflate over 600 appraisals over an undefined period of time. *Id.* ¶¶ 76-79.

None of these allegations is sufficient to state a claim against defendants. *First*, not one of the allegations is specific to any loans securitized in the Offerings. Indeed, no defendant is mentioned in any of the relevant paragraphs in the Complaint. *See id.* ¶¶ 73-79. The only arguable connection between the allegations in the Complaint and the Offerings is that some of the anonymous appraisers mentioned inflating appraisals for loans originated by Countrywide and AHM. But those lenders originated *billions* of dollars of loans *each month* (*see id.* ¶ 85), a tiny fraction of which were securitized in the relevant Offerings.[21] The leap of inference required to bridge the gap between these generalized allegations about problems in the mortgage industry and a specific claim that plaintiffs were damaged here is simply too great. As pled, the Complaint does not remotely approach the line that divides pure speculation from plausibility. *See Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 557).[22]

---

[21]  For example, AHM originated 2,126 loans, totaling $418 million, in 2006-AB4, which is the largest amount originated by AHM in any Offering. Ex. 17, Pro. Supp., 2006-AB4 at LW028. In contrast, plaintiffs allege that AHM originated more than *ten times* that amount of loans *each month*. *See* AC ¶ 85.

[22]  Similar anecdotal allegations scattered throughout the Complaint likewise are unavailing. *See, e.g.*, AC ¶ 146 (alleging that appraisal company claimed that Countrywide sought to pressure it to increase appraisals, *but that it refused*); *id.* ¶¶ 152-53 (alleging inflated appraisals on mortgages issued by a joint venture of Countrywide *that is not alleged to have issued loans securitized in the Offerings*); *id.* ¶ 155

*Second*, neither Hummel's testimony nor the October Research Corp. 2007 survey indicates that appraisals *actually were* inflated and, if so, to what degree. To the contrary, Hummel testified that "I have said no to pressure. I've lost jobs; I haven't been paid; I've been threatened to be blacklisted if I didn't remove certain information." Ex. 58 (June 26, 2007 Oral Statement by Alan E. Hummel before the Senate Subcommittee on Housing, Transportation, and Community Opportunity). To infer from Hummel's statement that a significant number of appraisers possessed less moral fortitude (or fear of censure or license revocation) than Mr. Hummel is, again, pure speculation.[23]

*Third*, the "dynamic" that plaintiffs allege to be the source of coercion is one that was publicly discussed and known to investors well before these Offerings. Mr. Hummel testified before the House Committee on Financial Services in *May 2005* that coercion of appraisers by lenders and mortgage brokers was "common knowledge." Ex. 50 (May 24, 2005 Oral Statement by Alan E. Hummel to House Committee of Financial Services). Moreover, according to the Complaint, a *2004* study by the October Research Corp. revealed that *more than 45%* of appraisers reported experiencing pressure to inflate appraisals. AC ¶ 74. Plaintiffs cannot assert a claim based on facts that were well known prior to their purchase of the securities at issue. *See Starr ex rel. Estate of Sampson v. Georgeson S'holder Commc'ns*, 412 F.3d 103, 110 (2d Cir. 2005) (the "total mix of information" used to assess offering documents "includes all

---

(allegations regarding appraisals for Washington Mutual, *which is not at issue in this case*); *id.* ¶ 156 (alleging *single instance* where appraisal for Countrywide described three-bedroom house as having four bedrooms); *id.* ¶¶ 175-76 (allegations regarding inflated appraisals at Indymac's "Homebuilder Division," *which is not alleged to have originated any loans in the relevant offerings*); *id.* ¶ 177 (allegations regarding alleged inflated appraisals *on commercial loans*) (emphasis added for all).

[23]     *See* AC ¶ 146 (alleging that appraisal company refused to inflate appraisals for Countrywide).

24

information reasonably available to the shareholders . . .") (internal citations and quotation marks omitted); *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005).[24]

c.   Other Lending Practices by "Key Originators"

The Complaint is replete with allegations concerning allegedly improper lending practices by the nine so-called "key originators."  AC ¶¶ 56-188.  Included among those allegations are claims that lenders (i) originated loans outside their guidelines without sufficient compensating factors, (ii) qualified borrowers for ARMs based on initial "teaser" interest rates rather than the "fully-indexed" rates; and (iii) compensated their employees to encourage them to approve loans.

One common critical flaw undermines all of these allegations: the Offering Documents disclose, in great detail, the relevant characteristics of the securitized loans and their borrowers. For example, plaintiffs claim that, "[t]he underwriting standards were commensurately lax, in that they required very little in the way of documentation to qualify borrowers for the loan programs."  AC ¶ 86.  The Prospectus Supplements, however, disclose the exact number, percentage and total value of loans corresponding to the different loan documentation programs (*e.g.*, stated documentation, no documentation, etc.).  *See, e.g.,* Ex. 17, Pro. Supp., 2006-AB4 at LW027.  The Prospectus Supplements further disclose other information that plaintiffs allege to have been omitted.  For example:

---

[24]   This is just one example where the very same facts plaintiffs rely on to support their allegations of improper lending practices were publicly known at the time when plaintiffs bought their securities and certainly by June 27, 2007, one year prior to when plaintiffs brought this action.  Plaintiffs cannot have it both ways.  If the available general information was not particularized enough to place plaintiffs on inquiry notice of their purported claims, it surely is not particularized enough to suggest beyond mere speculation that a material number of loans securitized in the Offerings was the product of the alleged improper lending practices.  And, conversely, if plaintiffs' generalized allegations based upon public reports about issues affecting the mortgage origination industry are sufficient to plead a claim, then similar reports from an earlier period were more than sufficient to put plaintiffs on inquiry notice and time-bar their claims.

- Plaintiffs allege that "bad loans" were extended to people whose credit scores were "not great." AC ¶ 25. **But the Prospectus Supplements provide extensive disclosures about the FICO scores of the borrowers**. *See, e.g.,* Ex. 17, Pro. Supp., 2006-AB4 at LW027.

- Plaintiffs allege that the increasing number of ARM loans was problematic. AC ¶ 83. **The Prospectus Supplements, however, disclose the number, percentage and total value of ARM loans.** *See, e.g.*, Ex. 8, Pro. Supp., 2006-AR5 at LW034-36.

- Plaintiffs allege that certain properties were not owner occupied and that there was no verification of occupancy status. AC ¶ 186. **The Prospectus Supplements, however, fully disclose the number, percentage and total value of mortgage loans by occupancy status and that the occupancy status was "as represented by the mortgagor in its loan application."** *See, e.g.,* Ex. 5, Pro. Supp., 2006-AR2 at LW023 (emphasis added).

Thus, plaintiffs knew exactly *what* they were buying when they purchased the Certificates. At best, they now ask *why* better loans were not included in the Offerings. That question, however, is not a sufficient basis for a Securities Act claim.

Each category of allegations of improper lending practices presents additional, independent grounds for dismissal.

### (1)   Loans Outside the Guidelines

The Complaint summarily alleges that the Offering Documents did not disclose adequately that lenders originated loans outside the disclosed loan program guidelines. *See, e.g.,* AC ¶¶ 91, 97, 159. Yet, the Offering Documents specifically disclosed that the originators made exceptions to their underwriting guidelines when there were other compensating factors. *See, e.g.,* Ex. 8, Pro. Supp., 2006-AR5 at 62 ("Exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception"); Ex. 6, Pro. Supp., 2006-AR3 at LW033 (Countrywide).[25] Although plaintiffs

---

[25]     Such language was included in Prospectus Supplements involving other "key originators." *See, e.g.,* Ex. 8,

allege that some loans likely were issued in the absence of compensating factors (AC ¶¶ 59, 63), plaintiffs' allegations focus on how loose the guidelines were, rather than the extent to which they were applied.  *See generally id.* ¶¶ 92-96, 97-143, 160-71.  Moreover, none of the allegations is supported by specific, concrete factual material required under *Twombly* and *Iqbal*.

In any event, Regulation AB unambiguously requires only the disclosure of deviations from originators' underwriting guidelines "to the extent known."  17 C.F.R. § 229.1111(a)(3); *see In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999), *aff'd* 202 F.3d 81 (2d Cir. 2000) ("The relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus"); *see also Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("Whether a duty to disclose exists [under Section 11] depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder . . . ").  Plaintiffs do not allege that defendants knew of any purported deviations from the originators' underwriting guidelines and, in fact, allege the opposite.  *See* AC ¶¶ 212, 223 ("Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct . . . .").  Accordingly, any claim based on alleged underwriting by originators outside of their guidelines fails.

(2)    ARM Loans

The Complaint alleges that originators approved borrowers based on whether their income could support payments during an initial period when lower payments were required, rather than the higher payments that would later be required if or when interest rates rose.  *Id.* ¶¶ 59, 83, 104-08, 113.  However, in no instance did a prospectus supplement falsely state or

---

Pro. Supp., 2006-AR5 at LW063 (IndyMac); Ex. 15, Pro. Supp., 2006-AB2 at LW026 (Greenpoint); Ex. 16, Pro. Supp., 2006-AB3 at LW026 (Impac); Ex. 5, Pro. Supp., 2006-AR2 at LW031-032 (OSB); Ex. 14,

suggest that the "fully indexed" rates were used to assess the sufficiency of a borrower's income.

*See Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 450 (S.D.N.Y. 2008) ("[S]ilence absent

a duty to disclose is not misleading").  Moreover, the relevant facts and risks were fully disclosed

in the Base Prospectus:

> **Adjustable rate or interest only loans may be underwritten to less stringent standards than fixed rate loans.**  A trust fund may include adjustable rate or interest-only loans that were underwritten on the assumption that the borrowers would be able to make higher monthly payments in a relatively short period of time. In fact, however, the borrowers' income may not be sufficient to meet their loan payments as payment amounts increase, thus increasing the risk of default.

*See, e.g.,* Ex. 8, Pro. Supp., 2006-AR5 at LW154 (emphasis in original).[26]

All of the Prospectus Supplements further disclosed the percentage of loans in each

Offering issued with an "interest only" period, and that "[w]hen the mortgagor's monthly

payment increases, the mortgagor may not be able to pay the increased amount and may default

or may refinance the related mortgage loan to avoid the higher payment." *See, e.g.*, Ex. 17, Pro.

Supp., 2006-AB4 at LW018.[27]  Thus, the Offering Documents contain the very disclosures that

plaintiffs claim were omitted.[28]

---

Pro. Supp., 2007-RAMP1 at LW033-034 (RFC);  Ex. 18, Pro. Supp., 2007-AB1 at LW035-036.

[26]   The fact that originators were not using "fully-indexed" rates to qualify borrowers also was a well-known fact *prior* to any of the offerings here at issue. *See* Ex. 60 (December 20, 2005 Joint Release by the Board of Governors of the Federal Reserve System).

[27]   This exact language appeared in all of the Prospectus Supplements except those for Offerings consisting entirely of "negative amortization" loans – *i.e.*, loans in which the payment made by the borrower during an initial period is less than the interest due, and the difference is added to the loan balance.  Those Prospectus Supplements similarly disclose that "[t]hese features may affect the rate at which principal on these mortgage loans is paid and may create a greater risk of default if the borrowers are unable to pay the monthly payments on the related increased principal balances."  Ex. 10, Pro. Supp. 2006-0A1 at LW011.

[28]   In addition, some originators' guidelines specifically disclosed the manner in which they evaluated the sufficiency of income for loans where payments were scheduled to increase. *See, e.g.*, Ex. 6, Pro. Supp., 2006-AR3 at LW033 (explaining how Countrywide calculated the interest rate used to assess a borrower's ability to pay for each type of variable interest loans); *compare id. with* AC ¶¶ 104-08, 113 (alleging failure to disclose that Countrywide was not evaluating ability to repay based on the fully-indexed rate).

(3)     Lender Employee Incentives

The Complaint alleges that employees of lenders who were underwriting the loans had financial incentives to grant approvals.  *See* AC ¶¶ 87, 129, 167, 185.  However, consistent with the requirements of Item 1110 of Regulation AB, the Offering Documents say nothing about how lenders' employees were compensated.  Therefore, even if plaintiffs' allegation is true, it does not constitute an actionable omission.  *See, e.g.*, *In re Morgan Stanley Tech. Fund Sec. Litig.*, No. 02 Civ. 6153, 2009 WL 256005, at *4, 12 (S.D.N.Y. Feb. 2, 2009) (dismissing Section 11 and 12(a)(2) claims arising out of failure to disclose alleged "economic incentive[s]" and conflicts of interest, where "Plaintiffs do not plead facts sufficient to show that Defendants had a duty to disclose this information").[29]

**3.**     The Offering Documents Accurately Disclose The Risk – And Sole Remedy For - Improperly Originated Loans

The Offering Documents accurately disclose the contractual remedy if loans affected by the alleged lending practices were included in the Offerings.  In particular, each Prospectus Supplement contained the following disclosure:

> If the depositor breaches any of the representations and warranties with respect to any Mortgage Loan which breach materially and adversely affects the interests of the certificateholders in the related mortgage loan, the depositor will be obligated to cure such breach in all material respects or repurchase the mortgage loan or any property acquired in respect thereof . . . **The obligation of the Sponsor to repurchase or substitute for a deleted Mortgage Loan is the sole remedy regarding any defects in the Mortgage**

---

[29]     The Complaint contains some additional lender-specific allegations that are conclusory in nature and are undermined by the disclosures in the Offering Documents.  For example, the Complaint alleges that "AHM management" overruled the judgment of some underwriters in favor of an approval generated by an automated program that approved certain loans.  AC ¶¶ 81-82.  However, the Offering Documents disclose the extent to which AHM relied on "automated underwriting systems."  Ex. 8, Pro. Supp., 2006-AR5 at LW062.  Similarly, the Complaint alleges that the disclosures concerning Countrywide's guidelines were inconsistent with a March 2007 public statement by Countrywide that "we have not eliminated 100% financing."  *Id.*  However, the Offering Documents disclosed that "Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000."  Ex. 6, Pro. Supp., 2006-AR3 at LW034.

**Loans and Related Documents available to the**
**certificateholders.**

Ex. 8, Pro. Supp., 2006-AR5 at LW114 (emphasis added).  Plaintiffs do not allege that

defendants failed to honor any such obligations.

The relevant representations and warranties are contained in the publicly-filed Mortgage

Loan Purchase Agreements, and they include the following:

> The Mortgage Loans were underwritten in accordance with the
> related originator's underwriting guidelines in effect at the time the
> Mortgage Loans were originated (the "Applicable Underwriting
> Guidelines"), except with respect to certain of those Mortgage
> Loans which had compensating factors permitting a deviation from
> the Applicable Underwriting Guidelines.

> The Mortgage File contains an appraisal of the related Mortgaged
> Property which satisfied the standards of [Fannie Mae] and
> [Freddie Mac] . . . and was made in accordance with the relevant
> provisions of the Financial Institutions Reform, Recovery, and
> Enforcement Act of 1989.

> Information provided to the Rating Agencies, including the loan
> level detail, is true and correct according to the Rating Agencies'
> requirements.

*See, e.g.*, Ex. 21 § 6 (xxxiv), (xix), (xxxiii).  These representations and warranties covered the

principal allegations in the Complaint.  *See* AC ¶¶ 58-197.  Thus, *if* the originators in fact

engaged in the improper lending practices alleged in the Complaint, and *if* some affected loans

ended up in the Offerings, these representations and warranties would have been violated.  If so,

plaintiffs' sole remedy is to require the sponsor, DBSP, to repurchase any such loan.

A federal district court recently dismissed Securities Act claims based on nearly identical

provisions in an RMBS securitization transaction in *Lone Star Fund V, L.P. v. Barclays Bank*

*PLC*, No. 08 Civ. 0261, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008).  In *Lone Star*, the

plaintiffs purchased $60 million in mortgage pass-through certificates from defendant Barclays,

and alleged that the actual delinquency rates of the loans differed from what was disclosed in the

offering documents.  Barclays argued that disclosures substantially the same as those quoted above precluded plaintiffs' claims.  The court agreed, holding that the offering documents "only represented that the loans are – or will be made – compliant" through repurchase or substitution and that because the "Plaintiffs have not alleged that Defendants failed to repurchase or substitute loans . . . , they have failed to state a claim upon which relief can be granted."  *Id.* at *10-11.[30]

As in *Lone Star*, the Offering Documents represented only that the securitized loans would either materially conform to the representations and warranties *or* would be repurchased or replaced.  Plaintiffs have not alleged that defendants have failed to repurchase or replace any materially non-conforming loans.  Thus, plaintiffs  fail to allege an actionable misrepresentation. Plaintiffs' Securities Act claims accordingly should be dismissed.

### 4.    The Complaint Fails To Allege Any Material Misstatement Concerning The Ratings Of The Certificates

Plaintiffs allege that the rating agencies used outdated assumptions regarding loan performance, relaxed their rating criteria, and used inaccurate data regarding the loans, which resulted in false and misleading ratings assigned to the Certificates.  AC ¶¶ 193-208.  These allegations suffer several fatal defects.

*First*, plaintiffs' Section 11 claim is barred by SEC Rule 436(g) of Regulation C, 17 C.F.R. § 230.436(g), which provides that "the security rating . . . shall not be considered a part of

---

[30]    Other courts have applied reasoning similar to *Lone Star* in other contexts.  For example, in *In re U.S. West, Inc. Sec. Litig.*, No. 02-2479, 2003 WL 21246539 (3d Cir. May 30, 2003), plaintiffs claimed that a proxy solicitation concerning a proposed merger was false and misleading because it failed to disclose that one of the parties allegedly did not intend to honor the "non-solicitation" clause of the merger agreement. The Third Circuit affirmed the dismissal of the complaint, concluding that the presence in the merger agreement of a remedy (termination fees) upon breach of the non-solicitation provision, which was disclosed in the proxy solicitation, had "the effect of disclosing to present and future shareholders" that the defendants' representation "was not of unlimited scope." *Id.* at *5-6.  Rather, the non-solicitation assurance had to be "read in conjunction with the 'Termination' provision" explicitly contemplating its breach, and plaintiffs' construction omitting the latter was "unreasonable." *Id.*

the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the [Securities] Act." This Rule prevents liability under Section 11 against any defendant for the rating disclosures.[31]

*Second*, there is no allegation that the Offering Documents failed accurately to disclose the ratings that were assigned by the rating agencies. Indeed, the Offering Documents disclosed precisely what Regulation AB required. *Compare* 17 C.F.R. § 229.1120 *with* Ex. 8, Pro. Supp., 2006-AR5 at LW124. Thus, there was no false or misleading statement by defendants. *See J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 393 (6th Cir. 2008) (affirming dismissal of Securities Act claims alleging misrepresentations with respect to the credit rating of securities and noting that "[defendant's] disclosure of its credit rating was merely a true statement of historical fact"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 255 (S.D.N.Y. 2004).

*Third*, plaintiffs provide no factual basis to support the assertion that the ratings of the Certificates were inaccurate, alleging only that the ratings of the Certificates were based on inaccurate loan data. AC ¶ 207. However, the claim of inaccurate loan data is deficient for all of the reasons described above. *See supra* Section III.D.1-2.

Thus, the Complaint fails to allege that the Offering Documents contained any material misrepresentations of fact concerning the credit ratings.

_____

[31] Even if the credit ratings were part of the registration statement, they would qualify as "expertised portions" under Section 11(b)(3) of the Securities Act. Section 11(b)(3)(C) provides that a defendant is entitled to rely on any part of the registration statement purporting to be made on the expert authority of another and that the defendant will not be liable if "he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue." 15 U.S.C. § 77(b)(3)(C). As discussed above, plaintiffs have expressly "disclaim[ed] any allegation that could be construed as alleging fraud or intentional or reckless misconduct." AC ¶¶ 212, 223. Accordingly, the Section 11(b)(3)(C) defense appears on the face of the Complaint, and the claim should be dismissed. *See Pany v. Empire Blue Cross Blue Shield*, 152 F.2d 67, 74 (2d Cir. 1998).

E.   **Plaintiffs Fail To State A Claim Under Section 15**

Plaintiffs' Section 15 claim against the Individual Defendants, Deutsche Alt-A or DBSP fails because plaintiffs have not pled sufficiently an underlying violation of Section 11 or Section 12. *See ECA, Local 134 IEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 207 (2d Cir. 2009); *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004) (dismissing Section 15 claim because claims under Sections 11 and 12(a)(2) were dismissed).

The Section 15 claim fails also because plaintiffs have not pled sufficiently that defendants "actually possess[ed], in fact, rather than in theory, the ability to direct the actions of the controlled person." *In re Global Crossing Ltd., Sec. Litig.,* No. 02 Civ. 910, 2005 U.S. Dist. LEXIS 16228, at *38 (S.D.N.Y. Aug. 8, 2005) ("*Global Crossing II*"); *see also* 17 C.F.R. § 230.405 ("control" means the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of [an entity] . . .")

Plaintiffs assert wholly conclusory allegations that, among other things (1) each of Individual Defendants was "a control person" of Deutsche Alt-A and the Trusts by virtue of his/her status as a director or officer of Deutsche Alt-A, and (2) "was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein." AC ¶¶ 230-32. These allegations do not state a claim under Section 15. "[I]n order to hold an individual liable as a 'control person' under section 15, a complaint must allege, at a minimum, 'meaningful culpable conduct [by that individual] beyond mere status as a director or officer." *Kane v. Wichita Oil Income Fund*, No. 90 Civ. 5714, 1991 WL 233266, at *7 (S.D.N.Y. Oct. 29, 2001); *see also Global Crossing II,* 2005 U.S. Dist. LEXIS 16228, at * 38-39 (finding that "[c]onclusory allegations of control are insufficient as a matter of law" to plead control person liability"). Furthermore, plaintiffs' allegations fail under the *Twombly-Iqbal*

33

standard which requires the pleading of facts – not mere conclusions – that if proven, would demonstrate a "plausible" basis that the defendants engaged in meaningful culpable conduct. *Twombly*, 550 U.S. at 555-56; *Kane,* 1991 WL 233266, at *7.

Accordingly, plaintiffs' Section 15 claim must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.


Dated:  August 14, 2009                     Respectfully submitted:

                                                            LATHAM & WATKINS LLP

                                            By: _____
                                                            Richard D. Owens (RO-4070)
                                                            Jamie L. Wine (JW-6412)
                                                            Joseph M. Salama (JS-2213)
                                                            885 Third Avenue
                                                            Suite 1000
                                                            New York, NY 10022
                                                            (212) 906-1200

                                                            *Attorneys for Defendants Deutsche Alt-A Securities,
                                                            Inc., Deutsche Bank Securities, Inc., DB Structured
                                                            Products, Inc. Anilesh Ahuja, Jeffrey Lehocky,
                                                            Richard W. Ferguson, Joseph J. Rice and Richard
                                                            D'Albert*