UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____ x

MASSACHUSETTS BRICKLAYERS AND          :   Civil Action No. 2:08-cv-03178-LDW-ARL
MASONS TRUST FUNDS, Individually and   :
On Behalf of All Others Similarly Situated,   :   CLASS ACTION
                                       :
                        Plaintiff,     :
                                       :   MEMORANDUM OF LAW IN
                                       :   OPPOSITION TO DEFENDANTS' MOTION
            vs.                        :   TO DISMISS THE AMENDED
                                       :   COMPLAINT
DEUTSCHE ALT-A SECURITIES, INC., et    :
al.,                                   :
                                       :
                        Defendants.    :
                                       :
_____ x

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    SUMMARY OF THE ALLEGATIONS ............................................................2

III.   ARGUMENT ......................................................................................................4

    A.     Legal Standard ........................................................................................4

    B.     Plaintiffs Have Standing to Assert the Claims Alleged ..........................6

          1.     Plaintiffs Have Standing to Pursue All §11 Claims Alleged .......................6

          2.     Plaintiffs Have Standing to Pursue All §12(a)(2) Claims Alleged .............8

          3.     Defendants' "Standing" Challenges Are Actually Derivative Rule 23 Class Certification Arguments ................................................9

    C.     The Complaint Adequately States Claims for Violations of Sections 11 and 12(a)(2) of the Securities Act ..........................................10

          1.     The Securities Act Provides Strict Liability for Material Misstatements ........................................................................10

          2.     Defendants Fail to Address the Complaint's Allegations of Actionable False and Misleading Statements .............................11

          3.     Plaintiffs Plead Adequate Factual Content ................................12

               a.     The Complaint Sufficiently "Ties" Improper Underwriting Practices to the Originators ..........................12

               b.     Every Loan Underwritten by the Originators was "Affected" by the Originators' Underwriting Practices .................13

               c.     Statements and Omissions Concerning the Originators' Improper Underwriting Practices Were Material ..........................14

          4.     The Offering Documents Misrepresented and Failed to Disclose Actual Lending Practices ..........................................15

               a.     Borrowers' Income and Debt-to-Income Ratios ..........................16

               b.     Appraisals and LTV Ratios ........................................18

               c.     Other Lending Practices by Originators ......................20

**Page**

     5.     The Offering Documents Did Not Disclose the Falsity of the Credit Ratings ...................................................................................................22

     6.     Defendants Were Under a Duty to Disclose the Omitted Information ....................................................................................................24

    D.     Plaintiffs' Claims Are Not Time-Barred.................................................................26

    E.     The Complaint Adequately States a Claim for Violation of §15 of the Securities Act ......................................................................................................33

    F.     Defendants Cannot Escape Liability by Pointing to Purported "Cure" Provisions in the Offering Documents ..................................................................33

IV.    CONCLUSION...........................................................................................................35

# TABLE OF AUTHORITIES

Page

**CASES**

*380544 Can., Inc.*,
   No. 07 Civ. 1204 (JFK)
   2009 U.S. Dist. LEXIS 38149 (S.D.N.Y. May 5, 2009)........................................................4

*Ashcroft v. Iqbal*,
   __ U.S. __, 129 S. Ct. 1937 (2009)...............................................................5, 13, 19, 29

*Barnes v. Osofsky*,
   373 F.2d 269 (2d Cir. 1967)........................................................................................7

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)...................................................................................................14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................5, 6, 13, 18

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002).........................................................................................25

*Capri v. Murphy*,
   856 F.2d 473 (2d Cir. 1988)...........................................................................................9

*Cent. States Se. & Sw. Areas Health & Welfare Fund* ............................................................
   *v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. N.Y. 2007)..................................................................................9

*Chance v. Armstrong*,
   143 F.3d 698 (2d Cir. 1998)...........................................................................................4

*Doody v. E.F. Hutton & Co.*,
   587 F. Supp. 829 (D. Minn. 1984)................................................................................34

*Erickson v. Pardus*,
   551 U.S. 89 (2007).......................................................................................................5

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)...........................................................................................15

*Fogarazzo v. Lehman Bros., Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004)...........................................................................31

Page

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..................................................................14

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)..................................................16

*Grasty v. Amalgamated Clothing & Textile Workers Union, etc.*,
    828 F.2d 123 (3d Cir. 1987)...................................................................9

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001)...................................................................4

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)...............................................................................8

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)...........................................................5, 11, 24, 25

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................................7

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998).................................................................16

*In re AnnTaylor Stores Sec. Litig.*,
    807 F. Supp. 990 (S.D.N.Y. 1992) .......................................................22

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009)............................................................9

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................7, 8

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993).....................................................................16

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    No. 98 Civ. 4318 (HB)
    2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 20, 2000).....................10

*In re Fuwei Films Sec. Litig.*,
    No. 07 Civ. 9416 (RJS)
    2009 U.S. Dist. LEXIS 59658 (S.D.N.Y. July 10, 2009) ...........*passim*

**Page**

*In re Giant Interactive Group, Inc. Sec. Litig.*,
No. 07 Civ. 10588 (RWS)
2009 U.S. Dist. LEXIS 69414 (S.D.N.Y. Aug. 7, 2009) ...................................15

*In re Global Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003)...............................................................7

*In re Initial Pub. Offering Sec. Litig.*,
341 F. Supp. 2d 328 (S.D.N.Y. 2004)........................................................30, 32

*In re Initial Pub. Offering Sec. Litig.*,
483 F.3d 70 (2d Cir. 2007)..............................................................................11

*In re Lilco Sec. Litig.*,
625 F. Supp. 1500 (E.D.N.Y. 1986) ................................................................24

*In re Marsh & McLennan Cos. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)...............................................................6

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
No. 02 Civ. 6153 (BSJ)
2008 U.S. Dist. LEXIS 106909 (S.D.N.Y. Feb. 3, 2008)...........................25, 26

*In re N2K Inc. Sec. Litig.*,
82 F. Supp. 2d 204 (S.D.N.Y. 1999).........................................................25, 26

*In re Polaroid Corp. Sec. Litig.*,
465 F. Supp. 2d 232 (S.D.N.Y. 2006)..............................................................27

*In re Progress Energy, Inc. Sec. Litig.*,
371 F. Supp. 2d 548 (S.D.N.Y. 2005) ..............................................................20

*In re Prudential Sec. Ltd. P'ships. Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ....................................................................18

*In re Regeneron Pharms., Inc. Sec. Litig.*,
No. 03 Civ. 3111 (RWS)
2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 3, 2005)....................................18

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006)..............................................................10

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................9

**Page**

*In re Twinlab Corp. Sec. Litig.*,
103 F. Supp. 2d 193 (E.D.N.Y. 2000) ........................................................5, 25

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 Civ. 3288 (DLC)
2004 U.S. Dist. LEXIS 4240 (S.D.N.Y. Mar. 19, 2004)................................7

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 CIV. 3288 DLC
2003 WL 22790942 (S.D.N.Y. Nov. 25, 2003) ...........................................31

*In re WorldCom Sec. Litig.*,
496 F.3d 245 (2d Cir. 2007)........................................................................10

*In re Ziff-Davis Inc. Sec. Litig.*,
No. 98 Civ. 7158 (SWK)
2000 U.S. Dist. LEXIS 9076 (S.D.N.Y. June 30, 2000)................................15

*Kronfeld v. Trans World Airlines, Inc.*,
832 F.2d 726 (2d Cir. 1987)........................................................................20

*Lapin v. Goldman Sachs Group, Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) .........................................................24

*Lavaggi v. Republic of Argentina,*
No. 04 CIV 5068 (TPG)
2005 WL 2072294 (S.D.N.Y. Aug. 25, 2005)................................................7

*LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*,
318 F.3d 148 (2d Cir. 2003)........................................................................27

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)........................................................................27

*Levitt v. Bear Stearns & Co.*,
340 F.3d  94 (2d Cir. 2003)........................................................................29

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
No. 3:08-CV-0261-L
2008 WL 4449508 (N.D. Tex. Sept. 30, 2008).......................................34, 35

**Page**

*McMahan & Co. v. Wherehouse Entm't,*
    65 F.3d 1044 (2d Cir. 1995) ....................................................................34

*Miller v. Lazard, Ltd.,*
    473 F. Supp. 2d 571 (S.D.N.Y. 2007) .................................................5, 11

*Mobley v. Acme Mkts., Inc.,*
    473 F. Supp. 851 (D. Md. 1979) ...............................................................9

*Newman v. Warnaco Group, Inc.,*
    335 F.3d 187 (2d Cir. 2003) ............................................................27, 29

*Nivram Corp. v. Harcourt Brace Joranovich, Inc.,*
    840 F. Supp. 243 (S.D.N.Y. 1993) ..........................................................27

*P. Stolz Family P'ship L.P. v. Daum,*
    355 F.3d 92 (2d Cir. 2004) .......................................................16, 17, 25

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,*
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) .....................................................25

*Rescuecom Corp. v. Google, Inc.,*
    562 F.3d 123 (2d Cir. 2009) ....................................................................4

*SEC v. Collins & Aikman Corp.,*
    524 F. Supp. 2d 477 (S.D.N.Y. 2007) .....................................................14

*SEC v. Universal Express, Inc.,*
    No. 04 Civ 2322 (GEL)
    2007 U.S. Dist. LEXIS 65009 (S.D.N.Y. Aug. 31, 2007) .........................20

*Shah v. Meeker,*
    435 F.3d 244 (2d Cir. 2006) ..................................................................27

*Staehr v. Hartford Fin. Servs. Group,*
    547 F.3d 406 (2d Cir. 2008) ........................................................27, 28, 30

*Starr v. Georgeson S'holder Inc.,*
    412 F.3d 103 (2d Cir. 2005) ..................................................................20

*Stratmore v. Combs,*
    723 F. Supp. 458 (N.D. Cal. 1989) .........................................................34

Page

*Thompson v. Metro. Life Ins. Co.*,
   149 F. Supp. 2d 38 (S.D.N.Y. 2001)...........................................................................31

*United States v. Corr*,
   543 F.2d 1042 (2d Cir. 1976)......................................................................................33

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77b.................................................................................................................................8
   §77k..........................................................................................................................6, 33
   §77k(a)...........................................................................................................8, 10, 24, 26
   §77l(a)(2)........................................................................................................................8
   §77n...............................................................................................................................33

17 C.F.R.
   §230.408(a)....................................................................................................................26
   §230.436(g)(1)...............................................................................................................23
   §229.512(a)(2).................................................................................................................7

Federal Rules of Civil Procedure
   Rule 8..............................................................................................................................5
   Rule 8(a)...................................................................................................................5, 6, 29
   Rule 8(a)(2).....................................................................................................................5
   Rule 12(b)(6)..............................................................................................................4, 15

**SECONDARY AUTHORITIES**

*Adoption of Integrated Disclosure System*, Securities Act Release No. 6383, 47 Fed.
   Reg. 11380, 11392 n.53 (Mar. 16, 1982)...................................................................23

*Disclosure of Security Ratings in Registration Statements*, SEC Release Nos. 33-
   6336, 34-18012, 46 Fed. Reg. 42024, 42025 (Aug. 18, 1981)...................................23

*Nationally Recognized Statistical Rating Organizations*, SEC Release Nos. 33-7085;
   34-34616, 59 Fed. Reg. 46314, 46316 n.19 (Sept. 7, 1994)......................................23

7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane,
   *Federal Practice & Procedure* (3d ed. 2005)
   §1785.1...........................................................................................................................10

Plaintiffs respectfully submit this memorandum of law in opposition to defendants'[1] motion to dismiss the Amended Complaint (the "Complaint").

## I.      INTRODUCTION

This is a class action brought by investors who acquired billions of dollars worth of mortgage-backed securities (the "Certificates") issued and underwritten by defendants, some of the key actors in the mortgage securitization industry that brought the national economy to its knees. Defendants chose to offer these securities via the federal securities regulation system, and chose to issue one Registration Statement and 14 Prospectus Supplements (collectively the "Offering Documents") pursuant to the strict liability and negligence liability framework of the Securities Act of 1933 ("Securities Act").  Having done so, defendants cannot escape liability for misstatements and omissions in the Offering Documents.  The effect of these misrepresentations has since become apparent as the Certificates issued and underwritten by defendants have been repeatedly downgraded by the rating agencies and are now worth a mere fraction of their original offering price.

Contrary to defendants' contentions, plaintiffs have standing to assert claims on behalf of the entire class of proposed investors, as each investor bought pursuant to the same Registration Statement.  Moreover, defendants' standing argument is actually an improper and premature attempt to litigate the typicality requirement of Federal Rule of Civil Procedure 23 on a motion to dismiss.

Additionally, the Complaint alleges material misrepresentations and omissions in the Offering Documents concerning the lending practices underlying, and credit ratings assigned to, the Certificates.  Defendants argue these allegations fail to state a claim because they are too general and

---

[1]      Defendants in this action are Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A"), Deutsche Bank Securities ("Deutsche Securities"), DB Structured Products, Inc., Anilesh Ahuja, Jeffrey Lehocky, Richard W. Ferguson, Joseph J. Rice, Richard d'Albert and Kevin P. Burns.  Mr. Burns did not join in defendants' motion.

that all risks were disclosed.  However, nowhere do defendants dispute plaintiffs' allegations that every named originator systematically employed improper lending practices affecting all of their loans.  Nor can defendants point to disclosures that reveal loans were made solely for the sake of making them and with no regard to borrowers' ability to repay, that the debt-to-income ("DTI") ratios were false, that the loan-to-value ("LTV") ratios were false because of systematically inflated appraisals, or that the credit ratings were false because they were based on inaccurate information and outdated models.

Finally, defendants' statute of limitations argument should be rejected as none of the information cited demonstrates that plaintiffs should have been on notice of the facts giving rise to this case more than one year before this action was filed.  The information cited is about the lending industry in general without mention of defendants or the Certificates at issue here.  Moreover, the reassuring statements of comfort in the Offering Documents, that borrowers were being evaluated on their ability to repay, do not put plaintiffs or the Class on notice of their claims.  Accordingly, defendants should be required to answer the Complaint and this case should proceed.

## II.   SUMMARY OF THE ALLEGATIONS

On May 1, 2006, defendant Deutsche Alt-A filed the Registration Statement with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing billions of dollars of certificates.  ¶3.  Deutsche Alt-A, a subsidiary of defendant DB Structural Products, Inc., was set up to acquire mortgage loans from several mortgage banks such as American Home Mortgage Corp ("AHM"), IndyMac and Countrywide. ¶2.  Deutsche Alt-A then transferred the mortgages to 14 New York common law trusts (the "Trusts") created for the sole purpose of issuing the Certificates.  Deutsche Alt-A and the Trusts then sold hundreds of millions of dollars worth of Certificates of various classes to investors such as Lead Plaintiffs and members of the Class, pursuant to a single Registration Statement and 14 Prospectus Supplements from May 2006

through May 2007.  ¶¶1, 12, 55.  Each of the Individual Defendants signed the Registration Statement and acted as directors or trustees to the Trusts. ¶¶15-21.

The Offering Documents described the mortgage loans contained in the pools held by the Trusts and emphasized the stringent underwriting standards utilized to generate the underlying "Investment Grade" loans purchased by Deutsche Alt-A.  ¶¶57, 58.  Investors purchased the Certificates based upon representations made by defendants in the Offering Documents, and focused on three primary factors: return (in the form of interest payments), timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets). ¶4.

The Complaint alleges in detail that the Offering Documents, however, misrepresented and failed to disclose that:

- The underwriting practices employed by the originators of the loans underlying the Certificates were *not* intended to evaluate the borrower's credit standing and repayment ability, but instead, were designed to originate as many loans as possible without regard to the borrowers' ability to meet their obligations under the mortgage, ¶¶4, 56-65, 80-189;

- Many of the loans underlying the Certificates had been issued to borrowers with DTI ratios that did *not* comply with the originators' requirements, ¶¶4-5, 124, 156-57;

- The appraisals performed in connection with the underlying loans did *not* conform to USPAP requirements and were *not* designed to evaluate the true value of properties being used as collateral, but rather were inflated in order to justify the loans being made, ¶¶4, 66-189;

- The LTV ratios included in the Offering Documents were understated, *false* and inaccurately low, ¶¶144-45, 190; and

- The credit ratings assigned to the Certificates, and included in the Offering Documents, were *false* and understated the true level of risk associated with the Certificates, because the ratings were based on outdated and inherently unreliable models and criteria, as well as inaccurate loan information.  ¶¶6, 191-208.

The Complaint further alleges that these material misrepresentations and omissions had the effect of providing a false picture of the low degree of risk associated with these investments.

However, far from being safe investments, the securities have been revealed to be extremely risky.  ¶¶53-54.  The value of the Certificates is affected by changes in risk of default on the underlying pool of mortgages from which these securities receive payments.  ¶¶209-211.  As the loans underlying the securities failed, these defaults resulted in a corresponding collapse in the values of the Certificates and damage to the Lead Plaintiffs and the Class.  ¶¶209-211.  As the Complaint details, the risk of default on the mortgages at issue was misrepresented by defendants.

## III.   ARGUMENT

### A.   Legal Standard

"When reviewing a motion to dismiss, a court must 'accept as true all of the factual allegations set out in plaintiff's complaint, [and] draw inferences from those allegations in the light most favorable to plaintiff . . . .'"  *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)).   As the Second Circuit emphasizes:

> It is important to recognize the difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment.  At the 12(b)(6) stage, "the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test."

*Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).[2]

Because plaintiffs' claims are based on theories of strict liability and negligence under §§11 and 12 of the Securities Act, and need allege no fraudulent conduct on behalf of defendants, they are

---

[2]    *See also 380544 Can., Inc.*, No. 07 Civ. 1204 (JFK), 2009 U.S. Dist. LEXIS 38149, at *24 (S.D.N.Y. May 5, 2009) ("On a motion to dismiss a complaint under Rule 12(b)(6), the district court's function 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'").  Unless otherwise noted, all citations are omitted and all emphasis is added.

governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a), which requires only a

"'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v.*

*Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

(under Fed. R. Civ. P. 8(a)(2), "[s]pecific facts are not necessary; the statement need only 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  As the Supreme Court recently reaffirmed, "the

pleading standard Rule 8 announces does not require 'detailed factual allegations.'"  *Iqbal*, 129 S.

Ct. at 1949.  Rather, a complaint need only allege "enough facts to state a claim to relief that is

plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Iqbal*, 129 S. Ct. at 1949 ("The

plausibility standard is ***not*** akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully.").

Section 11 of the Securities Act imposes a stringent standard of liability and "'places a

relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased

the security and that the registration statement contains false or misleading statements concerning a

material fact." *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) (quoting

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983)).  The same is true for claims

brought under §12(a)(2), in that a plaintiff must only plead that the prospectus at issue "'contained

an untrue statement of material fact or omitted to state a material fact that was required to be stated

therein or was necessary to make the statements therein not misleading.'"  *In re Fuwei Films Sec.*

*Litig.*, No. 07 Civ. 9416 (RJS), 2009 U.S. Dist. LEXIS 59658, at *29 (S.D.N.Y. July 10, 2009)

(quoting *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007)).

Plaintiffs have clearly and concisely alleged that defendants made specific and material

misrepresentations and omissions in the Offering Documents which are supported by detailed factual

allegations of systematic practices employed by the originators of the specific loans underlying the Certificates.  The totality of these allegations makes it much more than "plausible" that the Offering Documents contained material false statements and omissions and clearly raises plaintiffs' right to relief "above the speculative level."  *Twombly*, 550 U.S. at 555, 570.  Nothing more is required under Rule 8(a).

### B.      Plaintiffs Have Standing to Assert the Claims Alleged

It is undisputed that plaintiffs purchased Certificates pursuant and/or traceable to the Registration Statement.  ¶10.  It is also undisputed that each Certificate at issue in this matter was issued pursuant to that very same Registration Statement.  ¶3.  As such, plaintiffs have standing to assert claims under §§11 and 12(a)(2) on behalf of *all* Certificate purchasers, each of whom necessarily acquired his or her Certificates pursuant and/or traceable to the same false and misleading Registration Statement as plaintiffs.

### 1.      Plaintiffs Have Standing to Pursue All §11 Claims Alleged

Section 11 of the Securities Act provides liability for false statements in "Registration Statements."  15 U.S.C. §77k.  Every security in this motion was issued pursuant to one Registration Statement, and Lead Plaintiffs and the Class all bought securities from it, thus granting Lead Plaintiffs standing to assert §11 claims based on the false and misleading statements contained therein.  ¶¶3, 10; *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) ("The pleading requirement for Section 11 standing is satisfied by 'general allegations that plaintiff purchased "pursuant" to or traceable to [a] false registration statement.'").

Defendants argue that plaintiffs must have purchased Certificates traceable to each of the 14 different *Prospectus Supplements*, despite the fact that each Prospectus Supplement is incorporated by reference into the one Registration Statement.  Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs' Mem.") at 10-11.  Defendants identify no

authority that supports their position, relying instead on a misplaced application of SEC regulation S-K Item 512(a)(2), 17 C.F.R. §229.512(a)(2), and inapposite case law.[3]   Indeed, because the Prospectus Supplements for all 14 Trusts were issued pursuant to the same Registration Statement, and were explicitly incorporated by reference into that Registration Statement, plaintiffs have standing to assert §11 claims based on the false and misleading statements contained in each of the Prospectus Supplements.  ¶¶3, 55; *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1165 (C.D. Cal. 2008) (finding §11 standing for all offerings pursuant to an "initial shelf registration statement contain[ing] an actionable statement or omission that is common to more than one issuance").[4]

In *Countrywide*, 588 F. Supp. 2d 1132, the district court analyzed the identical standing issue presented here and determined that the plaintiffs had alleged sufficient §11 standing to overcome a motion to dismiss:

---

[3]     The cases relied on by defendants do not address the standing issues present here.  For example, *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008) involved mutual funds where plaintiffs sought to represent purchasers in separate and distinct funds that were ***not*** issued pursuant to common registration statements.  *Lavaggi v. Republic of Argentina,* No. 04 CIV. 5068 (TPG), 2005 WL 2072294, at *1-*2 (S.D.N.Y. Aug. 25, 2005) (27 series of bonds) did not even involve Securities Act claims, involved multiple series of bonds, and found that plaintiff did not have standing for the "recovery of unpaid interest" on behalf of purchasers of bonds issued under "different prospectuses ***and*** offering documents."  *See also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) (holding that "***the pleading requirement [for tracing] is not elaborate. . . .  general allegations that plaintiff purchased 'pursuant to' or traceable to [a] false registration statement***" is sufficient on a motion to dismiss); *Barnes v. Osofsky*, 373 F.2d 269, 271 (2d Cir. 1967) (holding that, ***at settlement***, participating shareholders must prove they acquired a security "'issued pursuant to the registration statement'").

[4]     *Accord In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 U.S. Dist. LEXIS 4240, at *6-*7 (S.D.N.Y. Mar. 19, 2004) (purchasers of one type of debt security had standing to pursue claims of purchasers of a second type of debt security issued pursuant to the same registration statement).

- 7 -

The statute contemplates the possibility that the "registration statement" in the first clause of §11 is not the same in every respect as the "registration statement" for a particular security because "parts" of the "registration statement" may "bec[o]me effective" at different times. 15 U.S.C. §77k(a) ("[A]ny part of the registration statement, when such part became effective . . . ."). To require that "registration statement" of §11's first clause be absolutely identical for each security traceable to the same initial registration and prospectus would rewrite "such part" to read "registration statement." *See also* 15 U.S.C. §77b (defining registration statement "unless the context otherwise requires"). ***The statute grants standing to anyone who buys "such security" – one traceable to a defective registration statement.*** *Hertzberg*, 191 F.3d 1076. ***If the initial shelf registration statement contained an actionable statement or omission that is common to more than one issuance under the shelf registration, then purchasers in those issuances may be able to trace the same injury to the same "registration statement*****."**

*Id.* at 1165-66; *see also id.* at 1166 ("So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is §11 standing."). As there is only one Registration Statement at issue, Lead Plaintiffs and the Class must have all purchased from it and Lead Plaintiffs therefore have standing to assert all of the pled claims.

### 2. Plaintiffs Have Standing to Pursue All §12(a)(2) Claims Alleged

Separately, plaintiffs bring a claim under §12(a)(2) of the Securities Act. Liability under §12(a)(2) flows from false statements in a prospectus (and verbal false statements). 15 U.S.C. §77l(a)(2); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 577-78 (1995). A plaintiff must allege that it bought securities directly from a defendant to have standing under §12(a)(2). Here, the Complaint alleges exactly that. *See* ¶¶10.[5] Moreover, there is only one selling defendant in this

---

[5]    To the extent the Court finds the allegations to be unclear, plaintiffs will amend the Complaint to allege that they bought the securities directly from Deutsche Bank Securities.

action, Deutsche Securities, and that entity sold the securities directly to plaintiffs. ¶13.[6]  At this

stage, nothing more is required.  *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 400

(S.D.N.Y. 2007) (finding sufficient standing under §12(a)(2) where plaintiffs "allege[d] that

defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and

plaintiffs acquired securities in the Offerings").

> ### 3.      Defendants' "Standing" Challenges Are Actually Derivative Rule 23 Class Certification Arguments

By contending that plaintiffs lacks "standing," *see* Defs' Mem. at 9-12, defendants "confuse

standing and the typicality requirement of Rule 23(a)(3)."  *Grasty v. Amalgamated Clothing &*

*Textile Workers Union, etc.*, 828 F.2d 123, 130 n.8 (3d Cir. 1987); *see also Mobley v. Acme Mkts.,*

*Inc.*, 473 F. Supp. 851, 858-59 (D. Md. 1979) ("Defendant has confused standing with typicality. . . .

Whether or not class certification is appropriate . . . raises entirely different concerns which need not

and cannot be addressed [on a motion to dismiss].").  Because, as set forth above, plaintiffs have

standing to advance claims based on their ***own*** purchases, any challenge to plaintiffs' ability to

bring claims on behalf of ***absent*** class members is not a question of "standing" but of plaintiffs'

fitness to represent a defined class, inappropriate for resolution on a motion to dismiss.  *See Cent.*

*States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d

229, 241 (2d Cir. N.Y. 2007) ("'for every named defendant there must be at least one named plaintiff

who can assert a claim directly against that defendant, and at that point standing is satisfied and . . .

---

[6]      *Accord Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (finding individuals who "prepared and circulated the prospectus" to be "sellers" under §12); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009) ("As many courts have found, the registration statement is itself a solicitation document.").

the inquiry shift[s] to a class action analysis'").[7]  These issues are more appropriately addressed at the class certification stage.  *See, e.g.*, *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469, at *8 (S.D.N.Y. Sept. 20, 2000) ("Courts . . . examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.").

### C. The Complaint Adequately States Claims for Violations of Sections 11 and 12(a)(2) of the Securities Act

#### 1. The Securities Act Provides Strict Liability for Material Misstatements

Section 11 of the Securities Act creates a private right of action for securities purchasers where "any part of" a registration statement, including any prospectuses that are incorporated therein, contains untrue statements of material fact or material omissions, and plaintiffs can trace their securities to those registration statements.  15 U.S.C. §77k(a).  In order to state a claim under §11, a plaintiff need only allege that the registration statement (1) "contain[ed] an 'untrue statement of a material fact'"; (2) "'omitt[ed] to state a material fact required to be stated therein;'" or (3) omitted to state a material fact "'necessary to make the statements therein not misleading.'"  *In re WorldCom Sec. Litig.*, 496 F.3d 245, 248-49 (2d Cir. 2007) (quoting 15 U.S.C. §77k(a)).  Similarly, in order to state a claim under §12(a)(2), a plaintiff need only allege that he or she purchased a

---

[7]      *See also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 605 (S.D.N.Y. 2006) ("Under established standing jurisprudence involving typical class actions, courts undertake a two-step analysis.  First, the court determines whether the representative plaintiff has standing vis-a-vis the defendant: *i.e.*, can the plaintiff demonstrate injury by that defendant so as to have a sufficiently direct and substantial interest.  If so, then the court determines whether the moving party can satisfy the class certification requirements under Rule 23."); 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* §1785.1, at 388-89 (3d ed. 2005) ("Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.").

security pursuant to a prospectus supplement that "'contained an untrue statement of material fact or omitted to state a material fact that was required to be stated therein or was necessary to make the statements therein not misleading.'" *Fuwei*, 2009 U.S. Dist. LEXIS 59658, at *29 (quoting *Lazard*, 473 F. Supp. 2d at 578).[8]

### 2.   Defendants Fail to Address the Complaint's Allegations of Actionable False and Misleading Statements

Defendants ignore specific allegations of false and misleading statements and instead focus on the general characteristics of certain mortgage loan programs underlying the offerings, making the unremarkable observation that the Complaint and the Offering Documents identify these general characteristics. Defs.' Mem. at 19-26. Defendants thus implicitly acknowledge that the Complaint's allegations of falsity are more than adequate to survive the instant motion to dismiss.

The Complaint alleges the Offering Documents contained affirmatively false statements and omitted certain material information regarding the Certificates. ¶¶5-7, 56-208. In particular, the Complaint alleges the Offering Documents misrepresented and failed to disclose: important information about originator's underwriting practices (¶¶4, 56-65, 80-189); that borrowers' DTI ratios did not comport with requirements (¶¶4-5, 124, 156-57); that appraisals did not conform to USPAP standards and were purposely inflated (¶¶4, 66-189); that the LTV ratios listed in the Offering Documents were false and inaccurately low (¶¶144-45, 190); and that the credit ratings

---

[8]     Section 11 was "designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a ***stringent standard of liability*** on the parties who play a direct role in a registered offering." *Huddleston*, 459 U.S. at 381-82 (citing Legislative History). As such, the issuer is held ***strictly liable*** for any material misstatements and omissions within the registration statement, while all other defendants are *prima facie* liable but may raise the affirmative defense of "due diligence" at a later stage. *See id.* at 382; *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007) ("an issuer's liability under section 11 is absolute").

were false and understated the true level of risk associated with the Certificates (¶¶6, 191-208). None of the aforementioned allegations are challenged by defendants.

Through these actionable false and misleading statements and omissions, the Offering Documents affirmatively misrepresented the true nature of and the level of risk associated with plaintiffs' Certificates. These misrepresentations were clearly material because investors in mortgage-backed securities would most certainly attach importance to matters such as the credit worthiness of the borrowers underlying the mortgages. *Fuwei*, 2009 U.S. Dist. LEXIS 59658, at *46 ("'A prospectus will violate federal securities laws if it does not disclose "material objective factual matters," or buries those matters beneath other information, or treats them cavalierly.'").

Rather than address the Complaint's actual allegations, defendants focus only on general statements in the Complaint concerning the types of loans underlying the mortgage-backed securities. Defs.' Mem. at 19-26. Defendants' argument that the general riskiness of the underlying mortgages rendered defendants' false statements immaterial lacks merit.

### 3. Plaintiffs Plead Adequate Factual Content

#### a. The Complaint Sufficiently "Ties" Improper Underwriting Practices to the Originators

Defendants ask the Court to ignore the detail pled regarding the various originating Companies' improper (and mis-described) business practices, calling them "speculation." Defs.' Mem. at 18. The Complaint, however, makes detailed factual allegations that, contrary to statements within the Offering Documents, the named originators of the mortgages underlying the Certificates – AHM, MortgageIT, Countrywide, IndyMac, GreenPoint, Impac, Ohio Savings Bank, RFC, and Home 123 – did not adhere to underwriting, quality control, and due diligence practices and policies. For example:

- AHM routinely made loans that "made no sense," (¶81) that were "questionable and risky," (¶86) and that had "especially lax underwriting guidelines." (¶90).

- MortgageIT's lending practices were "extremely aggressive" and it doled out "bad loans" that were characterized as "garbage" by MortgageIT's own employees. (¶¶94, 95).

- Countrywide's loan originators systematically disregarded and/or manipulated the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and sold ultimately to plaintiffs and the Class. (¶¶ 96-157).

*See also* ¶¶76-77, 79, 84-85, 87-89, 91-92 (AHM), ¶¶76-79, 91 (Countrywide), ¶¶159-78 (IndyMac), ¶¶180-83 (GreenPoint), ¶185 (Impac), ¶186 (Ohio Savings Bank), ¶187 ( RFC), and ¶188 (Home 123).  Indeed, Deutsche Bank bought MortgageIT in January 2007, and therefore had detailed knowledge of its activities.  This detail goes far beyond "speculation," showing systemic practices that differed from those described in the Offering documents.  Thus, no speculation is necessary to tie these originators to the improper practices used in issuing the loans underlying the Certificates.

### b.  Every Loan Underwritten by the Originators was "Affected" by the Originators' Underwriting Practices

Defendants next question whether "some" of the loans underlying the Certificates were "affected" by the improper lending practices alleged.  The Complaint, however, specifically alleges that ***every named originator systematically employed improper lending practices*** by virtue of their weak utilization of underwriting, quality control, and due diligence practices and policies.  ¶¶80-189.[9]  Thus, ***every loan from every one of the named originators was "affected" by such practices***.[10]

---

[9]     Defendants seemingly would have plaintiffs **prove** that the behavior alleged was in fact systemic.  However, plaintiffs need only allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

[10]    That some of the thousands of "affected" loans may have by chance met the Offering Documents' stated underwriting guidelines, notwithstanding that such guidelines were not actually

c.      **Statements and Omissions Concerning the Originators'
Improper Underwriting Practices Were Material**

Finally, defendants claim their misstatements were not material because the Complaint does not point to specific loans that were improperly issued. Defs.' Mem. at 19. Materiality, however, is generally not suitable for determination on a motion to dismiss. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance'").[11] Moreover, there is no bright-line test for materiality based on magnitude of the harm alone. *Id.* at 162-63 ("we have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation").[12]

The misstatements and omissions in the Offering Documents are material because they relate to pertinent information affecting the value of the Certificates and "'significantly altered the "total mix" of information made available'" about the securities. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) ("to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available'"); ¶¶58-208. The Offering Documents never disclosed that loans went to people who could not afford to repay them, and that

_____

followed, is irrelevant. Investors in the Certificates would still find the fact that the guidelines were not being followed material.

[11]    *See also Fuwei*, 2009 U.S. Dist. LEXIS 59658, at *45 ("'Materiality is generally a question for the fact finder.'").

[12]    *Cf. SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 496 (S.D.N.Y. 2007) ("'magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment'").

- 14 -

the originators were not following their lending guidelines but rather lending to whoever they could so they could profit by selling the loans. *See* ¶¶4, 56-65, 80-189.[13]

As explained above, plaintiffs' allegations do ***not*** require any leaps of speculation as they do ***not*** refer to the subprime market generally, but rather to ***systemic practices*** at each of the named originators.[14] Thus, the foregoing allegations – none of which are addressed in defendants' motion – are sufficient to survive a motion to dismiss.

### 4.    The Offering Documents Misrepresented and Failed to Disclose Actual Lending Practices

Defendants contend statements within the Offering Documents addressing the ***general characteristics*** of certain mortgage loan programs underlying the offerings, absolve them from liability. Defs.' Mem. at 19-28. However, the general characteristics of the relevant loans are not in dispute. The Complaint alleges that defendants are liable for misrepresentations that originators'

---

[13]    The materiality of defendants' misstatements and omissions is also demonstrated by the significant downgrading and diminution in value the Certificates experienced as the truth emerged about defendants' misrepresentations. ¶¶7, 209-11. Defendants' request for judicial notice of the recent economic downturn as the supposed true cause of the diminution in value the Certificates experienced is inappropriately raised at the motion to dismiss stage. *In re Ziff-Davis Inc. Sec. Litig.*, No. 98 Civ. 7158 (SWK), 2000 U.S. Dist. LEXIS 9076, at *7-*8 (S.D.N.Y. June 30, 2000) ("Whether the decline . . . was the result of increased competition and a loss of market share as opposed to factors affecting the computer technology industry generally . . . is a question of fact not properly resolved in a motion to dismiss."); *In re Giant Interactive Group, Inc. Sec. Litig.*, No. 07 Civ. 10588 (RWS), 2009 U.S. Dist. LEXIS 69414, at *22-*24 (S.D.N.Y. Aug. 7, 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion."); *see* Defs.' Mem. at 19 n.16.

[14]    Defendants' cases cited in support of its arguments are inapposite and unavailing.  For example, *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), did not even involve Securities Act claims; it involved a unique standing issue related to claims asserted under RICO. *Id.* at 765. Providing no guidance for what constitutes supposed "speculation" of Securities Act violations, *First Nationwide* merely rejected plaintiff's damages methodology utilized to establish standing. *Id.* at 770-72.

underwriting practices were intended "to evaluate the borrower's credit standing and repayment ability" (¶58),[15] when in fact the originators' polices were actually "designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage."[16]

¶59.  **Nowhere** in the Offering Documents did they disclose this.  As such, the so-called "disclosures" defendants rely on cannot shelter them from liability for the materially false and misleading statements contained in the Offering Documents.  *See Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . . must relate directly to that by which plaintiffs claim to have been misled."); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("the cautionary language must . . . warn[] of the specific contingency that lies at the heart of the alleged misrepresentation").

### a.  Borrowers' Income and Debt-to-Income Ratios

Defendants argue that investors had no basis to rely on stated underwriting standards for borrowers' incomes and DTI ratios because the Offering Documents disclosed the "originators' practice of making loans with little or no documentation or verification of borrowers' incomes."[17]

---

[15]     *See also* ¶¶64, 81, 91-92, 94, 97, 159, 180, 183, 185-87, 189.

[16]     *See also* ¶¶58-189.

[17]     Defendants go so far as to say that this fact alone somehow made it obvious to investors that certain loan programs, by virtue of not requiring documentation or verification of income or assets, gave borrowers and lenders **carte blanche** to lie.  *See* Defs.' Mem. at 21-22.  Defendants' cases, however, are factually distinct and stand for the unremarkable proposition that the "total mix of information" in a prospectus is not substantially altered by the run-of-the-mill consequences of already disclosed events.  *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993) (holding that a weakened ability to repay bonds owed is a natural consequence of an "already weakened" economy)*; Garber v. Legg Mason, Inc*., 537 F. Supp. 2d 597, 612-13 (S.D.N.Y. 2008) (holding that employees changing jobs is a natural result of a "significant change in [a company's] ownership and structure"), *aff'd*, 2009 U.S. App. LEXIS 21404 (2d Cir. Sept. 30, 2009).  Here, systemic lying by the borrowers and lenders underlying the mortgage-backed securities is hardly

Defs.' Mem. at 19-22.  As an initial matter, plaintiffs do *not* allege that the Offering Documents concealed the existence of loans with little or no documentation or verification of borrowers' incomes.  Rather, the Complaint alleges originators ***affirmatively encouraged borrowers to overstate income and therefore knew DTI ratios were understated***.  For example, the Complaint alleges that originators accepted applications from self-employed borrowers, who were actually required to submit stated income applications, that included income levels inflated to extreme levels relative to the stated job titles just to get the applications approved and the loans funded.  ¶¶60-61, 65; *see also* ¶¶4-5, 92, 101-103, 109, 112, 114, 118, 124, 156-57.

Moreover, defendants' argument concerning borrowers' incomes and DTI ratios is flawed for at least two reasons.  First, defendants fail to mention that the AHM Prospectus to which they cite (Defs.' Mem. at 21) states that loans made with little documentation or verification of borrowers' incomes have underwriting standards that ***require "other compensating factors"*** to be present.  ¶92 But, as the Complaint alleges these "other compensating factors" were not required in reality.  *Id.*

Second, disclosing that loans required "little or no documentation or verification of borrowers' incomes," is *not* the same as disclosing that originators intentionally and systematically overstate income and understated DTI ratios to create the false impression that the loans conformed to lending guidelines and allowed credit scores to be manipulated by the borrower (*i.e.*, become an approved user on another person's credit card or other account who had better credit ratings).  *See, e.g.*, ¶¶5, 92.  Thus, such general disclosures of loan characteristics cannot serve to immunize defendants.  *See Rombach*, 355 F.3d at 173 ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because

---

something that investors would consider run-of-the-mill and certainly would affect the "total mix of information" in the Offering Documents.

there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").[18]

### b.      Appraisals and LTV Ratios

With respect to appraisals, the Offering Documents falsely represented that loan originators would obtain independent appraisals for each property considered for financing and that such appraisals would be based on the market value of comparable homes, estimated rental income, and the cost of replacing the home all in conformity to industry standards.  ¶66.  The Complaint details how these statements were false and misleading.  Defendants however mischaracterize plaintiffs' allegations concerning appraisals and LTV ratios as merely anecdotal allegations of improper appraisal practices.  *See* Defs.' Mem. at 22-25.  To the contrary, the Complaint specifically alleges systemic improper appraisal practices such as appraisers not being independent from brokers and lenders, and appraisers succumbing to mortgage broker pressure to provide pre-determined inflated and false appraisal values that violated USPAP requirements.  *See* ¶¶76-79.[19]

The Complaint also sets forth additional ***specific*** large-scale examples that show it is more than plausible that each of the originators engaged in systemic, improper appraisal practices that violated USPAP requirements and contributed to industry-wide appraisal and LTV inflation. *Twombly*, 550 U.S. at 570 (a complaint need only allege "enough facts to state a claim to relief that

---

[18]      *See also In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *54 (S.D.N.Y. Feb. 3, 2005) ("discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized"); *In re Prudential Sec. Ltd. P'ships. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'").

[19]      Because AHM and Countrywide are specific originators who ***sold specific loans to twelve of the fourteen Trusts*** (¶¶12, 80, 96), plaintiffs' allegations concerning inflated appraisals and LTV ratios refer to the ***specific loans*** underlying the Certificates.

is plausible on its face"); *see also Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard is ***not*** akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); *see* ¶¶66-189.  For example, **the Chair of the Appraisal Institute testified before members of the Senate** that lenders placed pressure upon appraisers that "[t]oo often" "succeeded in generating artificially high appraisals and appraisals being done on a 'drive by' basis." ¶73.[20]  Thus, based on these allegations it was more than plausible that the appraisals were not performed in accordance with USPAP requirements and were systematically inflated because "lenders and/or their agents, such as mortgage brokers, exerted pressure on appraisers to come back with pre-determined, preconceived, inflated and false appraisal values."  *See* ¶71; *see also* ¶¶4, 58-189.  This information was not disclosed in the Offering Documents.[21]

Defendants improperly rely on testimony not cited in or referenced by the Complaint and misquote the findings of a study referenced by the Complaint to conclude that the systemic, improper appraisal practices "were well known [to plaintiffs] prior to their purchase of the securities at issue."  Defs.' Mem. at 24.  However, even if the testimony and the study results were somehow available to and known by plaintiffs prior to their 2006 and/or 2007 purchases, "[t]hat certain materially false company filings may be contradicted by publicly available facts merely demonstrates the brazenness of defendants' mendacity; it does not absolve defendants of their

---

[20]     In addition, a 2007 survey of 1,200 appraisers found that ***"90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through."***  ¶74.

[21]     Further, the Complaint alleges that "[d]ue to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements ***were*** artificially low, making it appear that the loans underlying the trusts were safer and less risky than they really were." ¶190.  This information – that the LTV ratios listed in the Prospectus Supplements were simply false and understated – was not disclosed anywhere in the Offering Documents, and in fact, defendants do not contend that it was.

reporting requirements under federal securities law." *SEC v. Universal Express, Inc.*, No. 04 Civ. 2322 (GEL), 2007 U.S. Dist. LEXIS 65009, at *23 (S.D.N.Y. Aug. 31, 2007).[22]  Defendants essentially demand that plaintiffs perform due diligence on the securities that, as alleged in the Complaint, they themselves failed to do.[23]

<strong>c.      Other Lending Practices by Originators</strong>

Defendants argue that the Complaint fails to allege material misrepresentations concerning loans issued outside the stated lending guidelines because "the Offering Documents disclose, in great detail, the relevant characteristics of the securitized loans and their borrowers." Defs.' Mem. at 25. As discussed above, while the Offering Documents described general characteristics of the loan programs and contained purported warnings and risk disclosures, ***none*** of these purported disclosures revealed the material information plaintiffs allege was omitted and contradicted those very disclosures.  For example, undisclosed to investors and contrary to the representations set forth in the Offering Documents, the actual lending practices used by the originators were not intended to evaluate the borrower's credit standing and repayment ability, but instead, were designed to originate

---

[22]     *Fuwei*, 2009 U.S. Dist. LEXIS 59658, at *39 ("[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them") (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987)).

[23]     Defendants' citations to both *Starr v. Georgeson S'holder Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) and *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005) for the proposition that investors are responsible for knowing about the improper appraisal practices is disingenuous at best.  In *Starr*, the Second Circuit merely held that where plaintiffs affirmatively plead and do not dispute that ***company-specific information was sent to them***, they cannot dispute that information was part of the "'total mix'" of information "'reasonably available'" to them.  412 F.3d at 110.  Moreover, the *Progress Energy* court held that defendants need not disclose a "***generally applicable tax provision that applies to all corporations***" as laws and regulations constitute information that is "publicly known."  371 F. Supp. 2d at 552-53.

- 20 -

as many loans as possible without regard to the borrowers' ability to meet their obligations under the mortgage. *See, e.g.*, ¶¶59, 63, 81-83, 92, 95, 157, 159, 180, 182, 185. Thus, **none** of these purported warnings put investors on notice of the actual risks associated with the Certificates.

More specifically, defendants argue that investors had no basis to rely on stated underwriting standards because the Offering Documents disclosed borrowers' Fair Isaac & Company ("FICO") credit scores and the statistics associated with both adjustable rate mortgages ("ARMs") and loans for properties that were not owner occupied. Defs.' Mem. at 26. Again, defendants attempt to hide the bigger picture painted by plaintiffs' allegations – that undisclosed to investors, underwriting guidelines existed to increase loan volume and **not** to evaluate borrowers' repayment ability. Moreover, plaintiffs do more than just conclude that there were misleading statements and omissions.

For example, the Complaint alleges that originators violated stated guidelines by systematically waiving FICO scores and by issuing loans, including ARMs, with less verification documentation when "other compensating factors" were not present. ¶¶83, 95, 124, 168, 169. In addition, the Complaint alleges that, undisclosed to investors, ARMs were **not** issued based on the borrowers' ability to repay as ARMs were issued to borrowers who could not afford them once the initial or "teaser" interest rate expired. ¶¶83, 104, 107. While defendants argue that the Offering Documents disclosed that ARMs "were underwritten on the assumption that the borrowers would be able to make higher monthly payments in a relatively short period of time," and "borrowers' income may not be sufficient to meet their loan payments as payment amounts increase" (Defs.' Mem. at 28), defendants failed to disclose that (1) these disclosures were misleading because ARMs were improperly issued to increase loan volume; (2) historical data showed that borrowers with ARMs "paid only the 'minimum' payment;" (3) borrowers' ***incomes were systematically inflated***; and (4) it

was a *certainty* that borrowers *would not be able to meet their loan payments once the teaser rate expired*. ¶¶5, 59-65, 83, 104, 107.

Finally, contrary to defendants' assertions, disclosing that the occupancy status of a property is "'as represented by the mortgagor in its loan application'" (Defs.' Mem. at 26) is not the same as disclosing that originators *unreasonably* considered the supposed owner-occupied status of a property as indicative of "the intent and willingness of a borrower to repay the mortgage" even though there was "*no verification either before or after the loan was funded* that the borrower took occupancy unless a review of a defaulted loan was being completed." ¶186.

These specific allegations of misstatements and omissions concerning the lending guidelines are more than adequate to defeat the instant motion.

### 5.   The Offering Documents Did Not Disclose the Falsity of the Credit Ratings

Defendants argue that the Certificates' ratings cannot give rise to liability under the Securities Act because the ratings are not considered part of the Offering Documents. Defs.' Mem. at 31-32 (citing SEC Rule 436(g)). But Rule 436(g) does not exempt defendants from liability. As an initial matter, Rule 436(g) was not intended to exempt any of the defendants at issue in this case. Rather, the Rule is applicable only to the *rating agencies*, not defendants. *See Disclosure of Security Ratings in Registration Statements*, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024, 42025 (Aug. 18, 1981) ("Rule 436(g) . . . if adopted, would not require a *rating organization* to consent under Section 7 and would exempt *it* from liability as an expert under Section 11 of the Act."). Rule 436(g) is thus inapplicable, and defendants remain liable for all misrepresentations contained in the Offering Documents, including the false and misleading ratings. *See In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 998 (S.D.N.Y. 1992) ("An issuer has absolute

- 22 -

liability [under §11] for *any* misrepresentations or omissions.").  Defendants here chose to include the statements at issue and remain responsible for them.

Moreover, Rule 436(g) is also inapplicable here because the Rule, by its plain terms, applies only to security ratings assigned to "a class of *debt securities*, a class of *convertible debt securities*, or a class of *preferred stock*."  SEC Regulation C, Rule 436(g)(1), 17 C.F.R. §230.436(g)(1).  Here, the Offering Documents make it clear that the Certificates are *not* debt securities, convertible debt securities or preferred stock.  Rather, the Certificates are common *equity interests* in the issuing Trusts.  *See* Taylor Decl., Ex. A at 92 ("The certificates represent in the aggregate the entire beneficial *ownership interest* in the trust fund established by the Depositor into which the Mortgage Loans will be deposited.") *see also Nationally Recognized Statistical Rating Organizations*, SEC Release Nos. 33-7085; 34-34616, 59 Fed. Reg. 46314, 46316 n.19 (Sept. 7, 1994) (stating that "Rule 436(g) under the Securities Act does not cover equity securities").[24]  As such, Rule 436(g)'s exemption from liability under §11 clearly does *not* apply to the Certificates here.[25]

Next, defendants attempt to avoid liability by disclaiming ownership of the ratings and asserting that the Offering Documents "disclosed precisely what Regulation AB required."  Defs.' Mem. at 32.  This argument, however, overlooks the strict liability that attaches under §§11 and

---

[24]      *See also Adoption of Integrated Disclosure System*, Securities Act Release No. 6383, 47 Fed. Reg. 11380, 11392 n.53 (Mar. 16, 1982) (codified at 17 C.F.R. pts. 200, 201, 229, 230, 239, 240, 249, 250, 260, and 274) (noting that investment companies may include security ratings for equities in registration statements, but "may not be able to rely on Rule 436(g) in connection with such ratings in view of the Rule's limitation to debt and convertible debt securities and preferred stock").

[25]      Moreover, even if Rule 436(g) were somehow applicable to the Certificates, defendants' liability under §12(a)(2) would be unaffected because the Rule explicitly applies only to §§7 and 11, and not §12.  *See Disclosure of Security Ratings in Registration Statements*, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024, 42025 (Aug. 18, 1981) ("Rule 436(g) . . . if adopted, would not require a rating organization to consent under Section 7 and would exempt it from liability as an expert under Section 11 of the Act.").

12(a)(2) to untrue statements of material fact or omissions in "***any part of the registration statement***." 15 U.S.C. §77k(a). Having chosen to include the ratings in the Offering Documents, defendants undertook responsibility for their falsity. *See In re Lilco Sec. Litig*., 625 F. Supp. 1500, 1503 (E.D.N.Y. 1986) ("'Liability against the issuer of a security is virtually absolute, even for innocent misstatements.'") (quoting *Huddleston,* 459 U.S. at 382). Because the ratings were false and misleading, defendants are liable under §11.

Finally, defendants' nonsensical argument that plaintiffs do not actually allege that the ratings were inaccurate, just that the ratings were based on inaccurate data, falls flat. Defs.' Mem. at 32. In addition to providing substantial detail about the ratings agencies' flawed methods of arriving at the ratings because of outdated models, relaxing of ratings criteria and use of inaccurate and unreliable loan data (*see* ¶¶193-208), plaintiffs specifically allege the ratings were inaccurate. The Complaint states, "[t]hese artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates." ¶208. *See also* ¶¶192, 207.

### 6.    Defendants Were Under a Duty to Disclose the Omitted Information

Defendants also argue that SEC Regulation AB insulates them from liability for misleading statements and omissions concerning violations of originators' underwriting guidelines and controls. Defs.' Mem. at 27, 29. Section 11, however, creates a private right of action where "any part of the registration statement . . . ***omitted to state a material fact*** required to be stated therein or ***necessary to make the statements therein not misleading***." 15 U.S.C. §77k(a). Defendants who choose to make disclosures in a registration statement have a duty to do so accurately and completely. *See, e.g.*, *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("once a party chooses to discuss material issues . . . one 'has a duty to be both accurate and complete'");

*Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak, one must speak truthfully about material issues").   Here, defendants failed that duty by making affirmative misstatements concerning loan underwriting and failing to disclose that lenders were underwriting loans for their own financial gain rather than based on following the stated underwriting guidelines. ¶¶58-208.

Moreover, as set forth above, "[n]either Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action." *Rombach*, 355 F.3d at 169 n.4 (citing *Huddleston*, 459 U.S. at 382).   As such, there is no requirement under §§11 or 12(a)(2) that plaintiff allege defendants actually had knowledge of the omitted information.   *See Twinlab*, 103 F. Supp. 2d at 203 ("defendant's knowledge of the misrepresentations is not an element of a Section 11 claim; indeed, a defendant can be held liable even for an innocent misstatement").   Despite these well-established principles, defendants argue that the SEC's "Regulation AB unambiguously requires only the disclosure of deviations from originators' underwriting guidelines 'to the extent known'" Defs.' Mem. at 27.   Defendants, however, identify no authority holding that untrue statements about underwriting standards in offering documents for an asset-backed security cannot form the basis of a §11 claim, absent allegations of knowledge.[26] Defendants' argument not only disregards the clearly mandated principles of strict liability under the Securities Act for innocent misstatements, but it also relies on a blatant misconstruction of Regulation AB.

---

[26]     Instead, defendants' cases stand for the unremarkable proposition that SEC regulations set forth certain items which must be disclosed in all registration statements and prospectuses. *See In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999), *aff'd*, 202 F.3d 81 (2d Cir. 2000); *In re Morgan Stanley Tech. Fund Sec. Litig.*, No. 02 Civ. 6153 (BSJ), 2008 U.S. Dist. LEXIS 106909 (S.D.N.Y. Feb. 3, 2008); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668-69 (S.D.N.Y. 2008).

SEC regulations, such as Regulation AB, are designed to supplement – not replace – the more general disclosure language of §§11 and 12(a)(2).  Indeed, defendants' own authority recognizes that the specific disclosure requirements promulgated under SEC regulations represent disclosure obligations that are in addition to, not in place of, defendants' general duty to disclose any information that is required in order to make other statements not misleading.  *See N2K Inc.*, 82 F. Supp. 2d at 207 ("a material omission from a registration statement is actionable if the omitted facts (1) were required by SEC regulations to be stated therein, *or* (2) were necessary to make the disclosures in the registration statement not misleading"); *Morgan Stanley*, 2008 U.S. Dist. LEXIS 106909, at \*22 ("a duty to disclose may arise when additional information is needed to make another statement, *whether required or voluntarily* made, not misleading").

Defendants' disclosure duty under Regulation AB was *separate and apart* from defendants' duty to disclose all material facts "necessary to make the statements [in the Offering Documents] not misleading."  15 U.S.C. §77k(a); *see also* 17 C.F.R. §230.408(a) ("*In addition to* the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.").  As set forth above, the Complaint adequately alleges defendants made statements in the Offering Documents regarding the originating and underwriting practices associated with the underlying loans.  Accordingly, notwithstanding Regulation AB, §§11 and 12(a)(2) make defendants liable for their failure to disclose certain material facts necessary to make such statements not misleading.

### D.   Plaintiffs' Claims Are Not Time-Barred

Defendants assert that plaintiffs were on inquiry notice of the causes of action asserted in the Complaint more than one year prior to the filing of the first complaint in this action.  Defs.' Mem. at 12.  Defendants are wrong.

- 26 -

### 1.      The Standard for Inquiry Notice

The Second Circuit has set forth a particularly stringent standard, pursuant to which "'[i]nquiry notice exists only when ***uncontroverted*** evidence ***irrefutably*** demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.'"  *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 194-95 (2d Cir. 2003) (quoting *Nivram Corp. v. Harcourt Brace Joranovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).   To demonstrate that plaintiffs had such inquiry notice, defendants must present uncontroverted evidence of so-called "'storm warnings,'" which must be ***directly related*** to the legal claims asserted by plaintiffs.  *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427 (2d Cir. 2008).  In the Second Circuit, defendants' evidence of storm warnings must be such that they would apprise a person of reasonable intelligence that the wrongdoing and legal claims which form the basis of plaintiffs' suit were "'***probable***, not merely possible.'"  *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006).

For this reason, "the U.S. Court of Appeals for the Second Circuit has stressed the caution with which courts must approach the inquiry notice question on a motion to dismiss."  *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 246 (S.D.N.Y. 2006) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)) ("'Whether a plaintiff had sufficient facts to place it on inquiry notice is "often ***inappropriate for resolution on a motion to dismiss***."'") (quoting *LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003)).

### 2.      Defendants Have Not Established Inquiry Notice

In support of their argument, defendants ignore plaintiffs' specific allegations and instead principally cite to an appendix of media reports, articles and/or lawsuits about general loan

underwriting standards.[27] *See* Defs.' Mem. at 14-18.  Defendants contend these materials establish inquiry notice because they supposedly demonstrate that "a wealth of information underpinning plaintiffs' allegations was publicly available well before June 27, 2007." *Id*. at 14.  However, defendants' argument fails to satisfy the extremely high burden they face in showing inquiry notice for the following reasons: (1) their "evidence" does not identify any defendant or the Certificates in this action, nor state that such Certificates at issue here were not within the "investment grade" range of rating agencies; (2) the Certificates' investment grade ratings provided purportedly reliable reassurance to investors; and (3) any information even related to loan underwriting by originators named in the Complaint is divorced from the asset-backed securitization context so integral to plaintiffs' claims and/or contains words of comfort that negate concerns raised.

Moreover, defendants' assertion that this general industry information somehow establishes inquiry notice as a matter of law completely undermines and contradicts other arguments made by defendants.  Defendants argue that the factual allegations of the Complaint fail to state a claim because they are "general allegations of industry-wide practices," and thus do not "relat[e] to improper lending practices . . . tied to *any* of the loans securitized in the Offerings." Defs.' Mem. at 18 (emphasis in original); *see also id.* at 2, 23.  Then, defendants also claim that the same information and allegations somehow placed plaintiffs on notice that their claims against defendants were "probable" two years ago.  *See* Defs.' Mem. at 12-18.  Defendants' stark contradiction is

---

[27]     Defendants' argument relies extensively on the availability of various materials from outside the pleadings.  While plaintiffs recognize the Court may take judicial notice of the fact that such materials were in existence at the time, plaintiffs object to the use of any such materials to support the truth of the matters asserted therein.  *Staehr*, 547 F.3d at 424 (noting with approval that, "[t]he District Court took judicial notice of, *inter alia*, media reports . . . and regulatory filings" but "***did 'not take judicial notice of the documents for the truth of the matters asserted in them***, but rather to establish that the matters [had] been publicly asserted'").

extremely telling – it severely undermines their arguments regarding the adequacy of plaintiffs'

factual allegations, and effectively destroys their contentions regarding inquiry notice.[28]

> a.     **Generic Media Reports Do Not Establish Inquiry Notice**

Contrary to defendants' assertions, media generally about the subprime industry's woes do

not lead to the ***probability*** that the misstatements and omissions alleged in the Complaint likely

occurred.  *See, e.g.*, Declaration of Joseph M. Salama in Support of Defendants' Motion to Dismiss

("Salama Decl."), Ex. 24 (regarding approvals of bad loans, with no mention of either a defendant in

this action or mortgage-backed securities).  Plaintiffs here purchased mortgage-backed securities –

Certificates – that were sold based on statements of assurance by defendants that the specific loans

underlying the Certificates were in accordance with originators' stated underwriting, quality control,

and due diligence practices and policies.  In that regard, the reports and articles cited by defendants

must be viewed through the lens of the plaintiffs who were purchasing specific loan pools that had

supposedly been vetted by defendants.[29]

---

[28]     Plaintiffs note that the differences between the pleading standard for adequately stating a claim for relief under Rule 8(a) and that for establishing inquiry notice as a matter of law prevent plaintiffs' argument here from contradicting or undermining the sufficiency of the allegations in the Complaint.  *Compare Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard is ***not*** akin to a 'probability requirement . . . .") *with Levitt v. Bear Sterns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003) (duty of inquiry arises only after "'the circumstances would suggest to an investor of ordinary intelligence the ***probability*** that she has been defrauded'").  In other words, while the totality of all the factual allegations set forth in the Complaint ***as well as*** those derived from plaintiffs' counsel's non-public investigatory efforts, clearly makes plaintiffs' claims ***"plausible"*** at this point in time, it is equally clear that the generic information relied on by defendants, which failed to specifically identify either the Certificates or the defendants, could not possibly have been understood at that time to apprise an investor of "ordinary intelligence" that the claims alleged in the Complaint were "***probable***, not merely possible."  *See Newman*, 335 F.3d at 193.

[29]     In fact, the various Prospectus Supplements identified the entities responsible for the various layers of underwriting and touted that "the Master Servicer [(who is usually the same entity as the originator)] may be required to enforce certain remedies on behalf of the Trust and at the direction of the Trustee against [a] defaulting Servicer."  *See, e.g.*, Taylor Decl., Ex. B at 76.  Even the media

The Second Circuit's opinion in *Staehr* is particularly instructive on the issue of general media failing to provide inquiry notice. *See* 547 F.3d at 426-33.  In *Staehr*, defendants argued that plaintiff had been placed on inquiry notice by four lawsuits, various articles from news sources and industry newsletters, portions of defendants' regulatory filings with the SEC, and samples of annual insurance filings. *Id.* at 416.  The Second Circuit found that "[b]ecause nearly all of the stories in the record are devoid of company-specific information, the argument that they constitute 'storm warnings' is far from compelling." *Id.* at 428.  Further noting that "the specificity of storm warnings bears directly on the determination of whether, under the totality of the circumstances, a plaintiff should be charged with a duty to inquire," the court held "[t]he news reports in the record were insufficient to give a reasonable investor notice of a probability that they might have been defrauded." *Id.* at 428-29.

Here, ***none*** of the articles or reports defendants rely on to establish inquiry notice specifically mention either the Certificates or any of the defendants.[30]  As in *Staehr*, these generic materials fail to irrefutably demonstrate that a reasonable investor would have had knowledge of a probable Securities Act claim prior to June 27, 2007. *See In re Initial Pub. Offering Sec. Litig.*, 341 F. Supp. 2d 328, 347 (S.D.N.Y. 2004) ("Unless Defendants can produce 'uncontroverted evidence [that]

---

articles cited by defendants support the fact that investors reasonably believed such vetting occurred. *See, e.g.*, Salama Decl., Ex. 61 (08/30/06: "The investment banks have been sending mortgages back to lenders if they find slip-ups, such as inaccurate paperwork or poor performance.").

[30]   Defendants utilize Mr. Salama's declaration to detail the allegations of three lawsuits (Defs.' Mem. at 17 (citing Salama Decl. ¶¶68, 76, 79)) and then summarily conclude that they provide inquiry notice of improper underwriting practices here.  While the lawsuits concern allegations against either IndyMac or New Century, the suits make no mention of defendants or the Certificates at issue in this litigation. *See* Salama Decl. ¶¶76, 79.

*irrefutably* demonstrates when plaintiff discovered or should have discovered the fraudulent scheme,' they cannot satisfy the ***heavy burden*** of establishing inquiry notice as a matter of law.").[31]

### b. Investment Grade Ratings Provided Reassurance

The best assurance that the specific pool of loans making up a particular issuance were in accordance with originators' stated underwriting, quality control, and due diligence practices and policies – and thus, unlikely to suffer surprising default rates – was the fact that the supposedly independent rating agencies had thoroughly examined the portfolios and offered the imprimatur of their stellar ratings. *See* ¶191. This is very important, because whatever problems Countrywide, for example, may have reportedly been experiencing with some of its subprime loans, ultimately the rating agencies' "investment grade" ratings provided the kind of reassurance to investors that absolutely disquieted any concerns about the underlying collateral. This is the critical overlay that must be considered in determining the relative strength of purported storm warnings about originators' stated underwriting, quality control, and due diligence practices and policies.

### c. Defendants' "Evidence" Is Controverted

Defendants cannot avoid the fact that even in the rare instance where defendants' materials reference originators identified in the Complaint, the vast majority of information concerning loan

---

[31]    *See also Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 300 (S.D.N.Y. 2004) (finding that "generalized media reports . . . without more specific reports pertaining to the parties . . . were insufficient to create a duty of inquiry [because] [a]t most, those reports should have instilled in plaintiffs a healthy skepticism towards research reports; they did not reveal a 'probability' of fraud"); *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 51 (S.D.N.Y. 2001) (finding two dozen articles reflecting "general public awareness" of industry wrongdoing insufficient to put plaintiffs on inquiry notice); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV. 3288 DLC, 2003 WL 22790942, at *5 (S.D.N.Y. Nov. 25, 2003) (finding press reports regarding conflicts between research departments and investment banking departments at large financial institutions did not constitute "'storm warnings'" where press reports were vague and did not discuss corporation in particular).

underwriting is divorced from the asset-backed securitization context so integral to plaintiffs' claims and/or contains reliable words of comfort.  Such materials are too general to constitute storm warnings.  For example:

- In a July 27, 2005 *Wall Street Journal* article regarding loosening of lending standards, a lender reassured the public that borrowers received home-equity loans "without having their incomes verified" "'***only***'" if the borrowers had "'***the very highest credit rating***.'"  Lenders further assured the public that "advances in technology and data analysis enable them to do a better job of determining who is a good credit risk. . . . '***we've become much better predictors of loan performance*** with automated and underwriting systems and appraisal practices.'"  *See* Salama Decl., Ex. 23.

- In an August 22, 2006 *Wall Street Journal* article entitled "'Stated Income' Home Mortgages Raise Red Flags," ***Countrywide Financial Corp.*** represented that it has "proper controls and safeguards in place to adequately manage risks of loans with reduced documentation" and they "always attempt to gauge the validity of the stated income."  *See* Salama Decl., Ex. 29.

Defendants use these and other articles to argue that the world in general was aware that the specific originators related to this case were issuing loans that were at a high risk of failure, and were engaging in poor business practices.  Yet the language they cite not only contradicts the conservative business practices they attribute to the originators throughout their opposition, but goes far beyond the purported "risk disclosures" they now seek to rely upon.  Defendants cannot have it both ways.  The statements they chose to include in the Offering Documents characterizing the originators' business practices, gave comfort to investors.  To the extent these statements contradicted allegations in the media, they remain misleading.  Defendants have thus failed to "produce '***uncontroverted*** evidence [that] ***irrefutably*** demonstrates'" that plaintiff was on notice of its claims prior to June 27, 2007.  *Initial Pub. Offering*, 341 F. Supp. 2d at 347.  As a result, defendants "cannot satisfy the heavy burden of establishing inquiry notice as a matter of law."  *Id.*

E.   **The Complaint Adequately States a Claim for Violation of §15 of the Securities Act**

Here, as set forth fully above, the Complaint adequately alleges primary violations for both §§11 and 12(a)(2) claims.  Thus, plaintiffs' §15 claim is viable, as the underlying §§11 and 12(a)(2) claims are actionable as a matter of law.[32]   Accordingly, defendants' motion to dismiss the Complaint for failing to plead a claim under §15 should be denied.

F.   **Defendants Cannot Escape Liability by Pointing to Purported "Cure" Provisions in the Offering Documents**

Defendants contend that they should be relieved of liability for misstatements concerning the characteristics of the loans underlying the Certificates because the Offering Documents purportedly describe a process by which loans that did not comply with the disclosed characteristics could be "cured" or replaced at the request of the investor.  *See* Defs.' Mem. at 29-31.  However, liability exists under §§11 and 12(a)(2) for a misstatement in the Offering Documents irrespective of any other remedial relief, especially where such remedial relief is available only *after* plaintiffs purchased the Certificates pursuant to false Offering Documents.  *See* 15 U.S.C. §77k (to state a claim under §11, a plaintiff need only plead that: (1) he or she purchased a registered security; and (2) the registration statement contained a material misstatement or omission).

Furthermore, the Securities Act specifically provides that defendants cannot insulate themselves from liability under §§11 or 12(a)(2) by including a provision in the Offering Documents requiring investors to waive their rights under the Securities Act. 15 U.S.C. §77n ("Any condition,

---

[32]   Moreover, the question of whether the Individual Defendants exercised sufficient control over a corporation is an inherently factual question and one that should not be resolved at the pleading stage.  *See, e.g.*, *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (noting that "control" status for purposes of control person liability is "a question of fact which depends upon the totality of the circumstances").

- 33 -

stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title . . . or of the rules and regulations of the Commission shall be void.").[33] Significantly, "[t]he statutory framework of the 1933 and 1934 Acts compels the conclusion that individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision." *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1050-51 (2d Cir. 1995) (holding that claims under the federal securities laws cannot be precluded by a "no-action clause" in an indenture).  In light of the foregoing, defendants' claim that the purported "cure" provision in the Offering Documents preempts plaintiffs' ability to bring claims under the Securities Act must fail.

Moreover, defendants' "sole remedy" argument relies on a decision in the Northern District of Texas, *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, No. 3:08-CV-0261-L, 2008 WL 4449508, at *7 (N.D. Tex. Sept. 30, 2008).  As the *Lone Star* Court disagrees with binding precedent in the Second Circuit, such as *McMahan* (65 F.3d 1044), this Court must disregard it.  Further, *Lone Star* is wholly distinguishable on its facts, as unlike the *Lone Star* plaintiffs who alleged that a small number of specific loans in each of the pools were delinquent (2008 WL 449508, at *3), plaintiffs here allege that the value of the securities as a whole were inflated because of defendants' misstatements about their systemic business practices which were used to underwrite all of the loans at issue.  ¶¶58-65.  Thus, unlike *Lone Star*, the problems at issue cannot be cured by invoking a "repurchase or substitute" provision and replacing a small handful of loans as ***all of the underlying***

---

[33]      Because of the express terms of §14 of the Securities Act, "courts have been careful in securities cases to preserve the rights of private action under the securities laws."  *Stratmore v. Combs*, 723 F. Supp. 458, 461 (N.D. Cal. 1989) (citing, *e.g.*, *Doody v. E.F. Hutton & Co.*, 587 F. Supp. 829, 833 (D. Minn. 1984) ("Since the securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision.")), *aff'd*, 968 F.2d 810 (9th Cir. 1992).

- 34 -

*loans* during the relevant period were generated pursuant to the same undisclosed underwriting and appraisal practices. *Id*. Additionally, to the extent plaintiffs and class members have sold their securities, the loan replacement remedy cannot apply.

## IV.    CONCLUSION

For the foregoing reasons, the Court must deny defendants' motion to dismiss in its entirety.

DATED:  October 9, 2009                    Respectfully submitted,

                                           COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           ARTHUR C. LEAHY
                                           THOMAS E. EGLER
                                           SCOTT H. SAHAM
                                           SUSAN G. TAYLOR
                                           COURTLAND W. CREEKMORE
                                           NATHAN R. LINDELL
                                           MATTHEW I. ALPERT


                                                    s/ Susan G. Taylor
                                           _____
                                                 SUSAN G. TAYLOR

                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)

                                           COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD
                                           CAROLINA C. TORRES
                                           JARRETT S. CHARO
                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

Co-Lead Counsel for Plaintiff

S:\CasesSD\Deutsche Alt\OPP00062057_1.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 6, 2009.

s/ SUSAN G. TAYLOR
SUSAN G. TAYLOR

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  staylor@csgrr.com

# Mailing Information for a Case 2:08-cv-03178-LDW -ARL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas E. Egler**
  tome@csgrr.com,nlindell@csgrr.com,e_file_sd@csgrr.com

- **Jonathan Gardner**
  jgardner@labaton.com,electroniccasefiling@labaton.com

- **Arthur C. Leahy**
  artl@csgrr.com,e_file_sd@csgrr.com

- **Nathan R Lindell**
  nlindell@csgrr.com,e_file_sd@csgrr.com

- **Richard Owens**
  richard.owens@lw.com

- **David A. Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H. Rudman**
  srudman@csgrr.com

- **Scott H Saham**
  scotts@csgrr.com,e_file_sd@csgrr.com

- **Joseph M. Salama**
  joseph.salama@lw.com,Jessica.bengels@lw.com,Jason.grossman@lw.com

- **Susan G. Taylor**
  susant@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)