UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

MASSACHUSETTS BRICKLAYERS AND
MASONS TRUST FUNDS, Individually and
On Behalf of All Others Similarly Situated,

                      Plaintiff,

      vs.

DEUTSCHE ALT-A SECURITIES, INC., et
al.,

                Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 2:08-cv-03178-LDW-ARL

CLASS ACTION

SECOND AMENDED COMPLAINT FOR
VIOLATION OF §§11, 12(A)(2) AND 15 OF
THE SECURITIES ACT OF 1933

523428_1

## NATURE OF THE ACTION

1.      This securities class action is brought on behalf of all persons or entities who acquired Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 and Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 Mortgage Pass-Through Certificates (the "Certificates") issued by Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A" or the "Depositor") pursuant and/or traceable to a false and misleading Registration Statement filed with the SEC on May 1, 2006.  This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.      Deutsche Alt-A is a Delaware corporation formed in 2002 for the purpose of acquiring and owning mortgage loan assets and selling interests in them.  Deutsche Alt-A is a subsidiary of DB Structural Products, Inc. and is a special purpose corporation.  The issuers of the above offerings are Deutsche Alt-A, Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 and Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4.  Both Trusts were established by Deutsche Alt-A to issue the Certificates.

3.      On May 1, 2006, the Defendant Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing hundreds of millions of dollars of Certificates.  Defendant Issuers issued the Certificates pursuant to two Prospectus Supplements dated September 28, 2006 and October 30, 2006, each of which was incorporated into the Registration Statement.  The Registration Statement and Prospectus Supplements are referred to collectively herein as the "Offering Documents."  The Certificates were supported by pools of mortgage loans generally secured by liens on residential properties, including conventional, adjustable-rate, and hybrid adjustable-rate mortgage loans.  The Offering Documents

- 1 -

specifically identify IndyMac, GreenPoint and American Home Mortgage Corp. ("AHM") as key
originators of mortgages supporting the Certificates.

    4.      Defendants made the following false and misleading statements in the Offering
Documents:

- Underwriting standards used by the key originators to originate the loans
  supporting the Certificates evaluated a prospective borrower's ability to
  repay the loan;

- Property appraisals conformed to the Uniform Standards of Professional
  Appraisal Practice ("USPAP"), Fannie Mae or Freddie Mac standards;

- The loans underlying the Certificates had certain, specific, loan-to-value
  ("LTV") ratios; and

- The Certificates had "investment grade" credit ratings.

    5.      According to reports of governmental investigations and statements of former
executives and employees of the key originators who were responsible for ensuring that the
underwriting practices were as stated, the true, material facts, which defendants omitted from the
Offering Documents, were that:

- Borrowers were not evaluated on their ability to repay the loans; instead,
  loans were made regardless of a borrower's ability to repay; loan originators
  made as many loans as possible regardless of repayment ability since they
  were selling the loans to defendants at a profit; in addition, borrowers and
  loan originators were routinely inflating borrowers' incomes to falsely high
  levels to qualify borrowers for loans they could not afford to repay;

- Property appraisers' future compensation was contingent upon providing loan
  originators with pre-determined, inflated property appraisals which allowed
  borrowers to qualify for loans; in addition, appraisals were not based on
  recent sales of comparable properties; and appraisals did not conform to
  USPAP, Fannie Mae or Freddie Mac standards;

- Because the specified LTV ratios contained in the Offering Documents were
  based on inaccurate and inflated property appraisals, the LTV ratios specified
  in the Offering Documents were false, inaccurate and understated; and

- The credit ratings of the Certificates were inaccurate and understated the
  investment risk associated with the Certificates because the rating agencies

used outdated assumptions, overly-relaxed rating criteria and inaccurate data in formulating the ratings.

6.     The above misrepresentations and omissions specifically impacted the value of the Certificates as a significant number of loans backing the Certificates purchased by Lead Plaintiffs and the class contained misrepresentations regarding the borrowers' ability to repay the mortgage and/or the properties' appraised value, which were a direct result of the originators' failure to utilize the underwriting and/or appraisal standards referenced in the Offering Documents. Moreover, during this same time period, wherein defendants were selling the certificates to Lead Plaintiffs and the class, Deutsche Bank was also engaging in credit default swaps and other investments from which it profited greatly, by wagering that loans like those underlying the Certificates would decline in value.

**The 2006-AB4 Trust Was Backed by Faulty Loans
as a Direct Result of the Originators' Failure to
Utilize the Underwriting and/or Appraisal Standards
Referenced in the Offering Documents**

7.     A review of documentation for 58 loans backing Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4, including information from the attendant borrowers which have been made publicly available pursuant to bankruptcy proceedings or other records, reveals that with respect to 45 of those 58 loans (or 78%) no apparent determination as to whether the borrower could afford to repay his or her loan occurred, contrary to representations in the Offering Documents. Twelve of these 45 faulty loans were originated by the key originator for the Trust AHM, which originated approximately 37.45% of the loans in the Trust.

8.     For example, a review of sworn bankruptcy filings related to the borrower for one loan originated by AHM which was utilized to back Trust Series 2006-AB4, reveals that the borrower, who had no significant liquid assets, was required to pay 125% of his estimated monthly

- 3 -

income to service his loan and other debt.  If AHM's underwriting was actually designed to weigh all risk factors inherent in the loan file or to determine the applicants' ability to repay the loan, this loan would not have been approved and funded.

9.      Similarly, a review of sworn bankruptcy filings related to the borrower for another loan originated by AHM which was utilized to back Trust Series 2006-AB4 reveals that the borrower actually reported no income for the year prior and the year the loan was originated nor did she possess any significant liquid assets.  Again, if AHM's underwriting was actually designed to weigh all risk factors inherent in the loan file or to determine the applicants' ability to repay the loan, this loan would not have been approved and funded.  The conduct described in the previous two paragraphs which impacted the ability to repay the loan in full is indicative of the 45 faulty loans described above.

10.      A review of property information from 38 loans backing Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4, including the automated valuation of the attendant properties, reveals that 17 of those loans (or 44%) overvalued the property by 9% or more, compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 17 loans.

**The 2006-AR5 Trust Was Backed by Faulty Loans
as a Direct Result of the Originators' Failure to
Utilize the Underwriting and/or Appraisal Standards
Referenced in the Offering Documents**

11.      Similarly, a review of documentation for 58 loans backing Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5, including information from the attendant borrowers which have been made publicly available pursuant to bankruptcy proceedings or other records, reveals that with respect to 41 of those 58 loans (or 71%), no apparent determination as to whether the borrower could afford to repay his or her loan occurred, contrary to the representations in the Offering

- 4 -

Documents.  Six of these faulty loans were originated by AHM, which originated approximately 20.91% of the loans backing the trust.  Eleven of these faulty loans were originated by IndyMac, which originated approximately 21.11% of the loans backing the trust.  Three of these faulty loans were originated by GreenPoint, which originated approximately 17.66% of the loans backing the trust.

12.     For example, a review of sworn bankruptcy filings related to the borrower for one loan originated by AHM, which was utilized to back Trust Series 2006-AR5, reveals that the borrower actually earned less than $13,000 of income for 2006, or under $1,100 per month nor did she possess any significant liquid assets.  This same year AHM lent the borrower over $238,000, requiring a monthly payment of over $1,900 per month.  Again, if AHM's underwriting was actually designed to weigh all risk factors inherent in the loan file or to determine the applicants' ability to repay the loan this loan, would not have been approved and funded.

13.     Similarly, a review of sworn bankruptcy filings related to the borrower for another loan originated by IndyMac, which was utilized to back Trust Series 2006-AR5, reveals that the borrower actually reported less than $27,000 income for 2006, or $2,250 per month nor did he possess any significant liquid assets.  This same year IndyMac lent the borrower over $540,000, requiring a monthly payment of over $3,400 per month.  This obligation was in addition to significant other outstanding debts that this borrower was required to service each month.  If IndyMac's underwriting was actually designed to determine the applicants' ability to repay the loan, this loan would not have been approved and funded.

14.     Similarly, a review of sworn bankruptcy filings related to the borrower for another loan originated by IndyMac, which was utilized to back Trust Series 2006-AR5, reveals that the borrower actually reported less than $21,000 in income for 2006, or $1,733 per month nor did he

- 5 -

possess any significant liquid assets.  This same year, IndyMac lent her over $278,000, requiring a monthly payment of over $2,000 per month.  This obligation was in addition to significant other outstanding debts that this borrower was required to service each month.  If IndyMac's underwriting was actually designed to determine the applicants' ability to repay the loan, this loan would not have been approved and funded.  The conduct described in the previous three paragraphs, which impacted the ability to repay the loan in full, is indicative of the 41 faulty loans described above.

15.     A review of property information from 41 loans backing Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5, including the automated valuation of the attendant properties, reveals that 21 of those loans (or 51%) overvalued the property by 9% or more compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 21 loans.

**The Certificates Purchased by Lead Plaintiffs and the
Class Have Declined in Value as a Result of the Offering
Documents' Misrepresentations and Omissions**

16.     As a result of defendants' misrepresentations and omissions of material fact, the loans backing the Certificates sold to Plaintiffs were not originated utilizing the underwriting and appraisal practices described in the Offering Documents and a significant number of these loans were originated based upon materially false information and as a result the Certificates at issue were secured by assets that had a much greater risk profile than represented in the Offering Documents. In this way, defendants were able to obtain superior ratings on the tranches or classes[1] of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings.

---

[1]     The Certificates were divided into tranches or classes depending on, among other things, credit risk and priority of payment.

523428_1

17.     As a result of defendants' misrepresentations and omissions the Certificates have not performed consistent with the ratings which they received.  According to the March 2010 Trustee distribution report for Series 2006-AR5, the total percentage of delinquent and foreclosed loans exceeded 49% of the total pool of loans.  According to the March 2010 Trustee distribution report for Series 2006-AB4, the total percentage of delinquent and foreclosed loans exceeded 41% of the total pool of loans.  As a result of the high number of delinquent loans being suffered by the pool of mortgages backing Series 2006-AB4, the Tranche purchased by the Lead Plaintiff has already realized cumulative principal losses.

18.     By mid 2007, the truth about the mortgage loans that secured the Certificates began to be revealed to the public, disclosing the risks that the Certificates would likely receive less absolute cash flow in the future and that investors would not receive it on a timely basis.  The credit rating agencies also began putting negative watch labels on the Certificate tranches or classes and to downgrade previously assigned ratings.  At present, both of the Trusts' Certificates have been downgraded.  For example, the Tranche purchased by the Lead Plaintiff in Series 2006-AR5 was downgraded from investment grade AAA to junk status of CCC and the Tranche purchased by the Lead Plaintiff in Series 2006-AB4 was downgraded from AAA to D.

19.     As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by Plaintiffs and the Class, and the holders of the Certificates are exposed to much more risk, with respect to both the timing and absolute cash flow to be received, than the Offering Documents represented.

20.     There is a secondary market for the purchase and sale of the Certificates.  There has been a market for the resale of investments like the Certificates since at least 2007.  The trading volume of Certificates like those at issue was at least $750 million during June of 2008, the time at

- 7 -

which the first of the actions asserting the claims herein was filed.  In a non-forced sale in the secondary market in June of 2008, the time the first lawsuit alleging the wrongful actions herein was filed, Lead Plaintiffs and the Class would have netted, at most, between *70 and 80 cents* on the dollar.  In other words, a sale on the date the first lawsuit was filed would have resulted in a loss of at least *20 to 30 cents* on each dollar amount purchased.

21.     Thus, because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which Plaintiffs and members of the Class could dispose of them.  These diminutions in value and price have caused damages to the Plaintiffs and the Class.

## JURISDICTION AND VENUE

22.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

23.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Defendants conduct business in this District.

## PARTIES

24.     Lead Plaintiffs Massachusetts Bricklayers and Masons Trust Funds and The Pipefitters' Retirement Fund Local 597 ("Lead Plaintiffs" or "Plaintiffs") acquired Certificates pursuant and traceable to the Registration Statement and the Prospectus Supplements and have been damaged thereby.

- 8 -

25.     On September 14, 2006, Massachusetts Bricklayers and Masons Trust Funds purchased Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 Mortgage Pass-Through Certificates Tranche A-1A with a face value of $140,000 from Deutsche Bank Securities.

26.     On October 25, 2006 the Pipefitters' Retirement Fund Local 597 purchased Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 Mortgage Pass-Through Certificates Tranche II-1A with a face value of $800,000 from Deutsche Bank Securities.

27.     Defendant Deutsche Alt-A is a Delaware corporation headquartered in New York, New York.  It is a special purpose corporation formed in 2002.  Defendant Deutsche Alt-A was an Issuer of the Certificates, the Depositor and controlled the Trusts.

28.     The Issuers of the Certificates are Defendant Deutsche Alt-A, Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 and Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4.  Deutsche Alt-A and the two Trusts issued hundreds of millions of dollars worth of Certificates pursuant to the Offering Documents.

29.     Defendant Deutsche Bank Securities ("Deutsche Securities") is a securities firm which provides a range of financial services, including engaging in the mortgage banking business. Deutsche Securities is a corporation based in New York, New York.  Deutsche Securities acted as the underwriter in the sale of Deutsche Alt-A offerings, helping to draft and disseminate the offering documents.  Deutsche Securities was the underwriter for both of the Trusts.  Deutsche Securities failed to perform adequate due diligence with respect to the statements in the Offering Documents about the underwriting of the mortgage loans.

30.     Defendant DB Structured Products, Inc. is a Delaware corporation based in New York.  DB Structured Products, Inc. acted as the sponsor and was responsible for pooling the mortgage loans to be securitized by the depositor – Deutsche Alt-A.  DB Structured Products, Inc.

- 9 -

was also responsible for negotiating the principal securitization transaction documents and participating with the underwriter – Deutsche Securities – in the structuring of such transactions.

31.     Defendant Anilesh Ahuja ("Ahuja") was Principal Executive Officer and President of Deutsche Alt-A during the relevant time period.  Defendant Ahuja signed the May 1, 2006 Registration Statement.

32.     Defendant Jeffrey Lehocky ("Lehocky") was a director, Principal Financial Officer and Principal Accounting Officer of Deutsche Alt-A during the relevant time period.  Defendant Lehocky signed the May 1, 2006 Registration Statement.

33.     Defendant Richard W. Ferguson ("Ferguson") was a director of Deutsche Alt-A during the relevant time period.  Defendant Ferguson signed the May 1, 2006 Registration Statement.

34.     Defendant Joseph J. Rice ("Rice") was a director of Deutsche Alt-A during the relevant time period.  Defendant Rice signed the May 1, 2006 Registration Statement.

35.     Defendant Richard d'Albert ("d'Albert") was a director of Deutsche Alt-A during the relevant time period.  Defendant d'Albert signed the May 1, 2006 Registration Statement.

36.     Defendant Kevin P. Burns ("Burns") was a director of Deutsche Alt-A during the relevant time period.  Defendant Burns signed the May 1, 2006 Registration Statement.

37.     The defendants identified in ¶¶31-36 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors or trustees to the Trusts as they were directors of Deutsche Alt-A and signed the Registration Statement for the registration of the securities issued by Deutsche Alt-A and the Trusts.

38.     These defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the

- 10 -

damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

39.     Plaintiffs bring this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons or entities who, between May 2006 and May 2007, acquired Mortgage Pass-Through Certificates from the two Trusts referenced above, pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-131600), and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Deutsche Alt-A and Deutsche Securities or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Hundreds of millions of dollars worth of Certificates were issued pursuant to the Registration Statement

41.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 11 -

42.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Offering Documents issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

45.     Deutsche Alt-A engaged in mortgage lending and other real estate finance-related businesses, including mortgage loan banking, mortgage loan warehouse lending, and insurance underwriting.  Deutsche Alt-A was set up to acquire mortgage loan pools that were transferred to the Trusts, and Certificates of various classes were sold to investors pursuant to the Registration Statement.  While the Offering Documents contained data about the mortgage loans, some of the most important information regarding the collateral that secured them and supported their payment stream was omitted.  Specifically, the omitted information involved the underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans and the

- 12 -

likelihood that borrowers would repay the mortgage loans according to the terms of the mortgage note and the mortgage or the deed of trust.  This depended on several factors, including creditworthiness of borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrowers, occupancy of the properties securing the mortgage loans, and the accuracy of other data collected during the origination of the mortgage loans.  These omissions caused the Offering Documents to be false and misleading.

46.     Deutsche Alt-A caused the Offering Documents to be filed with the SEC during 2006 in connection with the issuance of hundreds of millions of dollars in Certificates.  The Registration Statement incorporated by reference the subsequently filed Prospectus Supplements.

### MISREPRESENTATIONS AND OMISSIONS IN THE OFFERING DOCUMENTS

**The Offering Documents Misrepresented and Omitted**
**Material Facts Regarding the Underwriting Standards**
**Applied by the Loan Originators**

47.     The Offering Documents emphasized the underwriting standards utilized to generate the underlying mortgage loans purchased by Deutsche Bank Alt-A and eventually transferred to the Trusts, but omitted material facts related thereto.  The Offering Documents stated that the originators of the mortgage loans would use "***common sense***" underwriting and "professional judgment" when making their lending decisions.  The Offering Documents also stated that the originators would "***ensure that the borrower's income will support the total housing expense" and "evaluate the borrower's ability to manage all recurring payments on all debts***."  The Offering Documents further claimed that the originator's underwriting guidelines were applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  And the Offering Documents claimed that exceptions to the originator's guidelines would only be permitted when acceptable compensating factors were present.

- 13 -

48.     Contrary to these representations, the originators of the mortgages transferred to the Trusts were not originating loans in accordance with "common sense" and "professional judgment." Nor did the originators ensure that the borrower's income would support the total housing expense or evaluate the borrower's credit standing, loan repayment ability, or the value and adequacy of the mortgaged property as collateral.  Nor did the originators limit the granting of exceptions to their guidelines to situations where acceptable compensating factors were present.

49.     Rather, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the underwriters' underwriting standards, including directing applicants to no-documentation or low-documentation loan programs when their income was insufficient to qualify for full-documentation loan programs;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting low-documentation loans (such as stated income and stated assets loans) when they could not qualify for full-documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable loan rate adjusted; and

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called compensating factors when such compensating factors were not present.

50.     Further, the originators of loans transferred to the Trusts and the originators' agents, such as mortgage brokers, had become so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had altered the required documentation.  Moreover, in many instances the income/employment verifications that were purportedly completed by the originators were insufficient because the lenders' clerical staff

- 14 -

typically did not have proper verification skills, the mortgage brokers or their agents often completed verifications that were suspect, and oftentimes verifications were provided by inappropriate contacts at the borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of human resources). Unbeknownst to investors, these factors had the effect of dramatically increasing the risk profile of the Certificates.

51. Similarly, those borrowers who submitted stated income applications would include income levels which were routinely inflated to extreme levels, relative to the stated job titles, in order to get the mortgage loans approved and funded. Inflation of stated income was so rampant that a study cited by Mortgage Asset Research Institute found that almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, ***and more than half increased the amount by more than 50 percent***.

52. The originators' lack of underwriting controls essentially encouraged this type of income inflation. For instance, many stated income borrowers were actually wage earners who could have supplied W-2s or other income-verifying documentation, but did not. Numerous mortgages transferred to the Trusts were issued without requiring the borrowers to execute a Form 4506, which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service ("IRS"), out of fear that the lender would be put on notice that the borrower's true income level was less than the income level the borrower reported on his or her loan application.

53. The originators' departures from their stated origination practices – described in greater detail below – had the effect of dramatically increasing the risk profile of the Certificates.

- 15 -

**The Offering Documents Misrepresented**
**IndyMac's Underwriting Practices**

54.     The Prospectus Supplement for Alt-A 2006-AR5 included false statements about the

underwriting practices of IndyMac Bank, F.S.B. ("IndyMac"), a key originator for that Trust.

IndyMac originated approximately 21.11% of the loans backing trust series Alt-A 2006-AR5.

55.     The Prospectus Supplement for Alt-A 2006-AR5, falsely stated:

> IndyMac Bank has two principal underwriting methods designed to be
> responsive to the needs of its mortgage loan customers: traditional underwriting and
> Electronic Mortgage Information and Transaction System ("e-MITS") underwriting.
> E-MITS is an automated, internet-based underwriting and risk-based pricing system.
> IndyMac Bank believes that e-MITS generally enables it to estimate expected credit
> loss, interest rate risk and prepayment risk more objectively than traditional
> underwriting and also provides consistent underwriting decisions.  IndyMac Bank
> has procedures to override an e-MITS decision to allow for compensating factors.
>
> ***IndyMac Bank's underwriting criteria for traditionally underwritten
> mortgage loans includes an analysis of the borrower's credit history, ability to
> repay the mortgage loan and the adequacy of the mortgaged property as collateral.***

56.     This foregoing statement was false and misleading as it omitted to state that

IndyMac's company culture focused on originating as many loans as possible without regard

to prudent underwriting practices.   IndyMac's philosophy, in the words of its former

Chairman and CEO Michael Perry ("Perry"), was: "business guys rule . . . f*** you compliance

guys."

57.     IndyMac's institutional disregard for basic principles of underwriting and risk

management have been documented in numerous articles, lawsuits, and investigative reports, and has

been corroborated by both confidential and non-confidential witnesses.

58.     Michelle Leigh ("Leigh") was IndyMac's First Vice President and Division Head of

Post Production Quality Control until September 2006. Leigh found that while she was working

at IndyMac, 11% to 15% of all current loans had been issued in violation of the Bank's

internal policies, ten times the industry norm.  She drafted a report of her findings, intended for the Company's Board of Directors.  However, after CEO Perry reviewed the report, Leigh was instructed to delete the negative information from her report before it was provided to IndyMac's Board of Directors.

59.     An example of one non-conforming loan in her report was a "stated income" loan to an employee of Disneyland, who claimed annual income of $90,000.  In fact, her loan file disclosed that she earned $11.00 per hour.  According to Leigh, Michelle Minier, Executive Vice President of Mortgage Operations, refused to permit this loan to be included in a report to IndyMac's Board of Directors.

60.     Leigh was ultimately fired by IndyMac at approximately the same time as two other top internal control supervisors: Charles Williams ("Williams"), the head of internal audits, and Christopher Newkirk, Executive Vice President of IndyMac's Enterprise Risk Management Department.  According to Leigh, all three were terminated (directly or constructively) because they called attention to structural deficiencies in the Bank's internal controls, and noted specific deficiencies in internal controls over loan underwriters.  The Bank's Post Production Quality Control Department had been put under the supervision of the Mortgage Operation Department, eliminating any checks on the Mortgage Operation Department.  This organizational structure and lack of oversight violated FDIC, Fannie Mae and Freddie Mac regulations.  According to Leigh, Perry asked Williams to ignore a major problem that Williams had discovered, but Williams refused to do so.

61.     Unchecked, shoddy internal controls remained the rule throughout the relevant Period.  Wesley E. Miller ("Miller"), who worked as an underwriter for IndyMac in California from 2005 to 2007, stated that when he rejected a loan as questionable, he was berated by

sales managers who then went over his head and obtained approval of the loan from senior vice presidents. According to Miller, the underwriters' decisions might simply be overruled or the underwriter might be pressured or ordered to change his decision, because the managers' instructions were to "find a way to make this [loan application] work," since IndyMac wanted to make as many loans as possible, regardless of the underlying criteria.

62.     Scott Montilla ("Montilla"), a former IndyMac loan underwriter in Arizona during the same time period, stated that about one-half of his decisions to reject loans were overridden by the Bank's executives. Moreover, according to Montilla, some borrowers told him that they had no idea their stated incomes were being inflated as part of the application process.

63.     According to a Manager in IndyMac's fraud audit and investigation unit from December 2004 until October 2007, everyone at IndyMac knew that the underwriters were "pushing" bad loans and that the idea that IndyMac's Alt-A loans were any different from subprime loans was nonsense. Often, internal investigations would reveal that the IndyMac underwriter or sales person had pushed through a loan with inadequate or inaccurate documentation. The front office often overrode any findings and delinquencies or improper conduct by underwriters, with no or weak explanations. IndyMac routinely originated loans based upon rampant loan fraud but did not care so long as home prices continued to rise. CEO Perry had "vitriol" for quality control/audits and Perry took actions to "neuter" the quality control/audits department by moving the quality control department from the secondary mortgage division to the central mortgage operations division. As a result, the quality control department was now controlled by the very division it was supposed to monitor.

64.     A Senior Underwriter who joined IndyMac in 1997, and worked in IndyMac's Wholesale Mortgage Division until July 2008, confirmed that underwriters were

- 18 -

incentivized by IndyMac's bonus system to approve loans without adequate review. For example, one underwriter in Wisconsin was approving 20 loan applications per day. This Senior Underwriter was also assigned to process loan applications acquired in connection with IndyMac's hiring of over 1,400 professionals from AHM. For loans that had previously reached the first stage of approvals at AHM, employees were instructed to approve loans whether or not they met IndyMac's standards. Many loans did not meet IndyMac's standards, but were approved anyway. According to this Senior Underwriter, AHM employees were operating a "fraud shop" within IndyMac. Eventually IndyMac hired ten former AHM underwriters to approve additional loans generated by that company because IndyMac appraisers were unwilling to approve many of these loans.

65.     According to Cody Holland ("Holland"), a former IndyMac loan officer, IndyMac regularly violated its own internal guidelines for loan approvals. Although the guidelines at that time required borrowers to have minimum FICO scores of 620, loans were approved for borrowers with scores as low as 580 and thus, a greatly increased chance of default. IndyMac also regularly approved loans with loan-to-value ratios as high as 100%, notwithstanding Perry's public statements that IndyMac had discontinued such loans.

66.     According to a Mortgage Underwriter in a regional office of IndyMac, loan underwriters were told to approve loans that did not satisfy the current guidelines. Loan officers regularly bypassed regional underwriters to gain approval of loans outside the guidelines by contacting senior operations management at the Bank's Pasadena headquarters, who would order approval of loans in markets with which they were not familiar. FICO score requirements were regularly ignored in order to increase loan volume. IndyMac went so far as to instruct employees during loan underwriting training sessions as to how to obtain exceptions to the lending

guidelines, and underwriters began to view the mortgage guidelines as a joke. In addition, appraisals were frequently provided by a small number of brokers who were chosen because of their willingness to inflate appraisals.

67.    According to an IndyMac Underwriting Team Leader from 2005 to July 2007 who supervised eight underwriters, Frank Sillman, head of the IndyMac Mortgage Bank Division, regularly overrode underwriters' decisions to deny loans.  Underwriters were pressured to approve loans and told to "do anything to keep the loan from going to [IndyMac's Competitor] Countrywide."  Underwriting team leaders would receive an e-mail towards the end of each month from their Regional Manager, imploring them to "approve as many loans as you can because we need a certain amount of mortgage volume this month."

68.    On June 30, 2008, the Center for Responsible Lending (the "CRL") issued a report titled "IndyMac: What Went Wrong:  How an 'Alt-A' Lender Fueled its Growth with Unsound and Abusive Mortgage Lending."  The CRL corroborates and/or reports the witness statements recounted above. Based on interviews with 19 former employees, mostly underwriters, and a review of numerous pending actions against Indy Mac, the CRL uncovered evidence of: (i) pressure from managers on underwriters to approve unsound loans in contravention of IndyMac's internal underwriting guidelines; and (ii) managers overruling underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals.

69.    IndyMac's improper and fraudulent lending practices were also documented in the complaint filed in the action styled *Financial Guaranty Insurance Co. v. IndyMac Bank, F.S.B.*, No. 08-CV-06010-LAP, in the United States District Court for the Southern District of New York.  The complaint in that case quotes former employees stating:

> •    According to a former IndyMac central banking group vice
> president, IndyMac concocted "exceptions to its own underwriting

guidelines that allowed Indymac to make and approve mortgage loans that should have been denied under the actual guidelines and that direct fraud by Indymac loan sales representatives was rampant in the mortgage loan origination process at Indymac";

- According to a former IndyMac loan underwriter, IndyMac's loan origination process had evolved into organized chaos where, at management's direction, any concessions or adjustments were made in order to close loans that would not normally be made, including inflating appraisals to make the loan work;

- According to a former IndyMac vice president in IndyMac's mortgage banking segment, "in order to keep pace with its competition, Indymac greatly loosened its underwriting guidelines in order to bring in more loans";

- According to a former IndyMac senior auditor in IndyMac's central mortgage operations, "an increasing number of loans were made through apparently fraudulent or misrepresented documentation and there was an increase in defaults because of": (1) "these misrepresentations in the underwriting process"; (2) "the relaxation of the underwriting guidelines"; and (3) "approval of borderline loans";

- According to a former IndyMac investigator in IndyMac's central mortgage operations, "the quality of Indymac's loan origination process had become a running joke within Indymac, and that a whole class of Indymac originated mortgages were referred to internally as 'Disneyland Loans', because of insufficient documentation or the borrower's inability to repay the mortgage"; and

- According to a former IndyMac senior loan processor, "the increase in the number of Indymac originated delinquent loans was due to misrepresentations and fraud occurring in the mortgage loan origination process."

70.    On July 20, 2008, *The New York Post* published an article by investigative reporter Teri Buhl titled "[OTS] Officials Missed IndyMac Red Flags."  That article listed three "red flags" that regulators should have noticed, and defendants must have been aware of, long before Indy Mac's collapse:

. . . IndyMac was late in adhering to a federal rule banning lenders from lending to people who did not provide ample documentation verifying their income.

The rule, which was mandated by a group of regulators that included the Federal Reserve, FDIC and OTS, took effect in September 2006. But according to internal IndyMac compliance documents reviewed by The Post, IndyMac didn't comply until November 2007 - something OTS compliance officials should have spotted.

Another missed opportunity, CRL said, came when the lender would pull employees in on the weekends in 2006 to tweak loan documents by inflating home appraisals on mortgages that had been rejected by Wall Street. Had OTS safety and soundness officers reviewed IndyMac's appraisal valuation processes, CRL said, they would have noticed the practice.

The third strike for the regulators came in August 2007, when IndyMac bought branches of the defunct American Home Mortgage, even though data showed the bank had a growing problem with non-performing assets.

"The bottom line is that the IndyMac failure could have been prevented if common sense lending standards had been required in 2006," said Martin Eakes, CRL's CEO.

71.     Further evidencing the fraudulent quality of the loans underwritten and originated by IndyMac, and its deviation from safe and sound banking practices, on December 31, 2008, Bloomberg.com reported that Fannie Mae and Freddie Mac had found IndyMac to be liable to repurchase between $1 billion and $10 billion in loans that violated representation and warranty agreements between IndyMac and those agencies.  When a mortgage originator sells the loan, it makes representations and warranties to the buyer with respect to the borrower, the property securing the loan, the mortgage instruments, and the underwriting.  If those representations and warranties are false or breached – which most commonly occurs when there is fraud or misrepresentation in the underlying mortgage – the originator/underwriter is obligated to repurchase the mortgage. James Lockhart, director of the Federal Housing Finance Agency, the regulator of Fannie Mae and Freddie Mac explained the reason for such incredibly large repurchase demands: "In 2006 and 2007, the underwriting was so poor, there was a lot of fraud that happened or a total misrepresentation."

**The Offering Documents Misrepresented
GreenPoint's Underwriting Practices**

72.     The Prospectus Supplement for Trust Series Alt-A 2006-AR5 included false statements about the loan underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint") which was a key originator for Trust Series Alt-A 2006-AR5.  GreenPoint originated approximately 17.66% of the loans backing Trust Series 2006-AR5.

73.     The Prospectus Supplement for Trust Series 2006-AR5 stated:

> *Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.*  Exceptions to the guidelines are permitted where compensating factors are present.

74.     The foregoing representation was false and misleading because GreenPoint's underwriting guidelines were not applied to evaluate the prospective borrower's credit standing, repayment ability or the value and adequacy of the mortgaged property as collateral.  Rather, GreenPoint used guidelines supplied by Wall Street investors, such as Deutsche Alt-A, that were not based upon sound underwriting standards but were merely the minimum standards that Deutsche Alt-A was willing to accept for loans it would purchase and securitize.  As a former GreenPoint VP/Wholesale Branch Operations Manager – who worked for GreenPoint from July 2003 to January 2008 – explained, the fact that a borrower was unlikely to re-pay his or her loan was irrelevant so long as the loans were within the underwriting guidelines set forth by the Wall Street firms such as Deutsche Alt-A.

75.     GreenPoint's investor-driven underwriting guidelines were woefully inadequate.  As described by a former GreenPoint Account Executive – who worked in the Queens, New York branch from July 2003 through September 2007 – beginning in 2005, GreenPoint's underwriting standards became increasingly lenient, especially towards higher risk borrowers.  This Executive

- 23 -

characterized GreenPoint's underwriting guidelines as "loose" and becoming progressively "looser" during the 2005 through 2006 timeframe. This Account Executive attributed GreenPoint's loosening of its underwriting standards to its desire to remain competitive in the lending market, explaining that as other lenders relaxed their underwriting standards and began extending loans to people who probably couldn't repay their loans, GreenPoint had to do the same in order to remain competitive. These statements were corroborated by a former GreenPoint Senior Vice President of Branch Operations for the Western Wholesale Division who worked for GreenPoint and GreenPoint's predecessor, Headlands Mortgage, from 1992 to August 2007. This Senior Vice President stated that beginning in 2005 and continuing through 2006, GreenPoint's underwriting guidelines became increasingly lenient and the loans it extended became increasingly risky. GreenPoint began to significantly relax the requirements that borrowers would have to satisfy to qualify for a given loan program, including relaxing requirements involving documentation of repayment ability, minimum LTV ratios and minimum credit scores. GreenPoint's modification, in early 2007, of some of its underwriting standards, on some of its riskiest loan products, was not enough to stem the massive number of failed loans that led to GreenPoint's demise in August 2007.

76.     Additionally, GreenPoint did not limit its granting of exceptions to circumstances where actual compensating factors existed. Rather, it was granting exceptions even in the absence of compensating factors. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. This lack of monitoring was particularly problematic because, as noted by many regulators, brokers were

- 24 -

interested mainly in generating upfront fees triggered by making the loans, and did not pay attention to whether borrowers were actually qualified for the loans.

77.     GreenPoint did not verify the income of borrowers as represented but had a reputation in the industry for cutting corners on underwriting.  GreenPoint was one of the first innovators of Alt-A mortgages.  However, many of GreenPoint's Alt-A loans were actually subprime loans in disguise, a practice later copied by others.  GreenPoint's practice of disguising subprime loans as Alt-A loans was confirmed by the former GreenPoint Account Executive identified above.  This former Account Executive stated that GreenPoint offered loans it represented to be Alt-A even though their qualifying requirements were those of "junk" loans.  GreenPoint's innovation came back to haunt it, as in June 2007 GreenPoint began closing numerous operational centers and branch offices.  A spokesperson for GreenPoint attributed these closures to fallout from the subprime market and the resulting tightened lending standards.  Because GreenPoint was unable to maintain its poor mortgage lending practices, GreenPoint's parent company – Capital One – shut down GreenPoint on August 20, 2007, less than a year after Capital One's December 2006 acquisition of GreenPoint.

**The Offering Documents Misrepresented American Home**
**Mortgage Corp.'s Underwriting Standards**

78.     Both Prospectus Supplements made untrue statements about the underwriting practices of AHM, which was a key originator in both Trust Series Alt-A 2006-AR5, and Alt-B 2006-AB4.  AHM originated approximately 20.91% of the loans backing Trust Series 2006-AR5 and approximately 37.45% of the loans backing Trust Series 2006-AB4.

79.     The Prospectus Supplements stated:

>    *American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file*, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. *These standards are applied in accordance with applicable federal and state*

- 25 -

*laws and regulations*.  Exceptions to the underwriting standards may be permitted where compensating factors are present. . . .

> *American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.*

80.     The foregoing representations were false and misleading because AHM was not underwriting loans based upon a borrower's creditworthiness and repayment ability.  According to a former AHM Executive Vice President who worked at the company from 1999 through April of 2007, AHM's underwriting practices became increasingly lax during the 2005 through 2007 timeframe.  This resulted in AHM granting a larger and larger number of loans to people unlikely to repay them.  According to this Vice President, AHM "followed Countrywide" in offering "fast and sleazy products" that had very questionable underwriting requirements and were of low quality.  A former Wholesale Account Executive, who worked at AHM from January 2005 through July 2007, stated that at AHM "anybody could buy a house with zero percent down and ***no proof of ability to pay it [the loan] back***."  According to this person, AHM regularly extended loans that are now classified as predatory.

81.     Contrary to AHM's stated underwriting policy, AHM was not weighing all risk factors inherent in a loan file, nor did it encourage underwriters to use professional judgment based on their experience.  Instead, as discussed by a former Level 5 Underwriter who worked at AHM from 2004 until December 2006, the professional judgment of AHM's underwriters was often overridden by automated underwriting software.  This person pointed to a number of instances where the automated program approved loans that made no sense and were not likely to be paid back.  Despite these misgivings, AHM management overruled the Underwriter's human judgment and approved the risky loans.  This situation caused the Underwriter to "lose respect" for AHM, who believed the underwriter's role was to look at the totality of the information in the loan application

- 26 -

and ask "Does it fit?" and "Is it logical?"  The Underwriter said that many of the loans approved by the underwriting software were ones on which the Underwriter "would not have lent a dime."

82.     AHM's failure to comply with stated underwriting practices was confirmed by a former Level 3 Underwriter who worked at AHM from June 2004 to August 2007.  According to this Underwriter, the automated underwriting software approved "awful loans" that would not have been approved under AHM's manual underwriting guidelines.

83.     Further, in order to achieve desired loan production, AHM was as a matter of course granting exceptions even where "compensating factors" did not exist.  AHM's business was dependent on continually increasing volume.  A third of its mortgages were pay-option adjustable rate mortgages ("ARMs"), which allowed borrowers to make payments which were *less than the interest amount accruing on the loan*, resulting in the difference being added to the principal balance each month.  AHM granted exceptions as a matter of course because its business relied on volume as it was paid a fee for each loan and it was transferring securitization of these mortgages and not retaining the mortgage loans as assets on its own balance sheet.  AHM went bankrupt in August 2007.

84.     It has subsequently come to light that AHM's loan programs were very questionable and risky, and the underwriting standards were commensurately lax.  According to one AHM district manager, the loan pools sold to defendants and other Wall Street banks were made up of "nothing but junk."  Managers were "told to ignore the issues which should not be ignored, such as the borrower's ability to repay, and just sell these programs."

85.     AHM was a mortgage banker that used its line of credit to fund residential mortgage loans, create a loan pool, and then, to replenish its funds, sell the loans in bulk, as soon as possible, to "investors."  The investors were Wall Street firms, including defendants, that sought the loan

- 27 -

pools as collateral for the Certificates at issue herein. Wall Street firms, including the defendants, initiated the lending process by designing and delivering loan programs to AHM which did not comply with the underwriting standards set forth in the Offering Documents. The volume of business was very large and in the 2006 timeframe, AHM was funding mortgages amounting to about $5 billion per month.

86.     AHM sales representatives would contact loan brokers (and others who facilitated loans for borrowers) and would arrange with the loan brokers to offer whatever loan programs the AHM representatives were pushing at the time. One AHM district manager referred to this effort as "selling the loan programs," but in fact it was more of an effort in persuasion than a sale. The AHM sales reps pushed the loan products sponsored by the Wall Street firms (such as defendants) that eventually would buy AHM's loan pools and then resell them as Certificates to the Class. The underwriting standards were very lax, in that they required very little in the way of documentation to qualify borrowers for the loan programs.

87.     In addition to using the services of outside brokers who sold AHM's loan products, AHM had a Retail Lending group that sold loans directly to consumers. Those in the Retail Lending group were compensated, in part, based upon the type and number of loans they closed. However, in order to close a loan, the loan had to be approved by AHM's underwriters. Thus the Retail Lending group's compensation was determined, in part, by whether the underwriter approved the loans the Retail Lending group was attempting to sell to a potential customer. Similarly, pay raises for the underwriters were determined by the Retail Lending group. Accordingly, the underwriters' compensation was directly affected by decisions made by the Retail Lending group, and the Retail Lending group's compensation was directly affected by decisions made by the underwriters. This symbiotic relationship provided powerful incentives for the underwriters to approve as many loans

- 28 -

as possible notwithstanding whether a borrower could afford to repay the loan or whether the loan complied with underwriting guidelines, thereby financially rewarding the Retail Lending group, who in turn would approve pay raises for the underwriters.

88.     As noted by a former AHM employee, even loan pools that were ultimately rated AAA were made up of "nothing but junk."  AHM underwriting guidelines were designed to comply with the needs of the Wall Street firms that sought the loan pools to use as collateral for their securitizations.  When one AHM district manager learned that the rating agencies rated AHM's loan pools as AAA, it left the district manager "wondering."  But AHM, continued to sell these pools to Deutsche Bank and other Wall Street banks, who sold the Certificates at issue in this litigation which were backed by these questionable loan pools.

89.     Representatives of the Wall Street firms, including defendants, that purchased AHM's loans essentially told AHM, "Take our product and sell it."  Wall Street firms did not want to "miss out on the housing boom" and needed investment opportunities to soak up the funds coming in, particularly from foreign investors.  AHM ignored issues such as the borrower's ability to repay, and instead made loans which could then be resold to defendants and the other Wall Street banks. According to a former AHM district manager, Wall Street firms "fed off each other, and could not get enough of these loan pools, and these Wall Street firms were packaging these pools and securitizing them as fast as they could, and they sold these securities all over the world."  According to this former AHM district manager, "They distributed this toxic waste throughout the worldwide system."

90.     Deutsche Bank pushed a loan program with the seemingly "vanilla" title of Alt-A, that had especially lax underwriting guidelines.  Deutsche Bank set the guidelines based on what it could ultimately resell regardless of quality.  AHM loan brokers readily received the loan programs

- 29 -

and considered them to be attractive products because the credit and documentation requirements were so lax that virtually any prospective borrower could qualify regardless of ability to repay the loan.

91.     AHM's loans were particularly popular with speculators who would not occupy the homes, which would decrease the borrowers' "willingness" to pay the debt if home prices stagnated or dropped.  This ultimately came to bear on many of AHM's loans and AHM subsequently suffered losses itself when "borrowers whose incomes [AHM] hadn't verified began to default on little-money-down loans at an accelerated pace." *Smartmoney.com*, July 31, 2007.

92.     AHM claimed stated income applications were made where "other compensating factors," such as higher credit scores or lower loan-to-value requests, existed, but in fact: (i) AHM allowed credit scores to be manipulated by the borrower, who would become an approved user on another person's credit card or other account who had better credit ratings; and (ii) AHM had no reasonable basis to believe that lower loan-to-value ratios were being required because AHM was already aware that the appraisals being used by the company, particularly in Texas and Illinois in 2005 and 2006, were inflated (thus leading to a false, lower LTV ratio) and that the same defective methodologies were being used in states such as California and Florida.

93.     In an effort to keep loan volume up despite a slowdown in activity, AHM's brokers became so aggressive that borrowers were given loans with different terms than they were originally promised.  Borrowers have, in fact, complained that loans were switched on them by AHM, leaving them with mortgages they could not pay.  Further evidence of AHM's poor underwriting practices appeared when IndyMac hired over 1,400 of AHM's former employees.  As previously alleged, according to a former senior IndyMac underwriter, some of the AHM employees that IndyMac took in operated a "fraud shop" within IndyMac.

- 30 -

94.     AHM was using anything but "common sense" in granting mortgages to customers with little money down where a third of the mortgages were pay-option ARMs and many of the loans were to speculators.

**The Offering Documents Misrepresented and Omitted Material Facts Regarding the Appraisals Conducted by or for the Loan Originators**

95.     With respect to appraisals performed by AHM, the Offering Documents falsely stated:

> *In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform [to] the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation.* Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in a good condition and verify that construction, if new, has been substantially completed.  The appraisal generally will have been based on prices obtained on recent sales of comparable properties determined in accordance with Fannie Mae and Freddie Mac guidelines.

96.     With respect to appraisals performed by GreenPoint, the Offering Documents falsely stated:

> *Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.* The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment.

97.     With respect to appraisals performed by IndyMac, the Offering Documents falsely stated:

> *To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice.* The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues

- 31 -

an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form.

98.     The above statements were false and misleading as the appraisals conducted by or for these originators did not comply with USPAP standards.  Appraisers utilized by GreenPoint, AHM and IndyMac were pressured to appraise to certain pre-determined levels.  Appraisers were told and knew if they appraised under these levels they would not be hired again.  Thus, the appraisals violated USPAP standards and were inaccurate as there was little to support the pre-determined, inflated appraised value and adequacy of the mortgaged property.  The Offering Documents failed to describe the originators' practices of allowing staff or outside brokers to demand inflated appraisal values, which distorted the loan-to-value ratios referred to in the Prospectus Supplements and violated USPAP standards.

99.     To ensure the accuracy of appraisals, the USPAP imposes the following requirements on appraisers.  With respect to real estate appraisals, the USPAP provides:

(a)     An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)     In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)     An appraiser must not accept an assignment that includes the reporting of pre-determined opinions and conclusions; and

(d)     It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i)      The reporting of a pre-determined result (*e.g.*, opinion of value);

(ii)     A direction in assignment results that favors the cause of the client;

(iii)    The amount of a value opinion;

- 32 -

(iv)      The attainment of a stipulated result; or

(v)      The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

100.    The representations in the Offering Documents regarding appraisals were materially false and misleading in that they omitted to state that the appraisals were inaccurate and did not, in fact, comply with USPAP standards: (i) due to a complete lack of controls at the originators; and (ii) because, contrary to USPAP, the appraisers were not independent from the brokers such that the lenders and/or their agents, such as mortgage brokers, exerted pressure on appraisers to come back with pre-determined, pre-conceived, inflated and false appraisal values.

101.    For instance, each of the key originators allowed their sales personnel or account executives to order and control the appraisals.   These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible. These sales personnel and account executives would secretly pressure appraisers to appraise properties at artificially high levels to justify the approval of a loan under threat of not being hired again.

102.    Appraisals conducted for AHM were not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment.  Instead, contrary to USPAP, many of AHM's appraisals were based upon pre-determined values demanded by brokers.  As described above, AHM appraisers frequently succumbed to brokers' demands to appraise at pre-determined inflated values.  Indeed, as described by a former AHM Vice President from March 2003 through May 2007, appraisal fraud was a common problem at AHM.  This former Vice President recounted how loan officers pressured appraisers to come up

- 33 -

with the "right number." Due to inflated appraisals, the loan-to-value ratios represented above were inaccurate because these ratios assumed accurate appraisals were performed.

103.    Similarly, IndyMac selected particular appraisers who were known to inflate their appraisals for properties where the loan appeared questionable. According to confidential witnesses cited in the complaint filed in the action styled *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438-JGK, filed in the United States District Court for the Southern District of New York, IndyMac told its outside appraisers the "target value" that was needed to secure approval of a residential loan. Appraisers who accommodated IndyMac's requested appraisal values were rewarded with additional work, while those who did not were cut off. The witnesses also said that IndyMac's Chief Appraiser and other executives were aware of and acquiesced in this practice, and IndyMac's management intimidated and threatened to fire employees who rejected fraudulent appraisals.

104.    IndyMac's solicitation and use of inflated appraisals from non-independent appraisers is currently the subject of investigations by the FBI and FDIC. As *The New York Post* reported on August 3, 2008:

> The federal investigation into mortgage fraud at IndyMac Federal Bank has expanded into the company's Homebuilder Division, according to a bank executive interviewed by the FBI and FDIC. Investigators have seized 2005-06 construction loan audit reports from the files of the Homebuilder Division, the executive told The Post, and later questioned him and other workers about the reports, he said.

> The recently renamed Homebuilder Division, which lent money on commercial and residential construction projects until [it] stopped lending at the end of 2007, had a staggering 52 percent of its $1.3 billion in loans classified as non-performing as of March 31, [2008], according to a government filing.

> Even in a down market, a non-performing rate closer to 20 percent to 30 percent is more usual, according to a person familiar with the local real estate market.

Based on the question asked by investigators, one focus of the probe appears to center on whether or not the appraisal inspectors inflated real-estate development project values and whether IndyMac loan officers gave independent appraisers false information.

"They asked about how we verify appraisal values," said the executive, who spoke on the condition of anonymity.

"I explained the lack of risk controls in place for that group, such as loan officers who were allowed to pick their own appraisers instead of using a third party to assign an independent appraiser – which is a typical industry practice," he said.

105.    According to former IndyMac loan officer Holland, IndyMac continued to manipulate appraisals into the relevant period, and said manipulation affected both residential and commercial mortgages.  According to Holland, IndyMac selected particular appraisers who were known to inflate their appraisals for properties where the loan appeared questionable.  Holland's statements are corroborated by the confidential witnesses cited in the complaint filed in the action styled *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438-JGK, filed in the United States District Court for the Southern District of New York.  According to those witnesses, IndyMac told its outside appraisers the "target value" that was needed to secure approval of a residential loan.  Appraisers who accommodated IndyMac's requested appraisal values were rewarded with additional work, while those who did not were cut off.  The witnesses also said that IndyMac's Chief Appraiser and other executives were aware of and acquiesced in this practice, and IndyMac's management intimidated and threatened to fire employees who rejected fraudulent appraisals.

106.    Independent and accurate real estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in MBS with supposedly independent and accurate assessments of the value of the mortgaged properties.  Accurate appraisals ensure that a mortgage or home equity loan is not under-collateralized, thereby

- 35 -

protecting borrowers from financially over-extending themselves and protecting lenders and investors in the event a borrower defaults on a loan.  Accurate appraisals also provide investors with a basis for assessing the price and risk of MBS.

107.    An accurate appraisal is also critical in determining the LTV ratio, which is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of MBS.  The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property.  For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

108.    A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he/she defaults on the loan.  What is worse, particularly in an era of falling housing prices, is that a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

109.    A review of property information from 38 loans backing Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4, including the automated valuation of the attendant properties, reveals that 17 of those loans (or 44%) overvalued the property by 9% or more compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 17 loans.

110.    A review of property information from 41 loans backing Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5, including the automated valuation of the attendant properties, reveals that 21 of those loans (or 51%) overvalued the property by 9% or more compared

- 36 -

to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 21 loans.

111.    The lack of independence by appraisers was noted by Alan Hummel ("Hummel"), Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking.  Hummel noted this dynamic created a "terrible conflict of interest" by which appraisers "experience[d] systemic problems with coercion" and were "ordered to doctor their reports" or else they would never "see work from those parties again" and were placed on "exclusionary appraiser lists."  Too often, the pressure succeeded in generating artificially high appraisals and appraisals being done on a **drive-by** basis where appraisers issued their appraisal without reasonable bases for doing so.

112.    A 2007 survey of 1,200 appraisers conducted by October Research Corp., – a firm in Richfield, Ohio, who publishes *Valuation Review* – found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  This figure was nearly double the findings of a similar study conducted just three years earlier.  The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."  Adding to these problems was the fact that, lenders, for originations completed by mortgage brokers, generally lacked *knowledge of the accuracy of the* appraisals since they were typically located far from the actual property and knew very little about the general area where the property was located.

113.    As a result of this conduct, loans backing the Trust Certificates were frequently based on inflated appraisals stating that the home securing the loan was worth more than it in fact was.

114.    Numerous appraisers have confirmed that the inflation of appraisals was common place.  For example, the owner of a small Midwest residential real estate appraisal firm in Illinois, who was approved and/or utilized by Countrywide and **AHM** in over 100 transactions stated that

- 37 -

mortgage brokers would call him and say "I need this number."  This appraiser also stated that he was frequently threatened with, "[e]ither give us this home value or you will never do business for us again."

115.  An independent appraiser from Florida who was approved by AHM, and other originators, stated that she was told by brokers and/or lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN."  In order to stay in business, she gave the valuations the broker or lender demanded, even if it required driving 20 miles away for a comparable sale.  During the relevant period, this appraiser completed over one hundred appraisals for Countrywide, *AHM* and other originators that were over inflated.

116.  Another independent appraiser stated that Countrywide in-house and outside loan officers demanded inflated numbers from him in Compton and Watts, California.  He also indicated that he had similar experiences with *AHM*.  The lenders told him either give him the numbers they want, or he would be "done" and would be blackballed by every lender doing business in California.  According to this appraiser, "I did over 100 over inflated appraisals just for Wells [Fargo and] Countrywide."  In some cases he was appraising houses – that he described as "crack houses" that should have been bulldozed – for $100,000 more than they were worth.  The appraiser stated that the neighborhoods were so bad, that he would sometimes never get out of his car, and would merely drive by and take pictures of the house and give the broker or the lender the number they demanded.

**The Prospectus Supplements Misstated the True LTV**
**Ratios Associated with the Underlying Mortgages**

117.  The Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts.  In a series of charts, investors were repeatedly provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given

- 38 -

range.  The following 2 charts, taken from the Prospectus Supplements falsely represented the true

LTV ratio of the loans backing the trusts:

### Original Loan-to-Value Ratios of the Group I Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Group I Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-Off Date | % of Aggregate Principal Balance Outstanding as of the Cut-Off Date |
|---|---|---|---|
| Less than or equal to 50.00 | 76 | $ 20,267,523 | 1.54% |
| 50.01 - 55.00 | 26 | 9,887,514 | 0.75 |
| 55.01 - 60.00 | 55 | 25,744,474 | 1.96 |
| 60.01 - 65.00 | 112 | 45,191,498 | 3.44 |
| 65.01 - 70.00 | 78 | 189,564,968 | 14.43 |
| 70.01 - 75.00 | 328 | 106,250,420 | 8.09 |
| 75.01 - 80.00 | 3,237 | 882,862,373 | 67.22 |
| 80.01 - 85.00 | 8 | 2,332,534 | 0.18 |
| 85.01 - 90.00 | 69 | 13,026,119 | 0.99 |
| 90.01 - 95.00 | 51 | 11,384,755 | 0.87 |
| 95.01 - 100.00 | 31 | 6,830,148 | 0.52 |
| **Total:** | **4,775** | **$1,313,342,326** | **100.00%** |

### Original Loan-to-Value Ratios of the Group II Mortgage Loans

| Original Loan-to-Value Ratio (%) | Number of Group II Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-Off Date | % of Aggregate Principal Balance Outstanding as of the Cut-Off Date |
|---|---|---|---|
| Less than or equal to 50.00 | 119 | $ 17,947106 | 14.70% |
| 50.01-60.00 | 28 | 7,059,483 | 5.78 |
| 60.01-65.00 | 47 | 12,895,602 | 10.57 |
| 65.01-70.00 | 70 | 16,037,111 | 13.14 |
| 70.01-75.00 | 75 | 12,729,807 | 10.43 |
| 75.01-80.00 | 255 | 40,526,807 | 33.21 |
| 80.01-85.00 | 13 | 1,238666 | 1.01 |
| 85.01-90.00 | 44 | 4,167,274 | 3.41 |
| 90.01-95.00 | 9 | 913,873 | 0.75 |
| 95.01-100.00 | 1 | 36,368 | 0.03 |
| **Total:** | **713** | **$122,048,362** | **100.00%** |

- 39 -

**Original Loan-to-Value Ratios of the Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date |
|---|---|---|---|
| 0.01-50.00 | 128 | $ 23,659,979 | 2.11% |
| 50.01-55.00 | 59 | 12,665208 | 1.13 |
| 55.01-60.00 | 84 | 21,333,889 | 1.91 |
| 60.01-65.00 | 161 | 42,760-790 | 3.82 |
| 65.01-70.00 | 452 | 98,199,106 | 8.78 |
| 70.01-75.00 | 413 | 99,408,159 | 8.89 |
| 75.01-80.00 | 3137 | 667,510,327 | 59.66 |
| 80.01-85.00 | 43 | 8,576,879 | 0.77 |
| 85.01-90.00 | 210 | 32,107,792 | 2.87 |
| 90.01-95.00 | 163 | 29,993,009 | 2.68 |
| 95.01-100.00 | 578 | 82,573,971 | 7.38 |
| **Total:** | **5,428** | **$1,118,789,110** | **100.00%** |

118.    As alleged above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated.  These inflated appraisals and misleading sales price figures were used to form the LTV ratios listed in the Prospectus Supplements.  Incorporating an inflated appraisal into the LTV calculation will result in an inaccurate, lower LTV ratio for a given loan.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).  Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the Trusts were safer and less risky than they really were.

119.    A review of property information from 38 loans backing Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4, including the automated valuation of the attendant properties, reveals that 17 of those loans (or 44%) overvalued the property by 9% or more compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 17 loans.

523428_1

120.     A review of property information from 41 loans backing Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5, including the automated valuation of the attendant properties, reveals that 21 of those loans (or 51%) overvalued the property by 9% or more compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 21 loans.

121.     Based on the foregoing, Plaintiffs allege on information and belief that nearly half of the loans backing the Trusts had inflated appraisals and inaccurate LTV ratios.

**The Prospectus Supplements Misstated
the Certificates' True Investment Rating**

122.     The Prospectus Supplements stated that the Certificates would not be offered unless they receive a rating from a rating agency – such as Standard & Poor's Rating Services ("S&P"), Moody's Investors Services, Inc. ("Moody's"), or Fitch Rating ("Fitch") – that was at least as high as those set forth in the Prospectus Supplements.  Moody's, S&P and Fitch rated the Certificates. The ratings set forth in the Prospectus Supplements for the Certificates were within the "Investment Grade" range of Moody's, S&P and Fitch.  The Certificates purchased by Lead Plaintiffs had the highest/safest credit rating available, AAA.

123.     The ratings stated in the Prospectus Supplements were based, as alleged below, on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they really were.

**The Models that Produced the Certificates' Ratings
Were Based upon Outdated Assumptions Regarding
Loan Performance**

124.     Moody's and S&P used models to produce the ratings for the Certificates.  These models were based upon loan performance *prior* to the year 2000.  However, an unprecedented

- 41 -

decline and deterioration in mortgage lending standards occurred **after** 2000.  For instance, from 2001 through 2005: (i) the percentage of **sub-prime** mortgage loans tripled; (ii) the combined LTV ratio of loans in excess of 90% tripled; (iii) **limited documentation** loans (or "liar loans") nearly quadrupled; (iv) **interest only** and **option** ARMs quintupled; (v) "piggy-back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of loans including "silent second[s]" – a nearly non-existent phenomenon a few years prior to the issuance of the Certificates – experienced over a 16,000% increase; and (ix) the volume of non-traditional mortgages more than quintupled.

125.    This decline in lending standards and an increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered Moody's and S&P's pre-2000 loan performance data obsolete.  However, these agencies did not update their models to reflect these changes.  Thus, by the time the agencies provided "investment grade" certifications to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

126.    Moody's and S&P continued to use these models even though more current and accurate models were available.  According to Frank Raiter ("Raiter") – the Managing Director and Head of RMBS Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000 (particularly Alt-A type loans).  These models better captured the changes in the post-2000 mortgage landscape and were, therefore, better at determining default risks posed by these new mortgages.  However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest ratings market share amongst the three major rating agencies).  As Raiter explained, the unfortunate consequences of continuing to use outdated

- 42 -

versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  The current President of S&P, Deven Sharma, agreed, noting "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

127.    Executives at Moody's also acknowledged a lack of investment in Moody's rating models and the failure of Moody's rating models to capture the deterioration in lending standards.  In an internal e-mail, Raymond McDaniel ("McDaniel"), the current Chairman and Chief Executive Officer of Moody's, noted that a lack of investment in updating the rating models can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."  McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.  Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job of monitoring that [decline in underwriting standards]."

128.    Not only were Moody's and S&P's models based on outmoded data, but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And in some instances real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor rating agency.

**The Rating Agencies' Relaxing of Ratings Criteria Led to
Artificially High Ratings for the Certificates**

129.    In addition to using flawed models to generate ratings, Moody's and S&P repeatedly

eased their ratings standards in order to capture more market share of the ratings business.  This

easing of ratings standards was due in large part to the fact that rating agencies like Moody's and

S&P were compensated by the very entities that they provided ratings to, and the fact that those

entities were free to shop around for the rating agency that would provide them with the highest

ratings.  As former S&P Managing Director, Richard Gugliada ("Gugliada"), explained, the easing

of standards as a "***market-share war where criteria were relaxed***" and admitted "***I knew it was***

***wrong at the time . . . [i]t was either that or skip the business***.  That wasn't my mandate.  My

mandate was to find a way.  Find the way."  According to Gugliada, when the subject of tightening

S&P's rating criteria came up, the co-director of CDO ratings, David Tesher ("Tesher"), said "Don't

kill the golden goose."  This comment reflected Tesher's belief that if S&P implemented more

stringent rating criteria than its competitors (and thereby began assigning lower ratings to

investments that it rated), then entities that needed their investments rated – such as the defendants

herein – would avoid S&P.  Instead, these entities would seek ratings from S&P's competitors who,

because they had weaker rating criteria, would assign a higher rating to the investment.

130.    The loosening of ratings standards is exemplified by the following "instant message"

conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts

describing S&P's rating of an investment similar to the Trusts:

> Shah: btw – that deal is ridiculous
>
> Mooney: i know right . . . model def does not capture half of the rish [sic]
>
> Mooney: ***risk***
>
> Shah: ***we should not be rating it***

Mooney: *we rate every deal*

Mooney: *it could be structured by cows and we would rate it*

Shah: but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

131.    In another e-mail, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager and stated that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters*."

132.    The loosening of ratings criteria due to market share considerations was evident at Moody's also.  Jerome Fons ("Fons"), a former Managing Director for Credit Quality at Moody's, indicated that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "[m]anagement's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

133.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality*."  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "*prevented analysts from putting investor interests first*."

134.    McDaniel of Moody's also acknowledged the degradation of ratings standards.  In a presentation to Moody's Board of Directors in October 2007, McDaniel told his Board "The real problem is not that the market . . . underweight[s] ratings quality but rather that in some sectors, it

- 45 -

actually penalizes quality. . . .  It turns out that *ratings quality has surprisingly few friends*."  He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the amount of a mortgage deal that was rated AAA after its client complained and said it might go with a different rating firm.

135.    As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, *Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter*."

**Due to Defects in the Underwriting Process,**
**Inaccurate Data Was Entered into the Ratings**
**Models Thereby Yielding Inaccurate Ratings**

136.    In addition to the eroding rating standards and the flawed rating models alleged above, Moody's and S&P's ratings were also based on inaccurate information.  The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that the defendants provided to them – including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As alleged above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective underwriting alleged herein.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence was performed.  During a "Town Hall Meeting" hosted by Moody's

- 46 -

McDaniel, executives at Moody's acknowledged that the rating agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true. . . . [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law.  We know that's a lie.

> \*        \*        \*

> There's a lot of fraud that's involved there, things that we didn't see. . . . We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

> \*        \*        \*

> [W]e're being asked to figure out how much everyone lied. . . .  [If] all of the information was truthful and comprehensive and complete, we wouldn't have an issue here. . . .

> What we're really being asked to do is figure out how much lying is going on and bake that into a credit [rating] which is a pretty challenging thing to do.  I'm not sure how you tackle that from a modeling standpoint.

137.     In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's sub prime ratings leading to massive downgrades and potential more downgrades to come?  We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that *we had blinders on and never questioned the information we were given*.  Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan? As for #2, *it is our job to think of the worst case scenarios and model for them . . . . Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both*.

138.     Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk.  Certificates were given investment grade ratings when in reality they were not of investment grade quality.  As such, the statements regarding the ratings of the Certificates were false and misleading.

- 47 -

523428_1

139.    The problems identified above were not disclosed to the public and resulted in artificially high ratings for the Certificates.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES

140.    Since the Certificates were issued, the ratings on Certificates within each of the Trusts have been downgraded.  Certificates that received a rating of "AAA" (the highest rating category available) have fallen many notches and are now rated "CCC" or "D" (one of the lowest ratings and far below the threshold of "junk" status).

141.    These downgrades have occurred because the original ratings did not accurately reflect the risk associated with the assets underlying the Certificates.  Further, the delinquency rates on the underlying mortgage loans have skyrocketed.  ***In each of the Trusts, the 60+ day delinquency rate is in excess of 25%*** (the "60+ day delinquency rate" includes loans that are foreclosures, loans that are 60 days or more delinquent, and loans in which the real estate collateral was retaken by the lender).  The total percentage of delinquent and foreclosed loans and bank owned and sold properties for the Trusts exceeded 41% of the total loan pool as of March 2010.  The massive foreclosure rates and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above.

142.    There is a secondary market for the purchase and sale of the Certificates.  There has been a market for the resale of investments like the Certificates since at least 2007.  The trading volume of Certificates like those at issue was at least $750 million during June of 2008, the time at which the first of the actions asserting the claims herein was filed.  In a non-forced sale in the secondary market in June of 2008, Plaintiffs and the Class would have netted, at most, between 70

- 48 -

and 80 cents on the dollar.  In other words, a sale on the date the first lawsuit was filed would have resulted in a loss of at least 20 to 30 cents on each dollar amount purchased.

143.    Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which Plaintiffs and members of the Class could dispose of them.  These diminutions in value and price have caused damages to the Plaintiffs and the Class.

**Deutsche Bank is the Target of Recent Government Investigations**

144.    On April 19, 2010, *The Wall Street Journal* reported that the SEC is investigating mortgage deals by Wall Street firms including Deutsche Bank.  The article noted:  "Deutsche Bank's traders and bankers were on alert for problems in the housing industry as early as September 2005, well before the market cracked."   After one "analyst visited firms that service mortgages in California" a report noted that "it would be 'sensible' to buy credit protection against mortgage-bond defaults."

145.    On May 12, 2010, citing "a person familiar with the matter," *The Wall Street Journal* reported that "[f]ederal prosecutors, working with securities regulators, are conducting a preliminary criminal probe into whether several major Wall Street banks misled investors about their roles in mortgage-bond deals."  The article listed Deutsche Bank as among the four banks "under early-stage criminal scrutiny."  The article also noted all four banks also received civil subpoenas from the SEC "as part of a sweeping investigation of banks' selling and trading of mortgage-related deals."

146.    On May 13, 2010, various articles in the financial press reported that the New York Attorney General Andrew Cuomo opened an investigation into whether eight banks, including

- 49 -

Deutsche Bank, misled credit rating agencies in connection with mortgage-backed securities deals.

According to an article that appeared in *The Washington Post* on May 13th:

> Cuomo's investigation is focusing on the relationships between the banks and the agencies that rated certain mortgage-related securities packaged by the banks and sold to clients . . . .  Investigators are looking at whether the banks gave false information to the agencies about the assets in the securities to get better ratings . . . .

147.   The article further noted:

> Cuomo's latest inquiry . . . looks at whether the rating agencies were deceived by the banks, ***including whether banks took advantage of loopholes in the rating agencies' models***, one source said.

(Emphasis added).

148.   A *New York Times* article on the same day further noted that the NYAG investigation included a look at the practices by certain banks of recruiting and offering million dollar pay packages to former rating agency employees.   Specifically mentioned were three employees Deutsche Bank hired from rating agency Fitch.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

149.   Plaintiffs repeat and re-allege the allegations set forth above as if set forth fully herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.  This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

150.   The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

- 50 -

151.     The Defendant Issuer is strictly liable to Plaintiffs and the Class for the misstatements and omissions complained of herein.

152.     The Individual Defendants signed the Registration Statement which was false due to the misstatements described above.

153.     Defendant Deutsche Securities was an underwriter of the Certificates and sold and marketed these investments to members of the Class.

154.     None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

155.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated §11 of the 1933 Act.

156.     Deutsche Securities was the underwriter for the following issuances:

        Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5

        Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4

157.     Plaintiffs acquired the Certificates pursuant and/or traceable to the Registration Statement and Prospectus Supplements.

158.     Plaintiffs and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' misconduct.

159.     At the time of their purchases of the Certificates, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to late fall of 2007.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon

- 51 -

which this complaint is based to the time that Plaintiffs filed the initial complaint.  Less than three

years has elapsed between the time that the securities upon which this claim is brought were offered

to the public and the time Plaintiffs filed the initial complaint.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendant Deutsche Securities

160.    Plaintiffs repeat and re-allege the allegations above as if set forth fully herein.  For

purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be

construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based

solely on claims of strict liability and/or negligence under the 1933 Act.

161.    By means of the defective Prospectus Supplements, defendant Deutsche Securities

promoted and sold the Certificates to Plaintiffs and other members of the Class.

162.    The Prospectus Supplements contained untrue statements of material fact, and

concealed and failed to disclose material facts, as detailed above.  Defendant Deutsche Securities

owed Plaintiffs and the other members of the Class who purchased the Certificates pursuant to the

Prospectus Supplements the duty to make a reasonable and diligent investigation of the statements

contained in the Prospectus Supplements to ensure that such statements were true and that there was

no omission to state a material fact required to be stated in order to make the statements contained

therein not misleading.  Defendant Deutsche Securities, in the exercise of reasonable care, should

have known of the misstatements and omissions contained in the Prospectus Supplements as set

forth above.

163.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have

known, of the untruths and omissions contained in the Prospectus Supplements at the time they

acquired the Certificates.

- 52 -

164.     By reason of the conduct alleged herein, defendant Deutsche Securities violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements sustained substantial damages in connection with their purchases of the Certificates.  Accordingly, Plaintiffs and the other members of the Class who hold the Certificates issued pursuant to the Prospectus Supplements have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to the defendant sued herein.  Class members who have sold their Certificates seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants,
### Deutsche Alt-A, and DB Structured Products, Inc.

165.     Plaintiffs repeat and re-allege the allegations above as if set forth fully herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

166.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants and Deutsche Alt-A.

167.     Each of the Individual Defendants was a control person of Deutsche Alt-A and of the Trusts by virtue of his/her position as a director and/or senior officer of Deutsche Alt-A.  The Individual Defendants were responsible for the preparation of the contents of the Registration Statement which incorporated by reference the statements in the Prospectus Supplements.

- 53 -

523428_1

168.     Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

169.     Deutsche Alt-A was the Depositor and an Issuer for the offerings.  DB Structured Products, Inc. was the Sponsor for the offerings.  The defendants named herein were responsible for overseeing the formation of the Trusts as well as the operations of the Trusts, including routing payments from the borrowers to investors.

170.     Deutsche Alt-A and the Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiffs as Class representatives;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: May 24, 2010        ROBBINS GELLER RUDMAN
          & DOWD LLP
       ARTHUR C. LEAHY
       THOMAS E. EGLER
       SCOTT H. SAHAM
       SUSAN G. TAYLOR
       NATHAN R. LINDELL
       MATTHEW I. ALPERT


               s/ Scott H. Saham
              SCOTT H. SAHAM

       655 West Broadway, Suite 1900
       San Diego, CA  92101
       Telephone:  619/231-1058
       619/231-7423 (fax)

       ROBBINS GELLER RUDMAN
          & DOWD LLP
       SAMUEL H. RUDMAN
       DAVID A. ROSENFELD
       CAROLINA C. TORRES
       JARRETT S. CHARO
       58 South Service Road, Suite 200
       Melville, NY  11747
       Telephone:  631/367-7100
       631/367-1173 (fax)

       LABATON SUCHAROW LLP
       CHRISTOPHER J. KELLER
       JONATHAN GARDNER
       140 Broadway, 34th Floor
       New York, NY  10005
       Telephone:  212/907-0700
       212/818-0477 (fax)

       Co-Lead Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 24, 2010.

s/ Scott H. Saham
SCOTT H. SAHAM

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  scotts@rgrdlaw.com

# Mailing Information for a Case 2:08-cv-03178-LDW -ARL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas E. Egler**
  tome@rgrdlaw.com,nlindell@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John Michael Falzone , III**
  john.falzone@lw.com,johnmfalzone@yahoo.com

- **Jonathan Gardner**
  jgardner@labaton.com,electroniccasefiling@labaton.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nathan R Lindell**
  nlindell@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Richard Owens**
  richard.owens@lw.com

- **Marianne Margaret Recher**
  marianne.recher@lw.com

- **David A. Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Samuel H. Rudman**
  srudman@rgrdlaw.com,e_file_ny@csgrr.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph M. Salama**
  joseph.salama@lw.com,Jessica.bengels@lw.com,Jason.grossman@lw.com

- **Susan G. Taylor**
  susant@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`