UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

MASSACHUSETTS BRICKLAYERS AND    :    Civil Action No. 2:08-cv-03178-LDW-ARL
MASONS TRUST FUNDS, Individually and    :
On Behalf of All Others Similarly Situated,    :    CLASS ACTION
                                             :
                 Plaintiff,    :
                                             :
      vs.    :
                                             :
DEUTSCHE ALT-A SECURITIES, INC., et    :
al.,    :
                                             :
                 Defendants.    :

———————————————————— x

## DECLARATION OF JONATHAN GARDNER

I, JONATHAN GARDNER, declare as follows pursuant to 28 U.S.C. § 1746:

1.    I am a member of the law firm of Labaton Sucharow LLP, Court-appointed Co-Lead Counsel for the Massachusetts Bricklayers and Mason Trust Funds and the Pipefitters' Retirement Fund Local 597 (collectively, "Lead Plaintiffs") and the proposed class in this Litigation.  I am admitted to practice before this Court.

2.    I respectfully submit this declaration in support of Lead Plaintiffs' Unopposed Motion for: (I) Preliminary Approval of Settlement, (II) Certification of the Class for Purposes of Settlement, (III) Approval of Notice to the Class, and (IV) Scheduling of a Final Approval Hearing.  I have personal knowledge of the matters testified to herein.

3.    Annexed hereto as Exhibit 1 is a true and correct copy of the Stipulation and Agreement of Settlement, dated as of March 15, 2012, for this Settlement.  The Stipulation contains several exhibits negotiated by the parties: the proposed preliminary approval order

(Exhibit A); the notice (Exhibit A-1); summary notice (Exhibit A-3); proof of claim (Exhibit A-2); and judgment (Exhibit B).

4.      Annexed hereto as Exhibit 2 is a true and correct copy of the firm resume of Labaton Sucharow LLP, Co-Lead Counsel in the Litigation.

5.      Annexed hereto as Exhibit 3 is a true and correct copy of the firm resume of Robbins Geller Rudman & Dowd LLP, Co-Lead Counsel in the Litigation.


I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed at New York, New York, on March 22, 2012.


/s/ Jonathan Gardner
                      Jonathan Gardner

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MASSACHUSETTS BRICKLAYERS AND MASONS TRUST FUNDS, Individually and On Behalf of All Others Similarly Situated, | : | Civil Action No. 2:08-cv-03178-LDW-ARL |
| | : | |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | STIPULATION AND AGREEMENT OF SETTLEMENT |
| vs. | : | |
| | : | |
| DEUTSCHE ALT-A SECURITIES, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

This Stipulation and Agreement of Settlement, dated as of March 15, 2012 (the "Stipulation") is submitted pursuant to Rule 23 of the Federal Rules of Civil Procedure. Subject to the approval of the Court, this Stipulation is made and entered into by and among the following Settling Parties (as defined below) to the above-entitled Litigation: (i) the Lead Plaintiffs (on behalf of themselves and each of the Settlement Class Members), by and through their counsel of record in the Litigation; and (ii) the Defendants, by and through their counsel of record in the Litigation. Upon and subject to the terms and conditions hereof, the Stipulation is intended by the Settling Parties to fully, finally and forever resolve, discharge and settle the Released Claims (as defined below) and result in the complete dismissal of this Action with prejudice as against all Defendants and Kevin P. Burns ("Burns").

## I.      THE LITIGATION

On June 27, 2008 an action was filed in the Supreme Court of the State of New York, County of Nassau asserting claims under the Securities Act of 1933 (the "Securities Act") on behalf of all purchasers of Mortgage Pass-Through Certificates of Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A"). On August 5, 2008, the action was removed to the United States District Court for the Eastern District of New York. The action is referred to herein as the "Litigation." On October 2, 2008, Massachusetts Bricklayers and Masons Trust Funds moved to remand the Litigation back to the Supreme Court of New York, County of Nassau. That motion was denied on January 8, 2009. On May 18, 2009, the Court appointed Massachusetts Bricklayers and Mason Trust Funds and the Pipefitters' Retirement Fund Local 597 as lead plaintiffs pursuant to Section 27 of the Securities Act, 15 U.S.C. §77z-1(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995, and approved their selection of Robbins Geller Rudman & Dowd LLP (then Coughlin Stoia Geller Rudman & Robbins LLP) and Labaton Sucharow LLP as Lead Counsel.

On June 18, 2009, Lead Plaintiffs filed their Amended Complaint for Violation of §§ 11, 12(a)(2) and 15 of the Securities Act.  The amended complaint asserted claims related to fourteen (14) offerings issued pursuant to one common registration statement filed with the United States Securities and Exchange Commission ("SEC") by certain defendants on May 1, 2006.  Defendants filed a motion to dismiss, which the Court granted in part on April 6, 2010.  The Court allowed claims to proceed on behalf of investors who acquired certificates in either of the two trusts that Lead Plaintiffs' purchased only:  Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 and Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5.  The Court also granted Lead Plaintiffs leave to file a second amended complaint.

The operative complaint in the Litigation is the Second Amended Complaint for Violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Complaint") filed May 24, 2010.  The Complaint alleges violations of §§ 11, 12(a)(2) and 15 of the Securities Act on behalf of a class of all persons or entities who, between May 2006 and May 2007, acquired Mortgage Pass-Through Certificates issued by Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 or Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 pursuant and/or traceable to the Registration Statement filed with the SEC on May 1, 2006.

On July 9, 2010, Defendants moved to dismiss the Complaint.  After the motion to dismiss was fully briefed, it was denied by the Court on December 23, 2010. Discovery commenced, including: (i) party and third-party document production of over four (4) million documents; and (ii) depositions of Lead Plaintiffs and their investment managers, as well as the class certification experts retained by Lead Plaintiffs and Defendants.

On July 11, 2011, Lead Plaintiffs moved to certify a class of all persons or entities who purchased or otherwise acquired Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4

- 2 -

Mortgage Pass-Through Certificates and/or Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 Mortgage Pass-Through Certificates between May 2006 and May 2007 and who were damaged thereby.  The motion for certification was fully briefed and pending Court consideration.  The Court denied the motion for class certification without prejudice to renew pending the results of a mediation scheduled between the parties.

On November 18, 2011, Lead Plaintiffs and Defendants participated in a full-day mediation regarding potential settlement of the Litigation facilitated by Hon. Layn R. Phillips (Ret.).  In connection with the mediation process, Lead Plaintiffs conducted arm's-length negotiations with respect to a potential compromise and settlement of the Litigation with a view toward achieving the best relief possible consistent with the interests of the Settlement Class. Lead Plaintiffs and Defendants were unable to reach agreement as to a settlement at the conclusion of the one-day mediation session.  However, following the mediation session, Judge Phillips submitted a mediator's proposal to both Lead Plaintiffs and Defendants.  The mediator's proposal of $32.5 million in cash was accepted by Lead Plaintiffs and Defendants.

## II.    ASSERTIONS AND DENIALS OF THE SETTLING PARTIES AND THE BENEFITS OF THE SETTLEMENT

Lead Plaintiffs believe that the claims asserted in the Litigation have merit and that the evidence developed to date supports the claims.  However, Lead Plaintiffs recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Litigation against Defendants through trial and likely appeals.  Lead Plaintiffs have also taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Litigation, as well as the difficulties and delays inherent in such litigation.  Lead Plaintiffs are also mindful of the problems of proof, and possible defenses to the securities law violations asserted in the Litigation.  Lead Plaintiffs believe that the Settlement set forth in the

Stipulation confers substantial immediate benefits upon the Settlement Class Members, is in the best interests of the Lead Plaintiffs and the Settlement Class Members, and is fair, reasonable, and adequate.

Defendants, individually and collectively, have denied and continue to deny each and all of the claims and contentions alleged by Lead Plaintiffs in the Litigation. Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts, or omissions alleged, or that could have been alleged, in the Litigation. Defendants further deny that Lead Plaintiffs or the Settlement Class have suffered damages, that the prices of the Certificates were artificially inflated during the Relevant Time Period (as defined below) as the result of any alleged misrepresentations, omissions, non-disclosures or otherwise by Defendants, and that Lead Plaintiffs or the Settlement Class were harmed by the conduct alleged in the Complaint.

## III.   TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT

NOW THEREFORE, without any admission or concession on the part of Lead Plaintiffs of any lack of merit of the Litigation, and without any admission or concession of any liability or wrongdoing or lack of merit in the defenses whatsoever by any of Defendants, it is hereby

STIPULATED AND AGREED, by and among Lead Plaintiffs, acting on behalf of themselves and all Settlement Class Members, and Defendants, by and through their respective counsel or attorneys of record, that, subject to the approval of the Court, in consideration of the benefits flowing to the  parties to the Stipulation, the Litigation, the Released Claims, and all matters encompassed within the scope of the releases set forth or referenced in this Stipulation shall be finally, fully and forever compromised, settled,  released, and discharged and the Litigation shall be dismissed with prejudice as to all Defendants and Burns, upon and subject to the following terms and conditions:

- 4 -

1.      **Definitions**

As used in this Stipulation, the following terms have the meanings specified below:

1.1      "Authorized Claimant" means any Settlement Class Member whose claim for recovery has been allowed pursuant to the terms of the Stipulation.

1.2      "Certificates" means the Mortgage Pass-Through Certificates issued by Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 and Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4 pursuant to the registration statement filed with the SEC on May 1, 2006.

1.3      "Claimant" means any Settlement Class Member who submits a Proof of Claim and Release in such form and manner, and within such time, as the Court shall prescribe.

1.4      "Claims Administrator" means Gilardi & Co. LLC.

1.5      "Complaint" means the Second Amended Complaint for Violations of §§11, 12(a)(2) and 15 of the Securities Act of 1933, filed in the Litigation on May 24, 2010.

1.6      "Court" means the United States District Court for the Eastern District of New York.

1.7      "DBSI" means Deutsche Bank Securities Inc.

1.8      "DBSP" means DB Structured Products, Inc.

1.9      "Defendants" means the Deutsche Bank Defendants and the Individual Defendants.

1.10      "Defendants' Counsel" means Latham & Watkins LLP.

1.11      "Deutsche Alt-A" means Deutsche Alt-A Securities, Inc.

1.12      "Deutsche Bank Defendants" means Defendants Deutsche Alt-A, DBSI, and DBSP.

1.13    "Effective Date" means the first date by which all of the events and conditions specified in ¶ 8.1 of the Stipulation have been met and have occurred and the Settlement contemplated by the Stipulation shall become effective.

1.14    "Escrow Account" means the escrow account established and controlled by the Escrow Agent into which the settlement amount of Thirty-Two Million Five Hundred Thousand Dollars ($32,500,000) shall be deposited.

1.15    "Escrow Agent" means the law firms of Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP, or their successors.

1.16    "Final" means when the last of the following with respect to the Judgment approving the Stipulation, substantially in the form of Exhibit B attached hereto, shall occur: (i) the expiration of the time to file a motion to alter or amend the Judgment under Federal Rule of Civil Procedure 59(e) has passed without any such motion having been filed; (ii) the expiration of the time in which to appeal the Judgment has passed without any appeal having been taken, which date shall be deemed to be thirty (30) days following the entry of the Judgment, unless the date to take such an appeal shall have been extended by Court order or otherwise, or unless the thirtieth (30th) day falls on a weekend or a Court holiday, in which case the date for purposes of this Stipulation shall be deemed to be the next business day after such thirtieth (30th) day; and (iii) if a motion to alter or amend the Judgment under Federal Rule of Civil Procedure 59(e) is filed or if an appeal is taken, immediately after the determination of that motion or appeal so that it is no longer subject to any further judicial review or appeal whatsoever, whether by reason of affirmance by a court of last resort, lapse of time, voluntary dismissal of the appeal or otherwise, and in such a manner as to permit the consummation of the Settlement substantially in accordance with the terms and conditions of

this Stipulation. For purposes of this paragraph, an "appeal" shall include any petition for a writ of certiorari or other writ that may be filed in connection with approval or disapproval of this Settlement, but shall not include any appeal that concerns only the issue of payment or allocation of attorneys' fees and award of costs or the Plan of Allocation of the Net Settlement Fund.

1.17    "Final Approval Hearing" means the hearing to determine whether the proposed Settlement embodied by this Stipulation is fair, reasonable and adequate to the Settlement Class, and whether the Court should enter a Judgment approving the proposed Settlement.

1.18    "Gross Settlement Fund" means the principal amount of Thirty-Two Million Five Hundred Thousand Dollars ($32,500,000), plus any accrued interest earned thereon.

1.19    "Individual Defendants" means Anilesh Ahuja, Jeffrey Lehocky, Richard W. Ferguson, Joseph J. Rice, and Richard D'Albert.

1.20    "Judgment" means the judgment to be rendered by the Court, substantially in the form attached hereto as Exhibit B, or such other substantially similar form agreed to by the Settling Parties.

1.21    "Lead Counsel" means Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP.

1.22    "Lead Plaintiffs" means Massachusetts Bricklayers and Mason Trust Funds and the Pipefitters' Retirement Fund Local 597.

1.23    "Net Settlement Fund" has the meaning defined in ¶ 6.2 below.

1.24    "Person" means a natural person, individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated

- 7 -

association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives or assignees.

1.25 "Plan of Allocation" means a plan or formula of allocation of the Net Settlement Fund whereby the Net Settlement Fund shall be distributed to Authorized Claimants after payment of expenses of notice and administration of the Settlement, Taxes and Tax Expenses, and such attorneys' fees, costs, expenses and interest as may be awarded by the Court.

1.26 "Preliminary Approval Order" means the order (substantially in the form attached hereto as Exhibit A) to be entered by the Court preliminarily approving the Settlement and directing that notice be provided to the Settlement Class Members.

1.27 "Related Parties" means each of a Defendant's past or present directors, officers, employees, partners, insurers, co-insurers, reinsurers, principals, controlling shareholders, attorneys, accountants, auditors, underwriters, investment advisors, agents, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, affiliates, joint ventures, assigns, assignees, spouses, heirs, estates, related or affiliated entities, any entity in which a Defendant has a controlling interest, any member of an Individual Defendant's immediate family, any trust of which an Individual Defendant is the settlor or which is for the benefit of an Individual Defendant and/or any member of an Individual Defendant's immediate family, and any entity in which a Defendant and/or any member of an Individual Defendant's immediate family has or have a controlling interest (directly or indirectly). "Related Parties" specifically includes, but is not limited to: (i) Kevin P. Burns, who is named as a defendant in the Second Amended Complaint; (ii) Deutsche Alt-A

- 8 -

Securities Mortgage Loan Trust, Series 2006-AR5; and (iii) Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4.

    1.28    "Released Claims" shall collectively mean all claims (including "Unknown Claims" as defined in ¶ 1.39 below), demands, rights (including the right to appeal the Court's dismissal of any claims in the Litigation related to securities originally pled but no longer at issue in this Litigation), liabilities and causes of action of every nature and description whatsoever, known or unknown, contingent or absolute, mature or immature, discoverable or undiscoverable, whether concealed or hidden, suspected or unsuspected, which now exist, or heretofore have existed, asserted or that could have been asserted under federal, state, common or foreign law by Lead Plaintiffs or any Settlement Class Member against Defendants and their Related Parties based upon or arising out of (i) both (a) the allegations, facts, transactions, events, occurrences, disclosures, statements, representations, acts, omissions or failures to act which were or could have been alleged in the Litigation, and (b) the purchase or other acquisition or disposition or holding of the Certificates or any interest therein by Lead Plaintiffs or any Settlement Class Member during the Relevant Time Period; or (ii) the administration of the Net Settlement Fund.  Released Claims shall not include: (i) claims to enforce the Settlement; or (ii) claims brought in *Dexia SA/NV. at al. v. Deutsche Bank AG., et al.*, No. 11-cv-5672 (S.D.N.Y.); *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc., et al.,* No. 11-cv-30039 (D. Mass.); *Fed. Home Loan Bank of Boston v. Ally Fin., Inc. et al.*, No. 11-cv-10952 (D. Mass.); and *Teachers Ins. & Annuity Assoc. of Am. v. Deutsche Bank AG, et al.*, No. 11-cv-6141 (S.D.N.Y.).

    1.29    "Released Parties" means each and all of the Defendants and each and all of their Related Parties.

- 9 -

1.30    "Relevant Time Period" means the period between May 1, 2006 through May 30, 2007, inclusive.

1.31    "Settlement" means the settlement contemplated by this Stipulation.

1.32    "Settlement Amount" means Thirty-Two Million Five Hundred Thousand Dollars ($32,500,000).

1.33    "Settlement Class," "Settlement Class Members," or "Members of the Settlement Class" mean all Persons who purchased or otherwise acquired Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 Mortgage Pass-Through Certificates and/or Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 Mortgage Pass-Through Certificates during the Relevant Time Period and who were damaged thereby. Excluded from the Settlement Class are: the Defendants, IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage, Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; the officers, directors, successors and assigns of Deutsche Alt-A, DBSI, DBSP, IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; members of the immediate families, the legal representatives, heirs, successors or assigns of the Individual Defendants; any entity in which any excluded Person has or had a controlling interest; and any Person who timely and validly seeks exclusion from the Settlement Class.

- 10 -

1.34    "Settling Parties" means, collectively, Defendants and Lead Plaintiffs, on behalf of themselves and the Settlement Class Members.

1.35    "Stipulation" means this Stipulation of Settlement, including the recitals and exhibits hereto.

1.36    "Supplemental Agreement" means the agreement described in ¶ 8.3 below.

1.37    "Taxes" means all taxes (including any estimated taxes, interest or penalties) arising with respect to the income earned on the Settlement Amount described in ¶ 2.1 below.

1.38    "Tax Expenses" means expenses and costs incurred in connection with the calculation and payment of taxes or the preparation of tax returns and related documents including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in ¶ 2.7.

1.39    "Unknown Claims" means collectively any Released Claims that Lead Plaintiffs or any Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Parties, or might have affected his, her or its decision not to object to or opt out of this Settlement.  With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Lead Plaintiffs shall expressly waive, and each of the Settlement Class Members shall be deemed to have waived, and by operation of the Judgment shall have waived, the provisions, rights and benefits of California Civil Code § 1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

- 11 -

Lead Plaintiffs shall expressly waive and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code §1542. Lead Plaintiffs and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly, fully, finally and forever settle and release, and each Settlement Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  Lead Plaintiffs acknowledge, and the Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part.

    **2.**      **The Settlement**

        **a.**      **Settlement Consideration**

2.1     In consideration of the terms of this Stipulation, Deutsche Bank Defendants shall pay or cause the Settlement Amount to be paid into the Escrow Account no later than fifteen (15) business days after entry of the Court's Preliminary Approval Order and the provision of wiring instructions, Form W-9 for the payee, and email address for the payee are

sent to Jamie L. Wine, Esq.  If the agreed upon sum is not timely transferred to the Escrow Account, the Settlement may be voided at the option of Lead Plaintiffs.

### b. The Escrow Agent

2.2     The Escrow Agent shall invest funds in the Escrow Account in instruments backed by the full faith and credit of the United States Government or an agency thereof (or a mutual fund invested solely in such instruments), or deposit some or all of the funds in non-interest-bearing transaction accounts up to the limit of Federal Deposit Insurance Corporation insurance.  Defendants and Defendants' Counsel shall have no responsibility for, interest in, or liability whatsoever with respect to investment decisions executed by the Escrow Agent.  The Gross Settlement Fund shall bear all risks related to the investments of the Settlement Amount in accordance with the guidelines set forth in this paragraph.

2.3     The Escrow Agent shall not disburse the Gross Settlement Fund except as provided in the Stipulation, by an order of the Court, or with the written agreement of Lead Counsel and Defendants' Counsel.

2.4     Subject to further order and/or direction as may be made by the Court, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of the Stipulation.

2.5     All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to this Stipulation and/or further order(s) of the Court.

2.6     The Escrow Agent shall establish a "Notice and Administration Fund," and may deposit up to $500,000 from the Gross Settlement Fund into it.  The Notice and Administration Fund shall be used by Lead Counsel to pay the costs and expenses reasonably

- 13 -

and actually incurred in connection with providing notice to the Settlement Class, locating Settlement Class Members, assisting with the filing of claims, administering and distributing the Net Settlement Fund to Authorized Claimants, and processing Proof of Claim and Release forms.  The Notice and Administration Fund may also be invested and earn interest as provided in ¶ 2.2 above.  If the costs of notice and administration do not exceed $500,000, the balance with any interest earned shall be refunded to the balance of the Gross Settlement Fund by the Escrow Agent.  If the reasonable costs of notice and administration exceed $500,000, plus any interest earned, then, after the occurrence of the Effective Date, the Escrow Agent may authorize payment of such amounts from the balance of the Gross Settlement Fund.  Except as required by ¶ 2.1 concerning payment of the Settlement Amount and subject to ¶¶ 2.8 and 6.1 below, Defendants are not responsible for, and shall not be liable for, any costs incurred in connection with providing notice to the Settlement Class, locating Settlement Class Members, assisting with the filing of claims, administering and distributing the Net Settlement Fund, or processing Proof of Claim and Release forms.

### c.    Taxes

2.7    The Settling Parties and the Escrow Agent agree:

(i)    The Gross Settlement Fund, which includes the Notice and Administration Fund, is intended at all times to be treated as a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1.  In addition, the Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this ¶ 2.7, including the "relation-back election" (as defined in Treasury Regulation § 1.468B-1) back to the earliest permitted date.  Such elections shall be made in compliance with the procedures and requirements contained in such regulations.  It shall be the responsibility of the Escrow Agent to

timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(ii)     For the purpose of §1.468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the Escrow Agent shall be the "administrator" of the Gross Settlement Fund, as that term is defined in §1.468B. The Escrow Agent shall timely and properly cause to be filed all informational and other tax returns necessary or advisable with respect to the Gross Settlement Fund (including, without limitation, the returns described in Treasury Regulation §1.468B-2(k)). Such returns (as well as the election described in ¶ 2.7(i) hereof) shall be consistent with this ¶ 2.7 and in all events shall reflect that all Taxes (including any estimated Taxes, interest or penalties) on the income earned on the Settlement Amount shall be paid out of the Gross Settlement Fund as provided in ¶ 2.7(iii) hereof.

(iii)     All (a) Taxes (including any estimated Taxes, interest or penalties) arising with respect to the income earned on the Settlement Amount, including any Taxes or tax detriments that may be imposed upon Defendants or their Related Parties with respect to any income earned on the Settlement Amount for any period during which the Gross Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes, and (b) Tax Expenses shall be paid out of the Gross Settlement Fund; in no event shall Defendants, their Related Parties, or Defendants' Counsel have any responsibility for, or liability whatsoever with respect to, the Taxes or the Tax Expenses. Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Gross Settlement Fund and shall be timely paid by the Escrow Agent out of the Gross Settlement Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to

- 15 -

withhold from distribution to Authorized Claimants any funds necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treasury Regulation § 1.468B-2(1)(2)); neither Defendants, their Related Parties, nor their counsel are responsible, therefore nor shall they have any liability with respect thereto.  The Settling Parties agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this paragraph.

    (iv)  Except as required by ¶ 2.1 concerning payment of the Settlement Amount and subject to ¶¶ 2.8 and 6.1 below, Defendants and the Related Parties shall not have any responsibility for Taxes or Tax Expenses, nor shall they be liable for any claims with respect thereto.

  **d.**  **Termination of the Settlement**

  2.8  In the event that the Stipulation is not approved, or is terminated, canceled, or fails to become effective for any reason, the Settlement Amount, including accrued interest, less the expenses, Taxes and Tax Expenses described in ¶¶ 2.6 and 2.7 hereof actually incurred or due and owing, shall be refunded to such Persons that paid the Settlement Amount pursuant to written instructions from Defendants' Counsel.

  **3.**  **Certification of the Settlement Class**

  3.1  Solely for purposes of this Settlement, and subject to approval by the Court, the Settling Parties agree that the Settlement Class shall be certified and Lead Plaintiffs and Lead Counsel shall be appointed as representatives of the Settlement Class pursuant to Federal Rule of Civil Procedure 23, as set forth in the Preliminary Approval Order.  Should the Settlement Class not be certified, or should any court amend the scope of the Settlement Class, each of the Settling Parties reserve the right to void this Stipulation in accordance with ¶ 8.5 hereof.

- 16 -

4.      **Preliminary Approval Order and Final Approval Hearing**

4.1      Promptly after execution of the Stipulation (and, in no event, later than March 23, 2012), Lead Counsel shall submit the Stipulation together with its Exhibits to the Court and shall apply for entry of the Preliminary Approval Order, substantially in the form of Exhibit A attached hereto, requesting, inter alia, the preliminary approval of the Settlement set forth in the Stipulation, and approval for mailing a settlement notice ("Notice"), substantially in the form of Exhibit A-1 attached hereto, and publication of a summary notice ("Summary Notice"), substantially in the form of Exhibit A-3 attached hereto.  The Notice shall include the general terms of the Settlement set forth in the Stipulation, the proposed Plan of Allocation, the general terms of the Fee and Expense Application as defined in ¶ 7.1 below, and the date of the Final Approval Hearing.

4.2      Lead Counsel shall request that after notice is given, the Court hold a Final Approval Hearing and approve the Settlement of the Litigation as set forth herein.  Lead Counsel also will request that the Court approve the proposed Plan of Allocation and the Fee and Expense Application.

5.      **Releases**

5.1      The obligations incurred pursuant to this Stipulation shall be in full and final disposition of the Litigation and any and all Released Claims as against all Released Parties.

5.2      Upon the Effective Date, the Lead Plaintiffs shall have, and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, fully, finally and forever released, relinquished, dismissed, and discharged all Released Claims against the Released Parties, with prejudice and on the merits, whether or not such Settlement Class Member executes and delivers a Proof of Claim and Release form.  The Settling Parties acknowledge, and the Settlement Class Members shall be deemed by operation

- 17 -

of law to acknowledge, that the waiver of Unknown Claims, and of the provisions, rights and benefits of §1542 of the California Civil Code, was bargained for and is a key element of the Settlement of which the release in this paragraph is a part.

5.3     The Proof of Claim and Release form ("Proof of Claim") to be executed by Settlement Class Members shall release all Released Claims against the Released Parties and shall be substantially in the form contained in Exhibit A-2 attached hereto.

5.4     Upon the Effective Date, Lead Plaintiffs and all Settlement Class Members and anyone claiming through or on behalf of any of them, are forever barred and enjoined from commencing, instituting, or continuing to prosecute any action or proceeding in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind, asserting against any of the Released Parties, and each of them, any of the Released Claims.

5.5     Upon the Effective Date, each of the Released Parties shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged the Lead Plaintiffs, Settlement Class Members, and their attorneys, employees, heirs, successors, and assigns from all claims (including, without limitation, Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims.

## 6.     Administration and Calculation of Claims, Final Awards and Supervision and Distribution of Net Settlement Fund

6.1     The Claims Administrator shall administer and calculate the claims submitted by Settlement Class Members.  The Claims Administrator will be subject to such supervision and direction from the Court and/or Lead Counsel as may be necessary or as circumstances may require.  Deutsche Alt-A, DBSI, and/or DBSP shall provide or cause to be provided to the Claims Administrator, without any charge to Lead Plaintiffs or the Settlement Class, its lists of

Persons who held or purchased the Certificates during the Relevant Time Period in electronic and searchable form, such as an Excel file, within seven (7) calendar days of execution of this Stipulation, as appropriate for providing notice to the Settlement Class. To the extent such lists have already been produced to Lead Plaintiffs, they need not be provided again.

6.2     The Gross Settlement Fund shall be applied as follows:

(a)     to pay all the fees and expenses reasonably and actually incurred in connection with providing notice to the Settlement Class, locating Settlement Class Members, assisting with the filing of claims, administering and distributing the Net Settlement Fund to Authorized Claimants, processing Proofs of Claim and paying escrow fees and costs, if any;

(b)     to pay the Taxes and Tax Expenses described in ¶ 2.7 above;

(c)     to pay Lead Plaintiffs' attorneys' fees and expenses and Lead Plaintiffs' expenses, including lost wages, if and to the extent allowed by the Court (the "Fee and Expense Award"); and

(d)     after the Effective Date, to distribute the balance of the Gross Settlement Fund (the "Net Settlement Fund") to Authorized Claimants as allowed by the Stipulation, the Plan of Allocation, or the Court.

6.3     Upon the Effective Date and thereafter, and in accordance with the terms of the Stipulation, the Plan of Allocation, or such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Claims Administrator, under the supervision of Lead Counsel and subject to the Court's jurisdiction, shall distribute the Net Settlement Fund to Authorized Claimants, subject to and in accordance with the following:

(a)     Within one-hundred and twenty (120) days after the mailing of the Notice or such other time as may be set by the Court, each Person claiming to be an Authorized

Claimant shall be required to submit to the Claims Administrator a completed Proof of Claim, substantially in the form of Exhibit A-2 attached hereto, signed under penalty of perjury and supported by such documents as are specified in the Proof of Claim and as are reasonably available to the Authorized Claimant.

(b)      Except as otherwise ordered by the Court, all Settlement Class Members who fail to timely submit a Proof of Claim within such period, or such other period as may be ordered by the Court, or otherwise allowed, shall be forever barred from receiving any payments pursuant to the Stipulation and the Settlement set forth herein, but will in all other respects be subject to and bound by the provisions of the Stipulation, the releases contained herein, and the Judgment, and will be permanently barred and enjoined from bringing any action, claim or other proceeding of any kind against any Released Parties concerning any Released Claims. Notwithstanding the foregoing, Lead Counsel shall have the discretion to accept late-submitted claims for processing so long as distribution of the Net Settlement Fund is not materially delayed thereby.

(c)      The Net Settlement Fund shall be distributed to Authorized Claimants substantially in accordance with a Plan of Allocation to be described in the Notice and approved by the Court.  If there is any balance remaining in the Net Settlement Fund after six (6) months from the date of distribution of the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), Lead Counsel shall, if feasible, reallocate such balance among Authorized Claimants in an equitable and economic fashion.  Thereafter, any balance which still remains in the Net Settlement Fund shall be donated to Consumers Union .

6.4      This Settlement is not a claims-made settlement and, if all conditions of the Stipulation are satisfied and the Settlement becomes Final, no portion of the Gross Settlement

- 20 -

Fund will be returned to the Defendants. Defendants and their Related Parties shall have no responsibility for, interest in, or liability whatsoever with respect to the maintenance, investment or distribution of the Gross Settlement Fund; the establishment of the Escrow Account; the establishment or administration of the Plan of Allocation; the determination, administration, or calculation of claims, the payment or withholding of Taxes or Tax Expenses; the distribution of the Net Settlement Fund; the administration of the Settlement; or any losses incurred in connection with such matters.

6.5     No Person shall have any claim against Lead Plaintiffs, Lead Counsel, the Released Parties, the Claims Administrator or other entity designated by Lead Counsel based on distributions made substantially in accordance with the Stipulation and the Settlement contained herein, the Plan of Allocation, or further order(s) of the Court. This does not include any claim by any party for breach of this Stipulation. The Released Parties shall have no responsibility for, interest in, or liability whatsoever with respect to the maintenance, investment or distribution of the Gross Settlement Fund; the establishment or maintenance of the Escrow Account; the establishment or administration of the Plan of Allocation; the determination, administration, or calculation of claims; the payment or withholding of Taxes; the distribution of the Net Settlement Fund; the administration of the Settlement; or any losses incurred in connection with such matters. Defendants take no position with respect to the provisions of this Stipulation governing those issues. The Released Parties shall have no further or other liability or obligations to Lead Plaintiffs, Lead Counsel or any Settlement Class Member with respect to the Released Claims, except as expressly stated in this Stipulation.

6.6     It is understood and agreed by the Settling Parties that any proposed Plan of Allocation of the Net Settlement Fund including, but not limited to, any adjustments to an Authorized Claimant's claim set forth therein, is not a part of this Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Stipulation, and any order or proceeding relating to the Plan of Allocation shall not operate to terminate or cancel this Stipulation or affect or delay the finality of the Court's Judgment approving this Stipulation and the Settlement set forth herein (including the releases contained herein), or any other orders entered pursuant to this Stipulation.  The Plan of Allocation is not a necessary term of this Stipulation, and it is not a condition of this Stipulation that any particular plan of allocation be approved by the Court.  Lead Plaintiffs and Lead Counsel may not cancel or terminate the Stipulation or the Settlement based on the Court's or any appellate court's ruling with respect to the Plan of Allocation or any plan of allocation in this Litigation.

6.7     The Court shall maintain jurisdiction over all proceedings with respect to the Plan of Allocation, including disputed questions of law and fact with respect to the administration, processing and validity of Proofs of Claims submitted to the Claims Administrator.

**7.     Lead Plaintiffs' Attorneys' Fees and Expenses**

7.1     Counsel for Lead Plaintiffs may submit an application or applications (the "Fee and Expense Application") for distributions to them from the Gross Settlement Fund for: (a) an award of attorneys' fees; plus (b) payment of expenses, including Lead Plaintiffs' expenses (including lost wages) paid pursuant to 15 U.S.C. § 77z-1(a)(4), and the fees of any experts or consultants, incurred in connection with prosecuting the Litigation; plus (c) any interest on such fees and expenses at the same rate and for the same time periods as earned by the Gross

Settlement Fund (until paid), as may be awarded by the Court.  Lead Counsel reserves the right to make additional applications for distributions from the Gross Settlement Fund for fees and expenses incurred.

7.2     The Fee and Expense Award, as awarded by the Court, shall be paid to Lead Counsel from the Gross Settlement Fund, as ordered, immediately after the Court executes an order awarding such fees and expenses.  Lead Counsel may thereafter allocate the attorneys' fees and expenses among counsel for plaintiffs in a manner in which they in good faith believe reflects the contributions of such counsel to the institution, prosecution and resolution of the Litigation.  In the event that the Effective Date does not occur, or the Judgment or the order making the Fee and Expense Award is reversed or modified by final non-appealable order, or the Stipulation is canceled or terminated for any other reason, and in the event that the Fee and Expense Award has been paid to any extent, then, without regard to whether Lead Counsel has allocated the attorneys' fees and expenses among counsel for plaintiffs, Lead Counsel shall be obligated, within ten (10) business days from receiving notice from Defendants' Counsel or from a court of appropriate jurisdiction, to refund to the Gross Settlement Fund the fees and expenses previously paid to Lead Counsel from the Gross Settlement Fund plus interest thereon at the same rate as earned by the Gross Settlement Fund in an amount consistent with such reversal or modification.

7.3     The procedure for and the allowance or disallowance by the Court of any applications by Lead Counsel for attorneys' fees and expenses, including the fees of experts and consultants as well as any application of Lead Plaintiffs for an award of expenses, including lost wages, to be paid out of the Gross Settlement Fund, are not part of the Settlement set forth in this Stipulation, and are to be considered by the Court separately from

- 23 -

the Court's consideration of the fairness, reasonableness and adequacy of the Settlement set forth in this Stipulation.  Any order or proceeding relating to the Fee and Expense Application, or any appeal from any order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel this Stipulation, or affect or delay the finality of the Judgment approving the Stipulation and the Settlement of the Litigation set forth herein (including the releases contained herein).

   7.4  Defendants and their Related Parties shall have no responsibility for or liability with respect to the payment of any Fee and Expense Award to any counsel for plaintiffs over and above payment of the Settlement Amount, or with respect to the allocation among plaintiffs' counsel.

## 8. Conditions of Settlement, Effect of Disapproval, Cancellation or Termination

   8.1  The Effective Date of this Stipulation shall be conditioned on the occurrence of all of the following events:

   (a)  the Settlement Amount has been deposited into the Escrow Account maintained by the Escrow Agent, as required by ¶ 2.1 hereof;

   (b)  the Court has entered the Preliminary Approval Order, as required by ¶ 4.1 above;

   (c)  Defendants have not exercised their option to terminate the Stipulation pursuant to ¶ 8.3 below;

   (d)  the Court has entered the Judgment in the form of Exhibit B attached hereto, or such other substantially similar form agreed to by the Settling Parties; and

   (e)  the Judgment has become Final, as defined in ¶ 1.16 above.

8.2     Upon the occurrence of all of the events referenced in ¶ 8.1 above, any and all remaining interest or right of Defendants in or to the Gross Settlement Fund, if any, shall be absolutely and forever extinguished.  If all of the conditions specified in ¶ 8.1 hereof are not met, then the Stipulation shall be canceled and terminated subject to ¶ 8.5 hereof unless Lead Counsel and Defendants' Counsel mutually agree in writing to proceed with the Stipulation.

8.3     Defendants shall have the option to terminate the Settlement if the aggregate damages of Settlement Class Members, as computed according to the Plan of Allocation, who would otherwise be entitled to participate as Members of the Settlement Class, but who timely and validly request exclusion pursuant to ¶¶ 9.1 and 9.2 below, equals or exceeds the amount (the "Opt-Out Threshold") set forth in a separate agreement (the "Supplemental Agreement") executed between Lead Counsel and Defendants' Counsel, which is incorporated by reference into this Stipulation.  The Opt-Out Threshold may be disclosed to the Court for purposes of approval of the Settlement, as may be required by the Court, but such disclosure shall be carried out to the fullest extent possible in accordance with the practices of the Court so as to maintain the Opt-Out Threshold as confidential.   In the event of a termination of this Settlement pursuant to the Supplemental Agreement, this Stipulation shall become null and void and of no further force and effect.

8.4     Unless otherwise ordered by the Court, in the event the Stipulation shall terminate, or be canceled, or shall not become effective for any reason, then within ten (10) business days after written notification of such event is sent by Defendants' Counsel or Lead Counsel to the other, the Settlement Amount (including accrued interest if any), less any expenses and costs reasonably and actually incurred pursuant to ¶ 2.6 above and/or actually and properly paid from the Notice and Administration Fund and Taxes and Tax Expenses that

- 25 -

have been paid pursuant to ¶ 2.7 above, shall be refunded by the Escrow Agent pursuant to written instructions from Defendants' Counsel. At the request of Defendants' Counsel, the Escrow Agent or its designee shall apply for any tax refund owed on the Gross Settlement Fund and pay the proceeds, after deduction of any fees or expenses incurred in connection with such application(s) for refund, pursuant to written direction from Defendants' Counsel.

8.5     In the event that the Stipulation is not approved by the Court or the Settlement set forth in the Stipulation is terminated or fails to become effective in accordance with its terms, the Settling Parties shall be restored to their respective positions in the Litigation immediately prior to November 18, 2011. In such event, the terms and provisions of the Stipulation, with the exception of ¶¶ 2.6-2.8, 8.4-8.6, and 11.5-11.6 hereof, shall have no further force and effect with respect to the Settling Parties and shall not be used in this Litigation or in any other proceeding for any purpose, and any judgment or order entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc*. No order of the Court or modification or reversal on appeal of any order of the Court concerning the Plan of Allocation or any Fee and Expense Award shall constitute grounds for cancellation or termination of the Stipulation.

8.6     If the Effective Date does not occur, or if the Stipulation is terminated pursuant to its terms, neither the Lead Plaintiffs nor Lead Counsel shall have any obligation to repay any amounts actually and properly disbursed for notice costs and Taxes and Tax Expenses pursuant to ¶¶ 2.6-2.7 above. In addition, any expenses already incurred and properly chargeable pursuant to ¶ 2.6 above at the time of such termination or cancellation, but which have not been paid, shall be paid by the Escrow Agent in accordance with the terms of the Stipulation prior to the balance being refunded in accordance with ¶¶ 2.8 and 8.4 above.

8.7     If a case is commenced with respect to any Defendant under Title 11 of the United States Code (Bankruptcy), or a trustee, receiver or conservator is appointed under any similar law, and in the event of the entry of a final order of a court of competent jurisdiction determining the transfer of the Settlement Amount, or any portion thereof, by or on behalf of such Defendant to be a preference, voidable transfer, fraudulent transfer or similar transaction and any portion thereof is required to be returned, and such amount is not deposited into the Escrow Account by others within fifteen (15) business days thereafter, then, at the election of Lead Plaintiffs, the Settling Parties shall jointly move the Court to vacate and set aside the releases given and the Judgment entered and the Defendants, Lead Plaintiffs and the Settlement Class Members shall be restored to their litigation positions immediately prior to November 18, 2011, and the Settlement Amount (including accrued interest if any), less any expenses and costs reasonably and actually incurred pursuant to ¶ 2.6 above and/or actually and properly paid from the Notice and Administration Fund and Taxes and Tax Expenses that have been paid pursuant to ¶ 2.7 above, shall be refunded by the Escrow Agent as provided in ¶ 8.4 above.

**9.     Requests for Exclusion**

9.1     A Settlement Class Member requesting exclusion from the Settlement Class shall be requested to provide the following information to the Claims Administrator: (i) name; (ii) address; (iii) telephone number; (iv) identity and original face value of mortgage pass-through certificates purchased (or otherwise acquired) or sold, which are traceable to Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 or Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4; (v) prices or other consideration paid or received for such mortgage pass-through certificates; (vi) the date of each purchase or sale transaction; and (vii) a statement that the Person wishes to be excluded from the Settlement Class.  Unless

otherwise ordered by the Court, any Settlement Class Member who does not submit a timely written request for exclusion as provided by ¶¶ 9.1 and 9.2 shall be bound by the Settlement in this Stipulation. Lead Plaintiffs shall request that the deadline for submitting requests for exclusion be twenty-one (21) calendar days prior to the Final Approval Hearing.

9.2 The Claims Administrator shall scan and send electronically copies of all requests for exclusion in PDF format (or such other format as shall be agreed) to Defendants' Counsel and to Lead Counsel expeditiously (and not more than five (5) business days) after the Claims Administrator receives such a request. As part of the motion papers in support of the Settlement of the Litigation, Lead Counsel will cause to be provided a list of all the persons who have requested exclusion from the Settlement Class, and shall cause to be certified that all requests for exclusion received by the Claims Administrator have been copied and provided to Defendants' Counsel.

## 10. No Admission of Wrongdoing

10.1 Whether or not the Settlement in this Stipulation is approved by the Court, and whether or not it is consummated, the fact and terms of this Stipulation, including Exhibits, all negotiations, discussions, drafts, and proceedings in connection with the Settlement, and any act performed or document signed in connection with the Settlement:

(a) shall not be offered or received against any of Defendants or their Related Parties as evidence of or construed as or deemed to be evidence of any presumption, concession, or admission by any of Defendants or their Related Parties with respect to the truth of any fact alleged by Lead Plaintiffs or the validity of any claim that has been or could have been asserted in this Litigation or in any litigation, or the deficiency of any defense that has been or could have been asserted in this Litigation or in any litigation, or of any liability, negligence, fault, or wrongdoing of any of Defendants or their Related Parties;

- 28 -

(b)　　shall not be offered or received against any of Defendants or their Related Parties as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any of Defendants;

(c)　　shall not be offered or received against any of the Defendants as evidence of a presumption, concession or admission with respect to any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of the Defendants, in any arbitration proceeding or other civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation; provided, however, that if this Stipulation is approved by the Court, the Released Parties may refer to it to effectuate the liability protection granted them hereunder;

(d)　　shall not be construed against any of Defendants or their Related Parties as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial; and

(e)　　shall not be construed as or received into evidence as an admission, concession or presumption against Lead Plaintiffs or any other Settlement Class Members that any of their claims are without merit, or that any defenses asserted by any of Defendants have any merit, or that damages recoverable under the Complaint would not have exceeded the Gross Settlement Fund.

## 11. Miscellaneous Provisions

11.1　　The headings herein are used for the purposes of convenience only and are not meant to have legal effect.

11.2　　The Settling Parties (a) acknowledge that it is their intent to consummate this Settlement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and

implement all terms and conditions of the Stipulation and to exercise their reasonable best efforts to accomplish the foregoing terms and conditions of the Stipulation.

11.3    The Settling Parties to this Stipulation intend the Settlement of the Litigation to be the full, final and complete resolution of all claims asserted or which could have been asserted by the Settlement Class Members against the Released Parties with respect to the Released Claims. Accordingly, the Settling Parties agree not to assert in any forum or tribunal that the Litigation was brought, prosecuted or defended in bad faith or without a reasonable basis. The Judgment shall contain a finding that at all times each Settling Party and his, her, or its counsel has complied fully with Rule 11 of the Federal Rules of Civil Procedure in connection with the maintenance, prosecution, defense and settlement of the Litigation. The Settling Parties agree that the amount paid and the other terms of the Settlement were negotiated at arm's length in good faith by the Settling Parties, and their respective counsel, and reflect a settlement that was reached voluntarily based upon adequate information and after consultation with experienced legal counsel.

11.4    The Settling Parties shall refrain from any accusations of wrongful or actionable conduct by either party concerning the prosecution and resolution of the Litigation, and shall not otherwise suggest that the Settlement constitutes an admission of any claim or defense alleged.

11.5    Neither the Stipulation nor the Settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Released Parties; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault

or omission of any of the Released Parties in any civil, criminal or administrative proceeding in any court, arbitration proceeding, or any administrative agency or other tribunal.   The Released Parties may file the Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of, without limitation, claim preclusion or issue preclusion or similar defense or counterclaim.

11.6   All agreements made and orders entered during the course of the Litigation relating to the confidentiality of information shall survive this Stipulation, pursuant to their terms.

11.7   All of the Exhibits to the Stipulation are hereby incorporated by reference as though fully set forth herein.   Notwithstanding the foregoing, in the event that there exists a conflict or inconsistency between the terms of this Stipulation and the terms of any Exhibit hereto, the terms of this Stipulation shall prevail.

11.8   This Stipulation shall not be construed more strictly against one Settling Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Settling Parties, it being recognized that the Stipulation is the result of arm's-length negotiations between the Settling Parties and that all Settling Parties have contributed substantially and materially to the preparation of this Stipulation.

11.9   The Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

11.10   The Stipulation and the Exhibits attached hereto and the Supplemental Agreement constitute the entire agreement among the Settling Parties hereto and no

representations, warranties or inducements have been made to any Settling Party concerning the Stipulation or its Exhibits or the Supplemental Agreement other than the representations, warranties and covenants contained and memorialized in such documents.  Except as otherwise provided herein, each Settling Party shall bear its own costs.

11.11   Lead Counsel, on behalf of the Settlement Class, are expressly authorized by the Lead Plaintiffs to take all appropriate action required or permitted to be taken by the Settlement Class pursuant to the Stipulation to effectuate its terms and also are expressly authorized to enter into any modifications or amendments to the Stipulation on behalf of the Settlement Class which they deem appropriate.

11.12   Each counsel or other Person executing the Stipulation or any of its Exhibits on behalf of any Settling Party hereto hereby warrants that such Person has the full authority to do so.

11.13   The Stipulation may be executed in one or more counterparts, including by signature transmitted via facsimile or by email in pdf format.  All executed counterparts and each of them shall be deemed to be one and the same instrument.  A complete set of original executed counterparts shall be filed with the Court.

11.14   The Stipulation shall be binding upon, and inure to the benefit of the successors and assigns of the parties hereto, including any and all Released Parties and any corporation, partnership, or other entity into or with which any party hereto may merge, consolidate or reorganize.

11.15   The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation, and all Settling Parties submit to the jurisdiction

of the Court for purposes of implementing and enforcing the Settlement embodied in the Stipulation.

11.16   The Stipulation and the Exhibits hereto shall be considered to have been negotiated, executed and delivered, and to be wholly performed, in the State of New York, and the rights and obligations of the parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of New York without giving effect to that State's choice-of-law principles, except to the extent that federal law requires that federal law governs.

11.17   The Settling Parties agree that, prior to final approval of the Settlement, the Hon. Layn R. Phillips (Ret.) will continue to serve as a mediator for any disputes between them arising out of the Settlement.  The Settling Parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in the Stipulation.

11.18   A waiver by one party of any breach of this Stipulation by any other party shall not be deemed a waiver of any other prior or subsequent breach of this Stipulation.

11.19   The Settling Parties and their respective counsel of record agree that they will use their best efforts to obtain all necessary approvals of the Court required by this Stipulation.

IN WITNESS WHEREOF, the parties hereto have caused the Stipulation to be executed, by their duly authorized attorneys dated as of March 15, 2012.

DATED: March 15, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
JONAH H. GOLDSTEIN
RYAN A. LLORENS
NATHAN R. LINDELL
IVY T. NGO
L. DANA MARTINDALE

_____
ARTHUR C. LEAHY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Co-Lead Counsel for Plaintiffs

DATED: March ___, 2012

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER

_____
JONATHAN GARDNER

140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Co-Lead Counsel for Plaintiffs

- 34 -

DATED: March ___, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
JONAH H. GOLDSTEIN
RYAN A. LLORENS
NATHAN R. LINDELL
IVY T. NGO
L. DANA MARTINDALE


_____

ARTHUR C. LEAHY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Co-Lead Counsel for Plaintiffs

DATED: March 15, 2012

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER

_____

JONATHAN GARDNER

140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Co-Lead Counsel for Plaintiffs

- 34 -

DATED: March 19, 2012

LATHAM & WATKINS LLP
RICHARD D. OWENS
JAMIE L. WINE
JOHN M. FALZONE
JASON C. HEGT


JAMIE L. WINE

885 Third Avenue, Suite 1000
New York, NY 10022
Telephone: 212/906-1200
212/751-4864 (fax)

Attorneys for Defendants

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

MASSACHUSETTS BRICKLAYERS AND : Civil Action No. 2:08-cv-03178-LDW-ARL
MASONS TRUST FUNDS, Individually and :
On Behalf of All Others Similarly Situated, : CLASS ACTION
: 
Plaintiff, : [PROPOSED] ORDER PRELIMINARILY
: APPROVING SETTLEMENT AND
vs. : PROVIDING FOR NOTICE
:
DEUTSCHE ALT-A SECURITIES, INC., et :
al., :
:
Defendants. :
————————————————————
:
:
x

WHEREAS, a class action is pending before the Court entitled *Massachusetts Bricklayers and Masons Trust Funds, and the Pipefitters' Retirement Fund Local 597 v. Deutsche Alt-A Securities, Inc.*, No. 08 Civ. 3178 (LDW) (the "Litigation");

WHEREAS, the Court has received the Stipulation of Settlement, dated as of March 15, 2012 (the "Stipulation"), that has been entered into by Lead Plaintiffs and Defendants, and the Court has reviewed the Stipulation and its attached Exhibits;

WHEREAS, Lead Plaintiffs having made an application, pursuant to Federal Rule of Civil Procedure 23(e), for an order preliminarily approving the Settlement of this Litigation, in accordance with the Stipulation which, together with the Exhibits annexed thereto, sets forth the terms and conditions for a proposed settlement of the Litigation and for dismissal of the Litigation with prejudice upon the terms and conditions set forth therein; and the Court having read and considered the Stipulation and the Exhibits annexed thereto; and

WHEREAS, all defined terms contained herein shall have the same meanings as set forth in the Stipulation;

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.     The Court does hereby preliminarily approve the Stipulation and the Settlement set forth therein, subject to further consideration at the Final Approval Hearing described below.

2.     A hearing (the "Final Approval Hearing") shall be held before this Court on ____, __, 2012, at _:__ _.m., at the Long Island Federal Courthouse, 944 Federal Plaza, Central Islip, New York 11722, to determine whether the proposed Settlement of the Litigation on the terms and conditions provided for in the Stipulation is fair, reasonable and adequate to the Settlement Class and should be approved by the Court; whether a Judgment as provided in ¶ 1.20 of the

Stipulation should be entered herein; whether the proposed Plan of Allocation should be approved; and to determine the amount of fees and expenses that should be awarded to Lead Counsel and the amount that each Lead Plaintiff should be reimbursed for its expenses including lost wages. The Court may adjourn the Final Approval Hearing without further notice to Settlement Class Members.

   3. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court preliminarily certifies, for purposes of effectuating this Settlement only, a Settlement Class of all Persons who purchased or otherwise acquired Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 Mortgage Pass-Through Certificates and/or Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 Mortgage Pass-Through Certificates during the period between May 1, 2006 through May 30, 2007, inclusive (the "Relevant Time Period") and who were damaged thereby. Excluded from the Settlement Class are: the Defendants, IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; the officers, directors, successors and assigns of Deutsche Alt-A Securities, Inc., Deutsche Bank Securities, Inc., Deutsche Bank Structured Products, Inc., IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; members of the immediate families, the legal representatives, heirs, successors or assigns of the Individual Defendants; and any entity in which any excluded Person has or had a controlling interest. Also excluded from the

2

Settlement Class are those Persons who timely and validly request exclusion from the Settlement Class pursuant to the Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses ("Notice").

4.     With respect to the Settlement Class, this Court preliminarily finds, for purposes of effectuating this Settlement only, that the prerequisites for a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure have been satisfied in that: (i) the Members of the Settlement Class are so numerous that joinder of all Settlement Class Members in the Litigation is impracticable; (ii) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (iii) the claims of the Lead Plaintiffs are typical of the claims of the Settlement Class; (iv) the Lead Plaintiffs and Lead Counsel will fairly and adequately represent and protect the interests of all of the Settlement Class Members; and (v) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

5.     The Court approves, as to form and content, the Notice, the Proof of Claim and Release form (the "Proof of Claim") and the Summary Notice ("Summary Notice") annexed as Exhibits A-1, A-2 and A-3 hereto, and finds that the mailing and distribution of the Notice and publishing of the Summary Notice substantially in the manner and form set forth in ¶¶ 6-8 of this Order meet the requirements of Federal Rule of Civil Procedure 23, the Private Securities Litigation Reform Act of 1995 and due process, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all Persons entitled thereto.

6.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court appoints Gilardi & Co. LLC ("Claims Administrator") to supervise and administer the notice procedure as well as the processing of claims as more fully set forth below:

(a)     No later than ten (10) business days after entry of this Order (the "Notice Date"), Lead Counsel shall cause a copy of the Notice and Proof of Claim, substantially in the forms annexed as Exhibits A-1 and A-2 hereto, to be mailed by first class mail to all Settlement Class Members who can be identified with reasonable effort;

(b)     No later than fourteen (14) calendar days after the Notice Date, Lead Counsel shall cause the Summary Notice to be published once in *Investor's Business Daily* and transmitted over *PR Newswire*;

(c)     Lead Counsel shall cause the Stipulation, its Exhibits, the Notice, and Proof of Claim to be posted on the Settlement website; and

(d)     No later than thirty-eight (38) calendar days prior to the date set herein for the Final Approval Hearing, Lead Counsel shall cause to be served on Defendants' Counsel and filed with the Court proof, by affidavit or declaration, of such mailing, publishing and posting.

7.     Deutsche Alt-A Securities, Inc., Deutsche Bank Securities Inc. and/or DB Structured Products, Inc., to the extent they have not already done so, shall provide, or cause to be provided, to Lead Counsel or the Claims Administrator, at no cost to Lead Plaintiffs, Lead Counsel, the Settlement Class or the Claims Administrator, their lists of Persons who held or purchased the Certificates during the Relevant Time Period, in electronic searchable form within seven (7) calendar days of execution of the Stipulation.

8.     Nominees who purchased or otherwise acquired Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 Mortgage Pass-Through Certificates and/or Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 Mortgage Pass-Through Certificates during the Relevant Time Period shall send the Notice and Proof of Claim to all beneficial owners of such Certificates within ten (10) calendar days after receipt thereof, or send a list of the names and

addresses of such beneficial owners to the Claims Administrator within ten (10) calendar days of receipt thereof, in which event the Claims Administrator shall promptly mail the Notice and the Proof of Claim to such beneficial owners.  Lead Counsel shall, if requested, reimburse banks, brokerage houses or other nominees solely for their reasonable out-of-pocket expenses incurred in providing notice to beneficial owners who are Settlement Class Members out of the Settlement Fund, which expenses would not have been incurred except for the sending of such notice, subject to further order of this Court with respect to any dispute concerning such compensation.

9.      All Settlement Class Members shall be bound by all determinations and judgments in the Litigation concerning the Settlement, whether favorable or unfavorable to the Settlement Class.

10.      Settlement Class Members who wish to participate in the Settlement shall complete and submit Proofs of Claim in accordance with the instructions contained therein. Unless the Court orders otherwise, all Proofs of Claim must be postmarked no later one hundred and twenty (120) calendar days after the Notice Date.  Any Settlement Class Member who does not timely submit a Proof of Claim within the time provided for shall be barred from sharing in the distribution of the proceeds of the Net Settlement Fund, unless otherwise ordered by the Court or allowed by the Stipulation.  However, in all other respects, any such Member of the Settlement Class shall be subject to and bound by all of the terms of the Settlement, including the terms of the Stipulation, the Judgment, and the releases provided for by the Stipulation and the Judgment unless such Member of the Settlement Class has submitted a request to be excluded from the Settlement Class in the manner required by ¶ 11 of this Order.

11.      Any Person who desires to request exclusion from the Settlement Class shall do so no later than twenty-one (21) calendar days prior to the Final Approval Hearing and in the

manner described in the Notice.   Upon receiving any request(s) for exclusion the Claims Administrator shall promptly notify Lead Counsel and counsel for Defendants of such request(s) and provide them copies of such request(s) and documentation accompanying them by facsimile or email.

12.     All Persons who submit valid and timely requests for exclusion in the manner set forth in the Notice shall have no rights under the Stipulation, shall not share in the distribution of the Net Settlement Fund, and shall not be bound by the Stipulation or the Judgment entered in the Litigation.

13.     Any Settlement Class Member may enter an appearance in the Litigation, at his, her or its own expense, individually or through counsel of his, her or its own choice.  If he, she or it does not enter an appearance, he, she or it will be represented by Lead Counsel.

14.     Any Settlement Class Member may appear and show cause, if he, she or it has any reason why the proposed Settlement of the Litigation should or should not be approved as fair, reasonable and adequate, why the Judgment should or should not be entered thereon, why the Plan of Allocation should or should not be approved, why attorneys' fees and expenses should or should not be awarded to Lead Counsel or why reimbursement of Lead Plaintiffs' expenses including lost wages should or should not be made; provided, however, that no Settlement Class Member or any other Person shall be heard or entitled to contest the approval of the terms and conditions of the proposed Settlement, or, if approved, the Judgment to be entered thereon approving the same, or the order approving the Plan of Allocation or the attorneys' fees and expenses to be awarded to Lead Counsel, or reimbursement of Lead Plaintiffs' expenses including lost wages, unless that Person has filed said objection, papers and briefs with the Clerk of the United States District Court for the Eastern District of New York no later than twenty-one

(21) calendar days prior to the Final Approval Hearing, and delivered copies of any such papers to Robbins Geller Rudman & Dowd LLP, Arthur C. Leahy, 655 W. Broadway, Suite 1900, San Diego, CA 92101; Labaton Sucharow LLP, Jonathan Gardner, 140 Broadway, 34th Floor, New York, NY 10005; and Latham & Watkins LLP, Jamie L. Wine, 885 Third Avenue, Suite 1000, New York, NY 10022; such that they are received on or before the same date.  Any Settlement Class Member who does not make his, her or its objection in the manner provided shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness or adequacy of the proposed Settlement as set forth in the Stipulation, to the Plan of Allocation, or to the award of attorneys' fees and expenses to Lead Counsel, or to reimbursement of Lead Plaintiffs' expenses including lost wages, unless otherwise ordered by the Court.

15.     All funds held by the Escrow Agent shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to the Stipulation and/or further order(s) of the Court.

16.     Lead Plaintiffs shall file and serve their papers in support of final approval of the Settlement, the Plan of Allocation, and the application for attorneys' fees or expenses on or before thirty-eight (38) calendar days prior to the date set herein for the Final Approval Hearing. If reply papers are necessary, they are to be filed with the Court and served no later than seven (7) calendar days prior to the Final Approval Hearing.

17.     Neither the Defendants nor their Related Parties shall have any responsibility for, or liability with respect to, the Plan of Allocation or any application for attorneys' fees or

expenses submitted by Lead Counsel, and such matters will be considered separately from the fairness, reasonableness and adequacy of the Settlement.

18.     At or after the Final Approval Hearing, the Court shall determine whether the Plan of Allocation proposed by Lead Counsel, and any application for attorneys' fees or expenses shall be approved and any application for reimbursement of Lead Plaintiffs expenses including lost wages.

19.     All reasonable expenses incurred in identifying and notifying Settlement Class Members, as well as administering the Settlement Fund, shall be paid as set forth in the Stipulation.  In the event the Settlement is not approved by the Court, or otherwise fails to become effective, neither the Lead Plaintiffs nor Lead Counsel shall have any obligation to repay any amounts actually and properly disbursed from the Settlement Fund, as provided in the Stipulation.

20.     Neither the Stipulation, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by Defendants of the truth of any of the allegations in the Litigation, or of any liability, fault, or wrongdoing of any kind and shall not be construed as, or deemed to be evidence of, or an admission or concession that Lead Plaintiffs or any Settlement Class Members have suffered any damages, harm or loss.

21.     In the event that the Settlement does not become effective in accordance with the terms of the Stipulation or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to the Defendants, then this Order shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated

and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

22.     The Court reserves the right to adjourn the date of the Final Approval Hearing without further notice to Settlement Class Members, and retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement. The Court may approve the Settlement, with such modifications as may be agreed to by the Settling Parties, if appropriate, without further notice to the Settlement Class.

DATED: _____     _____
                                        THE HONORABLE LEONARD D. WEXLER
                                        UNITED STATES DISTRICT JUDGE

EXHIBIT A-1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

———————————————— x

MASSACHUSETTS BRICKLAYERS AND          :     Civil Action No. 2:08-cv-03178-LDW-ARL
MASONS TRUST FUNDS, Individually and    :
On Behalf of All Others Similarly Situated,  :     CLASS ACTION
                                        :
                Plaintiff,              :     NOTICE OF PENDENCY OF CLASS
                                        :     ACTION AND PROPOSED SETTLEMENT
       vs.                              :     AND MOTION FOR ATTORNEYS' FEES
                                        :     AND EXPENSES
DEUTSCHE ALT-A SECURITIES, INC., et     :
al.,                                    :
                                        :
                Defendants.             :
                                        :
———————————————— x

*IF YOU ACQUIRED MORTGAGE PASS-THROUGH CERTIFICATES IN EITHER: 1) THE DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST 2006-AR5 ; AND/OR 2) THE DEUTSCHE ALT-B SECURITIES MORTGAGE LOAN TRUST 2006-AB4 (THE "CERTIFICATES") BETWEEN MAY 1, 2006 THROUGH MAY 30, 2007, INCLUSIVE, YOU COULD RECEIVE A PAYMENT FROM A CLASS ACTION SETTLEMENT*

A federal court authorized this Notice.  This is not a solicitation from a lawyer.

**Securities and Time Period**: Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 and Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 Mortgage Pass-Through Certificates purchased between May 1, 2006 through May 30, 2007, inclusive (the "Relevant Time Period").  Please see Table A on page ___ below for a complete list of all tranches of Certificates included in the Settlement and their CUSIP Numbers.

**Settlement Fund**: $32,500,000 in cash.

**Statement of Plaintiffs' Recovery**:  Pursuant to this proposed Settlement, a Settlement Fund consisting of $32,500,000 in cash, plus any accrued interest, has been established.  A Settlement Class Member's actual recovery will be a portion of the "Net Settlement Fund" (the Settlement Fund minus taxes, the costs of claims administration, including the costs of printing and mailing this Notice and the cost of publishing newspaper notice, and attorneys' fees and expenses awarded by the Court) determined by comparing his or her loss to the total losses of all eligible Settlement Class Members.  Based on the total initial face dollar value of the Certificates as stated in the Prospectus Supplements pursuant to which the Certificates were offered (without subtracting the principal pay-downs received on the Certificates), and assuming claims are submitted for 100% of the eligible Certificates, the estimated average recovery is $12.80 per $1,000 in initial certificate value of the Certificates.  Members of the Settlement Class may recover more or less than that amount depending on a number of factors, including when the Certificates were purchased or sold, the purchase and sales price, if any, the amount of principal that has been repaid, the price of the Certificates on January 25, 2012, the number of Settlement

Class Members who timely file claims, and the Plan of Allocation, as described more fully below.  In addition, the actual recovery of a Settlement Class Member may be further reduced by the payment of fees and costs from the Settlement Fund as explained below.

**Settlement Class**:  The Court has preliminarily certified a Settlement Class of all Persons who purchased or otherwise acquired Certificates in the Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 and Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 between May 1, 2006 through May 30, 2007, inclusive, and who were damaged thereby.  Excluded from the Settlement Class are: the Defendants, IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; the officers, directors, successors and assigns of Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A"), Deutsche Bank Securities Inc. ("DBSI"), DB Structured Products, Inc. ("DBSP"), IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; members of the immediate families, the legal representatives, heirs, successors or assigns of the Individual Defendants; any entity in which any excluded Person has or had a controlling interest; and any Person who timely and validly seeks exclusion from the Settlement Class.

**Reasons for Settlement**:  The principal reasons for Lead Plaintiffs to settle are to avoid the costs and risks associated with continued litigation, including the danger of no recovery, and to provide an immediate benefit to Members of the Settlement Class.

**If the Case Had Not Settled**:  The Settlement must be compared to the risk of no recovery after contested motions, trial and likely appeals.  A trial is a risky proposition and Lead Plaintiffs might not have prevailed.  The claims in this case involve numerous complex legal and factual issues that would require extensive and costly expert testimony.  Among the key issues about which the two sides do not agree are: (1) whether any of the Defendants violated the securities laws or otherwise engaged in any wrongdoing; (2) whether the Registration Statement or Prospectus Supplements pursuant to which the Certificates were offered contained a material misstatement or omission; (3) whether the claims asserted by Lead Plaintiffs are time-barred; (4) whether Lead Plaintiffs have standing to represent the entire proposed class, or only a small subset thereof; (5) whether the proposed class would be certified at all; and (6) the amount of and method for determining damages.

**Attorneys' Fees and Expenses**:  Lead Counsel have not received any payment for their work investigating the facts, conducting this litigation and negotiating the Settlement on behalf of the Lead Plaintiffs and the Settlement Class.  Lead Counsel will ask the Court for attorneys' fees of no more than 29% of the Settlement Fund and expenses of no more than $950,000, plus any accrued interest on the amounts awarded by the Court, to be paid from the Settlement Fund. The fee request will be equal to or less than Lead Counsel's hourly charges incurred in the case even though the law allows, and courts in comparable cases regularly approve, attorneys' fees that are greater than counsel's hourly charges in order to compensate for the contingent risk of non-payment undertaken by counsel, the result obtained and other factors.  Litigation expenses may include reimbursement of the expenses of the Lead Plaintiffs in accordance with 15 U.S.C. § 77z-1(a)(4).

Based on the total initial face dollar value of the Certificates as stated in the Prospectus Supplements (without subtracting the principal pay-downs received in the Certificates), and assuming claims are submitted for 100% of the eligible Certificates and the Court approves Lead Counsels' attorneys' fees and expense application, the estimated average cost of those fees and expenses is $4.09 per $1,000 in initial certificate value of the Certificates.

**Deadlines**:

Submit Claim: _____, 2012

Request Exclusion: _____, 2012

File Objection _____, 2012

**Court Hearing on Fairness of Settlement**: _____, 2012

**More Information**:   www.gilardi.com

| Claims Administrator: | Lead Counsel: | Lead Counsel: |
|---|---|---|
| *Deutsche Mortgage Pass Through Certificates Securities Litigation* Claims Administrator c/o Gilardi & Co. LLC P.O. Box _____ San Rafael, CA 94912-8040 Tel: 415-_____ | Jonathan Gardner Labaton Sucharow LLP 140 Broadway, 34th Floor New York, NY 10005 Tel: 888-219-6877 info@settlementquestions.com www.labaton.com | Arthur C. Leahy Robbins Geller Rudman & Dowd LLP 655 West Broadway Suite 1900 San Diego, CA 92101 Tel: 619-231-1058 www.rgrdlaw.com |

- Your legal rights are affected whether you act or do not act.  Read this Notice carefully.

## YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT

| | |
|---|---|
| **SUBMIT A CLAIM** | The only way to receive a payment. |
| **OBJECT** | You may write the Court about why you do not like any part of the Settlement. |
| **GO TO HEARING ON FAIRNESS OF SETTLEMENT** | You may ask to speak in Court about any part of the Settlement. |
| **DO NOTHING** | Receive no payment and release claims. |
| **EXCLUDE YOURSELF** | Receive no payment.  This is the only option that allows you to participate in another lawsuit against |

4

the Defendants or any of the other Released Parties related to the claims being released in this Settlement.

• These rights and options – and the deadlines to exercise them – are explained in this Notice.

• The Court in charge of this case must decide whether to approve the Settlement. Payments will be made if the Court approves the Settlement and, if there are any appeals, after the appeals are resolved.  Please be patient.

## BASIC INFORMATION

**1.      Why Did I Receive This Notice?**

You may have purchased Certificates in the Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 or the Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 (the "Trusts") during the Relevant Time Period.

The Court directed that this Notice be sent to you because you have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.  If the Court approves the Settlement and after any objections or appeals are resolved, the Claims Administrator appointed by the Court will make the payments that the Settlement allows.

This package explains the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them and how to get them.

The Court in charge of this case is the United States District Court for the Eastern District of New York, and the case is known as *Massachusetts Bricklayers and Masons Trust Funds, et al. v. Deutsche Alt-A Securities, Inc., et al.*, Civil Action No. 2:08-cv-03178-LDW-ARL.  The two pension funds that sued are called the Lead Plaintiffs and the companies and individuals they

sued – Deutsche Alt-A, DBSI, DBSP, Anilesh Ahuja, Jeffrey Lehocky, Richard Ferguson, Joseph Rice, Richard d'Albert and Kevin Burns – are called the Defendants.

### 2.     What is This Lawsuit About?

This lawsuit was brought as a class action alleging that Defendants made false statements and omitted material information in a Registration Statement and two Prospectus Supplements (the "Offering Documents") pursuant to which the Certificates were offered to investors.  More specifically, the lawsuit claims that Defendants misrepresented the quality of bundled and securitized pools of mortgage loans, then sold the rights to payments made on those mortgage loans to the Members of the Settlement Class in the form of the Certificates.  It further alleges that the Offering Documents misrepresented that: 1) the mortgage loans supporting the Certificates were originated pursuant to certain underwriting standards – including evaluating whether the borrower could afford to repay the loan – when in fact they were not; 2) the appraisals performed in connection with the underlying loans conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP") and/or Fannie Mae and Freddie Mac requirements and evaluated the adequacy of the property as collateral for the mortgage loans, when in fact they did not; 3) the underlying loans had certain loan-to-value ratios, when those ratios were falsely understated; and 4) the Certificates had certain "investment grade" credit ratings, when in fact, those ratings should have been much lower.  The lawsuit claims that by making the misrepresentations and omissions described above, Defendants violated the Securities Act of 1933.  The Defendants have and continue to deny all allegations of misconduct or liability alleged in any of the complaints filed in this Litigation, and deny having engaged in any wrongdoing whatsoever.

### 3.      What Has Happened in the Case so Far?

The lawsuit was originally filed on June 27, 2008, in New York state court by Massachusetts Bricklayers and Masons Trust Funds on behalf of purchasers of certificates in fourteen trusts issued pursuant to a Registration Statement filed with the Securities and Exchange Commission ("SEC") dated May 1, 2006, and pursuant to prospectus supplements issued for each trust.  The lawsuit was subsequently removed to federal court by Defendants, and on May 18, 2009, the Court appointed Massachusetts Bricklayers and Masons Trust Funds and Pipefitters' Retirement Fund Local 597 to serve as Lead Plaintiffs, and Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as Lead Counsel.

On June 18, 2009, Lead Plaintiffs filed their amended complaint for violations of the Securities Act also on behalf of purchasers in the fourteen trusts arising from the May 1, 2006 Registration Statement.  On April 6, 2010, the Court granted, in part, a motion to dismiss filed by Defendants ruling that Lead Plaintiffs only had standing to pursue claims on behalf of the two Trusts in which the Lead Plaintiffs purchased, dismissing the claims of purchasers in the other twelve trusts without prejudice.

On May 24, 2010, at the instruction of the Court, Lead Plaintiffs filed the Second Amended Complaint for Violation of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Second Amended Complaint") on behalf of purchasers of Certificates in the Deutsche Alt-A Securities Mortgage Loan Trust Series 2006-AR5 and Deutsche Alt-B Securities Mortgage Loan Trust Series 2006-AB4.  The Court denied Defendants' motion to dismiss and sustained the Second Amended Complaint in its entirety.  After that, the lawsuit was allowed to proceed to discovery.

The lawsuit was heavily litigated requiring substantial effort on the part of counsel.  Following the extensive briefing on the two motions to dismiss, counsel served discovery on

Defendants and numerous third parties.  Likewise, Defendants served discovery on Lead Plaintiffs and third parties.  Lead Plaintiffs filed motions to compel certain information, and thereafter undertook a review of millions of pages of documents produced by Defendants, third-party loan originators, the Federal Deposit Insurance Corporation, and Defendants' outside due diligence firms.

Lead Plaintiffs also filed a motion for class certification.  In connection with the class certification motion, Defendants deposed the Lead Plaintiffs, their investment advisors, and their class certification expert, and Lead Plaintiffs deposed Defendants' class certification expert.  The motion for certification was fully briefed, and Lead Plaintiffs had noticed and were prepared to begin depositions of fact witnesses at the time the Settlement was reached.

### 4.      Why Is This A Class Action?

In a class action, one or more people called class representatives (in this case the Court-appointed Lead Plaintiffs, Massachusetts Bricklayers and Masons Trust Funds and The Pipefitters' Retirement Fund Local 597), sue on behalf of people who have similar claims.  Here, all these people are called the Settlement Class or Settlement Class Members.  One court resolves the issues for all Settlement Class Members, except for those who timely and validly exclude themselves from the Settlement Class.  Judge Leonard Wexler is in charge of this class action.

### 5.      Why Is There a Settlement?

The Court did not decide in favor of the Lead Plaintiffs or Defendants.  Instead, both sides agreed to the Settlement.  The Lead Plaintiffs and their attorneys think the Settlement is in the best interest of Settlement Class Members insofar as it avoids the cost and uncertainty of a trial, and eligible Settlement Class Members who submit valid claims ("Authorized Claimants") will receive compensation.

## WHO IS IN THE SETTLEMENT

To see if you will receive money from this Settlement, you first have to determine if you are a Settlement Class Member.

### 6.       How Do I Know if I Am Part of the Settlement?

The Settlement Class includes *persons who purchased Certificates in the Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 and/or the Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 between May 1, 2006 through May 30, 2007, inclusive, and who were damaged thereby*.

The table below sets forth the specific tranches, by CUSIP number, of Certificates in each Trust eligible to be included in the Settlement Class.

### TABLE A

| | TRANCHE | CUSIP | | TRANCHE | CUSIP |
|---|---|---|---|---|---|
| 1. | DBALT 2006-AR5 IA1 | 25150NAA2 | 27. | DBALT 2006-AB4 A1C | 251513AT4 |
| 2. | DBALT 2006-AR5 IA2 | 25150NAB0 | 28. | DBALT 2006-AB4 A2 | 251513AU1 |
| 3. | DBALT 2006-AR5 IA3 | 25150NAC8 | 29. | DBALT 2006-AB4 A3 | 251513AV9 |
| 4. | DBALT 2006-AR5 IA4 | 25150NAD6 | 30. | DBALT 2006-AB4 A3A1 | 251513AW7 |
| 5. | DBALT 2006-AR5 IM1 | 25150NAE4 | 31. | DBALT 2006-AB4 A3A2 | 251513AX5 |
| 6. | DBALT 2006-AR5 IM2 | 25150NAF1 | 32. | DBALT 2006-AB4 A4A | 251513AY3 |
| 7. | DBALT 2006-AR5 IM3 | 25150NAG9 | 33. | DBALT 2006-AB4 A4B | 251513AZ0 |
| 8. | DBALT 2006-AR5 IM4 | 25150NAH7 | 34. | DBALT 2006-AB4 A4C | 251513BA4 |
| 9. | DBALT 2006-AR5 IM5 | 25150NAJ3 | 35. | DBALT 2006-AB4 A5 | 251513BB2 |
| 10. | DBALT 2006-AR5 IM6 | 25150NAK0 | 36. | DBALT 2006-AB4 A6A1 | 251513BC0 |
| 11. | DBALT 2006-AR5 IM7 | 25150NAL8 | 37. | DBALT 2006-AB4 A6A2 | 251513BD8 |
| 12. | DBALT 2006-AR5 IM8 | 25150NAM6 | 38. | DBALT 2006-AB4 A7 | 251513BE6 |
| 13. | DBALT 2006-AR5 IM9 | 25150NAN4 | 39. | DBALT 2006-AB4 M1 | 251513AA5 |
| 14. | DBALT 2006-AR5 IM10 | 25150NAP9 | 40. | DBALT 2006-AB4 M2 | 251513AB3 |
| 15. | DBALT 2006-AR5 II1A | 25150NAT1 | 41. | DBALT 2006-AB4 M3 | 251513AC1 |
| 16. | DBALT 2006-AR5 IIM | 25150NAZ7 | 42. | DBALT 2006-AB4 M4 | 251513AD9 |
| 17. | DBALT 2006-AR5 IIB1 | 25150NBA1 | 43. | DBALT 2006-AB4 M5 | 251513AE7 |
| 18. | DBALT 2006-AR5 IIB2 | 25150NBB9 | 44. | DBALT 2006-AB4 M6 | 251513AF4 |
| 19. | DBALT 2006-AR5 IIPO | 25150NAW4 | 45. | DBALT 2006-AB4 M7 | 251513AG2 |
| 20. | DBALT 2006-AR5 IIX2 | 25150NAY0 | 46. | DBALT 2006-AB4 M8 | 251513AH0 |
| 21. | DBALT 2006-AR5 II2A | 25150NAU8 | 47. | DBALT 2006-AB4 M9 | 251513AJ6 |
| 22. | DBALT 2006-AR5 IIX1 | 25150NAX2 | 48. | DBALT 2006-AB4 M10 | 251513AK3 |
| 23. | DBALT 2006-AR5 II3A | 25150NAV6 | 49. | DBALT 2006-AB4 M11 | 251513AL1 |

| 24. | DBALT 2006-AB4 A1A | 251513AQ0 |
|-----|--------------------|-----------|
| 25. | DBALT 2006-AB4 A1B1 | 251513AR8 |
| 26. | DBALT 2006-AB4 A1B2 | 251513AS6 |

| 50. | DBALT 2006-AB4 M12 | 251513AM9 |
|-----|--------------------|-----------|
| 51. | DBALT 2006-AB4 M13 | 251513AN7 |
| 52. | DBALT 2006-AB4 M14 | 251513AP2 |

## 7.      What Are the Exceptions to Being Included?

You are not a Settlement Class Member if you are an excluded Person.  Excluded Persons are: the Defendants, IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; the officers, directors, successors and assigns of Deutsche Alt-A, DBSI, DBSP, IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; members of the immediate families, the legal representatives, heirs, successors or assigns of the Individual Defendants; and any entity in which any excluded Person has or had a controlling interest.  You are also not a Settlement Class Member if you timely and validly request exclusion from the Settlement Class pursuant to this Notice.

You are a Settlement Class Member only if you purchased Certificates during the Relevant Time Period and suffered damages.

## 8.      I'm Still Not Sure if I Am Included.

If you are still not sure whether you are included, you can ask for free help.  You can call the Claims Administrator at 800-___-____.  Or you can call Rick Nelson of Robbins Geller Rudman & Dowd LLP at 800-449-4900 or Colin Holmes of Labaton Sucharow LLP at 888-219-

6877 for more information.  Or you can fill out and return the claim form described in question 11, to see if you qualify.

## THE SETTLEMENT BENEFITS — WHAT YOU GET

### 9.      What Does the Settlement Provide?

In exchange for the Settlement, the dismissal of this Litigation, and the release of claims against all the Released Parties, certain Defendants have agreed to pay $32.5 million in cash (the "Gross Settlement Fund").  The balance of the Gross Settlement Fund after payment of Court-approved attorneys' fees and expenses, payment of taxes and tax expenses, reimbursement of the expenses of the Lead Plaintiffs in accordance with 15 U.S.C. § 77z-1(a)(4), and the costs of claims administration, including the costs of printing and mailing this Notice and the cost of publishing newspaper notice (the Net Settlement Fund) will be divided among all Settlement Class Members who timely send in valid claim forms and qualify for a distribution under the Plan of Allocation described below.

### 10.      How Much Will My Payment Be?

Your share of the Net Settlement Fund will depend on a number of things.  A claim will be calculated as follows.

### A.      THE PROPOSED PLAN OF ALLOCATION: GENERAL PROVISIONS

i.      The Plan of Allocation (the "Plan") described below will govern how the claims of Authorized Claimants ("Recognized Claims") are calculated and the Net Settlement Fund distributed.  In developing the Plan, Lead Plaintiffs' counsel conferred with a valuation consultant experienced in mortgage-backed securitizations.  The Plan is generally based on the each Authorized Claimant's out-of-pocket loss resulting from an investment in the Certificates at issue.  The Court may approve the Plan, or modify it without additional notice to the Class.  Any

11

order modifying the Plan will be posted on these websites: www.gilardi.com, www.rgrdlaw.com, www.labaton.com.

    ii.    Because the estimated aggregate damages of Authorized Claimants will, in all likelihood, exceed the amount of the Net Settlement Fund, a Recognized Claim amount is not an estimate of the amount that will be distributed to an Authorized Claimant from the Net Settlement Fund.  Rather, the Plan provides for a fair and reasonable basis for allocating the Net Settlement Fund, on a *pro rata* basis, to Authorized Claimants.

## B.    CALCULATION OF RECOGNIZED LOSS OR GAIN AMOUNTS

i.    A "Recognized Loss or Gain" will be calculated for each Certificate purchased or acquired for which adequate documentation is provided to the Claims Administrator (each an "Eligible Certificate").  The calculation of the Recognized Loss or Gain will depend on several considerations, including: (i) when the Certificate was purchased or acquired and the price at the time of purchase; (ii) any principal payments received; (iii) whether it was sold, and if so, when it was sold and for how much; and/or (iv) if held on January 25, 2012, the value of the Certificate on that date, which is the last date for which Trustee data is available (the "Measurement Date"). Because of these variables, among others, it is not possible at the present time to determine how much an Authorized Claimant may receive from the Net Settlement Fund.

    ii.    To assist the claims administrator in determining Recognized Loss(es) or Gain(s), Lead Plaintiffs' valuation consultant performed certain calculations based on the Trustee reports for each Certificate.  Specifically, the valuation consultant identified: (1) the portion of original face value remaining on each Certificate as of specific dates between the time of the initial offering of the Certificate for sale and the Measurement Date reflecting all principal payments received and write-downs incurred, referred to as the "Factor";  and (2)  the portion of original

12

face value on each Certificate as of specific dates between the time of the initial offering of the Certificate for sale and the Measurement Date reflecting all principal payments received but not reflecting write-downs incurred, referred to as the Write-Down Free Factor, or "WFF". Lead Plaintiffs' valuation consultant also calculated the price of each Certificate, if any, on the Measurement Date. Complete lists of the Factors (the "Factor Table"), the WFFs (the "WFF Table"), and the prices of the Certificates on the Measurement Date (the "Measurement Date Price Table") are available via the claims administrator's website at www.gilardi.com, or you can call [(800) ___-____] and request the information via hard copy. How each of the above amounts will be used by the claims administrator to calculate a Recognized Loss or Gain is explained below.

iii. If the amount received on sale of a Certificate or its value at the Measurement Date exceeds the "Original Principal Amount" (defined and discussed below), then the calculation will result in a Recognized Gain for that Certificate and you will not receive a recovery for that transaction. In addition, if after offsetting all Recognized Gains for a Certificate(s) with all Recognized Losses for Certificate(s) with the same CUSIP number, you have a net Recognized Gain for Certificates with the same CUSIP number, you will not receive a recovery for those transactions. If you purchased Certificates with different CUSIP numbers but within the same Trust, the claims administrator will calculate a separate total Recognized Gain or Loss for each set of Certificates with the same CUSIP number, which will be netted against the total Recognized Gain(s) or Loss(es) for transactions in sets of Certificates with different CUSIP numbers but within the same Trust. If you purchased Certificates of more than one Trust, the claims administrator will calculate a separate total Recognized Gain or Loss for each Trust,

which will not be netted against the total Recognized Gain or Loss for the other Trust. *See* paragraphs 10 and 11 below.

### C.    EXAMPLES OF RECOGNIZED GAIN OR LOSS CALCULATIONS

SET FORTH BELOW ARE EXAMPLES OF HOW CLAIMS WILL BE CALCULATED.

HOWEVER, THE CLAIMS ADMINISTRATOR WILL CALCULATE YOUR RECOGNIZED GAINS AND LOSSES FOR YOU BASED ON THE INFORMATION YOU SUPPLY ON THE PROOF OF CLAIM FORM WHICH ACCOMPANIES THIS NOTICE.

YOU DO <u>NOT</u> HAVE TO CALCULATE YOUR OWN CLAIM.

i.    **<u>Certificates Sold Prior to the Measurement Date</u>**:  For each Eligible Certificate sold prior to the Measurement Date, the claims administrator will calculate your Recognized Loss or Gain as follows:

**Step 1: Determine the Original Principal Amount**.

The Original Principal Amount will be calculated by the claims administrator as follows:

**Original Principal Amount = Face Amount of Certificates Purchased x Factor on Date of Purchase x (Purchase Price/100)**

The face amount of the Certificates you purchased and the purchase price can be determined from your records.  The value of the Factor on the date of your purchase can be found in the

Factor Table available from the claims administrator.  The Factor is determined by identifying the correct date range on the Factor Table within which your purchase falls.

**Step 2:  Determine the Principal Payments Received.**

The Principal Payments Received during the time you held your certificates can be calculated from the face amount of Certificates purchased and the WFFs at purchase and sale, as set forth in the WFF Table available from the claims administrator as follows:

**Principal Payments Received = Face Amount of Certificates Purchased x (WFF at Purchase – WFF at Sale)**

The face amount of the Certificates purchased can be determined from your records.  The WFF at the date of purchase and the WFF at the date of sale can be found in the WFF Table (available from the claims administrator) and are determined by identifying the correct date range within which each purchase and sale falls.

**Step 3: Determine the Amount Received on Sale.**

The Amount Received on Sale will be:

**Amount Received on Sale = Face Amount of Certificates Purchased x Factor on Date of Sale x (Sale Price/100)**

The face amount of the Certificates purchased and the sale price can be determined from your records.  The value of the Factor on date of sale can be found in the Factor Table available from the claims administrator and is determined by identifying the correct date range within which your date of sale falls.

**Step 4: Calculate Your Recognized Loss or Gain**

15

Your Recognized Loss or Gain will be your Original Principal Amount [Step 1] less the Principal Payments Received [Step 2], less the Amount Received on Sale [Step 3].

**Example 1:**  Investor A purchased $100,000.00 face amount of Certificate 25150NAB0 (DBALT 2006-AR5 IA2) on March 7, 2007.  The purchase price was 98.50.  On November 12, 2009, after receiving monthly principal payments during its holding period, Investor A sold its remaining interest in the Certificate. The sales price was 49.85.

To determine its Recognized Loss or Gain, Investor A first calculates Original Principal Amount (Step 1).  By identifying the correct date range for a purchase date of March 7, 2007 in the IA2 Certificate chart of the Factor Table, Investor A determines the appropriate Factor to use in the Step 1 calculation is 0.915498.

   Original Principal Amount  =  $100,000  x  0.915498  x  (98.50/100)  =  $90,176.55

To determine the amount of principal payments received during its holding period (Step 2), Investor A determines the WFFs at the date of purchase and the date of sale.  Using the purchase date of March 7, 2007, Investor A determines the WFF at the date of purchase is 0.915498 in the IA2 Certificate chart of the WFF Table.  Similarly, Investor A determines, from the same chart, that the WFF on its sale date of November 12, 2009 was 0.559290.  Thus,

   Principal Payments Received  =  $100,000.00  x  (0.915498 - 0.559290)  =  $35,620.80

Finally, in order to determine its Amount Received on Sale (Step 3), Investor A identifies the Factor at November 12, 2009 in the IA2 Certificate chart of the Factor Table.  The Factor during the period appropriate to November 12, 2009 was 0.559290.

Amount Received on Sale = $100,000.00 x 0.559290 x (49.85/100) = $27,880.61

As the final step (Step 4), Investor A calculates its Recognized Loss or Gain by subtracting the Principal Payments Received and Amount Received on Sale from the Original Principal Amount:

$$\$90,176.55 - \$35,620.80 - \$27,880.61 = \$26,675.14$$

Investor A's Recognized Loss is $26,675.14.

**Example 2:** Investor B purchased $100,000.00 face amount of Certificate 25150NAZ7 (DBALT 2006-AR5 IIM) on October 31, 2006.  The purchase price was 100.00.  On July 5, 2011, after receiving principal payments during its holding period, Investor B sold its remaining interest in the Certificate.  The sales price was 6.04.

To determine its Recognized Loss or Gain, Investor B first calculates its Original Principal Amount (Step 1).  By identifying the correct date range for a purchase date of October 31, 2006 in the IIM Certificate chart of the Factor Table, Investor B determines the appropriate Factor to use in the Step 1 calculation is 1.000000.

Original Principal Amount = $100,000 x 1.000000 x (100.00/100) = $100,000.00

To determine the amount of principal payments received during its holding period (Step 2), Investor B determines the WFFs at the date of purchase and the date of sale.  Using the purchase date of October 31, 2006, Investor B determines the WFF at the date of purchase is 1.000000 in the IIM Certificate chart of the WFF Table.  Similarly, Investor B determines, from the same chart, that the WFF on its sale date of July 5, 2011 was 0.840252.  Thus,

17

Principal Payments Received  =  $100,000.00  x  (1.000000 - 0.840252) = $15,974.80

Finally, in order to determine its Amount Received on Sale (Step 3), Investor B identifies the Factor at July 5, 2011 in the IIM Certificate chart of the Factor Table.  The Factor during the period appropriate to July 5, 2011 was 0.154122.

Amount Received on Sale  =  $100,000.00  x  0.154122  x  (6.04/100) = $930.90

As the final step (Step 4), Investor B calculates its Recognized Loss or Gain by subtracting the Principal Payments Received and Amount Received on Sale from the Original Principal Amount:

$100,000.00 - $15,974.80 - $930.90  =  $83,094.30

Investor B's Recognized Loss is $83,094.30.

ii.      **Certificates Not Sold or Sold After the Measurement Date**:  For each Eligible Certificate still held by the Authorized Claimant or sold after the Measurement Date, the Recognized Loss or Gain is calculated using the same steps set forth in ¶6 above except that a sale of the Certificate on the Measurement Date is assumed.

**Step 1: Determine Your Original Principal Amount**.

Your Original Principal Amount will be:

**Original Principal Amount = Face Amount of Certificates Purchased x Factor on Date of Purchase x (Purchase Price/100)**

The face amount of the Certificates you purchased and the purchase price can be determined from your records.  The value of the Factor on the date of your purchase can be found in the

Factor Table available from the claims administrator.  The Factor is determined by identifying the correct date range within which your date of purchase falls.

**Step 2:  Determine the Principal Payments Received.**

The Principal Payments Received during the time you held your certificates can be calculated from the face amount of Certificates purchased and the WFFs both at purchase and at the Measurement Date, as set forth in the WFF Table available from the claims administrator, as follows:

**Principal  Payments  Received = Face  Amount  of  Certificates  Purchased  x  (WFF  at Purchase – WFF at Measurement Date)**

The face amount of the Certificates you purchased can be determined from your records.  The values of the WFF at the date of purchase and the WFF at the Measurement Date can be found in the  WFF  Table  available  from  the  claims  administrator  and  are  individually  determined  by identifying the correct date range within which each date falls.

**Step 3: Determine the Value on the Measurement Date.**

The Value of your Certificates on the Measurement Date will be:

**Value  on  Measurement  Date = Face  Amount  of  Certificates  Purchased  x  Factor  on Measurement Date x (Price on Measurement Date/100)**

The face amount of the Certificates purchased can be determined from your records.  The value of the Factor on the Measurement Date can be found in the Factor Table available from the claims administrator by identifying the date range that contains January 25, 2012.  The Price on

19

Measurement Date can be found in the Measurement Date Price Table available from the claims administrator.

**Step 4: Calculate Your Recognized Loss**

Your Recognized Loss will be your Original Principal Amount [Step 1] less the Principal Payments Received [Step 2], less the Value on Measurement Date [Step 3].

**Example 3:** Investor C purchased $100,000.00 face amount of Certificate 251513AQ0 (DBALT 2006-AB4 A1A) on February 16, 2007. The purchase price was 99.72. Investor C retains its position in the Certificate.

To determine its Recognized Loss or Gain, Investor C first calculates its Original Principal Amount (Step 1). By identifying the correct date range for a purchase date of February 16, 2007 in the A1A Certificate chart of the Factor Table, Investor C determines the appropriate Factor to use in the Step 1 calculation is 0.829084.

Original Principal Amount = $100,000 x 0.829084 x (99.72/100) = $82,676.26

To determine the principal payments actually received during its holding period (Step 2), Investor C determines the WFFs at the date of purchase and the Measurement Date, as Investor C still retains ownership of the Certificate. Using the purchase date of February 16, 2007, Investor C determines the WFF at the date of purchase is 0.829084 in the A1A Certificate chart of the WFF Table. Similarly, Investor C determines, from the same chart, that the WFF on January 25, 2012, the Measurement Date, was 0.161616. Thus,

Principal Payments Received = $100,000.00 x (0.829084 - 0.161616) = $66,746.80

20

Finally, in order to determine the Value on Measurement Date (Step 3), Investor C identifies the Factor at January 25, 2012 in the A1A Certificate chart of the Factor Table.  The Factor during the period appropriate to January 25, 2012 was 0.129391.  Additionally, to determine the price on the Measurement Date, Investor C references the Measurement Date Price Table. The price appropriate to the A1A Certificate on the Measurement Date is 54.65.

Value on Measurement Date  =  $100,000.00  x  0.129391  x  (54.65/100)  = $7,071.22

As the final step (Step 4), Investor C calculates its Recognized Loss or Gain by subtracting the Principal Payments Received and Value on Measurement Date from the Original Principal Amount:

$82,676.26  -  $66,746.80  -  $7,071.22  =  $8,858.24

Investor C's Recognized Loss is $8,858.24.

**Example 4:** Investor D purchased $100,000.00 face amount of Certificate 25150NAD6 (DBALT 2006-AR5 IA4) on November 3, 2006.  The purchase price was 100.00.  Investor D retains its position in the Certificate.

To determine its Recognized Loss or Gain, Investor D first calculates its Original Principal Amount (Step 1).  By identifying the correct date range for a purchase date of November 3, 2006 in the IA4 Certificate chart of the Factor Table, Investor D determines the appropriate Factor to use in the Step 1 calculation is 1.000000.

Original Principal Amount  =  $100,000  x  1.000000  x  (100.00/100)  =  $100,000.00

To determine the principal payments actually received during its holding period (Step 2), Investor D determines the WFFs at the date of purchase and the Measurement Date, as Investor D still retains ownership of the Certificate.  Using the purchase date of November 3, 2006, Investor D determines the WFF at the date of purchase is 1.000000 in the IA4 Certificate chart of the WFF Table.  Similarly, Investor D determines, from the same chart, that the WFF on January 25, 2012, the Measurement Date, was 0.537265.  Thus,

Principal Payments Received  =  $100,000.00  x  (1.000000 - 0.537265)  =  $46,273.50

Finally, in order to determine the Value on Measurement Date (Step 3), Investor D identifies the Factor at January 25, 2012 in the IA4 Certificate chart of the Factor Table.  The Factor during the period appropriate to January 25, 2012 was 0.000000.  To determine the price on the Measurement Date, Investor D references the Measurement Date Price Table.  The price appropriate to the IA4 Certificate on the Measurement Date is 0.00.

Value on Measurement Date  =  $100,000.00  x  0.000000  x  (0.00/100)  = $0.00

As the final step (Step 4), Investor D calculates its Recognized Loss or Gain by subtracting the Principal Payments Received and Value on Measurement Date from the Original Principal Amount:

$100,000.00 - $46,273.50 - $0.00 = $53,726.50

Investor D's Recognized Loss is $53,726.50.

iii.     In each example above, if only a portion of the Certificate was sold, any Recognized Loss or Gain related to the remaining portion of the Certificate will be calculated separately.

iv.     Notwithstanding the above provisions, the Recognized Loss or Gain for any purchases or acquisitions that occurred after May 31, 2007 (the last day of the Settlement Class Period) is zero.

v.     A "Total Recognized Loss By CUSIP" will be calculated for each Authorized Claimant on a CUSIP-by-CUSIP basis.  Accordingly, multiple transactions by an Authorized Claimant in a single CUSIP will be netted; *i.e.*, the total of all Recognized Gains for that CUSIP will be subtracted from the total of all Recognized Losses for that CUSIP.  However, a Total Recognized Loss By CUSIP cannot be less than zero.

vi.     A total Recognized Loss by Trust will then be calculated.  Thus, an Authorized Claimant's "2006-AR5 Recognized Claim" and "2006-AB4 Recognized Claim" are the sum of all that Authorized Claimant's Total Recognized Loss By CUSIPs for just the CUSIPs contained in the respective Trust.

### D.     DISTRIBUTION OF THE NET SETTLEMENT FUND

i.     The Net Settlement Fund will be allocated to the two Trusts based on the aggregate damages Lead Plaintiffs would have asserted at trial attributable to each of the two Trusts.  Accordingly, 75.27% of the Net Settlement Fund will be allocated to the Recognized Claims based on the 2006-AR5 Trust (the "2006-AR5 Allocation") and 24.73% will be allocated to the Recognized Claims based on the 2006-AB4 Trust (the 2006-AB4 Allocation") (collectively, the "Net Settlement Fund Allocation").  Each Authorized Claimant will receive his,

her or its pro rata share of the Net Settlement Fund Allocation for that Trust which shall be his, her, or its Recognized Claim for that Trust divided by the total of all Recognized Claims for that Trust multiplied by the Net Settlement Allocation for that Trust.   In the event all Authorized Claimants' 2006-AR5 Recognized Claims and/or all Authorized Claimants' 2006-AB4 Recognized Claims are paid in full and there remains a balance in that Trust's allocation of the Net Settlement Fund, the remaining balance shall be allocated to the other Trust.   If all Recognized Claims in both Trusts are paid in full and there remains a balance in a Trust's Net Settlement Fund Allocation, the remaining balance(s) in each Trust will be allocated on a pro rata basis to Authorized Claimants for that Trust.

ii.      No distributions will be made to Authorized Claimants who would otherwise receive less than $10.   A Recognized Loss or Gain will be calculated only on purchases of Certificates.   No Recognized Loss or Gain will be calculated on receipt of Certificates by gift, grant, inheritance, or operation of law.

iii.      The Court has reserved jurisdiction to allow, disallow or adjust the claim of any Settlement Class Member on equitable grounds.

iv.      Payment pursuant to the Plan of Allocation set forth above shall be conclusive as to all Authorized Claimants.   No Person shall have any claim against Plaintiffs, Lead Counsel, any claims administrator, or Defendants or their Related Parties based on distributions made substantially in accordance with the Stipulation and the settlement contained therein, the Plan of Allocation, or further orders of the Court.   All Settlement Class Members who fail to complete and file a valid and timely Proof of Claim shall be barred from participating in distributions from the Net Settlement Fund (unless otherwise ordered by the Court), but otherwise shall be bound

by all of the terms of the Stipulation, including the terms of any judgment entered and the releases given.

## HOW YOU OBTAIN A PAYMENT — SUBMITTING A CLAIM FORM

### 11.    How Can I Obtain a Payment?

To qualify for payment, you must be an eligible Settlement Class Member, send in a timely and valid claim form, and properly document your claim as requested in the claim form. A claim form is enclosed with this Notice.  Read the instructions carefully, fill out the form, include all the documents the form asks for, sign it, and mail it **postmarked no later than _____, 2012** to:

> *Deutsche Mortgage Pass Through*
> *Certificates Securities Litigation*
> Claims Administrator
> c/o Gilardi & Co. LLC
> P.O. Box _____
> San Rafael, CA  94912-8040

### 12.    When Will I Receive My Payment?

The Court will hold a hearing on _____, 2012, to decide whether to approve the Settlement.  If the Court approves the Settlement, there may be appeals.  It is always uncertain whether these appeals can be resolved, and resolving them can take time, perhaps several years. Please be patient.

### 13.    What Am I Giving Up to Receive a Payment or Stay in the Settlement Class?

If you are in the Settlement Class, unless you timely and validly exclude yourself, you will remain a Member of the Settlement Class, and that means that you cannot sue, continue to sue, or be part of any other lawsuit against the Defendants about the Released Claims in this case.  It also means that all of the Court's orders will apply to you and legally bind you and you

will release your claims in this case against the Defendants. Upon the "Effective Date" of the Settlement, you will release all "Released Claims" (as defined below) against the "Released Parties" (as defined below):

"Released Claims" shall collectively mean all claims (including "Unknown Claims" as defined below), demands, rights (including the right to appeal the Court's dismissal of any claims in the Litigation related to securities originally pled but no longer at issue in this Litigation), liabilities and causes of action of every nature and description whatsoever, known or unknown, contingent or absolute, mature or immature, discoverable or undiscoverable, whether concealed or hidden, suspected or unsuspected, which now exist, or heretofore have existed, asserted or that could have been asserted under federal, state, common or foreign law by Lead Plaintiffs or any Settlement Class Member against Defendants and their Related Parties based upon or arising out of (i) both (a) the allegations, facts, transactions, events, occurrences, disclosures, statements, representations, acts, omissions or failures to act which were or could have been alleged in the Litigation, and (b) the purchase or other acquisition or disposition or holding of the Certificates or any interest therein by Lead Plaintiffs or any Settlement Class Member during the Relevant Time Period; or (ii) the administration of the Net Settlement Fund. Released Claims shall not include: (i) claims to enforce the Settlement; or (ii) claims brought in *Dexia SA/NV. at al. v. Deutsche Bank AG., et al.*, No. 11-cv-5672 (S.D.N.Y.); *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc., et al.*, No. 11-cv-30039 (D. Mass.); *Fed. Home Loan Bank of Boston v. Ally Fin., Inc. et al.*, No. 11-cv-10952 (D. Mass.); and *Teachers Ins. & Annuity Assoc. of Am. v. Deutsche Bank AG, et al.*, No. 11-cv-6141 (S.D.N.Y.).

"Released Parties" means each and all of the Defendants and each and all of their Related Parties.

"Related Parties" means each of a Defendant's past or present directors, officers, employees, partners, insurers, co-insurers, reinsurers, principals, controlling shareholders, attorneys, accountants, auditors, underwriters, investment advisors, agents, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, affiliates, joint ventures, assigns, assignees, spouses, heirs, estates, related or affiliated entities, any entity in which a Defendant has a controlling interest, any member of an Individual Defendant's immediate family, any trust of which an Individual Defendant is the settlor or which is for the benefit of an Individual Defendant and/or any member of an Individual Defendant's immediate family, and any entity in which a Defendant and/or any member of an Individual Defendant's immediate family has or have a controlling interest (directly or indirectly).  "Related Parties" specifically includes, but is not limited to: (i) Kevin P. Burns, who is named as a defendant in the Second Amended Complaint; (ii) Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5; and (iii) Deutsche Alt-B Securities Mortgage Loan Trust, Series 2006-AB4.

"Unknown Claims" means collectively any Released Claims that Lead Plaintiffs or any Settlement Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Parties, or might have affected his, her or its decision not to object to or opt out of this Settlement.  With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Lead Plaintiffs shall expressly waive, and each of the Settlement Class Members shall be deemed to have waived, and by operation of the Judgment shall have waived, the provisions, rights and benefits of California Civil Code § 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of

executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Lead Plaintiffs shall expressly waive and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code §1542. Lead Plaintiffs and Settlement Class Members may hereafter discover facts in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly, fully, finally and forever settle and release, and each Settlement Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released, any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiffs acknowledge, and the Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you do not want a payment from this Settlement, but you want to keep the right to sue or continue to sue the Defendants or any other Released Parties on your own for the Released

Claims in this case, then you must take steps to get out of the Settlement Class.  This is called excluding yourself, or is sometimes referred to as opting out of the Settlement Class.

### 14.    How Do I Get Out of the Settlement Class?

To exclude yourself from the Settlement Class you must send a letter by mail stating that you "request to be excluded from *Massachusetts Bricklayers and Masons Trust Funds, et al. v. Deutsche Alt-A Securities, Inc., et al.*, Civil Action No. 08-cv-03178 (E.D.N.Y.)."  You must include your name, address, telephone number, your signature, and the number of Certificates you purchased between May 1, 2006 through May 30, 2007, inclusive, identify the specific trusts and tranches in which you purchased, the dates of your purchases and any sales, and the purchase prices and sales prices, if any.   TO BE VALID YOUR EXCLUSION REQUEST MUST INCLUDE ALL OF THE INFORMATION REQUESTED.   You must mail your exclusion request **postmarked no later than _____, 2012**, to:

*Deutsche Mortgage Pass Through*
*Certificates Securities Litigation*
Claims Administrator
c/o Gilardi & Co. LLC
P.O. Box _____
San Rafael, CA  94912-8040

You cannot exclude yourself on the phone or by e-mail.  If you ask to be excluded, you are not eligible to receive any settlement payment, and you cannot object to the Settlement.  You will not be legally bound by anything that happens in this lawsuit.

### 15.    If I Do Not Exclude Myself, Can I Sue the Defendants for the Same Thing Later?

No.   Unless you timely and validly exclude yourself, you give up any right to sue the Defendants or any other Released Parties for any and all Released Claims.  If you have a pending lawsuit against any of the Defendants or Released Parties, speak to your lawyer in that case

29

immediately.  You must exclude yourself from this Settlement Class to continue your own lawsuit.  Remember, the exclusion deadline is _____, 2012.

**16.     If I Exclude Myself, Can I Receive Money from This Settlement?**

No.  If you timely and validly exclude yourself, do not send in a claim form because you are no longer a Settlement Class Member.  But, you may be able to sue, continue to sue, or be part of a different lawsuit involving the Released Claims against the Defendants.

## THE LAWYERS REPRESENTING YOU

**17.     Do I Have a Lawyer in This Case?**

The Court appointed the law firms of Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP to represent you and other Settlement Class Members.  These lawyers are called Lead Counsel.  You will not be directly charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

**18.     How Will the Lawyers Be Paid?**

Lead Counsel will ask the Court for attorneys' fees not to exceed 29% of the Settlement Fund and expenses up to $950,000, plus accrued interest, that were incurred in connection with the litigation.  The fee request will be equal to or less than Lead Counsel's hourly charges incurred in the case even though the law allows, and courts in comparable cases regularly approve, attorneys' fees that are greater than counsel's hourly charges in order to compensate for the contingent risk of non-payment undertaken by counsel, the result obtained and other factors. As part of the fee request, Lead Plaintiffs may seek reimbursement of up to $35,000 for time and expenses (including lost wages) incurred representing the Settlement Class in accordance with 15 U.S.C. §77z-1(a)(4).  Such sums as may be approved by the Court will be paid from the Settlement Fund.  Settlement Class Members are not personally liable for any such fees or expenses.

The attorneys' fees and expenses requested will be the only payment to Lead Counsel for their efforts in achieving this Settlement and for their risk in undertaking this representation on a wholly contingent basis.   Lead Counsel have committed significant time and expenses in litigating this case for the benefit of the Settlement Class.   To date, Lead Counsel have not been paid for their services in conducting this litigation on behalf of the Lead Plaintiffs and the Settlement Class, nor for their substantial expenses.   The fees requested will compensate Lead Counsel for their work in achieving the Settlement Fund.   The Court will ultimately decide what is a reasonable fee award and may award less than the amount requested by Lead Counsel.

## OBJECTING TO THE SETTLEMENT

You can tell the Court that you do not agree with the Settlement or some part of it.

### 19.    How Do I Tell the Court that I Do Not Like the Settlement?

If you are a Settlement Class Member, you can object to the Settlement if you do not like any part of it, including the Plan of Allocation and the request for attorneys' fees or expenses. You can state the reasons why you think the Court should not approve it.   The Court will consider your views.   To object, you must send a letter saying that you object to the Settlement in "*Massachusetts Bricklayers and Masons Trust Funds, et al. v. Deutsche Alt-A Securities, Inc., et al.*, Civil Action No. 08-cv-03178 (E.D.N.Y.)."   Be sure to include your name, address, telephone number, your signature, the number of Certificates purchased between May 1, 2006 through May 30, 2007, inclusive, the specific trusts and tranches in which you purchased, the dates of your purchases and any sales, the purchase prices and sales prices, if any, and the reasons you object.   TO BE VALID YOUR OBJECTION MUST INCLUDE ALL OF THE INFORMATION REQUESTED.   Any objection must be mailed or delivered such that it is **received by *each* of the following no later than _____, 2012**:

*Court*:

Clerk of the Court
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
100 Federal Plaza
Central Islip, NY  11722-4438

*Counsel for Lead Plaintiffs*:

Arthur C. Leahy
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

Jonathan Gardner
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, NY  10005

*Counsel for Defendants*:

Jamie L. Wine
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY  10022-4834

**20.     What's the Difference Between Objecting and Seeking Exclusion?**

Objecting is simply telling the Court that you do not like something about the Settlement.

You can object **only if** you stay in the Settlement Class.  Excluding yourself is telling the Court

that you do not want to be part of the Settlement Class.  If you exclude yourself, you have no

basis to object because the case no longer affects you.

**THE COURT'S FAIRNESS HEARING**

The Court will hold a hearing to decide whether to approve the Settlement.  You may

attend and you may ask to speak, but you do not have to.

21. **When and Where Will the Court Decide Whether to Approve the Settlement?**

The Court will hold a fairness hearing at ___ _.m., on _____, 2012, at _____.  At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them.  The Court will listen to people who have asked to speak at the hearing.  The Court will also consider whether to approve the Plan of Allocation and how much to pay to Lead Counsel.  The Court may decide these issues at the hearing or take them under consideration.  We do not know how long these decisions will take.

22. **Do I Have to Come to the Hearing?**

No.  Lead Counsel will answer any questions Judge Wexler may have.  But, you are welcome to come at your own expense.  If you send an objection, you do not have to come to Court to talk about it.  As long as you submitted your written objection on time, the Court will consider it.  You may also pay your own lawyer to attend, but it is not necessary.

23. **May I Speak at the Hearing?**

You may ask the Court for permission to speak at the fairness hearing.  To do so, you must send a letter saying that it is your intention to appear in "*Massachusetts Bricklayers and Masons Trust Funds, et al. v. Deutsche Alt-A Securities, Inc., et al.*, Civil Action No. 08-cv-03178 (E.D.N.Y.)."  Be sure to include your name, address, telephone number, your signature, and the number of Certificates purchased between May 1, 2006 through May 30, 2007, inclusive, identify the specific trusts and tranches in which you purchased, the dates of your purchases and any sales, and the purchase prices and sales prices, if any.  Your notice of intention to appear must **be received no later than _____, 2012**, by the Clerk of the Court, Lead Counsel, and Defendants' counsel, at the four addresses listed in question 19.  If you intend to present evidence or witnesses, you must explain in your letter what information you intend to present,

and identify the specific documents you intend to introduce and the witnesses you intend to present. You cannot speak at the hearing if you exclude yourself from the Settlement Class.

## IF YOU DO NOTHING

### 24. What Happens if I Do Nothing at All?

If you do nothing and you are a Member of the Settlement Class, you will remain a Settlement Class Member. However, you will not receive any money from this Settlement unless you submit a claim form. Unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants or any other Released Parties about the Released Claims in this case.

## GETTING MORE INFORMATION

### 25. Are There More Details About the Settlement?

This Notice summarizes the proposed Settlement. More details are in the Stipulation of Settlement, dated as of March 15, 2012. You can obtain a copy of the Stipulation of Settlement or receive other information about the Settlement by going to www.gilardi.com, www.rgrdlaw.com, www.labaton.com, or by contacting Rick Nelson, c/o Shareholder Relations, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, 800-449-4900, or Colin Holmes c/o Labaton Sucharow LLP, 140 Broadway, 34th Floor, New York, NY 10005, 888-219-6877.

### *DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE*

### SPECIAL NOTICE TO BANKS, BROKERS AND OTHER NOMINEES

The Court has ordered that if you held any Certificate purchased between May 1, 2006 through May 30, 2007, inclusive, as nominee for a beneficial owner, then, within ten (10) days after you receive this Notice, you must either: (1) send a copy of this Notice by first class mail to

all such Persons; or (2) provide a list of the names and addresses of such Persons to the Claims Administrator:

*Deutsche Mortgage Pass Through*
*Certificates Securities Litigation*
Claims Administrator
c/o Gilardi & Co. LLC
P.O. Box _____
San Rafael, CA 94912-8040

If you choose to mail the Notice and Proof of Claim yourself, you may obtain from the Claims Administrator (without cost to you) as many additional copies of these documents as you will need to complete the mailing.

Regardless of whether you choose to complete the mailing yourself or elect to have the mailing performed for you, you may obtain reimbursement for, or advancement of, reasonable administrative costs actually incurred or expected to be incurred in connection with forwarding the Notice and which would not have been incurred but for the obligation to forward the Notice, upon submission of appropriate documentation to the Claims Administrator.

DATED: _____, 2012        BY ORDER OF THE COURT
                                       UNITED STATES DISTRICT COURT
                                       EASTERN DISTRICT OF NEW YORK

EXHIBIT A-2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ——————————————— x | | |
| MASSACHUSETTS BRICKLAYERS AND MASONS TRUST FUNDS, Individually and On Behalf of All Others Similarly Situated, | : : : : | Civil Action No. 2:08-cv-03178-LDW-ARL CLASS ACTION |
| Plaintiff, | : : | PROOF OF CLAIM AND RELEASE |
| vs. | : : | |
| DEUTSCHE ALT-A SECURITIES, INC., et al., | : : : | |
| Defendants. | : : | |
| ——————————————— x | | |

## I.      GENERAL INSTRUCTIONS

1.      To recover as a Member of the Settlement Class based on your claims in the action entitled *Massachusetts Bricklayers and Masons Trust Funds v. Deutsche Alt-A Securities, Inc., et al.*, Civil Action No. 2:08-cv-03178-LDW-ARL (the "Litigation"), you must complete and, on page ___ hereof, sign this Proof of Claim and Release form ("Proof of Claim").  If you fail to submit a properly addressed (as set forth in paragraph 3 below) Proof of Claim, your claim may be rejected and you may be precluded from any recovery from the Net Settlement Fund created in connection with the proposed Settlement of the Litigation.

2.      Submission of this Proof of Claim, however, does not assure that you will share in the proceeds of settlement in the Litigation.

3.      YOU MUST MAIL YOUR COMPLETED AND SIGNED PROOF OF CLAIM POSTMARKED ON OR BEFORE _____, ADDRESSED AS FOLLOWS:

*Deutsche Mortgage Pass Through*
*Certificates Securities Litigation*
Claims Administrator
c/o Gilardi & Co. LLC
P.O. Box _____
San Rafael, CA 94912-8040

If you are NOT a Member of the Settlement Class, as defined in the Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses ("Notice"), DO NOT submit a Proof of Claim.

4.      If you are a Member of the Settlement Class, you are bound by the terms of any judgment entered in the Litigation, WHETHER OR NOT YOU SUBMIT A PROOF OF CLAIM.

## II.    DEFINITIONS

1.      "Defendants" means Deutsche Alt-A Securities, Inc. ("Deutsche Alt-A"), Deutsche Bank Securities Inc. ("DBSI"), DB Structured Products, Inc. ("DBSP"), and the Individual Defendants, as defined below.

2.      "Individual Defendants" means Anilesh Ahuja, Jeffrey Lehocky, Richard W. Ferguson, Joseph J. Rice, and Richard D'Albert.

3.      "Released Claims" means the claims defined in the accompanying Notice at page ___.

4.      "Released Parties" means each and all of the Defendants and each and all of their Related Parties (as defined in the accompanying Notice).

5.      "Unknown Claims" means the claims defined in the accompanying Notice at page ___.

## III.   CLAIMANT IDENTIFICATION

1.      If you acquired mortgage pass-through certificates in either: 1) the Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5; and/or 2) the Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 (the "Certificates") between May 1, 2006 through May 30, 2007, inclusive (the "Relevant Time Period"), and held the Certificate(s) in your name, you are the beneficial purchaser as well as the record purchaser.  If, however, the Certificate(s) were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial purchaser and the third party is the record purchaser.

2.      Use Part I of this form entitled "Claimant Identification" to identify each purchaser of record ("nominee"), if different from the beneficial purchaser of the Certificates that form the basis of this claim.  THIS CLAIM MUST BE SUBMITTED BY THE ACTUAL BENEFICIAL PURCHASER(S), OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER(S) OF THE CERTIFICATES UPON WHICH THIS CLAIM IS BASED.

3.      All joint purchasers must sign this claim.  Executors, administrators, guardians, conservators and trustees must complete and sign this claim on behalf of Persons represented by them and their authority must accompany this claim and their titles or capacities must be stated. The Social Security (or taxpayer identification) number and telephone number of the beneficial owner may be used in verifying the claim.  Failure to provide the foregoing information could delay verification of your claim or result in rejection of the claim.

## IV.    CLAIM FORM

1.      Use Part II of this form entitled "Schedule of Transactions in Deutsche Mortgage Pass-Through Certificates" to supply all required details of your transaction(s) in the Certificates. If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form.  Sign and print or type your name on each additional sheet.

2.      On the schedules, provide all of the requested information with respect to all of your purchases/acquisitions and all of your sales (or transfers out) of the Certificates, regardless of whether such transactions resulted in a profit or a loss.  Failure to report all such transactions may result in the rejection of your claim.

3.      List each transaction separately and in chronological order, by trade date, beginning with the earliest.  You must accurately provide the month, day and year of each transaction you list.

4.      Copies of broker confirmations or other documentation of your transactions in the Certificates should be attached to your claim.  Failure to provide this documentation could delay verification of your claim or result in rejection of your claim.

5.      The above requests are designed to provide the minimum amount of information necessary to process the simplest claims.  The Claims Administrator may request additional

information as required to efficiently and reliably calculate your losses.  In some cases where the Claims Administrator cannot perform the calculation accurately or at a reasonable cost to the Settlement Class with the information provided, the Claims Administrator may condition acceptance of the claim upon the production of additional information and/or the Claimant's responsibility for any increased costs due to the nature and/or scope of the claim.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
*Deutsche Mortgage Pass Through*
*Certificates Securities Litigation*
Civil Action No. 2:08-cv-03178-LDW-ARL
PROOF OF CLAIM AND RELEASE
Must Be Postmarked No Later Than:
_____
Please Type or Print

PART I:        CLAIMANT IDENTIFICATION

_____
Beneficial Owner's Name (First, Middle, Last)

_____
Street Address

_____          _____
City                                State          Zip Code

_____          _____
Foreign Province                    Foreign Country

_____          _____  Individual

Social Security Number or           _____  Corporation/Other
Taxpayer Identification Number

_____          _____  (work)
Area Code                   Telephone Number

_____          _____  (home)
Area Code                   Telephone Number

_____
Record Owner's Name (if different from beneficial owner listed above)

PART II:     SCHEDULE OF TRANSACTIONS IN DEUTSCHE MORTGAGE PASS-THROUGH CERTIFICATES

    A.     Purchases/Acquisitions of Certificates (May 1, 2006 – May 30, 2007, inclusive):

| Trade Date Month/Day/Year | CUSIP | Face Value | Price | Total Cost* |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

    B.     Sales of Certificates (May 1, 2006 – January 25, 2012, inclusive):

| Trade Date Month/Day/Year | CUSIP | Face Value | Price | Total Proceeds* |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

*excluding commissions, transfer taxes or other fees

    C.     Unsold Certificates at the Measurement Date (January 25, 2012).

January 25, 2012:

| CUSIP | Face value |
|---|---|
| | |
| | |
| | |
| | |

If you require additional space, attach extra schedules in the same format as above.  Sign and print your name on each additional page.

YOU MUST READ AND SIGN THE RELEASE ON PAGE _____.  FAILURE TO SIGN THE RELEASE MAY RESULT IN A DELAY IN PROCESSING OR THE REJECTION OF YOUR CLAIM.

**V.     SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS**

    I (We) submit this Proof of Claim and Release form under the terms of the Stipulation of Settlement, dated as of March 15, 2012 ("Stipulation"), described in the Notice.  I (We) also submit to the jurisdiction of the United States District Court for the Eastern District of New York

with respect to my (our) claim as a Settlement Class Member (as defined in the Notice) and for purposes of enforcing the release set forth herein.  I (We) further acknowledge that I am (we are) bound by and subject to the terms of any judgment that may be entered in the Litigation.  I (We) agree to furnish additional information to Lead Counsel to support this claim if required to do so. I (We) have not submitted any other claim covering the same purchases of the Certificates during the Relevant Time Period and know of no other Person having done so on my (our) behalf.

## VI.  RELEASE

1.      I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally and forever settle, release, relinquish, dismiss, and discharge all of the Released Claims, including Unknown Claims, (as described in the accompanying Notice), against each and all of the Released Parties, with prejudice and on the merits.

2.      This release shall be of no force or effect unless and until the Court approves the Stipulation and it becomes effective on the Effective Date.

3.      I (We) hereby acknowledge that upon the Effective Date I (we) am (are) forever barred and enjoined from commencing, instituting, or continuing to prosecute any action or proceeding in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind, asserting against any of the Released Parties, and each of them, any of the Released Claims

4.      I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof.

5.      I (We) hereby warrant and represent that I (we) have included all requested information about all of my (our) transactions in the Certificates, as well as the number of Certificates held by me (us) as of January 25, 2012.

6.      I (We) hereby warrant and represent that I am (we are) not excluded from the Settlement Class, as defined in the Notice.

7.      The number(s) shown on this form is (are) the correct SSN/TIN(s).

8.      I (We) certify that I am (we are) NOT subject to backup withholding under the provisions of Section 3406 (a)(1)(C) of the Internal Revenue Code because:  (a) I am (we are) exempt from backup withholding; or (b) I (we) have not been notified by the Internal Revenue Service that I am (we are) subject to backup withholding as a result of a failure to report all interest or dividends; or (c) the Internal Revenue Service has notified me (us) that I am (we are) no longer subject to backup withholding.

(NOTE: If you have been notified by the Internal Revenue Service that you are subject to backup withholding, you must cross out Item 8 above.).

I (We) declare under penalty of perjury under the laws of the United States of America that the foregoing information supplied by the undersigned is true and correct.

Executed this _____ day of _____,
                                                          (Month/Year)

in _____, _____.
        (City)                              (State/Country)


_____
(Sign your name here)


_____
(Type or print your name here)


_____
(Capacity of person(s) signing, *e.g.*, Beneficial Purchaser, Executor or Administrator)

**ACCURATE CLAIMS PROCESSING TAKES A**

**SIGNIFICANT AMOUNT OF TIME.**

**THANK YOU FOR YOUR PATIENCE.**

Reminder Checklist:

1.    Please sign the above release and declaration.

2.    Remember to attach copies of supporting documentation, if available.

3.    Do not send the originals of certificates or other documents.

4.    Keep a copy of your claim form for your records.

5.    If you desire an acknowledgment of receipt of your claim form, please send it

Certified Mail, Return Receipt Requested.

6.    If you move, please send us your new address.

EXHIBIT A-3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

MASSACHUSETTS BRICKLAYERS AND
MASONS TRUST FUNDS, Individually and
On Behalf of All Others Similarly Situated,

                        Plaintiff,

      vs.

DEUTSCHE ALT-A SECURITIES, INC., et
al.,

                     Defendants.

———————————————————— x

Civil Action No. 2:08-cv-03178-LDW-ARL

CLASS ACTION

SUMMARY NOTICE OF PENDENCY OF
CLASS ACTION AND PROPOSED
SETTLEMENT AND MOTION FOR
ATTORNEYS FEES AND EXPENSES

TO: ALL PERSONS WHO PURCHASED OR OTHERWISE ACQUIRED DEUTSCHE ALT-B SECURITIES MORTGAGE LOAN TRUST 2006-AB4 MORTGAGE PASS-THROUGH CERTIFICATES AND/OR DEUTSCHE ALT-A SECURITIES MORTGAGE LOAN TRUST 2006-AR5 MORTGAGE PASS-THROUGH CERTIFICATES DURING THE PERIOD BETWEEN MAY 1, 2006 THROUGH MAY 30, 2007, INCLUSIVE, AND WHO WERE DAMAGED THEREBY (THE "SETTLEMENT CLASS").

YOU ARE HEREBY NOTIFIED pursuant to an Order of the United States District Court for the Eastern District of New York, that a hearing will be held on _____ __, 2012, at _:__ _.m., before the Honorable Leonard D. Wexler at the Long Island Federal Courthouse, 944 Federal Plaza, Central Islip, New York 11722, for the purpose of determining: (1) whether the proposed settlement of the claims in the Litigation for the sum of $32.5 million in cash should be approved by the Court as fair, reasonable and adequate; (2) whether a Settlement Class should be certified for purposes of the Settlement; (3) whether this Litigation should be dismissed with prejudice pursuant to the terms and conditions set forth in the Stipulation of Settlement, dated as of March 15, 2011 ("Stipulation"); (4) whether the Plan of Allocation is fair, reasonable and adequate and therefore should be approved; and (5) whether the application of Lead Counsel for the payment of attorneys' fees and expenses incurred in connection with this Litigation should be approved.

If you purchased Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 Mortgage Pass-Through Certificates and/or Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 Mortgage Pass-Through Certificates during the period between May 1, 2006 through May 30, 2007, inclusive, your rights may be affected by the settlement of this Litigation. If you have not received a detailed Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses ("Notice") and a copy of the Proof of Claim and Release form ("Proof of Claim"), you may obtain copies by writing to [Deutsche Mortgage Pass-Through Certificates Securities Litigation], Claims Administrator, c/o Gilardi & Co. LLC, ____ or going to www.gilardi.com. If you are a Settlement Class Member, in order to share in the distribution of the Net Settlement Fund, you must submit a Proof of Claim postmarked no later than _____ __, 2012, establishing that you are entitled to recovery.

If you desire to be excluded from the Settlement Class, you must submit a request for exclusion postmarked no later than _____ __, 2012, in the manner and form explained in the detailed Notice referred to above.  All Settlement Class Members who do not timely and validly request exclusion from the Settlement Class will be bound by any judgment entered in the Litigation pursuant to the terms and conditions of the Stipulation.

Any objection to the Settlement must be mailed or delivered such that it is received by each of the following no later than _____ __, 2012:

> Clerk of the Court
> UNITED STATES DISTRICT COURT
> EASTERN DISTRICT OF NEW YORK
> 100 Federal Plaza
> Central Islip, NY  11722-4438
>
> *Counsel for Lead Plaintiffs*:
>
> Arthur C. Leahy
> ROBBINS GELLER RUDMAN &
> DOWD LLP
> 655 West Broadway, Suite 1900
> San Diego, CA  92101
>
> Jonathan Gardner
> LABATON SUCHAROW LLP
> 140 Broadway, 34th Floor
> New York, NY  10005
>
> *Counsel for Defendants*:
>
> Jamie L. Wine
> LATHAM & WATKINS LLP
> 885 Third Avenue
> New York, NY  10022-4834

**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE REGARDING**

**THIS NOTICE**.  If you have any questions about the Settlement, you may contact counsel for

the Lead Plaintiffs at the address listed above or go to the following websites: www.gilardi.com;

www.labaton.com; www.rgrdlaw.com.

DATED: _____, 2012  BY ORDER OF THE COURT
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK

4

EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

MASSACHUSETTS BRICKLAYERS AND
MASONS TRUST FUNDS, Individually and
On Behalf of All Others Similarly Situated,

                          Plaintiff,

       vs.

DEUTSCHE ALT-A SECURITIES, INC., et
al.,

                      Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 2:08-cv-03178-LDW-ARL

CLASS ACTION

[PROPOSED] FINAL ORDER AND
JUDGMENT

This matter came before the Court for hearing pursuant to an Order of this Court, dated _____, 2012, on the application of the Lead Plaintiffs for approval of the Settlement set forth in the Stipulation of Settlement, dated as of March 15, 2012 (the "Stipulation").  Due and adequate notice having been given of the Settlement as required in said Order, and the Court having considered all papers filed and proceedings held herein and otherwise being fully informed in the premises and good cause appearing therefore, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.      This Judgment incorporates by reference the definitions in the Stipulation, and all terms used herein shall have the same meanings set forth in the Stipulation.

2.      This Court has jurisdiction over the subject matter of the Litigation and over all parties to the Litigation, including all Members of the Settlement Class.

3.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court hereby certifies, for purposes of effectuating this Settlement, a Settlement Class of all Persons who purchased or otherwise acquired Deutsche Alt-B Securities Mortgage Loan Trust 2006-AB4 Mortgage Pass-Through Certificates and/or Deutsche Alt-A Securities Mortgage Loan Trust 2006-AR5 Mortgage Pass-Through Certificates during the period between May 1, 2006 through May 30, 2007, inclusive (the "Relevant Time Period") and who were damaged thereby. Excluded from the Settlement Class are: the Defendants, IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America; the officers, directors, successors and assigns of Deutsche Alt-A Securities, Inc., Deutsche Bank Securities, Inc., Deutsche Bank Structured Products, Inc.,

- 1 -

IndyMac Bank, F.S.B., GreenPoint Mortgage Funding, Inc., American Home Mortgage Corp., Dexia SA/NV, Dexia Holdings, Inc., FSA Asset Management LLC, Dexia Credit Local SA, Massachusetts Mutual Life Insurance Company, Federal Home Loan Bank of Boston, and Teachers Insurance and Annuity Association of America;; members of the immediate families, the legal representatives, heirs, successors or assigns of the Individual Defendants; and any entity in which any excluded Person has or had a controlling interest. Also excluded from the Settlement Class are those Persons who timely and validly requested exclusion from the Settlement Class pursuant to the Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses ("Notice"), as set forth in Exhibit 1 attached hereto.

4.      With respect to the Settlement Class, this Court finds for the purposes of effectuating this Settlement only, that the prerequisites for a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedures have been satisfied in that: (i) the Members of the Settlement Class are so numerous that joinder of all Settlement Class Members in the Litigation is impracticable; (ii) there are questions of law and fact common to the Settlement Class which predominate over any individual questions; (iii) the claims of the Lead Plaintiffs are typical of the claims of the Settlement Class; (iv) the Lead Plaintiffs and Lead Counsel will fairly and adequately represent and protect the interests of all of the Settlement Class Members; and (v) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

5.      Except as to any individual claim of those Persons (identified in Exhibit 1 attached hereto) who have validly and timely requested exclusion from the Settlement Class, the Litigation and all claims contained therein, including all of the Released Claims, are dismissed

- 2 -

with prejudice as to the Lead Plaintiffs and the other Settlement Class Members, and as against each and all of the Released Parties.  The parties are to bear their own costs, except as otherwise provided in the Stipulation.

6.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement set forth in the Stipulation and finds that said Settlement is, in all respects, fair, reasonable and adequate to, and is in the best interests of, Lead Plaintiffs and each of the Settlement Class Members.  This Court further finds the Settlement set forth in the Stipulation is the result of arm's-length negotiations between experienced counsel representing the interests of the Lead Plaintiffs, Settlement Class Members and Defendants.  Accordingly, the Settlement embodied in the Stipulation is hereby approved in all respects and shall be consummated in accordance with its terms and provisions.  The Settling Parties are hereby directed to perform the terms of the Stipulation.

7.     Upon the Effective Date, Lead Plaintiffs and each of the Settlement Class Members shall be deemed to have, and by operation of this Judgment shall have, fully, finally and forever released, relinquished and discharged all Released Claims against the Released Parties, whether or not such Settlement Class Member executes and delivers a Proof of Claim and Release form.  The Settling Parties acknowledge and the Settlement Class Members shall be deemed by operation of law to acknowledge, that the waiver of Unknown Claims, and of the provisions, rights and benefits of Section 1542 of the California Civil Code, was bargained for and is a key element of the Settlement of which the release in this paragraph is a part.

8.     Upon the Effective Date, the Lead Plaintiffs and all Settlement Class Members and anyone claiming through or on behalf of any of them, are forever barred and enjoined from commencing, instituting, or continuing to prosecute any action or proceeding in any court of law

or equity, arbitration tribunal, administrative forum or other forum of any kind, asserting against any of the Released Parties, and each of them, any of the Released Claims.

9.      Upon the Effective Date, each of the Released Parties shall be deemed to have, and by operation of this Judgment shall have, fully, finally and forever released, relinquished and discharged the Lead Plaintiffs, Settlement Class Members, and their counsel, employees, successors and assigns, from all claims (including, without limitation, Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims.

10.      The distribution of the Notice and the publication of the Summary Notice as provided for in the Order Preliminarily Approving Settlement and Providing for Notice constituted the best notice practicable under the circumstances, including individual notice to Settlement Class Members who could be identified through reasonable effort.  Said notice provided the best notice practicable under the circumstances of those proceedings and of the matters set forth therein, including the proposed Settlement set forth in the Stipulation, to all Persons entitled to such notice, and said notice fully satisfied the requirements of Federal Rule of Civil Procedure 23, the requirements of due process, and any other applicable law, including the Private Securities Litigation Reform Act of 1995.

11.      Any Plan of Allocation submitted by Lead Counsel or any Fee and Expense Award shall in no way disturb or affect this Judgment and shall be considered separate from this Judgment.

12.      Neither the Stipulation nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (i) is or may be deemed to be or may be used as an admission of, or evidence of, the

validity of any Released Claim, or of any wrongdoing or liability of the Defendants; or (ii) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Defendant in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  Defendants and their Related Parties may file the Stipulation and/or this Judgment in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

13.     Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of this Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees and expenses in the Litigation; and (d) all Settling Parties for the purpose of construing, enforcing and administering the Stipulation.

14.     The Court finds that during the course of the Litigation, the Settling Parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

15.     In the event that the Settlement does not become effective in accordance with the terms of the Stipulation or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to the Defendants, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

- 5 -

DATED: _____

_____
THE HONORABLE LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

# EXHIBIT 1

769309 v7
[3/14/2012 13:25]

EXHIBIT 2



# LABATON SUCHAROW LLP

## INVESTOR PROTECTION LITIGATION

# THE FIRM AND ITS ACHIEVEMENTS

## Table of Contents

OVERVIEW ......................................................................................................................... 1

CORPORATE GOVERNANCE .............................................................................................. 2

NOTABLE LEAD COUNSEL APPOINTMENTS ...................................................................... 6

TRIAL EXPERIENCE ........................................................................................................... 7

NOTABLE SUCCESSES ........................................................................................................ 7

COMMENTS ABOUT OUR FIRM BY THE COURTS ............................................................... 19

PRO BONO ACTIVITIES .................................................................................................... 21

WOMEN'S INITIATIVE AND MINORITY SCHOLARSHIP ..................................................... 21

ATTORNEYS ...................................................................................................................... 22

    LAWRENCE A. SUCHAROW, CHAIRMAN ...................................................................22

    MARTIS ALEX, PARTNER .........................................................................................24

    MARK S. ARISOHN, PARTNER...................................................................................26

    CHRISTINE S. AZAR, PARTNER.................................................................................28

    ERIC J. BELFI, PARTNER ..........................................................................................29

    JOEL H. BERNSTEIN, PARTNER ................................................................................30

    JAVIER BLEICHMAR, PARTNER ................................................................................31

    THOMAS A. DUBBS, PARTNER .................................................................................32

    JOSEPH A. FONTI, PARTNER ....................................................................................34

    JONATHAN GARDNER, PARTNER ..............................................................................36

    DAVID J. GOLDSMITH, PARTNER .............................................................................37

    LOUIS GOTTLIEB, PARTNER ....................................................................................39

    JAMES W. JOHNSON, PARTNER ................................................................................40

    CHRISTOPHER J. KELLER, PARTNER ........................................................................41

    EDWARD LABATON, PARTNER .................................................................................43

    CHRISTOPHER J. MCDONALD, PARTNER..................................................................44

JONATHAN M. PLASSE, PARTNER ...................................................................46

HOLLIS SALZMAN, PARTNER ........................................................................47

IRA A. SCHOCHET, PARTNER ........................................................................48

MICHAEL W. STOCKER, PARTNER ................................................................50

JORDAN A. THOMAS, PARTNER .....................................................................52

STEPHEN W. TOUNTAS, PARTNER ................................................................54

RICHARD T. JOFFE, SENIOR COUNSEL .........................................................55

JOSEPH V. STERNBERG, SENIOR COUNSEL .................................................56

DOMINIC J. AULD, OF COUNSEL ..................................................................57

MARK S. GOLDMAN, OF COUNSEL ...............................................................58

TERRI GOLDSTONE, OF COUNSEL ................................................................59

BARRY M. OKUN, OF COUNSEL ...................................................................60

PAUL SCARLATO, OF COUNSEL ....................................................................60

NICOLE M. ZEISS, OF COUNSEL ..................................................................61

Founded in 1963, Labaton Sucharow LLP ("Labaton Sucharow") is an internationally respected law firm with offices in New York, New York and Wilmington, Delaware and has relationships throughout the U.S., Europe and the world.  The Firm consists of more than 60 attorneys and a professional support staff that includes certified public accountants, licensed private investigators, resident securities analysts and 17 paralegals.  The Firm prosecutes major complex litigation in the United States, and has successfully conducted a wide array of representative actions (principally class, mass and derivative) in the areas of securities, antitrust, merger/ acquisition, limited partnership, ERISA, product liability, and consumer litigation. Labaton Sucharow's Securities Litigation Group offers comprehensive services for our institutional investor clients and has recovered, through trial and settlement, more than $4 billion for the benefit of investors who have been victimized by such diverse schemes as stock price manipulation, mismanagement, and fraudulent offerings of securities.  Through its efforts, the litigation group has also obtained meaningful corporate governance reforms to minimize the likelihood of repetitive wrongful conduct.  Visit our website at **www.labaton.com** for more information about our dynamic firm.

# CORPORATE GOVERNANCE

Labaton Sucharow is committed to corporate governance reform.  Through its leadership of membership organizations which seek to advance the interests of shareholders and consumers, Labaton Sucharow seeks to strengthen corporate governance and support legislative reforms which improve and preserve shareholder and consumer rights.

The Firm is a patron of the John L. Weinberg Center for Corporate Governance of the University of Delaware ("The Center").  The Center provides a forum for business leaders, directors of corporate boards, the legal community, academics, practitioners, graduate and undergraduate students, and others interested in corporate governance issues to meet and exchange ideas.  One of Labaton Sucharow's partners, Edward Labaton, is a member of the Advisory Committee of The Center.  Additionally, Mr. Labaton has served for more than 10 years as a member of the Program Planning Committee for the annual ALI-ABA Corporate Governance Institute, and serves on the Task Force on the Role of Lawyers in Corporate Governance of the Association of the Bar of the City of New York.

Through the aegis of NASCAT, a membership organization of approximately 100 law firms that practice class action and complex civil litigation, the Firm continues to advocate against those who would legislatively seek to weaken shareholders' rights, including their right to obtain compensation through the legal system.

From 2009-2011 Partner Ira A. Schochet served as President of NASCAT, following in the footsteps of Chairman Lawrence A. Sucharow who held the position from 2003-2005.

On behalf of its institutional and individual investor clients, Labaton Sucharow has achieved some of the largest precedent-setting settlements since the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and has helped avert future instances of

securities fraud by negotiating substantial corporate governance reforms as conditions of many of its largest settlements.

Because of the depth of their experience and deep commitment to the principles of corporate governance, many Labaton Sucharow partners have served as featured speakers on topics relating to corporate governance and reform at various symposia and lectures.

As a result of Labaton Sucharow's extensive experience and commitment to corporate governance reform, the Firm's clients have secured meaningful reforms, in addition to substantial monetary recoveries, in significant settlements such as:

- ***In re Waste Management, Inc. Securities Litigation***, Civ. No. H-99-2183 (S.D. Tex.):  Labaton Sucharow, acting as Lead Counsel for the State of Connecticut Retirement Plans & Trust Funds, caused the Company to present a binding resolution to declassify its board of directors, which was approved by its shareholders.  As a consequence of Labaton Sucharow's efforts, the Company further agreed to amend its Audit Committee charter, which led to its enhanced effectiveness.

- ***In re Vesta Insurance Group Securities Litigation***, Civ. No. CV-98-W-1407-S (N.D. Ala.):  Labaton Sucharow, acting as Lead Counsel for the Florida State Board of Administration, caused the Company to adopt provisions requiring that:  (i) a majority of its Board members be independent; (ii) at least one independent director be experienced in corporate governance; (iii) the audit, nominating and compensation committees be comprised entirely of independent directors; and (iv) the audit committee comply with the recommendations of the Blue Ribbon Panel on the effectiveness of audit committees.

- 3 -

- ***In re Orbital Sciences Corporation Securities Litigation***, Civ. No. 99-197-A (E.D. Va.): Labaton Sucharow, acting as Lead Counsel for the New York City Pension Funds, negotiated the implementation of measures concerning the Company's quarterly review of its financial results, the composition, role and responsibilities of its Audit and Finance committee, and the adoption of a Board resolution providing guidelines regarding senior executives' exercise and sale of vested stock options.

- ***In re Bristol-Myers Squibb Securities Litigation***, Civ. No. 00-1990 (D.N.J.): Labaton Sucharow, acting as Lead Counsel for the LongView Collective Investment Fund of the Amalgamated Bank, negotiated noteworthy corporate governance reforms. Bristol-Myers Squibb ("BMS") agreed to publicly disclose the following information concerning all of its drugs marketed for at least one indication: a description of the clinical study design and methodology; results of the clinical trials; and safety results, including the reporting of adverse events seen during the clinical trials. The disclosures are posted on BMS's website, *www.BMS.com*, as well as an industry website, *www.clinicalstudyresults.org*. BMS agreed to post these disclosures for a 10-year period following approval of the settlement, and has further agreed that any modifications to the disclosure protocol must be approved by the Court, at the request of Labaton Sucharow as Lead Counsel, unless the modifications increase the scope of the disclosures. The corporate reform measures obtained in this case exceed the scope of reforms obtained by the New York State Attorney General's office in the settlement of an action against GlaxoSmithKline ("GSK") arising from the sale of Paxil, an

antidepressant.  The Paxil settlement is limited to drugs sold in the United States, whereas as a result of the BMS settlement, the company must post the clinical trial results of drugs marketed in any country throughout the world.

- ***The Boeing Company,*** Civ. No. 03 CH 15039 and Civ. No. 03 CH 16301 (Cook Co., Ill, Ch. Div.):  In 2006, Labaton Sucharow, acting as Lead Counsel for Plaintiffs in a derivative class action against the directors of The Boeing Company ("Boeing"), achieved a landmark settlement establishing unique and far-reaching corporate governance standards relating to ethics compliance, provisions that obligated Boeing to contribute significant funds over and above base compliance spending to implement the various prescribed initiatives.  The terms were well designed to provide for early detection and prevention of corporate misconduct. They were comprehensive and integrated, enhancing effectiveness by providing for top-down oversight, direction and planning; and buttressed by extensive and coordinated bottom-up and horizontal reporting.  In addition, the reforms were also designed to enhance Board independence and effectiveness and, by creating a direct reporting role to the Board, the independence of the management level oversight functions.

- ***In re Take-Two Interactive Securities Litigation***, No. 06-CV-803-RJS (S.D.N.Y.):  In 2009, Labaton Sucharow, acting as Lead Counsel for Lead Plaintiffs New York City Employees' Retirement System, New York City Police Pension Fund and New York City Fire Department Pension Fund in a securities class action against Take-Two Interactive Software, Inc. ("Take-Two") and its officers and directors, achieved significant corporate governance reforms.  Take-

Two was required to adopt a policy, commonly referred to as "clawback" provision, providing for the recovery of bonus or incentive compensation paid to senior executives in the event that such compensation was awarded based on financial results later determined to have been erroneously reported as a result of fraud or other knowing misconduct by the executive.  The Company was also required to adopt a policy requiring that its Board of Directors submit any stockholder rights plan (also commonly known as a "poison pill") that is greater than 12 months in duration to a vote of stockholders.  Finally, Take-Two was required to adopt a bylaw providing that no business may be properly brought before an annual meeting of stockholders by a person other than a stockholder unless such matter has been included in the proxy solicitation materials issued by the Company.

## NOTABLE LEAD COUNSEL APPOINTMENTS

Labaton Sucharow's institutional and individual investor clients are regularly appointed by federal courts to serve as lead plaintiffs in prominent securities litigations brought under the PSLRA.  Since 1995, dozens of state, city and county public pension funds and union funds have selected Labaton Sucharow to represent them in federal securities class actions and advise them as securities litigation/investigation counsel.  Listed below are several of our current notable Lead and Co-Lead Counsel appointments.

### IN RE THE BEAR STEARNS COMPANIES INC. SECURITIES, DERIVATIVE AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION
NO. CV :08-MD-01963-RWS (S.D.N.Y.)

Representing Michigan Retirement Systems
as Co-Lead Plaintiff

*CITY OF NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM*
*V. PRIVATEBANCORP, INC., ET AL*
*NO.1:10-CV-06826 (N.D. ILL.)*

Representing the State-Boston Retirement System
as Co-Lead Plaintiff

*IN RE GOLDMAN SACHS GROUP INC. SECURITIES LITIGATION*
*No. 1:10-CV-03461(S.D.N.Y.)*

Representing the Arkansas Teacher Retirement System
as Co-Lead Plaintiff

# TRIAL EXPERIENCE

Few securities class action cases go to trial.  But when it is in the best interests of its clients and the class, Labaton Sucharow repeatedly has demonstrated its willingness and ability to try these complex securities cases before a jury.  Labaton Sucharow's recognized willingness and ability to bring cases to trial significantly increases the ultimate settlement value for shareholders.

In *In re Real Estate Associates Limited Partnership Litigation*, when defendants were unwilling to settle for an amount Labaton Sucharow and its clients viewed as fair, we tried the case with co-counsel for six weeks and obtained a landmark $184 million jury verdict in November 2002.  The jury supported plaintiffs' position that defendants knowingly violated the federal securities laws, and that the general partner had breached his fiduciary duties to plaintiffs.  The $184 million award was one of the largest jury verdicts returned in any PSLRA action and one in which the plaintiff class, consisting of 18,000 investors, recovered 100% of their damages.

# NOTABLE SUCCESSES

Labaton Sucharow has achieved notable successes in major securities litigations on behalf of its clients and certified investor classes.

- Labaton Sucharow served as Co-Lead Counsel in *In re HealthSouth Securities Litigation*, Civ. No CV-03-BE-1500-S (N.D. Ala.), a case stemming from the largest fraud ever perpetrated in the healthcare industry.  In early 2006, Lead Plaintiffs negotiated a settlement of $445 million with defendant HealthSouth.  This partial settlement, comprised of cash and HealthSouth securities to be distributed to the class, is one of the largest in history.  On June 12, 2009, the Court also granted final approval to a $109 million settlement with defendant Ernst & Young LLP ("E&Y") believed to be the eighth largest securities fraud class action settlement with an auditor.  In addition, on July 26, 2010, the Court granted final approval to a $117 million partial settlement with the remaining principal defendants in the case, UBS AG, UBS Warburg LLC, Howard Capek, Benjamin Lorello and William McGahan (the "UBS Defendants").  The total value of the settlements for Healthsouth stockholders and Healthsouth bondholders, who were represented by separate counsel, is $804.5 million.

- In *In re American International Group, Inc. Securities Litigation*, Master File No. 04 Civ. 8141 (JES) (AJP) (S.D.N.Y.), Lead Counsel Labaton Sucharow represents Lead Plaintiff Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund, along with the Attorney General of the State of Ohio.  On October 3, 2008, a $97.5 million settlement between the Lead Plaintiff and PricewaterhouseCoopers LLP was announced.  The settlement, which still must be approved by the Court, was the eighth largest at the time by an accounting firm to settle a securities fraud class action.  On July 16, 2010, an agreement on the terms of a proposed $725

- 8 -

million settlement was announced, which, if approved by the Court, would resolve the Ohio Funds' claims against AIG and certain individual AIG directors and officers.

- On behalf of the New York State Common Retirement Fund and five New York City public pension funds, Labaton Sucharow served as Lead Counsel in ***In re Countrywide Financial Corporation Securities Litigation***, No. CV 07-05295 MRP (MANx) (C.D. Cal.), for claims alleging that Countrywide, one of the nation's largest mortgage lenders, and other defendants violated the federal securities laws by making misstatements and omitting material facts about Countrywide's policies and procedures for underwriting loans that entailed greater risk than disclosed. The parties have agreed to a Settlement whereby Countrywide and its auditing firm, KPMG LLP, together have paid $624 million in cash, with a portion set aside for up to two years to satisfy certain opt-out claims. This recovery is among the largest securities fraud settlements since the enactment of the PSLRA. On March 10, 2011, the Settlement was granted final approval.

- ***In re Waste Management, Inc. Securities Litigation***, Civ. No. H-99-2183 (S.D. Tex.). In 2002, Judge Melinda Harmon approved an extraordinary settlement that provided for recovery of $457 million in cash, plus an array of far-reaching corporate governance measures. At that time, this settlement was the largest common fund settlement of a securities action achieved in any court within the Fifth Circuit and the third-largest achieved in any federal court in the nation. Judge Harmon noted, among other things, that Labaton Sucharow "obtained an

outstanding result by virtue of the quality of the work and vigorous representation of the Class."

- In *In re General Motors Corp. Securities Litigation*, No. 06-1749, (E.D. Mich.), Co-Lead Counsel Labaton Sucharow represented Lead Plaintiffs Deka Investment GmbH and Deka International S.A. Luxembourg in claims alleging that General Motors, and certain of GM's officers and directors (including CEO Rick Wagoner), issued a series of false and misleading statements to investors about the auto maker's financial health going back to 2000. On July 21, 2008, a settlement was reached whereby GM made a cash payment of $277 million and Defendant Deloitte & Touche LLP, which served as GM's outside auditor during the period covered by the action, agreed to contribute an additional $26 million in cash.

- In *In re PaineWebber Limited Partnerships Litigation*, Master File No. 94 Civ. 832/7 (SHS) (S.D.N.Y.), Judge Sidney H. Stein approved a settlement valued at $200 million and found "that Class Counsel's representation of the Class has been of high caliber in conferences, in oral arguments and in work product."

- *Eastwood Enterprises, LLC v. Farha et al.*, 8:07-cv-1940-T-33EAJ (M.D. Fla.). On behalf of The New Mexico State Investment Council and the Public Employees Retirement Association of New Mexico, Co-Lead Counsel for the Class, Labaton Sucharow LLP, negotiated a $200 million settlement over allegations that WellCare Health Plans, Inc., a Florida-based managed healthcare service provider, disguised its profitability by overcharging state Medicaid programs. Under the terms of the settlement, which is still subject to approval by

the Court, WellCare agreed to pay an additional $25 million in cash if, at any time in the next three years, WellCare is acquired or otherwise experiences a change in control at a share price of $30 or more after adjustments for dilution or stock splits.

- In *In re El Paso Corporation Securities Litigation*, Civ. No. H-02-2717 (S.D. Tex.), Labaton Sucharow secured a $285 million class action settlement against the El Paso Corporation.  The case involved a securities fraud stemming from the Company's inflated earnings statements, which cost shareholders hundreds of millions of dollars during a four-year span.  The settlement was approved by the Court on March 6, 2007.

- *In re Bristol-Myers Squibb Securities Litigation*, Civ. No. 00-1990 (D.N.J.).  After prosecuting securities fraud claims against BMS for more than five years, Labaton Sucharow reached an agreement to settle the claims for $185 million and significant corporate governance reforms.  This settlement is the second largest recovery against a pharmaceutical company, and it is the largest recovery ever obtained against a pharmaceutical company in a securities fraud case involving the development of a new drug.  Moreover, the settlement is the largest ever obtained against a pharmaceutical company in a securities fraud case that did not involve a restatement of financial results.

- On behalf of Lead Plaintiff New Mexico State Investment Council, Labaton Sucharow served as Lead Counsel in *In re Broadcom Corp. Securities Litigation*, No. CV-05036-R (C.D. Cal.), a case stemming from Broadcom Corp.'s $2.2 billion restatement of its historic financial statements for 1998-2005 - the

- 11 -

largest restatement in history due to options backdating.  In December 2009, New Mexico reached an agreement-in-principle with Broadcom and two individual defendants to resolve this matter for $160.5 million, the second largest up-front cash settlement ever recovered from a company accused of options backdating.

- In *In re Mercury Interactive Corp. Securities Litigation*, Civ. No. 5:05-CV-3395 (N.D. Cal.), Labaton Sucharow reached an agreement to settle for $117.5 million, a figure representing one of the largest known settlements in a securities fraud litigation based upon options backdating.  The allegations in *Mercury* concern backdated option grants used to compensate employees and officers of the Company.  Mercury's former CEO, CFO, and General Counsel actively participated in and benefited from the options backdating scheme, which came at the expense of Mercury shareholders and the investing public.  Labaton Sucharow and Hewlett-Packard's counsel executed a Stipulation of Settlement and the Court granted preliminary approval of the settlement on June 2, 2008.  On September 25, 2008, the Court granted final approval of the settlement.

- In the well-known *In re Prudential Securities Inc. Limited Partnership Litigation*, Civ. No. M-21-67 (S.D.N.Y.), the late Judge Milton Pollack cited the "Herculean" efforts of Labaton Sucharow and its Co-Lead Counsel and, in approving a $110 million partial settlement, stated that "this case represents a unique recovery – a recovery that does honor to every one of the lawyers on your side of the case."

- 12 -

- *In re Vesta Insurance Group, Inc. Securities Litigation*, Civ. No. CV-98-AR-1407 (N.D. Ala.).  After years of protracted litigation, Labaton Sucharow secured a settlement of $78 million on the eve of trial.

- *In re St. Paul Traveler's II Securities Litigation*, Civ. No. 04-4697 (JRT/FLN) (D. Minn.), the second of two cases filed against St. Paul Travelers by Labaton Sucharow, arose from the industry-wide insurance scandal involving American International Group, Marsh McClennan, the St. Paul Companies and numerous other insurance providers and brokers.  On July 23, 2008, the Court granted final approval of the $77 million settlement and certified the settlement Class.

- In *In re St. Paul Travelers Securities Litigation*, 04-CV-3801 (D. Minn.), Labaton Sucharow was able to successfully negotiate the creation of an all cash settlement fund to compensate investors in the amount of $67.5 million in November 2005.  This settlement is one of the largest securities class action settlements in the Eighth Circuit.

- In *In re Monster Worldwide, Inc. Securities Litigation*, No. 07-CV-02237 (S.D.N.Y.), Labaton Sucharow represented Middlesex County Retirement System in claims alleging that Defendants engaged in a long-running scheme to backdate Monster's stock option grants to attract and retain employees without recording the resulting compensation expenses.  On November 25, 2008, the Court granted final approval of the $47.5 million settlement.

- In *Abrams v. VanKampen Funds, Inc.*,  01 C 7538 (N.D. Ill.), in January 2006 Labaton Sucharow obtained final approval of a $31.5 million settlement in an

innovative class action concerning VanKampen's senior loan mutual fund, alleging that the fund overpriced certain senior loan interests where market quotations were readily available. The gross settlement fund constitutes a recovery of about 70% of the class's damages as determined by plaintiffs' counsel.

- In *Desert Orchid Partners, L.L.C. v. Transactions Systems Architects, Inc.*, Civ. No. 02 CV 533 (D. Neb.), Labaton Sucharow represented the Genesee Employees' Retirement System as Lead Plaintiff in claims alleging violations of the federal securities laws. On March 2, 2007, the Court granted final approval to the settlement of this action for $24.5 million in cash.

- *In re Orbital Sciences Corp. Securities Litigation*, Civ. No. 99-197-A (E.D. Va.). After cross-motions for summary judgment were fully briefed, defendants (and Orbital's auditor in a related proceeding) agreed to a $23.5 million cash settlement, warrants, and substantial corporate governance measures.

- On September 9, 2008, the Court granted final approval of the $20 million settlement in *In re International Business Machines Corp. Securities Litigation*, Civ. No. 1:05-cv-6279 (AKH) (S.D.N.Y.), in which Labaton Sucharow served as Lead Counsel. The action alleged that that International Business Machines Corp. ("IBM"), and its Chief Financial Officer, Mark Loughridge, made material misrepresentations and omissions concerning IBM's expected 2005 first quarter earnings, IBM's expected 2005 first quarter operational performance, and the financial impact of IBM's decision to begin expensing stock options on its 2005 first quarter financial statements.

- In *In re Just for Feet Noteholder Litigation*, Civ. No. CV-00-C-1404-S (N.D. Ala.), Labaton Sucharow, as Lead Counsel, represented Lead Plaintiff Delaware Management and the Aid Association for Lutherans with respect to claims brought on behalf of noteholders.  On October 21, 2005, Chief Judge Clemon of the U.S. District Court for the Northern District of Alabama preliminarily approved Plaintiffs' settlement with Banc of America Securities LLC, the sole remaining defendant in the case, for $17.75 million.  During the course of the litigation, Labaton Sucharow obtained certification for a class of corporate bond purchasers in a ground-breaking decision, *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676 (N.D. Ala. 2005), which is the first decision by a federal court to explicitly hold that the market for high-yield bonds such as those at issue in the action was efficient.

- In *In re American Tower Corporation Securities Litigation*, Civ. No. 06 CV 10933 (MLW) (D. Mass.), Labaton Sucharow represented the Steamship Trade Association-International Longshoreman's Association Pension Fund (STA-ILA) in claims alleging that certain of American Tower Corporation's current and former officers and directors improperly backdated the Company's stock option grants and made materially false and misleading statements to the public concerning the Company's financial results, option grant policies and accounting, causing damages to investors.  On June 11, 2008, the Court granted final approval of the $14 million settlement.

- In *In re CapRock Communications Corp. Securities Litigation*, Civ. No. 3-00-CV-1613-R (N.D. Tex.), Labaton Sucharow represented a prominent

Louisiana-based investment adviser in claims alleging violations of the federal securities laws. The case settled for $11 million in 2003.

- In *In re SupportSoft Securities Litigation*, Civ. No. C 04-5222 SI (N.D. Cal.), Labaton Sucharow secured a $10.7 million settlement on October 2, 2007 against SupportSoft, Inc. The action alleged that the defendants had artificially inflated the price of the Company's securities by re-working previously entered into license agreements for the Company's software in order to accelerate the recognition of revenue from those contracts.

- In *In re InterMune Securities Litigation*, Master File No. 03-2454 SI (N.D. Cal. 2005), Labaton Sucharow commenced an action on behalf of its client, a substantial investor, against InterMune, a biopharmaceutical firm, and certain of its officers, alleging securities fraud in connection with InterMune's sales and marketing of a drug for off-label purposes. Notwithstanding higher pleading and proof standards in the jurisdiction in which the action had been filed, Labaton Sucharow utilized its substantial investigative resources and creative alternative theories of liability to successfully obtain an early, pre-discovery settlement of $10.4 million. The Court complimented Labaton Sucharow on its ability to obtain a substantial benefit for the Class in such an effective manner.

- Labaton Sucharow served as Lead Counsel in *In re HCC Insurance Holdings, Inc. Securities Litigation*, Civ. No. 4:07-cv-801 (S.D. Tex.), a case alleging that certain of HCC's current and former officers and directors improperly backdated the Company's stock option grants and made materially false and misleading statements to the public concerning the Company's financial results, option grant

- 16 -

policies and accounting, causing damages to investors. On June 17, 2008, the Court granted final approval of the $10 million settlement.

- In *In re Adelphia Communications Corp. Securities & Derivative Litigation*, Civ. No. 03 MD 1529 (LMM) (S.D.N.Y.), Labaton Sucharow represents the New York City Employees' Retirement System (and certain other New York City pension funds) and the Division of Investment of the New Jersey Department of the Treasury in separate individual actions against Adelphia's officers, auditors, underwriters, and lawyers. To date, Labaton Sucharow has fully resolved certain of the claims brought by New Jersey and New York City for amounts that significantly exceed the percentage of damages recovered by the Class. New Jersey and New York City continue to prosecute their claims against the remaining defendants.

- In *STI Classic Funds v. Bollinger Industries, Inc.*, No. 96-CV-0823-R (N.D. Tex.), Labaton Sucharow commenced related suits in both state and federal courts in Texas on behalf of STI Classic Funds and STI Classic Sunbelt Equity Fund, affiliates of the SunTrust Bank. As a result of Labaton Sucharow's efforts, the class of Bollinger Industries, Inc. investors on whose behalf the bank sued obtained the maximum recovery possible from the individual defendants and a substantial recovery from the underwriter defendants. Notwithstanding a strongly unfavorable trend in the law in the State of Texas, and strong opposition by the remaining accountant firm defendant, Labaton Sucharow has obtained class certification and continues to prosecute the case against that firm.

- In ***Rosengarten v. International Telephone & Telegraph Corp.***, Civ. No. 76-1249 (N.D.N.Y.), Judge Morris Lasker noted that the Firm "served the corporation and its stockholders with professional competence as well as admirable intelligence, imagination and tenacity."

- In ***In re Prudential-Bache Energy Income Partnerships Securities Litigation***, MDL No. 888, an action in which Labaton Sucharow served on the Executive Committee of Plaintiffs' Counsel, Judge Marcel Livaudais, Jr., of the United States District Court for the Eastern District of Louisiana, observed that:

  > Counsel were all experienced, possessed high professional reputations and were known for their abilities. Their cooperative effort in efficiently bringing this litigation to a successful conclusion is the best indicator of their experience and ability . . . .

  > The Executive Committee is comprised of law firms with national reputations in the prosecution of securities class action and derivative litigation. The biographical summaries submitted by each member of the Executive Committee attest to the accumulated experience and record of success these firms have compiled.

Among the institutional investor clients Labaton Sucharow represents and advises are:

Arkansas Teacher Retirement System

Baltimore County Retirement System

Bristol County Retirement Board

California Public Employees' Retirement System

City of New Orleans Employees' Retirement System

Connecticut Retirement Plans & Trust Funds

Division of Investment of the New Jersey Department of the Treasury

Doubloon Capital LLC

Genesee County Employees' Retirement System

Illinois Municipal Retirement Fund

Louisiana Municipal Police Employees' Retirement System

- 18 -

Teachers' Retirement System of Louisiana

Macomb County Employees Retirement System

Metropolitan Atlanta Rapid Transit Authority

Michigan Retirement Systems

Middlesex Retirement Board

Mississippi Public Employees' Retirement System

New York City Pension Funds

New York State Common Retirement Fund

Norfolk County Retirement System

Office of the Ohio Attorney General and several of its Retirement Systems

Oklahoma Firefighters Pension and Retirement System

Plymouth County Retirement System

Office of the New Mexico Attorney General and several of its Retirement Systems

Rhode Island State Investment Commission

San Francisco Employees' Retirement System

State of Oregon Public Employees' Retirement System

State of Wisconsin Investment Board

State-Boston Retirement System

Steamship Trade Association/International Longshoremen's Association

Virginia Retirement Systems

## COMMENTS ABOUT OUR FIRM BY THE COURTS

Many federal judges have commented favorably on the Firm's expertise and results achieved in securities class action litigation.  Judge John E. Sprizzo complimented the Firm's work in *In re Revlon Pension Plan Litigation*, Civ. No. 91-4996 (JES) (S.D.N.Y.).  In granting final approval to the settlement, Judge Sprizzo stated that "[t]he recovery is all they could have gotten if they had been successful.  I have probably never seen a better result for the class than you have gotten here."

Labaton Sucharow was a member of the Executive Committee of Plaintiffs' Counsel in *In re PaineWebber Limited Partnerships Litigation*, Master File No. 94 Civ. 8547 (SHS).  In approving a class-wide settlement valued at $200 million, Judge Sidney H. Stein of the Southern District of New York stated:

> The Court, having had the opportunity to observe first hand the quality of Class Counsel's representation during this litigation, finds that Class Counsel's representation of the Class has been of high caliber in conferences, in oral arguments and in work product.

Judge Lechner, presiding over the $15 million settlement in *In re Computron Software Inc. Securities Class Action Litigation*, Civ. No. 96-1911 (AJL) (D.N.J.), where Labaton Sucharow served as Co-Lead Counsel, commented that

> I think it's a terrific effort in all of the parties involved . . . , and the co-lead firms . . . I think just did a terrific job.
>
> You [co-lead counsel and] Mr. Plasse, just did terrific work in the case, in putting it all together . . . .

In *Middlesex County Retirement System v. Monster Worldwide, Inc.*, No. 07-cv-2237 (S.D.N.Y.), Judge Rakoff appointed Labaton Sucharow as Lead Counsel, stating that "the Labaton firm is very well known to courts for the excellence of its representation."

In addition, Judge Rakoff commented during a final approval hearing that "the quality of the representation was superb" and "[this case is a] good example of how [the] securities class action device serves laudatory public purposes."

During a fairness hearing in the *In re American Tower Corporation Securities Litigation*, No. 06-CV-10933 (MLW) (D. Mass.), Chief Judge Mark L. Wolf stated:

> "[t]he attorneys have brought to this case considerable experience and skill as well as energy.  Mr. Goldsmith has reminded me of that with his performance today and he maybe educated me to understand it better."

- 20 -

## *PRO BONO* ACTIVITIES

Our attorneys devote substantial time to *pro bono* activities.  Many of our attorneys participated in the Election Protection Program sponsored in 2004 by the Lawyers Committee for Civil Rights Under the Law to ensure that every voter could vote and every vote would count. In addition, the Firm's attorneys devote their time to *pro bono* activities in the fields of the arts, foundations, education, and health and welfare issues.

## WOMEN'S INITIATIVE AND MINORITY SCHOLARSHIP

Labaton Sucharow founded a Women's Initiative to reflect the Firm's commitment to the advancement of women professionals.  The goal of the initiative is to bring professional women together to collectively advance women's influence in business.  Each event showcases a successful woman role model as a guest speaker.  We actively discuss our respective business initiatives and hear the guest speaker's strategies for success.  Labaton Sucharow mentors and promotes the professional achievements of the young women in our ranks and others who join us for events.  The Firm also is a member of the National Association of Women Lawyers (NAWL).  For more information regarding Labaton Sucharow's Women's Initiative, please visit http://www.labaton.com/en/about/women/Womens-Initiative.cfm

Further, as part of an effort to increase attorney diversity, the Firm has established an annual scholarship program at Brooklyn Law School that provides a $5,000 scholarship and a summer associate position at the Firm to a member of a minority group.  Currently, there are two minority associates employed by Labaton Sucharow who were recipients of this scholarship.

# ATTORNEYS

Among the attorneys at Labaton Sucharow who are involved in the prosecution of securities actions are partners Lawrence A. Sucharow, Martis Alex, Mark S. Arisohn, Christine S. Azar, Eric J. Belfi, Joel H. Bernstein, Javier Bleichmar, Thomas A. Dubbs, Joseph A. Fonti, Jonathan Gardner, David J. Goldsmith, Louis Gottlieb, James W. Johnson, Christopher J. Keller, Edward Labaton, Christopher J. McDonald, Jonathan M. Plasse, Hollis L. Salzman, Ira A. Schochet, Michael W. Stocker, Jordan A. Thomas, and Stephen W. Tountas; senior counsel Richard T. Joffe and Joseph V. Sternberg; and of counsel attorneys Dominic J. Auld, Mark S. Goldman, Terri Goldstone, Barry M. Okun, Paul Scarlato, and Nicole M. Zeiss.  A short description of the qualifications and accomplishments of each follows.

### LAWRENCE A. SUCHAROW, CHAIRMAN                    lsucharow@labaton.com

Lawrence A. Sucharow, a nationally recognized leader of the securities class action bar, is the chairman of Labaton Sucharow.  In this capacity, he participates in developing the litigation and settlement strategies for many of the class action cases Labaton Sucharow prosecutes.

For more than three decades, Mr. Sucharow has devoted his practice to counseling clients and prosecuting cases on complex issues involving securities, antitrust, business transaction, product liability, and other class actions.  Mr. Sucharow has successfully recovered more than $1 billion on behalf of institutional investors such as state, city, county and union pension funds, shareholders of public companies, bondholders, purchasers of limited partnership interests, purchasers of consumer products and individual investors.

Mr. Sucharow obtained $225 million in savings for the class of In re CNL Resorts, Inc. Securities Litigation.  In other recently settled actions, Mr. Sucharow undertook a lead role in

obtaining benefits for class members of $200 million (*In re Paine Webber Incorporated Limited Partnerships Litigation*); $110 million partial settlement (*In re Prudential Securities Incorporated Limited Partnerships Litigation*); $91 million (*In re Prudential Bache Energy Income Partnerships Securities Litigation*); and more than $92 million (*Shea v. New York Life Insurance Company*).  In approving the *Prudential* settlement, Judge Milton Pollack referred to the efforts of plaintiffs' counsel as "Herculean," stating: "…this case represents a unique recovery – a recovery that does honor to every one of the lawyers on your side of the case."

In addition, in 2002 Mr. Sucharow served as Co-Trial Counsel in a six-week trial of a federal securities law claim on behalf of 18,000 passive investors in the Real Estate Associates limited partnerships.  That trial resulted in an unprecedented $182 million jury verdict.

Mr. Sucharow is the author of "Schapiro Takes Right Path On Market Reform, But Auditors, Lawyers and Shareholders Need Better Tools," *Pensions & Investments*, June 1, 2009. He is the co-author of "How Courts Analyze Guilty Pleas and Government Investigations When Considering the Plausibility of an Antitrust Conspiracy After Twombly," *BNA's Class Action Litigation Report*, March 26, 2010; "Death of the Worldwide Class?," *BNA's Securities Regulation & Law Report*, June 22, 2009, and "Executive Compensation: Despite reforms, pay is less transparent and shareholder-friendly than in the past," *New York Law Journal*, March 20, 2008.

Mr. Sucharow is a member of the Federal Bar Council's Committee on Second Circuit Courts, and the Federal Courts Committee of the New York County Lawyers' Association.  He is also a member of the Securities Law Committee of the New Jersey State Bar Association and was the founding chairman of the Class Action Committee of the Commercial and Federal Litigation Section of the New York State Bar Association from 1988-1994.  He was honored by

his peers by his election to serve a two-year term as President of the National Association of Shareholder and Consumer Attorneys (NASCAT), a membership organization of approximately 100 law firms which practice complex civil litigation including class actions.

Mr. Sucharow earned a B.B.A., *cum laude*, from Baruch School of the City College of the City University of New York in 1971 and a J.D., *cum laude*, from Brooklyn Law School in 1975.

Mr. Sucharow is admitted to practice in New York, New Jersey, and Arizona, as well as before the United States District Courts for the Southern and Eastern Districts of New York, the District of New Jersey, the District of Arizona, the United States Court of Appeals for the Second Circuit, and the United States Supreme Court.

As a result of his career accomplishments, Mr. Sucharow is one of only four plaintiff's securities lawyers in the United States independently selected by *Chambers and Partners USA* to be in its highest category, Band 1, (Plaintiffs Securities Class Actions).  In August 2010, he was recognized by *Law360* as one the ten Most Admired Securities Attorneys in the United States. Mr. Sucharow has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### MARTIS ALEX, PARTNER                                    malex@labaton.com

Martis Alex concentrates her practice on prosecuting complex securities fraud cases on behalf of institutional investors.  She has extensive experience managing complex nationwide litigation, including securities class actions as well as product liability and consumer fraud litigation.  She has successfully represented investors and consumers in cases that achieved cumulative recoveries of hundreds of millions of dollars for plaintiffs.

Ms. Alex was an integral part of the team that successfully litigated *In re Bristol Myers Squibb Securities Litigation*, where Labaton Sucharow was able to secure a $185 million settlement on behalf of investors, as well as meaningful corporate governance reforms that will affect future consumers and investors alike. She is currently litigating *In re American International Group, Inc. Securities Litigation*, a major securities class action brought by Lead Plaintiff Ohio (comprised of several of Ohio's retirement systems). Ms. Alex was Lead Trial Counsel and Chair of the Executive Committee in *Zenith Laboratories Securities Litigation*, a federal securities fraud class action which settled during trial, and achieved a significant recovery for investors. She also was Chair of the Plaintiffs' Steering Committee in *Napp Technologies Litigation*, where Labaton Sucharow won substantial recoveries for families and firefighters injured in a chemical plant explosion.

Ms. Alex served as Co-Lead Counsel or in a leadership role in several securities class actions that achieved substantial awards for investors, including *Cadence Design Securities Litigation*, *Halsey Drug Securities Litigation*, *Slavin v. Morgan Stanley, Lubliner v. Maxtor Corp.* and *Baden v. Northwestern Steel and Wire*. She also served on the Executive Committee or in other leadership roles in national product liability actions against the manufacturers of breast implants, orthopedic bone screws, and atrial pacemakers, and was a member of the Plaintiffs' Legal Committee in the national litigation against the tobacco companies.

Ms. Alex is the author of "Women in the Law: Many Mentors, Many Lessons: A Baby Boomer's Perspective," *New York Law Journal*, November 8, 2010; and the co-author of "Role of the Event Study in Loss Causation Analysis," *New York Law Journal*, August 20, 2009.

Prior to entering private practice, Ms. Alex was a trial lawyer with the Sacramento, California District Attorney's Office. She is a frequent speaker at national conferences on

product liability and securities fraud litigation, and is a recipient of the American College of Trial Lawyers' Award for Excellence in Advocacy.

Ms. Alex earned a J.D. from McGeorge Law School and a Masters Degree in Psychology from California State College.  She is admitted to practice in New York, California, the United States Supreme Court, and in Federal Courts in several jurisdictions.

### MARK S. ARISOHN, PARTNER                                    marisohn@labaton.com

Mark S. Arisohn, a trial lawyer since 1973, concentrates his practice on prosecuting complex securities fraud cases on behalf of institutional investors.

For the past 37 years, Mr. Arisohn's extensive trial experience in jury and non-jury matters has been in the state and federal courts nationwide.  He has also argued in the New York Court of Appeals, the United States Court of Appeals for the Second Circuit and appeared before the United States Supreme Court in the landmark insider trading case of *Chiarella v. United States.*

Most recently, Mr. Arisohn was lead trial counsel in a securities class action against BankAtlantic Bancorp, Inc. and several of its highest officers.  After a four-week trial in the federal court in Miami, the jury found BankAtlantic and its two senior officers liable for securities fraud because they intentionally lied about and failed to disclose the extent of the bank's lending risk.  This was only the 10th securities fraud class action to go to trial since passage of the Private Securities Litigation Reform Act in 1995 and is the first securities class action case arising out of the financial crisis to go to jury verdict.  Following the trial, *The AmLaw Litigation Daily* named Mr. Arisohn "Litigator of the Week." On April 25, 2011, Judge Ungaro vacated the jury's verdict.  Lead Counsel is looking forward to a favorable review of the issues by the appellate court.

Mr. Arisohn's areas of practice have been wide-ranging, including prosecuting and defending individuals and corporations in cases involving securities fraud, mail and wire fraud, bank fraud and RICO violations.  He has represented public officials, individuals and companies in the construction and securities industries as well as professionals accused of regulatory offenses and professional misconduct.  He also has appeared as trial counsel for both plaintiffs and defendants in civil fraud matters and corporate and business commercial matters, including shareholder litigation, business torts, unfair competition and misappropriation of trade secrets.

A prominent trial lawyer, Mr. Arisohn has also authored numerous articles including "Electronic Eavesdropping," *New York Criminal Practice*, LEXIS - Matthew Bender, 2005; "Criminal Evidence," *New York Criminal Practice*, Matthew Bender, 1986; and "Evidence," New York Criminal Practice, Matthew Bender, 1987.  He was a contributing author of *Business Crime*, Matthew Bender, 1981.

Mr. Arisohn is an active member of the Association of the Bar of the City of New York and has served on its Judiciary Committee, the Committee on Criminal Courts, Law and Procedure, the Committee on Superior Courts and the Committee on Professional Discipline.  He serves as a mediator for the Complaint Mediation Panel of the Association of the Bar of the City of New York where he mediates attorney client disputes and as a hearing officer for the New York State Commission on Judicial Conduct where he presides over misconduct cases brought against judges.

He earned his B.S. and M.S. degrees from Cornell University in 1968 and 1969 and received his J.D. from Columbia University School of Law in 1972.

Mr. Arisohn is admitted to practice in New York and the District of Columbia as well as before the United States District Courts for the Southern, Eastern and Northern Districts of New

York; the Northern District of Texas; the Northern District of California; the United States Court of Appeals for the Second Circuit; and the United States Supreme Court.

Mr. Arisohn has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### CHRISTINE S. AZAR, PARTNER                                    cazar@labaton.com

A seasoned litigator of investor rights, Christine S. Azar is the partner in charge of Labaton Sucharow LLP's Delaware office.

Prior to joining Labaton Sucharow, Ms. Azar practiced corporate litigation at Blank Rome LLP with a primary focus on corporate governance, shareholders' rights and other disputes in courts nationwide as well as in the Delaware Court of Chancery.

Ms. Azar began her career at Grant & Eisenhofer, P.A., where she specialized in the representation of institutional investors in complex federal and state securities and corporate governance actions.

Ms. Azar is the co-author of the following articles: "M&A on the rise - and litigation may well follow," *The National Law Journal*, April 4, 2011; "Running on Empty," *The Deal Magazine*, February 18, 2011; "Appointment of Lead Plaintiff Under the Private Securities Litigation Reform Act: Update 2001", 1269 PLI/Corp 689 (September 2001); and "Appointment of Lead Plaintiff Under the Private Securities Litigation Reform Act: Update 2000", 199 PLI/Corp 455 (September 2000).

Ms. Azar earned a B.S., *cum laude*, from James Madison University in 1988.  She earned a J.D., *cum laude*, from the University of Notre Dame Law School in 1991.

Ms. Azar is admitted to practice in Delaware, New Jersey and Pennsylvania.

## ERIC J. BELFI, PARTNER                                    ebelfi@labaton.com

Eric J. Belfi is an accomplished litigator in a broad range of commercial matters.  He concentrates his practice in the investigation and initiation of securities and shareholder class actions, with an emphasis on the representation of major international and domestic pension funds and other institutional investors.

Prior to entering private practice, Mr. Belfi served as an Assistant Attorney General for the State of New York and an Assistant District Attorney for the County of Westchester.  As a prosecutor, Mr. Belfi investigated and prosecuted numerous white-collar criminal cases, including securities law violations and environmental crimes.  In this capacity, he presented hundreds of cases to the grand jury and obtained numerous felony convictions after jury trials.

Mr. Belfi is a regular speaker and author on issues involving shareholder litigation, particularly as it relates to international institutional investors.  He co-authored "The Proportionate Trading Model: Real Science or Junk Science?," 52 *Cleveland St. L. Rev.* 391 (2004-05) and "International Strategic Partnerships to Prosecute Securities Class Actions," *Investment & Pensions Europe*.  Over the last several years, Mr. Belfi has served as a panelist at programs on U.S. class actions in numerous European countries.  He also participated in a panel discussion regarding socially responsible investments for public pension funds during the New England Public Employees' Retirement Systems Forum.

Mr. Belfi received a B.A. from Georgetown University in 1992 and a J.D. from St. John's University School of Law in 1995.  He is an associate prosecutor for the Village of New Hyde Park, and is also a member of the Federal Bar Council and the Association of the Bar of the City of New York.

Mr. Belfi is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Michigan, the District of Colorado, the District of Nebraska, and the Eastern District of Wisconsin.

## JOEL H. BERNSTEIN, PARTNER                jbernstein@labaton.com

With more than 30 years' experience in the area of complex litigation, Joel H. Bernstein concentrates his practice in the protection of investors who have been victimized by securities fraud and breach of fiduciary duty.  His expertise in the area of shareholder litigation has resulted in the recovery of hundred of millions of dollars in damages to wronged investors.

Mr. Bernstein advises numerous large public pension funds, hedge funds, other institutional investors and individual investors with respect to securities litigation in the federal and state courts as well as in arbitration proceedings before the New York Stock Exchange, the National Association of Securities Dealers and other self-regulatory organizations.

Mr. Bernstein has played a central role in numerous high profile cases, including *In re Paine Webber Incorporated Limited Partnerships Litigation*, $200 million settlement; *In re Prudential Securities Incorporated Limited Partnerships Litigation*, $130 million settlement; *In re Prudential Bache Energy Income Partnerships Securities Litigation*, $91 million settlement; *Shea v. New York Life Insurance Company*, $92 million settlement; and, *Saunders et al. v. Gardner*, $10 million -- then the largest punitive damage award in the history of the NASD. Most recently, Mr. Bernstein was instrumental in securing a $117.5 million settlement in *In re Mercury Interactive Securities Litigation*, a figure representing one of the largest known settlements or judgments in a securities fraud litigation based upon options backdating.

A leading figure in his area of practice, Mr. Bernstein is frequently sought out by the press to comment on securities law and also has authored numerous articles on related issues,

including "Stand Up to Your Stockbroker, Your Rights As An Investor."  He is a member of the American Bar Association and the New York County Lawyers' Association.

Mr. Bernstein earned a J.D. from Brooklyn Law School in 1975 and received his undergraduate degree from Queens College in 1971.

He is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, and the United States Courts of Appeals for the Second and Third Circuits.  He is a member of the American Bar Association and the New York County Lawyers' Association.

Mr. Bernstein has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### JAVIER BLEICHMAR, PARTNER                                     jbleichmar@labaton.com

Javier Bleichmar concentrates his practice on prosecuting complex securities fraud cases on behalf of institutional investors.  Since joining Labaton Sucharow, Mr. Bleichmar was instrumental in securing a $77 million settlement in the *In re St. Paul Travelers Securities Litigation II* on behalf of the Lead Plaintiff, the Educational Retirement Board of New Mexico. Most recently, he has been a member of the team prosecuting securities class actions against British Petroleum and The Bear Stearns Companies, Inc.

Mr. Bleichmar is very active in educating European institutional investors on developing trends in the law, particularly the ability of international investors to participate in securities class actions in the United States.  Through these efforts, many of Mr. Bleichmar's European clients were able to join the Foundation representing investors in the first securities class action settlement under a recently enacted Dutch statute against Royal Dutch Shell.

Prior to joining Labaton Sucharow, Mr. Bleichmar practiced securities litigation at Bernstein Litowitz Berger & Grossmann LLP, where he prosecuted securities actions on behalf of institutional investors. He was actively involved in the *In re Williams Securities Litigation*, which resulted in a $311 million settlement, as well as securities cases involving Lucent Technologies, Inc., Conseco, Inc. and Biovail Corp.

Mr. Bleichmar graduated from Phillips Academy, Andover in 1988, earned a B.A. from the University of Pennsylvania in 1992 and a J.D. from Columbia University Law School in 1998. He was a managing editor of the *Journal of Law and Social Problems*. Additionally, he was a Harlan Fiske Stone Scholar. As a law student, Mr. Bleichmar served as a law clerk to the Honorable Denny Chin, United States District Court Judge for the Southern District of New York.

After law school, Mr. Bleichmar authored the article "Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law,"*14 Georgetown Immigration Law Journal* 115 (1999).

Mr. Bleichmar is admitted to practice in New York as well as before the following United States District Courts: the Southern and Eastern Districts of New York, the Northern District of Oklahoma, the Western District of Washington, the Southern District of Florida, the Eastern District of Missouri, and the Northern District of Illinois. He also is admitted to practice before the United States Court of Appeals for the Second, Eighth and Ninth Circuits.

Mr. Bleichmar is a native Spanish speaker and fluent in French.

**THOMAS A. DUBBS, PARTNER**                    *tdubbs@labaton.com*

Thomas A. Dubbs specializes in the representation of institutional investors including pension funds in securities fraud and other types of litigation. A recognized leader in the field,

Mr. Dubbs represented the first major private institutional investor to become a lead plaintiff in a class action under the Private Securities Litigation Reform Act.

Mr. Dubbs currently serves as Lead or Co-Lead Counsel in federal securities class actions against AIG, Wellcare and Bear Stearns, among others.

Most recently, Mr. Dubbs has played a central role in numerous high profile cases, including *In re HealthSouth Securities Litigation*, $804.5 million settlement; *In re Broadcom Corp. Securities Litigation*, $160.5 million settlement; *In re Vesta Insurance Group, Inc. Securities Litigation*, $79 million settlement; and *In re St. Paul Travelers II Securities Litigation*, $77 million settlement.

Representing an affiliate of the Amalgamated Bank, the largest labor-owned bank in the United States, a Labaton Sucharow team led by Mr. Dubbs successfully litigated a class action against Bristol-Myers Squibb, which resulted in a settlement of $185 million and major corporate governance reforms.

Mr. Dubbs is the author of "Shortsighted?," *Investment Dealers' Digest*, May 29, 2009; "A Scotch Verdict on 'Circularity' and Other Issues," 2009 *Wis. L. Rev.* 455 n.2 (2009); and several columns in UK-wide pensions publications focusing on securities class actions and corporate governance. He also is the co-author of the following articles: "In Debt Crisis, An Arbitration Alternative," *The National Law Journal*, March 16, 2009; "The Impact of the LaPerriere Decision: Parent Companies Face Liability," *Directors Monthly*, February 1, 2009; "Auditor Liability in the Wake of the Subprime Meltdown," *BNA's Accounting Policy & Practice Report*, November 14, 2009; and "US Focus: Time for Action," *Legal Week*, April 17, 2008.

Mr. Dubbs frequently lectures to institutional investors and other groups such as the Government Finance Officers Association, the National Conference on Public Employee Retirement Systems and the Council of Institutional Investors.

Prior to joining Labaton Sucharow, Mr. Dubbs was Senior Vice President & Senior Litigation Counsel for Kidder, Peabody & Co. Incorporated where he represented the firm in many class actions, including the First Executive and Orange County litigations.  Before joining Kidder, Mr. Dubbs was head of the litigation department at Hall, McNicol, Hamilton & Clark, where he was the principal partner representing Thomson McKinnon Securities Inc. in litigation matters including class actions such as the *Petro Lewis* and *Baldwin United* litigations.

Mr. Dubbs earned a B.A. and a J.D. from the University of Wisconsin-Madison in 1969 and 1974, respectively.  He received an M.A. from the Fletcher School of Law & Diplomacy, Tufts University in 1971.

Mr. Dubbs is admitted to practice in New York as well as before the United States District Court for the Southern District of New York; the United States Courts of Appeals for the Second, Ninth and Eleventh Circuits; and the United States Supreme Court.  He is a member of the New York State Bar Association, the Association of the Bar of the City of New York, and the American Society of International Law.

Mr. Dubbs has been recognized by *The National Law Journal*, *Chambers and Partners USA* and the *Lawdragon 500*.  Mr. Dubbs has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### JOSEPH A. FONTI, PARTNER                                      jfonti@labaton.com

Joseph A. Fonti concentrates his practice on prosecuting complex securities fraud cases on behalf of institutional investors.  Currently, Mr. Fonti is actively involved in prosecuting *In re*

*HealthSouth Securities Litigation*, *In re Broadcom Corp. Securities Litigation*, *In re Celestica Inc. Securities Litigation* and *Caisse de Depot du Quebec v. Vivendi et al*.

Mr. Fonti has successfully litigated complex civil and regulatory securities matters, including obtaining a favorable judgment after trial.  Prior to joining Labaton Sucharow, Mr. Fonti was an attorney at Bernstein Litowitz Berger & Grossmann LLP, where he prosecuted securities class actions on behalf of institutional investors, including class actions involving WorldCom, Bristol-Myers, Omnicom, Biovail, and the mutual fund industry scandal.  Mr. Fonti's work on these cases contributed to historic recoveries for shareholders, including the $6.15 billion recovery in the WorldCom litigation and the $300 million recovery in the Bristol-Myers litigation, alleging accounting fraud and improper inventory practices.

Mr. Fonti began his legal career at Sullivan & Cromwell, where he represented several Fortune 500 corporations, focusing on securities matters and domestic and international commercial law.  Mr. Fonti also represented clients in complex investigations conducted by federal regulators, including the U.S. Securities and Exchange Commission.  Over the past several years, he has represented victims of domestic violence in affiliation with inMotion, an organization that provides *pro bono* legal services to indigent women.

Mr. Fonti earned a B.A., *cum laude*, from New York University in 1996 and a J.D. from New York University School of Law in 1999, where he was active in the Marden Moot Court Competition and served as a Student Senator-at-Large of the NYU Senate.  As a law student, he served as a law clerk to the Honorable David Trager, United States District Court Judge for the Eastern District of New York.

Mr. Fonti is admitted to practice in New York, as well as before the United States District Courts for the Southern and Eastern Districts of New York, the United States Courts of Appeals for the Ninth and Eleventh Circuits and the United States Supreme Court.

### JONATHAN GARDNER, PARTNER                                    jgardner@labaton.com

Jonathan Gardner concentrates his practice on prosecuting complex securities fraud cases on behalf of institutional investors. Mr. Gardner has participated in many of the Firm's significant matters including *In re MF Global Securities Litigation*, which resulted in a recovery of $90 million for investors. Mr. Gardner also represented the Successor Liquidating Trustee of Lipper Convertibles, a convertible bond hedge fund, in an action against the Fund's former independent auditor and a member of the Fund's general partner as well as numerous former limited partners who received excess distributions. He has successfully recovered over $5.2 million for the Successor Liquidating Trustee from overwithdrawn limited partners and $29.9 million from the former auditor.

Mr. Gardner has been responsible for prosecuting several of the Firm's options backdating cases, including *In re Monster Worldwide, Inc. Securities Litigation* ($47.5 million settlement), *In re SafeNet, Inc. Securities Litigation* ($25 million settlement), and *In re Semtech Securities Litigation* ($20 million settlement). He also was involved in *In re Mercury Interactive Corp. Securities Litigation*, which settled for $117.5 million, a figure representing one of the largest known settlements or judgments in a securities fraud litigation based upon options backdating.

In 2005, Mr. Gardner litigated claims of securities fraud, common law fraud, breach of contract, defamation, and civil RICO violations against CFI Mortgage Inc. and its principals in federal court. Following a five-day jury trial, Mr. Gardner secured a verdict of over $50 million.

Prior to practicing securities litigation, Mr. Gardner was actively involved in litigating all aspects of commercial and business disputes from pre-dispute investigation and settlement to trials and appeals before state and federal courts, as well as arbitration and mediation forums.

Mr. Gardner is the co-author of "Pre-Confirmation Remedies to Assure Collection of Arbitration Rewards," *New York Law Journal*, October 12, 2010.

Mr. Gardner earned a B.S.B.A. from American University in 1987 and a J.D. from St. John's University Law School in 1990.

Mr. Gardner is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Wisconsin, and the United States Court of Appeals for the Ninth Circuit.  He is a member of the New York State Bar Association and the Association of the Bar of the City of New York.

### DAVID J. GOLDSMITH, PARTNER                    dgoldsmith@labaton.com

David J. Goldsmith has more than ten years of experience representing institutional and individual investors in securities litigation.

Most recently, Mr. Goldsmith was an integral member of the team representing the New York State Common Retirement Fund and the New York City Pension Funds as lead plaintiffs in *In re Countrywide Financial Corporation Securities Litigation*.  The $624 million settlement is one of the largest securities fraud settlements in U.S. history.

Mr. Goldsmith also represents the Genesee County (Mich.) Employees' Retirement System as a lead plaintiff in several securities matters including actions against Spectranetics Corporation, Merck & Co., and CBeyond, Inc., and previously against Transaction Systems Architects, Inc.  He was instrumental in achieving a significant settlement in an action alleging stock option backdating at American Tower Corporation, and was a member of the team

representing the Connecticut Retirement Plans and Trust Funds in an action against Waste Management, Inc. that resulted in one of the largest securities class action settlements ever achieved up to that time.

Mr. Goldsmith played a key role in a series of cases alleging that mutual funds sold by Van Kampen, Morgan Stanley and Eaton Vance defrauded investors by overpricing senior loan interests.  Mr. Goldsmith obtained a decision in one of these actions excluding before trial certain opinions of a nationally recognized economist who regularly serves as a defense expert in such cases.  In 2001, Mr. Goldsmith obtained one of the earliest decisions finding that a class action had been improperly removed under the Securities Litigation Uniform Standards Act of 1998.

Mr. Goldsmith has lectured frequently on class actions and securities litigation for continuing legal education programs and investment symposia.

Mr. Goldsmith earned B.A. and M.A. degrees from the University of Pennsylvania.  He received a J.D. from the Benjamin N. Cardozo School of Law, where he was managing editor of the *Cardozo Arts & Entertainment Law Journal*.  Mr. Goldsmith served as a judicial intern to the Honorable Michael B. Mukasey, then a United States District Judge for the Southern District of New York.

He is admitted to practice in New York and New Jersey as well as before the United States District Courts for the Southern and Eastern Districts of New York; the District of New Jersey; the District of Colorado, the Western District of Michigan; and the United States Courts of Appeals for the First, Second, Fifth, Eighth and Ninth Circuits.

## LOUIS GOTTLIEB, PARTNER                    *lgottlieb@labaton.com*

Lou Gottlieb has successfully represented institutional and individual investors in numerous securities and consumer class action cases, resulting in cumulative settlements well in excess of $500 million.

Mr. Gottlieb was an integral part of the Firm's representation of the Connecticut Retirement Plans and Trust Funds in *In re Waste Management, Inc. Securities Litigation*, which resulted in a $457 million settlement, one of the largest settlements ever achieved in a securities class action. The settlement also included corporate governance enhancements, including an agreement by management to support a campaign to obtain shareholder approval of a resolution to declassify its board of directors, and a resolution to encourage and safeguard whistleblowers among the company's employees.

Mr. Gottlieb has led litigation teams in the *Metromedia Fiber Networks*, *Maxim Pharmaceuticals*, and *PriceSmart* securities fraud class action litigations as well as a consumer breach of contract class action against New York Life Annuities. He is also helping to lead major class action cases against the company and related defendants in *In re American International Group Inc. Securities Litigation*, *In re Royal Bank of Scotland Group plc Securities Litigation*, and in *In re Satyam Computer Services, Ltd. Securities Litigation*.

Mr. Gottlieb has made presentations on punitive damages at Federal Bar Association meetings and has often spoken on securities class actions for institutional investors.

Mr. Gottlieb graduated first in his class from St. John's School of Law. Prior to joining Labaton Sucharow, he clerked for the Hon. Leonard B. Wexler of the Eastern District of New York, and he was a litigation associate with Skadden Arps Slate Meagher & Flom. He has also enjoyed a successful career as a public school teacher and as a restaurateur.

Mr. Gottlieb is admitted to practice in New York and Connecticut as well as before the United States District Courts for the Southern and Eastern Districts of New York, and the United States Courts of Appeals for the Fifth and Seventh Circuits.

### JAMES W. JOHNSON, PARTNER                                 jjohnson@labaton.com

James W. Johnson specializes in complex litigation, with primary emphasis on class actions involving securities fraud.

Mr. Johnson has successfully litigated a number of high profile securities and RICO class actions, including: *In re Bristol-Myers Squibb Co. Securities Litigation*, in which the Court, after approving a settlement of $185 million coupled with significant corporate governance reforms, recognized plaintiffs' counsel as "extremely skilled and efficient"; *In re HealthSouth Corp. Securities Litigation*, which resulted in a total settlement of $804.5 million; *In re Vesta Insurance Group, Inc. Securities Litigation*, which resulted in a recovery of almost $80 million for the plaintiff class; and *Murphy v. Perelman*, which, along with a companion federal action, *In re National Health Laboratories, Inc. Securities Litigation*, brought by Co-Counsel, resulted in a recovery of $80 million. *In County of Suffolk v. Long Island Lightning Co.*, Mr. Johnson represented the plaintiff in a RICO class action, securing a jury verdict after a two-month trial, which resulted in a $400 million settlement. The Second Circuit, in awarding attorneys' fees to Plaintiff, quoted the trial judge, Honorable Jack B. Weinstein, as stating "counsel [has] done a superb job [and] tried this case as well as I have ever seen any case tried."

Mr. Johnson also assisted in prosecuting environmental damage claims on behalf of Native Americans resulting from the Exxon Valdez oil spill.

He is the co-author of "The Impact of the LaPerriere Decision: Parent Companies Face Liability," *Directors Monthly*, February 2009.

Mr. Johnson received a B.A. from Fairfield University in 1977 and a J.D. from New York University School of Law in 1980.

He is admitted to practice in New York and Illinois as well as before the United States District Courts for the Southern, Eastern and Northern Districts of New York; the Northern District of Illinois; the U.S. Courts of Appeals for the Second, Third, Fourth, Fifth, Seventh and Eleventh Circuits; and the United States Supreme Court.

He is a member of the American Bar Association and the Association of the Bar of the City of New York, where he served on the Federal Courts Committee.

Mr. Johnson has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### CHRISTOPHER J. KELLER, PARTNER                                  ckeller@labaton.com

Christopher J. Keller concentrates his practice in sophisticated securities class action litigation in federal courts throughout the country.

Mr. Keller has served as lead counsel in over a dozen options backdating class actions filed under the federal securities laws.  He was instrumental in securing a $117.5 million settlement in *In re Mercury Interactive Securities Litigation*, which is one of the largest settlements to date in an options backdating class action.  He also serves as Co-Lead Counsel in *In re Satyam Computer Services, Ltd. Securities Litigation*.

Mr. Keller was a member of the trial team that successfully litigated the *In re Real Estate Associates Limited Partnership Litigation* in the United States District Court for the Central District of California.  The six-week jury trial resulted in a landmark $184 million plaintiffs' verdict, which is one of the largest jury verdicts since the passage of the Private Securities Litigation Reform Act of 1995.

Mr. Keller is very active in investigating and initiating securities and shareholder class actions.  He also concentrates his efforts on educating institutional investors on developing trends in the law and new case theories.  Mr. Keller is a regular speaker at institutional investor gatherings as well as a frequent speaker at continuing legal education seminars relating to securities class action litigation.

Mr. Keller is the co-author of the following articles: "The Benefits of Investor Protection," *Law360*, October 11, 2011; "SEC Contemplating Governance Reforms," Executive Counsel, December 2010; "Is the Shield Beginning to Crack?," *New York Law Journal*, November 15, 2010; "Say What? Pay What? Real World Approaches to Executive Compensation Reform," *Corporate Counsel*, August 5, 2010; "Reining in the Credit Ratings Industry," *New York Law Journal*, January 11, 2010; "Japan's Past Recession Provides a Cautionary Tale," *The National Law Journal*, April 13, 2009; "Balancing the Scales: The Use of Confidential Witnesses in Securities Class Actions," *BNA's Securities Regulation & Law Report*, January 19, 2009; "Eyeing Executive Compensation," *The National Law Journal*, November 17, 2008; and "Tellabs: PSLRA Pleading Test Comparative, Not Absolute," *New York Law Journal*, October 3, 2007.

Mr. Keller earned a B.S. from Adelphi University in 1993 and a J.D. from St. John's University School of Law in 1997.

He is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Wisconsin, the District of Colorado and the United States Supreme Court.  Mr. Keller is a member of several professional groups, including the New York State Bar Association and the New York County Lawyers' Association.

*EDWARD LABATON, PARTNER*                              **elabaton@labaton.com**

An accomplished trial lawyer and Partner with the Firm, Edward Labaton has devoted his 50 years of practice to representing a full range of clients in class action and complex litigation matters in state and federal court.  Mr. Labaton has played a lead role as plaintiffs' class counsel in a number of successfully prosecuted high profile cases, involving companies such as PepsiCo, Dun & Bradstreet, Financial Corporation of America, ZZZZ Best, Revlon, GAF Co., American Brands, Petro Lewis and Jim Walter, as well as several Big Eight (now Four) accounting firms. He has also argued appeals in state and federal courts, achieving results with important precedential value.

Mr. Labaton has been President of the Institute for Law and Economic Policy since its founding in 1996.  The Institute co-sponsors at least one annual symposium with a major law school dealing with issues relating to the civil justice system.  In 2010 he was appointed to the newly formed Advisory Board of George Washington University's Center for Law, Economics, & Finance (C-LEAF), a think tank within the Law School, for the study and debate of major issues in economic and financial law confronting the United States and the globe.  Mr. Labaton is also a member of the Advisory Committee of the Weinberg Center for Corporate Governance of the University of Delaware, a Director of the Lawyers' Committee for Civil Rights under Law, a member of the American Law Institute, and a life member of the ABA Foundation.  In addition, he has served on the Executive Committee and has been an officer of the Ovarian Cancer Research Fund since its inception in 1996.

Mr. Labaton is the past Chairman of the Federal Courts Committee of the New York County Lawyers Association, and was a member of the Board of Directors of that organization. He is an active member of the Association of the Bar of the City of New York, where he was Chair of the Senior Lawyers' Committee and served on its Task Force on the Role of Lawyers in

Corporate Governance.  He has also served on its Federal Courts, Federal Legislation, Securities Regulation, International Human Rights and Corporation Law Committees.  He also served as Chair of the Legal Referral Service Committee, a joint committee of the New York County Lawyers' Association and the Association of the Bar of the City of New York.  He has been an active member of the American Bar Association, the Federal Bar Council and the New York State Bar Association, where he has served as a member of the House of Delegates.

Mr. Labaton is the co-author of "It's Time to Resuscitate the Shareholder Derivative Action," *The Panic of 2008: Causes, Consequences, and Implications for Reform*, Lawrence Mitchell and Arthur Wilmarth, Jr., eds, (Edward Elgar, 2010).

For more than 30 years, he has lectured in the areas of federal civil litigation, securities litigation and corporate governance.  Mr. Labaton graduated *cum laude* with a B.B.A. from Baruch College, City College of New York in 1952 and earned his LL.B. from Yale University in 1955.

He is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York; the Central District of Illinois; the United States Courts of Appeals for the Second, Fifth, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits; and the United States Supreme Court.

Mr. Labaton has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### CHRISTOPHER J. MCDONALD, PARTNER                    cmcdonald@labaton.com

Christopher J. McDonald, a member of the Firm's Antitrust Practice Group, represents businesses, associations and individuals injured by anticompetitive activities.  Mr. McDonald's

practice also involves prosecuting complex securities fraud cases on behalf of institutional investors.

In the antitrust field, Mr. McDonald currently represents end-payors (e.g., union health and welfare funds and consumers) of the prescription drug TriCor® in the *In re TriCor Indirect Purchaser Antitrust Litigation*.  The drug's manufacturer and U.S. marketer are alleged to have unlawfully impeded the introduction of lower-priced generic alternatives in violation of federal and state antitrust laws.  The case is set to go to trial in early November 2008.

In the securities field, Mr. McDonald is currently prosecuting *In re Schering-Plough Corporation/ENHANCE Securities Litigation* to recover losses investors suffered after the disclosure of negative clinical trial data for Vytorin®, a fixed-dose combination pill comprised of ezitimibe (Schering-Plough's Zetia®) and simvastatin (Merck & Co., Inc.'s Zocor®).  He was also part of the team that litigated *In re Bristol-Myers Squibb Securities Litigation*, where Labaton Sucharow was able to secure a $185 million settlement and meaningful corporate governance reforms on behalf of Bristol-Myers Squibb shareholders following negative disclosures about omapatrilat, an experimental hypertension drug.  The settlement with BMS is the largest ever obtained against a pharmaceutical company in a securities fraud case that did not involve a restatement of financial results.

A litigator for most of his career, Mr. McDonald also has in-house and regulatory experience.  As a senior attorney with a telecommunications company he regularly addressed legal, economic and public policy issues before state public utility commissions.

Mr. McDonald received his undergraduate degree, *cum laude*, from Manhattan College in 1985, and a J.D. from Fordham University School of Law in 1992, where he was on the *Law Review*.

Mr. McDonald is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York; the Western District of Michigan; and the United States Courts of Appeals for the Second, Third and Federal Circuits. He is a member of the New York State Bar Association and the Association of the Bar of the City of New York.

### JONATHAN M. PLASSE, PARTNER                                   jplasse@labaton.com

An accomplished litigator, Jonathan M. Plasse has devoted over 30 years of his practice to the prosecution of complex cases involving securities class action, derivative, transactional, and consumer litigation.  Currently, he is prosecuting securities class actions against Schering-Plough, Fannie Mae and Morgan Stanley.

Most recently, Mr. Plasse was an integral member of the team representing the New York State Common Retirement Fund and the New York City Pension Funds as lead plaintiffs in *In re Countrywide Financial Corporation Securities Litigation*.  The $624 million settlement is one of the largest securities fraud settlements in U.S. history.  His other recent successes include serving as Co-Lead Counsel in *In re General Motors Corp. Securities Litigation* ($303 million settlement) and *In re El Paso Corporation Securities Litigation* ($285 million settlement).  Mr. Plasse also served as Lead Counsel in *In re Waste Management Inc. Securities Litigation*, where he represented the Connecticut Retirement Plans and Trusts Funds, and obtained a settlement of $457 million.

Mr. Plasse serves as the Chair of the Securities Litigation Committee of the Association of the Bar of the City of New York.  He has also chaired and been a regular speaker at continuing legal education seminars relating to securities class action litigation.

Mr. Plasse received a B.A. degree, *magna cum laude*, from the State University of New York in Binghamton in 1972.  He received a J.D. from Brooklyn Law School in 1976, where he served as a member of the *Brooklyn Journal of International Law*.

He is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second Circuit.

Mr. Plasse has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### HOLLIS SALZMAN, PARTNER                                      hsalzman@labaton.com

Hollis Salzman is Managing Chair of the Firm's Antitrust Practice Group.  She primarily represents clients in cases involving federal antitrust law violations.  Her work in the area of antitrust law has been recognized in the 2008 Plaintiffs' Hot List published by *The National Law Journal*.  She is also involved in the Firm's securities litigation practice group where she represents institutional investors in portfolio monitoring and securities litigation.  Some of Ms. Salzman's clients include MARTA and the City of Macon, Georgia.

Ms. Salzman is actively engaged in the prosecution of major antitrust class actions pending throughout the United States.  She is presently Co-Lead Counsel in many antitrust cases, including: *In re Air Cargo Shipping Services Antitrust Litigation*, *In re Marine Hoses Antitrust Litigation*, and *In re Puerto Rican Cabotage Antitrust Litigation*.

She also served as Co-Lead Counsel in several antitrust class actions which resulted in extraordinary settlements for class members, such as *In re Air Cargo Shipping Services Antitrust Litigation* ($85 million partial settlement from certain defendants); *In re Abbott Labs Norvir Antitrust Litigation* ($10 million settlement); *In re Buspirone Antitrust Litigation* ($90 million

settlement); *In re Lorazepam & Clorazepate Antitrust Litigation* ($135.4 million settlement) and *In re Maltol Antitrust Litigation* and *Continental Seasonings Inc. v. Pfizer, Inc., et al.*, ($18.45 million settlement).  Additionally, she was principally responsible for administering a $65 million settlement with certain brand-name prescription drug manufacturers where their conduct allegedly caused retail pharmacy customers to overpay for their prescription drugs.

Ms. Salzman is the co-author of the following articles: "Iqbal And The Twombly Pleading Standard," *CompLaw 360*, June 15, 2009; "Analysis of Abbott Laboratories Antitrust Litigation," *Pharmaceutical Law & Industry Report*, June 20, 2008; and "The State of State Antitrust Enforcement," NYSBA *NYLitigator*, Winter 2003, Vol. 8, No. 1.

She is a Co-Chair of the New York State Bar Association, Commercial & Federal Litigation Section – Antitrust Committee, and a member of the Association of the Bar of the City of New York Antitrust Committee and Women's Antitrust Bar Association.  Ms. Salzman also provides *pro bono* representation to indigent and working-poor women in matrimonial and family law matters.

Ms. Salzman received a J.D. from Nova University School of Law in 1992 and a B.A. in Economics from Boston University in 1987.

Ms. Salzman is admitted to practice in New York, New Jersey, and Florida as well as before the United States District Courts for the Southern and Eastern Districts of New York; the Southern and Middle Districts of Florida; and the United States Court of Appeals for the Eleventh Circuit.

### IRA A. SCHOCHET, PARTNER                              ischochet@labaton.com

Ira A. Schochet has over 20 years of experience in commercial litigation, with primary emphasis on class actions involving securities fraud.

Mr. Schochet has played a leading role in litigation resulting in multimillion dollar recoveries for class members in cases such as those against Countrywide Financial Corp., Caterpillar, Inc., Spectrum Information Technologies, Inc., InterMune, Inc., and Amkor Technology, Inc. In *Kamarasy v. Coopers & Lybrand*, a securities fraud class action, Mr. Schochet led a team that won a settlement equal to approximately 75% of the highest possible damages that class members could have recovered.  The Court in that case complimented him for "the superior quality of the representation provided to the class."  In approving the settlement he achieved in the *InterMune* litigation, the Court complimented Mr. Schochet's ability to obtain a significant cash benefit for the class in a very efficient manner, saving the class from additional years of time, expense and substantial risk.  Mr. Schochet represented one of the first institutional investors acting as a Lead Plaintiff in a post-Private Securities Litigation Reform Act case, *STI Classic Funds v. Bollinger, Inc.*, and obtained one of the first rulings interpreting that statute's intent provision in a manner favorable to investors.

From 2009-2011, Mr. Schochet served as President of the National Association of Shareholder and Consumer Attorneys (NASCAT), a membership organization of approximately 100 law firms that practice class action and complex civil litigation.

Since 1996, Mr. Schochet has acted as chairman of the Class Action Committee of the Commercial and Federal Litigation Section of the New York State Bar Association.  In that capacity, he has served on the Executive Committee of the Section and was the primary author of articles and reports on a wide variety of issues relating to class action procedure.  Such issues include revisions to that procedure proposed over the years by both houses of the United States Congress and the Advisory Committee on Civil Procedure of the United States Judicial Conference. Examples include "Proposed Changes in Federal Class Action Procedure," "Opting

Out On Opting In," and "The Interstate Class Action Jurisdiction Act of 1999." He also has lectured extensively on securities litigation at continuing legal education seminars.

Mr. Schochet earned a B.A., *summa cum laude*, from the State University of New York at Binghamton in 1977, and a J.D. from Duke University School of Law in 1981.

He is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, the Central District of Illinois, the Northern District of Texas, and the United States Court of Appeals for the Second Circuit.

Mr. Schochet has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### MICHAEL W. STOCKER, PARTNER                      *mstocker@labaton.com*

Michael W. Stocker represents institutional investors in commercial litigation, shareholder advocacy, and corporate governance matters. His work has won repeated accolades in *The National Law Journal*'s Plaintiffs' Hot List.

Earlier in his career, Mr. Stocker worked as a senior staff attorney with the United States Court of Appeals for the Ninth Circuit, and completed a legal externship with United States Magistrate Judge (now District Judge) Phyllis J. Hamilton of the Northern District of California.

Mr. Stocker's recent publications include: "What is the Most Important Volcker Rule Issue that Regulators Must Address Next Year?," *Bloomberg Law*, January 3, 2012; "A scandal like Olympus can happen in the U.S.," *Institutional Investor*, December 17, 2011;"Proposals to reform credit-rating firms falling short," *Pensions & Investments*, October 31, 2011; "The Benefits of Investor Protection," *Law360*, October 11, 2011; "U.S. Changing to Looser Accounting Standards," *Executive Counsel*, August/September 2011; "Government Reliance on Private Litigants Diverges With Court Trends," *New York Law Journal*, September 9, 2011;

"Handle with Care," Corporate Counsel, July 2011; "Shell Game," *The Deal*, June 10, 2011;

"Are Regulators Retreating From Dodd-Frank?," *Institutional Investor*, May 24, 2011;

"Resolving the deadlock over credit ratings," *Pensions & Investments*, April 4, 2011; "M&A on

the rise - and litigation may well follow," *The National Law Journal*, April 4, 2011; "Running on

Empty," *The Deal Magazine*, February 18, 2011; "SEC Contemplating Governance Reforms,"

*Executive Counsel*, December 2010; "SEC paper focuses on proxy voting shortcomings," *The*

*National Law Journal*, November 15, 2010; "Is the Shield Beginning to Crack?," *New York Law*

*Journal*, November 15, 2010; "What Wall Street Can Learn From the BP Spill," *Institutional*

*Investor*; November 1, 2010; "Automated Trading Leaving Retail Investors In The Dust,"

(Opinion), Forbes.com, October 15, 2010; "Toyota Debacle Spurs Reform Questions,"

*Directorship*, August 9, 2010; "Say What? Pay What? Real World Approaches to Executive

Compensation Reform," *Corporate Counsel*, August 5, 2010; "SEC Measures To Prevent Flash

Crashes Are Sensible, But Are They Enough?" (Opinion), Forbes.com, May 20, 2010; "A Recall

for Toyota's Corporate Governance?" (Opinion), *Pensions & Investments*, April 5,

2010,"Reining in the Credit Ratings Industry," *New York Law Journa*l, January 11, 2010; and

"It's Time to Resuscitate the Shareholder Derivative Action," *The Panic of 2008: Causes,*

*Consequences, and Implications for Reform*, Lawrence Mitchell and Arthur Wilmarth, Jr., eds,

(Edward Elgar, 2010).

Mr. Stocker has offered financial commentary and analysis to BBC4 Radio, and on the

Canadian Broadcasting Corporation's Lang & O'Leary Exchange, and is a frequent speaker and

panelist on topics relating to financial reform.

Mr. Stocker is also the Chief Contributor to "Eyes On Wall Street" (www.eyesonwallstreet.com), Labaton Sucharow's blog on economics, corporate governance, and other issues of interest to investors.

Mr. Stocker earned a B.A. from the University of California, Berkeley, in 1989, a J.D. from the University of California, Hastings College of Law, in 1995, and a Master of Criminology degree from the Law Department of the University of Sydney in 2000.

He is admitted to practice in California and New York as well as before the United States District Courts for the Northern and Central Districts of California, the Southern and Eastern Districts of New York, and the United States Courts of Appeals for the Second, Eighth and Ninth Circuits.  Mr. Stocker is a member of the National Association of Public Pension Attorneys (NAPPA).

## JORDAN A. THOMAS, PARTNER                    jthomas@labaton.com

Jordan A. Thomas exclusively concentrates his practice on investigating and prosecuting securities fraud on behalf of whistleblowers and institutional clients. As Chair of the Firm's Whistleblower Representation practice, Mr. Thomas protects and advocates for whistleblowers throughout the world who have information about potential violations of the federal securities laws. He strongly believes that whistleblowers play a critical role in protecting investors and is deeply committed to helping courageous whistleblowers come forward and report securities violations to law enforcement authorities without having personal or professional regrets.

A career public servant and seasoned trial lawyer, Mr. Thomas joined Labaton Sucharow from the Securities and Exchange Commission where he served as an Assistant Director and, previously, as an Assistant Chief Litigation Counsel in the Division of Enforcement. He had a leadership role in the development of the Commission's Whistleblower Program, including

leading fact-finding visits to other federal agencies with whistleblower programs, drafting the proposed legislation and implementing rules and briefing House and Senate staffs on the proposed legislation. He is also the principal architect and first National Coordinator of the Commission's Cooperation Program, an initiative designed to facilitate and incentivize individuals and companies to self-report securities violations and participate in its investigations and related enforcement actions. In recognition of his important contributions to these national initiatives, while at the Commission, Mr. Thomas was a recipient of the Arthur Mathews Award, which recognizes "sustained demonstrated creativity in applying the federal securities laws for the benefit of investors," and, on two occasions, the Law and Policy Award.

Throughout his tenure at the Commission, Mr. Thomas was assigned to many of the Commission's highest-profile matters such as those involving Enron and Fannie Mae. He successfully investigated, litigated and supervised a wide variety of enforcement matters involving violations of the Foreign Corrupt Practices Act, issuer accounting fraud and other disclosure violations, audit failures, insider trading, market manipulations, offering frauds and broker-dealer, investment adviser and investment company violations. His cases resulted in monetary recoveries for harmed investors in excess of $35 billion.

Prior to joining the Commission, Mr. Thomas was a Trial Attorney at the Department of Justice, where he specialized in complex financial services litigation involving the FDIC and Office of Thrift Supervision. He began his legal career as a Navy Judge Advocate on active duty and continues to serve as a senior officer in the Reserve Law Program. Earlier, Mr. Thomas worked as a stockbroker.

Throughout his career, Mr. Thomas has received numerous awards and honors. At the Commission, he was the recipient of four Chairman's Awards, four Division Director's Awards

and a Letter of Commendation from the United States Attorney for the District of Columbia. He is also a decorated military officer, who has twice been awarded the Rear Admiral Hugh H. Howell Award of Excellence—the highest award the Navy can bestow upon a reserve judge advocate.

Mr. Thomas is a frequent speaker at prominent law schools and legal conferences on securities enforcement and whistleblower issues.

### STEPHEN W. TOUNTAS, PARTNER                    *stountas@labaton.com*

Stephen W. Tountas concentrates his practice on prosecuting complex securities fraud cases on behalf of institutional investors.      Currently, Mr. Tountas is actively involved in prosecuting *In re Schering-Plough Corp. / ENHANCE Securities Litigation*, *Medoff v. CVS Caremark Corporation et al*, and two individual actions related to *In re Adelphia Communications Corp. Securities & Derivative Litigation*.

Since joining Labaton Sucharow, Mr. Tountas has been responsible for prosecuting several of the Firm's options backdating cases, including *In re Broadcom Corp. Securities Litigation* ($160.5 million settlement), *In re Amkor Technologies Inc. Securities Litigation* ($11.25 million settlement), *In re HCC Insurance Holdings, Inc. Securities Litigation* ($10 million settlement), and *In re American Tower Corp. Securities Litigation* ($14 million settlement).  Among other matters, Mr. Tountas was also a member of the team responsible for prosecuting *In re VERITAS Software Corp. Securities Litigation*, which settled for $21.5 million.

Prior to joining Labaton Sucharow, Mr. Tountas practiced securities litigation at Bernstein Litowitz Berger & Grossmann LLP.  During his time there, he prosecuted the *In re OM Group, Inc. Securities Litigation*, which resulted in a settlement of $92.4 million, as well as securities cases involving Biovail Corp., MasTec, Inc., Collins & Aikman Corp. and Scottish Re

Group.  His work on the securities class action against Biovail Corp. contributed to a settlement of $138 million.

Mr. Tountas earned a B.A. from Union College in 2000 and a J.D. from Washington University School of Law in 2003.  As a law student, he served as Editor-in-Chief of the *Washington University Journal of Law & Policy* and was a finalist in the Environmental Law Moot Court Competition.  Additionally, Mr. Tountas worked as Research Assistant to Joel Seligman, one of the country's foremost experts on securities law.  In May 2003, he received the Scribe's Award in recognition of his Note entitled, *Carnivore: Is the Regulation of Wireless Technology a Legally Viable Option to Curtail the Growth of Cybercrime?*, 11 Wash. U. J.L. & Pol'y 351.

Mr. Tountas is admitted to practice in New York and New Jersey, as well as before the United States District Courts for the Southern District of New York and the District of New Jersey, and the United States Court of Appeals for the Second, Third and Ninth Circuits.

### RICHARD T. JOFFE, SENIOR COUNSEL                      *rjoffe@labaton.com*

Richard Joffe's practice focuses on class action litigation, including securities fraud, antitrust and consumer fraud cases.  Since joining the Firm, Mr. Joffe has represented such varied clients as institutional purchasers of corporate bonds, Wisconsin dairy farmers, and consumers who alleged they were defrauded when they purchased annuities.  He played a key role in shareholders obtaining a $303 million settlement of securities claims against General Motors and its outside auditor.

Prior to joining Labaton Sucharow, Mr. Joffe was an associate at Gibson, Dunn & Crutcher LLP, where he played a key role in obtaining a dismissal of claims against Merrill Lynch & Co. and a dozen other of America's largest investment banks and brokerage firms, who,

in *Friedman v. Salomon/Smith Barney, Inc.*, were alleged to have conspired to fix the prices of initial public offerings.

Mr. Joffe also worked as an associate at Fried, Frank, Harris, Shriver & Jacobson where, among other things, in a case handled *pro bono*, he obtained a successful settlement for several older women who alleged they were victims of age and sex discrimination when they were selected for termination by New York City's Health and Hospitals Corporation during a city-wide reduction in force.

He co-authored "Protection Against Contribution and Indemnification Claims" in *Settlement Agreements in Commercial Disputes* (Aspen Law & Business, 2000).

Mr. Joffe earned a B.A., *summa cum laude*, from Columbia University in 1972, and a Ph.D. from Harvard University in 1984.  He received a J.D. from Columbia Law School in 1993.

Mr. Joffe is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, and the United States Courts of Appeals for the Second, Third, Ninth and Eleventh Circuits.  He is a member of the Association of the Bar of the City of New York and the American Bar Association.

Long before becoming a lawyer, Mr. Joffe was a founding member of the internationally famous rock and roll group, Sha Na Na.

### JOSEPH V. STERNBERG, SENIOR COUNSEL                          jsternberg@labaton.com

Joseph V. Sternberg is a trial and appellate lawyer with more than 35 years of experience in the areas of civil and class action litigation.  He has prosecuted cases that have resulted in the return of hundreds of millions of dollars to class members.  Among the numerous landmark cases in which Mr. Sternberg has participated are *Limmer v. Medallion Group, Inc.*, *Koppel v. Wien*, *In*

*re Energy Systems Equipment Leasing Securities Litigation*, *Koppel v. 4987 Corp.*, *Gunter v. Ridgewood Energy Corp.*, and *In re Real Estate Associates Limited Partnership Litigation*.

Mr. Sternberg authored "Using and Protecting Against Rule 12(b) and 9(b) Motions," *The Practical Litigator*, September 1993.

Mr. Sternberg earned a B.A. from Hofstra University in 1963 and a J.D. from New York University School of Law in 1966.

He is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, and the United States Courts of Appeals for the Second and Third Circuits.

He has received a rating of AV from the publishers of the Martindale-Hubble Directory.

### DOMINIC J. AULD, OF COUNSEL                    dauld@labaton.com

Dominic J. Auld joined Labaton Sucharow with over seven years of experience in the area of securities class action litigation.  He has also worked in the areas of environmental and antitrust litigation.  Mr. Auld is primarily responsible for working with the client and case development departments in identifying meritorious securities fraud cases and presenting them to the institutional investors harmed by the conduct at issue.  Mr. Auld focuses on the Firm's existing relationships with institutional investors from his home country of Canada, and is also part of the Firm's outreach to other institutions worldwide.

Prior to joining Labaton Sucharow, Mr. Auld practiced securities litigation at Bernstein Litowitz Berger & Grossmann LLP, where he began his career as a member of the litigation team responsible for prosecuting the landmark WorldCom action which resulted in a settlement of over $6 billion.  He also has a great deal of experience in working directly with institutional clients affected by securities fraud and worked extensively with the Ontario Teachers' Pension

Plan in their actions *In re Nortel Networks Corporation Securities Litigation*, *In re Williams Securities Litigation*, and *In re Biovail Corporation Securities Litigation* - cases that settled for a total of over $1.7 billion.  In the last two years, Mr. Auld has focused his practice on client relationships and development, and regularly advises large worldwide institutional investors on their rights and avenues of recovery available in the U.S. Courts and elsewhere.

He is a regular speaker at law and investment conferences and recently published an article on executive compensation in *Benefits Canada* magazine.

Mr. Auld earned a B.A. (hons) from Queen's University in Kingston, Ontario, Canada in 1992 and a J.D. from Lewis and Clark Law School in Portland, Oregon in 1998 where he was an annual member of the Dean's List.  As a law student, he served as a founding member of the law review, *Animal Law*, which explores legal and environmental issues relating to laws such as the Endangered Species Act.

Mr. Auld is admitted to practice in New York.

## MARK S. GOLDMAN, OF COUNSEL                    mgoldman@labaton.com

Mark S. Goldman has 22 years' experience in commercial litigation, primarily litigating class actions involving securities fraud, consumer fraud, and violations of federal and state antitrust laws.

Mr. Goldman is currently prosecuting securities fraud claims on behalf of institutional and individual investors against a pharmaceutical company alleged to have misrepresented the status of clinical drug trials, hedge funds that misrepresented the net asset value of investors' shares, and a high tech company that did not disclose declining sales in its initial public offering materials.  In addition, Mr. Goldman is participating in litigation brought against international air

cargo carriers charged with conspiring to fix fuel and security surcharges, and domestic manufacturers of air filters, OSB, flat glass and chocolate, also charged with price fixing.

Recently, Mr. Goldman successfully litigated a number of consumer fraud cases brought against insurance companies challenging the manner in which they calculated life insurance premiums. He also prosecuted a number of insider trading cases brought against company insiders who, in violation of Section 16(b) of the Securities Exchange Act, engaged in short swing trading. In addition, Mr. Goldman participated in the prosecution of *In re AOL Time Warner Securities Litigation*, a massive securities fraud case that settled for $2.5 billion.

Mr. Goldman earned a B.A. from The Pennsylvania State University in 1981 and a J.D. from the University of Kansas School of Law in 1986.

He is admitted to practice in Pennsylvania.

Mr. Goldman has received a rating of AV from the publishers of the Martindale-Hubbell directory.

### TERRI GOLDSTONE, OF COUNSEL                    tgoldstone@labaton.com

Terri Goldstone concentrates her practice on prosecuting complex securities litigations on behalf of institutional investors.

Prior to joining Labaton Sucharow, Ms. Goldstone worked as an associate at Schwartz Goldstone & Campisi LLP. During her time there, she litigated personal injury cases and was the liaison to union members injured in the course of their employment.

Ms. Goldstone began her career as an Assistant District Attorney at the Bronx County District Attorney's Office.

Ms. Goldstone earned a B.A., *cum laude*, from American University in 1994. She earned a J.D. from Emory University School of Law in 1998, where she was a member of the Dean's

List.  During law school, Ms. Goldstone was a member of the International Law Society and was a semi-finalist in the Emory Appellate Advocacy Competition.

Ms. Goldstone is admitted to practice in New York.

### BARRY M. OKUN, OF COUNSEL                                    bokun@labaton.com

Barry Michael Okun is a seasoned trial and appellate lawyer with more than 20 years' experience in a broad range of commercial litigation.  Mr. Okun has litigated several leading commercial law cases, including the first case in which the United States Supreme Court ruled on issues relating to products liability.

Mr. Okun has argued appeals before the United States Court of Appeals for the Second Circuit and the Appellate Divisions of three out of the four judicial departments in New York State.  He has appeared in numerous trial courts throughout the country.

Mr. Okun received a B.A. from the State University of New York at Binghamton and is a *cum laude* graduate of the Boston University School of Law, where he was Articles Editor of the *Law Review*.

He is admitted to practice in New York as well as before the United States District Courts for the Southern and Eastern Districts of New York, the United States Courts of Appeals for the First, Second, Seventh and Eleventh Circuits, and the United States Supreme Court.

### PAUL SCARLATO, OF COUNSEL                                  pscarlato@labaton.com

Paul Scarlato has over 20 years' experience litigating complex commercial matters, primarily in the prosecution of securities fraud and consumer fraud class actions and shareholder derivative actions.

Mr. Scarlato has litigated numerous cases on behalf of institutional and individual investors involving companies in a broad range of industries, many of which involved financial

statement manipulation and accounting fraud.  Mr. Scarlato was one of three lead attorneys for the class in *Kaufman v. Motorola, Inc.*, a securities-fraud class action case that recovered $25 million for investors just weeks before trial and, was one of the lead counsel in *Seidman v. American Mobile Systems, Inc.*, a securities-fraud class action case that resulted in a favorable settlement for the class on the eve of trail.  Mr. Scarlato also served as co-lead counsel in *In re: Corel Corporation Securities Litigation*, and as class counsel in *In re AOL Time Warner Securities Litigation*, a securities fraud class action that recovered $2.5 billion for investors.

After law school, Mr. Scarlato served as law clerk to Judge Nelson Diaz of the Court of Common Pleas of Philadelphia County, and Justice James McDermott of the Pennsylvania Supreme Court.  Thereafter, he worked in the tax department of a "big-six" accounting firm prior to entering private practice.

Mr. Scarlato earned a B.A. in Accounting from Moravian College in 1983 and a J.D. from Delaware Law School of Widener University in 1986.

He is admitted to practice in Pennsylvania and New Jersey.

### NICOLE M. ZEISS, OF COUNSEL                                             nzeiss@labaton.com

Nicole M. Zeiss works principally in the area of securities class action litigation.  Before joining Labaton Sucharow, Ms. Zeiss worked for MFY Legal Services, practicing in the area of poverty law and at Gaynor & Bass doing general complex civil litigation, particularly representing the rights of freelance writers seeking copyright enforcement.

Ms. Zeiss was part of the team that successfully litigated *In re Bristol-Myers Squibb Securities Litigation*.  Labaton Sucharow was able to secure a $185 million settlement on behalf of investors, as well as meaningful corporate governance reforms that will affect future

consumers and investors alike.  She has also litigated on behalf of investors who have been damaged by fraud in the telecommunications, hedge fund and banking industries.

Ms. Zeiss maintains a commitment to *pro bono* legal services by continuing to assist mentally ill clients in a variety of matters—from eviction proceedings to trust administration.

Ms. Zeiss earned a B.A. from Barnard College in 1991 and a J.D. from Benjamin N. Cardozo School of Law in 1995.  She is admitted to practice in New York.

EXHIBIT 3

# ROBBINS GELLER RUDMAN & DOWD LLP

**Robbins Geller Rudman & Dowd LLP** (the "Firm") is a 180-lawyer firm with offices in Atlanta, Boca Raton, Chicago, Melville, New York, San Diego, San Francisco, Philadelphia and Washington, D.C. (www.rgrdlaw.com). The Firm is actively engaged in complex litigation, emphasizing securities, consumer, insurance, healthcare, human rights, employment discrimination and antitrust class actions. The Firm's unparalleled experience and capabilities in these fields are based upon the talents of its attorneys, who have successfully prosecuted thousands of class action lawsuits.

This successful track record stems from our experienced attorneys, including many who left partnerships at other firms or came to the Firm from federal, state and local law enforcement and regulatory agencies, including dozens of former prosecutors and SEC attorneys. The Firm also includes more than 25 former federal and state judicial clerks.

The Firm currently represents more institutional investors, including public and multi-employer pension funds and domestic and international financial institutions, in securities and corporate litigation than any other firm in the United States.

The Firm is committed to practicing law with the highest level of integrity and in an ethical and professional manner. We are a diverse firm with lawyers and staff from all walks of life. Our lawyers and other employees are hired and promoted based on the quality of their work and their ability to enhance our team and treat others with respect and dignity. Evaluations are never influenced by one's background, gender, race, religion or ethnicity.

We also strive to be good corporate citizens and to work with a sense of global responsibility. Contributing to our communities and our environment is important to us. We raised hundreds of thousands of dollars in aid for the victims of Hurricane Katrina and we often take cases on a pro bono basis. We are committed to the rights of workers and to the extent possible, we contract with union vendors. We care about civil rights, workers' rights and treatment, workplace safety and environmental protection. Indeed, while we have built a reputation as the finest securities and consumer class action law firm in the nation, our lawyers have also worked tirelessly in less high-profile, but no less important, cases involving human rights.

## PRACTICE AREAS

### SECURITIES FRAUD

As recent corporate scandals demonstrate clearly, it has become all too common for companies and their executives – often with the help of their advisors, such as bankers, lawyers and accountants – to manipulate the market price of their securities by misleading the public about the company's financial condition or prospects for the future. This misleading information has the effect of artificially inflating the price of the company's securities above their true value. When the underlying truth is eventually revealed, the prices of these securities plummet, harming those innocent investors who relied upon the company's misrepresentations.

Robbins Geller Rudman & Dowd LLP is the leader in the fight to provide investors with relief from corporate securities fraud. We utilize a wide range of federal and state laws to provide investors with remedies, either by bringing a class action on behalf of all affected investors or, where appropriate, by bringing individual cases.

The Firm's reputation for excellence has been repeatedly noted by courts and has resulted in the appointment of Firm attorneys to lead roles in hundreds of complex class-action securities and other cases. In the securities area alone, the Firm's attorneys have been responsible for a number of outstanding recoveries on behalf of investors. Currently, Robbins Geller Rudman & Dowd LLP attorneys are lead or named counsel in approximately 500 securities class action or large institutional-investor cases. Some current and past cases include:

- *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.). Investors lost billions of dollars as a result of the massive fraud at Enron. In appointing Robbins Geller Rudman & Dowd LLP lawyers as sole lead counsel to represent the interests of Enron investors, the court found that the Firm's zealous prosecution and level of "insight" set it apart from its peers. Robbins Geller Rudman & Dowd LLP attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of *$7.2 billion* for the benefit of investors. *This is the largest aggregate class action settlement not only in a securities class action, but in class action history.*

- *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.). In the *UnitedHealth* case, Robbins Geller Rudman & Dowd LLP represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances. For example, in 2006, the issue of high-level executives backdating stock options made national headlines. During that time, many law firms, including Robbins Geller Rudman & Dowd LLP, brought shareholder derivative lawsuits against the companies' boards of directors for breaches of their fiduciary duties or for improperly granting backdated options. Rather than pursuing a shareholder derivative case, the Firm filed a securities fraud class action against the company on behalf of CalPERS. In doing so, Robbins Geller Rudman & Dowd LLP faced significant and unprecedented legal obstacles with respect to loss causation, *i.e.*, that defendants' actions were responsible for causing the stock losses. Despite these legal hurdles, Robbins Geller Rudman & Dowd LLP obtained an $895 million recovery on behalf of the UnitedHealth shareholders. Shortly after reaching the $895 million settlement with UnitedHealth, the remaining corporate defendants, including former CEO William A. McGuire, also settled. Mr. McGuire paid $30 million and returned stock options representing more than three million shares to the shareholders. The total recovery for the class was over $925 million, the largest stock option backdating recovery ever, and *a recovery which is more than four times larger than the next largest*

*options backdating recovery*. Moreover, Robbins Geller Rudman & Dowd LLP obtained unprecedented corporate governance reforms, including election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms which tie pay to performance.

- *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.). Sole lead counsel Robbins Geller Rudman & Dowd LLP obtained a jury verdict on May 7, 2009, following a six-week trial in the Northern District of Illinois, on behalf of a class of investors led by plaintiffs PACE Industry Union-Management Pension Fund, the International Union of Operating Engineers, Local No. 132 Pension Plan, and Glickenhaus & Company. The jury determined that Household and the individual defendants made fraudulent misrepresentations concerning the company's predatory lending practices, the quality of its loan portfolio, and the company's financial results between March 23, 2001 and October 11, 2002. Although certain post-trial proceedings are ongoing, plaintiffs' counsel anticipate that the verdict will ultimately allow class members to recover in excess of $1 billion in damages. Since the enactment of the PSLRA in 1995, trials in securities fraud cases have been rare. According to published reports, only nine such cases have gone to verdict since the passage of the PSLRA.

- *Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)*, No. 03 Civ. 8269 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001. The Firm's clients included major public institutions from across the country such as CalPERS, CalSTRS, the state pension funds of Maine, Illinois, New Mexico and West Virginia, union pension funds, and private entities such as AIG and Northwestern Mutual. Robbins Geller Rudman & Dowd LLP attorneys recovered more than $650 million for their clients on the May 2000 and May 2001 bond offerings (the primary offerings at issue), substantially more than they would have recovered as part of the class.

- *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575 (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Robbins Geller Rudman & Dowd LLP obtained a recovery of $600 million for investors. On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund, the Firm aggressively pursued class claims and won notable courtroom victories, including a favorable decision on defendants' motion to dismiss. *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the $600 million settlement was the tenth-largest settlement in the

history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit.

- ***AOL Time Warner Cases I & II***, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles County). Robbins Geller Rudman & Dowd LLP represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. Robbins Geller Rudman & Dowd LLP attorneys exposed a massive and sophisticated accounting fraud involving America Online's e-commerce and advertising revenue. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- ***In re HealthSouth Corp. Sec. Litig.***, No. CV-03-BE-1500-S (N.D. Ala.). As court-appointed co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys obtained a combined recovery of $671 million from HealthSouth, its auditor Ernst & Young, and its investment banker, UBS, for the benefit of stockholder plaintiffs. The settlement against HealthSouth represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA. Likewise, the settlement against Ernst & Young is one of the largest securities class action settlements entered into by an accounting firm since the passage of the PSLRA. HealthSouth and its financial advisors perpetrated one of the largest and most pervasive frauds in the history of U.S. healthcare, prompting Congressional and law enforcement inquiry and resulting in guilty pleas of 16 former HealthSouth executives in related federal criminal prosecutions.

- ***In re Dynegy Inc. Sec. Litig.***, No. H-02-1571 (S.D. Tex.). As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller Rudman & Dowd LLP attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc. and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha. Given Dynegy's limited ability to pay, Robbins Geller Rudman & Dowd LLP attorneys structured a settlement (reached shortly before the commencement of trial) that maximized plaintiffs' recovery without bankrupting the company. Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller Rudman & Dowd LLP and The Regents believe will benefit all of Dynegy's stockholders.

- ***In re Qwest Commc'ns Int'l, Inc. Sec. Litig.***, No. 01-cv-1451 (D. Colo.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased Qwest securities. In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice. After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC. In 2008, Robbins Geller Rudman & Dowd LLP attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- ***In re AT&T Corp. Sec. Litig.***, MDL No. 1399 (D.N.J.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased AT&T common stock. The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, the largest IPO in American history. After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million. In granting approval of the settlement, the court stated the following about the Robbins Geller Rudman & Dowd LLP attorneys handling the case:

  > Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

  *In re AT&T Corp. Sec. Litig.*, MDL No. 1399, 2005 U.S. Dist. LEXIS 46144, at *28-*29 (D.N.J. Apr. 25, 2005), *aff'd*, 455 F.3d 160 (3d Cir. 2006).

- ***In re Dollar General Corp. Sec. Litig.***, No. 01-CV-00388 (M.D. Tenn.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel in this case in which the Firm recovered $172.5 million for investors. The *Dollar General* settlement was the largest shareholder class action recovery ever in Tennessee.

- ***Carpenters Health & Welfare Fund v. Coca-Cola Co.***, No. 00-CV-2838 (N.D. Ga.). As co-lead counsel representing Coca-Cola shareholders, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of $137.5 million after nearly eight years of litigation. Robbins Geller Rudman & Dowd LLP attorneys traveled to three continents to uncover the evidence that ultimately resulted in the settlement of this hard-fought litigation. The case concerned Coca-Cola's shipping of excess concentrate at the end of financial reporting periods for the sole purpose of meeting analyst earnings expectations, as well as the company's failure to properly account for certain impaired foreign bottling assets.

- ***Schwartz v. TXU Corp.***, No. 02-CV-2243 (N.D. Tex). As co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of over $149 million for a class of purchasers of TXU securities. The recovery compensated class members for damages they incurred as a result of their purchases of TXU securities at inflated prices. Defendants had inflated the price of these securities by concealing the fact that TXU's operating earnings were declining due to a deteriorating gas pipeline and the failure of the company's European operations.

- ***Thurber v. Mattel, Inc.***, No. 99-CV-10368 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel for a class of investors who purchased Mattel common stock. When the shareholders approved Mattel's acquisition of The Learning Company, they were misled by defendants' false statements regarding the financial condition of the acquired company. Within months of the close of the transaction, Mattel disclosed that The Learning Company had incurred millions in losses, and that instead of adding to Mattel's earnings, earnings would be far less than previously stated. After thorough discovery, Robbins Geller Rudman & Dowd LLP attorneys negotiated a settlement of $122 million plus corporate governance changes.

- ***Brody v. Hellman (U.S. West Dividend Litigation)***, No. 00-CV-4142 (Dist. Ct. for the City & Cty. of Denver, Colo.). Robbins Geller Rudman & Dowd LLP attorneys were court-appointed counsel for the class of former stockholders of U.S. West, Inc. who sought to recover a dividend declared by U.S. West before its merger with Qwest. The merger closed before the record and payment dates for the dividend, which Qwest did not pay following the merger. The case was aggressively litigated and the plaintiffs survived a motion to dismiss, two motions for summary judgment and successfully certified the class over vigorous opposition from defendants. In certifying the class, the court commented, "Defendants do not contest that Plaintiffs' attorneys are extremely well qualified to represent the putative class. This litigation has been ongoing for four years; in that time Plaintiffs' counsel has proven that they are more than adequate in ability, determination, and resources to represent the putative class." The case settled for $50 million on the day before trial was scheduled to commence. At

the August 30, 2005 final approval hearing relating to the settlement, the court noted that the case "was litigated by extremely talented lawyers on both sides" and that the settlement was "a great result." In describing the risk taken by the Firm and its co-counsel, the court noted, "There wasn't any other lawyer[] in the United States that took the gamble that these people did. Not one other firm anywhere said I'm willing to take that on. I'll go five years. I'll pay out the expenses. I'll put my time and effort on the line." In discussing the difficulties facing the Firm in this case, the court said, "There wasn't any issue that wasn't fought. It took a great deal of skill to get to the point of trial." In concluding, the court remarked that the class was "fortunate they had some lawyers that had the guts to come forward and do it."

Robbins Geller Rudman & Dowd LLP's Securities Department includes dozens of former federal and state prosecutors and trial attorneys. The Firm's securities practice is also strengthened by the existence of a strong Appellate Department, whose collective work has established numerous legal precedents. The Securities Department also utilizes an extensive group of in-house economic and damage analysts, investigators and forensic accountants to aid in the prosecution of complex securities issues.

## CORPORATE GOVERNANCE

While obtaining monetary recoveries for our clients is our primary focus, Robbins Geller Rudman & Dowd LLP attorneys have also been at the forefront of securities fraud *prevention*. The Firm's prevention efforts are focused on creating important changes in corporate governance, either as part of the global settlements of derivative and class cases or through court orders. Recent cases in which such changes were made include:

- *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.). In the *UnitedHealth* case, our client, CalPERS, obtained sweeping corporate governance improvements, including the election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercises, as well as executive compensation reforms which tie pay to performance. These corporate governance reforms were obtained in addition to a $925 million cash recovery for UnitedHealth shareholders, the largest stock option backdating recovery ever. The recovery included $30 million paid to the class by the CEO out of his own pocket.

- *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Hanover Compressor Co.*, No. H-02-0410 (S.D. Tex.). Groundbreaking corporate governance changes obtained include: direct shareholder nomination of two directors; mandatory rotation of the outside audit firm; two-thirds of the board required to be independent; audit and other key committees to be filled only by independent directors; and creation and appointment of lead independent director with authority to set up board meetings.

- ***In re Sprint Corp. S'holder Litig.***, No. 00-CV-230077 (Mo. Cir. Ct., Jackson County). In connection with the settlement of a derivative action involving Sprint Corporation, the company adopted over 60 new corporate governance provisions which, among other things, established a truly independent board of directors and narrowly defines "independence" to eliminate cronyism between the board and top executives; required outside board directors to meet at least twice a year without management present; created an independent director who will hold the authority to set the agenda, a power previously reserved for the CEO; and imposed new rules to prevent directors and officers from vesting their stock on an accelerated basis.

- ***Teachers' Ret. Sys. of La. v. Occidental Petroleum Corp.***, No. BC185009 (Cal. Super. Ct., Los Angeles County). As part of the settlement, corporate governance changes were made to the composition of the company's board of directors, the company's nominating committee, compensation committee and audit committee.

- ***Barry v. E*Trade Grp., Inc.***, No. CIV419804 (Cal. Super. Ct., San Mateo County). In connection with settlement of derivative suit, excessive compensation of the company's CEO was eliminated (reduced salary from $800,000 to zero; bonuses reduced and to be repaid if company restates earnings; reduction of stock option grant; and elimination of future stock option grants) and important governance enhancements were obtained, including the appointment of a new unaffiliated outside director as chair of board's compensation committee.

Through these efforts, Robbins Geller Rudman & Dowd LLP has been able to create substantial shareholder guarantees to prevent future securities fraud. The Firm works closely with noted corporate governance consultant Robert Monks and his firm, LENS Governance Advisors, to shape corporate governance remedies for the benefit of investors.

### SHAREHOLDER DERIVATIVE LITIGATION

The Firm's shareholder derivative practice is focused on ***preserving*** corporate assets, ***restoring*** accountability, ***improving*** transparency, ***strengthening*** the shareholder franchise and ***protecting*** long-term investor value. Often brought by large institutional investors, these actions typically address executive malfeasance that resulted in violations of the nation's securities, environmental, labor, health & safety and wage & hour laws, coupled with self-dealing. Corporate governance therapeutics recently obtained in the following actions were valued by the market in the billions of dollars:

- ***Unite Nat'l Ret. Fund v. Watts (Royal Dutch Shell Derivative Litigation)***, No. 04-CV-3603 (D.N.J.). Successfully prosecuted and settled a shareholder derivative action on behalf of the London-based Royal Dutch Shell plc, achieving very unique and quite valuable transatlantic corporate governance reforms. The suit, filed June 25, 2004, charged that misconduct by executives and board members that resulted in four separate misstatements

of Shell's oil and gas reserves – which collectively erased billions of gallons of previously improperly reported "proven reserves" – was due in large part to inadequate internal controls. To settle the derivative litigation, the complicit executives agreed to:

- Improved Governance Standards: The Dutch and English Company committed to changes that extend well beyond the corporate governance requirements of the New York Stock Exchange listing requirements, while preserving the important characteristics of Dutch and English corporate law.

- Board Independence Standards: Shell agreed to a significant strengthening of the company's board independence standards and a requirement that a majority of its board members qualify as independent under those rigorous standards.

- Stock Ownership Requirements: The company implemented enhanced director stock ownership standards and adopted a requirement that Shell's officers or directors hold stock options for two years before exercising them.

- Improved Compensation Practices: Cash incentive compensation plans for Shell's senior management must now be designed to link pay to performance and prohibit the payment of bonuses based on reported levels of hydrocarbon reserves.

- Full Compliance with U.S. GAAP: In addition to international accounting standards, Shell agreed to comply in all respects with the Generally Accepted Accounting Principles of the United States.

- **_Alaska Electrical Pension Fund v. Brown (EDS Derivative Litigation)_**, No. 6:04-CV-0464 (E.D. Tex.). Prosecuted shareholder derivative action on behalf of Electronic Data Systems Corporation alleging EDS's senior executives breached their fiduciary duties by improperly using percentage-of-completion accounting to inflate EDS's financial results, by improperly recognizing hundreds of millions of dollars in revenue and concealing millions of dollars in losses on its contract with the U.S. Navy Marine Corps, by failing in their oversight responsibilities, and by making and/or permitting material, false and misleading statements to be made concerning EDS's business prospects, financial condition and expected financial results in connection with EDS's contracts with the U.S. Navy Marine Corps and WorldCom. In settlement of the action, EDS agreed, among other provisions, to:

- limits on the number of current EDS employees that may serve as board members and limits on the number of non-independent directors;

- limits on the number of other boards on which independent directors may serve;

- requirements for the compensation and benefits committee to retain an independent expert consultant to review executive officer compensation;

- formalize certain responsibilities of the audit committee in connection with its role of assisting the board of directors in its oversight of the integrity of the company's financial statements;

- a requirement for new directors to complete an orientation program, which shall include information about principles of corporate governance;

- a prohibition on repricing stock options at a lower exercise price without shareholder approval;

- change of director election standards from a plurality standard to a majority vote standard;

- change from classified board to annual election of directors;

- elimination of all supermajority voting requirements;

- a termination of rights plan; and

- adopt corporate governance guidelines, including: requirement that a substantial majority of directors be outside, independent directors with no significant financial or personal tie to EDS; that all board committees be composed entirely of independent directors; and other significant additional practices and policies to assist the board in the performance of its duties and the exercise of its responsibilities to shareholders.

- ***In re BP p.l.c. Derivative Litig.***, No. 3AN-06-11929CI (Alaska Super. Ct.). Successfully prosecuted a shareholder derivative action on behalf of the London-based BP plc. The action, filed in late 2006, arose out of the misconduct of certain of BP's officers and directors whose gross dereliction of duty and failure to oversee BP's U.S. operations exposed the company to significant criminal and civil liability in connection with the 2005 Texas City refinery explosion (where 15 workers were killed and 170 more were injured), the 2006 Prudhoe Bay oil spill (where 200,000 gallons of crude were spilled on the Alaska tundra) and the Federal Commodities Trade Commission energy trading manipulation charges (where BP and its traders were charged with intentionally inflating the price of propane, the primary heating source in the northeastern United States). BP ultimately pled guilty to several felony

and misdemeanor criminal charges, paid over $373 million in criminal fines and penalties and agreed to serve five years felony corporate probation, and paid over $2 billion in civil damages for its failure to properly fund or oversee maintenance and operations at its U.S. facilities. As part of the settlement of the shareholder derivative action, BP agreed to:

- Improved Operational Safety Oversight in the United States: BP adopted a six-point plan to enhance the operational integrity and safety oversight function; formed two new board-level operations committees to facilitate the flow of important safety and operations information; put in place a new management team in Alaska; and improved oversight responsibility over compliance, safety and operational integrity at BP's U.S. operations.

- Increased Shareholder Input: BP agreed to hold annual meetings with the company's top 20 shareholders – including ADR holders – to engage in discussions concerning BP's ongoing commitment to good corporate governance.

- Site Inspections: BP agreed to facilitate regular visits for BP board members to the company's operational sites around the globe.

- Safety as an Executive Compensation Metric: BP agreed to include operational health, safety and environmental performance in the principles used to calculate performance pay for executives.

- Strengthened the Shareholder Voting Franchise: BP agreed to take measures to improve shareholder access to the proxy, webcast the annual shareholder meeting and remove impediments that prevent ADR holders from putting up resolutions at the annual meeting.

Robbins Geller Rudman & Dowd LLP lawyers are also currently prosecuting shareholder derivative actions against executives at several companies charged with violating the Foreign Corrupt Practices Act and have obtained an injunction preventing the recipient of the illegally paid bribe payments at one prominent international arms manufacturer from removing those funds from the United States while the action is pending. In another ongoing action, Robbins Geller Rudman & Dowd LLP lawyers are prosecuting audit committee members who knowingly authorized the payment of illegal "security payments" to a terrorist group though expressly prohibited by U.S. law. As artificial beings, corporations only behave – or misbehave – as their directors and senior executives let them. So they are only as valuable as their corporate governance. Shareholder derivative litigation enhances value by allowing shareholder-owners to replace chaos and self-dealing with accountability.

## CORPORATE TAKEOVER LITIGATION

Robbins Geller Rudman & Dowd LLP has earned a reputation as the leading law firm in representing shareholders in corporate takeover litigation. Through its aggressive efforts in prosecuting corporate takeovers, the Firm has secured for shareholders billions of dollars of additional consideration as well as beneficial changes for shareholders in the context of mergers and acquisitions.

The Firm regularly prosecutes merger and acquisition cases post-merger, often through trial, to maximize the benefit for its shareholder class. Some of these cases include:

- ***In re Kinder Morgan, Inc. S'holders Litig.***, No. 06-C-801 (Kan. Dist. Ct., Shawnee County). In the largest recovery ever for corporate takeover litigation, the firm negotiated a settlement fund of $200 million in 2010. As co-lead counsel, the Firm represented former shareholders for Kinder Morgan, Inc., challenging a management-led buyout announced in 2006. Following settlement, the court noted: "Throughout this litigation, the Court has found that Lead Plaintiff's Counsel have zealously rendered legal services in a professional and skillful manner. Moreover, it is important to recognize that this action was vigorously defended by attorneys with substantial experience and expertise in complex litigation, including class actions. Despite facing significant factual and legal hurdles, Lead Plaintiff's Counsel were ultimately successful in negotiating a large settlement on behalf of the Class Members."

- ***In re Chaparral Resources, Inc. S'holders Litig.***, No. 2633-VCL (Del. Ch.). After a full trial and a subsequent mediation before the Delaware Chancellor, the Firm obtained a common fund settlement of $41 million (or 45% increase above merger price) for both class and appraisal claims. The Delaware Vice Chancellor who presided over the trial noted that "the performance was outstanding, and frankly, without the efforts of counsel, nothing would have been achieved. The class would have gotten zero. I don't think that can be more clear."

- ***In re TD Banknorth S'holders Litig.***, No. 2557-VCL (Del. Ch.). After objecting to a modest recovery of just a few cents per share, the Firm took over the litigation and obtained a common fund settlement of $50 million. The Delaware Vice Chancellor who presided over the case expressly noted that "through the sheer diligence and effort of plaintiffs' counsel," the Firm's efforts "resulted in substantial awards for plaintiffs, after overcoming serious procedural and other barriers."

- ***In re eMachines, Inc. Merger Litig.***, No. 01-CC-00156 (Cal. Super. Ct., Orange County). After four years of litigation, the Firm secured a common fund settlement of $24 million on the brink of trial.

- ***In re Prime Hospitality, Inc. S'holders Litig.***, No. 652-N (Del. Ch.). The Firm objected to a settlement that was unfair to the class and proceeded to

litigate breach of fiduciary duty issues involving a sale of hotels to a private equity firm. The litigation yielded a common fund of $25 million for shareholders. The Delaware Chancellor presiding over the case noted that "had it not been for the intervention of [Robbins Geller Rudman & Dowd LLP] . . . there would not have been a settlement that would have generated actual cash for the shareholders. . . . That's quite an achievement . . . ."

- *In re Dollar Gen. Corp. S'holder Litig.*, No. 07MD-1 (Tenn. Cir. Ct., Davidson County). As lead counsel, the Firm secured a recovery of up to $57 million in cash for former Dollar General shareholders on the eve of trial.

- *In re UnitedGlobalCom, Inc. S'holder Litig.*, No. 1012-VCS (Del. Ch.). The Firm secured a common fund settlement of $25 million just weeks before trial.

Robbins Geller Rudman & Dowd LLP has also obtained significant benefits for shareholders, including increases in consideration and significant improvements to merger terms. Some of these cases include:

- *Harrah's Entertainment*, No. A529183 (Nev. Dist. Ct., Clark County). The Firm's active prosecution of the case on several fronts, both in federal and state court, assisted Harrah's shareholders in securing an additional $1.65 billion in merger consideration.

- *In re Chiron S'holder Deal Litig.*, No. RG 05-230567 (Cal. Super. Ct., Alameda County). The Firm's efforts helped to obtain an additional $800 million in increased merger consideration for Chiron shareholders.

- *In re PeopleSoft, Inc. S'holder Litig.*, No. RG-03100291 (Cal. Super. Ct., Alameda County). The Firm successfully objected to a proposed compromise of class claims arising from takeover defenses by PeopleSoft, Inc. to thwart an acquisition by Oracle Corp., resulting in shareholders receiving an increase of over $900 million in merger consideration.

- *ACS S'holder Litig.*, No. CC-09-07377-C (Tex. County Ct., Dallas County). The Firm forced ACS's acquirer, Xerox, to make significant concessions by which shareholders would not be locked out of receiving more money from another buyer. The *New York Times* Deal Professor deemed this result both "far reaching" and "unprecedented."

OPTIONS BACKDATING LITIGATION

As has been widely reported in the media, the stock options backdating scandal suddenly engulfed hundreds of publicly traded companies throughout the country. Robbins Geller Rudman & Dowd LLP was at the forefront of investigating and prosecuting options backdating derivative and securities cases. Robbins Geller Rudman & Dowd LLP lawyers have recovered over $1 billion in damages on behalf of injured companies and

shareholders. Robbins Geller Rudman & Dowd LLP attorneys have served as lead counsel in several large stock option backdating actions, including actions involving Affiliated Computer Services, Extreme Networks, Inc., KLA-Tencor Corp., KB Home, Inc., Marvell Technology Group, Inc., McAfee, Inc. and UnitedHealth Group, Inc.

- ***In re PMC-Sierra, Inc. Derivative Litig.***, No. C-06-05330 (N.D. Cal.). As lead counsel for lead plaintiff, Robbins Geller Rudman & Dowd LLP obtained substantial relief for nominal party PMC-Sierra in the form of extensive corporate governance measures, including improved stock option granting practices and procedures and an executive compensation "claw-back" in the event of a future restatement.

- ***In re KLA-Tencor Corp. S'holder Derivative Litig.***, No. C-06-03445 (N.D. Cal.). After successfully opposing the special litigation committee of the board of directors' motion to terminate the derivative claims, Robbins Geller Rudman & Dowd LLP recovered $43.6 million in direct financial benefits for KLATencor, including $33.2 million in cash payments by certain former executives and their directors' and officers' insurance carriers.

- ***In re Marvell Technology Grp. Ltd. Derivative Litig.***, No. C-06-03894 (N.D. Cal.). In this stock option backdating derivative action, Robbins Geller Rudman & Dowd LLP recovered $54.9 million in financial benefits, including $14.6 million in cash, for Marvell, in addition to extensive corporate governance reforms related to Marvell's stock option granting practices, board of directors' procedures and executive compensation. At the time, the recovery in Marvell represented one of the largest of its kind in shareholder derivative actions.

- ***In re KB Home S'holder Derivative Litig.***, No. 06-CV-05148 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP served as co-lead counsel for the plaintiffs and recovered more than $31 million in financial benefits, including $21.5 million in cash, for KB Home, plus substantial corporate governance enhancements relating to KB Home's stock option granting practices, director elections and executive compensation practices.

- ***In re Affiliated Computer Servs. Derivative Litig.***, No. 06-CV-1110 (N.D. Tex.). Robbins Geller Rudman & Dowd LLP served as counsel for the federal plaintiffs. After defeating the defendants' dismissal motions and opposing the special litigation committee of the board of directors' motion to terminate the federal derivative claims, Robbins Geller Rudman & Dowd LLP recovered $30 million in cash for Affiliated Computer Services. This amount exceeded the cash recovery anticipated for the company in the settlement negotiated by the special litigation committee in a parallel state court stock option backdating proceeding.

- ***In re Ditech Networks, Inc. Derivative Litig.***, No. C-06-05157 (N.D. Cal.). Robbins Geller Rudman & Dowd LLP served as co-lead counsel for plaintiffs

in this stock option backdating derivative action. The prosecution and settlement of the action resulted in the adoption of substantial corporate governance measures designed to enhance Ditech Network's stock option granting practices and improve the overall responsiveness of the Ditech Networks' board to shareholder concerns.

- ***In re F5 Networks, Inc. Derivative Litig.***, No. 81817-7 (Wash. Sup. Ct.). Robbins Geller Rudman & Dowd LLP represented the plaintiffs in this precedent-setting stock option backdating derivative action. Adopting the plaintiffs' arguments, the Washington Supreme Court unanimously held that shareholders of Washington corporations need not make a pre-suit litigation demand upon the board of directors where such a demand would be a futile act. The Washington Supreme Court also adopted Delaware's less-stringent pleading standard for establishing backdating and futility of demand in a shareholder derivative action, as urged by the plaintiffs.

## INSURANCE

Fraud and collusion in the insurance industry by executives, agents, brokers, lenders and others is one of the most costly crimes in the United States. Some experts have estimated the annual cost of white collar crime in the insurance industry to be over $120 billion nationally. Recent legislative proposals seek to curtail anti-competitive behavior within the industry. However, in the absence of comprehensive regulation, Robbins Geller Rudman & Dowd LLP has played a critical role as private attorney general in protecting the rights of consumers against insurance fraud and other unfair business practices within the insurance industry.

Robbins Geller Rudman & Dowd LLP attorneys were among the first to expose illegal and improper bid-rigging and kickbacks between insurance companies and brokers. The Firm is a leader in representing businesses, individuals, school districts, counties and the State of California in numerous actions in state and federal courts nationwide to stop these practices. To date, the Firm has helped recover over $200 million on behalf of insureds.

Robbins Geller Rudman & Dowd LLP attorneys have long been at the forefront of litigating race discrimination issues within the life insurance industry. For example, the Firm has fought the practice by certain insurers of charging African-Americans and other people of color more for life insurance than similarly situated Caucasians. The Firm recovered over $400 million for African-Americans and other minorities as redress for civil rights abuses, including landmark recoveries in *McNeil v. American General Life & Accident Insurance Company*; *Thompson v. Metropolitan Life Insurance Company*; and *Williams v. United Insurance Company of America*.

The Firm's attorneys fight on behalf of elderly victims targeted for the sale of deferred annuity products with hidden sales loads and illusory bonus features. Sales agents for life insurance companies such as Allianz Life Insurance Company of North America, Midland National Life Insurance Company, and National Western Life Insurance Company have targeted senior citizens for these annuities with lengthy investment horizons and high sales

commissions. The Firm has recovered millions of dollars for elderly victims and seeks to ensure that senior citizens are afforded full and accurate information regarding deferred annuities.

Robbins Geller Rudman & Dowd LLP attorneys also stopped the fraudulent sale of life insurance policies based on misrepresentations about how the life insurance policy would perform, the costs of the policy, and whether premiums would "vanish." Purchasers were also misled about the financing of a new life insurance policy, falling victim to a "replacement" or "churning" sales scheme where they were convinced to use loans, partial surrenders or withdrawals of cash values from an existing permanent life insurance policy to purchase a new policy.

- **Brokerage "Pay to Play" Cases**. On behalf of individuals, governmental entities, businesses, and non-profits, Robbins Geller Rudman & Dowd LLP has sued the largest commercial and employee benefit insurance brokers and insurers for unfair and deceptive business practices. While purporting to provide independent, unbiased advice as to the best policy, the brokers failed to adequately disclose that they had entered into separate "pay to play" agreements with certain third-party insurance companies. These agreements provide additional compensation to the brokers based on such factors as profitability, growth and the volume of insurance that they place with a particular insurer, and are akin to a profit-sharing arrangement between the brokers and the insurance companies. These agreements create a conflict of interest since the brokers have a direct financial interest in selling their customers only the insurance products offered by those insurance companies with which the brokers have such agreements.

  Robbins Geller Rudman & Dowd LLP attorneys were among the first to uncover and pursue the allegations of these practices in the insurance industry in both state and federal courts. On behalf of the California Insurance Commissioner, the Firm brought an injunctive case against the biggest employee benefit insurers and local San Diego brokerage, ULR, which resulted in major changes to the way they did business. The Firm also sued on behalf of the City and County of San Francisco to recover losses due to these practices. Finally, Robbins Geller Rudman & Dowd LLP represents a putative nationwide class of individuals, businesses, employers, and governmental entities against the largest brokerage houses and insurers in the nation. To date, the Firm has obtained over $200 million on behalf of policyholders and enacted landmark business reforms.

- **Discriminatory Credit Scoring and Redlining Cases**. Robbins Geller Rudman & Dowd LLP attorneys have prosecuted cases concerning countrywide schemes of alleged discrimination carried out by Nationwide, Allstate, and other insurance companies against African-American and other persons of color who are purchasers of homeowner and automobile insurance policies. Such discrimination includes alleged redlining and the improper use of "credit scores," which disparately impact minority

communities. Plaintiffs in these actions have alleged that the insurance companies' corporate-driven scheme of intentional racial discrimination includes refusing coverage and/or charging them higher premiums for homeowners and automobile insurance. On behalf of the class of aggrieved policyholders, the Firm has recovered over $400 million for these predatory and racist policies.

- **Senior Annuities**. Insurance companies and their agents target senior citizens for the sale of long-term deferred annuity products and misrepresent or otherwise fail to disclose the extremely high costs, including sales commissions. These annuities and their high costs are particularly harmful to seniors because they do not mature for 15 or 20 years, often beyond the elderly person's life expectancy. Also, they carry exorbitant surrender charges if cashed in before they mature. As a result, the annuitant's money is locked up for years, and the victims or their loved ones are forced to pay high surrender charges if they need to get it out early. Nevertheless, many companies and their sales agents intentionally target the elderly for their deferred annuity products, holding seminars in retirement centers and nursing homes, and through pretexts such as wills and estate planning or financial advice. The Firm has filed lawsuits against a number of life insurance companies, including Allianz Life Insurance Company of North America, Midland National Life Insurance Company, and Jackson National Insurance Company, in connection with the marketing and sales of deferred annuities to senior citizens. We are investigating similar practices by other companies.

- **State Farm**. State Farm and other automobile insurance companies in California have illegally charged monthly policyholders more premiums than they are required to pay. Because automobile insurance is required under law, it is closely regulated. State Farm and others bring in millions of dollars each year by concealing up front that policyholders must pay an extra charge if they opt for a monthly plan, and they later tack on the extra charge without revealing it as a premium as they must do under state law. Robbins Geller Rudman & Dowd LLP attorneys have fought this practice, recovering millions of dollars on behalf of policyholders.

## ANTITRUST

Robbins Geller Rudman & Dowd LLP's antitrust practice focuses on representing businesses and individuals who have been the victims of price-fixing, unlawful monopolization, market allocation, tying and other anti-competitive conduct. The Firm has taken a leading role in many of the largest federal and state price-fixing, monopolization, market allocation and tying cases throughout the United States.

- ***In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.***, 05 MDL No. 1720 (E.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel in one of the country's largest antitrust actions,

in which merchants allege Visa, MasterCard and their member banks, including Bank of America, Citibank, JPMorgan Chase, Capital One, Wells Fargo and HSBC, among others, have collectively imposed and set the level of interchange fees paid by merchants on each Visa and MasterCard credit and debit transaction, in violation of federal and state antitrust laws. Fact discovery has closed, and plaintiffs' motion for class certification and the defendants' motions to dismiss are under submission.

- *In re Currency Conversion Fee Antitrust Litig.*, 01 MDL No. 1409 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys recovered $336 million for credit and debit cardholders in this multi-district litigation in which the Firm served as co-lead counsel. Plaintiffs alleged that Visa and MasterCard, and certain leading member banks of Visa and MasterCard, conspired to fix and maintain the foreign currency conversion fee charged to U.S. cardholders, and failed to disclose adequately the fee in violation of federal law. In October 2009, the trial court granted final approval of the $336 million settlement and described the Firm as a "highly competent and experienced" law firm. The court specifically commented: "Class Counsel provided extraordinarily high-quality representation. This case raised a number of unique and complex legal issues including the effect of arbitration clauses on consumer antitrust class actions, and collusive activity in the context of joint ventures." The court further praised the Firm as "indefatigable" and noted that the Firm's lawyers "represented the Class with a high degree of professionalism, and vigorously litigated every issue against some of the ablest lawyers in the antitrust defense bar." The trial court's final approval decision is currently on appeal.

- *The Apple iPod iTunes Antitrust Litig.*, No. C-05-00037-JW (N.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel for a proposed class of iPod purchasers. Plaintiffs assert that Apple illegally maintained its monopolies in the digital music and portable player markets by designing and revising its products to render any competing player or digital music incompatible. This conduct locked Apple's competitors out of the market and allowed Apple to inflate the price at which iPods were sold. Discovery is ongoing.

- *In re Aftermarket Automotive Lighting Products Antitrust Litig.*, 09 MDL No. 2007 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel in this multi-district litigation in which plaintiffs allege that defendants conspired to fix prices and allocate markets for automotive lighting products. Discovery is ongoing.

- *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388-EFH (D. Mass). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel on behalf of shareholders in this action against the nation's largest private equity firms who have colluded to restrain competition to suppress prices paid to

shareholders of public companies in connection with leveraged buyouts. The trial court denied the defendants' motion to dismiss and discovery is ongoing.

- ***In re Digital Music Antitrust Litig.***, 06 MDL No. 1780 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys are co-lead counsel in an action against the major music labels (Sony-BMG, EMI, Universal and Warner Music Group) in a case involving music that can be downloaded digitally from the Internet. Plaintiffs allege that defendants restrained the development of digital downloads and agreed to fix the distribution price of digital downloads at supracompetitive prices. Plaintiffs also allege that as a result of defendants' restraint of the development of digital downloads, and the market and price for downloads, defendants were able to maintain the prices of their CDs at supracompetitive levels. The Second Circuit Court of Appeals recently upheld plaintiffs' complaint, reversing the trial court's dismissal.

- ***In re NASDAQ Market-Makers Antitrust Litig.***, MDL No. 1023 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel in this case in which investors alleged that NASDAQ market-makers set and maintained artificially wide spreads pursuant to an industry-wide conspiracy. After three and one half years of intense litigation, the case settled for a total of $1.027 billion, at the time the largest ever antitrust settlement. The court commended counsel for its work, saying:

  > Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for the Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

  *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998).

- ***Hall v. NCAA (Restricted Earnings Coach Antitrust Litigation)***, No. 94-2392 (D. Kan.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel and lead trial counsel for one of three classes of coaches who alleged that the National Collegiate Athletic Association illegally fixed their compensation by instituting the "restricted earnings coach" rule. On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

- ***Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc. (Carbon Fiber Antitrust Litigation)***, No. CV-99-7796 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys were co-lead counsel (with one other firm) in this consolidated class action in which a class of purchasers alleged that the major producers of carbon fiber fixed its price from 1993 to 1999. The case settled for $67.5 million.

- ***In re Carbon Black Antitrust Litig.***, MDL No. 1543 (D. Mass.). Robbins Geller Rudman & Dowd LLP attorneys recovered $20 million for the class in this multi-district litigation in which the Firm served as co-lead counsel. Plaintiffs purchased carbon black from major producers that unlawfully conspired to fix the price of carbon black, which is used in the manufacture of tires, rubber and plastic products, inks and other products, from 1999 to 2005.

- ***In re Dynamic Random Access Memory (DRAM) Antitrust Litig.***, 02 MDL No. 1486 (N.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys served on the executive committee in this multi-district class action in which a class of purchasers of dynamic random access memory (or DRAM) chips alleged that the leading manufacturers of semiconductor products fixed the price of DRAM chips from the fall of 2001 through at least the end of June 2002. The case settled for more than $300 million.

- ***Microsoft I-V Cases***, JCCP No. 4106 (Cal. Super. Ct., San Francisco County). Robbins Geller Rudman & Dowd LLP attorneys served on the executive committee in these consolidated cases in which California indirect purchasers challenged Microsoft's illegal exercise of monopoly power in the operating system, word processing and spreadsheet markets. In a settlement approved by the court, class counsel obtained an unprecedented $1.1 billion worth of relief for the business and consumer class members who purchased the Microsoft products.

## CONSUMER FRAUD

In our consumer-based economy, working families who purchase products and services must receive truthful information so they can make meaningful choices about how to spend their hard-earned money. When financial institutions and other corporations deceive consumers or take advantage of unequal bargaining power, class action suits provide, in many instances, the only realistic means for an individual to right a corporate wrong.

Robbins Geller Rudman & Dowd LLP attorneys represent consumers around the country in a variety of important, complex class actions. Our attorneys have taken a leading role in many of the largest federal and state consumer fraud, environmental, human rights and public health cases throughout the United States. The Firm is also actively involved in many cases relating to banks and the financial services industry, pursuing claims on behalf of individuals victimized by abusive telemarketing practices, abusive mortgage lending practices, market timing violations in the sale of variable annuities, and deceptive consumer credit lending practices in violation of the Truth-In-Lending Act. Below are a few representative samples of our robust, nationwide consumer practice.

- ***Bank Overdraft Fees Litigation***. The banking industry charges consumers exorbitant amounts for "overdraft" of their checking accounts, even if the customer did not authorize a charge beyond the available balance and even if the account would not have been overdrawn had the transactions been

ordered chronologically as they occurred – that is, banks reorder transactions to maximize such fees. In fact, it is reported that Americans spent more money on bank overdraft fees than on vegetables last year. The Firm has brought lawsuits against major banks to stop this practice and recover the hundreds of millions, if not billions, of dollars in overdraft fees. We are investigating other banks that engage in this practice.

- ***Vertrue Sales and Marketing Practices Litigation***. Telemarketing companies use a deceptive telemarketing practice they call "upselling." In the *Vertrue Sales Practices Litigation*, after purchasing products (including Nad's, vitamins, knives, Q-Ray bracelets, Edgemaster paint roller, Simoniz car washer, flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean) via an infomercial, consumers were told they were being sent a free 30-day trial membership in an unrelated buying club. Those consumers who did not refuse the 30-day membership were charged between $60 and $150 annually for this so-called "gift." We have filed suit in 21 states.

- ***Chase Bank Home Equity Line of Credit Litigation***. In October 2008, after receiving $25 billion in TARP funding to encourage lending institutions to provide businesses and consumers with access to credit, Chase Bank began unilaterally suspending its customers' home equity lines of credit. Plaintiffs charge that Chase Bank did so using an unreliable computer model that did not reliably estimate the actual value of its customers' homes in breach of the borrowers' contracts. The Firm has brought a lawsuit to secure damages on behalf of borrowers whose credit lines were improperly suspended.

- ***Pacific Gas & Electric Trespass Litigation***. Robbins Geller Rudman & Dowd LLP attorneys have filed suit on behalf of property owners alleging that PG&E has trespassed on their land. In short, PG&E has electricity easements giving it access for the purposes of building towers and stringing lines related to the transmission of electricity. PG&E has recently installed a fiberoptic telecommunications network which it has leased to telephone and Internet services, despite the fact that the electricity easements do not allow PG&E to use plaintiffs' property to engage in general telecommunications business. Through their lawsuit, plaintiffs seek damages to compensate them for PG&E's trespass.

## SETTLEMENTS

- ***Visa and MasterCard Fees***. After years of litigation and a six-month trial, Robbins Geller Rudman & Dowd LLP attorneys won one of the largest consumer-protection verdicts ever awarded in the United States. The Firm's attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from cardholders. The court ordered Visa and MasterCard to return $800,000,000 in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest. In addition, the court ordered full disclosure of the hidden fee.

- ***Drivers' Privacy Case***. In a cutting-edge consumer case, Robbins Geller Rudman & Dowd LLP attorneys brought a case on behalf of a half-million Florida drivers against a national bank for purchasing their private information from the state department of motor vehicles for marketing purposes. After years of litigation that included appeals to the United States Supreme Court, the Firm's attorneys successfully negotiated a $50 million all-cash settlement in this cutting-edge case involving consumer privacy rights. The published decision in *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209 (11th Cir. 2005), one of the first opinions construing the Federal Drivers Privacy Protection Act, was a victory for the Firm's clients.

- ***LifeScan Diabetic Systems***. Robbins Geller Rudman & Dowd LLP attorneys were responsible for achieving a $45 million all-cash settlement with Johnson & Johnson and its wholly owned subsidiary, LifeScan, Inc., over claims that LifeScan deceptively marketed and sold a defective blood-glucose monitoring system for diabetics. The LifeScan settlement was noted by the court as providing "exceptional results" for members of the class.

- ***West Telemarketing Case***. Robbins Geller Rudman & Dowd LLP attorneys secured a $39 million settlement for class members caught up in a telemarketing scheme where consumers were charged for an unwanted membership program after purchasing Tae-Bo exercise videos. Under the settlement, consumers were entitled to claim between one and one-half to three times the amount of all fees they unknowingly paid.

- ***Dannon Activia***®. Robbins Geller Rudman & Dowd LLP attorneys secured the largest ever settlement for a false advertising case involving a food product. The case alleged that Dannon's advertising for its Activia® and DanActive® branded products and their benefits from "probiotic" bacteria were overstated. As part of the nationwide settlement, Dannon agreed to modify its advertising and establish a fund of up to $45 million to compensate consumers for their purchases of Activia® and DanActive®.

- ***Out-of-Network Emergency Room Doctors***. In a case that changed the way out-of-network emergency room physicians are paid by insurance carriers in Florida, Robbins Geller Rudman & Dowd LLP successfully represented a class of physicians who claimed their reimbursements for emergency services were unfair. As a result of the case, these physicians were guaranteed approximately double the rate of reimbursement they received prior to the case being pursued, resulting in a recovery of nearly $20 million and important business reforms.

- ***Mattel Lead Paint Toys***. In 2006-2007, toy manufacturing giant Mattel, and its subsidiary Fisher-Price, announced the recall of over 14 million toys made in China due to hazardous lead and dangerous magnets. Robbins Geller Rudman & Dowd LLP attorneys filed lawsuits on behalf of millions of parents and other consumers who purchased or received toys for children that were

marketed as safe but were later recalled because they were dangerous. The Firm's attorneys reached a landmark settlement for millions of dollars in refunds and lead testing reimbursements, as well as important testing requirements to ensure that Mattel's toys are safe for consumers in the future.

- ***Tenet Healthcare Cases***. Robbins Geller Rudman & Dowd LLP attorneys were co-lead counsel in a class action alleging a fraudulent scheme of corporate misconduct, resulting in the overcharging of uninsured patients by the Tenet chain of hospitals. The Firm's attorneys represented uninsured patients of Tenet hospitals nationwide who were overcharged by Tenet's admittedly "aggressive pricing strategy," which resulted in price gouging of the uninsured. The case was settled with Tenet changing its practices and making refunds to patients.

## HUMAN RIGHTS, LABOR PRACTICES AND PUBLIC POLICY

Robbins Geller Rudman & Dowd LLP attorneys have a long tradition of representing the victims of unfair labor practices and violations of human rights. These include:

- ***Does I v. The Gap, Inc.***, No. 01 0031 (D. N. Mar. I.). In this groundbreaking case, Robbins Geller Rudman & Dowd LLP attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top U.S. retailers such as The Gap, Target and J.C. Penney. In the first action of its kind, Robbins Geller Rudman & Dowd LLP attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act, and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan. This case was a companion to two other actions: ***Does I v. Advance Textile Corp.***, No. 99 0002 (D. N. Mar. I.), which alleged overtime violations by the garment factories under the Fair Labor Standards Act and local labor law, and ***UNITE v. The Gap, Inc.***, No. 300474 (Cal. Super. Ct., San Francisco County), which alleged violations of California's Unfair Practices Law by the U.S. retailers. These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones. The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts at bringing about the precedent-setting settlement of the actions.

- ***Kasky v. Nike, Inc.***, 27 Cal. 4th 939 (2002). The California Supreme Court upheld claims that an apparel manufacturer misled the public regarding its exploitative labor practices, thereby violating California statutes prohibiting unfair competition and false advertising. The Court rejected defense contentions that any misconduct was protected by the First Amendment,

finding the heightened constitutional protection afforded to noncommercial speech inappropriate in such a circumstance.

- **World War II-Era Slave Labor**. Against steep odds, the Firm's lawyers took up the claims of people forced to work as slave labor for Japanese corporations during the Second World War. Their human rights case ran into trouble when the Ninth Circuit agreed with the Bush administration that any claims against Japanese corporations and their subsidiaries were preempted by the federal government's foreign-affairs power. *See Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003). The case nonetheless demonstrates the lawyers' dedication to prosecuting human-rights violations against the challenge of formidable political opposition.

- **Taco Bell workers**. Robbins Geller Rudman & Dowd LLP attorneys represented over 2,300 Taco Bell workers who were denied thousands of hours of overtime pay because, among other reasons, they were improperly classified as overtime-exempt employees.

Shareholder derivative litigation brought by Robbins Geller Rudman & Dowd LLP attorneys at times also involves stopping anti-union activities, including:

- **Southern Pacific/Overnite**. A shareholder action stemming from several hundred million dollars in loss of value in the company due to systematic violations by Overnite of U.S. labor laws.

- **Massey Energy**. A shareholder action against an anti-union employer for flagrant violations of environmental laws resulting in multi-million-dollar penalties.

- **Crown Petroleum**. A shareholder action against a Texas-based oil company for self-dealing and breach of fiduciary duty while also involved in a union lockout.

## ENVIRONMENT AND PUBLIC HEALTH

Robbins Geller Rudman & Dowd LLP attorneys have also represented plaintiffs in class actions related to environmental law. The Firm's attorneys represented, on a *pro bono* basis, the Sierra Club and the National Economic Development and Law Center as *amici curiae* in a federal suit designed to uphold the federal and state use of project labor agreements ("PLAs"). The suit represented a legal challenge to President Bush's Executive Order 13202, which prohibits the use of project labor agreements on construction projects receiving federal funds. Our *amici* brief in the matter outlined and stressed the significant environmental and socio-economic benefits associated with the use of PLAs on large-scale construction projects.

Attorneys with Robbins Geller Rudman & Dowd LLP have been involved in several other significant environmental cases, including:

- **Public Citizen v. U.S. D.O.T**. Robbins Geller Rudman & Dowd LLP attorneys represented a coalition of labor, environmental, industry and public health organizations including Public Citizen, The International Brotherhood of Teamsters, California AFL-CIO and California Trucking Industry in a challenge to a decision by the Bush Administration to lift a Congressionally-imposed "moratorium" on cross-border trucking from Mexico on the basis that such trucks do not conform to emission controls under the Clean Air Act, and further, that the Administration did not first complete a comprehensive environmental impact analysis as required by the National Environmental Policy Act. The suit was dismissed by the United States Supreme Court, the Court holding that because the D.O.T. lacked discretion to prevent crossborder trucking, an environmental assessment was not required.

- **Sierra Club v. AK Steel**. Brought on behalf of the Sierra Club for massive emissions of air and water pollution by a steel mill, including homes of workers living in the adjacent communities, in violation of the Federal Clean Air Act, Resource Conservation Recovery Act and the Clean Water Act.

- **MTBE Litigation**. Brought on behalf of various water districts for befouling public drinking water with MTBE, a gasoline additive linked to cancer.

- **Exxon Valdez**. Brought on behalf of fisherman and Alaska residents for billions of dollars in damages resulting from the greatest oil spill in U.S. history.

- **Avila Beach**. A citizens' suit against UNOCAL for leakage from the oil company pipeline so severe it literally destroyed the town of Avila Beach, California.

Federal laws such as the Clean Water Act, the Clean Air Act, and the Resource Conservation and Recovery Act and state laws such as California's Proposition 65 exist to protect the environment and the public from abuses by corporate and government organizations. Companies can be found liable for negligence, trespass or intentional environmental damage, be forced to pay for reparations and to come into compliance with existing laws. Prominent cases litigated by Robbins Geller Rudman & Dowd LLP attorneys include representing more than 4,000 individuals suing for personal injury and property damage related to the Stringfellow Dump Site in Southern California, participation in the Exxon Valdez oil spill litigation, and litigation involving the toxic spill arising from a Southern Pacific train derailment near Dunsmuir, California.

Robbins Geller Rudman & Dowd LLP attorneys have led the fight against Big Tobacco since 1991. As an example, Robbins Geller Rudman & Dowd LLP attorneys filed the case that helped get rid of Joe Camel, representing various public and private plaintiffs, including the State of Arkansas, the general public in California, the cities of San Francisco, Los Angeles and Birmingham, 14 counties in California, and the working men and women of this country in the Union Pension and Welfare Fund cases that have been filed in 40 states.

In 1992, Robbins Geller Rudman & Dowd LLP attorneys filed the first case in the country that alleged a conspiracy by the Big Tobacco companies.

## INTELLECTUAL PROPERTY

Individual inventors, universities, and research organizations provide the fundamental research behind many existing and emerging technologies. Every year, the majority of U.S. patents are issued to this group of inventors. Through this fundamental research, these inventors provide a significant competitive advantage to this country. Unfortunately, while responsible for most of the inventions that issue into U.S. patents every year, individual inventors, universities and research organizations receive very little of the licensing revenues for U.S. patents. Large companies reap 99% of all patent licensing revenues.

Robbins Geller Rudman & Dowd LLP enforces the rights of these inventors by filing and litigating patent infringement cases against infringing entities. Our attorneys have decades of patent litigation experience in a variety of technical applications. This experience, combined with the Firm's extensive resources, gives individual inventors the ability to enforce their patent rights against even the largest infringing companies.

Our attorneys have experience handling cases involving a broad range of technologies, including:

- biochemistry
- telecommunications
- medical devices
- medical diagnostics
- networking systems
- computer hardware devices and software
- mechanical devices
- video gaming technologies
- audio and video recording devices

Current intellectual property cases include:

- ***vTRAX Technologies Licensing, Inc. v. Siemens Communications, Inc.***, No. 10-CV-80369 (S.D. Fla.). Counsel for plaintiff vTRAX Technologies in a patent infringement action involving U.S. Patent No. 6,865,268 for "Dynamic, Real-Time Call Tracking for Web-Based Customer Relationship Management."

- **U.S. Ethernet Innovations**. Counsel for plaintiff U.S. Ethernet Innovations, owner of the 3Com Ethernet Patent Portfolio, in multiple patent infringement actions involving U.S. Patent Nos. 5,307,459 for "Network Adapter with Host Indication Optimization," 5,434,872 for "Apparatus for Automatic Initiation of Data Transmission," 5,732,094 for "Method for Automatic Initiation of Data Transmission," and 5,299,313 for "Network Interface with Host Independent Buffer Management."

- **SIPCO, LLC v. Johnson Controls, Inc.**, No. 09-CV-532 (E.D. Tex.). Counsel for plaintiff SIPCO in a patent infringement action involving U.S. Patent Nos. 7,103,511 for "Wireless Communications Networks for Providing Remote Monitoring of Devices" and 6,437,692 and 7,468,661 for "System and Method for Monitoring and Controlling Remote Devices."

- **SIPCO, LLC v. Florida Power & Light Co.**, No. 09-CV-22209 (S.D. Fla.). Counsel for plaintiff SIPCO, LLC in a patent infringement action involving U.S. Patent Nos. 6,437,692, 7,053,767 and 7,468,661, entitled "System and Method for Monitoring and Controlling Remote Devices."

- **IPCO, LLC v. Cellnet Technology, Inc.**, No. 05-CV-2658 (N.D. Ga.). Counsel for plaintiff IPCO, LLC in a patent infringement action involving U.S. Patent No. 6,044,062 for a "Wireless Network System and Method for Providing Same" and U.S. Patent No. 6,249,516 for a "Wireless Network Gateway and Method for Providing Same."

- **IPCO, LLC v. Tropos Networks, Inc.**, No. 06-CV-585 (N.D. Ga.). Counsel for plaintiff IPCO, LLC in a patent infringement action involving U.S. Patent No. 6,044,062 for a "Wireless Network System and Method for Providing Same" and U.S. Patent No. 6,249,516 for a "Wireless Network Gateway and Method for Providing Same."

- **Jardin v. Datallegro, Inc.**, No. 08-CV-01462 (S.D. Cal.). Counsel for plaintiff Cary Jardin in a patent infringement action involving U.S. Patent No. 7,177,874 for a "System and Method for Generating and Processing Results Data in a Distributed System."

- **NorthPeak Wireless, LLC v. 3Com Corporation**, No. 09-CV-00602 (N.D. Cal.). Counsel for plaintiff NorthPeak Wireless, LLC in a multi-defendant patent infringement action involving U.S. Patent Nos. 4,977,577 and 5,987,058 related to spread spectrum devices.

- **PageMelding, Inc. v. Feeva Technology, Inc.**, No. 08-CV-03484 (N.D. Cal.). Counsel for plaintiff PageMelding, Inc. in a patent infringement action involving U.S. Patent No. 6,442,577 for a "Method and Apparatus for Dynamically Forming Customized Web Pages for Web Sites."

- ***SIPCO, LLC v. Amazon.com, Inc.***, No. 08-CV-359 (E.D. Tex.). Counsel for plaintiff SIPCO in a multi-defendant patent infringement action involving U.S. Patent No. 6,891,838 for a "System and Method for Monitoring and Controlling Residential Devices" and U.S. Patent No. 7,103,511 for "Wireless Communication Networks for Providing Remote Monitoring Devices."

- ***IPCO, LLC d/b/a Intus IQ v. Oncor Electric Delivery Co. LLC***, No. 09-CV-00037 (E.D. Tex.). Counsel for plaintiff Intus IQ in a patent infringement action involving U.S. Patent Nos. 6,249,516 and 7,054,271 for a "Wireless Network System and Method for Providing Same."

## PRO BONO

Robbins Geller Rudman & Dowd LLP attorneys have a distinguished record of *pro bono* work. In 1999, the Firm's lawyers were finalists for the San Diego Volunteer Lawyer Program's 1999 *Pro Bono* Law Firm of the Year Award, for their work on a disability-rights case. In 2003, when the Firm's lawyers were nominated for the California State Bar President's *Pro Bono* Law Firm of the Year award, the State Bar President praised them for "dedication to the provision of *pro bono* legal services to the poor" and "extending legal services to underserved communities."

More recently, one of the Firm's lawyers obtained political asylum, after an initial application for political asylum had been denied, for an impoverished Somali family whose ethnic minority faced systematic persecution and genocidal violence in Somalia. The family's female children also faced forced genital mutilation if returned to Somalia.

The Firm's lawyers worked as cooperating attorneys with the ACLU in a class action filed on behalf of welfare applicants subject to San Diego County's "Project 100%" program, which sent investigators from the D.A.'s office (Public Assistance Fraud Division) to enter and search the home of every person applying for welfare benefits, and to interrogate neighbors and employers – never explaining they had no reason to suspect wrongdoing. Real relief was had when the County admitted that food-stamp eligibility could not hinge upon the Project 100% "home visits," and again when the district court ruled that unconsented "collateral contacts" violated state regulations. The district court's ruling that CalWORKs aid to needy families could be made contingent upon consent to the D.A.'s "home visits" and "walk throughs," was affirmed by the Ninth Circuit with eight judges vigorously dissenting from denial of *en banc* rehearing. *Sanchez v. County of San Diego*, 464 F.3d 916 (9th Cir. 2006), *reh'g denied* 483 F.3d 965 (9th Cir. 2007). The decision was noted by the *Harvard Law Review*, *The New York Times*, and even *The Colbert Report*.

The Firm's lawyers also have represented groups such as the Sierra Club and the National Economic Development and Law Center as *amici curiae* before the United States Supreme Court.

Senior appellate partner Eric Alan Isaacson has in a variety of cases filed *amicus curiae* briefs on behalf of religious organizations and clergy supporting civil rights, opposing government-backed religious-viewpoint discrimination, and generally upholding the

American traditions of religious freedom and church-state separation. Organizations represented as *amici curiae* in such matters have included the California Council of Churches, Union for Reform Judaism, Jewish Reconstructionist Federation, United Church of Christ, Unitarian Universalist Association of Congregations, Unitarian Universalist Legislative Ministry – California, and California Faith for Equality.

## JUDICIAL COMMENDATIONS

Robbins Geller Rudman & Dowd LLP attorneys have been commended by countless judges all over the country for the quality of their representation in class-action lawsuits.

- In March 2009, Judge Karon Bowdre commented in the HealthSouth class certification opinion that "[t]he court has had many opportunities since November 2001 to examine the work of class counsel and the supervision by the Class Representatives. The court find both to be far more than adequate."

  *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S, Memorandum Opinion (S.D. Ala. Mar. 31, 2009).

- In October 2007, a $600 million settlement for shareholders in the securities fraud class action against Ohio's biggest drug distributor, Cardinal Health, Inc., was approved – the largest settlement in the Sixth Circuit. Judge Marbley commented:

  > The quality of representation in this case was superb. Lead Counsel, [Robbins Geller Rudman & Dowd LLP], are nationally recognized leaders in complex securities litigation class actions. The quality of the representation is demonstrated by the substantial benefit achieved for the Class and the efficient, effective prosecution and resolution of this action. Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law firms.

  *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007).

- In the *Enron* securities class action, Robbins Geller Rudman & Dowd LLP attorneys and lead plaintiff The Regents of the University of California successfully recovered over ***$7.2 billion*** on behalf of Enron investors. The court overseeing this action had utmost praise for Robbins Geller Rudman & Dowd LLP's efforts and stated that "[t]he experience, ability, and reputation of the attorneys of [Robbins Geller Rudman & Dowd LLP] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008).

The court further commented, "[I]n the face of extraordinary obstacles, the skills, expertise, commitment, and tenacity of [Robbins Geller Rudman & Dowd LLP] in this litigation cannot be overstated. Not to be overlooked are the unparalleled results, . . . which demonstrate counsel's clearly superlative litigating and negotiating skills." *Id.* at 789.

In addition, the court noted, "This Court considers [Robbins Geller Rudman & Dowd LLP] 'a lion' at the securities bar on the national level," noting that the Lead Plaintiff selected Robbins Geller Rudman & Dowd LLP because of the Firm's "outstanding reputation, experience, and success in securities litigation nationwide." *Id.* at 790.

- In *Stanley v. Safeskin Corp.*, No. 99 CV 454 (S.D. Cal. May 25, 2004), where Robbins Geller Rudman & Dowd LLP attorneys obtained $55 million for the class of investors, Judge Moskowitz stated:

   > I said this once before, and I'll say it again. I thought the way that your firm handled this case was outstanding. This was not an easy case. It was a complicated case, and every step of the way, I thought they did a very professional job.

- In April 2005, in granting final approval of a $100 million settlement obtained after two weeks of trial in *In re AT&T Corp. Sec. Litig.*, MDL No. 1399 (D.N.J.), Judge Garrett E. Brown, Jr. stated the following about the Robbins Geller Rudman & Dowd LLP attorneys prosecuting the case:

   > Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

   *In re AT&T Corp. Sec. Litig.*, MDL No. 1399, 2005 U.S. Dist. LEXIS 46144, at *28-*29 (D.N.J. Apr. 25, 2005), *aff'd*, 455 F.3d 160 (3d Cir. 2006).

- In a December 2006 hearing on the $50 million consumer privacy class action settlement in *Kehoe v. Fidelity Fed. Bank & Trust*, No. 03-80593-CIV (S.D. Fla.), United States District Court Judge Daniel T.K. Hurley said the following:

   > First, I thank counsel. As I said repeatedly on both sides we have been very, very fortunate. We have had fine lawyers on

both sides. The issues in the case are significant issues. We are talking about issues dealing with consumer protection and privacy – something that is increasingly important today in our society. [I] want you to know I thought long and hard about this. I am absolutely satisfied that the settlement is a fair and reasonable settlement. [I] thank the lawyers on both sides for the extraordinary effort that has been brought to bear here.

- In July 2007, the Honorable Richard Owen of the Southern District of New York approved the $129 million settlement of *In re Doral Fin. Corp. Sec. Litig.*, 05 MDL No. 1706 (S.D.N.Y.), finding in his order that:

  The services provided by Lead Counsel [Robbins Geller Rudman & Dowd LLP] were efficient and highly successful, resulting in an outstanding recovery for the Class without the substantial expense, risk and delay of continued litigation. Such efficiency and effectiveness supports the requested fee percentage.

  Cases brought under the federal securities laws are notably difficult and notoriously uncertain. . . . Despite the novelty and difficulty of the issues raised, Lead Plaintiffs' counsel secured an excellent result for the Class.

  . . . Based upon Lead Plaintiff's counsel's diligent efforts on behalf of the Class, as well as their skill and reputations, Lead Plaintiff's counsel were able to negotiate a very favorable result for the Class. . . . The ability of [Robbins Geller Rudman & Dowd LLP] to obtain such a favorable partial settlement for the Class in the face of such formidable opposition confirms the superior quality of their representation . . . .

## NOTABLE CLIENTS

**PUBLIC FUND CLIENTS**

- Alaska State Pension Investment Board

- California Public Employees' Retirement System

- California State Teachers' Retirement System

- Teachers' Retirement System of the State of Illinois

- Illinois Municipal Retirement Fund

- Illinois State Board of Investment

- Los Angeles County Employees Retirement Association

- Maine State Retirement System

- The Maryland-National Capital Park & Planning Commission Employees' Retirement System

- Milwaukee Employees' Retirement System

- Minnesota State Board of Investment

- New Hampshire Retirement System

- New Mexico Public Funds (New Mexico Educational Retirement Board, New Mexico Public Employees Retirement Association, and New Mexico State Investment Council)

- Ohio Public Funds (Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio, Ohio Police and Fire Pension Fund, Ohio State Highway Patrol Retirement System, and Ohio Bureau of Workers' Compensation)

- The Regents of the University of California

- State Universities Retirement System of Illinois

- State of Wisconsin Investment Board

- Tennessee Consolidated Retirement System

- Washington State Investment Board

- Wayne County Employees' Retirement System

- West Virginia Investment Management Board

**MULTI-EMPLOYER CLIENTS**

- Alaska Electrical Pension Fund

- Alaska Hotel & Restaurant Employees Pension Trust Fund

- Alaska Ironworkers Pension Trust

- Carpenters Pension Fund of West Virginia

- Carpenters Health & Welfare Fund of Philadelphia & Vicinity

- Carpenters Pension Fund of Baltimore, Maryland

- Carpenters Pension Fund of Illinois

- Southwest Carpenters Pension Trust

- Central States, Southeast and Southwest Areas Pension Fund

- Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund

- Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds

- 1199 SEIU Greater New York Pension Fund

- Massachusetts State Carpenters Pension and Annuity Funds

- Massachusetts State Guaranteed Fund

- New England Health Care Employees Pension Fund

- SEIU Staff Fund

- Southern California Lathing Industry Pension Fund

- United Brotherhood of Carpenters Pension Fund

**ADDITIONAL INSTITUTIONAL INVESTORS**

- Bank of Ireland Asset Management

- Northwestern Mutual Life Insurance Company

- Standard Life Investments

## PROMINENT CASES AND PRECEDENT-SETTING DECISIONS

**PROMINENT CASES**

- ***In re Enron Corp. Sec. Litig.***, No. H-01-3624 (S.D. Tex.). Investors lost billions of dollars as a result of the massive fraud at Enron. In appointing Robbins Geller Rudman & Dowd LLP lawyers as sole lead counsel to represent the interests of Enron investors, the court found that the Firm's zealous prosecution and level of "insight" set it apart from its peers. Robbins Geller Rudman & Dowd LLP attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of ***$7.2 billion*** for the benefit of investors. ***This is the largest***

*aggregate class action settlement not only in a securities class action, but in class action history*.

- *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.). In the *UnitedHealth* case, Robbins Geller Rudman & Dowd LLP represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances. For example, in 2006, the issue of high-level executives backdating stock options made national headlines. During that time, many law firms, including Robbins Geller Rudman & Dowd LLP, brought shareholder derivative lawsuits against the companies' boards of directors for breaches of their fiduciary duties or for improperly granting backdated options. Rather than pursuing a shareholder derivative case, the Firm filed a securities fraud class action against the company on behalf of CalPERS. In doing so, Robbins Geller Rudman & Dowd LLP faced significant and unprecedented legal obstacles with respect to loss causation, *i.e.*, that defendants' actions were responsible for causing the stock losses. Despite these legal hurdles, Robbins Geller Rudman & Dowd LLP obtained an $895 million recovery on behalf of the UnitedHealth shareholders. Shortly after reaching the $895 million settlement with UnitedHealth, the remaining corporate defendants, including former CEO William A. McGuire, also settled. Mr. McGuire paid $30 million and returned stock options representing more than three million shares to the shareholders. The total recovery for the class was over $925 million, the largest stock option backdating recovery ever, and *a recovery which is more than four times larger than the next largest options backdating recovery*. Moreover, Robbins Geller Rudman & Dowd LLP obtained unprecedented corporate governance reforms, including election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms which tie pay to performance.

- *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.). Sole lead counsel Robbins Geller Rudman & Dowd LLP obtained a jury verdict on May 7, 2009, following a six-week trial in the Northern District of Illinois, on behalf of a class of investors led by plaintiffs PACE Industry Union-Management Pension Fund, the International Union of Operating Engineers, Local No. 132 Pension Plan, and Glickenhaus & Company. The jury determined that Household and the individual defendants made fraudulent misrepresentations concerning the company's predatory lending practices, the quality of its loan portfolio and the company's financial results between March 23, 2001 and October 11, 2002. Although certain post-trial proceedings are ongoing, plaintiffs' counsel anticipate that the verdict will ultimately allow class members to recover in excess of $1 billion in damages. Since the enactment of the PSLRA in 1995, trials in securities fraud cases have been rare. According to published reports, only nine such cases have gone to verdict since the passage of the PSLRA.

- ***Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)***, No. 03 Civ. 8269 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001. The Firm's clients included major public institutions from across the country such as CalPERS, CalSTRS, the state pension funds of Maine, Illinois, New Mexico and West Virginia, union pension funds, and private entities such as AIG and Northwestern Mutual. Robbins Geller Rudman & Dowd LLP attorneys recovered more than $650 million for their clients on the May 2000 and May 2001 bond offerings (the primary offerings at issue), substantially more than they would have recovered as part of the class.

- ***In re Cardinal Health, Inc. Sec. Litig.***, No. C2-04-575 (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Robbins Geller Rudman & Dowd LLP obtained a recovery of $600 million for investors. On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund, the Firm aggressively pursued class claims and won notable courtroom victories, including a favorable decision on defendants' motion to dismiss. *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the $600 million settlement was the tenth-largest settlement in the history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit.

- ***AOL Time Warner Cases I & II***, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles County). Robbins Geller Rudman & Dowd LLP represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. Robbins Geller Rudman & Dowd LLP attorneys exposed a massive and sophisticated accounting fraud involving America Online's e-commerce and advertising revenue. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- ***In re HealthSouth Corp. Sec. Litig.***, No. CV-03-BE-1500-S (N.D. Ala.). As court-appointed co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys obtained a combined recovery of $671 million from HealthSouth, its auditor Ernst & Young, and its investment banker, UBS, for the benefit of stockholder plaintiffs. The settlement against HealthSouth represents one of

the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA. Likewise, the settlement against Ernst & Young is one of the largest securities class action settlements entered into by an accounting firm since the passage of the PSLRA. HealthSouth and its financial advisors perpetrated one of the largest and most pervasive frauds in the history of U.S. healthcare, prompting Congressional and law enforcement inquiry and resulting in guilty pleas of 16 former HealthSouth executives in related federal criminal prosecutions.

- ***In re Dynegy Inc. Sec. Litig.***, No. H-02-1571 (S.D. Tex.). As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller Rudman & Dowd LLP attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc. and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha. Given Dynegy's limited ability to pay, Robbins Geller Rudman & Dowd LLP attorneys structured a settlement (reached shortly before the commencement of trial) that maximized plaintiffs' recovery without bankrupting the company. Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller Rudman & Dowd LLP and The Regents believe will benefit all of Dynegy's stockholders.

- ***In re Qwest Commc'ns Int'l, Inc. Sec. Litig.***, No. 01-cv-1451 (D. Colo.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased Qwest securities. In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice. After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC. In 2008, Robbins Geller Rudman & Dowd LLP attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- ***In re AT&T Corp. Sec. Litig.***, MDL No. 1399 (D.N.J.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased AT&T common stock. The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, the largest IPO in American history. After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million. In granting approval of the settlement, the

court stated the following about the Robbins Geller Rudman & Dowd LLP attorneys handling the case:

> Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

*In re AT&T Corp. Sec. Litig.*, MDL No. 1399, 2005 U.S. Dist. LEXIS 46144, at *28-*29 (D.N.J. Apr. 25, 2005), *aff'd*, 455 F.3d 160 (3d Cir. 2006).

- ***In re Dollar Gen. Corp. Sec. Litig.***, No. 01-CV-00388 (M.D. Tenn.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel in this case in which the Firm recovered $172.5 million for investors. The *Dollar General* settlement was the largest shareholder class action recovery ever in Tennessee.

- ***Carpenters Health & Welfare Fund v. Coca-Cola Co.***, No. 00-CV-2838 (N.D. Ga.). As co-lead counsel representing Coca-Cola shareholders, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of $137.5 million after nearly eight years of litigation. Robbins Geller Rudman & Dowd LLP attorneys traveled to three continents to uncover the evidence that ultimately resulted in the settlement of this hard-fought litigation. The case concerned Coca-Cola's shipping of excess concentrate at the end of financial reporting periods for the sole purpose of meeting analyst earnings expectations, as well as the company's failure to properly account for certain impaired foreign bottling assets.

- ***Schwartz v. TXU Corp.***, No. 02-CV-2243 (N.D. Tex). As co-lead counsel, Robbins Geller Rudman & Dowd LLP attorneys obtained a recovery of over $149 million for a class of purchasers of TXU securities. The recovery compensated class members for damages they incurred as a result of their purchases of TXU securities at inflated prices. Defendants had inflated the price of these securities by concealing the fact that TXU's operating earnings were declining due to a deteriorating gas pipeline and the failure of the company's European operations.

- ***Thurber v. Mattel, Inc.***, No. 99-CV-10368 (C.D. Cal.). Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel for a class of investors who purchased Mattel common stock. When the shareholders approved Mattel's acquisition of The Learning Company, they were misled by

defendants' false statements regarding the financial condition of the acquired company. Within months of the close of the transaction, Mattel disclosed that The Learning Company had incurred millions in losses, and that instead of adding to Mattel's earnings, earnings would be far less than previously stated. After thorough discovery, Robbins Geller Rudman & Dowd LLP attorneys negotiated a settlement of $122 million plus corporate governance changes.

- ***Brody v. Hellman (U.S. West Dividend Litigation)***, No. 00-CV-4142 (Dist. Ct. for the City & Cty. of Denver, Colo.). Robbins Geller Rudman & Dowd LLP attorneys were court-appointed counsel for the class of former stockholders of U.S. West, Inc. who sought to recover a dividend declared by U.S. West before its merger with Qwest. The merger closed before the record and payment dates for the dividend, which Qwest did not pay following the merger. The case was aggressively litigated and the plaintiffs survived a motion to dismiss, two motions for summary judgment and successfully certified the class over vigorous opposition from defendants. In certifying the class, the court commented, "Defendants do not contest that Plaintiffs' attorneys are extremely well qualified to represent the putative class. This litigation has been ongoing for four years; in that time Plaintiffs' counsel has proven that they are more than adequate in ability, determination, and resources to represent the putative class." The case settled for $50 million on the day before trial was scheduled to commence. At the August 30, 2005 final approval hearing relating to the settlement, the court noted that the case "was litigated by extremely talented lawyers on both sides" and that the settlement was "a great result." In describing the risk taken by the Firm and its co-counsel, the court noted, "There wasn't any other lawyer[] in the United States that took the gamble that these people did. Not one other firm anywhere said I'm willing to take that on. I'll go five years. I'll pay out the expenses. I'll put my time and effort on the line." In discussing the difficulties facing the Firm in this case, the court said, "There wasn't any issue that wasn't fought. It took a great deal of skill to get to the point of trial." In concluding, the court remarked that the class was "fortunate they had some lawyers that had the guts to come forward and do it."

- ***In re NASDAQ Market-Makers Antitrust Litig.***, MDL No. 1023 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys served as court-appointed co-lead counsel for a class of investors. The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry-wide conspiracy in one of the largest and most important antitrust cases in recent history. After three and one half years of intense litigation, the case was settled for a total of $1.027 billion, at the time the largest ever antitrust settlement. An excerpt from the court's opinion reads:

> Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for the Defendants includes some of the largest, most successful and well

regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998).

- ***In re Exxon Valdez***, No. A89 095 Civ. (D. Alaska), and ***In re Exxon Valdez Oil Spill Litig.***, No. 3 AN 89 2533 (Alaska Super. Ct., 3d Jud. Dist.). Robbins Geller Rudman & Dowd LLP attorneys served on the Plaintiffs' Coordinating Committee and Plaintiffs' Law Committee in this massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. The jury awarded hundreds of millions in compensatory damages, as well as $5 billion in punitive damages (the latter were later reduced by the United States Supreme Court to $507 million).

- ***In re 3Com, Inc. Sec. Litig.***, No. C-97-21083 (N.D. Cal.). A hard-fought class action alleging violations of the federal securities laws in which Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for the class and obtained a recovery totaling $259 million.

- ***Mangini v. R.J. Reynolds Tobacco Co.***, No. 939359 (Cal. Super. Ct., San Francisco County). In this case, R.J. Reynolds admitted that "the *Mangini* action, and the way that it was vigorously litigated, was an early, significant and unique driver of the overall legal and social controversy regarding underage smoking that led to the decision to phase out the Joe Camel Campaign."

- ***Cordova v. Liggett Grp., Inc.***, No. 651824 (Cal. Super. Ct., San Diego County), and ***People v. Philip Morris, Inc.***, No. 980864 (Cal. Super. Ct., San Francisco County). Robbins Geller Rudman & Dowd LLP attorneys, as lead counsel in both these actions, played a key role in these cases which were settled with the Attorneys General's global agreement with the tobacco industry, bringing $26 billion to the State of California as a whole and $12.5 billion to the cities and counties within California.

- ***Does I v. The Gap, Inc.***, No. 01 0031 (D. N. Mar. I.). In this groundbreaking case, Robbins Geller Rudman & Dowd LLP attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top U.S. retailers such as The Gap, Target and J.C. Penney. In the first action of its kind, Robbins Geller Rudman & Dowd LLP attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act, and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan. This case was a companion to two other actions: ***Does I v. Advance Textile Corp.***, No. 99 0002 (D. N. Mar. I.), which alleged overtime violations by the garment factories under the Fair Labor Standards Act and local labor law, and ***UNITE v. The Gap, Inc.***, No.

300474 (Cal. Super. Ct., San Francisco County), which alleged violations of California's Unfair Practices Law by the U.S. retailers. These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones. The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts in bringing about the precedent-setting settlement of the actions.

- ***Hall v. NCAA (Restricted Earnings Coach Antitrust Litigation)***, No. 94-2392 (D. Kan.). Robbins Geller Rudman & Dowd LLP attorneys were lead counsel and lead trial counsel for one of three classes of coaches in these consolidated price fixing actions against the National Collegiate Athletic Association. On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

- ***In re Prison Realty Sec. Litig.***, No. 3:99-0452 (M.D. Tenn.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for the class, obtaining a $105 million recovery.

- ***In re Honeywell Int'l, Inc. Sec. Litig.***, No. 00-cv-03605 (D.N.J.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel for a class of investors that purchased Honeywell common stock. The case charged Honeywell and its top officers with violations of the federal securities laws, alleging the defendants made false public statements concerning Honeywell's merger with Allied Signal, Inc. and that defendants falsified Honeywell's financial statements. After extensive discovery, Robbins Geller Rudman & Dowd LLP attorneys obtained a $100 million settlement for the class.

- ***In re Reliance Acceptance Grp., Inc. Sec. Litig.***, 99 MDL No. 1304 (D. Del.). Robbins Geller Rudman & Dowd LLP attorneys served as co-lead counsel and obtained a recovery of $39 million.

- ***Schwartz v. Visa Int'l***, No. 822404-4 (Cal. Super. Ct., Alameda County). After years of litigation and a six-month trial, Robbins Geller Rudman & Dowd LLP attorneys won one of the largest consumer protection verdicts ever awarded in the United States. Robbins Geller Rudman & Dowd LLP attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from their cardholders. The court ordered Visa and MasterCard to return $800,000,000 in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest. In addition, the court ordered full disclosure of the hidden fee.

- ***Thompson v. Metro. Life Ins. Co.***, No. 00-cv-5071 (S.D.N.Y.). Robbins Geller Rudman & Dowd LLP attorneys served as lead counsel and obtained

$145 million for the class in a settlement involving racial discrimination claims in the sale of life insurance.

- *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, MDL No. 1061 (D.N.J.). In one of the first cases of its kind, Robbins Geller Rudman & Dowd LLP attorneys obtained a settlement of $4 billion for deceptive sales practices in connection with the sale of life insurance involving the "vanishing premium" sales scheme.

## PRECEDENT-SETTING DECISIONS

### INVESTOR AND SHAREHOLDER RIGHTS

- *Fox v. JAMDAT Mobile, Inc.*, 185 Cal. App. 4th 1068 (2010). Concluding that Delaware's shareholder ratification doctrine did not bar the claims, the California Court of Appeal reversed dismissal of a shareholder class action alleging breach of fiduciary duty in a corporate merger.

- *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009). The Third Circuit flatly rejected defense contentions that where relief is sought under §11 of the Securities Act of 1933, which imposes liability when securities are issued pursuant to an incomplete or misleading registration statement, class certification should depend upon findings concerning market efficiency and loss causation.

- *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009). In a securities fraud action, the Ninth Circuit rejected reliance upon a bright-line "statistical significance" materiality standard, agreeing with plaintiffs that defendants had omitted a material fact by failing to disclose a possible link between the company's popular cold remedy and the loss of sense of smell in some users.

- *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009). Aided by former United States Supreme Court Justice O'Connor's presence on the panel, the Fifth Circuit reversed a district court order denying class certification and also reversed an order granting summary judgment to defendants. The court held that the district court applied an incorrect fact-forfact standard of loss causation, and that genuine issues of fact on loss causation precluded summary judgment.

- *In re F5 Networks, Inc., Derivative Litig.*, 207 P.3d 433 (Wash. 2009). In a derivative action alleging unlawful stock option backdating, the Supreme Court of Washington ruled that shareholders need not make a pre-suit demand on the board of directors where this step would be futile, agreeing with plaintiffs that favorable Delaware case law should be followed as persuasive authority.

- ***Lormand v. US Unwired, Inc.***, 565 F.3d 228 (5th Cir. 2009). In a rare win for investors in the Fifth Circuit, the court reversed an order of dismissal, holding that safe harbor warnings were not meaningful when the facts alleged established a strong inference that defendants knew their forecasts were false. The court also held that plaintiffs sufficiently alleged loss causation.

- ***Institutional Investors Grp. v. Avaya, Inc.***, 564 F.3d 242 (3d Cir. 2009). In a victory for investors in the Third Circuit, the court reversed an order of dismissal, holding that shareholders pled with particularity why the company's repeated denials of price discounts on products were false and misleading when the totality of facts alleged established a strong inference that defendants knew their denials were false.

- ***Alaska Elec. Pension Fund v. Pharmacia Corp.***, 554 F.3d 342 (3d Cir. 2009), *cert. denied*, _ U.S. _, 130 S. Ct. 2401 (2010). The Third Circuit held that claims filed for violation of §10(b) of the Securities Exchange Act of 1934 were timely, adopting investors' argument that because scienter is a critical element of the claims, the time for filing them cannot begin to run until the defendants' fraudulent state of mind should be apparent.

- ***Rael v. Page***, 222 P.3d 678 (N.M. Ct. App.), *cert. denied*, 224 P.3d 649 (N.M. 2009). In this shareholder class and derivative action, Robbins Geller Rudman & Dowd LLP attorneys obtained an appellate decision reversing the trial court's dismissal of the complaint alleging serious director misconduct in connection with the merger of SunCal Companies and Westland Development Co., Inc., a New Mexico company with large and historic landholdings and other assets in the Albuquerque area. The appellate court held that plaintiff's claims for breach of fiduciary duty were direct, not derivative, because they constituted an attack on the validity or fairness of the merger and the conduct of the directors. Although New Mexico law had not addressed this question directly, at the urging of the Firm's attorneys, the court relied on Delaware law for guidance, rejecting the "special injury" test for determining the direct versus derivative inquiry and instead applying more recent Delaware case law.

- ***Luther v. Countrywide Home Loans Servicing LP***, 533 F.3d 1031 (9th Cir. 2008). In a case of first impression, the Ninth Circuit held that the Securities Act of 1933's specific non-removal features had not been trumped by the general removal provisions of the Class Action Fairness Act of 2005.

- ***In re Gilead Scis. Sec. Litig.***, 536 F.3d 1049 (9th Cir. 2008), *cert. denied*, _ U.S. _, 129 S. Ct. 1993 (2009). The Ninth Circuit upheld defrauded investors' loss causation theory as plausible, ruling that a limited temporal gap between the time defendants' misrepresentation was publicly revealed and the subsequent decline in stock value was reasonable where the public had not immediately understood the impact of defendants' fraud.

- ***Fidel v. Farley***, 534 F.3d 508 (6th Cir. 2008). The Sixth Circuit upheld class-notice procedures, rejecting an objector's contentions that class action settlements should be set aside because his own stockbroker had failed to forward timely notice of the settlement to him.

- ***In re WorldCom Sec. Litig.***, 496 F.3d 245 (2d Cir. 2007). The Second Circuit held that the filing of a class action complaint tolls the limitations period for all members of the class, including those who choose to opt out of the class action and file their own individual actions without waiting to see whether the district court certifies a class – reversing the decision below and effectively overruling multiple district court rulings that *American Pipe* tolling did not apply under these circumstances.

- ***In re Merck & Co. Sec., Derivative & ERISA Litig.***, 493 F.3d 393 (3d Cir. 2007). In a shareholder derivative suit appeal, the Third Circuit held that the general rule that discovery may not be used to supplement demand-futility allegations does not apply where the defendants enter a voluntary stipulation to produce materials relevant to demand futility without providing for any limitation as to their use.

- ***Alaska Elec. Pension Fund v. Brown***, 941 A.2d 1011 (Del. 2007). The Supreme Court of Delaware held that the Alaska Electrical Pension Fund, for purposes of the "corporate benefit" attorney-fee doctrine, was presumed to have caused a substantial increase in the tender offer price paid in a "going private" buyout transaction. The Court of Chancery originally ruled that Alaska's counsel, Robbins Geller Rudman & Dowd LLP, was not entitled to an award of attorney fees but Delaware's high court, in its published opinion, reversed and remanded for further proceedings.

- ***Crandon Capital Partners v. Shelk***, 157 P.3d 176 (Or. 2007). Oregon's Supreme Court ruled that a shareholder plaintiff in a derivative action may still seek attorney fees even if the defendants took actions to moot the underlying claims. The Firm's attorneys convinced Oregon's highest court to take the case, and reverse, despite the contrary position articulated by both the trial court and the Oregon Court of Appeals.

- ***In re Qwest Commc'ns Int'l***, 450 F.3d 1179 (10th Cir. 2006). In a case of first impression, the Tenth Circuit held that a corporation's deliberate release of purportedly privileged materials to governmental agencies was not a "selective waiver" of the privileges such that the corporation could refuse to produce the same materials to non-governmental plaintiffs in private securities fraud litigation.

- ***In re Guidant S'holders Derivative Litig.***, 841 N.E.2d 571 (Ind. 2006). Answering a certified question from a federal court, the Supreme Court of Indiana unanimously held that a pre-suit demand in a derivative action is excused if the demand would be a futile gesture. The court adopted a

"demand futility" standard and rejected defendants' call for a "universal demand" standard that might have immediately ended the case.

- **Denver Area Meat Cutters v. Clayton**, 209 S.W.3d 584 (Tenn. Ct. App. 2006). The Tennessee Court of Appeals rejected an objector's challenge to a class action settlement arising out of Warren Buffet's 2003 acquisition of Tennessee-based Clayton Homes. In their effort to secure relief for Clayton Homes stockholders, the Firm's attorneys obtained a temporary injunction of the Buffet acquisition for six weeks in 2003 while the matter was litigated in the courts. The temporary halt to Buffet's acquisition received national press attention.

- **DeJulius v. New Eng. Health Care Emps. Pension Fund**, 429 F.3d 935 (10th Cir. 2005). The Tenth Circuit held that the multi-faceted notice of a $50 million settlement in a securities fraud class action had been the best notice practicable under the circumstances, and thus satisfied both constitutional due process and Rule 23 of the Federal Rules of Civil Procedure.

- **In re Daou Sys.**, 411 F.3d 1006 (9th Cir. 2005). The Ninth Circuit sustained investors' allegations of accounting fraud and ruled that loss causation was adequately alleged by pleading that the value of the stock they purchased declined when the issuer's true financial condition was revealed.

- **Barrie v. Intervoice-Brite, Inc.**, 397 F.3d 249 (5th Cir.), *reh'g denied and opinion modified*, 409 F.3d 653 (5th Cir. 2005). The Fifth Circuit upheld investors' accounting-fraud claims, holding that fraud is pled as to both defendants when one knowingly utters a false statement and the other knowingly fails to correct it, even if the complaint does not specify who spoke and who listened.

- **Ill. Mun. Ret. Fund v. Citigroup, Inc.**, 391 F.3d 844 (7th Cir. 2004). The Seventh Circuit upheld a district court's decision that the Illinois Municipal Retirement Fund was entitled to litigate its claims under the Securities Act of 1933 against WorldCom's underwriters before a state court rather than before the federal forum sought by the defendants.

- **Nursing Home Pension Fund, Local 144 v. Oracle Corp.**, 380 F.3d 1226 (9th Cir. 2004). The Ninth Circuit ruled that defendants' fraudulent intent could be inferred from allegations concerning their false representations, insider stock sales and improper accounting methods.

- **City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.**, 399 F.3d 651 (6th Cir. 2004). The Sixth Circuit held that a statement regarding objective data supposedly supporting a corporation's belief that its tires were safe was actionable where jurors could have found a reasonable basis to believe the corporation was aware of undisclosed facts seriously undermining the statement's accuracy.

- ***Southland Sec. Corp. v. INSpire Ins. Solutions Inc.***, 365 F.3d 353 (5th Cir. 2004). The Fifth Circuit sustained allegations that an issuer's CEO made fraudulent statements in connection with a contract announcement.

- ***Pirraglia v. Novell, Inc.***, 339 F.3d 1182 (10th Cir. 2003). The Tenth Circuit upheld investors' accounting-fraud claims, holding that plaintiffs could not be expected to plead details of documents from defendants' files, that the materiality of defendants' false statements is usually not resolvable at the pleading stage, and that the absence of insider trading by individual defendants did not mean they lacked a motive to commit fraud.

- ***No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.***, 320 F.3d 920 (9th Cir. 2003). The Ninth Circuit upheld investors' fraud claims, ruling that the materiality of defendants' fraud was not reflected in the stock's market price until the full economic effects of defendants' fraud were finally revealed, and that a lack of stock sales by defendants is not dispositive as to scienter.

- ***In re Cavanaugh***, 306 F.3d 726 (9th Cir. 2002). The Ninth Circuit disallowed judicial auctions to select lead plaintiffs in securities class actions and protected lead plaintiffs' right to select the lead counsel they desire to represent them.

- ***Lone Star Ladies Inv. Club v. Schlotzsky's Inc.***, 238 F.3d 363 (5th Cir. 2001). The Fifth Circuit upheld investors' claims that securities offering documents were incomplete and misleading, reversing a district court order that had applied inappropriate pleading standards to dismiss the case.

### INSURANCE

- ***Smith v. Am. Family Mut. Ins. Co.***, 289 S.W.3d 675 (Mo. Ct. App. 2009). Capping nearly a decade of hotly contested litigation, the Missouri Court of Appeals reversed the trial court's judgment notwithstanding the verdict for auto insurer American Family and reinstated a unanimous jury verdict for the plaintiff class.

- ***Troyk v. Farmers Grp., Inc.***, 171 Cal. App. 4th 1305 (2009). The California Court of Appeal held that Farmers Insurance's practice of levying a "service charge" on one-month auto insurance policies, without specifying the charge in the policy, violated California's Insurance Code.

- ***Lebrilla v. Farmers Grp., Inc.***, 119 Cal. App. 4th 1070 (2004). Reversing the trial court, the California Court of Appeal ordered class certification of a suit against Farmers, one of the largest automobile insurers in California, and ruled that Farmers' standard automobile policy requires it to provide parts that are as good as those made by vehicle's manufacturer. The case

involved Farmers' practice of using inferior imitation parts when repairing insureds' vehicles.

- ***In re Monumental Life Ins. Co.***, 365 F.3d 408, 416 (5th Cir. 2004). The Fifth Circuit Court of Appeals reversed a district court's denial of class certification in a case filed by African-Americans seeking to remedy racially discriminatory insurance practices. The Fifth Circuit held that a monetary relief claim is viable in a Rule 23(b)(2) class if it flows directly from liability to the class as a whole and is capable of classwide "'computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.'"

- ***Dehoyos v. Allstate Corp.***, 345 F.3d 290 (5th Cir. 2003). The Fifth Circuit Court of Appeals held that claims under federal civil rights statutes involving the sale of racially discriminatory insurance policies based upon the use of credit scoring did not interfere with state insurance statutes or regulatory goals and were not preempted under the McCarran-Ferguson Act. Specifically, the appellate court affirmed the district court's ruling that the McCarran-Ferguson Act does not preempt civil-rights claims under the Civil Rights Act of 1866 and the Fair Housing Act for racially discriminatory business practices in the sale of automobile and homeowners insurance.

- ***Mass. Mut. Life Ins. Co. v. Superior Court***, 97 Cal. App. 4th 1282 (2002). The California Court of Appeal affirmed a trial court's order certifying a class in an action by purchasers of so-called "vanishing premium" life-insurance policies who claimed violations of California's consumer-protection statutes. The court held that common issues predominate where plaintiffs allege a uniform failure to disclose material information about policy dividend rates.

- ***Moore v. Liberty Nat'l Life Ins. Co.***, 267 F.3d 1209 (11th Cir. 2001). The Eleventh Circuit affirmed the district court's denial of the defendant's motion for judgment on the pleadings, rejecting contentions that insurance policyholders' claims of racial discrimination were barred by Alabama's common law doctrine of repose. The Eleventh Circuit also rejected the insurer's argument that the McCarran-Ferguson Act mandated preemption of plaintiffs' federal civil rights claims under 42 U.S.C. §§1981 and 1982.

## CONSUMER PROTECTION

- ***Kwikset Corp. v. Superior Court***, 51 Cal. 4th 310 (2011). In a leading decision interpreting the scope of Proposition 64's new standing requirements under California's Unfair Competition Law (UCL), the California Supreme Court held that consumers alleging that a manufacturer has misrepresented its product have "lost money or property" within the meaning of the initiative, and thus have standing to sue under the UCL, if they "can truthfully allege that they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise."

*Id.* at 317. *Kwikset* involved allegations, proven at trial, that defendants violated California's "Made in the U.S.A." statute by representing on their labels that their products were "Made in U.S.A." or "All-American Made" when, in fact, the products were substantially made with foreign parts and labor.

- ***Safeco Ins. Co. of Am. v. Superior Court***, 173 Cal. App. 4th 814 (2009). In a class action against auto insurer Safeco, the California Court of Appeal agreed that the plaintiff should have access to discovery to identify a new class representative after her standing to sue was challenged.

- ***Consumer Privacy Cases***, 175 Cal. App. 4th 545 (2009). The California Court of Appeal rejected objections to a nationwide class action settlement benefiting Bank of America customers.

- ***Koponen v. Pac. Gas & Elec. Co.***, 165 Cal. App. 4th 345 (2008). The Firm's attorneys obtained a published decision reversing the trial court's dismissal of the action, and holding that the plaintiff's claims for damages arising from the utility's unauthorized use of rights-of-way or easements obtained from the plaintiff and other landowners were not barred by a statute limiting the authority of California courts to review or correct decisions of the California Public Utilities Commission.

- ***Sanford v. MemberWorks, Inc.***, 483 F.3d 956 (9th Cir. 2007). In a telemarketing-fraud case, where the plaintiff consumer insisted she had never entered the contractual arrangement that defendants said bound her to arbitrate individual claims to the exclusion of pursuing class claims, the Ninth Circuit reversed an order compelling arbitration – allowing the plaintiff to litigate on behalf of a class.

- ***Ritt v. Billy Blanks Enters.***, 870 N.E.2d 212 (Ohio Ct. App. 2007). In the Ohio analog to the West case, the Ohio Court of Appeals approved certification of a class of Ohio residents seeking relief under Ohio's consumer protection laws for the same telemarketing fraud.

- ***Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n***, 148 P.3d 1179 (Haw. 2006). The Supreme Court of Hawaii ruled that claims of unfair competition were not subject to arbitration and that claims of tortious interference with prospective economic advantage were adequately alleged.

- ***Branick v. Downey Sav. & Loan Ass'n***, 39 Cal. 4th 235 (2006). Robbins Geller Rudman & Dowd LLP attorneys were part of a team of lawyers that briefed this case before the Supreme Court of California. The court issued a unanimous decision holding that new plaintiffs may be substituted, if necessary, to preserve actions pending when Proposition 64 was passed by California voters in 2004. Proposition 64 amended California's Unfair

Competition Law and was aggressively cited by defense lawyers in an effort to dismiss cases after the initiative was adopted.

- **McKell v. Wash. Mut., Inc.**, 142 Cal. App. 4th 1457 (2006). The California Court of Appeal reversed the trial court, holding that plaintiff's theories attacking a variety of allegedly inflated mortgage-related fees were actionable.

- **West Corp. v. Superior Court**, 116 Cal. App. 4th 1167 (2004). The California Court of Appeal upheld the trial court's finding that jurisdiction in California was appropriate over the out-of-state corporate defendant whose telemarketing was aimed at California residents. Exercise of jurisdiction was found to be in keeping with considerations of fair play and substantial justice.

- **Kruse v. Wells Fargo Home Mortg., Inc**., 383 F.3d 49 (2d Cir. 2004), and **Santiago v. GMAC Mortg. Grp., Inc.**, 417 F.3d 384 (3d Cir. 2005). In two groundbreaking federal appellate decisions, the Second and Third Circuits each ruled that the Real Estate Settlement Practices Act prohibits marking up home loan-related fees and charges.

- **Lavie v. Procter & Gamble Co**., 105 Cal. App. 4th 496 (2003). The California Court of Appeal issued an extensive opinion elaborating, for the first time in California law, the meaning of the "reasonable consumer" standard. The court announced a balanced approach that has enabled actions under California's leading consumer protection statutes when necessary to protect the public from acts of unfair business competition.

- **Kasky v. Nike, Inc.**, 27 Cal. 4th 939 (2002). The California Supreme Court upheld claims that an apparel manufacturer misled the public regarding its exploitative labor practices, thereby violating California statutes prohibiting unfair competition and false advertising. The court rejected defense contentions that such misconduct was protected by the First Amendment.

- **Spielholz v. Superior Court**, 86 Cal. App. 4th 1366 (2001). The California Court of Appeal held that false advertising claims against a wireless communications provider are not preempted by the Federal Communications Act of 1934.

## ATTORNEY BIOGRAPHIES

**PARTNERS**

### Mario Alba, Jr.

Mario Alba, Jr. is a partner in the Firm's New York office. Mr. Alba is responsible for initiating, investigating, researching and filing securities fraud class actions. Mr. Alba has served as lead counsel in numerous class actions alleging violations of securities laws,

including cases against NBTY ($16 million recovery) and OSI Pharmaceuticals ($9 million recovery). He is also part of the Firm's Institutional Outreach Department whereby he advises institutional investors. In addition, Mr. Alba is active in all phases of the Firm's lead plaintiff motion practice.

**Education:** B.S., St. John's University, 1999; J.D., Hofstra University School of Law, 2002

**Honors/Awards:** B.S., Dean's List, St. John's University, 1999; Selected as participant in Hofstra Moot Court Seminar, Hofstra University School of Law

### Susan K. Alexander

Susan K. Alexander is a partner in the Firm's San Francisco office and focuses on federal appeals of securities fraud class actions. With 25 years of federal appellate experience, Ms. Alexander has argued on behalf of defrauded investors in the First, Second, Fifth, Seventh, Ninth, Tenth and Eleventh Circuits. Representative results include *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) (reversal of district court dismissal of securities fraud complaint, focused on loss causation); and *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir.) (reversal of district court dismissal of securities fraud complaint, focused on scienter), *reh'g denied and opinion modified*, 409 F.3d 653 (5th Cir. 2005).

Ms. Alexander's prior appellate work was with the California Appellate Project ("CAP"), where she prepared appeals and petitions for writs of *habeas corpus* on behalf of individuals sentenced to death. At CAP, and subsequently in private practice, Ms. Alexander litigated and consulted on death penalty direct and collateral appeals for ten years. Representative results include *In re Brown*, 17 Cal. 4th 873 (1998) (reversal of first degree murder conviction, special circumstance finding, and death penalty), and *Odle v. Woodford*, 238 F.3d 1084 (9th Cir. 2001) (remand of death penalty conviction for retrospective competency hearing).

**Education:** B.A., Stanford University, 1983; J.D., University of California, Los Angeles, 1986

**Honors/Awards:** Appellate Delegate, Ninth Circuit Judicial Conference; Executive Committee, ABA Council of Appellate Lawyers

### X. Jay Alvarez

X. Jay Alvarez is a partner in the Firm's San Diego office. Mr. Alvarez's practice areas include securities fraud and other complex litigation. Mr. Alvarez is responsible for litigating securities class actions and has obtained recoveries for investors including in the following matters: *Carpenters Health & Welfare Fund v. Coca-Cola Co.* (N.D. Ga.) ($137.5 million recovery); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.* (D. Colo.) ($445 million recovery); *Hicks v. Morgan Stanley* (S.D.N.Y.), *Abrams v. VanKampen Funds Inc.* (N.D. Ill.), and *In re Eaton Vance* (D. Mass.) ($51.5 million aggregate settlements); *In re Cooper Cos., Inc. Sec. Litig.* (C.D. Cal.) ($27 million recovery); and *In re Bridgestone Sec. Litig.* (M.D. Tenn.) ($30 million recovery). Prior to joining the Firm, Mr. Alvarez served as an Assistant United States

Attorney for the Southern District of California, where he prosecuted a number of bank fraud, money laundering, and complex narcotics conspiracy cases.

**Education:** B.A., University of California, Berkeley, 1984; J.D., University of California, Berkeley, Boalt Hall School of Law, 1987

### STEPHEN R. ASTLEY

Stephen R. Astley is a partner in the Firm's Boca Raton office. Mr. Astley's practice is devoted to representing shareholders in actions brought under the federal securities laws. Mr. Astley has been responsible for the prosecution of complex securities cases and has obtained significant recoveries for investors, including cases involving Red Hat, US Unwired, TECO Energy, Tropical Sportswear, Medical Staffing, Sawtek, Anchor Glass, ChoicePoint, Jos. A. Bank, TomoTherapy, and Navistar. Prior to joining the Firm, Mr. Astley clerked for the Honorable Peter T. Fay, United States Court of Appeals for the Eleventh Circuit. In addition, he obtained extensive trial experience as a member of the United States Navy's Judge Advocate General's Corps, where he was the Senior Defense Counsel for the Pearl Harbor, Hawaii, Naval Legal Service Office Detachment.

**Education:** B.S., Florida State University, 1992; M. Acc., University of Hawaii at Manoa, 2001; J.D., University of Miami School of Law, 1997

**Honors/Awards:** J.D., *Cum Laude*, University of Miami School of Law, 1997; United States Navy Judge Advocate General's Corps., Lieutenant

### A. RICK ATWOOD, JR.

A. Rick Atwood, Jr. is a partner in the Firm's San Diego office and represents shareholders in securities class actions, merger-related class actions, and shareholder derivative actions in federal and state courts in numerous jurisdictions. Through his efforts on behalf of the Firm's clients, he has helped recover billions of dollars for shareholders. Significant opinions include *Brown v. Brewer*, No. CV 06-3731, 2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) (holding corporate directors to a higher standard of good faith conduct); *Crandon Capital Partners v. Shelk*, 157 P.3d 176 (Or. 2007) (expanding rights of shareholders in derivative litigation); *Ind. State Dist. Council of Laborers & HOD Carriers Pension Fund v. Renal Care Grp., Inc.*, No. 05-0451, 2005 U.S. Dist. LEXIS 24210 (M.D. Tenn. Aug. 18, 2005) (successfully obtaining remand of case improperly removed to federal court under the Class Action Fairness Act); *Pipefitters Local 522 & 633 Pension Trust Fund v. Salem Commc'ns Corp.*, No. CV 05-2730, 2005 U.S. Dist. LEXIS 14202 (C.D. Cal. June 28, 2005) (successfully obtaining remand of case improperly removed to federal court under the Securities Litigation Uniform Standards Act of 1998); *In re Prime Hospitality, Inc. S'holders Litig.*, No. 652-N, 2005 Del. Ch. LEXIS 61 (Del. Ch. May 4, 2005) (successfully objecting to unfair settlement and thereafter obtaining $25 million recovery for shareholders); and *Pate v. Elloway*, No. 01-03-00187-CV, 2003 Tex. App. LEXIS 9681 (Tex. App. Houston 1st Dist. Nov. 13, 2003) (upholding certification of shareholder class action under new Texas standards).

**Education:** B.A., University of Tennessee, Knoxville, 1987; B.A., Katholieke Universiteit Leuven, Belgium, 1988; J.D., Vanderbilt School of Law, 1991

**Honors/Awards:** B.A., Great Distinction, Katholieke Universiteit Leuven, Belgium, 1988; B.A., Honors, University of Tennessee, Knoxville, 1987; Authorities Editor, *Vanderbilt Journal of Transnational Law*, 1991

### AELISH M. BAIG

Aelish Marie Baig is a partner in the Firm's San Francisco office and focuses her practice on securities class action litigation in federal court. Ms. Baig has litigated a number of cases through jury trial, resulting in multi-million dollar awards or settlements for her clients. Ms. Baig has prosecuted numerous securities fraud actions filed against corporations such as Huffy, Pall and Verizon. Ms. Baig was part of the litigation and trial team in *White v. Cellco Partnership d/b/a Verizon Wireless*, which ultimately settled for $21 million and Verizon's agreement to an injunction restricting its ability to impose early termination fees in future subscriber agreements. Ms. Baig also prosecuted numerous stock option backdating actions, securing tens of millions of dollars in cash recoveries, as well as the implementation of comprehensive corporate governance enhancements for companies victimized by fraudulent stock option practices. Her clients have included the Counties of Santa Clara and Santa Cruz, as well as state, county and municipal pension funds across the country. Ms. Baig is a member of the California Bar, and has been admitted to practice in state and federal courts in California as well as in the U.S. Supreme Court.

**Education:** B.A., Brown University, 1992; J.D., Washington College of Law at American University, 1998.

**Honors/Awards:** J.D., *Cum Laude*, Washington College of Law at American University, 1998; Senior Editor, *Administrative Law Review*, Washington College of Law at American University

### RANDALL J. BARON

Randall J. Baron is a partner in the Firm's San Diego office and specializes in securities and corporate takeover litigation and breach of fiduciary duty actions. Mr. Baron is responsible for 7 of the 12 largest takeover settlements in history, including the largest settlement of its kind. In 2010, as a lead counsel in *In re Kinder Morgan, Inc. S'holder Litig.* (Kan. Dist. Ct., Shawnee County), Mr. Baron secured a settlement of $200 million on behalf of shareholders who were cashed out in the buyout. Other notable achievements include *In re Chaparral Res., Inc. S'holder Litig.* (Del. Ch.), where Mr. Baron was one of the lead trial counsel, which resulted in a common fund settlement of $41 million (or 45% increase above merger price); *In re ACS S'holder Litig.* (Del. Ch. and Tex. County Ct., Dallas County), where Mr. Baron, as lead Texas counsel, obtained significant modifications to the terms of the merger agreement and a $69 million common fund; *In re Prime Hospitality, Inc. S'holder Litig.* (Del. Ch.), where Mr. Baron led a team of lawyers who objected to a settlement that was unfair to the class and proceeded to litigate breach of fiduciary duty

issues involving a sale of hotels to a private equity firm, which resulted in a common fund settlement of $25 million for shareholders; and *In re Dollar Gen. S'holder Litig.* (Tenn. Cir. Ct., Davidson County), where Mr. Baron was lead trial counsel and helped to secure a settlement of up to $57 million in a common fund shortly before trial. Prior to joining the Firm, Mr. Baron served as a Deputy District Attorney from 1990-1994 in Los Angeles County.

**Education:** B.A., University of Colorado at Boulder, 1987; J.D., University of San Diego School of Law, 1990

**Honors/Awards:** J.D., *Cum Laude*, University of San Diego School of Law, 1990

### JAMES E. BARZ

James E. Barz is a former federal prosecutor and a registered CPA. He is a trial lawyer who has tried 18 federal and state jury trials to verdict. Mr. Barz has also been the lead or co-lead in numerous evidentiary hearings and injunction hearings, and he has argued nine cases in the Seventh Circuit. Mr. Barz has experience in state and federal court, as a prosecutor and plaintiffs' attorney, as well as defending both criminal and civil cases.

For the past three years, Mr. Barz has been an Adjunct Professor at Northwestern University School of Law where he teaches Trial Advocacy.

**Education:** B.B.A., Loyola University Chicago, School of Business Administration, 1995; J.D., Northwestern University School of Law, 1998

**Honors/Awards:** B.B.A., *Summa Cum Laude*, Loyola University Chicago, School of Business Administration, 1995; J.D., *Cum Laude*, Northwestern University School of Law, 1998

### ALEXANDRA S. BERNAY

Alexandra S. Bernay is a partner in the San Diego office of Robbins Geller Rudman & Dowd LLP, where she specializes in antitrust and unfair competition class-action litigation. Ms. Bernay has also worked on some of the Firm's largest securities fraud class actions, including the *Enron* litigation, which recovered an unprecedented $7.2 billion for investors.

Ms. Bernay's current practice focuses on the prosecution of antitrust and consumer fraud cases. She is on the litigation team prosecuting the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, which is pending in the Eastern District of New York. Ms. Bernay is also a member of the team prosecuting *The Apple iPod iTunes Anti-Trust Litigation* in the Northern District of California as well as the litigation team involved in the *In re Digital Music Antitrust Litigation*, among other cases in the Firm's antitrust practice area.

She is also actively involved in the consumer action on behalf of bank customers who were overcharged for debit card transactions. That case, *In re Checking Account Overdraft Litigation*, is pending in the Southern District of Florida.

**Education:** B.A., Humboldt State University, 1997; J.D., University of San Diego School of Law, 2000

### DOUGLAS R. BRITTON

Douglas R. Britton is a partner in the Firm's San Diego office and represents shareholders in securities class actions. Mr. Britton has secured settlements exceeding $1 billion and significant corporate governance enhancements to improve corporate functioning.

Notable achievements include the *In re WorldCom, Inc. Sec. & "ERISA" Litig.*, where Mr. Britton was one of the lead partners that represented a number of opt-out institutional investors and secured an unprecedented recovery of $651 million; *In re SureBeam Corp. Sec. Litig.*, where Mr. Britton was the lead trial counsel and secured an impressive recovery of $32.75 million; and *In re Amazon.com, Inc. Sec. Litig.*, where Mr. Britton was one of the lead attorneys securing a $27.5 million recovery for investors.

Mr. Britton has been specializing in securities litigation his entire legal career.

**Education:** B.B.A., Washburn University, 1991; J.D., Pepperdine University School of Law, 1996

**Honors/Awards:** J.D., *Cum Laude*, Pepperdine University School of Law, 1996

### LUKE O. BROOKS

Luke O. Brooks is a partner in the Firm's San Francisco office and is a member of the securities litigation practice group. Notably, Mr. Brooks was on the trial team that won a jury verdict in *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-C-5893 (N.D. Ill.), a securities fraud class action against one of the world's largest subprime lenders. Although the litigation is ongoing, the *Household* verdict is expected to yield in excess of $1 billion for the plaintiff class.

**Education:** B.A., University of Massachusetts at Amherst, 1997; J.D., University of San Francisco, 2000

**Honors/Awards:** Member, *University of San Francisco Law Review*, University of San Francisco

### ANDREW J. BROWN

Andrew J. Brown is a partner in the Firm's San Diego office and prosecutes complex securities fraud and shareholder derivative actions against executives and corporations. Mr. Brown's efforts have resulted in numerous multi-million dollar recoveries to shareholders and precedent-setting changes in corporate practices. Recent examples include *Batwin v. Occam Networks, Inc.*, No. CV 07-2750, 2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009); *In re UNUMProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858 (E.D. Tenn. 2005); and *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691, 2007 U.S. Dist. LEXIS 94616 (D.

Minn. Dec. 26, 2007). Prior to joining the Firm, Mr. Brown worked as a trial lawyer for the San Diego County Public Defender's Office. Thereafter, he opened his own law firm, where he represented consumers and insureds in lawsuits against major insurance companies.

**Education:** B.A., University of Chicago, 1988; J.D., University of California, Hastings College of the Law, 1992

### JOY ANN BULL

Joy Ann Bull is a partner in the Firm's San Diego office and focuses her practice on court approval of settlements reached in the Firm's class actions. Ms. Bull has negotiated complex settlement agreements and obtained court approval of a variety of notable settlements, including *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S (N.D. Ala.) ($671 million recovery); *BP plc Shareholder Litigation*, No. 3AN-06-11929CI (Alaska Super. Ct.) (BP agreed to improved shareholder input and shareholder rights as well as operational safety oversight); *Royal Dutch Shell Shareholder Litigation*, No. 04-CV-3603 (D.N.J.) (obtained improved governance standards, shareholder participation in nomination of board members, board independence standards, and compensation practices); *Carbon Fiber Antitrust Litigation*, No. CV-99-7796 (C.D. Cal.) ($67.5 million recovery); *Ryan v. Flowserve Corp.*, No. 3:03-CV-01769-B (N.D. Tex.) ($55 million recovery); *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.*, No. 1:04-cv-00416 (M.D.N.C.) ($75 million recovery); *In re Northwestern Corp. Sec. Litig.*, No. CIV-03-4049 (D.S.D.) ($48 million recovery); *In re Dole S'holders Litig.*, No. BC281949 (Cal. Super. Ct., Los Angeles County) ($172 million recovery plus injunctive relief); *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030 (M.D. Fla.) ($89 million); *In re LifeScan, Inc. Consumer Litig.*, No. C-98-20321 (N.D. Cal.) ($45 million cash recovery); and *Hall v. NCAA*, No. 94-2392 (D. Kan.) (more than $70 million cash recovery).

**Education:** B.A., University of Illinois, Springfield, 1970; M.A., University of Illinois, Springfield, 1972; J.D., University of San Diego School of Law, 1988

**Honors/Awards:** J.D., *Magna Cum Laude*, University of San Diego School of Law, 1988; Member, University of San Diego National Trial Competition Team; Member, *San Diego Law Review*, University of San Diego School of Law

### SPENCER A. BURKHOLZ

Spencer A. Burkholz is a partner in the Firm's San Diego office and a member of the Firm's Executive and Management Committees. Mr. Burkholz specializes in securities class actions and private actions on behalf of large institutional investors and was one of the lead trial attorneys in the *Household* securities class action that resulted in a jury verdict on liability and per share damages in favor of investors in May 2009. Mr. Burkholz has also represented public and private institutional investors in the *Enron*, *WorldCom*, *Qwest* and *Cisco* securities actions that have recovered billions of dollars for investors. Mr. Burkholz is currently representing large institutional investors in actions involving the credit crisis.

**Education:** B.A., Clark University, 1985; J.D., University of Virginia School of Law, 1989

**Honors/Awards:** B.A., *Cum Laude*, Clark University, 1985; *Phi Beta Kappa*, Clark University, 1985

## JAMES CAPUTO

James Caputo is a partner in the Firm's San Diego office. Mr. Caputo focuses his practice on the prosecution of complex litigation involving securities fraud and corporate malfeasance, consumer protection violations, unfair business practices, contamination and toxic torts, and employment and labor law violations. Mr. Caputo successfully served as lead or co-lead counsel in numerous class, consumer and employment litigation matters, including *In re S3 Sec. Litig.*, No. CV770003 (Cal. Super. Ct., Santa Clara County); *Santiago v. Kia Motors Am.*, No. 01CC01438 (Cal. Super. Ct., Orange County); *In re Fleming Cos. Sec. Litig.*, No. 02-CV-178 (E.D. Tex.); *In re Valence Tech. Sec. Litig.*, No. C95-20459 (N.D. Cal.); *In re THQ, Inc. Sec. Litig.*, No. CV-00-01783 (C.D. Cal.); *Mynaf v. Taco Bell Corp.*, CV 761193 (Cal. Super. Ct., Santa Clara County); *Newman v. Stringfellow* (Cal. Super. Ct., Riverside County); *Carpenters Health & Welfare Fund v. Coca Cola Co.*, No. 00-CV-2838-WBH (N.D. Ga.); *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, No. 1-04-cv-021465 (Cal. Super. Ct., Santa Clara County); and *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S (N.D. Ala.). Collectively, these actions have returned well over $1 billion to injured stockholders, consumers and employees.

Prior to joining the Firm, Mr. Caputo was a staff attorney to Associate Justice Don R. Work and Presiding Justice Daniel J. Kremer of the California Court of Appeal, Fourth Appellate District.

**Education:** B.S., University of Pittsburgh, 1970; M.A., University of Iowa, 1975; J.D., California Western School of Law, 1984

**Honors/Awards:** San Diego Super Lawyer (2008-Present); J.D., *Magna Cum Laude*, California Western School of Law,1984; Editor-in-Chief, International Law Journal, California Western School of Law

## CHRISTOPHER COLLINS

Christopher Collins is a partner in the Firm's San Diego office. His practice areas include antitrust, consumer protection and tobacco litigation. Mr. Collins served as co-lead counsel in *Wholesale Elec. Antitrust Cases I & II*, JCCP Nos. 4204 & 4205, charging an antitrust conspiracy by wholesale electricity suppliers and traders of electricity in California's newly deregulated wholesale electricity market wherein plaintiffs secured a global settlement for California consumers, businesses and local governments valued at more than $1.1 billion. Mr. Collins was also involved in California's tobacco litigation, which resulted in the $25.5 billion recovery for California and its local entities. Mr. Collins is currently counsel on the MemberWorks upsell litigation, as well as a number of consumer actions alleging false and misleading advertising and unfair business practices against major corporations. Mr. Collins formerly served as a Deputy District Attorney for Imperial County.

**Education:** B.A., Sonoma State University, 1988; J.D., Thomas Jefferson School of Law, 1995

### JOSEPH D. DALEY

Joseph D. Daley is a partner in the Firm's San Diego office, serves on the Firm's Securities Hiring Committee, and is a member of the Firm's Appellate Practice Group. Precedents include *Frank v. Dana Corp.* ("*Dana II*"), 646 F.3d 954 (6th Cir.), *cert. denied*, _U.S._, 132 S. Ct. 559 (2011); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd*, _U.S._, 131 S.Ct. 1309 (2011); *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248 (11th Cir. 2009); *Frank v. Dana Corp.* ("*Dana I*"), 547 F.3d 564 (6th Cir. 2008); *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008); *In re Merck & Co. Sec., Derivative & ERISA Litig.*, 493 F.3d 393 (3d Cir. 2007); *In re Qwest Commc'ns Int'l*, 450 F.3d 1179 (10th Cir. 2006); and *DeJulius v. New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935 (10th Cir. 2005). Mr. Daley is admitted to practice before the Supreme Court of the United States, as well as before 12 United States Courts of Appeals around the nation.

**Education:** B.S., Jacksonville University, 1981; J.D., University of San Diego School of Law, 1996

**Honors/Awards:** San Diego Super Lawyer (2011); Appellate Moot Court Board, Order of the Barristers, University of San Diego School of Law; Best Advocate Award (Traynore Constitutional Law Moot Court Competition), First Place and Best Briefs (Alumni Torts Moot Court Competition and USD Jessup International Law Moot Court Competition)

### PATRICK W. DANIELS

Patrick W. Daniels is a founding partner of the Firm and a member of the Firm's Management Committee. Mr. Daniels counsels private and state government pension funds, central banks and fund managers in the United States, Australia, United Arab Emirates, United Kingdom, the Netherlands, and other countries within the European Union on issues related to corporate fraud in the United States securities markets and on "best practices" in the corporate governance of publicly traded companies. Mr. Daniels has represented dozens of institutional investors in some of the largest and most significant shareholder actions in the United States, including the *Enron*, *WorldCom*, *AOL Time Warner* and *BP* actions.

**Education:** B.A., University of California, Berkeley, 1993; J.D., University of San Diego School of Law, 1997

**Honors/Awards:** One of the Most 20 Most Influential Lawyers in the State of California Under 40 Years of Age, *Daily Journal*; Rising Star of Corporate Governance, Yale School of Management's Milstein Center for Corporate Governance & Performance; B.A., *Cum Laude*, University of California, Berkeley, 1993

### STUART A. DAVIDSON

Stuart A. Davidson is a partner in the Firm's Boca Raton office and currently devotes his time to the representation of investors in class actions involving mergers and acquisitions, in prosecuting derivative lawsuits on behalf of public corporations, and in prosecuting a

number of consumer fraud cases throughout the nation. Since joining the Firm, Mr. Davidson has obtained multi-million dollar recoveries for healthcare providers, consumers and shareholders, including cases involving Aetna Health, Vista Healthplan, Fidelity Federal Bank & Trust, and UnitedGlobalCom. Mr. Davidson is a former lead trial attorney in the Felony Division of the Broward County, Florida Public Defender's Office. During his tenure at the Public Defender's Office, Mr. Davidson tried over 30 jury trials and represented individuals charged with a variety of offenses, including life and capital felonies.

**Education:** B.A., State University of New York at Geneseo, 1993; J.D., Nova Southeastern University Shepard Broad Law Center, 1996

**Honors/Awards:** J.D., *Summa Cum Laude*, Nova Southeastern University Shepard Broad Law Center, 1996; Associate Editor, *Nova Law Review*, Book Awards in Trial Advocacy, Criminal Pretrial Practice and International Law

### JASON C. DAVIS

Jason C. Davis is a partner in the Firm's San Francisco office. Mr. Davis' practice focuses on securities class actions and complex litigation involving equities, fixed-income, synthetic and structured securities issued in public and private transactions. Mr. Davis was on the trial team that won a unanimous jury verdict in a class action against one of the world's largest subprime lenders in *Jaffe v. Household Int'l, Inc.*, No. 02-C-5893 (N.D. Ill.).

Previously, Mr. Davis focused on cross-border transactions, mergers and acquisitions at Cravath, Swaine and Moore LLP in New York.

**Education:** B.A., Syracuse University, 1998; J.D., University of California at Berkeley, Boalt Hall School of Law, 2002

**Honors/Awards:** B.A., *Summa Cum Laude*, Syracuse University, 1998; International Relations Scholar of the year, Syracuse University; Teaching fellow, examination awards, Moot court award, University of California at Berkeley, Boalt Hall School of Law

### MICHAEL J. DOWD

Michael J. Dowd is a founding partner in the Firm's San Diego office and a member of the Firm's Executive and Management Committees. Mr. Dowd is responsible for prosecuting complex securities cases and has obtained significant recoveries for investors in cases such as *AOL Time Warner*, *UnitedHealth*, *WorldCom*, *Qwest*, *Vesta*, *U.S. West* and *Safeskin*. In 2009, Mr. Dowd served as lead trial counsel in *Jaffe v. Household Int'l Inc.* in the Northern District of Illinois, which resulted in a jury liability verdict for plaintiffs expected to yield in excess of $1 billion for the injured class. Mr. Dowd also served as the lead trial lawyer in *In re AT&T Corp. Sec. Litig.*, which was tried in the District of New Jersey and settled after only two weeks of trial for $100 million. Mr. Dowd served as an Assistant United States Attorney in the Southern District of California from 1987-1991, and again from 1994-1998.

**Education:** B.A., Fordham University, 1981; J.D., University of Michigan School of Law, 1984

**Honors/Awards:** Attorney of the Year, *California Lawyer*; Director's Award for Superior Performance, United States Attorney's Office; Top 100 Lawyers, *Daily Journal*, 2009; B.A., *Magna Cum Laude*, Fordham University, 1981

### TRAVIS E. DOWNS III

Travis E. Downs III is a partner in the Firm's San Diego office and focuses his practice on the prosecution of shareholder and securities litigation, including shareholder derivative litigation on behalf of corporations. Mr. Downs has extensive experience in federal and state shareholder litigation and recently led a team of lawyers who successfully prosecuted over 65 stock option backdating derivative actions pending in state and federal courts across the country, including *In re Marvell Tech. Grp., Inc. Derivative Litig.* ($54 million in financial relief and extensive corporate governance enhancements); *In re KLA-Tencor Corp. Derivative Litig.* ($42.6 million in financial relief and significant corporate governance reforms); *In re McAfee, Inc. Derivative Litig.* ($30 million in financial relief and corporate governance enhancements); *In re Activision Corp. Derivative Litig.* ($24.3 million in financial relief and extensive corporate governance reforms); and *In re Juniper Networks, Inc. Derivative Litig.* ($22.7 million in financial relief and significant corporate governance enhancements).

**Education:** B.A., Whitworth University, 1985; J.D., University of Washington School of Law, 1990

**Honors/Awards:** B.A., Honors, Whitworth University, 1985

### DANIEL S. DROSMAN

Daniel S. Drosman is a partner in the Firm's San Diego office and focuses his practice on securities fraud and other complex civil litigation. Mr. Drosman has obtained significant recoveries for investors in cases such as *Cisco Systems*, *Coca-Cola*, *Petco*, *PMI* and *America West*. In 2009, Mr. Drosman served as one of the lead trial attorneys in *Jaffe v. Household Int'l, Inc.* in the Northern District of Illinois, which resulted in a jury verdict for plaintiffs expected to yield in excess of $1 billion for the injured investors. Mr. Drosman currently leads a group of attorneys prosecuting fraud claims against the credit rating agencies, where he is distinguished as one of the few plaintiffs' counsel to overcome the credit rating agencies' motions to dismiss.

Prior to joining the Firm, Mr. Drosman served as an Assistant District Attorney for the Manhattan District Attorney's Office, and an Assistant United States Attorney in the Southern District of California, where he investigated and prosecuted violations of the federal narcotics, immigration, and official corruption law.

**Education:** B.A., Reed College, 1990; J.D., Harvard Law School, 1993

**Honors/Awards:** Department of Justice Special Achievement Award, Sustained Superior Performance of Duty; B.A., Honors, Reed College, 1990; *Phi Beta Kappa*, Reed College, 1990

### THOMAS E. EGLER

Thomas E. Egler is a partner in the Firm's San Diego office and focuses his practice on the prosecution of securities class actions on behalf of defrauded shareholders. Mr. Egler is responsible for prosecuting securities fraud class actions and has obtained recoveries for investors in litigation involving WorldCom ($657 million recovery), AOL Time Warner ($629 million recovery), and Qwest ($445 million recovery), as well as dozens of other actions.

Prior to joining the Firm, Mr. Egler was a law clerk to the Honorable Donald E. Ziegler, Chief Judge, United States District Court, Western District of Pennsylvania.

**Education:** B.A., Northwestern University, 1989; J.D., The Catholic University of America, Columbus School of Law, 1995

**Honors/Awards:** Associate Editor, *The Catholic University Law Review*

### JASON A. FORGE

Jason A. Forge is a partner in the Firm's San Diego office, specializing in complex investigations, litigation, and trials. As a federal prosecutor and private practitioner, Mr. Forge has conducted dozens of jury and bench trials in federal and state courts, including the month-long trial of a defense contractor who conspired with Congressman Randy "Duke" Cunningham in the largest bribery scheme in congressional history. Mr. Forge has taught trial practice techniques on local and national levels. He has also written and argued many state and federal appeals, including an en banc argument in the Ninth Circuit. Representative results include *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011) (affirming in all substantive respects, fraud, bribery, and money laundering convictions), and *United States v. Iribe*, 564 F.3d 1155 (9th Cir. 2009) (affirming use of U.S.-Mexico extradition treaty to extradite and convict defendant who kidnapped and murdered private investigator).

**Education:** B.B.A., The University of Michigan Ross School of Business, 1990; J.D., The University of Michigan Law School, 1993

**Honors/Awards:** Two-time recipient of one of Department of Justice's highest awards: Director's Award for Superior Performance by Litigation Team; numerous commendations from Federal Bureau of Investigation (including commendation from FBI Director Robert Mueller III), Internal Revenue Service, and Defense Criminal Investigative Service; J.D., *Magna Cum Laude*, Order of the Coif, The University of Michigan Law School, 1993; B.B.A., High Distinction, The University of Michigan Ross School of Business, 1990

## PAUL J. GELLER

Paul J. Geller, one of the Firm's founding partners, manages the Firm's Boca Raton, Florida office and sits on the Firm's Executive Committee. Before devoting his practice exclusively to the representation of plaintiffs, Mr. Geller defended blue-chip companies in class action lawsuits at one of the world's largest corporate defense firms.

Mr. Geller's class action experience is broad, and he has handled cases in each of the Firm's practice areas. His securities fraud successes include class actions against three large mutual fund families for the manipulation of asset values (*Hicks v. Morgan Stanley*; *Abrams v. Van Kampen*; *In re Eaton Vance*) ($51.5 million aggregate settlements) and a case against Lernout & Hauspie Speech Products, N.V. ($115 million settlement). In the derivative arena, Mr. Geller was lead derivative counsel in a case against Prison Realty Trust (total aggregate settlement of $120 million). In the corporate takeover area, Mr. Geller led cases against the boards of directors of Outback Steakhouse ($30 million additional consideration to shareholders) and Intermedia Corp. ($38 million settlement). Finally, Mr. Geller has handled many consumer fraud class actions, including cases against Fidelity Federal for privacy violations ($50 million settlement) and against Dannon for falsely advertising the health benefits of yogurt ($45 million settlement).

**Education:** B.S., University of Florida, 1990; J.D., Emory University School of Law, 1993

**Honors/Awards:** One of Florida's Top Lawyers, *Law & Politics*; One of the Nation's Top 500 Lawyers, *Lawdragon*; One of the Nation's Top 40 Under 40, *The National Law Journal*; Editor, *Emory Law Review*; Order of the Coif, Emory University School of Law; "Florida Super Lawyer," *Law & Politics;* "Legal Elite," *South Fla. Bus. Journal*; "Most Effective Lawyer Award," *American Law Media*

## DAVID J. GEORGE

David J. George is a partner in the Firm's Boca Raton office and devotes his practice to representing defrauded investors in securities class actions. Mr. George, a zealous advocate of shareholder rights, has been lead and/or co-lead counsel with respect to various securities class action matters, including *In re Cryo Cell Int'l, Inc. Sec. Litig.* (M.D. Fla.) ($7 million settlement); *In re TECO Energy, Inc. Sec. Litig.* (M.D. Fla.) ($17.35 million settlement); *In re Newpark Res., Inc. Sec. Litig.* (E.D. La.) ($9.24 million settlement); *In re Mannatech, Inc. Sec. Litig.* (N.D. Tex.) ($11.5 million settlement); *Reese v. McGraw Hill Cos., Inc.* (S.D.N.Y.); *Kuriakose v. Fed. Home Loan Mtg. Co.* (S.D.N.Y.); *City of Lakeland Emps. Pension Plan v. Baxter Int'l, Inc.* (N.D. Ill.); *Locals 302 & 612 of the Int'l Union of Operating Eng's v. Mort. Asset Securitization Transactions, Inc.* (D.N.J.); *City of Roseville Emps. Ret. Sys. v. Textron, Inc.* (D.R.I.); and *Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.* (D. Conn.). Mr. George has also acted as lead counsel in numerous consumer class actions, including *Lewis v. Labor Ready, Inc.* (S.D. Fla.) ($11 million settlement); *In re Webloyalty.com, Inc. Mktg. Practices & Sales Practices Litig.* (D. Mass.) ($10 million settlement); and *In re Navisite Migration Litig.* (D. Md.) ($1.7 million settlement). Mr. George was also a member of the litigation team in *In re UnitedHealth Grp. Inc. PSLRA Litig.* (D. Minn.) ($925.5 million settlement).

**Education:** B.A., University of Rhode Island, 1988; J.D., University of Richmond School of Law, 1991

**Honors/Awards:** One of Florida's Most Effective Corporate/Securities Lawyers (only plaintiffs' counsel recognized), *Daily Business Review*; J.D., Highest Honors, Outstanding Graduate & Academic Performance Awards, President of McNeill Law Society, University of Richmond School of Law

### JONAH H. GOLDSTEIN

Jonah H. Goldstein is a partner in the Firm's San Diego office and responsible for prosecuting complex securities cases and obtaining recoveries for investors. Mr. Goldstein also represents corporate whistleblowers who report violations of the securities laws. Mr. Goldstein has achieved significant settlements on behalf of investors including in *In re HealthSouth Sec. Litig.* (over $670 million recovered against HealthSouth, UBS and Ernst & Young) and *In re Cisco Sec. Litig.* (approximately $100 million). Mr. Goldstein also served on the Firm's trial team in *In re AT&T Corp. Sec. Litig.*, MDL No. 1399 (D.N.J.), which settled after two weeks of trial for $100 million. Prior to joining the Firm, Mr. Goldstein served as a law clerk for the Honorable William H. Erickson on the Colorado Supreme Court and as an Assistant United States Attorney for the Southern District of California, where he tried numerous cases and briefed and argued appeals before the Ninth Circuit Court of Appeals.

**Education:** B.A., Duke University, 1991; J.D., University of Denver College of Law, 1995

**Honors/Awards:** Comments Editor, *University of Denver Law Review*, University of Denver College of Law

### BENNY C. GOODMAN III

Benny C. Goodman III is a partner in the Firm's San Diego office and concentrates his practice on shareholder derivative and securities class actions. Mr. Goodman has achieved groundbreaking settlements as lead counsel in a number of shareholder derivative actions related to stock option backdating by corporate insiders, including *In re KB Home S'holder Derivative Litig.*, No. CV-06-05148 (C.D. Cal.) (extensive corporate governance changes, over $80 million cash back to the company); *In re Affiliated Computer Servs. Derivative Litig.*, No. 06-CV-1110 (N.D. Tex.) ($30 million recovery); and *Gunther v. Tomasetta*, No. 06-cv-02529 (C.D. Cal.) (corporate governance overhaul, including shareholder nominated directors, and cash payment to Vitesse Semiconductor Corporation from corporate insiders).

Mr. Goodman also represented over 60 public and private institutional investors that filed and settled individual actions in the *WorldCom* securities litigation. Additionally, Mr. Goodman successfully litigated several other notable securities class actions against companies such as Infonet Services Corporation, Global Crossing, and Fleming Companies, Inc., each of which resulted in significant recoveries for shareholders.

**Education:** B.S., Arizona State University, 1994; J.D., University of San Diego School of Law, 2000

### ELISE J. GRACE

Elise J. Grace is a partner in the San Diego office and responsible for advising the Firm's state and government pension fund clients on issues related to securities fraud and corporate governance. Ms. Grace serves as the Editor-in-Chief of the Firm's Corporate Governance Bulletin and is a frequent lecturer on securities fraud, shareholder litigation, and options for institutional investors seeking to recover losses caused by securities and accounting fraud. Ms. Grace has prosecuted various significant securities fraud class actions, including the *AOL Time Warner* state and federal securities opt-out litigations, which resulted in a combined settlement of $629 million for defrauded shareholders. Prior to joining the Firm, Ms. Grace was an associate at Brobeck Phleger & Harrison LLP and Clifford Chance LLP, where she defended various Fortune 500 companies in securities class actions and complex business litigation.

**Education:** B.A., University of California, Los Angeles, 1993; J.D., Pepperdine School of Law, 1999

**Honors/Awards:** J.D., *Magna Cum Laude*, Pepperdine School of Law, 1999; AMJUR American Jurisprudence Awards - Conflict of Laws; Remedies; Moot Court Oral Advocacy; Dean's Academic Scholarship, Pepperdine School of Law; B.A., *Summa Cum Laude*, University of California, Los Angeles, 1993; B.A., *Phi Beta Kappa*, University of California, Los Angeles, 1993

### JOHN K. GRANT

John K. Grant is a partner in the Firm's San Francisco office and devotes his practice to representing investors in securities fraud class actions. Mr. Grant has litigated numerous successful securities actions as lead or co-lead counsel, including *In re Micron Tech., Inc. Sec. Litig.* ($42 million recovery), *Perera v. Chiron Corp.* ($40 million recovery), *King v. CBT Grp., PLC* ($32 million recovery), and *In re Exodus Commc'ns, Inc. Sec. Litig.* ($5 million recovery).

**Education:** B.A., Brigham Young University, 1988; J.D., University of Texas at Austin, 1990

### KEVIN K. GREEN

Kevin K. Green is a partner in the Firm's San Diego office and represents defrauded investors and consumers in the appellate courts. He is a member of the California Academy of Appellate Lawyers and a Certified Appellate Specialist, State Bar of California Board of Legal Specialization. Mr. Green has filed briefs and argued appeals and writs in jurisdictions across the country. Decisions include: *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011); *Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789 (2011); *Fox v. JAMDAT Mobile, Inc.*, 185 Cal. App. 4th 1068 (2010); *In re F5 Networks, Inc., Derivative Litig.*, 207 P.3d 433 (Wash. 2009); *Smith v. Am. Family Mut. Ins. Co.*, 289 S.W.3d 675 (Mo.

Ct. App. 2009); *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011 (Del. 2007); and *Lebrilla v. Farmers Grp., Inc.*, 119 Cal. App. 4th 1070 (2004).

**Education:** B.A., University of California, Berkeley, 1989; J.D., Notre Dame Law School, 1995

**Honors/Awards:** San Diego Super Lawyer (2008- present)

### TOR GRONBORG

Tor Gronborg is a partner in the Firm's San Diego office and focuses his practice on securities fraud actions. Mr. Gronborg has served as lead or co-lead litigation counsel in various cases that have collectively recovered more than $1 billion for investors, including *In re Cardinal Health, Inc. Sec. Litig.* ($600 million); *In re Prison Realty Sec. Litig.* ($104 million); *In re Accredo Health, Inc. Sec. Litig.* ($33 million); and *Roth v. Aon Corp.* ($30 million). On three separate occasions, Mr. Gronborg's pleadings have been upheld by the federal Courts of Appeals (*Broudo v. Dura Pharms., Inc.*, 339 F.3d 933 (9th Cir. 2003), *rev'd on other grounds*, 554 U.S. 336 (2005); *In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005); *Staehr v. Hartford Fin.Servs. Grp.*, 547 F.3d 406 (2d Cir. 2008)), and he has been responsible for a number of significant rulings, including *Roth v. Aon Corp.*, No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471 (N.D. Ill. Mar. 7, 2008); *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006); *In re Direct Gen. Corp. Sec. Litig.*, No. 3:05-0077, 2006 U.S. Dist. LEXIS 56128 (M.D. Tenn. Aug. 8, 2006); and *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006).

**Education:** B.A., University of California, Santa Barbara, 1991; Rotary International Scholar, University of Lancaster, U.K., 1992; J.D., University of California, Berkeley, 1995

**Honors/Awards:** Moot Court Board Member, University of California, Berkeley; AFL-CIO history scholarship, University of California, Santa Barbara

### ELLEN GUSIKOFF STEWART

Ellen Gusikoff Stewart is a partner in the Firm's San Diego office and practices in the Firm's settlement department, negotiating and documenting the Firm's complex securities, merger, ERISA and stock options backdating derivative actions. Recent settlements include *In re Forest Labs., Inc. Sec. Litig.* (S.D.N.Y.) ($65 million); *In re Activision, Inc. S'holder Derivative Litig.* (C.D. Cal.) ($24.3 million in financial benefits to Activision in options backdating litigation); *In re Affiliated Computer Servs. Derivative Litig.* (N.D. Tex.) ($30 million cash benefit to ACS in options backdating litigation); and *In re TD Banknorth S'holders Litig.* (Del. Ch.) ($50 million).

**Education:** B.A., Muhlenberg College, 1986; J.D., Case Western Reserve University, 1989

**Honors/Awards:** Peer-Rated by Martindale-Hubbell

### DENNIS J. HERMAN

Dennis J. Herman is a partner in the Firm's San Francisco office and concentrates his practice on securities class action litigation. Mr. Herman has led or been significantly involved in the prosecution of numerous securities fraud claims that have resulted in substantial recoveries for investors, including settled actions against Coca-Cola ($137 million), VeriSign ($78 million), NorthWestern ($40 million), America Service Group ($15 million), Specialty Laboratories ($12 million), Stellent ($12 million) and Threshold Pharmaceuticals ($10 million). Mr. Herman led the prosecution of the securities action against Lattice Semiconductor, which resulted in a significant, precedent-setting decision regarding the liability of officers who falsely certify the adequacy of internal accounting controls under the Sarbanes-Oxley Act.

**Education:** B.S., Syracuse University, 1982; J.D., Stanford Law School, 1992

**Honors/Awards:** Order of the Coif, Stanford Law School; Urban A. Sontheimer Award (graduating second in his class), Stanford Law School; Award-winning Investigative Newspaper Reporter and Editor in California and Connecticut

### JOHN HERMAN

John Herman is the Chair of the Firm's Intellectual Property Practice and manages the Firm's Atlanta office. Mr. Herman has spent his career enforcing the intellectual property rights of famous inventors and innovators against infringers throughout the United States. He has assisted patent owners in collecting hundreds of millions of dollars in royalties. Mr. Herman is recognized by his peers as being among the leading intellectual property litigators in the country.

Mr. Herman's noteworthy cases include representing renowned inventor Ed Phillips in the landmark case of *Phillips v. AWH Corp.*; representing pioneers of mesh technology – David Petite and Edwin Brownrigg – in a series of patent infringement cases on multiple patents; and acting as plaintiffs' counsel in the *In re Home Depot* shareholder derivative actions pending in Fulton County Superior Court.

**Education:** B.S., Marquette University, 1988; J.D., Vanderbilt University Law School, 1992

**Honors/Awards:** Georgia Super Lawyer, *Atlanta Magazine*; Top 100 Georgia Super Lawyers list; John Wade Scholar, Vanderbuilt University Law School; Editor-in-Chief, *Vanderbilt Journal*, Vanderbilt University Law School; B.S., *Summa Cum Laude*, Marquette University, 1988

### ERIC ALAN ISAACSON

Eric Alan Isaacson is a partner in the Firm's San Diego office and has prosecuted many securities fraud class actions, including *In re Apple Computer Sec. Litig.*, No. C 84-20148 (N.D. Cal.). Since the early 1990s, Mr. Issacson's practice has focused primarily on appellate matters in cases that have produced dozens of published precedents, including *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342 (3d Cir. 2009); *In re NYSE*

*Specialists Sec. Litig.*, 503 F.3d 89 (2d Cir. 2007); and *In re WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007). Mr. Isaacson has also authored a number of publications, including *What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and Its Import for Securities-Fraud Litigation* (co-authored with Patrick J. Coughlin and Joseph D. Daley), 37 Loy. U. Chi. L.J. 1 (2005); and *Securities Class Actions in the United States* (co-authored with Patrick J. Coughlin), Litigation Issues in the Distribution of Securities: An International Perspective 399 (Kluwer International/International Bar Association, 1997).

**Education:** B.A., Ohio University, 1982; J.D., Duke University School of Law, 1985

**Honors/Awards:** San Diego Super Lawyer; Unitarian Universalist Association Annual Award for Volunteer Service; J.D., High Honors, Order of the Coif, Duke University School of Law, 1985; Comment Editor, *Duke Law Journal*, Moot Court Board, Duke University School of Law

### JAMES I. JACONETTE

James I. Jaconette is a partner in the Firm's San Diego office and focuses his practice on securities class action and shareholder derivative litigation. Mr. Jaconette has served as one of the lead counsel in securities cases with recoveries to individual and institutional investors totaling over $8 billion. He also advises institutional investors, including hedge funds, pension funds and financial institutions. Landmark securities actions in which Mr. Jaconette contributed in a primary litigating role include *In re Informix Corp. Sec. Litig.*, and *In re Dynegy Inc. Sec. Litig.* and *In re Enron Corp. Sec. Litig.*, where Mr. Jaconette represented lead plaintiff The Regents of the University of California. In addition, Mr. Jaconette has extensive experience in options backdating matters.

**Education:** B.A., San Diego State University, 1989; M.B.A., San Diego State University, 1992; J.D., University of California Hastings College of the Law, 1995

**Honors/Awards:** J.D., *Cum Laude*, University of California Hastings College of the Law, 1995; Associate Articles Editor, *Hastings Law Journal*, University of California Hastings College of the Law; B.A., with Honors and Distinction, San Diego State University, 1989

### FRANK J. JANECEK, JR.

Frank J. Janecek, Jr. is a partner in the Firm's San Diego office and practices in the areas of consumer/antitrust, Proposition 65, taxpayer and tobacco litigation. Mr. Janecek served as co-lead counsel, as well as court appointed liaison counsel, in *Wholesale Elec. Antitrust Cases I & II*, JCCP Nos. 4204 & 4205, charging an antitrust conspiracy by wholesale electricity suppliers and traders of electricity in California's newly deregulated wholesale electricity market. In conjunction with the Governor of the State of California, the California State Attorney General, the California Public Utilities Commission, the California Electricity Oversight Board, a number of other state and local governmental entities and agencies, and California's large, investor-owned electric utilities, plaintiffs secured a global settlement for California consumers, businesses and local governments valued at more than $1.1 billion. Mr. Janecek also chaired several of the litigation committees in California's tobacco

litigation, which resulted in the $25.5 billion recovery for California and its local entities, and also handled a constitutional challenge to the State of California's Smog Impact Fee in *Ramos v. Dep't of Motor Vehicles*, No. 95AS00532 (Cal. Super. Ct., Sacramento County), which resulted in more than a million California residents receiving full refunds and interest, totaling $665 million.

**Education:** B.S., University of California, Davis, 1987; J.D., Loyola Law School, 1991

### RACHEL L. JENSEN

Rachel L. Jensen is a partner in the Firm's San Diego office and focuses her practice on nationwide consumer, insurance and securities class actions against some of the largest companies in the United States. Most recently, her practice has focused on hazardous children's toys, helping to secure a nationwide settlement with toy manufacturing giants Mattel and Fisher-Price that provided full consumer refunds and required greater quality assurance programs. She has also helped to secure millions of dollars on behalf of policyholders against insurance brokers and carriers for engaging in bid-rigging and other conduct that betrayed their trust and resulted in higher premiums and inferior coverage.

Prior to joining the Firm, Ms. Jensen was an associate at Morrison & Foerster in San Francisco and later served as a clerk to the Honorable Warren J. Ferguson of the Ninth Circuit Court of Appeals. Ms. Jensen also worked abroad as a law clerk in the Office of the Prosecutor at the International Criminal Tribunal for Rwanda (ICTR) and at the International Criminal Tribunal for the Former Yugoslavia (ICTY).

**Education:** B.A., Florida State University, 1997; University of Oxford, International Human Rights Law Program at New College, Summer 1998; J.D., Georgetown University Law School, 2000

**Honors/Awards:** Nominated for 2011 Woman of the Year, *San Diego Magazine*; Editor-in-Chief, *First Annual Review of General and Sexuality Law*, Georgetown University Law School; Dean's List 1998-1999; B.A., *Cum Laude*, Florida State University's Honors Program, 1997; *Phi Beta Kappa*; Awarded Best Executive Agency Director of the Year in college for revamping Florida State University's Women's Educational and Cultural Center

### EVAN J. KAUFMAN

Evan J. Kaufman is a partner in the Firm's New York office and focuses his practice in the area of complex litigation in federal and state courts including securities, corporate mergers and acquisitions, derivative, and consumer fraud class actions. Mr. Kaufman has served as lead counsel or played a significant role in numerous actions, including *In re TD Banknorth S'holders Litig.* ($50 million recovery); *In re Gen. Elec. Co. ERISA Litig.* ($40 million cost to GE, including significant improvements to GE's employee retirement plan, and benefits to GE plan participants valued in excess of $100 million); *In re Warner Chilcott Ltd. Sec. Litig.* ($16.5 million recovery); *In re Royal Grp. Tech. Sec. Litig.* ($9 million recovery); and *In re Audiovox Derivative Litig.* ($6.75 million recovery and corporate governance reforms).

**Education:** B.A., University of Michigan, 1992; J.D., Fordham University School of Law, 1995

**Honors/Awards:** Member, *Fordham International Law Journal*, Fordham University School of Law

### CATHERINE J. KOWALEWSKI

Catherine J. Kowalewski is a partner in the Firm's San Diego office and focuses her practice on the investigation of potential actions on behalf of defrauded investors, primarily in the area of accounting fraud. In addition to being an attorney, Ms. Kowalewski is a Certified Public Accountant. Ms. Kowalewski has participated in the investigation and litigation of many large accounting scandals, including *In re Cardinal Health, Inc. Sec. Litig.* and *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.*, and numerous companies implicated in the stock option backdating scandal. Prior to joining the Firm, Ms. Kowalewski served as a judicial extern to the Honorable Richard D. Huffman of the California Court of Appeal.

**Education:** B.B.A., Ohio University, 1994; M.B.A., Limburgs Universitair Centrum, 1995; J.D., University of San Diego School of Law, 2001

**Honors/Awards:** Lead Articles Editor, *San Diego Law Review*, University of San Diego

### LAURIE L. LARGENT

Laurie L. Largent is a partner in the Firm's San Diego, California office.  Her practice focuses on securities class action and shareholder derivative litigation and she has helped recover millions of dollars for injured shareholders.  Ms. Largent earned her Bachelor of Business Administration degree from the University of Oklahoma in 1985 and her Juris Doctor degree from the University of Tulsa in 1988.  While at the University of Tulsa, Ms. Largent served as a member of the *Energy Law Journal* and is the author of *Prospective Remedies Under NGA Section 5; Office of Consumers' Counsel v. FERC*, 23 Tulsa L.J. 613 (1988). Ms. Largent has also served as an Adjunct Business Law Professor at Southwestern College in Chula Vista, California. Prior to joining the Firm, Ms. Largent was in private practice for 15 years specializing in complex litigation, handling both trials and appeals in state and federal courts for plaintiffs and defendants.

**Education:** B.B.A., University of Oklahoma, 1985; J.D., University of Tulsa, 1988

### ARTHUR C. LEAHY

Arthur C. Leahy is a founding partner in the Firm's San Diego office and a member of the Firm's Executive and Management Committees. Mr. Leahy has over 15 years of experience successfully litigating securities class actions and derivative cases. Mr. Leahy has recovered well over a billion dollars for the Firm's clients and has also negotiated comprehensive pro-investor corporate governance reforms at several large public companies. Mr. Leahy was part of the Firm's trial team in the AT&T securities litigation, which AT&T and its former officers paid $100 million to settle after two weeks of trial. Prior to joining the Firm, Mr. Leahy served as a judicial extern for the Honorable J. Clifford

Wallace of the United States Court of Appeals for the Ninth Circuit, and served as a judicial law clerk for the Honorable Alan C. Kay of the United States District Court for the District of Hawaii.

**Education:** B.A., Point Loma College, 1987; J.D., University of San Diego School of Law, 1990

**Honors/Awards:** J.D., *Cum Laude*, University of San Diego School of Law, 1990; Managing Editor, *San Diego Law Review*, University of San Diego School of Law

### JEFFREY D. LIGHT

Jeffrey D. Light is a partner in the Firm's San Diego office and also currently serves as a Judge Pro Tem for the San Diego County Superior Court. Mr. Light practices in the Firm's settlement department, negotiating, documenting, and obtaining court approval of the Firm's complex securities, merger, consumer and derivative actions. These settlements include *In re Kinder Morgan, Inc. S'holder Litig.* (Kan. Dist. Ct., Shawnee County) ($200 million recovery); *In re Currency Conversion Fee Antitrust Litig.* (S.D.N.Y.) ($336 million recovery); *In re Qwest Commc'ns Int'l Inc. Sec. Litig.* (D. Colo.) ($445 million recovery); and *In re AT&T Corp. Sec. Litig.* (D.N.J.) ($100 million recovery). Prior to joining the Firm, Mr. Light served as a law clerk to the Honorable Louise DeCarl Adler, United States Bankruptcy Court, Southern District of California, and the Honorable James Meyers, Chief Judge, United States Bankruptcy Court, Southern District of California.

**Education:** B.A., San Diego State University, 1987; J.D., University of San Diego School of Law, 1991

**Honors/Awards:** J.D., *Cum Laude*, University of San Diego School of Law, 1991; Judge Pro Tem, San Diego Superior Court; American Jurisprudence Award in Constitutional Law

### RYAN LLORENS

Ryan Llorens is a partner in the Firm's San Diego office. Mr. Llorens' practice focuses on litigating complex securities fraud cases. Mr. Llorens has worked on a number of securities cases that have resulted in significant recoveries for investors, including *In re HealthSouth Corp. Sec. Litig.* ($670 million recovery); *AOL Time Warner* ($629 million recovery); *In re AT&T Corp. Sec. Litig.* ($100 million recovery); *In re Fleming Cos. Sec. Litig.* ($95 million recovery); and *In re Cooper Cos., Inc. Sec Litig.* ($27 million recovery).

**Education:** B.A., Pitzer College, 1997; J.D., University of San Diego School of Law, 2002

### THOMAS R. MERRICK

Thomas R. Merrick is a partner in the Firm's San Diego office whose practice focuses on complex class action and antitrust litigation. Most recently, Mr. Merrick was on the successful trial teams in *Lebrilla v. Farmers Grp., Inc.*, and *Smith v. Am. Family Mut. Ins. Co.*, 289 S.W.3d 675 (Mo. Ct. App. 2009) (upholding unanimous jury verdict in plaintiffs' favor). Mr. Merrick represented the plaintiff in the precedent-setting case of *Safeco Ins. Co.*

*of Am. v. Superior Court*, 173 Cal. App. 4th 814 (2009). Mr. Merrick is also counsel for direct purchaser plaintiffs in *The Apple iPod iTunes Anti-Trust Litigation*, currently pending in the Northern District of California. Prior to joining the Firm, Mr. Merrick served as a Deputy San Diego City Attorney and worked as a general practice attorney in Illinois.

**Education:** B.A., University of California, Santa Barbara, 1986; J.D., California Western School of Law, 1992

**Honors/Awards:** B.A., with high honors and distinction, University of California, Santa Barbara, 1986; J.D. *Magna Cum Laude*, California Western School of Law, 1992; Editor-in-Chief of both *California Western Law Review* and *California Western International Law Journal*, California Western School of Law

### DAVID W. MITCHELL

David W. Mitchell is a partner in the Firm's San Diego office and focuses his practice on securities fraud, antitrust and derivative litigation. Mr. Mitchell has achieved significant settlements on behalf of plaintiffs in numerous cases, including *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, No. CV-99-7796 (C.D. Cal.), which settled for $67.5 million, and *In re Currency Conversion Fee Antitrust Litig.*, 01 MDL No. 1409 (S.D.N.Y.), which settled for $336 million. Mr. Mitchell is currently litigating securities, derivative and antitrust actions, including *In re NYSE Specialists Sec. Litig.*, No. 03-Civ.-8264 (S.D.N.Y.); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05 MDL No. 1720 (E.D.N.Y.); *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388-EFH (D. Mass); and *In re Johnson & Johnson Derivative Litig.*, No. 10-cv-02033 (D.N.J.).

Prior to joining the Firm, Mr. Mitchell served as an Assistant United States Attorney in the Southern District of California and prosecuted cases involving narcotics trafficking, bank robbery, murder-for-hire, alien smuggling, and terrorism. Mr. Mitchell has tried nearly 20 cases to verdict before federal criminal juries and made numerous appellate arguments before the Ninth Circuit Court of Appeals.

**Education:** B.A., University of Richmond, 1995; J.D., University of San Diego School of Law, 1998

### CULLIN AVRAM O'BRIEN

Cullin Avram O'Brien is a partner in the Firm's Boca Raton, Florida office and concentrates his practice in direct and derivative shareholder class actions, consumer class action litigation, and securities fraud cases. Some recent representative cases include: *In re Compellent Techs, Inc. S'holder Litig.*, No. 6084-VCL, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011); *All Family Clinic of Daytona Beach, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 10-12554, 2011 WL 4954171 (11th Cir. Oct. 19, 2011); *Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011). Prior to joining the Firm, Mr. O'Brien gained extensive trial and appellate experience in a wide variety of practices, including as an Assistant Public Defender in Broward County, Florida, as a civil rights litigator in non-profit institutes, and as an associate at a national law firm that provides litigation defense for corporations.

**Education:** B.A., Tufts University, 1999; J.D., Harvard Law School, 2002

### BRIAN O. O'MARA

Brian O. O'Mara is a partner in the Firm's San Diego office. Mr. O'Mara's practice focuses on securities litigation and corporate governance. Since 2003, Mr. O'Mara has been lead or co-lead counsel in numerous securities fraud and derivative actions, including *In re Direct Gen. Sec. Litig.*; *In re St. Paul Travelers Cos., Inc. Derivative Litig.*; *In re Constar Int'l Inc. Sec. Litig.*; *In re Surebeam Corp. Sec. Litig.*; *Broudo v. Dura Pharms.*; *In re NYSE Specialists Sec. Litig.*; and *In re CIT Grp. Inc. Sec. Litig.* Mr. O'Mara has been responsible for a number of significant rulings, including *In re Constar Int'l Inc. Sec. Litig.*, No. 03-5020, 2008 U.S. Dist. LEXIS 16966 (E.D. Pa. Mar. 5, 2008); *In re Direct Gen. Corp. Sec. Litig.*, No. 3:05-0077, 2006 U.S. Dist. LEXIS 56128 (M.D. Tenn. Aug. 8, 2006); and *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006). Mr. O'Mara is the co-author of *Whether Alleging "Motive and Opportunity" Can Satisfy the Heightened Pleading Standards for the Private Securities Litigation Reform Act: Much Ado About Nothing*, 1 DePaul Bus. & Com. L.J. 313 (2003). Prior to joining the Firm, Mr. O'Mara served as law clerk to the Honorable Jerome M. Polaha of the Second Judicial District Court of the State of Nevada.

**Education:** B.A., University of Kansas, 1997; J.D., DePaul University, College of Law, 2002

**Honors/Awards:** CALI Excellence Award in Securities Regulation, DePaul University, College of Law

### KEITH F. PARK

Keith F. Park is a partner in the Firm's San Diego office and a member of the Firm's Management Committee.

Mr. Park is responsible for prosecuting complex securities cases and has overseen the court approval process in more than 1,000 securities class action and shareholder derivative settlements, including actions involving Enron ($7.2 billion recovery); UnitedHealth ($925 million recovery and corporate governance reforms); Dynegy ($474 million recovery and corporate governance reforms); 3Com ($259 million recovery); Dollar General ($162 million recovery); Mattel ($122 million recovery); and Prison Realty ($105 million recovery). Mr. Park is also responsible for obtaining significant corporate governance changes relating to compensation of senior executives and directors; stock trading by directors, executive officers and key employees; internal and external audit functions; and financial reporting and board independence.

**Education:** B.A., University of California, Santa Barbara, 1968; J.D., Hastings College of Law, 1972

**Honors/Awards:** San Diego Super Lawyer, Securities Litigation

### STEVEN W. PEPICH

Steven W. Pepich is a partner in the Firm's San Diego office. Mr. Pepich's practice primarily focuses on securities class action litigation, but he has also represented plaintiffs in a wide variety of complex civil cases, including mass tort, royalty, civil rights, human rights, ERISA and employment law actions. Mr. Pepich has participated in the successful prosecution of numerous securities class actions, including *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 00-CV-2838 (N.D. Ga.) ($137.5 million recovery); *In re Fleming Cos. Sec.*, No. 02-CV-178 (E.D. Tex.) ($95 million recovery); and *In re Boeing Sec. Litig.*, No. C-97-1715Z (W.D. Wa.) ($92 million recovery). Mr. Pepich was also a member of the plaintiffs' trial team in *Mynaf v. Taco Bell Corp.*, which settled after two months at trial on terms favorable to two plaintiff classes of restaurant workers for recovery of unpaid wages, and a member of the plaintiffs' trial team in *Newman v. Stringfellow*, where after a nine-month trial, all claims for exposure to toxic chemicals were resolved for $109 million.

**Education:** B.S., Utah State University, 1980; J.D., DePaul University, 1983

### THEODORE J. PINTAR

Theodore J. Pintar is a partner in the Firm's San Diego office. Mr. Pintar has over 20 years of experience prosecuting securities fraud actions on behalf of investors and over 10 years of experience prosecuting insurance-related consumer class actions on behalf of policyholders, with recoveries in excess of $1 billion. Mr. Pintar was a member of the litigation team in the *AOL Time Warner* state and federal court securities opt-out actions, which arose from the 2001 merger of America Online and Time Warner. These cases resulted in a global settlement of $629 million. Mr. Pintar's participation in the successful prosecution of insurance-related and consumer class actions includes: (i) actions against major life insurance companies based on the deceptive sale of annuities and life insurance such as Manufacturer's Life ($555 million initial estimated settlement value) and Principal Mutual Life Insurance Company ($380+ million settlement value); (ii) actions against major homeowners insurance companies such as Allstate ($50 million settlement) and Prudential Property and Casualty Co. ($7 million settlement); (iii) actions against automobile insurance companies such as the Auto Club and GEICO; and (iv) actions against Columbia House ($55 million settlement value) and BMG Direct, direct marketers of CDs and cassettes.

**Education:** B.A., University of California, Berkeley, 1984; J.D., University of Utah College of Law, 1987

**Honors/Awards:** Note and Comment Editor, *Journal of Contemporary Law*, University of Utah College of Law; Note and Comment Editor, *Journal of Energy Law and Policy*, University of Utah College of Law

### WILLOW E. RADCLIFFE

Willow E. Radcliffe is a partner in the Firm's San Francisco office and concentrates her practice on securities class action litigation in federal court. Ms. Radcliffe has been significantly involved in the prosecution of numerous securities fraud claims, including actions filed against Flowserve, NorthWestern and Ashworth, and has represented plaintiffs

in other complex actions, including a class action against a major bank regarding the adequacy of disclosures made to consumers in California related to Access Checks. Prior to joining the Firm, Ms. Radcliffe clerked for the Honorable Maria-Elena James, Magistrate Judge for the United States District Court for the Northern District of California.

**Education:** B.A., University of California, Los Angeles 1994; J.D., Seton Hall University School of Law, 1998

**Honors/Awards:** J.D., *Cum Laude*, Seton Hall University School of Law, 1998; Most Outstanding Clinician Award; Constitutional Law Scholar Award

### JACK REISE

Jack Reise is a partner in the Firm's Boca Raton office. Mr. Reise devotes a substantial portion of his practice to representing shareholders in actions brought under the federal securities laws. He has served as lead counsel in over 50 cases brought nationwide and is currently serving as lead counsel in more than a dozen cases. Recent notable actions include a series of cases involving mutual funds charged with improperly valuating their net assets, which settled for a total of over $50 million; *In re NewPower Holdings Sec. Litig.*, No. 02-cv-01550 (S.D.N.Y.) ($41 million settlement); *In re Red Hat Sec. Litig.*, No. 04-cv-473 (E.D.N.C.) ($20 million settlement); and *In re AFC Enters., Inc. Sec. Litig.*, No. 03-cv-0817 (N.D. Ga.) ($17.2 million settlement). Mr. Reise started his legal career representing individuals suffering from their exposure back in the 1950s and 1960s to the debilitating affects of asbestos.

**Education:** B.A., Binghamton University, 1992; J.D., University of Miami School of Law, 1995

**Honors/Awards:** American Jurisprudence Book Award in Contracts; J.D., *Cum Laude*, University of Miami School of Law, 1995; *University of Miami Inter-American Law Review*, University of Miami School of Law

### JOHN J. RICE

John J. Rice is a partner in the Firm's San Diego office. Mr. Rice brings significant trial experience to the Firm and is a member of the Firm's litigation team. In his time at the Firm, he has prosecuted complex securities cases and helped obtain recoveries for investors in numerous cases, including *AOL Time Warner*, *HealthSouth*, *Forest Labs.*, and *Healthways*.

Prior to joining the Firm, Mr. Rice prosecuted a wide array of cases, ranging from complex white-collar cases to murder to organized crime cases. Most recently, he worked as an Assistant United States Attorney in the Southern District of California, specializing in public corruption cases. He has also served stints prosecuting organized crime for the United States Attorney's Office in the Southern District of New York and was nominated to serve as Branch Chief in the Northern Mariana Islands, prosecuting public corruption and white-collar criminal cases. Mr. Rice has been praised for his diligent efforts to combat graft, corruption, and collusion among public and private officials in San Diego and has received numerous awards from local and federal law enforcement agencies.

After law school, Mr. Rice was a judicial clerk to the late United States District Court Judge Judith N. Keep of the Southern District of California. Mr. Rice has taught for many years and currently serves as an adjunct professor at the University of San Diego School of Law.

**Education:** B.A., Harvard College, 1983; J.D., University of Virginia, 1987

**Honors/Awards:** B.A., *Cum Laude*, Harvard College, 1983; Commendations from FBI, DEA, IRS, and DOJ

### DARREN J. ROBBINS

Darren J. Robbins is a founding partner of Robbins Geller and a member of its Executive and Management Committees. Mr. Robbins oversees various aspects of the Firm's practice, including the Firm's Institutional Outreach Department and its Mergers and Acquisitions practice. Mr. Robbins has served as lead counsel in more than one hundred securities-related actions, which have yielded recoveries of over $2 billion for injured shareholders.

One of the hallmarks of Mr. Robbins' practice has been his focus on corporate governance reform. For example, in *UnitedHealth*, a securities fraud class action arising out of an options backdating scandal, Mr. Robbins represented lead plaintiff the California Public Employees' Retirement System and was able to obtain the cancellation of more than 3.6 million stock options held by the company's former CEO and a record $925 million cash recovery for shareholders.

**Education:** B.S., University of Southern California, 1990; M.A., University of Southern California, 1990; J.D., Vanderbilt Law School, 1993

**Honors/Awards:** One of the Top 100 Lawyers Shaping the Future, *Daily Journal*; One of the "Young Litigators 45 and Under," *The American Lawyer*; Attorney of the Year, *California Lawyer*; Managing Editor, *Vanderbilt Journal of Transnational Law*, Vanderbilt Law School

### ROBERT J. ROBBINS

Robert J. Robbins is a partner in the Firm's Boca Raton office. Mr. Robbins focuses his practice on the representation of individuals and institutional investors in class actions brought pursuant to the federal securities laws. His efforts on behalf of shareholders and consumers have resulted in numerous multi-million dollar recoveries, including *In re Cryo Cell Int'l, Inc. Sec. Litig.* ($7 million settlement); *In re TECO Energy, Inc. Sec. Litig.* ($17.35 million settlement); *In re Newpark Res., Inc. Sec. Litig.* ($9.24 million settlement); *In re Mannatech, Inc. Sec. Litig.* ($11.5 million settlement); and *Lewis v. Labor Ready, Inc.* ($11 million settlement). Mr. Robbins, an ardent advocate, is counsel for shareholders in *Reese v. The McGraw-Hill Cos., Inc.* (S.D.N.Y.), *Kuriakose v. Fed. Home Loan Mtg. Co.* (Freddie Mac) (S.D.N.Y.), *City of Lakeland Employees Pension Plan v. Baxter Int'l Inc.* (N.D. Ill.), and many other securities fraud actions.

**Education:** B.S., University of Florida, 1999; J.D., University of Florida College of Law, 2002

**Honors/Awards:** J.D., High Honors, University of Florida College of Law, 2002; Member, *Journal of Law and Public Policy*, University of Florida College of Law; Member, *Phi Delta Phi*, University of Florida College of Law; *Pro bono* certificate, Circuit Court of the Eighth Judicial Circuit of Florida

### HENRY ROSEN

Henry Rosen is a partner in the Firm's San Diego office and a member of the Firm's Hiring Committee and Technology Committee, which focuses on applications to digitally manage documents produced during litigation and internally generate research files.

Mr. Rosen has significant experience prosecuting every aspect of securities fraud class actions, including largescale accounting scandals, and has obtained hundreds of millions of dollars on behalf of defrauded investors. Prominent cases include *In re Cardinal Health, Inc. Sec. Litig.*, in which Mr. Rosen recovered $600 million for defrauded Cardinal Health shareholders. This $600 million settlement is the largest recovery ever in a securities fraud class action in the Sixth Circuit, and remains one of the largest settlements in the history of securities fraud litigation. Additional recoveries include *In re First Energy* ($89.5 million recovery); *Stanley v. Safeskin Corp.* ($55 million recovery); *In re Storage Tech. Corp. Sec. Litig.* ($55 million recovery); and *Rasner v. Sturm* (First World Commc'ns) ($25.9 million recovery). Major clients include Minebea Co., Ltd., a Japanese manufacturing company represented in securities fraud arbitration against a United States investment bank.

**Education:** B.A., University of California, San Diego, 1984; J.D., University of Denver, 1988

**Honors/Awards:** Editor-in-Chief, *University of Denver Law Review*, University of Denver

### DAVID A. ROSENFELD

David A. Rosenfeld is a partner in the Firm's New York office and focuses his practice on securities and corporate takeover litigation. Mr. Rosenfeld is currently prosecuting many cases involving widespread financial fraud, ranging from options backdating to Bernie Madoff, as well as litigation concerning collateralized debt obligations and credit default swaps.

Mr. Rosenfeld has been appointed as lead counsel in dozens of securities fraud cases and has successfully recovered hundreds of millions of dollars for defrauded shareholders. For example, Mr. Rosenfeld was appointed as lead counsel in the securities fraud lawsuit against First BanCorp, which provided shareholders with a $74.25 million recovery. He also served as lead counsel in *In re Aramark Corp. S'holders Litig.*, which resulted in a $222 million increase in consideration paid to shareholders of Aramark and a dramatic reduction to management's voting power in connection with shareholder approval of the going-private transaction (reduced from 37% to 3.5%).

**Education:** B.S., Yeshiva University, 1996; J.D., Benjamin N. Cardozo School of Law,1999

**Honors/Awards:** Advisory Board Member of *Stafford's Securities Class Action Reporter*

### JOSEPH RUSSELLO

Joseph Russello is a partner in the Firm's New York office, where he concentrates his practice on prosecuting shareholder class action and breach of fiduciary duty claims, as well as complex commercial litigation and consumer class actions.

Mr. Russello has played a vital role in recovering millions of dollars for aggrieved investors, including those of NBTY, Inc. ($16 million); LaBranche & Co., Inc. ($13 million); The Children's Place Retail Stores, Inc. ($12 million); Prestige Brands Holdings, Inc. ($11 million); and Jarden Corporation ($8 million).  He also has significant experience in corporate takeover and breach of fiduciary duty litigation.  In expedited litigation in the Delaware Court of Chancery involving Mat Five LLC, for example, his efforts paved the way for an "opt-out" settlement that offered investors more than $38 million in increased cash benefits.  In addition, he played an integral role in convincing the Delaware Court of Chancery to enjoin Oracle Corporation's $1 billion acquisition of Art Technology Group, Inc. pending the disclosure of material information.  He also has experience in litigating consumer class actions.

Prior to joining the Firm, Mr. Russello practiced in the professional liability group at Rivkin Radler LLP, where he defended attorneys, accountants and other professionals in state and federal litigation and assisted in evaluating and resolving complex insurance coverage matters.

**Education:** B.A., Gettysburg College, 1998; J.D., Hofstra University School of Law, 2001

### ROBERT M. ROTHMAN

Robert M. Rothman is a partner in the Firm's New York office. He has extensive experience litigating cases involving investment fraud, consumer fraud and antitrust violations. Mr. Rothman also lectures to institutional investors throughout the world.

Mr. Rothman has served as lead counsel in numerous class actions alleging violations of securities laws, including cases against First Bancorp ($74.25 million recovery), Spiegel ($17.5 million recovery), NBTY ($16 million recovery), and The Children's Place ($12 million recovery). Mr. Rothman actively represents shareholders in connection with going-private transactions and tender offers. For example, in connection with a tender offer made by Citigroup, Mr. Rothman secured an increase of more than $38 million over what was originally offered to shareholders.

**Education:** B.A., State University of New York at Binghamton, 1990; J.D., Hofstra University School of Law, 1993

**Honors/Awards:** Dean's Academic Scholarship Award, Hofstra University School of Law; J.D., with Distinction, Hofstra University School of Law, 1993; Member, *Hofstra Law Review*, Hofstra University School of Law

### SAMUEL H. RUDMAN

Samuel H. Rudman is a founding member of the Firm, a member of the Firm's Executive and Management Committees, and manages the Firm's New York office. Mr. Rudman's practice focuses on recognizing and investigating securities fraud, and initiating securities and shareholder class actions to vindicate shareholder rights and recover shareholder losses. A former attorney with the United States Securities and Exchange Commission, Mr. Rudman has recovered hundreds of millions of dollars for shareholders, including $129 million recovery in *In re Doral Fin. Corp. Sec. Litig.*, No. 05 MD 1706 (S.D.N.Y.); $74 million recovery in *In re First BanCorp Sec. Litig.*, No. 05-CV-2148 (D.P.R.); $65 million recovery in *In re Forest Labs., Inc. Sec. Litig.*, No. 05-CV-2827 (S.D.N.Y.); and $50 million recovery in *In re TD Banknorth S'holders Litig.*, No. 2557-VCL (Del. Ch.).

**Education:** B.A., Binghamton University, 1989; J.D., Brooklyn Law School, 1992

**Honors/Awards:** Dean's Merit Scholar, Brooklyn Law School; Moot Court Honor Society, Brooklyn Law School; Member, Brooklyn Journal of International Law, Brooklyn Law School

### SCOTT SAHAM

Scott Saham is a partner in the Firm's San Diego office whose practice areas include securities and other complex litigation. Mr. Saham recently served as lead counsel prosecuting the *Coca-Cola* securities litigation in the Northern District of Georgia, which resulted in a $137.5 million settlement after nearly 8 years of litigation. Prior to joining the Firm, Mr. Saham served as an Assistant United States Attorney in the Southern District of California, where he tried over 20 felony jury trials.

**Education:** B.A., University of Michigan, 1992; J.D., University of Michigan Law School, 1995

### STEPHANIE SCHRODER

Stephanie Schroder is a partner in the Firm's San Diego office. Ms. Schroder has significant experience prosecuting securities fraud class actions and shareholder derivative actions. Ms. Schroder's practice also focuses on advising institutional investors, including multi-employer and public pension funds, on issues related to corporate fraud in the United States securities markets. Currently, Ms. Schroder is representing clients that have suffered losses from the Madoff fraud in the *Austin Capital* and *Meridian Capital* litigations.

Ms. Schroder has obtained millions of dollars on behalf of defrauded investors. Prominent cases include *In re AT&T Corp. Sec. Litig.* ($100 million recovery at trial); *In re FirstEnergy Corp. Sec. Litig.* ($89.5 million recovery); and *Rasner v. Sturm* (FirstWorld Communications) ($25.9 million recovery). Major clients include the Pension Trust Fund for Operating Engineers, the Kentucky State District Council of Carpenters Pension Trust Fund, the Laborers Pension Trust Fund for Northern California, the Construction Laborers Pension Trust for Southern California, and the Iron Workers Mid-South Pension Fund.

**Education:** B.A., University of Kentucky, 1997; J.D., University of Kentucky College of Law, 2000

### CHRISTOPHER P. SEEFER

Christopher P. Seefer is a partner in the Firm's San Francisco office. Mr. Seefer concentrates his practice in securities class action litigation. One recent notable recovery was a $30 million settlement with UTStarcom in 2010, a recovery that dwarfed a $150,000 penalty obtained by the SEC. Prior to joining the Firm, Mr. Seefer was a Fraud Investigator with the Office of Thrift Supervision, Department of the Treasury (1990-1999), and a field examiner with the Office of Thrift Supervision (1986-1990).

**Education:** B.A., University of California Berkeley, 1984; M.B.A., University of California, Berkeley, 1990; J.D., Golden Gate University School of Law, 1998

### TRIG SMITH

Trig Smith is a partner in the Firm's San Diego office. Mr. Smith focuses on complex securities class actions in which he has helped obtain significant recoveries for investors in cases such as *Cardinal Health* ($600 million recovery); *Qwest* ($445 million recovery); *Forest Labs.* ($65 million recovery); *Accredo* ($33 million recovery); and *Exide* ($13.7 million recovery).

**Education:** B.S., University of Colorado, Denver, 1995; M.S., University of Colorado, Denver, 1997; J.D., Brooklyn Law School, 2000

**Honors/Awards:** Member, *Brooklyn Journal of International Law*, Brooklyn Law School; CALI Excellence Award in Legal Writing, Brooklyn Law School

### MARK SOLOMON

Mark Solomon is a partner in the Firm's San Diego office. Mr. Solomon regularly represents both United States and United Kingdom-based pension funds and asset managers in class and non-class securities litigation. Mr. Solomon has spearheaded the prosecution of many significant cases and has obtained substantial recoveries and judgments for plaintiffs through settlement, summary adjudications and trial. Mr. Solomon played a pivotal role in *In re Helionetics*, where plaintiffs won a unanimous $15.4 million jury verdict, and in many other cases, among them: *Schwartz v. TXU* ($150 million recovery plus significant corporate governance reforms); *In re Informix Corp. Sec. Litig.* ($142 million recovery); *Rosen v. Macromedia, Inc.* ($48 million recovery); *In re Cmty. Psychiatric Ctrs. Sec. Litig.* ($42.5 million recovery); *In re Advanced Micro Devices Sec. Litig.* ($34 million recovery); and *In re Tele-Commc'ns, Inc. Sec. Litig.* ($33 million recovery).

**Education:** B.A., Trinity College, Cambridge University, England, 1985; L.L.M., Harvard Law School, 1986; Inns of Court School of Law, Degree of Utter Barrister, England, 1987

**Honors/Awards:** Lizette Bentwich Law Prize, Trinity College, 1983 and 1984; Hollond Travelling Studentship, 1985; Harvard Law School Fellowship, 1985-1986; Member and Hardwicke Scholar of the Honourable Society of Lincoln's Inn

### SANFORD SVETCOV

Sandy Svetcov is a partner in the Firm's San Francisco office and has been an appellate lawyer for 45 years. Mr. Svetcov has briefed and argued more than 300 appeals in state and federal court, including *Braxton v. Mun. Court*, 10 Cal. 3d 138 (1973) (First Amendment); *Procunier v. Navarette*, 434 U.S. 555 (1978) (prisoner civil rights); *United States v. Henke*, 222 F.3d 633 (9th Cir. 2000) (securities fraud); *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001) (civil rights); *In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) (securities fraud); *Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) (securities fraud); *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (securities fraud); and *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009) (securities fraud).

Prior to joining the Firm in July 2000, Mr. Svetcov was a partner at Landels firm from 1989-2000; served as Chief, Appellate Section, United States Attorney's Office, San Francisco, 1984-1989; Attorney-in-Charge, Organized Crime Strike Force, San Francisco, 1981-1984; Chief Assistant United States Attorney, San Francisco, 1978-1981; Deputy Attorney General, State of California, 1969-1977; Legal Officer, United States Navy, VT-25, Chase Field, Beeville, Texas, 1966-1969; and Deputy Legislative Counsel, Legislature of California, Sacramento, 1965-1966.

**Education:** B.A., Brooklyn College, 1961; J.D., University of California, Berkeley, 1964

**Honors/Awards:** Appointed by Chief Justice Rehnquist to Federal Appellate Rules Advisory Committee; Department of Justice's John Marshall Award for Excellence in Appellate Advocacy, California Attorney General; Specialist in Appellate Practice, State Bar of California Board of Legal Specialization

### BONNY E. SWEENEY

Bonny E. Sweeney is a partner in the Firm's San Diego office, where she specializes in antitrust and unfair competition class action litigation. Ms. Sweeney has served as co-lead counsel in several multi-district antitrust class actions pending in federal courts around the country, including *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.* (E.D.N.Y.), and *In re Currency Conversion Fee Antitrust Litig.* (S.D.N.Y.). In *Currency Conversion*, Ms. Sweeney helped recover $336 million for class members through a proposed settlement that is awaiting approval from the federal court. Ms. Sweeney was also one of the trial lawyers in *Law v. NCAA/Hall v. NCAA/Schreiber v. NCAA* (D. Kan.), in which the jury awarded $67 million to three classes of college coaches.

Ms. Sweeney has participated in the successful prosecution and settlement of numerous other antitrust and unfair competition cases, including *In re LifeScan, Inc. Consumer Litig.* (N.D. Cal.), which settled for $45 million; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (N.D. Cal.), which settled for more than $300 million; *In re NASDAQ Market-*

*Makers Antitrust Litig.* (S.D.N.Y.), which settled for $1.027 billion; and *In re Airline Ticket Comm'n Antitrust Litig.* (D. Minn.), which settled for more than $85 million.

**Education:** B.A., Whittier College, 1981; M.A., Cornell University, 1985; J.D., Case Western Reserve University School of Law, 1988

**Honors/Awards:** "Outstanding Women in Antitrust," *Competition Law 360*; Wiley M. Manuel Pro Bono Services Award; San Diego Volunteer Lawyer Program Distinguished Service Award; J.D., *Summa Cum Laude*, Case Western Reserve University of School of Law, 1988

### SUSAN GOSS TAYLOR

Susan Goss Taylor is a partner in the Firm's San Diego office. Ms. Taylor's practice focuses on antitrust, consumer, and securities fraud class actions. Ms. Taylor has served as counsel on the Microsoft, DRAM and Private Equity antitrust litigation teams, as well as on a number of consumer actions alleging false and misleading advertising and unfair business practices against major corporations such as General Motors, Saturn, Mercedes-Benz USA, LLC, BMG Direct Marketing, Inc., and Ameriquest Mortgage Company. Ms. Taylor is also responsible for prosecuting securities fraud class actions and has obtained recoveries for investors in litigation involving *WorldCom* ($657 million recovery), *AOL Time Warner* ($629 million recovery), and *Qwest* ($445 million recovery). Prior to joining the Firm, Ms. Taylor served as a Special Assistant United States Attorney for the Southern District of California, where she obtained considerable trial experience prosecuting drug smuggling and alien smuggling cases.

**Education:** B.A., Pennsylvania State University, 1994; J.D., The Catholic University of America, Columbus School of Law, 1997

**Honors/Awards:** Member, Moot Court Team, The Catholic University of America, Columbus School of Law

### RYAN K. WALSH

Ryan K. Walsh, a founding partner of the Firm's Atlanta office, is an experienced litigator of complex commercial disputes. Mr. Walsh's practice focuses primarily on protecting the rights of innovators in patent litigation and related technology disputes. Mr. Walsh has appeared and argued before federal appellate and district courts, state trial courts, and in complex commercial proceedings across the country. Mr. Walsh's cases have involved a wide variety of technologies, ranging from basic mechanical applications to more sophisticated technologies in the wireless telecommunications and medical device fields. Recent notable cases have involved patents in the wireless mesh networking and wired Ethernet networking fields.

Throughout his career, Mr. Walsh has been active in the Atlanta legal community. Beginning in January 2011, Mr. Walsh will serve as President of the Atlanta Legal Aid Society, having previously served on the ALAS Board of Directors for several years. Mr.

Walsh also serves on the Board of the Atlanta Bar Association and is a regular speaker at the State Bar of Georgia's Beginning Lawyer's Program.

**Education:** B.A., Brown University, 1993; J.D., University of Georgia School of Law, 1999

**Honors/Awards:** "Rising Star" in the field of Intellectual Property, *Atlanta Magazine*; Super Lawyer, *Atlanta Magazine*; J.D., *Magna Cum Laude*, Bryant T. Castellow Scholar, Order of the Coif, University of Georgia School of Law, 1999

### DAVID C. WALTON

David C. Walton is a partner in the Firm's San Diego office and a member of the Firm's Executive and Management Committees. Mr. Walton specializes in pursuing financial fraud claims, using his background as a Certified Public Accountant and Certified Fraud Examiner to prosecute securities law violations on behalf of investors. Mr. Walton has investigated and participated in the litigation of many large accounting scandals, including Enron, WorldCom, AOL Time Warner, Krispy Kreme, Informix, HealthSouth, Dynegy, Dollar General, and numerous companies implicated in stock option backdating. In 2003-2004, Mr. Walton served as a member of the California Board of Accountancy, which is responsible for regulating the accounting profession in California.

**Education:** B.A., University of Utah, 1988; J.D., University of Southern California Law Center, 1993

**Honors/Awards:** Member, *Southern California Law* Review, University of Southern California Law Center; Hale Moot Court Honors Program, University of Southern California Law Center; Appointed to California State Board of Accountancy, 2004

### DOUGLAS WILENS

Douglas Wilens is a partner in the Firm's Boca Raton office. Mr. Wilens is involved in all aspects of securities class action litigation, focusing on lead plaintiff issues arising under the Private Securities Litigation Reform Act. Mr. Wilens is also involved in the Firm's appellate practice and participated in the successful appeal of a motion to dismiss before the Fifth Circuit Court of Appeals in *Lormand v. US Unwired, Inc.*, No 07-30106 (5th Cir. 2009) (reversal of order granting motion to dismiss).

Prior to joining the Firm, Mr. Wilens was an associate at a nationally recognized firm, where he litigated complex actions on behalf of numerous professional sports leagues, including the National Basketball Association, the National Hockey League and Major League Soccer. Mr. Wilens has also served as an adjunct professor at Florida Atlantic University and Nova Southeastern University, where he taught undergraduate and graduate-level business law classes.

**Education:** B.S., University of Florida, 1992; J.D., University of Florida College of Law, 1995

**Honors/Awards:** Book Award for Legal Drafting, University of Florida College of Law; J.D., with Honors, University of Florida College of Law, 1995

### SHAWN A. WILLIAMS

Shawn A. Williams is a partner in the Firm's San Francisco office and focuses his practice on securities class actions and shareholder derivative actions. Mr. Williams has served as lead class counsel in notable cases, including *In re Harmonic Inc. Sec. Litig.*, No. 00-2287 (N.D. Cal.); *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.*, No. 04-0416 (M.D.N.C.); and *In re Veritas Software Corp. Sec. Litig.*, No. 03-0283 (N.D. Cal.). Mr. Williams has also prosecuted significant shareholder derivative actions, including numerous stock option backdating actions, in which he secured tens of millions of dollars in cash recoveries and negotiated the implementation of comprehensive corporate governance enhancements. *See, e.g.*, *In re McAfee, Inc. Derivative Litig.*, No. 06-3484- JF (N.D. Cal.); *In re Marvell Tech. Grp. Ltd. Derivative Litig.*, No. 06-3894-RMW (N.D. Cal.); and *The Home Depot, Inc. Derivative Litig.*, No. 2006-cv-122302 (Ga. Super. Ct., Fulton County). Prior to joining the Firm, Mr. Williams served as an Assistant District Attorney in the Manhattan District Attorney's Office, where he tried over 20 cases to New York City juries and led white-collar fraud grand jury investigations.

**Education:** B.A., The State of University of New York at Albany, 1991; J.D., University of Illinois, 1995

### DAVID T. WISSBROECKER

David T. Wissbroecker is a partner in the Firm's San Diego office and focuses his practice on securities class action litigation in the context of mergers and acquisitions, representing both individual shareholders and institutional investors. Mr. Wissbroecker combines aggressive advocacy with a detailed knowledge of the law to achieve effective results for his clients in both state and federal courts nationwide. Mr. Wissbroecker has successfully litigated matters resulting in monetary settlements in excess of $500 million over the last four years, including the two largest settlements ever obtained in merger-related litigation in *In re Kinder Morgan, Inc. S'holder Litig.* ($200 million) and *In re ACS S'holders Litig.* ($69 million). Other large fund settlements obtained by Mr. Wissbroecker include *In re PETCO Animal Supplies* ($16 million); and *In re Dollar Gen. Corp. S'holders Litig.* ($40 million). Most recently, Mr. Wissbroecker obtained a $45 million common fund settlement in *Brown v. Brewer*, a breach of fiduciary duty and securities class action litigated on behalf of former shareholders of Intermix, Inc. over the value of MySpace sold via merger to News Corporation in 2005.

**Education:** B.A., Arizona State University, 1998; J.D., University of Illinois College of Law, 2003

**Honors/Awards:** J.D., *Magna Cum Laude*, University of Illinois College of Law, 2003; B.A., *Cum Laude*, Arizona State University, 1998

### DEBRA J. WYMAN

Debra J. Wyman is a partner in the Firm's San Diego office who specializes in securities litigation. Ms. Wyman has litigated numerous cases against public companies in state and federal courts that have resulted in over $1 billion in recoveries for victims of securities fraud. Ms. Wyman was a member of the trial team in *In re AT&T Corp. Sec. Litig.*, which was tried in the United States District Court, District of New Jersey, and settled after only two weeks of trial for $100 million. Ms. Wyman recently prosecuted a complex securities and accounting fraud case against HealthSouth Corporation, one of the largest and longest-running corporate frauds in history, in which $671 million was recovered for defrauded HealthSouth investors.

**Education:** B.A., University of California Irvine, 1990; J.D., University of San Diego School of Law, 1997

### OF COUNSEL

### RANDI D. BANDMAN

Randi D. Bandman has directed numerous complex securities cases at the Firm, such as the pending case of *In re BP plc Derivative Litig.*, a case brought to address the alleged utter failure of BP to ensure the safety of its operation in the United States, including Alaska, and which caused such devastating results as in the Deepwater Horizon oil spill, the worst environmental disaster in history. Ms. Bandman was instrumental in the Firm's development of representing coordinated groups of institutional investors in private opt-out cases that resulted in historical recoveries, such as in WorldCom and AOL Time Warner. Through her years at the Firm, Ms. Bandman has represented hundreds of institutional investors, including domestic and non-U.S. investors, in some of the largest and most successful shareholder class actions ever prosecuted, resulting in billions of dollars of recoveries, involving such companies as Enron, Unocal and Boeing. Ms. Bandman was also instrumental in the landmark 1998 state settlement with the tobacco companies for $12.5 billion.

**Education:** B.A., University of California, Los Angeles; J.D., University of Southern California

### BRUCE BOYENS

Bruce Boyens has served as Of Counsel to the Firm since 2001. A private practitioner in Denver, Colorado since 1990, Mr. Boyens specializes in issues relating to labor and environmental law, labor organizing, labor education, union elections, internal union governance and alternative dispute resolutions. In this capacity, Mr. Boyens previously served as a Regional Director for the International Brotherhood of Teamsters elections in 1991 and 1995, and developed and taught collective bargaining and labor law courses for the George Meany Center, Kennedy School of Government, Harvard University, and the Kentucky Nurses Association, among others.

In addition, Mr. Boyens served as the Western Regional Director and Counsel for the United Mine Workers from 1983-1990, where he was the chief negotiator in over 30 major agreements, and represented the United Mine Workers in all legal matters. From 1973-1977, Mr. Boyens served as General Counsel to District 17 of the United Mine Workers Association, and also worked as an underground coal miner during that time.

**Education:** J.D., University of Kentucky College of Law, 1973; Harvard University, Certificate in Environmental Policy and Management

### PATRICK J. COUGHLIN

Patrick J. Coughlin is Of Counsel to the Firm and has served as lead counsel in several major securities matters, including one of the largest class action securities cases to go to trial, *In re Apple Computer Sec. Litig.*, No. C-84-20148 (N.D. Cal.). Additional prominent securities class actions prosecuted by Mr. Coughlin include the *Enron* litigation ($7.2 billion recovery); the *Qwest* litigation ($445 million recovery); and the *HealthSouth* litigation ($671 million recovery). Mr. Coughlin was formerly an Assistant United States Attorney in the District of Columbia and the Southern District of California, handling complex white-collar fraud matters.

**Education:** B.S., Santa Clara University, 1977; J.D., Golden Gate University, 1983

**Honors/Awards:** Southern California Super Lawyer, 2009, 2007, 2006; Top 100 Lawyers, *Daily Journal*, 2008

### MARK J. DEARMAN

Mark J. Dearman is Of Counsel to the Firm and is based in the Firm's Boca Raton office. Mr. Dearman devotes his practice to protecting the rights of those who have been harmed by corporate misconduct. Mr. Dearman is involved as lead or co-lead trial counsel in the context of protecting shareholders' rights, representing pension funds in the context of securities lending, and in consumer class actions which are pending in a multi-district venue or in many of the district courts throughout the United States, notably, *In re Burger King Holdings, Inc. S'holder Litig.*, No. 10-48395 (11th Cir.); *The Board of Trustees of the Southern California IBEW-NECA v. The Bank of New York Mellon Corp.*, No. 09-06273 (S.D.N.Y.); *POM Wonderful LLC Mktg. & Sales Practices Litig.*, MDL No. 2199; *Gutierrez v. Home Depot U.S.A., Inc.*, No. 10-cv-0166 (N.D. Ga.); and *Pelkey v. McNeil Consumer Health Care*, No. 10-cv-61853 (S.D. Fla.). Prior to joining the Firm, Mr. Dearman founded Dearman & Gerson, where he defended Fortune 500 companies in all aspects of litigation, with an emphasis on complex commercial litigation, consumer claims, and products liability. During the past 17 years of practice, Mr. Dearman has obtained extensive jury trial experience throughout the United States. Having represented defendants for so many years before joining the Firm, Mr. Dearman has a unique perspective that enables him to represent clients effectively.

**Education:** B.A., University of Florida, 1990; J.D., Nova Southeastern University, 1993

**Honors/Awards:** AV rated by Martindale-Hubbell; In top 1.5% of Florida Civil Trial Lawyers in *Florida Trend's* Florida Legal Elite, 2004 and 2006

### L. THOMAS GALLOWAY

L. Thomas Galloway is Of Counsel to the Firm. Mr. Galloway is the founding partner of Galloway & Associates PLLC, a law firm that specializes in the representation of institutional investors – namely, public and multi-employer pension funds. Mr. Galloway is also President of the Galloway Family Foundation, which funds investigative journalism into human rights abuses around the world.

**Education:** B.A., Florida State University, 1967; J.D., University of Virginia School of Law, 1972

**Honors/Awards:** Articles Editor, *University of Virginia Law Review*, University of Virginia School of Law; *Phi Beta Kappa*, University of Virginia School of Law; Trial Lawyer of the Year in the United States, 2003

### EDWARD M. GERGOSIAN

Edward M. Gergosian is Of Counsel in the Firm's San Diego office. Mr. Gergosian has practiced solely in complex litigation for 28 years, first with a nationwide securities and antitrust class action firm, managing its San Diego office, and thereafter as a founding member of his own firm. Mr. Gergosian has actively participated in the leadership and successful prosecution of several securities and antitrust class actions and shareholder derivative actions, including *In re 3Com Corp. Sec. Litig.* (which settled for $259 million); *In re Informix Corp. Sec. Litig.* (which settled for $142 million); and the Carbon Fiber antitrust litigation (which settled for $60 million). Mr. Gergosian was part of the team that prosecuted the *AOL Time Warner* state and federal court securities opt-out actions, which settled for $629 million. He also obtained a jury verdict in excess of $14 million in a consumer class action captioned *Gutierrez v. Charles J. Givens Organization*.

**Education:** B.A., Michigan State University, 1975; J.D., University of San Diego School of Law, 1982

**Honors/Awards:** J.D., *Cum Laude*, University of San Diego School of Law, 1982

### MITCHELL D. GRAVO

Mitchell D. Gravo is Of Counsel to the Firm and concentrates his practice on government relations. Mr. Gravo represents clients before the Alaska Congressional delegation, the Alaska Legislature, the Alaska State Government and the Municipality of Anchorage.

Mr. Gravo's clients include Anchorage Economic Development Corporation, Anchorage Convention and Visitors Bureau, UST Public Affairs, Inc., International Brotherhood of Electrical Workers, Alaska Seafood International, Distilled Spirits Council of America, RIM Architects, Anchorage Police Department Employees Association, Fred Meyer, and the Automobile Manufacturer's Association. Prior to joining the Firm, Mr. Gravo served as an

intern with the Municipality of Anchorage, and then served as a law clerk to Superior Court Judge J. Justin Ripley.

**Education:** B.A., Ohio State University; J.D., University of San Diego School of Law

### HELEN J. HODGES

Helen J. Hodges is Of Counsel to the Firm and is based in the Firm's San Diego office. Ms. Hodges has been involved in numerous securities class actions, including *Knapp v. Gomez*, No. 87-0067 (S.D. Cal.), in which a plaintiffs' verdict was returned in a Rule 10b-5 class action; *Nat'l Health Labs*, which settled for $64 million; *Thurber v. Mattel*, which settled for $122 million; and *Dynegy*, which settled for $474 million. More recently, Ms. Hodges focused on the prosecution of *Enron*, where a record recovery ($7.2 billion) was obtained for investors.

**Education:** B.S., Oklahoma State University, 1979; J.D., University of Oklahoma, 1983

**Honors/Awards:** Rated AV by Martindale-Hubbell; San Diego Super Lawyer, 2007; Oklahoma State University Foundation Board of Governors, 2009

### DAVID J. HOFFA

David J. Hoffa is based in Michigan and works out of the Firm's Washington, D.C. office. Since 2006, Mr. Hoffa has been serving as a liaison to over 80 institutional investors in portfolio monitoring and securities litigation matters. His practice focuses on providing a variety of legal and consulting services to single and multi-employer Taft-Hartley benefit funds, as well as municipal pension funds. Mr. Hoffa also serves as a member of the Firm's lead plaintiff advisory team, and advises public and multi-employer pension funds around the country on issues related to fiduciary responsibility, legislative and regulatory updates, and "best practices" in the corporate governance of publicly traded companies.

Early in his legal career, Mr. Hoffa worked for a law firm based in Birmingham, Michigan, where he appeared regularly in Michigan state court in litigation pertaining to business, construction, and employment related matters. Mr. Hoffa has also appeared before the Michigan Court of Appeals on several occasions.

**Education:** B.A., Michigan State University, 1993; J.D., Michigan State University College of Law, 2000

### NANCY M. JUDA

Nancy M. Juda is Of Counsel to the Firm and is based in the Firm's Washington, D.C. office. Ms. Juda concentrates her practice on employee benefits law and works in the Firm's Institutional Outreach Department. Using her extensive experience representing union pension funds, Ms. Juda advises Taft-Hartley fund trustees regarding their options for seeking redress for losses due to securities fraud. Ms. Juda also represents workers in ERISA class actions involving breach of fiduciary duty claims against corporate plan sponsors and fiduciaries.

Prior to joining the Firm, Ms. Juda was employed by the United Mine Workers of America Health & Retirement Funds, where she practiced in the area of employee benefits law. Ms. Juda was also associated with union-side labor law firms in Washington, D.C., where she represented the trustees of Taft-Hartley pension and welfare funds on qualification, compliance, fiduciary, and transactional issues under ERISA and the Internal Revenue Code.

**Education:** B.A., St. Lawrence University, 1988; J.D., American University, 1992

### RUBY MENON

Ruby Menon is Of Counsel to the Firm and focuses on providing a variety of legal and consulting services to single and multi-employer pension funds, and also serves as a member of the Firm's advisory team and liaison between the Firm's individual and institutional investor clients in the United States and abroad. For over 12 years, Ms. Menon served as chief legal counsel to two large multi-employer retirement plans, developing her expertise in many areas of employee benefits administration, including legislative initiatives and regulatory affairs, investments, tax, fiduciary compliance and plan administration.

**Education:** B.A., Indiana University, 1985; J.D., Indiana University School of Law, 1988

### MARK T. MILLKEY

Mark T. Millkey is Of Counsel to the Firm and is based in the Firm's New York Office. Mr. Millkey has significant experience in the area of complex securities class actions, consumer fraud class actions, and derivative litigation.

Mr. Millkey was previously involved in a consumer litigation against MetLife, which resulted in a benefit to the class of approximately $1.7 billion, and a securities class action against Royal Dutch/Shell, which settled for a minimum cash benefit to the class of $130 million and a contingent value of more than $180 million. Mr. Millkey also has significant appellate experience in both the federal court system and the state courts of New York.

**Education:** B.A., Yale University, 1981; M.A., University of Virginia, 1983; J.D., University of Virginia, 1987

### ROXANA PIERCE

Roxana Pierce is Of Counsel to the Firm and focuses her practice on negotiations, contracts, international trade, real estate transactions, and project development. She is presently acting as liaison to several international funds in the area of securities litigation. She has represented clients in over 65 countries, with extensive experience in the Middle East, Asia, Russia, the former Soviet Union, the Caribbean and India. Ms. Pierce counsels institutional investors on recourse available to them when the investors have been victims of fraud or other schemes. Her diverse clientele includes international institutional investors in Europe and the Middle East and domestic public funds across the United States.

**Education:** B.A., Pepperdine University, 1988; J.D., Thomas Jefferson School of Law, 1994

**Honors/Awards:** Certificate of Accomplishment, Export-Import Bank of the United States

### MARK S. REICH

Mark S. Reich is Of Counsel in the Firm's New York office, where he has helped recover millions of dollars for individual and institutional shareholders and achieved significant results for aggrieved consumers. He concentrates his practice in corporate takeover, ERISA, breach of fiduciary duty, derivative and consumer litigation matters. Mr. Reich's notable achievements include *In re Aramark Corp. S'holders Litig.* ($222 million increase in consideration paid to shareholders and substantial reduction to management's voting power – from 37% to 3.5% – in connection with approval of going-private transaction), and *In re TD Banknorth S'holders Litig.* (played significant role in convincing court to reject $3 million initial settlement and appointing Firm to litigate case, which later resulted in a $50 million recovery).

**Education:** B.A., Queens College, 1997; J.D., Brooklyn Law School, 2000

### LEONARD B. SIMON

Leonard B. Simon is Of Counsel to the Firm. His practice has been devoted heavily to litigation in the federal courts, including both the prosecution and defense of major class actions and other complex litigation in the securities and antitrust fields. Mr. Simon has also handled a substantial number of complex appellate matters, arguing cases in the United States Supreme Court, several federal Courts of Appeals, and several California appellate courts. Mr. Simon has served as plaintiffs' co-lead counsel in dozens of class actions, including *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 90-834 (D. Ariz.) (settled for $240 million) and *In re NASDAQ Market-Makers Antitrust Litig.*, MDL No. 1023 (S.D.N.Y.) (settled for more than $1 billion), and was centrally involved in the prosecution of *In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551 (D. Ariz.), the largest securities class action ever litigated.

Mr. Simon is an Adjunct Professor of Law at Duke University, the University of San Diego, and the University of Southern California Law Schools. He is an Editor of California Federal Court Practice and has authored a law review article on the Private Securities Litigation Reform Act of 1995.

**Education:** B.A., Union College, 1970; J.D., Duke University School of Law, 1973

**Honors/Awards:** San Diego Super Lawyer; J.D., Order of the Coif and with Distinction, Duke University School of Law, 1973

### LAURA S. STEIN

Laura S. Stein is Of Counsel to the Firm and has practiced in the areas of securities class action litigation, complex litigation and legislative law. In a unique partnership with her

mother, attorney Sandra Stein, also Of Counsel to the Firm, the Steins focus on minimizing losses suffered by shareholders due to corporate fraud and breaches of fiduciary duty. The Steins also seek to deter future violations of federal and state securities laws by reinforcing the standards of good corporate governance. The Steins work with over 500 institutional investors across the nation and abroad, and their clients have served as lead plaintiff in successful cases where billions of dollars were recovered for defrauded investors against such companies as AOL Time Warner, Tyco, Cardinal Health, AT&T, Hanover Compressor, First Bancorp, Enron, Dynegy, Honeywell International and Bridgestone.

Ms. Stein is Special Counsel to the Institute for Law and Economic Policy (ILEP), a think tank that develops policy positions on selected issues involving the administration of justice within the American legal system. Ms. Stein has also served as Counsel to the Annenberg Institute of Public Service at the University of Pennsylvania.

**Education:** B.A., University of Pennsylvania, 1992; J.D., University of Pennsylvania Law School, 1995

### SANDRA STEIN

Sandra Stein is Of Counsel to the Firm and concentrates her practice in securities class action litigation, legislative law and antitrust litigation. In a unique partnership with her daughter, Laura Stein, also Of Counsel to the Firm, the Steins focus on minimizing losses suffered by shareholders due to corporate fraud and breaches of fiduciary duty.

Previously, Ms. Stein served as Counsel to United States Senator Arlen Specter of Pennsylvania. During her service in the United States Senate, Ms. Stein was a member of Senator Specter's legal staff and a member of the United States Senate Judiciary Committee staff. Ms. Stein is also the Founder of the Institute for Law and Economic Policy (ILEP), a think tank that develops policy positions on selected issues involving the administration of justice within the American legal system. Ms. Stein has also produced numerous public service documentaries for which she was nominated for an Emmy and received an ACE award, cable television's highest award for excellence in programming.

**Education:** B.S., University of Pennsylvania, 1961; J.D., Temple University School of Law, 1966

**Honors/Awards:** Nominated for an Emmy and received an ACE award for public service documentaries

### JOHN J. STOIA, JR.

John J. Stoia, Jr. is Of Counsel to the Firm and is based in the Firm's San Diego office. Mr. Stoia was a founding partner of Robbins Geller Rudman & Dowd LLP, previously known as Coughlin Stoia Geller Rudman & Robbins LLP. Currently, Mr. Stoia is court-appointed co-lead counsel in eight nationwide class actions against sellers of deferred annuities to senior citizens. Mr. Stoia has worked on dozens of nationwide complex securities class actions, including *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz.), which arose out of the collapse of Lincoln Savings & Loan and Charles Keating's empire.

Mr. Stoia was a member of the plaintiffs' trial team, which obtained verdicts against Mr. Keating and his co-defendants in excess of $3 billion and settlements of over $240 million.

Mr. Stoia has brought over 50 nationwide class actions against life insurance companies and recovered over $10 billion on behalf of victims of insurance fraud due to deceptive sales practices such as "vanishing premiums," "churning," and discrimination in the sale of burial or debit insurance. Mr. Stoia has also represented numerous large institutional investors who suffered hundreds of millions of dollars in losses as a result of major financial scandals, including AOL Time Warner and WorldCom.

**Education:** B.S., University of Tulsa, 1983; J.D., University of Tulsa, 1986; LL.M. Georgetown University Law Center, 1987

**Honors/Awards:** Litigator of the Month, *The National Law Journal*; Super Lawyer, *Southern California Super Lawyers* (2008-Present); California Super Lawyer; LL.M. Top of Class, Georgetown University Law Center

**SPECIAL COUNSEL**

### BRUCE GAMBLE

Bruce Gamble is Special Counsel to the Firm and a member of the Institutional Outreach Department.

Mr. Gamble serves as a liaison with the Firm's institutional investor clients in the United States and abroad, advising them on securities litigation matters. Previously, Mr. Gamble was General Counsel and Chief Compliance Officer for the District of Columbia Retirement Board, where he served as chief legal advisor to the Board of Trustees and staff. Mr. Gamble's experience also includes serving as Chief Executive Officer of two national trade associations and several senior level staff positions on Capitol Hill.

**Education:** B.S., University of Louisville, 1979; J.D., Georgetown University Law Center, 1989

**Honors/Awards:** Executive Board Member, National Association of Public Pension Attorneys, 2000-2006; American Banker selection as one of the most promising U.S. bank executives under 40 years of age, 1992

### TRICIA MCCORMICK

Tricia L. McCormick is Special Counsel to the Firm and focuses primarily on the prosecution of securities class actions. Ms. McCormick has litigated numerous cases against public companies in state and federal courts that resulted in hundreds of millions of dollars in recoveries for investors. She is also a member of a team that is in constant contact with clients who wish to become actively involved in the litigation of securities fraud. In addition, Ms. McCormick is active in all phases of the Firm's lead plaintiff motion practice.

**Education:** B.A., University of Michigan, 1995; J.D., University of San Diego School of Law, 1998

**Honors/Awards:** J.D., *Cum Laude*, University of San Diego School of Law, 1998

**FORENSIC ACCOUNTANTS**

### R. STEVEN ARONICA

R. Steven Aronica is a Certified Public Accountant licensed in the States of New York and Georgia and is a member of the American Institute of Certified Public Accountants, the Institute of Internal Auditors and the Association of Certified Fraud Examiners. Mr. Aronica has been instrumental in the prosecution of numerous financial and accounting fraud civil litigation claims against companies including Lucent Technologies, Tyco, Oxford Health Plans, Computer Associates, Aetna, WorldCom, Vivendi, AOL Time Warner, Ikon, Doral Financial, First BanCorp, Acclaim Entertainment, Hibernia Foods, and NBTY. In addition, Mr. Aronica assisted in the prosecution of numerous claims against major United States public accounting firms.

Mr. Aronica has been employed in the practice of financial accounting for more than 25 years, including public accounting, where he was responsible for providing clients with a wide range of accounting and auditing services; private accounting with Drexel Burnham Lambert, Inc., where he held positions with accounting and financial reporting responsibilities; and at the United States Securities and Exchange Commission, where he held various positions in the divisions of Corporation Finance and Enforcement.

**Education:** B.B.A., University of Georgia, 1979

### ANDREW J. RUDOLPH

Andrew J. Rudolph is the Director of the Firm's Forensic Accounting Department, which provides in-house forensic accounting expertise in connection with securities fraud litigation against national and foreign companies.

Mr. Rudolph has directed hundreds of financial statement fraud investigations, which were instrumental in recovering billions of dollars for defrauded investors. Prominent cases include *Qwest*, *HealthSouth*, *WorldCom*, *Boeing*, *Honeywell*, *Vivendi*, *Aurora Foods*, *Informix*, *Platinum Software*, *AOL Time Warner*, and *UnitedHealth*.

Mr. Rudolph is a Certified Fraud Examiner and a Certified Public Accountant licensed to practice in California.

He is an active member of the American Institute of Certified Public Accountants, California's Society of Certified Public Accountants, and the Association of Certified Fraud Examiners. His 20 years of public accounting, consulting and forensic accounting experience includes financial fraud investigation, auditor malpractice, auditing of public and private companies, business litigation consulting, due diligence investigations and taxation.

**Education:** B.A., Central Connecticut State University, 1985

### CHRISTOPHER YURCEK

Christopher Yurcek is the Assistant Director of the Firm's Forensic Accounting Department, which provides in-house forensic accounting and litigation expertise in connection with major securities fraud litigation. Mr. Yurcek has directed the Firm's forensic accounting efforts on numerous high-profile cases, including *In re Enron Corp. Sec. Litig.* and *Jaffe v. Household Int'l, Inc.*, which resulted in a major jury verdict at trial in 2009. Other prominent cases include *HealthSouth*, *UnitedHealth*, *Vesta*, *Informix*, *Mattel*, *Coca-Cola* and *Media Vision*.

Mr. Yurcek has over 20 years of accounting, auditing, and consulting experience in areas including financial statement audit, forensic accounting and fraud investigation, auditor malpractice, turn-around consulting, business litigation and business valuation. Mr. Yurcek is a Certified Public Accountant licensed in California, holds a Certified in Financial Forensics (CFF) Credential from the American Institute of Certified Public Accountants, and is a member of the California Society of CPAs and the Association of Certified Fraud Examiners.

**Education:** B.A., University of California, Santa Barbara, 1985